UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> ROCA LABS, INC., *et al.*, <br><br> Defendants. | Civ. No. 8:15-cv-02231-MSS-TBM <br><br> PLAINTIFF'S MOTION FOR NOTICED TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT <br><br> **INJUNCTIVE RELIEF SOUGHT** |

## I.    INTRODUCTION

Defendants aggressively advertise a costly dietary supplement—billed as "Gastric Bypass NO Surgery"—with outrageously deceptive claims that users, even young children, can achieve extreme weight loss.  Using these claims, Defendants have made sold millions of dollars' worth of products.  They run a website supposedly offering neutral advice on gastric bypass surgery, but which actually promotes their products, and offer to pay consumers for positive reviews.  They cite onerous restrictions in their online terms and conditions to threaten consumers who post negative reviews or complain publicly about their products with financial and legal consequences, and also disclose sensitive personal information about their customers to outsiders.  These practices are unfair and deceptive in violation of Sections 5 and 12 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a) and 52.  To put a stop to this conduct, Plaintiff Federal Trade Commission ("FTC") seeks, under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Fed. R. Civ. P. 65, and Local Rule 4.05, a temporary restraining order ("TRO") to halt Defendants' unlawful conduct, preserve documents and assets, and require limited expedited discovery as well as a prompt

accounting of their businesses and finances.  This is necessary to prevent ongoing harm to consumers and preserve the Court's ability to provide effective final relief.

## II.     PARTIES

### A.     Plaintiff

The FTC is an independent agency of the United States Government created by the FTC Act, 15 U.S.C. § 41 *et seq*.  The FTC enforces Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, which respectively prohibit unfair or deceptive acts or practices in or affecting commerce and false advertisements for (among other things) foods or drugs in or affecting commerce.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC, through its own attorneys, to initiate federal district court proceedings to enjoin violations of the FTC Act and secure appropriate equitable relief, including rescission of contracts and restitution, the refund of monies paid, and the disgorgement of ill-gotten gains.

### B.     Defendants

Defendants are Roca Labs, Inc. and Roca Labs Nutraceutical USA, Inc., and Don Juravin and George Whiting, the officers, owners, or operators of the companies (collectively, "Defendants").  See PX 1 (Howe Dec.), Att. W-X (FTC000115-134).[1]  Since about 2009 (PX 2 (Parham Dec.), Att. H (285)), they have sold weight-loss supplements, the

---

[1] Throughout this Memorandum, we abbreviate specific FTC exhibit page references to the last three or four numerals in the "FTC" numbering in their bottom, right corners.  These page references are shown in parentheses in the text.

Roca Labs "Formula" and "Anti-Cravings" ("products"), blends of dietary fibers[2] that users mix with water and consume to purportedly limit their food intake and suppress their appetites.  See, e.g., PX 1, Att. B (012-13); Att. V1 (114).  Defendants often describe their products as "Gastric Bypass No Surgery," or "Gastric Bypass Alternative."  PX 1, Att. B (012), Att. D (023); PX 4 (Colbert Dec.), Att. C (504).  Defendants' 2010-2014 revenues from Roca Labs product sales were about $21 million.  PX 4 ¶¶ 15, 16(a), 17(d)-(e) (491-93).

## III.    DEFENDANTS' DECEPTIVE AND UNFAIR BUSINESS PRACTICES

### A.    Defendants' Deceptive Weight-Loss Ads

Defendants have spent millions of dollars on search engine ads to direct consumers—most often consumers seeking information on gastric bypass surgery—to their websites selling dietary supplements.[3]  PX 4 ¶¶ 13(d), 14(c)-(e) (489-91).[4]  The search ads typically mention "Extreme Weight Loss" and a "90% Success Rate," and favorably compare their products  to bariatric surgery in price and outcome.  E.g., PX 1 ¶ 2 (002-03).  Defendants claim they are for consumers who wish to lose fifty or more pounds.  PX 2, Att. G (263), Att. M (339); PX 1, Att. V4 (114).  The cost is about $500 for a three- to four-month supply.  PX 1 ¶ 2 (002-03), Att. B (015-16), Att. L (062-64), Att. O (085-86); PX 2, Att. G (271).

---

[2] Defendants state that the Formula "contains a proprietary combination of healthy fibers: B-Glucan, Xanthan Gum, Guar Gum, Konjac, and Inulin," PX 1, Att. G (044), and that Anti-Cravings contains B-Glucan and Fibersol-2.  PX 1, Att. H (047-48), Att. D (023-24); PX 2 ¶ 10 (154).

[3] Bariatric (i.e., weight-loss) surgical procedures, including gastric bypass surgery, cause weight loss by restricting the amount of food the stomach can hold, reducing absorption of nutrients, or by a combination of both.  *See https://asmbs.org/patients/bariatric-surgery-procedures* (last visited Sept. 22, 2015).  PX 7 (Heymsfield Dec.) ¶ 21 (698-99).

[4] More than $1.5 million of these online advertising payments were made by Juravin, Incorporated, PX 4 ¶ 14(e) (491).  Don Juravin is listed as that entity's sole officer.  PX 1, Att. Z (145-50).

On their websites, *RocaLabs.com* and *mini-gastric-bypass.me*, ("Roca Labs sites") Defendants claim that taking Roca Labs Formula will restrict a user's stomach volume, creating a "gastric bypass effect."  PX 1, Att. A (008), Att. B (012-13), Att. O (085), Att. P (091), Att. V1 (114); PX 4, Att. C (504).  By leaving only twenty percent of the stomach available for food intake for approximately ten to sixteen hours and reducing cravings, the products supposedly cause weight loss comparable to the results of bariatric surgery, including 21 pounds per month, and 100 pounds in seven to ten months:

> **How does it work?**
> NEW: a dose of the Roca Labs formula is mixed with water and turns into 350cc stomach-sized red mixture. Successful users report that when consumed in the morning, the Regimen creates a feeling akin to limiting functional stomach volume for the duration of your day. This result is achieved **without** surgical procedures, including cutting parts of the digestive system.
>
> With limited stomach volume, you eat much less. . . .  Bariatric surgery does not eliminate your cravings; Roca Labs Anti-Cravings can reduce your urge for sweets and snacks and other foods that prevent your weight loss success enhancing the loss of an additional 5 to 8 pounds a month! Learn more

PX 1, Att. B (012-13).

> **How much weight can I expect to lose?**
> The weight loss can be **immediate** with the Roca Labs' regimen, just as if you had undergone a bariatric surgery, and within a few days the cravings should be diminished significantly. Depending on your commitment to the recommended rules for suggested use, a loss of **21 lb a month** is possible; however, realistically, it may take 7 to 10 months to lose 100 lb.

PX 1, Att. B (013).  See also PX 1, Att. D (023).

> **No Menus, No Diet Restrictions**
> Unlike weight loss pills or diet programs, Roca Labs® Formula **does not require a strict menu or calorie restrictions**.  It practically FORCES you to eat **HALF** the food you ate before, so you will automatically lose weight without having to keep track of every calorie you consume.

PX 1, Att. C at (020).  See also PX 4, Att. C (504).

-4-

The sites also feature videos of persons in lab coats reiterating the "gastric bypass effect," a ninety-percent success rate, and rapid and substantial weight loss.  See, e.g., PX 1, Att. V1-V4 (114).  For example, a video on the "success rate" begins:

> Well I'm sure you're wondering, what is the success rate?  Roca Labs' Formula is scientifically proven to have a 90% success rate.  It will always achieve a gastric bypass effect by physically occupying your stomach, leaving only 20% available space for 10-16 hours.  You'll eat 50% less, and can spare your body as much as 2,000 unnecessary calories a day without feeling any urge to overeat.  That equals 15 pounds a month.

PX 1, Att. V2 (114); see also Att. V3 (114).

The sites also tout the efficacy and safety of their products when used by children as young as six years old.  Defendants claim that "[m]any children have used the Formula successfully and safely," with the same "gastric bypass effect":

> Roca Labs Natural Formula can help your child lose weight **safely and naturally**. Its active ingredients are natural healthy fibers, and it's safe for children ages 6 and up with a parent's supervision. It works by physically expanding in the stomach to leave only a very limited space available for food intake. Throughout the day, your child will eat HALF the food they used to, without hunger. The Formula has almost no flavor and adapts to the taste of your child's favorite non-carbonated, non-dairy drink.

PX 1, Att. E (029); see also Att. E (034-35).

Defendants also expressly claim their products' benefits are scientifically proven, stating, for example, that the Formula "has been used in Europe for 6 years, and is scientifically proven to have a 90% success rate."  PX 1, Att. P (091).  See also PX 1, Att. V2 (114).  Their webpages titled "Letter to your doctor" (PX 1, Att. F (039-42)) and "Medical Evidence for Success" (PX 1, Att. Q (095-103)) feature a physician, Ross Finesmith, extolling the products' weight-loss benefits based on his patients' and his own use.  The

-5-

pages refer to "multiple medical studies" or "medical and scientific research" that supposedly prove the weight-loss benefits of the Formula.  PX 1, Att. F (039); Att. Q (097).  Indeed, nearly every aspect of the websites' text and images—from the name Roca "Labs," photos of lab workers, and caduceus symbols, to references to FDA approval of an ingredient—fortify the net impression that their weight-loss claims are scientifically proven.  See, e.g., PX 1 Att. A (008-10), Att. B (012, 015-16), Att. E (029), Att. L (062), Att. M (067), Att. O (085-89); Att. V4 (114) at 2:04-2:25.

Unfortunately for consumers, Defendants are simply selling common,  dietary fibers with exaggerated claims at a grossly inflated cost.  Their weight-loss claims lack any scientific basis, and are often flat out false.  The FTC retained Dr. Steven Heymsfield, an expert in obesity treatment and weight loss, who reviewed information on Roca Labs' websites about the products and their ingredients, as well as numerous other published scientific articles on weight loss.  PX 7 ¶¶ 9-10 (693-95).  He found no reliable scientific evidence to support Defendants' weight-loss claims of 21 pounds a month, or 100 pounds in seven to ten months.  *Id.* ¶¶ 12-13 (696).  According to Dr. Heymsfield, substantiating Defendants' weight-loss claims would require well-designed and properly conducted human clinical trials on Roca Labs' actual products (as opposed to its individual ingredients).  *Id.* ¶¶ 23-26 (699-702).  Individual testimonials, no matter how numerous or superlative, do not amount to reliable scientific evidence of a weight-loss product's effect.  *Id.* ¶ 26 (702).  Defendants acknowledge that "[n]o clinical study has been performed on this product" (PX 1, Att. N (078); PX 2, Att. M (362)), and Dr. Heymsfield found no such trials.  PX 7 ¶¶ 36-37, 59 (704, 714-15).

Defendants will likely argue that some fibers in their products have been studied individually and shown to cause some weight loss; therefore aggregating those results supports their claims.  But Dr. Heymsfield reviewed weight-loss studies on the individual ingredients and found very few trials that showed any effect.  None of the results could in any way support the Defendants' extravagant claims.  For example, clinical trials on glucomannan, one of the fibers in Roca Labs Formula, do not show weight loss comparable to Defendants' ad claims, and many show no weight loss at all:

> The greatest weight loss reported in any trial that I am aware of, for glucomannan, was in the neighborhood of three and a half pounds in a month net of placebo, and those trials were of questionable validity … Meanwhile, at least 14 glucomannan trials that I am aware of showed less than one pound a month in weight loss, with several showing no loss at all.

*Id.* ¶ 59 (715).  It is also invalid to assume that combining ingredients that individually *may* result in small amounts of weight loss will have an additive effect. *Id.* ¶¶ 25, 37 (701, 704).

Because there is no reliable scientific evidence that Roca Labs users will lose substantial amounts of weight (or any weight at all), Defendants' claim that Roca Labs products have a ninety-percent success rate is also unsupported.  *Id.* ¶¶ 64-68 (716-17).  Moreover, going further to assert that the substantial weight loss and ninety percent success rate are "scientifically proven," as Defendants claim in their ads, is false.  According to Dr. Heymsfield, these claims would also require a clinical study, and there are none.  *Id.* ¶¶ 23-27 (699-702), 89-92 (722-23).

There are also no studies comparing weight loss with Roca Labs products and bariatric surgery, and certainly no studies showing that using the products leads to the 41.5 to 91.8 pound weight loss in eight months that is typical for bariatric surgery patients.  *Id.* ¶¶

69-72 (717-18).  Nor is there evidence that Defendants' products are safe and effective for weight loss in children as young as six years old.  This would require clinical trials on children; one cannot simply extrapolate from use of a product in adults (even if the product were shown effective in adults, which is not the case here).  *Id.* ¶¶ 74, 85 (718, 721).  Yet there are no known tests in which Roca Labs products or their combinations of ingredients were specifically tested for safety on children.[5]  The few small efficacy studies of one ingredient, glucomannan, on children showed very little if any weight loss.  *Id.* ¶¶ 77-82, 88 (719-20, 722).  Ultimately, Defendants' claims are inconsistent with a basic understanding of weight loss and metabolism.  Dr. Heymsfield opines that to lose 21 pounds in a month, individuals would have to reduce food intake to a level at which, if they did it long enough, they would likely not survive.  *Id.* ¶ 62 (716).

B.      **Defendants' Deceptive Endorsements**

Defendants also rely heavily on consumer video testimonials, with claims like "Real Testimonials of 100,000 users," and feature many so-called "Success Stories" on their sites and YouTube channels.  See, e.g., PX 1, Att. B (013-16), Att. I (050-53), Att. J (055), Att. O (085), Att. U (113).  The people appearing in many of these videos claim weight loss comparable to the amounts claimed in Defendants' ads; in fact, Defendants cite the supposedly vast number of these "success videos" as evidence that their products work.  PX 1, Att. B (013-14), Att. J (055).  Defendants solicit these videos via a "Money back reward for your true success story" program.  They claim to return up to 50% of customers'

---

[5] Testing to ensure that a product is safe for children is more extensive than testing for effect, and typically requires a large number of test subjects observed over an extended time.  PX 7 ¶ 74 (718).

payments for the products in exchange for "inspirational and convincing" before-and-after videos. PX 1, Att. K (058-59). They do not disclose (or disclose adequately) on websites, YouTube, or in the videos themselves, that customers were offered or received substantial financial rewards for providing the testimonials. PX 1, Att. B (013-14), I (050-53), O (085), and U (113).

Defendants also operate *GastricBypass.me* (PX 4 ¶ 12 (488), Att. J (559), Att. K (561)), a purportedly independent website providing information about bariatric surgery and "alternatives to surgery." PX 1, Att. S (108). It includes lengthy "Surgery Failures" and "Surgical Alternatives" pages. But, in fact, Roca Labs' products are the only "alternative" the site favorably discusses. Using seemingly objective language, the site states that its "panel of experts" concluded that Roca Labs' weight-loss claims are trustworthy "for the most part," and that the Roca Labs "[m]edical claims are correct[.]" PX 1, Att. T (110-11). Defendants deceptively portray this site as an objective resource for consumers seeking information on gastric bypass surgery. They never disclose the material fact that they control *GastricBypass.me*, and that they in fact sell the Roca Labs "alternative" discussed.

> **C.     Defendants' Deceptive and Unfair Practices During and After Product Purchase**
>
>> **1.     Deceptive Privacy Promises During the "Qualification," Health Questionnaire, and Ordering Process**

Defendants strongly imply that consumers who decide to buy Roca Labs products must meet stringent medical criteria, further bolstering the impression from the ads that Defendants' overpriced fiber supplement is a medically-sanctioned weight-loss intervention. Indeed, the site's order page is titled "Qualify & Order" and has videos about the

"qualification" process.  It states, "This form is designed to filter out those with limited chance of being successful and who are absolutely not suited to use the STRONG Formula or handle the regimen successfully."  The pages also promise: "[t]his information will be kept confidential and will NOT be shared.  Privacy Policy [with link]."  PX 1, Att. M (067), Att. R (105); see also Att. N (073); PX 2, Att. C1 (162).

Prospective purchasers enter personal information (name, gender, age, weight, height, and insurance carrier), and complete a "Health Application," with questions about conditions like heart issues, high blood pressure, and diabetes.  PX 2 ¶ 5 (152-53) and Att. C3-C4 (165-68).  The Health Application also requests information about weight-related psychological or emotional issues, including past weight-loss failures, depression, and binge eating.  PX 2 ¶ 6 (153), and Att. C5 (170).  Near the end of the Health Application, prospective purchasers reach a page questioning their commitment to losing weight, where they are asked to state why they are "truly committed" to losing weight "this time around," and encouraged to agree with the statement that "fat is unhealthy and ugly, and I am going to fight and change it" before proceeding with the purchase.  PX 2 ¶ 7 (153), and Att. C6 (172).  Expressing the desperation and disappointment with past efforts that drives people to spend $480 or more on a supplement promising extreme weight loss, purchasers have given deeply personal and emotional responses:  "Yes as this weight is taking potentially fatal toll on my life"; "yes!! i don't like myself anymore, If I don't how do I expect others to."; and "Yes, I want to be here for my son.  I want to live."  PX 4 ¶ 17(g) (493-94).

After entering shipping, order, and billing information, purchasers must check a box next to a statement, reading in part, "I have read and agree to the terms, privacy, and money

back reward / return policy[.]"  The "terms" and other referenced documents are accessible at

that point via hyperlinks in the statement, but are not presented in the purchase process

otherwise.  PX 2 ¶¶ 8-9 (153) and Att. C9 (178).

Only after Defendants ship the products do consumers learn some of the onerous

terms, both physical and financial, of the costly "procedure."  The "Roca Labs Procedure

Rules & Diet" enclosure shipped with the products contradicts the advertised message of

"automatic" weight loss:  it turns out consumers must stick to a nine-hour "Limited Eating

Interval," drink six half-liter bottles of water per day to "maintain the **gastric bypass effect**,"

and exercise at least thirty minutes five or more times per week.  PX 2, Att. D3 (185-86).  A

"Thanks for purchasing" insert warns purchasers that "[t]here are **NO** returns or refunds as

stated on RocaLabs.com/Terms," and that consumers who dispute or fail to pay monthly

installments face possible litigation and significant monetary damages:

> Payments can NOT be cancelled or disputed as this may result in legal action
> against you in Florida where you may need to hire an attorney and may face
> charges in excess of $3,500.  We love our customers and we trust them to pay
> on time.  Our Marketing Dept. subsidized your purchase in return for your
> commitment to lose weight and post positive feedback.  As agreed, you will
> owe the unsubsidized price of $1,580 if you breach the Terms.

PX 2, Att. D1 (180).  Along with these consumer-unfriendly terms, Defendants reiterate that

they "will not share your private information with anyone."  PX 2, Att. D1 (181).

### 2.    Defendants' Unfair Gag Clause, Legal Threats, and Enforcement

Even worse, Defendants have buried in the voluminous "Terms and Conditions"

(accessible only via hyperlinks on their websites) an unusual clause that purports to prohibit

consumers from publishing even truthful disparaging comments about Roca Labs or its

products, with severe consequences for failing to comply.  Recent versions, for example, ban

-11-

any negative statements, punishable by having to pay the "full price" for the products and

other legal remedies:

> You agree that regardless of your personal experience with RL, you will **not** disparage RL and/or any of its employees, products or services.  This means that you will not speak, publish, cause to be published, print, review, blog, or otherwise write negatively about RL, or its products or employees in any way.  This encompasses all forms of media, including and especially the internet.  This paragraph is to protect RL and its current and future customers from the harm of libelous or slanderous content in any form, and thus, your acceptance of the [Terms] prohibits you from taking any action that negatively impacts RL, its reputation, products, services, management, or employees.  We make it clear that RL and its Regimen may not be for everyone, and in that regard, the foregoing clause is meant to prevent "one person from ruining it for everyone."  Should any customer violate this provision, as determined by RL in its sole discretion, you will be provided with seventy-two (72) hours to retract the content in question.  If the content remains, RL would be obliged to seek all legal remedies to protect its name, products, current customers, and future customers.

> If you breach this Agreement, as determined by RL in its sole discretion, all discounts will be waived and you agree to pay the full price for your product.  In addition, we retain all legal rights and remedies against the breaching customer for breach of contract and any other appropriate causes of action.

PX 1, Att. N (077-78).  The Terms further state that "[t]he full price for your custom

Regimen and RL support is $1580." PX 1, Att. N (076).  Defendants represent that customers

agree to this gag clause, and to promote Roca Labs and its products, in exchange for a

"discounted" price (i.e., the $480 advertised price), although it is highly unlikely that

consumers were aware of, or agreed to such terms.[6]  The purported "full" price for the

---

[6] Defendants claim that "99%" of RLI customers "agree" to the Terms in exchange for the discount.  PX 2, Att. G (263 n1).

product is disclosed, pre-purchase, only in the Terms.[7]  The two-page, large-print

"Summary" of the Terms – provided to customers for the first time *after* purchase with their

orders – also states, in pertinent part:

> Discount Policy.  We believe in our customers and that word of mouth is the best promotion.  **We are here to help you.**  You were given a discount off the unsubsidized price of $1580 in exchange for your agreement to promote our products and when possible share your weight loss success with us (keep the youtube videos coming).  **As part of this endorsement you also agree not to write any negative reviews about RLN or our products.**  In the event that you do not honor this agreement, you may owe immediately the full price of $1,580.

PX 2 ¶ 10 (154) and Att. D1 (181).

Defendants have threatened legal action against consumers who say they will

complain, or who have complained, to the Better Business Bureau ("BBB"); the FTC has

obtained declarations from two such consumers.  PX 5 (McGaha Dec.) (670-86); PX 6 Baker

Dec. (687-89).  Defendants have accused consumers who seek refunds of attempted

"extortion," and even threatened criminal charges.  PX 5 ¶¶ 13-14 (672-73) and Exh. A-B

thereto (677-79).  One customer who blogged about her negative experience with

Defendants' products and return policy faced a variety of outrageous legal threats from

Defendants.  WordPress, which hosted the blog, notified her that Roca Labs threatened it

with a lawsuit about her posts, and shut down her blog.  PX 5 ¶ 18 (673).

These are not empty threats:  RLI has actually sued parties based on negative

comments.  The FTC is aware of at least four customers Defendants have sued for violating

---

[7] Although the exact language has varied over time, prior versions of the Terms include similar language about purchasers agreeing not to disparage Roca Labs, revocation of purported discounts, and other penalties.  E.g., PX 1, Att. N (077-78); PX 2, Att. F (245-58), Att. M (357, 359, 363).

the gag clause, among other causes of action.  PX 2, Att. M and N (336-455).  Although these lawsuits were voluntarily dismissed, the reasons for the dismissals are not clear from the record and give no indication that Defendants have stopped enforcing the gag clause.[8] PX 2 ¶ 14 (156).  If lawsuits and threats of damages were not bad enough, Defendants' legal complaints against purchasers have made public sensitive information these consumers entered in their Health Applications, in direct contravention of Defendants' stated privacy policy.  PX 2, ¶¶ 12-13 (155-56), Att. M (372-73), N (397, 400, 402).  Defendants have also revealed this personal consumer information to banks and payment processors in disputes over credit card chargebacks, including highly personal reasons why consumers bought the products.  PX 4 ¶ 17(f) (493-94); Att. T (658-69).

Further undermining Defendants' contention that consumers "agree" to withhold their negative opinions in exchange for an illusory "discount" is that more than 100 consumer complaints about Roca Labs have been lodged with the BBB or the FTC in the past several years, including approximately twenty complaints specifically related to Defendants' legal threats against them, or to a prohibition on making negative comments about Roca Labs.  PX 4 ¶ 4 (483).  Even some consumers who lodged complaints have been unwilling to speak with FTC staff because of the fear of legal action.  PX 4 ¶ 5 (483-84).  Defendants' gag clause practices not only injure the purchasers threatened for complaining or expressing negative opinions; they adversely affect the information available to the public at large and distort the marketplace.  Consumers will, because of this practice, be more likely to spend

---

[8] Defendant RLI also sued the owners of a website hosting negative reviews about Roca Labs for inducing RLI customers to violate the gag clause and tortiously interfering with prospective economic relationships with consumers searching for Roca Labs products.  PX 2, Att. F (224-31).

-14-

substantial sums on Roca Labs products that they would not otherwise buy.  Prospective consumers searching online for information on Roca Labs products prior to purchasing likely did not see much truthful negative commentary on the price, side effects, return policy, or other aspects of Roca Labs products, because those comments were suppressed via the gag clause and related threats or enforcement.[9]  As set forth below, Defendants' use of the gag clause in connection with the sale of their products causes substantial injury to current and future purchasers, and should be enjoined.

## IV.    LEGAL ARGUMENT

Under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), a district court may order preliminary relief needed to make permanent relief possible.  *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996).  To obtain such relief, the FTC must show that (1) it is likely to succeed on the merits, and (2) injunctive relief is in the public interest.  The FTC need not show irreparable injury to obtain preliminary injunctive relief.  *FTC v. IAB Mktg. Assoc., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014).[10]  This standard is met here.

### A.    The FTC is Likely to Succeed on the Merits of Its Deception Counts (Counts I, II, IV - VII)

An act or practice is deceptive under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), if (1) there was a representation (2) likely to mislead customers acting reasonably under the circumstances, and (3) it was material.  *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir.

---

[9] Indeed, Defendants incentivize positive reviews (which appears to be the only way for consumers to get any money back), further distorting the true picture about Defendants and Roca Labs products. One consumer who spoke to the FTC noted that she saw only positive information about the products before she purchased.  PX 6 ¶ 3 (688).

[10] The FTC need not give security for interim injunctive relief.  *See* Fed R. Civ. P. 65(c).

2003); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1045 (C.D. Cal. 1999).  Section 12 of the FTC Act,

15 U.S.C. § 52, prohibits the dissemination of any false advertisement in order to induce the

purchase of food, drugs, devices, services, or cosmetics.[11]  A false advertisement is one that

is "misleading in a material respect."  15 U.S.C. § 52, 55; *FTC v. Pantron I Corp.*, 33 F.3d

1088, 1099 (9th Cir. 1994).

     In determining whether an advertiser has made deceptive claims, a court must con-

sider the overall net impression created by the advertisement, and whether consumers acting

reasonably under the circumstances would interpret it to contain a particular message.  *FTC*

*v. National Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008), *aff'd* 356

Fed. Appx. 358 (11th Cir. 2009) ("*NUG*"); *FTC v. QT*, 448 F. Supp. 2d 908, 957-58 (N.D.

Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008).  A claim is material if it conveys information

"that is important to consumers and, hence, likely to affect their choice of, or conduct

regarding a product." *FTC v. Cyberspace.com,* 453 F.3d 1196, 1201 (9th Cir. 1996) (quoting

*Cliffdale Assocs., Inc*., 103 F.T.C. 110, 165 (1984)).  Express claims, deliberately-implied

claims used to induce the purchase of a product, and claims that "significantly involve

health" are presumed material.  *Pantron I*, 33 F.3d at 1095-96; *Kraft, Inc. v. FTC*, 970 F.2d

311, 322 (7th Cir. 1992).  As set forth below, Defendants' representations about their

---

[11] Roca Labs Formula and Anti-Cravings are foods and/or drugs for purposes of Section 12.  *See FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1266, 1272 (S.D. Fla. 1999) (weight-loss supplements, including one containing glucomannan, were a food and/or drug).  Courts apply the same three-prong test to determine if a party has disseminated a "false advertisement" and Section 12 violations are violations of Section 5(a).  15 U.S.C. § 52(b); *see FTC v. National Urological Grp., Inc.* 645 F. Supp. 2d 1167, 1188 (N.D. Ga. 2008), *aff'd* 356 Fed. Appx. 358 (11th Cir. 2009); *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992).

products' efficacy for weight loss, their privacy promises, and consumers' agreement to "full price" liability are likely to mislead consumers acting reasonably, and they are material.

### 1. Defendants' Weight-Loss Claims (Counts I, II)

As described above in Section III.A., Defendants' advertising and websites make express claims that:

- Use of Roca Labs products enables the user to reduce food intake by fifty percent and to lose substantial amounts of weight quickly, including as much as 21 pounds in one month, and as much as 100 pounds in seven to ten months, and that this is scientifically proven;

- Ninety percent of users of Roca Labs products will lose substantial amounts of weight, and that this is scientifically proven;

- Roca Labs products are comparable or superior to bariatric surgery in providing weight-loss benefits; and

- Roca Labs products are safe and effective for weight loss in children as young as six years old.

The record shows that these claims are deceptive.

There are two bases upon which FTC can show that ad claims are deceptive or misleading:  (1) that the advertiser had no reasonable basis to assert the claims as true, or (2) that the claims are false.  *Pantron I*, 33 F.3d at 1096; *QT*, 448 F. Supp. 2d at 958-59.  False and unsubstantiated claims are inherently "likely to mislead" consumers, and consumers have no obligation to doubt the veracity of express claims.  *Thompson Med. Co.*, 104 F.T.C. 648, 788, 818-819 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986).  For health-related efficacy

claims, including weight-loss claims, an advertiser must possess "competent and reliable scientific evidence" to have a reasonable basis to assert a claim as true. *NUG*, 645 F. Supp. 2d at 1190; *QT*, 448 F. Supp. 2d at 908; *FTC v. SlimAmerica, Inc*., 77 F. Supp. 2d 1263, 1274 (S.D. Fla. 1999). The FTC's expert Dr. Heymsfield notes that for weight-loss claims, in the relevant scientific community, competent and reliable scientific evidence means randomized, double-blind, placebo controlled human clinical trials on the product itself. PX 7 ¶¶ 23-26 (699-702). If a claim goes even further to suggest that a product's effectiveness or superiority has been scientifically established or proven, the advertiser must have must have evidence sufficient to satisfy the relevant scientific community of the claim's truth. *See POM Wonderful, LLC v. FTC*, 777 F.3d 478, 491 (D.C. Cir. 2015). Dr. Heymsfield states that these "scientific proof" claims about weight loss also would require such clinical trials. PX 7 ¶¶ 23-27 (699-702), ¶¶ 89-92 (722-23).

As discussed in Section III.A., above, there are no such clinical studies on their products, and any studies on an individual ingredient show relatively small amounts of weight loss over short periods of time, not the rapid and sustained pounds dropping off that Defendants promise. Nor is there any evidence comparing the results of Defendants' products to bariatric surgery, or evaluating their safety and efficacy for children. Indeed, it is simply false to say that the weight loss and success rate claims are "scientifically proven," since there are no studies supporting them. Moreover, these claims, which were express and involve health, are presumptively material. Indeed, it's unlikely that consumers would spend nearly $500 on their weight-loss products if Defendants had not made these extreme claims, promising significant weight loss where all other attempts had failed, and promoting their

products as a viable alternative to invasive and potentially dangerous surgery.  That these ads generated more than $20 million in sales confirms their importance to consumers.

### 2. Defendants' Representations About Gastricbypass.me and Testimonialists (Counts IV, V)

Defendants misrepresented that *Gastricbypass.me* is an independent, objective resource for research and information related to bariatric surgery and alternatives to bariatric surgery for weight loss, and about Roca Labs products.  PX 1, Att. S-T (107-11).  They fail to disclose that they own this website and are reviewing their own products.  PX 4 ¶ 12, Att. J (559), Att. K (561).  Defendants have also failed to disclose, or failed to disclose adequately, that they offered or paid financial compensation to people for their testimonials or other postings about Defendants' products.  PX 1, Att. I (050-53), Att. U (113). Consumers would reasonably rely on these material misrepresentations and omissions about the objectivity of the information presented to their detriment because they would be unable to give appropriate weight or credibility to the representations.  Thus, Defendants' conduct is deceptive.  *See FTC v. Standard Educ. Soc'y*, 302 U.S. 112, 118 (1937) (use of fictitious testimonials to sell encyclopedias violated Section 5); *see generally*, 16 C.F.R. § 255.5 (FTC guidance that material connections between seller and endorser that the audience may not reasonably expect must be fully disclosed).

### 3. Defendants' Privacy Promises (Count VI)

To induce consumers to enter private health information to "qualify" to buy Roca Labs products, Defendants also represent that they keep that information confidential.  PX 1, Att. M (067), Att. R (105); see also Att. N (073); PX 2, Att. C1 (162).  In lawsuits filed against purchasers for violating the gag clause, however, Defendants' court filings have

included details from purchaser Health Application responses.  PX 2 ¶¶ 12-13 (155), Att. M (372-73), N (397, 400, 402).  In disputes over chargebacks, Defendants provided to payment processors and banks the ages, weights, heights, and sometimes purchasers' reasons why they needed and had the proper commitment level to buy the products, including some of the very personal responses from consumers expressing why they needed to lose weight.  PX 4 ¶ 17, Att. T (493-94).  These actions blatantly violate Defendants' express privacy promise to the purchasers who reasonably entrusted them with private health information, to their obvious detriment.  Defendants' express privacy promises are false or misleading, and are presumed to be material, and their conduct is therefore deceptive under Section 5 of the FTC Act.  *See FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp.2d 502, 528 (S.D.N.Y. 2000) ("Consumer reliance on express claims is presumptively reasonable.  It is reasonable to interpret express statements as intended to say exactly what they say."); *cf. FTC v. Para-Link Int'l, Inc.*, 2001 U.S. Dist. LEXIS 17372, *13 (M.D. Fla. 2001) (preliminary injunction against sellers of paralegal training opportunities; material misrepresentations or omissions made to induce purchase of goods or services constitute deceptive acts or practices that violate Section 5(a)).[12]

---

[12] The FTC has taken action against companies that misrepresented their privacy practices, which resulted in settlements.  *See, e.g.*, *Facebook, Inc.*, FTC Dkt. No. C-4365 (2012) (consent order) (settling charges that website misrepresented that users could restrict profile information to specific groups); *Educational Rsch. Ctr. of Am., Inc.*, FTC Dkt. No. C-4067 (2003) (consent order) (settling charges that survey firm collected personal information from students, promised to share it only with educational institutions, but also shared it with commercial entities for marketing).

### 4.   Defendants' Representation That Consumers Agree to Pay "Full Price" for Breach of Terms (Count VII)

Defendants intimidate dissatisfied purchasers into remaining silent by warning them that they have agreed to pay hundreds of dollars more for the products if they post negative reviews.  Specifically, Defendants have misrepresented that purchasers agreed to pay the $1100 difference between the purported "discount" price charged and a purported "full price" if they post negative comments about the Defendants or their products.  PX 2 ¶ 10 (154), and Att. D1 (180-81).  Defendants' search ads and websites make pervasive reference to a $480 price, and the price that most consumers pay at the point of purchase is likely that price, or an advertised price that is a few hundred dollars more.  See, e.g., PX 1 ¶ 2 (002-03) and Atts. B (013), L (062), M (067), O (086), R (105), V1 (114, at 1:20); see also PX 4, Att. M (605) ("average ticket" is $200).  Defendants' assertion that purchasers agree to pay a substantially higher price buried in fine print (see, e.g., PX 1, Att. N (076, 078))—contradicting the clear price representations in its ads and websites—fundamentally misrepresents the actual transaction.  Defendants claimed in a court filing in another case that "99%" of their customers "agree" to the Terms to receive the purported "discount" or "subsidy."  PX 2, Att. G at (263 n1).  Their search ads (PX 1, ¶ 2 (002-03), PX 2 ¶ 3, Att. A (158)) websites (PX 1, Att. A (008), Att. B (015-16), Att. K (062-64), Att. O (085-86)), and purchase process (PX 2 ¶¶ 3-9 (152-53), Att. A (158), B (160), C1-C9 (161-78); PX 1, Att. R (105)), however, make it highly unlikely that purchasers "agreed" that the product was sold for anything other than the price advertised, or the price they actually paid.  *See, e.g., FTC v. Commerce Planet*, 878 F. Supp.2d 1048, 1065 (C.D. Cal. 2012) (disclosure of continuity program in separate hyperlinked "Terms of Membership" did not overcome net impression that product was free);

-21-

*see also Cyberspace.com*, 453 F.3d at 1200-01 (9th Cir. 2006) (small-print disclosures on the back of check regarding a monthly fee not sufficient to defeat net impression that check was a refund or rebate). Moreover, claims about price are presumptively material. *See FTC v. Johnson*, 2015 U.S. Dist. LEXIS 42196, *23 (D. Nev. 2015) (information concerning cost of product is material); *FTC v. Lights of Am., Inc.*, 2013 U.S. Dist. LEXIS 133040, at *105 (C.D. Cal. 2013) (same). Defendants' "full price" representations made post-sale to purchasers to suppress their negative comments are therefore deceptive.

## B. The FTC Is Likely to Succeed on the Merits of Its Unfairness Count (Count III)

Section 5 of the FTC Act prohibits "unfair" acts or practices in commerce, i.e., those that "cause[] or [are] likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). *See, e.g., Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1363-68 (11th Cir. 1988) (affirming FTC finding that seller's unilateral breach of over 200,000 contracts was unfair). A practice that "unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking" is unfair. *Unfairness Policy Statement*, appended to *International Harvester Co.*, 104 F.T.C. 949, 1074 (1984). This can include a seller's use, and threats to enforce, certain contractual provisions to create such obstacles.[13] Defendants' use of gag clause, including notices, threats, and legal

---

[13] *Cf. Credit Practices Rule, Statement of Basis and Purpose*, 49 Fed. Reg. 7740, 7762-65, 7768-70 (1984) (prohibiting as unfair the use of certain provisions frequently included in consumer credit contracts; creditor threats to enforce them were commonplace; substantial injury caused by practices which flowed from inclusion of provisions in contracts).

actions to prevent their customers from making truthful negative comments about them or their products, thwarts informed consumer decisionmaking, corrodes the marketplace, and is unfair under Section 5.

**1.     Defendants' Practices Cause or Are Likely To Cause Substantial Injury**

Defendants' gag clause practices cause or are likely to cause substantial injury by limiting the flow of truthful information to consumers and the marketplace about their products.  Online reviews by consumers who have actually used a product or dealt with a seller, like a seller's own advertising claims, can be an important source of information for prospective purchasers.[14]  Negative information from actual purchasers can be important to prospective customers because sellers have little interest in disseminating negative, truthful criticism of themselves or their goods.  Defendants gag prior purchasers to deprive prospective purchasers of potentially important information about the efficacy, tolerability, and side effects of Roca Labs products and about Defendants' policies and practices.  Consequently, purchasers will have spent, or will likely spend, significant sums of money and forgo or delay more effective weight-loss measures.

---

[14] *See* U.K. Competition & Markets Authority, *Online Reviews and Endorsements: Report on the CMA's Call for Information*, at 2-3,16-18, June 19, 2015 (survey findings that consumers who use online reviews find them valuable, appear to trust them, and largely find that products purchased after reading reviews matched their expectations), *available at* https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/436238/Online_reviews_and_endorsements.pdf; Eric Goldman, *The Regulation of Reputational Information*, *in* The Next Digital Decade: Essays on the Future of the Internet 293, 295-96 (Berin Szoka and Adam Marcus, eds., 2010) ("When information is costly, reputational information can improve the operation of the invisible hand by helping consumers make better decisions about vendors. . . .  Any distortions in reputational information effectively distort the marketplace itself."), *available at* http://digitalcommons.law.scu.edu/facpubs/633/.

Negative information would be especially useful for prospective Roca Labs purchasers in light of Defendants' deceptive product claims.  By depriving prospective purchasers of truthful, critical customer accounts about their products and practices, Defendants' gag clause practices enable them to reduce the harm to their reputation even after they continually misrepresent the effectiveness of their goods.  They have therefore likely been able to make sales they would not have otherwise made, and charge their customers higher prices than they might have otherwise.[15]

Defendants recognize that negative reviews undercut their carefully crafted marketing campaign of promoting only positive information.  They have devoted significant resources to suing a review site for allegedly inducing breaches of the gag clause (PX 2, Att. F (200-04, 222-31, Att. G (266)), suing purchasers for allegedly breaching it, threatening other purchasers for saying that they will complain publicly, and warning all purchasers post sale via package inserts that they are contractually bound not to make negative comments.  These actions, on their face, evidence the fact that any leakage of negative purchaser information into the marketplace harms the Defendants' business by reducing the volume of product that they can deceptively sell at a premium.  They clearly believe that (and behave as if) negative purchaser comments cause, or are likely to cause, other consumers to doubt their deceptive

---

[15] *Cf. Statement of Basis and Purpose, Advertising of Ophthalmic Goods and Services,* 42 Fed. Reg. 23,992, 24,001 (1978) ("[E]conomic theory indicates that if price information is not available, or if it can be obtained only at high cost, consumers are deprived of the opportunity to satisfy their needs at the lowest available price. . . .  [T]he lack of price information means that in many places prices will be higher than they would be if consumers could readily compare potential sources of supply.").

claims, and thus be dissuaded from buying Defendants' overpriced mixture of commonly available dietary fibers.[16]

Similar restrictions prohibiting dissemination of truthful information by businesses aimed at competitors have been recognized to unfairly harm competition and consumers, including restraints on the dissemination of truthful information about products and services that relate to consumer health.[17]  The FTC has also long recognized that agreements between competitors to restrict truthful comparative advertising, including truthful criticism of competitors, harms competition in the marketplace.[18]  The FTC has challenged and prohibited these types of restrictions in numerous cases.  *See, e.g., Polygram Holding, Inc.,* 136 F.T.C. 310, 354-55 (2003) (agreement between competing record companies barring truthful advertising of recordings not part of their joint venture held "presumptively anticompetitive"), *aff'd*, 416 F.3d 29, 37 (D.C. Cir. 2005); *RealComp II, Ltd.*, 2009 FTC LEXIS 250, *55-56, 70-73 (F.T.C. Oct. 30, 2009) (agreement to restrict availability of real estate listings consumers use to evaluate prices and other features of competing providers' offerings  held "inherently suspect" and "presumptively unreasonable" where it made information more difficult and costly to obtain and tended to alleviate downward pricing

---

[16] For example consumers can buy 100 665 mg glucomannan capsules for about $10, one pound of guar gum for about $13, and ninety 100 mg capsules of beta glucan for $10.  PX 4 ¶ 18 (495).

[17] *Statement of Basis and Purpose, Advertising of Ophthalmic Goods and Services*, 43 Fed. Reg. 23,992, 24,007 (1978) (enacting 16 C.F.R. § 456.6(a)) (declaring it an unfair act or practice for private persons to prohibit, limit, or burden the dissemination of information concerning opthalmic goods and services by any seller).

[18] *Statement of Policy Regarding Comparative Advertising*, 16 C.F.R. § 14.15(c)(1) (truthful, non-deceptive advertising that disparages a seller's competitors, or their goods and services, is lawful; industry codes prohibiting such truthful advertising are subject to challenge by the Commission).

pressure), *aff'd on other grounds*, 635 F.3d 815 (6th Cir. 2011).  Given the emergence of online reviews and other user-generated content as important sources of information on products and services in the marketplace, suppressing such information is as likely to constrain consumer choices and lead to higher prices as when companies do the same.

Research on consumer-generated online reviews supports the conclusion that restricting consumers' ability to share truthful, negative information in the marketplace, as Defendants' gag clause practices do, is likely to cause substantial injury.  In the opinion of the FTC's expert, Professor Pavlou,[19] these practices are likely to negatively impact consumer welfare.  PX 8 (Pavlou Dec.) ¶¶ 11, 16-19 (803, 806-07).  Online reviews, including negative reviews, play an important informational role for consumers.  PX 8 ¶¶ 13-14 (804-05).  Manipulation of reviews, including their suppression, lowers their information value.  PX 8 ¶ 15 (805).  Defendants' practices, in Professor Pavlou's opinion, are likely to inflate consumers' perceptions of the quality of the Defendants and Roca Labs products, thus increasing consumers' willingness to buy the products; and consumers are less likely to learn about previous purchasers' problems with Defendants and Roca Labs products, thus encouraging consumers to buy inappropriate products.  See PX 8 ¶¶ 11, 16-19 (803, 806-07).

### 2.    Not Reasonably Avoidable by Consumers Themselves

Defendants' gag clause practices cause injuries that are not reasonably avoidable by consumers themselves.  Defendants' prospective customers have no input into whether

---

[19] Paul A. Pavlou, Ph.D., is the Milton F. Stauffer Professor of Information Technology and Strategy at the Fox School of Business at Temple University, and the Fox School's Chief Research Officer and Associate Dean of Research, Doctoral Programs, and Strategic Initiatives.  He is an expert in the field of information systems, with particular expertise in electronic commerce and emphasis on the study of consumer-generated online reviews.  PX 8. ¶¶ 2-6 (799-800).

negative information about the Defendants and their products is suppressed.  Moreover, Defendants make it difficult for consumers to find and understand the gag clause. Prospective customers searching for information on Roca Labs or similar products would not necessarily know that previous purchasers had negative experiences.  As the FTC stated in its Unfairness Policy Statement, "[i]t has long been recognized that certain types of sales techniques may prevent consumers from effectively making their own decisions. . . . Some [sellers] may withhold or fail to generate critical price or performance data, for example, leaving buyers with insufficient information for informed comparisons."  104 F.T.C. at 1074. Defendants' gag clause keeps a great deal of negative information from buyers, and makes it difficult or impossible for them to make a truly informed choice.

### 3.    Substantial Injury Not Outweighed by Countervailing Benefits

The injury from Defendants' gag clause practices is not outweighed by countervailing benefits to competition or consumers.  Unlike nondisclosure provisions that could protect legitimate interests of the parties negotiating a contract, e.g., forbidding disclosure of trade secrets or private medical information, Defendants' gag clause does not appear to protect any legitimate interest of either Defendants or the consumers "agreeing" to it.

Defendants' practices here, much like the competitor advertising restrictions described above, are designed to insulate them from free competition with sellers of other weight-loss products and services.  Defendants cannot articulate a legally cognizable, plausible competitive justification for their gag clause practices.  Instead, they essentially admit that the purpose of the gag clause is to put an entirely (and misleadingly) positive spin on their products and enhance their bottom line:  "Roca relies upon its reputation and the

-27-

weight-loss success of its customers to generate new business and attract new customers.  To foster, encourage, and protect its customer relationship, Roca has developed a special incentive / discount program, where it rewards customers for positive reviews and to refrain from making any negative postings."  PX 2, Att. G (266).  These gag clause practices are "injurious in [their] net effects," "prevent consumers from effectively making their own decisions," and "undermine[] an essential precondition to . . . free and informed consumer transaction[s]."  *Unfairness Policy Statement*, 104 F.T.C. at 1073, 1074.  Therefore, injunctive relief is necessary to halt this unfair practice.  *Id.*

### C.     Injunctive Relief is in the Public Interest

Defendants engaged in multiple deceptive business practices to the detriment of consumers nationwide.  If their deceptive advertising continues during the litigation, consumers will likely pay Defendants millions of dollars more than they have to date for ineffective Roca Labs products that they would not otherwise buy.  The proposed TRO is tailored to prohibit Defendants from marketing Roca Labs products using the deceptive weight-loss claims (TRO ¶ I) and endorsement practices (TRO ¶ III) described herein.  These are similar to prohibitions that courts have entered in prior FTC deception cases.  *See, e.g.*, *FTC v. Health Formulas, LLC*, 2015 U.S. Dist. LEXIS 59387, *11-12, 40-43, 75 (D. Nev. 2015) (preliminary injunction against false and misleading weight-loss supplement claims); *FTC v. LeanSpa, LLC*, 2014 U.S. Dist. LEXIS 2575, *14-20 (D. Conn. 2014) (stipulated permanent injunction against deceptive weight loss and endorsement claims).

Defendants have also warned, threatened to sue, and sued consumers for sharing, or telling Defendants that they will share, negative information about the Defendants and their

products, including truthful non-defamatory information.  As described above, this conduct

causes substantial injury.  The Court should halt Defendants' unfair campaign to whitewash

their reputation by suppressing purchasers' negative reviews and stories.  Paragraph II(a) of

the proposed TRO would prohibit this suppression of truthful information to gain an unfair

advantage over consumers and distort their decisionmaking.

The Court should also enjoin Defendants from claiming that consumers would be

liable for the "full" price of Roca Labs products if they speak out or breach the Terms.  This

pernicious falsehood is likely to chill consumers from publicly criticizing Defendants out of

fear that Defendants will summarily impose a significant financial liability on them.  TRO

Paragraph II(b) would halt this deception and deprive Defendants of its *in terrorem* value.

Paragraph II(c) of the proposed TRO would bar Defendants from retaliating against

anyone—purchasers, employees, or business partners—for providing relevant information to

the Court, law enforcement agencies, and other litigants.  In light of Defendants' history of

threats and litigation against anyone who might criticize them, their highly intrusive and

vexatious subpoenas to purchaser witnesses (see PX 2, Att. I (295-99)), and threats that

persons requesting refunds or payment of funds owed will be referred for criminal

prosecution (PX 2, Att. L (325, 333), Att. M (381-82)**;** PX 5 ¶¶ 13-14 and Exh. A and B

thereto (673, 677, 679)), the requested prohibition is necessary and in the public interest.

*See, e.g., Collins v. Walden*, 613 F. Supp. 1306, 1314-15 (N.D. Ga. 1985) (witnesses absolute

immunity from civil liability for testimony in judicial proceeding, including testimony by

affidavit).  It will assure prospective witnesses that they are free to share information about

Defendants without regard to Defendants' Terms.  *Cf. Health Formulas*, 2015 U.S. Dist. LEXIS 59387, at *103-04 (noninterference with consumer witnesses).

Proposed TRO Paragraph IV would bar Defendants from gratuitously disclosing purchasers' private health information in direct violation of their express promises made to induce consumers to do business with them.  *Cf. FTC v. Wyndham Worldwide Corp.*, 2015 U.S. App. LEXIS 14839, at *17 (3d Cir. Aug. 24, 2015) (company does not act equitably when it publishes privacy policy to attract customers concerned about data privacy, fails to make good on that promise, exposes unsuspecting customers to substantial financial injury, and retains the profits of their business); *Health Formulas,* 2015 U.S. Dist. LEXIS 59387, at *86-87 (preliminary injunction against release of customer information or customer lists).

Furthermore, the proposed TRO would provide ancillary relief appropriate to this case to make permanent relief, including equitable monetary relief, possible.  *See*, *e.g.*, *IAB Mktg.*, 746 F.3d at 1234 (affirming preliminary injunction freezing assets).  Paragraph V impedes Defendants from dissipating assets, while permitting reasonable business and living expenses.  Paragraph VI requires Defendants to report gross revenues and net profits from sales of Roca Labs products, and identify and explain payments of $1000 or more between the Defendants.  Paragraph XI allows the FTC to obtain consumer or credit reports on Defendants.  Paragraph VIII requires Defendants to provide limited expedited discovery to determine the nature and location of key documents (e.g., business operations and control, substantiation, gag clause communications, assets).

Finally, the proposed TRO includes provisions to preserve the status quo, and monitor and ensure compliance.  These include provisions preserving records and reporting new

entities (TRO ¶ VII), order distribution and service on third parties (TRO ¶¶ IX, X), and

scheduling and service matters relating to this action (TRO ¶¶ XII-XV).  Courts in other

cases alleging FTC Act violations have granted similar, and often more extensive, relief.

*See, e.g., Health Formulas*, 2015 U.S. Dist. LEXIS 59387, at *78-80 (asset freeze), *83

(financial statements), *85-86 (consumer credit reports), *86 (record preservation), *104-07

(order distribution, service of order, correspondence with FTC).

### D.      Defendants Juravin and Whiting Are Personally Liable

Individuals with "some knowledge" of a corporate entity's FTC Act violations are

liable if they directly participate in, or have the authority to control, the violations.  *IAB*

*Mktg.*, 746 F.3d at 1233; *FTC v. Windward Mktg., Ltd.*, 1997 U.S. Dist. LEXIS 17114, *38

(N.D. Ga. 1997).  Juravin's and Whiting's formal roles in RLI and RLNU, described in

Section II.B., above, raise the presumption that they each have or have had the necessary

authority to control the unlawful conduct alleged in this case. [20]  *See Windward* at *38-39

("An individual's status as a corporate officer gives rise to a presumption of ability to control

a small, closely-held corporation.").  Authority to control may be established by active

involvement in business affairs and the making of corporate policy and by evidence that the

individual had some knowledge of the practices.  *IAB Mktg.*, 746 F.3d at 1233.

The record is replete with evidence that Don Juravin is heavily involved with the

management and all facets of the "day to day operations" of RLI and RLNU.  PX 4, Att. H

(537-38).  For example, he has been involved with setting up bank accounts for both

---

[20] Whiting has also served as the sole officer of Zero Calorie Labs, Inc., a Florida corporation that has claimed to have hired personnel to perform services on behalf of RLI.  PX 1, Att. Y (135-44); PX 3 (McGregor Dec.), Att. A (460-62, 466) and B (470-71, 474); PX 4 ¶ 13(d) (489), Att. F (516-22).

companies (PX 4 ¶ 13 (488-90)); registering trademarks (PX 4 ¶ 6 (484-85)); paying for

search advertising (PX 4 ¶ 13(c-d), 14(b-c), 14(e) (489-91)); registering domain names (PX 4

¶ 12 (486-88)); and obtaining merchant bank services to process credit card payments (PX 4

¶¶ 14(a), 17 (490, 492)).  Bank and credit card statements for RLI, RLNU, and related

company accounts have routinely been directed to his home addresses.  PX 4 ¶¶ 13-14 (488-

90).  A former RLI employee has testified that Juravin trained employees about how to

respond to customer inquiries and refund requests, and instructed her to lie about her

personal weight loss while using Roca Labs products when speaking to customers.  PX 2,

Att. K (313-15).  Juravin has provided sworn verification and affidavits supporting RLI

filings describing Defendants' gag clause practices.  PX 2, Att. G (280), Att. H (285-88), Att.

J (307-09), Att. M (385), Att. N (455), and PX4, Att. H (537-38).  Given the limited number

of Roca Labs products and sales channels, and the consistency of deceptive Roca Labs

advertising claims over several years (compare PX 4, Att. C (504) and PX 2, Att. K (319-21)

to PX 1, Att. B (012-18), Att. C (020-21), and Att. P (091-93)), it is reasonable to infer from

his deep involvement in the corporations' operations – and as RLI's titular "Director of

Marketing" – that Juravin knew of the deceptive claims made through the search ads and

Roca Labs sites.  There is thus prodigious evidence already that his involvement in RLI and

RLNU makes him personally liable for their Section 5 violations.  *See Gem Merch.*, 87 F.3d

at 467-68 (individual held liable under the FTC Act where he "was aware that salespeople

made material representations to consumers to induce sales, and he was in a position to

control the salespeople's behavior").[21]

---

[21] Juravin has also served as a representative of Zero Calorie Labs, Inc., and been involved in its

Whiting's own recently-filed declaration in other litigation relating to Defendants' gag clause practices (PX 2, Att. E (197-98)), and other documents attributed to him, evidence his active involvement in the companies' affairs, and knowledge of the deceptive claims. Indeed, in letter to a payment processor in 2013, he stated that RLI's company policy is to reinvest potential profits "to increase our sales and establish our reputation as the premiere provider of the nonsurgical alternative to gastric bypass surgery" and "using every available means of informing the public of our product as well as its proven benefits." PX 4, Att. R (642). This statement clearly indicates his knowledge of the core advertising message and specific weight-loss claims challenged here. Thus, Whiting is also likely individually liable for RLI and RLNUs' corporate violations.

## V.      CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court enter the attached TRO and Order to Show Cause, halting Defendants' deceptive and unfair conduct.

Date:  September 24, 2015

> */s/ Carl H. Settlemyer, III*
> Carl H. Settlemyer, Esq.
> Paul B. Spelman, Esq.
> Federal Trade Commission
> 600 Pennsylvania Avenue, N.W., CC-10528
> Washington, D.C. 20580
> Tel.:  202-326-2019, -2487
> Fax:  202-326-3259
> Email:  csettlemyer@ftc.gov, pspelman@ftc.gov
> Counsel for Plaintiff

---

operations.  See, e.g., PX 4 ¶¶ 8-9 (485-86), ¶ 12 (487) (domain registration), ¶ 13(c) (489), and Att. F (515-18), G (526-28), L (577, 579); PX 1, Att Y (136).