UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ROCA LABS, INC., a corporation; ROCA LABS NUTRACEUTICAL USA, INC., a corporation; MUST CURE OBESITY, CO., a corporation; JURAVIN, INCORPORATED, a corporation; ZERO CALORIE LABS, INC., a corporation; DON JURAVIN, individually and as an officer of Roca Labs, Inc., Roca Labs Nutraceutical USA, Inc., Must Cure Obesity, Co, and Juravin, Incorporated; and GEORGE C. WHITING, individually and as an officer of Roca Labs, Inc., Roca Labs Nutraceutical USA, Inc., and Zero Calorie Labs, Inc.<br><br>Defendants. | Case No. 8:15-cv-02231-MSS-TBM<br><br>**INJUNCTIVE RELIEF REQUESTED** |

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
WITH OTHER EQUITABLE RELIEF AND AN ORDER TO SHOW CAUSE WHY
<u>THE PRELIMINARY INJUNCTION SHOULD NOT BE MODIFIED</u>**

Plaintiff, the Federal Trade Commission ("FTC") has obtained evidence that

Defendant Don Juravin ("Juravin") has been concealing or dissipating Defendants' assets by:

- instructing one of his agents to create a new, seemingly independent company over which Juravin exerted control in whole or in part, to provide purported computer programming services for his company, defendant Must Cure Obesity, Co. and the Roca Labs business;

- depositing more than $50,000 of Defendants' assets in an account for the new company in March 2016, even though any services it had provided at the time were

1

only for a fraction of that amount, and it had no written agreement to provide any services to any Defendant;

- instructing his agent in July 2016 to generate fictitious invoices from the new company to Must Cure Obesity for purported computer programming services provided on behalf of Must Cure Obesity and the Roca Labs business;

- depositing $289,188 of Defendants' assets in the new company's bank account in July and August 2016 as purported payment of the fictitious invoices with the expectation of personally reclaiming those funds at a later date; and

- proposing a fraudulent conveyance of title to his Mercedes Benz convertible to his agent, while he maintained possession, with the expectation of reclaiming title to the car at a later date.

The FTC moves pursuant to Fed. R. Civ. P. 65 for a temporary restraining order freezing assets, other equitable relief, and an order to show cause why the Preliminary Injunction should not be modified against defendants Don Juravin, Roca Labs, Inc., Roca Labs Nutraceutical USA, Inc., Must Cure Obesity, Co. ("MCO"), Juravin, Incorporated, and Zero Calorie Labs, Inc. ("ZCL"), (collectively, "Asset Freeze Defendants").[1] In particular,

---

[1] MCO, Juravin, Incorporated, and ZCL are not specifically named in the Preliminary Injunction, but have at all times since it issued been bound by it because Juravin has controlled them and they have been in active concert or participation with the original defendants. See Exhibit 2, hereto, Att. A (Colbert Aug. 12, 2016 Declaration, showing Juravin is the sole officer listed in MCO corporate filings); Don Juravin's Answer to Amended Complaint [Dkt. 58], ¶ 11 (Juravin admits his "influence" over MCO and ZCL, and his ownership and control of Juravin, Incorporated); Colbert Sept. 18, 2015 Declaration [Dkt. 6-7, PageID 673, 675, 671-72] (illustrating Juravin's control over ZCL).

the FTC requests that the Court freeze the business account at issue, along with all other business and personal assets directly or indirectly controlled by Juravin and the corporate defendants.[2] This relief will prevent them from further concealing or dissipating assets that could be used to pay equitable monetary relief to injured consumers. The FTC has prepared a proposed form of Temporary Restraining Order setting forth this relief, is sending a copy of the proposed order to Defendants' counsel with service of this motion, and can provide it promptly to the Court at the Court's request.

I.  STATEMENT OF FACTS

  A.  Procedural History

The FTC filed its Complaint in this matter on September 24, 2015 [Dkt. 1]. The Complaint alleged that Defendants made false and unsubstantiated weight-loss claims for their "Gastric Bypass No Surgery" dietary supplement, and engaged in other deceptive practices. It also alleged that Defendants unfairly used non-disparagement clauses against consumers who complained or posted negative comments about Defendants' products or business practices.[3] The FTC charged that these acts and practices violated Sections 5 and 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a), 52. The FTC concurrently moved

---

[2] The FTC does not request at this time that any personal assets of defendant George Whiting be frozen except to the extent they are otherwise controlled by or held for the benefit of Juravin or the corporate defendants. Mr. Whiting's personal assets would remain subject to the asset preservation provisions of the Preliminary Injunction.

[3] The original Complaint named defendants Roca Labs, Inc., Roca Labs Nutraceutical USA, Inc., Don Juravin, and George Whiting. On February 19, 2016, the Court docketed the Commission's First Amended Complaint [Dkt. 48] adding defendants MCO, Juravin, Incorporated, and ZCL, alleging that they are part of the common enterprise and liable for the same conduct as the original defendants.

for entry of a temporary restraining order [Dkt. 6]. The parties stipulated to, and the Court entered, a TRO on September 29, 2015 [Dkt. 13].

On October 29, 2015, the Court entered an Order for Preliminary Injunction and Other Equitable Relief ("Preliminary Injunction") [Dkt. 38] prohibiting the original defendants from engaging in the challenged conduct, setting conditions on their use of non-disparagement clauses, and prohibiting retaliation against persons who cooperate or provide information to the FTC.[4]

Relevant to this motion, the Preliminary Injunction included provisions, to which the original defendants stipulated, to prevent concealment or dissipation of their assets. Specifically, Section V of the Preliminary Injunction prohibits them from:

> directly or indirectly selling, transferring, alienating, liquidating, encumbering, pledging, loaning, assigning, concealing, dissipating, converting, withdrawing, or making any other disposition of any assets or any interest therein, wherever located, including any assets outsider the territorial United States, that are owned, controlled, or held by, or for the benefit of, in whole or in part, Defendants, or in the actual or constructive possession of Defendants, other than those assets that are used for actual, ordinary, or necessary business expenses or living expenses that Defendants reasonably incur, including reasonable legal expenses.

---

[4] The Preliminary Injunction included findings that: (1) in the past, Roca Labs had made numerous representations that could not be scientifically proven, and the FTC was likely to succeed on the merits of a proceeding to establish that various statements by the original defendants were deceptive and unsubstantiated claims; and (2) that in the past, in order to squelch comment and public discourse about its products, the original defendants had, in fact, pursued and threatened to pursue consumers both by threatening criminal sanctions and civil action and financial loss for their comments. [Dkt. 38 at 3, PageID 1567].

[Dkt. 38 at 11].[5] Discovery and settlement discussions ensued, and this case was stayed for the parties to pursue potential settlement. See [Dkt. 49] and [Dkt. 65].

### B. Juravin's Scheme to Conceal or Dissipate Assets

The FTC recently learned that defendant Juravin had set into motion a scheme to conceal or dissipate several hundred thousand dollars of the Defendants' assets. The end result is that Defendants' assets appear to have been spent on "actual" business expenses, but are in fact being concealed by Juravin, presumably so he can reclaim them after the litigation.

In February 2016, Juravin asked one of his contract workers, Jenna Antico,[6] to incorporate a new business, which he instructed her to name "Jugaad Co.," through which he would route payments to foreign computer programmers providing services to the Roca Labs business.[7] Exhibit 1 hereto, Declaration of Jenna Antico at ¶ 4. Ms. Antico incorporated Jugaad Co. ("Jugaad") in Florida on February 26, 2016.[8] She is Jugaad's sole officer and shareholder, and the company has no employees. The only services that Jugaad has ever provided are to the Roca Labs business, at Juravin's direction. *Id.*

---

[5] These restrictions are to preserve assets for monetary redress to consumers if the Court ultimately finds the Defendants liable. *See, e.g.*, *FTC v. IAB Mktg. Assoc., LP*, 746 F.3d 1228, 1234 (11th Cir. 2014) (affirming preliminary injunction freezing assets).

[6] Juravin had hired Ms. Antico, on an independent contractor basis, as a home-school teacher for his family in 2014, and in September 2015 to provide customer support for the Roca Labs business at an hourly rate ranging from $10-$13 per hour. *Id.* ¶¶ 2-3.

[7] "Jugaad" is apparently a colloquial Hindi and Punjabi word, "literally meaning a hack. It is generally used as a word to represent an innovative fix or a simple work-around, used for solutions that bend rules, or a resource that can be used as such, or a person who can solve a complicated issue." https://en.wikipedia.org/wiki/Jugaad (accessed on Aug. 12, 2016).

[8] See also Exhibit 2 hereto, Colbert Aug. 12, 2016 Declaration, Att. B (Jugaad Co. Articles of Incorporation).

Juravin directed Ms. Antico to set up a bank account for Jugaad on or about March 14, 2016, with Wells Fargo. She set up the account and has at all times been the sole signatory on the account, and the only person with electronic access to the account. *Id.* ¶ 5. Juravin's company, defendant Must Cure Obesity, transferred a total of $56,500 to the Jugaad bank account on March 21, and March 31, 2016. Juravin told her that this money was for Jugaad to use to pay the programmers, and to pay her expenses and herself, based on her hourly rate. She had not signed any agreements about the services Jugaad would provide to the Roca Labs business or Juravin. At the time of these transfers in March, Jugaad had not sent the Roca Labs business or Juravin any invoices for services. *Id.* ¶ 6.

Ms. Antico, also at Juravin's direction, used Jugaad funds to purchase MoneyGrams at Walmart to pay foreign programmers for work performed for the Roca Labs business. Juravin instructed her when to make such payments, whom to pay, what verbiage to include in emails notifying them of the payments, and specified the payment amounts. These MoneyGrams included payments in April through June of less than $1000 each to several different individuals in Pakistan and India. *Id.* ¶ 8.

In April 2016, Juravin instructed Ms. Antico to establish a company in Ireland, named Jugaad Limited. She is the sole officer and shareholder of Jugaad Limited, which has no operations, employees, or bank accounts. Juravin has, since around the time he asked her to create Jugaad Limited, asked her multiple times to travel with him to Ireland to set up a bank account for that company. He advised her that she should set up an account in Ireland for "tax planning." *Id.* ¶ 9.

Juravin has stated to Ms. Antico on several occasions that the money in the Jugaad Wells Fargo account was her money, but that he hoped she would "do the right thing." She has never believed that these funds truly belonged to her. She reported her hours to Juravin, who approved her pay, and she only drew Jugaad funds for hours she worked. *Id.* ¶ 7.

Starting around April 2016, Juravin started asking her to sign a promissory note that would require her, personally, to pay him $1,000,000. According to Juravin's proposed note, the full amount would become due immediately if she were to default on installment payments, to be determined, on the note. Juravin referred to the promissory note, on multiple occasions, as an "atomic bomb" that he could use to hurt her if she did anything with money that he would send to Jugaad to pay the programmers to whom he said he owed money. Juravin gave her a draft of the document on July 27, 2016, and another draft (attached as Exhibit 1 to Ms. Antico's Declaration) on August 2, 2016. She did not sign the promissory note. *Id.* ¶ 10.

In the first half of July 2016, programmers who had previously done work for the Roca Labs business signed new contracts between themselves and Jugaad. These included individuals to whom Ms. Antico had sent MoneyGram payments from Jugaad. She learned about the proposed and signed contracts via emails she received in early July. She did not send the programmers these draft contracts, negotiate the contracts, or request that the programmers sign and send them to her, and believes that Juravin did. *Id.* ¶ 11.

In mid-July 2016, Juravin directed her to create invoices from Jugaad Co. to Must Cure Obesity. Juravin provided her the dates the invoices should cover, total invoice amounts and the names and hourly rates for different service items, which were "Designer" at $35,

7

"PHP" at $45, and "Expert" at $60. He left it to her to devise hour and dollar subtotals that would add up to the total amounts that he specified. He reviewed with her, via a Skype screen-sharing service, several drafts of the invoices and instructed her as to changes he wanted her to make. She also emailed him invoices that he rejected because they did not look "legitimate." He yelled at her over the phone and made her re-do the rejected invoices. Per his instructions, she created invoices from Jugaad to Must Cure Obesity, and sent them on July 22, July 28, July 31, and August 2, 2016. *Id.* ¶ 12.The invoices totaled $289,188. Juravin also dictated to her the following text to include on one invoice for $222,018 (attached as Exhibit 2 of Ms. Antico's Declaration):

> Dear Don,
>
> We appreciate your business as my team worked with you closely for the last two years. The accumulated debt reached more than $315,080. As previously discussed, the programmers have asked me to step in to represent them with their pay through Jugaad Co. You have a past due balance with my team. You should have paid by the end of March, 2016. Jack has sent you the itemized list of what is owed. The team has been there for you every time you needed emergency assistance fixing and building the site as well as working hard to meet FTC specifications. Which will show in the remaining balance, 87,982. As you can see the programmers are paid less then half the cost of the US cost of programmers. They need to be paid on time. We have programmers at 35, 45 and 60 dollars per hour. My team has worked hard and met many of your requests. They must be paid accordingly!

*Id.* ¶ 12.

On July 28, 2016, Juravin shared with her, via Google Drive, a document that appeared to be a December 2015 invoice from Silicon Web Services, at an "Akurdi, Pune" address. That document reflects at least $378,767 in expenses for "Advertising," and several hundred thousand dollars in additional expenses. *Id.* ¶ 13.

8

Starting in late July 2016, Juravin told Ms. Antico that he wanted her to sign a contract between Jugaad and Must Cure Obesity. He sent her a proposed contract August 2, 2016, showing rates of pay that Jugaad would charge Must Cure Obesity for programming and website maintenance. The stated rates were $35 per hour for programmers, $45 per hour for designers, and $60 per hour for experts. She did not propose these rates, or contract terms, and has not signed the contract. *Id.* ¶ 14.

At Juravin's direction, in the last few weeks of July 2016, Ms. Antico also created a website for Jugaad. He instructed her to include information about the programmers' expertise and to list their rates as the $35, $45, and $60 per hour rates shown on the invoices he asked her to create. He specified that she include in the Jugaad site references to business operations in Florida, Australia, and Ireland. Juravin registered the domain name now used for the site, "Jugaad.global," in late July 2016, and set up the site to be accessible from that domain name. *Id.* ¶ 15. [9]

In the last week of July 2016, Juravin instructed Ms. Antico to post ads for personnel on the Upwork.com online platform, including an ad for a social media manager. He said to post the rate as $4.50 per hour because "that is what we pay the Indians."[10] *Id.* ¶ 16.

---

[9] See also Exhibit 2, Colbert Aug. 12, 2016 Declaration, Att. C (printout of page from Jugaad.Global website).

[10] Notably, this hourly rate is consistent with information already in the record. A computer programmer based in India, whom Roca Labs, Inc. and ZCL had sued for breach of a non-disparagement provision and other alleged wrongs in 2012, was apparently hired for only $7 per hour, with the possibility of modest bonuses. See Complaint and Independent Contractor Programmer Agreement, attached to the Declaration of Bonnie McGregor, [Dkt. 6-6, PageID 647, ¶¶ 7, 9-10, and PageID 652].

As of August 5, 2016, the Jugaad Wells Fargo account had a balance of $272,735.16. Substantially all the deposits in the account were from Must Cure Obesity. The dates and amounts of these deposits (totaling $295,688) were as follows:

| | |
|---|---|
| March 21, 2016 | $8,000.00 |
| March 31, 2016 | $48,500.00 |
| July 25, 2016 | $20,970.00 |
| July 25, 2016 | $23,010.00 |
| July 25, 2016 | $23,190.00 |
| August 1, 2016 | $100,000.00 |
| August 2, 2016 | $72,018.00 |

In an email message dated July 29, 2016, Juravin advised Ms. Antico that $50,000 more would be paid to Jugaad "in the next couple of weeks." *Id.* ¶ 17.

In addition to these events, on or about late July 2016, Juravin requested that Ms. Antico take title to his Mercedes Benz convertible. Juravin proposed that she would pay him $8,000 from Jugaad, they would sign a document requiring her to pay an unspecified balance, and she would later fail to pay the debt and thereby allow him to repossess the car. Ms. Antico did not take title to the car or pay him any money for it. *Id.* ¶ 18.

Ms. Antico, as a result of her history with Juravin, is fearful of him. He has, for several years, controlled her income. He has, in the past, withheld her pay for weeks at a time because he was angry with her. She reports that he has a strong temper. He has often phoned her multiple times per day, every day of the week. She has feared that Juravin will retaliate against her, with legal actions or otherwise, if she did not do his bidding. She knows that he has, in the past, sued people who have worked for him. She felt intense pressure to create the Jugaad companies, to accompany Juravin to Ireland to set up a Jugaad Limited bank account

10

there, and to sign the promissory note he presented to her. Indeed, she fears for her physical safety and that of her family because she is providing testimony in this case. *Id.* ¶ 19.

## II.     LEGAL ARGUMENT

Under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), a district court may order preliminary relief, including an asset freeze, needed to make permanent relief possible. *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996). To obtain such relief, the FTC must show that (1) it is likely to succeed on the merits, and (2) injunctive relief is in the public interest. The FTC need not show irreparable injury to obtain preliminary injunctive relief. *FTC v. IAB Mktg. Assoc., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014).[11]

This Court has already found the FTC likely to succeed on the merits of its deceptive weight loss claims against the Defendants [Dkt. 38 at 3, PageID 1567], and the public interest clearly warrants additional interim injunctive relief, including freezing their existing assets to preserve the status quo. When the FTC sought the Preliminary Injunction at the outset of this case, it had no information that Defendants had taken steps to conceal or dissipate their assets. Thus, restricting outlays to actual and reasonable business expenses with monitoring and reporting provisions appeared equitable to protect consumers while allowing Defendants to operate their business in accordance with the Preliminary Injunction's terms.

But defendant Juravin's conduct described in Ms. Antico's Declaration shows that the Preliminary Injunction's current provisions to prevent asset concealment are inadequate. He clearly has little regard for the asset preservation provisions of the Preliminary Injunction to

---

[11] The FTC need not give security for interim injunctive relief. *See* Fed R. Civ. P. 65(c).

which he agreed. *Cf. United States v. Western Elec. Co.*, 46 F.3d 1198, 1202 (D.C. Cir. 1995) ("At the request of the party who sought the equitable relief, a court may tighten the decree in order to accomplish its intended result.") (citing *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 252 (1968)). Thus, the Court should issue an Order to Show Cause why the Preliminary Injunction should not be modified to include an asset freeze, rather than an asset preservation requirement. The requested asset freeze and other ancillary relief requested in this motion would be in addition to the existing provisions of the Preliminary Injunction, and would not affect the operation of any provisions of the Preliminary Injunction.

    **A.**    **An Asset Freeze is Warranted in Light of Juravin's Brazen Siphoning of Assets to a Newly-Formed Company, Creation of Fictitious Invoices, and Attempted Fraudulent Conveyance**

A Temporary Restraining Order and modification of the Preliminary Injunction to freeze Jugaad's funds, the corporate assets, and Juravin's assets, is appropriate to prevent ongoing and future asset dissipation during the litigation. A district court has the inherent equitable power to freeze assets as an incident to its express statutory authority to issue a permanent injunction under Section 13 of the FTC Act. *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984) (per curiam). Many courts have imposed asset freezes in FTC cases for this very purpose when granting interim equitable relief. *See, e.g.*, *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1234 (11th Cir. 2014); *FTC v. Lanier Law, LLC*, 2015 U.S. Dist. LEXIS 170610, at *3-4 (M.D. Fla. Dec. 22, 2015); *FTC v. Vacation Commc'ns. Grp., LLC*, 2013 U.S. Dist. LEXIS 79715, at *12-19 (M.D. Fla. Jun. 6, 2013); *FTC v. FTN Promotions, Inc.*, 2008 U.S. Dist. LEXIS 45637, at *3-5 (M.D. Fla. Mar. 26, 2008).

Where, as in this case, business operations are permeated by deceptive practices, there is a strong likelihood assets may be dissipated and defendants' assets can be frozen solely on that basis. *FTC v. Febre*, 1994 U.S. Dist. LEXIS 9787, *61 (N.D. Ill. 1994). In this case, that likelihood has ripened to certainty; an asset freeze of the Jugaad account and all the Roca Labs corporate accounts (including the MCO account from which the funds have been transferred to Jugaad) is not just warranted, but necessary.

A freeze of individual assets is warranted when the individuals have, as Juravin has, participated directly in and controlled the deceptive activities of the corporation, and would be individually liable for money damages. *Id.* at *62. The facts here rise far above that level. Juravin directed Ms. Antico, an hourly-wage Roca Labs customer service representative, working from home, to create Jugaad well after the Preliminary Injunction was entered, and on the eve of mediation. Although he has kept his name off of it, he has thoroughly controlled Jugaad's operations from the time it was formed. His company, MCO, transferred over $50,000 to Jugaad in March 2016, at time at which Jugaad had provided no programming services or signed any agreement to provide services for MCO or any other defendant. He directed and oversaw the creation of fabricated invoices – replete with self-serving verbiage that he dictated – that show rates and amounts that are wildly inflated and disproportionate to any plausible actual expenditures for, or debts to, foreign programmers working for the Defendants. His company transferred hundreds of thousands of dollars of Defendants' funds to Jugaad on the eve of the original stay in this case expiring. He has attempted to protect his interest in the funds through a $1,000,000 promissory note to use as an "atomic bomb" against Ms. Antico. He even tried to fraudulently convey title to his

Mercedes Benz convertible to her as a means of appearing to sell the asset, only to recoup it at a later date (presumably after the conclusion of this litigation).

"The FTC's burden of proof in the asset-freeze context is relatively light." *IAB Mktg.*, 746 F.3d at 1234. Only a "reasonable approximation of a defendant's ill-gotten gains" is required for an asset freeze and "[e]xactitude is not a requirement." *Id.* quoting *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) (per curiam). The amount of assets to be frozen, prior to the finding of liability, is determined not by whether the funds themselves are traceable to the fraudulent activity underlying the lawsuit, but by showing a reasonable approximation of the amount, with interest, the defendant was unjustly enriched. *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1371 (S.D. Fla. 2006), citing *ETS Payphones*, 408 F.3d at 735-36. Risk of uncertainty about the exact amount falls on the wrongdoer whose illegal conduct created the uncertainty. *Lauer*, 445 F. Supp.2d at 1370 n.11.

The FTC has already submitted unrebutted evidence, in support of its original motion for a temporary restraining order, that the Defendants' 2010-2014 revenues from Roca Labs product sales were about $21 million. Colbert Sept. 18, 2015 Declaration ¶¶ 15, 16(a), 17(d)-(e) [Dkt. 6-7, PageID 677-79]. The few hundred thousand dollars Juravin has siphoned from MCO to park in the Jugaad Co. account,[12] though significant, is a pittance compared to

---

[12] Courts have inherent authority to enforce their orders against nonparties. *FTC v. Productive Mktg., Inc.*, 136 F. Supp. 2d 1096, 1106 (C.D. Cal. 2001) (court had authority over nonparty that held funds subject to permanent injunction that it had failed to pay to defendant companies), citing *United States v. Hall*, 472 F.2d 261, 265-66, 268 (5th Cir. 1972). *See also United States v. New York Tel. Co.*, 434 U.S. 159, 172-74 (1977) (All Writs

Defendants' total ill-gotten gains. Any additional assets the Defendants have would need to be extensive to approach the revenues from their deceptive and unfair conduct in the years leading up to this lawsuit.[13] *Cf. Lanier Law*, 2015 U.S. Dist. LEXIS 170610, at *9, 11 (denying release of frozen funds to pay attorney fees when defendants' monetary liability greatly exceeded the frozen funds); *FTC v. IAB Mktg. Assoc., LP*, 2013 U.S. Dist. LEXIS 78307, *7, 12-13 (S.D. Fla. June 4, 2013) (same). Thus, the asset freeze would reasonably approximate, or dramatically understate, the Defendants' potential monetary liability.

### B. Additional Ancillary Injunctive Relief is Appropriate

There is a strong likelihood that Juravin has engaged in, or plans to engage in, similar schemes with other ostensible third parties, including overseas vendors, to park assets for later retrieval, so immediate asset discovery is appropriate. Ms. Antico's Declaration indicates that Juravin is familiar with, and understands the financial motivations for, setting up bank accounts in foreign countries. He entreated her for several months to travel with him to Ireland so that she could set up a foreign bank account for Jugaad Limited. These circumstances suggest that Juravin likely already has assets in foreign bank accounts. The FTC therefore requests that the Court include in the Temporary Restraining Order provisions

---

Act, 28 U.S.C. § 1651(a) can extend to persons who are not parties to the action or engaged in wrongdoing, and are in a position to frustrate implementation of a court order).

[13] Disgorgement is measured by the defendants' unjust enrichment, calculated as the amount of net revenue (gross receipts minus refunds), rather than the amount of profit (net revenues minus expenses). *FTC v. Washington Data Res., Inc.*, 704 F.3d 1323, 1326-27 (11th Cir. 2013) (per curiam).

that require the Asset Freeze Defendants to repatriate forthwith any assets located in foreign countries. Pending the required repatriation and Order to Show Cause, Juravin should also be required to surrender his passport temporarily to minimize the risk that he would be able to travel outside the United States to further conceal any assets.

Because of Ms. Antico's concern over Juravin potentially retaliating against her for providing testimony in this case, the Court should also bar him from having direct contact with her or her family. Ms. Antico's testimony could jeopardize Juravin's access to hundreds of thousands of dollars. Her testimony makes clear that she fears not only his proven reputation for litigiousness, but also for her physical safety. Thus, an order provision that prevents him or his representatives from contacting her directly would be appropriate, and assist the Court in rendering permanent injunctive relief at the conclusion of this matter.

## **CONCLUSION**

For the reasons set forth above, the FTC requests that the Court issue a Temporary Restraining Order to: freeze the already existing assets of the Asset Freeze Defendants; order those Defendants to repatriate assets; allow the FTC to conduct expedited asset discovery; issue an Order to Show Cause why the Preliminary Injunction should not be modified to include an Asset Freeze; order Juravin to surrender his passport temporarily; bar Juravin or his representatives from contacting Ms. Antico or her family members directly; facilitate service of the Temporary Restraining Order to third parties holding assets subject to the Order, and clarify obligations of those parties with respect to the subject assets; and provide for the continued operation of the provisions of the Preliminary Injunction. *See, e.g., FTC v. Vacation Commc'ns. Grp*, 2013 U.S. Dist. LEXIS 79715, at *12-19, 36-38, 41-43, 43-44, 45

(asset freeze, third party obligations, repatriation and non-interference, expedited discovery, service, retention of jurisdiction).

Because no conference is required under Local Rule 3.01(g) for this motion for injunctive relief, undersigned counsel has not conferred with opposing counsel.

Respectfully submitted,

Dated: August 15, 2016     /s/ *Carl H. Settlemyer, III*
CARL H. SETTLEMYER, III (Trial Counsel)
PAUL B. SPELMAN
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mail Drop CC-10528
Washington, DC 20580
(202) 326-2019, -2487 (Tel.)
(202) 326-3259 (Fax)
csettlemyer@ftc.gov
pspelman@ftc.gov

Attorneys for Plaintiff Federal Trade Commission

**CERTIFICATE OF SERVICE**

I CERTIFY that on this 15th day of August 2016, I electronically filed the foregoing "Plaintiff's Motion For Temporary Restraining Order With Other Equitable Relief And An Order To Show Cause Why The Preliminary Injunction Should Not Be Modified" and supporting exhibits with the Clerk of the Court by using the CM/ECF filing system, and this document will be served electronically through same to counsel for all parties of record. I FURTHER CERTIFY that I have sent a copy of the foregoing via email to Defendants' counsel:

        SUZETTE M. MARTENY
        Shumaker, Loop & Kendrick, LLP
        Bank of America Plaza
        101 E. Kennedy Boulevard
        Suite 2800
        Tampa, FL 33602
        smarteny@slk-law.com

                              s/Carl H. Settlemyer, III

                              Attorney