# PX6(1)

# Excerpts and Exhibits From Corporate Defendants' 30(b)(6) Deposition (2/15/17-2/16/17)

# In the Matter of:

# FTC v. Roca Labs, Inc., et al.

*February 15, 2017*
*George Whiting*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1

1                    I N D E X
2
3   WITNESS                           PAGE
4
5   GEORGE WHITING
6       BY MR. SETTLEMYER                5
7
8   EXHIBITS        DESCRIPTION        PAGE
9    1  Copy of Rule 30(b)(6) Notice
        of Deposition                    5
10
     2  Copy of the Federal Trade
11      Commission's complaint
        (First Amended)                  5
12
     3  Copy of Answer of Defendant,
13      Roca Labs, Inc.                  5
14   4  Copy of Answer of Defendant,
        Roca Labs Nutraceuticals,
15      USA, Inc.                        5
16   5  Copy of Answer of Defendant,
        Must Cure Obesity                5
17
     6  Copy of Roca Labs Form 1120
18      (2010 corporation income
        Tax return)                     20
19
     7  Copy of statement dated
20      31/July/2013                    23
21   8  Copy of Roca Labs profit
        and Loss, January-December
22      2013                            23
23   9  Copy of document reflecting
        sales numbers in years
24      2009-2015                       34
25

3

1          UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF FLORIDA
2               TAMPA DIVISION
3   FEDERAL TRADE COMMISSION,
4        Plaintiff,
5   ROCA LABS, INC., a corporation, et al.
6            Defendants.
    _____
7
8              Wednesday, February 15, 2017
9              Offices of Shumaker, Loop &
10             Kendrick, LLP
11             101 East Kennedy Boulevard
12             Suite 2800
13             Tampa, Florida
14
15      The above-entitled matter came on for
16  deposition, pursuant to Notice, at 9:32 a.m.
17
18
19
20
21
22
23
24
25

2

1   EXHIBITS         DESCRIPTION        PAGE
2   10  Copy of document reflecting
        sales numbers in years
3       2009-2015                       34
4   11  Copy of trademark filings       44
5   12  Copy of trademark filings       44
6   13  Copy of trademark filings       44
7   14  Copy of trademark filings       44
8   15  Copy of restructuring agreement 45
9   16  Copy of application to open
        account                         46
10
    17  Copy of FDMS merchant services
11      Application                     47
12  18  Copy of American Express
        Statements (3/13-12/13)         49
13
    19  Copy of American Express
14      Statements (1/14-2/15)          49
15  20  Copy of American Express
        Statements (2/14-1/15)          49
16
17
18
19
20
21
22
23
24
25

4

1   APPEARANCES
2   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
3        MICHAEL J. DAVIS, ESQ.
4        CARL H. SETTLEMYER, III, ESQ.
5        600 Pennsylvania Avenue, NW
6        Washington, DC 20580
7        (202) 326-2458
8        EMAIL: mdavis@ftc.gov
9            csettlemyer@ftc.gov
10
11  ON BEHALF OF THE DEFENDANT, GEORGE WHITING:
12       SUZETTE MARTENY, ESQ.
13       SHUMAKER, LOOP & KENDRICK, LLP
14       101 East Kennedy Boulevard
15       Suite 2800
16       Tampa, Florida 33602
17       (813) 229-7600
18       EMAIL: Smarteny@slk-law.com
19
20  Also present:  Mr. Don Juravin
21
22
23
24
25

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017

---

5

1    (Plaintiff's Exhibit Nos. 1 through 5 were
2    premarked for identification.)
3         P R O C E E D I N G S
4         - - - - - - - -
5    Whereupon,
6         GEORGE WHITING,
7    a witness, called for examination,
8    having been first duly sworn, was
9    examined and testified as follows:
10        EXAMINATION
11        MR. SETTLEMYER:  Good morning, everyone.
12   My name's Carl Settlemyer.  I'm an
13   attorney for the Federal Trade
14   Commission.  We're here in connection
15   with FTC versus Roca Labs, et al.  With
16   me is Mike Davis, also with the FTC.
17   And the others in the room to
18   introduce themselves for the record,
19   please.
20        THE WITNESS:  I'm George Whiting.
21   W-h-i-t-i-n-g.
22        MS. MARTENY:  Suzette Marteny,
23   attorneys for defendants.
24        MR. JURAVIN:  Don Juravin.  J-u-r-a-v-i-n.
25        MR. SETTLEMYER:  Today is the Rule 30(b)(6)

---

6

1    deposition of Roca Labs, Inc., Roca Labs
2    Nutraceutical USA, Inc., and Must Cure Obesity
3    Co. and we have -- Mr. Whiting and Mr. Juravin,
4    I understand, are here to be the
5    representatives of those three
6    defendants.  Is that correct?
7        MS. MARTENY:  That's correct.
8        MR. SETTLEMYER:  Okay.  And I believe
9    Mr. Whiting is prepared to testify on
10   behalf of Roca Labs, Inc., and I
11   suppose to the extent necessary, Zero
12   Calorie Labs, Inc., another defendant
13   in connection with several of the
14   topics for today's deposition.
15       I've had marked as exhibits several
16   documents, and I would just like to go
17   ahead and put those out on the table
18   and recite what they are.  And we can
19   refer to those early on and, then, try
20   to front load our questions so we get
21   Mr. Whiting's portion of this done as
22   expeditiously as possible.
23       MS. MARTENY:  Yes.
24       MR. SETTLEMYER:  Pause for two seconds.
25       (Off the record from 9:33 a.m. to 9:34 a.m.)

---

7

1    BY MR. SETTLEMYER:
2        Q.  Back on.  All right.  So, first exhibit is
3    the Rule 30(b)(6) deposition notice, I'll put
4    here in front of Mr. Whiting since he'll be up
5    first.  Copies for me.  You'll have to share,
6    unfortunately.
7        Exhibit 2 is a copy of the
8    Federal Trade Commission's complaint in this
9    matter.  I'll just put that.  The first
10   amended complaint I'll say.
11       MS. MARTENY:  Okay.
12   BY MR. SETTLEMYER:
13       Q.  Exhibit 3 is the answer of defendant, Roca
14   Labs, Inc.  Exhibit 4 is the answer of defendant,
15   Roca Labs Nutraceuticals USA, Inc.
16   Exhibit 5 is the answer of defendant, Must
17   Cure Obesity.  We don't necessarily have to
18   refer to those right now.  I'm just offering
19   them for convenience later.
20       We'll start with Exhibit 1, which
21   is the Rule 30(b)(6) deposition notice.  And
22   before I ask Mr. Whiting questions about that,
23   I just want to ask you general questions.
24       Mr. Whiting, you understand that you've
25   taken an oath to tell the truth.  Correct?

---

8

1        A.  That is correct.
2        Q.  I'll try to finish my questions before
3    you begin any answer, and I would ask that
4    you -- I will try to let you finish your
5    answer before I start asking another question.
6    Please answer audibly with words, not nods or
7    uh-huhs.  Do you understand?
8        A.  Yes.
9        Q.  If you don't understand a question,
10   please tell me.  I'm not trying to trick or
11   confuse you.  If you answer, I'll assume you
12   understood.  You understand?
13       A.  I understand.
14       Q.  If you hear your attorney make an
15   objection to a question, you should go ahead
16   and answer the question unless they're making
17   an objection based on privilege and
18   instructing you not to answer.
19       Ms. Marteny may at times object to
20   things for form, but you may still have to
21   answer the question.  If you need a break,
22   say something.  We can take a break, and
23   we'll try not to do that when a question is
24   pending.  But please let us know.  You
25   understand?

---

2 (Pages 5 to 8)

Whiting

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017

---

13

1       A. I talked briefly with Don.  But not --
2    you know, we didn't go into any great detail
3    or anything.
4       Q. Okay.  And are there any people other
5    than Don and your attorneys who you could have
6    consulted with to obtain information relevant
7    to topic one that you did not consult with?
8       A. I suppose I could have talked to Hal
9    Hershkowitz.
10      Q. He's an accountant?
11      A. He's a CPA in St. Petersburg.
12      Q. And he's done accounting work for Roca
13   Labs, Inc.?
14      A. He's assisted us.
15      Q. Okay.  And when you refer to Don, you're,
16   of course, referring to Don Juravin.  Correct?
17      A. Yes.
18      Q. Who's a defendant in this case.
19   Did you review the records of any other person
20   other than your own in order to prepare for
21   today's deposition?
22      A. No.  Let me be very clear about this.
23   When you're asking about records and
24   documents and all that, I took a look -- I
25   skimmed through what was on my computer.

---

14

1       Q. Okay.  All right.  Now, in order to
2    perhaps economize on time, I'm going to ask you
3    if you recall testifying about Roca Labs, Inc.
4    bank statements in your January 11 deposition.
5       A. Yes, I do.
6       Q. Are you prepared as a representative of
7    Roca Labs, Inc. to adopt your individual
8    testimony from January 11th as the testimony of
9    the company as to your discussion of Roca Labs,
10   Inc. bank statements on January 11th?
11      A. Yes.
12         MR. SETTLEMYER:  Okay.  So, I will
13      forgo detailed questioning of
14      Mr. Whiting on those.  But I won't
15      promise that that won't come up at some
16      point.  Can we go off the record for
17      one minute?
18         (Off the record from 9:44 a.m.
19   to 9:45 a.m.)
20   BY MR. SETTLEMYER:
21      Q. Back on the record.  Mr. Whiting, I
22   believe on January 11th you personally testified
23   about the Roca Labs income tax returns, Roca
24   Labs, Inc. income tax return for 2011, 2014, and
25   2015.  Do you recall that?

---

15

1       A. I recall we talked about them.  Yes.
2    I don't recall the substance of the
3    conversation.
4       Q. Are you prepared as representative of Roca
5    Labs, Inc. to adopt your personal testimony from
6    your January 11, 2017 deposition about the Roca
7    Labs 2011, 2014, and 2015 tax returns as that of
8    the company?
9       A. Yes.
10      Q. Mr. Whiting, I believe on January 11,
11   2017, you also testified about corporate
12   structure and some Secretary of State
13   records relating to Roca Labs, Inc.  Do
14   you recall that generally?
15      A. Generally, yes.
16      Q. Okay.  Are you prepared as representative
17   of Roca Labs, Inc. to adopt your individual
18   testimony from January 11, 2017 about the
19   Roca Labs, Inc. Secretary of State records and
20   corporate structure as the testimony of Roca
21   Labs, Inc. today?
22      A. Yes.
23      Q. Let's see.  Now, Mr. Whiting, you're
24   also here, to the extent relevant, as the
25   representative of Zero Calorie Labs, Inc.

---

16

1    Is that correct?
2       A. Yes.
3       Q. At least as to the topics we
4    enumerated earlier.  Right?
5       A. Yes.
6       Q. In terms of your own previous testimony,
7    you've made any testimony about Zero Calorie
8    Labs, Inc. in your deposition on January 11th
9    based on your own personal knowledge.  Is that
10   correct?
11      A. That is correct.
12      Q. Since that time, did you do anything
13   additional to prepare to testify today as
14   to the deposition topics for -- as they relate
15   to Zero Calorie Labs?
16      A. As I said earlier, I just skimmed
17   through what was on my computer.  Some of it
18   was Roca.  Some of it was Zero.
19      Q. So, when you were discussing what
20   you did for Roca Labs just a few minutes ago,
21   is that essentially coextensive with what you
22   did to prepare to testify on behalf of Zero
23   Calorie Labs, Inc.?
24      A. Yes.
25      Q. On January 11th you testified, if you

---

4 (Pages 13 to 16)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-4

Whiting

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017

21

1    A.  Yes.
2    Q.  Okay.  So, in line one of the 2010 tax
3  return for Roca Labs, Inc., Exhibit 6 --
4    A.  Mmm-hmm.
5    Q.  -- what is the source of the gross
6  receipts for Roca Labs, Inc.?
7    A.  The source for the gross receipts
8  would have been the deposits on the bank
9  statements.
10    Q.  That's the source of the information.
11  But what would be the source of the receipts,
12  of the actual funds?
13    A.  Well, that was the way I did it.
14  I assumed, unless I was informed otherwise,
15  that all deposits were receipts.
16    Q.  Receipts from what?
17    A.  Sale of products.
18    Q.  Okay.  Of which product?
19    A.  Well, whatever -- whatever Roca Labs
20  was selling.
21    Q.  So, how did you ascertain that
22  that was the case?
23    A.  Well, I remember asking Don once
24  if the deposits were receipts.  And he said,
25  "Yes."

22

1    Q.  So, as far as you knew, that accounts for
2  the entirety of the gross receipts for, you
3  expressed in the 2010 return, line one.
4    A.  Okay.  The line one gross receipts for
5  2010 are the sum of the deposits listed on
6  the bank statements.
7    Q.  Which bank statements?  Roca Labs, Inc.
8  bank statements?
9    A.  Well, it's Roca Labs, Inc.  So, yes,
10  it would have been the Roca Labs, Inc. bank
11  statements.
12    Q.  Was that a Bank of America account,
13  do you recall?
14    A.  I don't remember.  It could have been.
15    Q.  Look down to line 22 on the first
16  page of Exhibit 6 --
17    A.  Mmm-hmm.
18    Q.  -- for advertising.
19    A.  Yes.
20    Q.  And that amount is $423,274.  Is that
21  correct?
22    A.  Actually, it's --
23    Q.  And 75 cents.
24    A.  I apologize.  You said 74.  I believe
25  47.

23

1    Q.  Forty-seven.  Yes.  I'm sorry.  423,247
2  and 75 cents.
3    A.  Yes.
4    Q.  How was that number in line 22 derived?
5    A.  Again, I worked exclusively off the
6  bank statements, and when I saw entries for
7  things like Google, Facebook, they were
8  advertising, and that's how the numbers were
9  derived.
10    Q.  Okay.  Let me back up to line one again
11  just to state for the record we agreed that that
12  figure, gross receipts for sales, is $732,195.88.
13  Correct?
14    A.  Gross receipts.  Yes.
15    Q.  That's the same as total income on line
16  11.  Is that correct?
17    A.  That is correct.
18    Q.  Okay.  We're done with Exhibit 6 for now.
19  I'm having two exhibits marked as 7 and 8.
20      (Plaintiff's Exhibit Nos. 7 and 8
21  were marked for identification.)
22  BY MR. SETTLEMYER:
23    Q.  Mr. Whiting, I'm handing you documents
24  that have been marked as Exhibit 7 and 8.
25  Let's start with No. 7.  Could you please

24

1  review Exhibit 7 and let me know when you've
2  had a chance to look at that?
3    A.  Exhibit 7, this is a letter dated --
4  this is a statement, I guess, dated 31, July
5  2013.  And what questions do you have?
6    Q.  Okay.  First of all, do you recall seeing
7  this same document in your individual deposition
8  of January 11th?
9    A.  Vaguely.
10    Q.  Okay.  Let's go over this one a little
11  more closely.  In the indented portion in the
12  middle of the page --
13    A.  Mmm-hmm.
14    Q.  -- the document states, 2010 sales of
15  $732,195, reinvested profits of $140,000.
16  Do you see that?
17    A.  Yes.
18    Q.  And in your capacity as representative
19  of Roca Labs, Inc. for topics one and three,
20  which covers corporate defendants' finances,
21  do you adopt that number of $732,195 as the
22  2010 sales for Roca Labs, Inc.?
23    A.  Yes.
24    Q.  I just want to stop for a moment
25  and just read into the record topic three, is

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-5

Whiting

FTC v. Roca Labs, Inc., et al.                                                                    2/15/2017

29

1      A.  Correct.
2      **Q.  What does that figure represent?**
3      A.  That would be the income for the year.
4      **Q.  Income from what?**
5      A.  Again, from the bank statements.
6  All the deposits on the bank statements for
7  the year.
8      **Q.  And deposits for -- of money for what?**
9      A.  Well, again, I would get the bank
10  statement, the bank statement would show
11  deposits.  Based on previous conversation
12  with Don, I simply assumed it was income.
13      **Q.  You assumed, or you understood when**
14  **you were preparing the statement that it**
15  **was income?**
16      A.  I don't -- I don't see a significant
17  difference between assumed and understood.
18  So, I'll just say yes.
19      **Q.  But in your role as representative**
20  **of Roca Labs, Inc. today, is it your testimony**
21  **that the total income for Roca Labs, Inc. for**
22  **2013 was $6,999,180.97?**
23      A.  That is correct.
24      **Q.  Looking a little further down the**
25  **page in that same column, there is a --**

30

1  **about halfway down the line, total**
2  **advertising.  Do you see that?**
3      A.  Yes.  $3,530,983.95.
4      **Q.  And that represents the Roca Labs, Inc.**
5  **advertising expenditures for 2013.  Correct?**
6      A.  As determined by the bank statements.
7  Yes.
8      **Q.  Could you explain to me how that was**
9  **determined from the bank statements, please?**
10      A.  Well, again, the bank statements would
11  show money going to entities such as Google,
12  Facebook, and those were for advertising.
13      **Q.  So, it's your testimony in your**
14  **capacity as representative of Roca Labs, Inc.**
15  **that the advertising expenditures for Roca**
16  **Labs, Inc., in 2013 were $3,530,983 -- I'm**
17  **sorry.  $3,530,983.95**
18      A.  Yes.  As I found them on the bank
19  statements.
20      **Q.  Okay.  Let's look at the far right**
21  **column of Exhibit 8 under the January**
22  **through December of 2012 column, I believe.**
23  **Do you see that?**
24      A.  Yes.
25      **Q.  The line total income shows total**

31

1  income of $4,480,678.73.
2      A.  Yes.  Mmm-hmm.
3      **Q.  And that I believe is only slightly**
4  **off from the figure cited in Exhibit 7**
5  **as to 2012.  Do you see that?**
6      A.  Mmm-hmm.  Well, let me come back
7  and take a look at it.
8      **Q.  Take a look.**
9      A.  About six thousand off.  Yes.
10      **Q.  Okay.  Which figure is the correct**
11  **one, in your view?  In Exhibit 7 or**
12  **Exhibit 8?**
13      A.  I would say Exhibit 8.
14      **Q.  Looking down further in column --**
15  **the right-hand column of Exhibit 8, you'll**
16  **see the line for total advertising.**
17      A.  Total advertising, $1,513,369.28.
18      **Q.  Is it your testimony that the total**
19  **advertising expenditure for Roca Labs,?**
20  **Inc. in 2012 was $1,513,369.28?**
21      A.  Again, as determined by the bank
22  statements, yes.
23      **Q.  Again, the process was you would examine**
24  **the bank statements and include such items as --**
25      A.  Google, Facebook.

32

1      **Q.  Correct.  Okay.  Essentially, what you've**
2  **said as to 2013.  Is that correct?**
3      A.  Yes.
4      **Q.  Can you tell me, please, on the balance**
5  **sheet in the advertising column --**
6      A.  Are we talking balance sheet or income
7  statement?
8      **Q.  I'm sorry.  The profit and loss**
9  **statement, Exhibit 8.**
10      A.  Mmm-hmm.
11      **Q.  There is, above the total advertising**
12  **line, there are several lines under the**
13  **advertising heading.  I see radio.  Right?**
14      A.  Yes.
15      **Q.  Then, there's advertising other.**
16  **Correct?**
17      A.  Yes.
18      **Q.  And advertising -- I'm sorry.  Then**
19  **there's CRD5019.**
20      A.  5019.  Yes.
21      **Q.  What does that signify?**
22      A.  Radio would be ads placed through
23  radio stations.  Card 5019 was a bank
24  card on one of the accounts, and other was
25  everything else.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-6

Whiting

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017

33

1      Q.  Okay.  What was the account associated
2  with card 5019?
3      A.  I don't remember.
4      Q.  And do you remember if it was a
5  specific variety of advertising or --
6      A.  No.  Again, I wasn't concerned with
7  the mechanics of the advertising.  The
8  nature of the advertising.  Or, you know,
9  how it was booked or anything.  I was only
10  concerned with the dollars in and dollars
11  out.
12      Q.  Okay.  So, if someone knew what
13  was signified by advertising grouped
14  under Card 5019, that would probably be
15  Mr. Juravin?
16      A.  I would assume so.
17      Q.  But it's not something you're
18  prepared to testify about specifically?
19      A.  No.
20      Q.  Other than just the wrong number in the
21  column.  Correct?
22      A.  Correct.
23      Q.  We're done with Exhibit Number 8 for the
24  time being.
25      A.  So, we're finished with 8, and we're

34

1  finished with 7.
2      Q.  Yes.  Finished with 7.
3      A.  This is number -- I'm getting
4  confused.
5      Q.  Let's take a short break and sort our
6  stuff here.
7          (Short recess taken from 10:14 a.m.
8  to 10:24 a.m.)
9          (Plaintiff's Exhibit Nos. 9 and 10 were
10  marked for identification.)
11  BY MR. SETTLEMYER:
12      Q.  Back on the record.  The court reporter
13  has marked two documents as Exhibit 9 and 10.
14  And there are going to be some stipulations
15  about what these document represent.
16          MS. MARTENY:  Counsel have conferred
17      off the record.  And the corporate
18      defendants have agreed to stipulate
19      that the numbers reflected in years
20      2009 through 2013 on Exhibit 9 are true
21      and accurate.  And that the numbers
22      reflected on the years 2014 and 2015
23      were accurate, to the best of their
24      estimations, when this Exhibit 9 was
25      created.

35

1          The tax returns for 2014, 2015 have since
2  been filed, so those numbers may change.
3  And we can stipulate that the addition
4  on the total column is probably
5  correct.
6          MR. SETTLEMYER:  Okay.
7          MS. MARTENY:  Also, with respect to
8  Exhibit 10, that the corporate
9  defendants will make the same
10  stipulations for years 2009 through
11  2013, and, also, with respect to 2014
12  and 2015.  I think that's -- did you
13  have other questions on the other item
14  20 on the bottom of Exhibit 10?
15          MR. SETTLEMYER:  No.  But I do
16  have just a few followup questions on
17  item -- we'll start with 9.
18          MR. DAVIS:  Exhibit 9.
19          MR. SETTLEMYER:  Exhibit 9.  Yes.
20  So, I want to make sure we are also
21  stipulating that the dollars
22  represented in Exhibit 9 in terms of
23  gross orders and I guess actual
24  receipts are money paid to one of the
25  defendants, either Roca Labs, Inc.,

36

1  Roca Labs Nutraceutical, or Must Cure
2  Obesity for purchases of Roca Labs
3  products.  Is that correct?
4          MS. MARTENY:  Yes.  The numbers
5  reflected in Exhibit 9.  Can we go off
6  the record for one second?
7          (Off-the-record discussion.)
8          MS. MARTENY:  With regard to the
9  numbers reflected on Exhibit 9,
10  corporate defendants are willing to
11  stipulate that those revenue figures
12  were only generated from sales of
13  products.  Sales of the Roca Labs
14  regimen.
15          MR. SETTLEMYER:  And they were sales
16  by one or more of the defendants.
17          MS. MARTENY:  That's right.
18          MR. SETTLEMYER:  Okay.  And the
19  same would apparently be true of
20  Exhibit 10 and the numbers shown there
21  in the gross orders natural receipts
22  column of Item 19.  Is that correct?
23          MS. MARTENY:  That's correct.
24  BY MR. SETTLEMYER:
25      Q.  Mr. Whiting, during the period of 2009

9 (Pages 33 to 36)

Whiting

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017

---

41

1    Q. Okay. And Mr. Juravin, of course, would
2  be someone else knowledgeable about that topic, I
3  assume. Correct?
4    A. If you are asking me does Don -- would
5  Don be the best source of information about
6  money he received, the answer is yes.
7    Q. Okay. Is there anyone else who would know
8  that information?
9    A. I can't think of anyone.
10   Q. Mr. Hershkowitz?
11   A. I don't know. Possibly.
12   Q. But you're not personally aware?
13   A. No.
14   Q. You haven't prepared to answer that
15 particular line of questioning by consulting
16 with him. Is that correct?
17   A. I haven't consulted with Hal
18 Hershkowitz about Don's revenue. That is
19 correct.
20   Q. Okay. Why is it that you -- strike that.
21     Do you have a belief as to how much money
22 Mr. Juravin received out of the Roca Labs
23 business in 2009?
24   A. 2009, if I remember is correct, the
25 first year?

---

42

1    Q. That sounds correct. Yes?
2    A. My recollection is -- and this is
3  just, remember, do the math, nine from 17.
4  It's been a while.
5    Q. Yes.
6    A. And I haven't looked at the records,
7  you know, carefully. My best guess is that
8  for 2009, the revenue from Roca -- I'm trying
9  to think about that -- I would say probably
10 somewhere between 35 and 40,000. If you hang
11 on. Okay? Are you asking me on 2009, are
12 you asking me for gross revenue for the
13 company?
14   Q. I'm asking you for money paid to
15 Mr. Juravin for 2009.
16   A. If I had to guess -- this is just a
17 guess off of recollection -- I'd say probably
18 in the thirties.
19   Q. 30,000 or so?
20   A. For some reason, the numbers 36 or
21 39,000 sticks in my mind. But that's just a
22 guess.
23   Q. Okay. With respect to 2010, what
24 would be your understanding of how much
25 money from the Roca Labs business was paid to

---

43

1  Mr. Juravin personally?
2    A. That I don't know.
3    Q. With respect to 2011, what is your
4  understanding, if any, of the amount of money
5  paid from the Roca Labs business to Mr. Juravin
6  personally?
7    A. Again, I can't tell you how much was
8  paid personally because I don't remember.
9  The only thing I can tell you is how I would
10 go back and track it through the bank
11 statements.
12   Q. Okay. And the same question for 2012,
13 what's your understanding of how much money
14 Mr. Juravin was paid out of the Roca Labs
15 business in 2012?
16   A. Again, you'd have to look at the bank
17 statements.
18   Q. Okay. And for 2013, is your answer
19 the same?
20   A. Yes.
21   Q. 2014?
22   A. Yes.
23   Q. 2015?
24   A. Yes.
25   Q. Okay. All right.

---

44

1       MR. SETTLEMYER: Can we go off the
2  record for a second?
3       (Off the record from 10:37 a.m. to
4  10:41 a.m.)
5       (Plaintiff's Exhibit Nos. 11, 12, 13
6  and 14 were marked for identification.)
7       MR. SETTLEMYER: We've marked as
8  exhibits several documents, Exhibit 11,
9  12, 13 and 14, which relate to
10 defendants' trademarks, and Ms. Marteny
11 has some stipulations the defendants
12 wish to make?
13      MS. MARTENY: Defendants are willing
14 to stipulate that Exhibits 11 through
15 14 are true and accurate copies of the
16 Roca Labs trademark filings, and that
17 the content of the same exhibits is
18 accurate. Okay.
19      Off the record for one
20 second.
21      (Off the record from 10:42 a.m. to
22 10:44 a.m.)
23      MR. SETTLEMYER: I guess I'll clarify
24 that we're not asking the defendants to
25 stipulate that these are all of the

---

11 (Pages 41 to 44)

PX6-8

Whiting

FTC v. Roca Labs, Inc., et al.

2/15/2017

49

1   to 11:06 a.m.)
2         (Plaintiff's Exhibit Nos. 18, 19, 20
3   were marked for identification.
4         MS. MARTENY:  Counsel conferred off
5   the record, and defendants have agreed
6   to stipulate with respect to Exhibit 18
7   that it is a true and accurate copy of
8   the American Express Plum statements,
9   card number ending 5-11006, date range
10  March 2013 through December 2013.
11        And also, defendants have agreed
12  to stipulate that Exhibit 19 is a true
13  and accurate copy of American Express
14  Plumb card statement, the card ending
15  5-11006, for date range January 2014
16  through February 2015.
17        And with regard to Exhibit 20 --
18        MR. SETTLEMYER:  I'm sorry.  That's
19  the same, 5-11006?
20        MS. MARTENY:  Yes.  Card ending 5-11006.
21  And Exhibit 20, defendants will stipulate
22  that it is a true and accurate copy of
23  Amex Plum card statements, the card
24  ending in 1-91009 for the date range of
25  February 2014 through January 2015.

50

1         MR. SETTLEMYER:  And do the
2   defendants also stipulate that the
3   expenditure shown on Exhibits 18, 19
4   and 20 that were paid to Google, Yahoo,
5   Microsoft and/or Bing, and Facebook are
6   expenditures for advertising to drive
7   traffic to Roca Labs Web sites for
8   consumers to buy Roca Labs product?
9         MR. JURAVIN:  It was for the
10  purposes of general sales.  I don't
11  know if Roca Labs, this site, this --
12  everything was to generate more
13  exposure.  To generate more exposure
14  regardless of what site.  Because
15  they're so -- let's make it even
16  broader.
17        MS. MARTENY:  Defendants are
18  willing to stipulate that the
19  advertising or the payments to
20  Microsoft, Bing, Yahoo, Facebook, were
21  for the purposes of driving traffic
22  to generate sales of the Roca Labs
23  regimen.
24        MS. JURAVIN:  No.  Let's call
25  all of them advertisers.  Okay.

51

1         MR. SETTLEMYER:  Can I pause for one moment?
2   Because Mr. Juravin is speaking.  Mr. Juravin,
3   you've not been sworn in yet.  Can we go ahead
4   and have Mr. Juravin sworn in since we're going
5   to be segueing into his testimony for a moment?
6   Whereupon,
7         DON JURAVIN,
8   a witness, called for examination,
9   having been first duly sworn, was
10  examined and testified as follows:
11        MR. SETTLEMYER:  And can I also just
12  ask: Mr. Juravin, you understand
13  you've taken an oath to tell the truth
14  today?
15        MR. JURAVIN:  Yes.
16        MR. SETTLEMYER:  And there's no condition,
17  aside from your very strained voice, that would
18  prevent you from giving your best
19  testimony.  Is that correct?
20        MR. JURAVIN:  Yes.
21        MR. SETTLEMYER:  And you've been
22  deposed before previously.  So, you
23  understand the ground rules --
24        MR. JURAVIN:  Yes.
25        MR. SETTLEMYER:  -- about us not talking

52

1   over each other and trying to wait for
2   each other to finish.  To answer
3   verbally.  Yes?
4         MR. JURAVIN:  Yes.
5         MR. SETTLEMYER:  And to make sure
6   that if your counsel objects on
7   privilege, you would be instructed to
8   not answer.  But if you're hearing a
9   different objection, you're obligated
10  to answer the question.  You understand
11  that?
12        MR. JURAVIN:  I do.
13        MR. SETTLEMYER:  So, we were
14  talking about the advertising.
15  My form of stipulation I was
16  offering was to ascertain principally
17  that all of the advertising shown in
18  18, 19, and 20 for those different
19  entities we mentioned, all the
20  expenditures paid to those entities was
21  to promote the Roca Labs business and
22  products.  Is that correct?
23        MR. JURAVIN:  Not exactly.
24        MR. SETTLEMYER:  Please explain.
25        MR. JURAVIN:  Let's call them advertisers

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-9

53

1   instead of different stuff.  It was used
2   for the -- to promote the concept of
3   the Gastric Bypass Alternative
4   option.  And, also, for the sales.
5   Okay?
6       And in a very, very small part,
7   I used it personally to promote --
8   depends on the years -- very small part
9   to promote personal agenda.  Like,
10  again, second amendment people, guns
11  and so on.  For very, very small I used
12  it.  But mainly was used for to explain
13  people that there is another option.
14      So it's not just -- but it's also
15  to promote the idea, so we
16  eventually sell it.  Which eventually,
17  it will be sales.  It's not only
18  Roca Labs.  Because we also
19  Nutraceutical and stuff.
20      MR. SETTLEMYER:  So, we want --
21  I guess to make sure we're clear about
22  a few things.  First of all, by
23  advertisers, we are expressly including
24  what we referred to previously as
25  expenditures for Google advertising,

54

1   Microsoft Bing advertising, Yahoo
2   advertising, and Facebook advertising.
3   We all agreed on that.  Correct?
4       THE WITNESS:  At least them.  Yes.
5       MR. SETTLEMYER:  So, in terms of
6   the beneficiary of the advertising, we
7   are talking primarily, with maybe some
8   small exclusions, about the Roca
9   Labs business.  Is that correct?
10      THE WITNESS:  2009, 2012, it was Roca
11  Labs.  Then, it was Nutraceutical.
12  Then, in '15, I think it was Must Cure
13  Obesity.  So, we can say for the
14  general benefit of the regimen, whoever
15  company benefited financially.
16      So it was promoting the
17  concept of a Gastric Bypass
18  Alternative.  And every time the
19  beneficiary was different.  Any one of
20  these companies was the beneficiary.
21      MR. SETTLEMYER:  Let me also just
22  make sure we've got on the record:  So,
23  this is, as we've talked about for
24  Mr. Whiting, this is a 30(b)(6)
25  deposition, which you, today,

55

1   Mr. Juravin, are appearing as a
2   representative of, as I understand, for
3   many topics, perhaps all of them, but
4   some overlap with Mr. Whiting, all of
5   the topics noticed in the Exhibit 1,
6   30(b)(6) deposition notice on behalf of
7   Roca Labs, Inc., Roca Labs
8   Nutraceutical USA, Inc., and Must Cure
9   Obesity.  Is that correct?
10      THE WITNESS:  Not exactly.
11  Not exactly.  Roca Labs, Inc. belonged
12  to -- belongs to Dr. Whiting.  Must
13  Cure Obesity belongs to me.
14  Nutraceutical, we kind of in a
15  disagreement a little.  But I'm
16  responsible for everything that has to
17  do with the marketing, the sales, and
18  the expenditures.  And that I can
19  support that.
20      MR. SETTLEMYER:  So, in terms of
21  just -- this is maybe somewhat technically
22  legal -- ownership aside --
23      MR. JURAVIN:  Okay.
24      MR. SETTLEMYER:  And Ms. Marteny can
25  correct me if she disagrees with this

56

1   characterization -- the representative
2   of a company for a 30(b)(6) purposes
3   need not be the owner.  And we're not
4   necessarily talking in terms of your
5   answers binding a company, is
6   irrelevant in a way whether or not you
7   are the owner of any particular
8   company.
9       MR. JURAVIN:  Then I agree.
10      MR. SETTLEMYER:  Okay.  All right.
11      MR. JURAVIN:  So, let's stipulate
12  that all expenditures on the credit
13  cards, whatever credit cards they are,
14  which include advertisement to whatever
15  advertisement channel there is, was for
16  the purposes of promoting the concept
17  of a Gastric Bypass Alternative, which
18  benefited the sales of any company of
19  ours in any particular time.  Okay?
20      MR. SETTLEMYER:  Okay.
21      MR. DAVIS:  We may want to hear that back.
22      MR. SETTLEMYER:  We may want to hear
23  that back.  But let me offer this.  We
24  are asking for a stipulation that Bing,
25  Yahoo, Facebook, Google, are all

14 (Pages 53 to 56)

FTC v. Roca Labs, Inc., et al.                                                2/15/2017

---

57

1    advertising channels that were used by
2    one or more of the entities that have
3    offered what you refer to as the
4    Gastric Bypass Alternative or sold for
5    Roca Labs formula or advertised through
6    the Roca labs.com Web site. Is that
7    correct?
8        MR. JURAVIN: Yes.
9        MR. SETTLEMYER: All right.
10       MR. DAVIS: Do you want to hear that
11   back, the stipulation?
12       MR. SETTLEMYER: Yes, please.
13       (Testimony read back as requested.)
14       MR. JURAVIN: That's fine. Can we decide
15   the GBA?
16       MR. SETTLEMYER: So, Mr. Juravin,
17   just to clarify, we're all agreed that
18   again, Bing, Facebook, Google, Yahoo
19   are all advertising platforms.
20   Correct?
21       MR. JURAVIN: Correct.
22       MR. SETTLEMYER: And that the
23   entities, be they Roca Labs, Inc., Roca
24   Labs Nutraceutical, or Must Cure
25   Obesity is the advertiser. Correct?

---

58

1        MR. JURAVIN: Yes.
2        MR. SETTLEMYER: And that the
3    expenditures shown in Exhibits 18, 19
4    and 20, for those advertising channels
5    is primarily, with small exclusion for
6    your personal pursuits, but primarily
7    to benefit the business that those
8    three entities were conducting.
9    Is that correct?
10       MR. JURAVIN: Can you explain to me
11   what do you mean "benefit of the
12   business"? Because I wanted to promote
13   a concept. Not just sales. I wanted
14   to promote a concept. And I set the
15   fruits of promoting the concept will be
16   probably also sales. If not, at least
17   they saved themselves from a surgery.
18       MR. SETTLEMYER: But they were a
19   business expense of those three
20   entities.
21       MR. JURAVIN: Yes.
22       MR. DAVIS: We can call them defendants?
23       MR. SETTLEMYER: Yes. Those three
24   defendants. Corporate defendants.
25       MR. JURAVIN: Okay. Yes.

---

59

1        MR. SETTLEMYER: And perhaps also
2    yourself personally to the extent you
3    derived income from those entities.
4    Is that correct?
5        MR. JURAVIN: Me personally?
6        MR. SETTLEMYER: Right.
7        MR. JURAVIN: I think I used some
8    of it to promote concept like second
9    amendment, first amendment, and so on.
10       MR. SETTLEMYER: No. No. I'm
11   talking about the beneficiary of the
12   advertising done and placed by Roca
13   Labs, Inc. Roca Labs Nutraceuticals,
14   and Must Cure Obesity.
15       MR. JURAVIN: Not for me personally.
16   Let me clarify it. I see you are
17   puzzled. I'm the inventor. I already
18   got my deal. I got my deal as the
19   inventor. I have a set amount that I
20   am receiving, whether the company makes
21   the money or not. But if it doesn't
22   make, I have an interest for the
23   company to make the money because
24   otherwise, they cannot pay me. But I
25   am not directly enjoying the money.

---

60

1    Not directly.
2        MR. SETTLEMYER: We can get to that.
3    But you're not testifying that you
4    received no money from those three
5    entities. Is that correct?
6        MR. JURAVIN: I definitely did, according
7    to the agreement.
8        MR. SETTLEMYER: Okay.
9        MR. JURAVIN: But when I advertised,
10   I did not think, "Oh, I'm getting the
11   money." I did it on behalf of the
12   company so the company can have it.
13       MR. SETTLEMYER: Well, you're here
14   right now on behalf of those companies.
15   So, your testimony as representative of
16   those companies, those companies
17   sought to make money from the sales of
18   Roca Labs products by virtue of
19   advertising with these different
20   channels and drawing traffic to those
21   sites.
22       MR. JURAVIN: Agreed.
23       MR. DAVIS: If I may, to Mr. Settlemyer,
24   it may be helpful to refer to corporate
25   defendants, if that's the label that

---

15 (Pages 57 to 60)

FTC v. Roca Labs, Inc., et al.

2/15/2017

49

1    to 11:06 a.m.)
2        (Plaintiff's Exhibit Nos. 18, 19, 20
3    were marked for identification.
4        MS. MARTENY:  Counsel conferred off
5    the record, and defendants have agreed
6    to stipulate with respect to Exhibit 18
7    that it is a true and accurate copy of
8    the American Express Plum statements,
9    card number ending 5-11006, date range
10   March 2013 through December 2013.
11       And also, defendants have agreed
12   to stipulate that Exhibit 19 is a true
13   and accurate copy of American Express
14   Plumb card statement, the card ending
15   5-11006, for date range January 2014
16   through February 2015.
17       And with regard to Exhibit 20 --
18       MR. SETTLEMYER:  I'm sorry.  That's
19   the same, 5-11006?
20       MS. MARTENY:  Yes.  Card ending 5-11006.
21   And Exhibit 20, defendants will stipulate
22   that it is a true and accurate copy of
23   Amex Plum card statements, the card
24   ending in 1-91009 for the date range of
25   February 2014 through January 2015.

50

1        MR. SETTLEMYER:  And do the
2    defendants also stipulate that the
3    expenditure shown on Exhibits 18, 19
4    and 20 that were paid to Google, Yahoo,
5    Microsoft and/or Bing, and Facebook are
6    expenditures for advertising to drive
7    traffic to Roca Labs Web sites for
8    consumers to buy Roca Labs product?
9        MR. JURAVIN:  It was for the
10   purposes of general sales.  I don't
11   know if Roca Labs, this site, this --
12   everything was to generate more
13   exposure.  To generate more exposure
14   regardless of what site.  Because
15   they're so -- let's make it even
16   broader.
17       MS. MARTENY:  Defendants are
18   willing to stipulate that the
19   advertising or the payments to
20   Microsoft, Bing, Yahoo, Facebook, were
21   for the purposes of driving traffic
22   to generate sales of the Roca Labs
23   regimen.
24       MS. JURAVIN:  No.  Let's call
25   all of them advertisers.  Okay.

51

1        MR. SETTLEMYER:  Can I pause for one moment?
2    Because Mr. Juravin is speaking.  Mr. Juravin,
3    you've not been sworn in yet.  Can we go ahead
4    and have Mr. Juravin sworn in since we're going
5    to be segueing into his testimony for a moment?
6    Whereupon,
7        DON JURAVIN,
8    a witness, called for examination,
9    having been first duly sworn, was
10   examined and testified as follows:
11       MR. SETTLEMYER:  And can I also just
12   ask:  Mr. Juravin, you understand
13   you've taken an oath to tell the truth
14   today?
15       MR. JURAVIN:  Yes.
16       MR. SETTLEMYER:  And there's no condition,
17   aside from your very strained voice, that would
18   prevent you from giving your best
19   testimony.  Is that correct?
20       MR. JURAVIN:  Yes.
21       MR. SETTLEMYER:  And you've been
22   deposed before previously.  So, you
23   understand the ground rules --
24       MR. JURAVIN:  Yes.
25       MR. SETTLEMYER:  -- about us not talking

52

1    over each other and trying to wait for
2    each other to finish.  To answer
3    verbally.  Yes?
4        MR. JURAVIN:  Yes.
5        MR. SETTLEMYER:  And to make sure
6    that if your counsel objects on
7    privilege, you would be instructed to
8    not answer.  But if you're hearing a
9    different objection, you're obligated
10   to answer the question.  You understand
11   that?
12       MR. JURAVIN:  I do.
13       MR. SETTLEMYER:  So, we were
14   talking about the advertising.
15   My form of stipulation I was
16   offering was to ascertain principally
17   that all of the advertising shown in
18   18, 19, and 20 for those different
19   entities we mentioned, all the
20   expenditures paid to those entities was
21   to promote the Roca Labs business and
22   products.  Is that correct?
23       MR. JURAVIN:  Not exactly.
24       MR. SETTLEMYER:  Please explain.
25       MR. JURAVIN:  Let's call them advertisers

Whiting

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017

---

53

1    instead of different stuff.  It was used
2    for the -- to promote the concept of
3    the Gastric Bypass Alternative
4    option.  And, also, for the sales.
5    Okay?
6         And in a very, very small part,
7    I used it personally to promote --
8    depends on the years -- very small part
9    to promote personal agenda.  Like,
10   again, second amendment people, guns
11   and so on.  For very, very small I used
12   it.  But mainly was used for to explain
13   people that there is another option.
14        So it's not just -- but it's also
15   to promote the idea, so we
16   eventually sell it.  Which eventually,
17   it will be sales.  It's not only
18   Roca Labs.  Because we also
19   Nutraceutical and stuff.
20        MR. SETTLEMYER:  So, we want --
21   I guess to make sure we're clear about
22   a few things.  First of all, by
23   advertisers, we are expressly including
24   what we referred to previously as
25   expenditures for Google advertising,

---

54

1    Microsoft Bing advertising, Yahoo
2    advertising, and Facebook advertising.
3    We all agreed on that.  Correct?
4         THE WITNESS:  At least them.  Yes.
5         MR. SETTLEMYER:  So, in terms of
6    the beneficiary of the advertising, we
7    are talking primarily, with maybe some
8    small exclusions, about the Roca
9    Labs business.  Is that correct?
10        THE WITNESS:  2009, 2012, it was Roca
11   Labs.  Then, it was Nutraceutical.
12   Then, in '15, I think it was Must Cure
13   Obesity.  So, we can say for the
14   general benefit of the regimen, whoever
15   company benefited financially.
16        So it was promoting the
17   concept of a Gastric Bypass
18   Alternative.  And every time the
19   beneficiary was different.  Any one of
20   these companies was the beneficiary.
21        MR. SETTLEMYER:  Let me also just
22   make sure we've got on the record:  So,
23   this is, as we've talked about for
24   Mr. Whiting, this is a 30(b)(6)
25   deposition, which you, today,

---

55

1    Mr. Juravin, are appearing as a
2    representative of, as I understand, for
3    many topics, perhaps all of them, but
4    some overlap with Mr. Whiting, all of
5    the topics noticed in the Exhibit 1,
6    30(b)(6) deposition notice on behalf of
7    Roca Labs, Inc., Roca Labs
8    Nutraceutical USA, Inc., and Must Cure
9    Obesity.  Is that correct?
10        THE WITNESS:  Not exactly.
11   Not exactly.  Roca Labs, Inc. belonged
12   to -- belongs to Dr. Whiting.  Must
13   Cure Obesity belongs to me.
14   Nutraceutical, we kind of in a
15   disagreement a little.  But I'm
16   responsible for everything that has to
17   do with the marketing, the sales, and
18   the expenditures.  And that I can
19   support that.
20        MR. SETTLEMYER:  So, in terms of
21   just -- this is maybe somewhat technically
22   legal -- ownership aside --
23        MR. JURAVIN:  Okay.
24        MR. SETTLEMYER:  And Ms. Marteny can
25   correct me if she disagrees with this

---

56

1    characterization -- the representative
2    of a company for a 30(b)(6) purposes
3    need not be the owner.  And we're not
4    necessarily talking in terms of your
5    answers binding a company, is
6    irrelevant in a way whether or not you
7    are the owner of any particular
8    company.
9         MR. JURAVIN:  Then I agree.
10        MR. SETTLEMYER:  Okay.  All right.
11        MR. JURAVIN:  So, let's stipulate
12   that all expenditures on the credit
13   cards, whatever credit cards they are,
14   which include advertisement to whatever
15   advertisement channel there is, was for
16   the purposes of promoting the concept
17   of a Gastric Bypass Alternative, which
18   benefited the sales of any company of
19   ours in any particular time.  Okay?
20        MR. SETTLEMYER:  Okay.
21        MR. DAVIS:  We may want to hear that back.
22        MR. SETTLEMYER:  We may want to hear
23   that back.  But let me offer this.  We
24   are asking for a stipulation that Bing,
25   Yahoo, Facebook, Google, are all

---

14 (Pages 53 to 56)

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017

57

1    advertising channels that were used by
2    one or more of the entities that have
3    offered what you refer to as the
4    Gastric Bypass Alternative or sold for
5    Roca Labs formula or advertised through
6    the Roca labs.com Web site.  Is that
7    correct?
8        MR. JURAVIN:  Yes.
9        MR. SETTLEMYER:  All right.
10       MR. DAVIS:  Do you want to hear that
11   back, the stipulation?
12       MR. SETTLEMYER:  Yes, please.
13       (Testimony read back as requested.)
14       MR. JURAVIN:  That's fine.  Can we decide
15   the GBA?
16       MR. SETTLEMYER:  So, Mr. Juravin,
17   just to clarify, we're all agreed that
18   again, Bing, Facebook, Google, Yahoo
19   are all advertising platforms.
20   Correct?
21       MR. JURAVIN:  Correct.
22       MR. SETTLEMYER:  And that the
23   entities, be they Roca Labs, Inc., Roca
24   Labs Nutraceutical, or Must Cure
25   Obesity is the advertiser.  Correct?

58

1        MR. JURAVIN:  Yes.
2        MR. SETTLEMYER:  And that the
3    expenditures shown in Exhibits 18, 19
4    and 20, for those advertising channels
5    is primarily, with small exclusion for
6    your personal pursuits, but primarily
7    to benefit the business that those
8    three entities were conducting.
9    Is that correct?
10       MR. JURAVIN:  Can you explain to me
11   what do you mean "benefit of the
12   business"?  Because I wanted to promote
13   a concept.  Not just sales.  I wanted
14   to promote a concept.  And I set the
15   fruits of promoting the concept will be
16   probably also sales.  If not, at least
17   they saved themselves from a surgery.
18       MR. SETTLEMYER:  But they were a
19   business expense of those three
20   entities.
21       MR. JURAVIN:  Yes.
22       MR. DAVIS:  We can call them defendants?
23       MR. SETTLEMYER:  Yes.  Those three
24   defendants.  Corporate defendants.
25       MR. JURAVIN:  Okay.  Yes.

59

1        MR. SETTLEMYER:  And perhaps also
2    yourself personally to the extent you
3    derived income from those entities.
4    Is that correct?
5        MR. JURAVIN:  Me personally?
6        MR. SETTLEMYER:  Right.
7        MR. JURAVIN:  I think I used some
8    of it to promote concept like second
9    amendment, first amendment, and so on.
10       MR. SETTLEMYER:  No.  No.  I'm
11   talking about the beneficiary of the
12   advertising done and placed by Roca
13   Labs, Inc. Roca Labs Nutraceuticals,
14   and Must Cure Obesity.
15       MR. JURAVIN:  Not for me personally.
16   Let me clarify it.  I see you are
17   puzzled.  I'm the inventor.  I already
18   got my deal.  I got my deal as the
19   inventor.  I have a set amount that I
20   am receiving, whether the company makes
21   the money or not.  But if it doesn't
22   make, I have an interest for the
23   company to make the money because
24   otherwise, they cannot pay me.  But I
25   am not directly enjoying the money.

60

1    Not directly.
2        MR. SETTLEMYER:  We can get to that.
3    But you're not testifying that you
4    received no money from those three
5    entities.  Is that correct?
6        MR. JURAVIN:  I definitely did, according
7    to the agreement.
8        MR. SETTLEMYER:  Okay.
9        MR. JURAVIN:  But when I advertised,
10   I did not think, "Oh, I'm getting the
11   money."  I did it on behalf of the
12   company so the company can have it.
13       MR. SETTLEMYER:  Well, you're here
14   right now on behalf of those companies.
15   So, your testimony as representative of
16   those companies, those companies
17   sought to make money from the sales of
18   Roca Labs products by virtue of
19   advertising with these different
20   channels and drawing traffic to those
21   sites.
22       MR. JURAVIN:  Agreed.
23       MR. DAVIS:  If I may, to Mr. Settlemyer,
24   it may be helpful to refer to corporate
25   defendants, if that's the label that

15 (Pages 57 to 60)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-14

# In the Matter of:

## FTC v. Roca Labs, Inc., et al.

*February 15, 2017*
*Don Juravin*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Page 1**

```
1              I N D E X
2
3   WITNESS                            PAGE
4
5   DON JURAVIN
6        BY MR. SETTLEMYER              6
7
8
9   EXHIBITS      DESCRIPTION          PAGE
10  21  Copy of Secretary of State
        Documents                      6
11  22  Copy of Bank of America
        signature care for Roca Labs
12      Nutraceutical account          6
    23  Copy of Roca Labs Nutraceutical
13      bank statements (3/25/15-2/28/16) 6
    24  Copy of merchant processing
14      Application to iPayment
        (Roca Labs Nutraceutical, USA) 6
15  25  Copy of 6/7/14 e-mail          6
    26  Copy of Roca Labs Nutraceutical
16      2014 tax return                6
    27  Copy of Roca Labs Nutraceutical
17      2015 tax return                6
    28  Copy of Roca Labs, Inc. 2012
18      tax return                     42
    29  Copy of Roca Labs, Inc. 2013
19      tax return                     42
    30  Copy of Articles of Amendment
20      For Must Cure Obesity Company  43
    31  Copy of Statement of Change
21      For Must Cure Obesity Company  43
    32  Copy of annual report for
22      Must Cure Obesity              43
    33  Cop of Bank of America Signature
23      Cared for Must Cure Obesity    43
    34  Copy of American Express
24      Account statement for
        Must Cure Obesity (1/15)       43
25  35  Copy of Chase Bank statement
```

**Page 2**

```
1   EXHIBITS      DESCRIPTION          PAGE
2   36  Copy of Must Cure Obesity
        Chase Bank account statements
3       (1/1/16-12/30/16)              43
    37  Copy of Must Cure Obesity
4       2014 tax return                43
    38  Copy of Must Cure Obesity
5       2015 tax return                43
    39  Copy of Must Cure Obesity
6       PayPal statements
        (12/31/16-1/31/17)             43
7   40  Copy of court filings          70
    41  Copy of court filings          70
8   42  Copy of court filings          70
    43  Copy of court filings          70
9   44  Copy of court filings          70
    45  Copy of court filings          70
10  46  Copy of court filings          70
    47  Copy of court filings          70
11  48  Copy of court filings          70
    49  Copy of Roca Labs, Inc.
12      Website terms and conditions   80
    50  Copy of Roca Labs, Inc.
13      Website terms and conditions
        (September 2012)               80
14  51  Copy of Roca Labs, Inc.
        Website terms and conditions
15      (June 2014)                    80
    52  Copy of Roca Labs, Inc.
16      Website terms and conditions
        (August 2014)                  80
17  53  Copy of Roca Labs, Inc.
        Website terms and conditions
18      (December 2014)                80
    54  Copy of Facebook ads           97
19  55  Copy of Facebook ads           97
    56  Copy of Facebook ads           97
20  57  Copy of urls for Facebook ads  97
    58  Copy of Roca Labs, Inc.
21      images                         120
    59  Copy of Roca Labs, Inc.
22      images                         120
    60  Copy of images from 2011
23      Trademark application          120
    61  Copy of images from 2012       120
24
25
```

**Page 3**

```
1   EXHIBITS      DESCRIPTION          PAGE
2   62  Copy of images from 2012       120
    63  Copy of images from March 2013 120
3   64  Copy of images from 2/13       128
    65  Copy of images from 2/13       128
4   66  Copy of homepage image
        (Mini-gastric-bypass.me 2013)  128
5   67  Copy of Web page               128
    68  Copy of images/ads             128
6   69  Copy of Roca Labs Website with
        privacy policy language        132
7   70  Copy of text and images
        Roca Labs Website 9/14)        140
8   71  Copy of text and images
        Roca Labs Website              141
9   72  Copy of text and images
        Roca Labs Website              142
10  73  Copy of text and images
        Roca Labs Website              143
11  74  Copy of document regarding
        Juravin, Incorporated          144
12  75  Copy of account information
        regarding Roca Labs            144
13  76  Copy of account information
        regarding Dieb Labs            144
14  77  Copy of Roca Labs, Inc.
        ad with qualify and order
15      information                    151
    78  Copy of package insert         166
16  79  Copy of instructions insert    171
    80  Copy of Roca Labs Website
17      images and text
        (Gastric.me)                   174
18
19
20
21
22
23
24
25
```

**Page 4**

```
1         UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF FLORIDA
2              TAMPA DIVISION
3   FEDERAL TRADE COMMISSION,
4         Plaintiff,
5   ROCA LABS, INC., a corporation, et al.
6         Defendants.
        _____
7
8              Wednesday, February 15, 2017
9              Offices of Shumaker, Loop &
10             Kendrick, LLP
11             101 East Kennedy Boulevard
12             Suite 2800
13             Tampa, Florida.
14
15
16        The above-entitled matter came on for
17  deposition, pursuant to Notice, at 12:31 p.m.
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

Juravin

FTC v. Roca Labs, Inc., et al.                                    2/15/2017

---

5

```
1    APPEARANCES
2    ON BEHALF OF THE FEDERAL TRADE COMMISSION:
3         MICHAEL J. DAVIS, ESQ.
4         CARL H. SETTLEMYER, III, ESQ.
5         600 Pennsylvania Avenue, NW
6         Washington, DC  20580
7         (202) 326-2458
8         EMAIL: mdavis@ftc.gov
9              csettlemyer@ftc.gov
10
11   ON BEHALF OF THE DEFENDANT, GEORGE WHITING:
12        SUZETTE MARTENY, ESQ.
13        SHUMAKER, LOOP & KENDRICK, LLP
14        101 East Kennedy Boulevard
15        Suite 2800
16        Tampa, Florida 33602
17        (813) 229-7600
18        EMAIL: Smarteny@slk-law.com
19
20
21
22
23
24
25
```

6

```
1         (Plaintiff's Exhibit Nos. 21, 22, 23,
2    24, 25, 26 and 27 were marked for
3    identification.)
4         P R O C E E D I N G S
5         - - - - - - - -
6    Whereupon,
7              DON JURAVIN,
8         a witness, called for examination,
9         having been first duly sworn, was
10        examined and testified as follows:
11
12        MS. MARTENY:  Counsel have conferred
13   off the record, and the corporate
14   defendants are able to stipulate that
15   Exhibits 21, 22, 23, 24, 26 and 27 are
16   authentic and the information contained
17   therein is accurate.
18        EXAMINATION
19   BY MR. SETTLEMYER:
20        Q.  All right.  Thank you.  I would just
21   run through very quickly what these things
22   are.  So, Exhibit 21 includes documents
23   relating to the corporate officers of Roca
24   Labs, Nutraceutical, filed with the Secretary
25   of State.  22 is a Bank of America signature
```

7

```
1    card for Roca Labs Nutraceutical account
2    ending 5888.
3         23 is a series of bank statements
4    from, I guess, March 25, 2014, through
5    February 28, 2015 for Roca Labs Nutraceutical
6    USA account ending 5888, and 24 is a merchant
7    processing application to iPayment from Roca
8    Labs Nutraceutical, USA.
9         25, which we have not stipulated
10   to, is an e-mail which we will ask some
11   questions about.  26 is 2014 Roca Labs
12   Nutraceutical USA tax return.  27 is the
13   2015 Roca Labs Nutraceutical tax return.
14        Mr. Juravin, you're here today,
15   again, as we've discussed before, as a
16   corporate representative on behalf of Roca
17   Labs, Inc. and Roca Labs Nutraceutical, and
18   Must Cure Obesity.  And you, from what I
19   understand, have personal knowledge of many of
20   the topics listed in Exhibit 1, which is the
21   deposition notice.  Is that correct?
22        A.  Yes.
23        Q.  Did you do any preparation to be
24   able to answer questions about the topics
25   in the deposition notice prior to coming
```

8

```
1    here today, beyond your personal knowledge?
2         A.  I know what I know, and I looked at
3    it again.  And whether I am familiar with it
4    or not, I didn't need the memory to refresh on
5    things.
6         Q.  But you didn't actually take any --
7    I'm just asking what active steps you took
8    to actually review specific documents or
9    consulted individuals who have knowledge that
10   might be beyond your specific personal
11   knowledge to be here today.
12        A.  I didn't have to.  It's either I know
13   or I don't.
14        Q.  But the answer to my question is no, you
15   didn't do anything additional.  Is that correct?
16        A.  I couldn't do anything additional.
17        Q.  Okay.
18        A.  I didn't feel I could do anything
19   additional.
20        Q.  Okay.  So, do you believe your personal
21   knowledge covers most of the topics listed in the
22   deposition notice?
23        A.  I believe so.
24        Q.  Okay.  Let's go on that basis.
25   So, you can refer to Exhibit 21, if this
```

2 (Pages 5 to 8)

Case 8:15-cv-02231-MSS-TBM   Document 141-6   Filed 03/24/17   Page 19 of 258 PageID 3190
Juravin
FTC v. Roca Labs, Inc., et al.                                                          2/15/2017

9

1  refreshes your recollection.  But this
2  document relates principally to the formation
3  and officers of Roca Labs Nutraceutical.
4  Who owns Roca Labs Nutraceutical?
5      A.  I don't know because George and I are
6  a little bit in a disagreement, as far as the
7  ownership of Roca Labs Nutraceuticals.
8  I can tell you how it came about.  But as far
9  as true ownership, we discussed it a couple of
10  times.  And we are in somehow disagreement.
11      Q.  Okay.  So, let's just start out with at
12  the time Roca Labs Nutraceutical was formed --
13  first of all, let me back up.  When you refer to
14  George, you're referring to Mr. Whiting.  Is that
15  correct?
16      A.  Yes.
17      Q.  So, at the time of formation of Roca
18  Labs Nutraceutical, who was considered to
19  be the owner at that time?
20      A.  Would you allow me to take a step back
21  and explain everything --
22      Q.  Go ahead and explain, and then I'll
23  see if we can ask any follow-up questions.
24  I'm trying to be efficient.
25      A.  I'll explain exactly for efficiency.

10

1  2009 to 2012 or '13, basically, George owns
2  Roca Labs.  George is like, in my opinion,
3  like board of directors.  I was not supposed
4  to be in the company at all.  I'm the
5  inventor.  I sold it.  I promised to help,
6  also.  George is supposed to bring the
7  investors.  I'm supposed to get money.
8      But I see that George is not.
9  So, little by little, I'm doing more and more
10  work to protect my investment.  George's
11  situation deteriorated '12 and '13 because of
12  Angie, his sister, and maybe other reasons.
13  The way that it worked between -- from '09
14  till 2013 about, is that George set the rules,
15  I followed them.
16      Like, for example, George says
17  no employees.  I can argue once or twice, and
18  then George makes the final decision, I am to
19  follow it.  And I can be also a good soldier.
20  So, with time, George started trusting me
21  more, and more, and more.  In the beginning, I
22  had to ask permission for everything.  Because
23  it's his company, you know, bank accounts and
24  stuff.  As time progresses, between '12 and
25  '13, George trusted me more and more.  And,

11

1  basically, I would say, "George, I need your
2  signature."  He will sign much faster.
3      When '12 and '13 and his situation
4  deteriorated, and I could not wait any longer
5  for signatures, and I saw that he's not
6  bringing the promised investors, and I feel
7  that I need more freedom to do things, I
8  initiated Roca Labs Nutraceutical, RNL.
9      Q.  RLN?
10      A.  RLN.  I created it.  As an agent of
11  Roca Labs.  Because I cannot be -- the
12  intellectual property belongs to Roca Labs.
13  I cannot suddenly take a new company and use
14  intellectual property from another company.
15  So, only I did it because I wanted to avoid
16  asking him for signatures at the time.
17      And I knew that his mind is not there,
18  and didn't know what to do.  This one looked
19  to me like the best solution.  I notified him
20  that it's easy.  He can take the company.  But
21  I need the freedom right now to sign and do
22  things.
23      Q.  What do you mean it's his?  Which "it" are
24  you referring to?
25      A.  The Nutraceutical, it's an extension

12

1  of Roca Labs.  So, we treated it in the text.
2  We treated Roca Labs Nutraceutical as an
3  agent of Roca labs.  And in the end 2014 I
4  said -- the end of '15.  I think '14.
5  The end of one of the years, I said, "George,
6  it is yours because it's an extension of Roca
7  Labs."
8      And he said, Don, let me have another
9  try to bring in the investors."  George can
10  benefit from our deal only if he brings the
11  investors and capitalize.  Only then.  I can
12  benefit financially if I will get money from
13  my invention.
14      Q.  Let me interrupt you here.  When you refer
15  to the "deal," are you referring to what's set
16  forth in the restructuring agreement that we've
17  discussed?
18      A.  No.  The deal is any -- the
19  restructuring agreement is like an odd animal
20  in our relationship, but we were advised that
21  we need something.  Neither George or I liked
22  the agreement, agreed to it.  But we were
23  forced to do it because somebody told us that
24  we need to.  But George and I work with a
25  handshake from the very beginning.  And I

Juravin

FTC v. Roca Labs, Inc., et al.                                          2/15/2017

21

1    agreement, then Zero Calorie needs to pay,
2    regardless if Roca Labs agrees or not agree.
3    If there is an agreement between Zero and an
4    employee or independent -- I'm sorry --
5    independent contractor, Zero needs to pay.
6       Q. But the individual who made the decision
7    to instruct Zero Calorie Labs that an obligation
8    was to be undertaken or had been met, that was
9    Don Juravin's. Correct?
10      A. For the most part. Yes.
11      Q. Okay.
12      A. For the most part.
13      Q. Is there any exception to that that
14   you can think of?
15      A. Yeah. Any. Sharon King who was the
16   general manager. Sharon King instructed me
17   to pay and how much to pay. She made the
18   monthly hourly -- she told me how much to pay
19   each person, and I just acted upon it.
20      Q. But Sharon King, as general manager, did
21   not have authority to instruct you, Don Juravin,
22   to do those things. You were free to accept or
23   reject her requests. Is that correct?
24      A. I don't know how to answer. I could
25   have said no, I don't want to pay. With no

22

1    grovels.
2       Q. Okay. Thank you. When Roca Labs
3    Nutraceutical was formed and began operating, was
4    its relationship to Zero Calorie Labs basically
5    the same as Roca Labs, Inc.'s relationship?
6       A. I don't think they had the
7    relationship.
8       Q. So, would --
9       A. I don't remember using Zero in 2014.
10   I don't remember.
11      Q. Is there any reason to think that the
12   relationship would have changed?
13      A. Yes.
14      Q. Why would the relationship have changed?
15      A. Because I tried to do decisions
16   without George in 2014, and I couldn't use
17   George's company to make a decision to use
18   Zero Calories. It's not my company. So, I
19   think Nutraceutical paid directly, not
20   through Zero.
21          The reason Zero was created was
22   to be an HR. Because that's what George
23   wanted. Up to '14 I didn't need it anymore.
24      Q. I believe we can find -- I think that are
25   in the record from other depositions, I believe

23

1    2014, a contract between Zero Calorie Labs and
2    independent contractors. Why would that have
3    been the case?
4       A. Because maybe I did not send the
5    contracts. I did not make people sign. That
6    was probably Sharon King. But if Sharon King
7    sent it, it is maybe because I did not inform
8    her. Maybe because I did not inform her.
9    I think the pay was -- I'm almost sure that
10   the pay was from RLN. Even if Sharon sent
11   some old agreement, I believe that the payment
12   was from RLN.
13      Q. So, in terms of just the different
14   corporate entities, would it be correct to say
15   that at different times between 2010 and 2014,
16   independent contractors doing work on behalf of
17   Roca Labs would have been paid either by Roca
18   Labs, Zero Calorie, or Roca Labs Nutraceutical?
19      A. Possible.
20      Q. Or even by Don Juravin personally.
21   Correct?
22      A. No. No. George's rules were very
23   clear. I mean, I'm glad that you bought it
24   up. Things that I absolutely didn't agree
25   with him. For example, from 2009 till 2014,

24

1    George's -- George did not -- absolutely
2    oppose paying for gas, paying for cars,
3    paying for personal space at home, even if I
4    work at home. He absolutely did not agree to
5    these things because he says it's all --
6    never mind. He just did not agree.
7          I fought with him about it.
8    I said, "Hey, I'm driving my car to work.
9    I'm using gas. I'm going to restaurants on
10   behalf of the company."
11         He said, "I've heard this before.
12   The answer is no. You are not to expense any
13   of those. Not Internet from home. Not the
14   place from home." So, that was part of his
15   instructions. So, in '14 when I had Roca Labs
16   Nutraceutical, and I was the signature, I
17   believe that I did everything. You know, I
18   paid, and I did it. Part of what he never
19   allowed me to do, not to involve personal, Don
20   Juravin. So, things I did in my home, I can
21   never make payment from the company.
22      Q. I don't want to cut you off. But I do
23   want to make sure we're clear on one part.
24      A. By the way, if you don't cut me off,
25   you will never get to talk.

6 (Pages 21 to 24)

Juravin

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017

---

25

1      Q.  I will not be shy about trying to keep us
2  focused on the question.  Because I know you want
3  to be expeditious about today's deposition as
4  well, even though we have a lot to cover.
5          So, Don Juravin would, similar to
6  his role in Roca Labs, Inc., would provide
7  direction for the activities of Roca Labs
8  Nutraceutical in terms of marketing,
9  personnel, and products.  Is that correct?
10     A.  No.
11     Q.  No.  Why not?
12     A.  Because Roca Labs Nutraceutical was
13  under my signature.  I could do whatever I
14  wanted with general guidance of George.  But
15  I could take risks that I could not do from
16  2009 until 2013.
17     Q.  But there's nothing about the marketing
18  that Don Juravin ceased to be responsible for.
19     A.  Correct.
20     Q.  There's nothing about the product that Don
21  Juravin ceased to be --
22     A.  Correct.
23     Q.  There's nothing about the personnel that
24  Don Juravin ceased to be responsible for?
25     A.  Correct.

---

26

1      Q.  So, let's move on to Exhibit Number 22,
2  please.  And I just want to make sure I'm clear
3  about who had signatory authority over the Roca
4  Labs Nutraceutical USA Bank of America account --
5      A.  Myself.
6      Q.  -- ending in 588.  Only you, Mr. Juravin.
7      A.  Myself, because I incorporated.
8  Because it was my company.  And in an early
9  time, George formed the bank accounts.  But
10  because we didn't want to mix things, we were
11  afraid that it won't be organized.  George
12  and I decided that I will be responsible and
13  I will be the sole signature.  Just for the
14  purposes of organization.
15     Q.  Okay.  So, let's go to Exhibit 23, which
16  are the bank statements.
17     A.  Okay.
18     Q.  I'm just going to pull up something as an
19  example.  I'm going to try to direct you to a
20  page.  Bear with me for a moment.  First of all,
21  let's go to the third page of the document that's
22  marked at the bottom 2554.
23     A.  I'm there.
24     Q.  Okay.  So, there is a March 28, 2014
25  deposit of one million dollars that originated

---

27

1  with Don A. Juravin.  You see that?
2      A.  Yes.
3      Q.  What was that money for?
4      A.  Impression.
5      Q.  Say again, please.
6      A.  Impression.
7      Q.  Impression?
8      A.  Yes.
9      Q.  Can you explain what you mean?
10     A.  We live in a world that the bank wants
11  to see a big deposit.
12     Q.  Okay.
13     A.  So, I give the bank a big deposit for
14  a short while, and then I took it back.
15     Q.  Where did that money come from?  That one
16  million.
17     A.  From TD.  From the stock.  Either TD
18  or something.
19     Q.  This is from Don Juravin's personal
20  account?
21     A.  Correct.
22     Q.  Would that have been Wells Fargo?
23     A.  No.  Wells Fargo doesn't have.  You
24  guys got confused a few times about it.  This
25  is either Schwab or TD.

---

28

1      Q.  So, in 2014, would it have been Schwab, or
2  TD, or you don't recall?
3      A.  I don't know.
4      Q.  So, basically, the million dollars was
5  from Don Juravin personally, and, then, the
6  withdrawal on the 31st just below of a million
7  dollars went back to Don Juravin personally?
8      A.  Exactly.
9      Q.  Okay.  So, then, let's go to --
10     A.  If I might say something that will
11  help you with many, many questions.
12     Q.  Okay.
13     A.  The things that I created, a lot of
14  times I learned how the bank's investors,
15  they want to see things.  So, I just followed
16  the game.  Dog and pony show.  Investing the
17  money, putting the money, creating things
18  that I call legit.  Things that need to look
19  like wow, the bank had really a lot of money
20  before we get there.  Because this is what
21  they're looking for, so this is what I do.
22  It'll repeat itself again and again almost in
23  every question.
24     Q.  We'll come back to that.  I'm going to
25  direct your attention to the page marked at the

---

7 (Pages 25 to 28)

Juravin

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017

---

29

1    bottom 2562.
2        A.  I'm there.
3        Q.  Okay.  You'll notice there are a number of
4    entries on this page, and I believe this is true
5    on other pages of the statement, that are labeled
6    "merchant bank deposit"?
7        A.  Okay.
8        Q.  Day to day.  Can you explain what that
9    signifies?
10       A.  Probably merchant searches.
11       Q.  Tell me with more particularity, where is
12   that money coming from?  Just explain.  It may be
13   obvious to you and to me, but I want you to
14   explain it on the record.
15       A.  All the monies we sell for money, we
16   never had cash deals.  Everything from 2009
17   always goes through the credit cards.  So,
18   always there is a merchant service that is
19   forwarding the money.  PayPal merchant
20   service is this.
21       Q.  So, basically, this is money that's paid
22   by consumers to Roca Labs, Inc. or Roca Labs
23   Nutraceutical, depending on which time frame
24   we're talking about?  Is that right?
25       A.  Yes.  Every time it's a different name

---

30

1    because the bank register does it different.
2    Let's call it merchant services all the time.
3    Let's call it credit cards.
4        Q.  Would it also have been debit cards?
5        A.  We don't know.
6        Q.  You don't know?
7        A.  That's why it's called processing.
8        Q.  Right.
9        A.  So, how they paid the processing
10   service, I don't know.
11       Q.  You used the word credit card.  I just
12   wanted to make sure it wasn't specific, only a
13   credit card.
14       A.  Let's call it processing services.
15   Merchant service.
16       Q.  Okay.  Understood.  I think we got that.
17   Would you agree, then, that throughout Exhibit
18   23, wherever the indication in the deposits are
19   from merchant bank, that those are, in fact,
20   cumulatively payments from consumers for
21   purchases from Roca Labs?
22       A.  Purchases of the regimen.
23       Q.  Whatever you want to call it.
24       A.  Let's call it from now on regimen.
25   Because sometimes if I be on the site called

---

31

1    Roca Labs, sometimes on the site called
2    Gastric Bypass Alternative, let's call it
3    regimen.  It is from the sales of the
4    regimen.
5        Q.  Well, the regimen includes -- I understand
6    you, from prior discussions, you would consider
7    the Roca Labs formula to be one component of the
8    regimen.  Is that correct?
9        A.  One of four.
10       Q.  But we all agreed that at the very least
11   that any iteration of the regimen includes the
12   Roca Labs formula.  Is that correct?
13       A.  Yes.  Yes.
14       Q.  Okay.  So, but, essentially all those
15   merchant processor things were the card
16   payments --
17       A.  Yes.
18       Q.  -- from consumers.  Correct?
19       A.  Correct.
20       Q.  Okay.  So, we're done with 23 for the
21   moment.  I want to go back to something you said
22   a moment ago about Don, the inventor.  So, what
23   was the invention, in your words, in your own
24   description?  How would you sum that up?
25       A.  The gastric bypass effect morning

---

32

1    dose, anti-cravings, basically.
2        Q.  Okay.  Did you develop this invention on
3    your own or in conjunction with anyone else?
4        A.  On my own.  I was helped by others.
5    But it's my -- I was leading it.
6        Q.  Who helped you?
7        A.  It's not helped.  I was -- I consulted
8    with.
9        Q.  With whom did you consult?
10       A.  I cannot even remember names.  But
11   it's anybody I could.  It can be a doctor
12   that I will ask.  It can be on the Web.
13   It can be that on the Web I will ask a doctor.
14   I will ask the lab people.  Anybody possible.
15       Q.  Okay.  When did you come up with what you
16   refer to as the invention?
17       A.  I was then in Israel, and it was maybe
18   2005, '6, '7.
19       Q.  And were you selling your invention in
20   Israel at the time?
21       A.  I invented it.  I developed it over
22   there.  And, then, slowly turned into sales.
23       Q.  And you were doing on-line sales of that
24   product, invention?
25       A.  I can't remember -- yes.  Yes.  Later

---

8 (Pages 29 to 32)

Juravin

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017



37

1    A.  Yes.  Exactly.  It's me.  And I signed
2  this Roca Nutraceutical.  So, it's kind of
3  like, I don't know what kind of error.  But
4  this is me trying to break free from George,
5  saying, "Okay.  This is my name.  I can do
6  it."  It never took place.
7    **Q.  Basically, regardless of what was**
8  **happening in terms of the transition that**
9  **was contemplated, whether it succeeded or**
10 **failed, it was to be the case that Sharon**
11 **Hensley, Sharon King, or both, to continue**
12 **their same duties, but just be paid by a**
13 **different entity.  Is that right?**
14   A.  I don't think -- I don't know if I
15 referred to them or to the people under them.
16   **Q.  Well, Sharon Hensley was an American.**
17 **Right?**
18   A.  Yeah.  But I haven't -- we had a deal
19 with her as independent contractor.  I meant
20 there may be other Americans.  I don't
21 remember because we never acted upon it.
22 I think George intercepted it in some way, and
23 say, "If I have anything to do with RLN,
24 that's not the way I want things to be done."
25 Then maybe I buried it.

38

1    **Q.  Sharon King is also an American.  Right?**
2    A.  Yes.  But I don't know even if I refer
3  to them.
4    **Q.  But either way, their duties didn't change**
5  **as a result of this contemplated change.  Is that**
6  **right?**
7    A.  Duties?
8    **Q.  Their duties.**
9    A.  No.
10   **Q.  Okay.  Thank you.  The next --**
11   A.  Did I give you a very long answer
12 again to something very simple?
13   **Q.  You gave me I think about what I**
14 **needed to understand what this document is.**
15 **Let's look at Exhibit 26.  This is a 2014**
16 **tax return for Roca Labs Nutraceutical.  If**
17 **you look at line one on page one of Exhibit**
18 **26, there are -- it lists zero gross receipts.**
19 **You see that?**
20   A.  Yeah.  But I have to tell you that I
21 really don't understand about tax returns and
22 lines and stuff.  I've never understood it.
23 And I will answer to the best -- the best of
24 my knowledge.
25   **Q.  Okay.  Well, let's go back to Exhibit 23,**

39

1  the bank statements.
2    A.  Sure.
3    **Q.  And we talked about the merchant**
4  **processing.  So, these merchant bank deposits**
5  **into the Roca Labs Nutraceutical account --**
6    A.  Okay.
7    **Q.  Why would they not be gross receipts**
8  **for Roca Labs Nutraceutical on the tax**
9  **return for the 2014 year?**
10   A.  That's why I took the time earlier to
11 explain you everything and my answer was
12 there.
13   **Q.  Okay.**
14   A.  I said earlier that -- I said RLN is
15 an agent, an extension of Roca Labs only.
16   **Q.  Okay.**
17   A.  And, so, everything that you see will
18 be in the tax returns of Roca Labs.
19   **Q.  Okay.**
20   A.  And they are kind of like overlapping.
21   **Q.  All right.  That answers that question.**
22 **So, the answer, then, would be the same for**
23 **Exhibit 27, the 2015 tax return for Roca Lab**
24 **Nutraceutical --**
25   A.  Then you can cross reference the

40

1  numbers.
2    **Q.  Okay.  So, again, the zero gross receipts**
3  **for the 2015 year for Roca Labs Nutraceutical is**
4  **a consequence of the fact that Roca Labs**
5  **Nutraceutical was being treated as an agent of**
6  **Roca Labs, Inc.  Is that right?**
7    A.  Yes.  But I'll make your life easier.
8  You're looking at the bank statements, and
9  you're looking at the minimum numbers.  We
10 don't look at it.  We care about one number.
11 1099 issued by iPayment.  1099 issued by
12 PayPal.  This is the only thing that matters.
13 It encompasses everything.
14   **Q.  So, we have not received 1099s**
15 **from any of these entities.**
16   A.  I will make sure that you get it.  But
17 this is the only thing that we care about.
18 One year in 2012 George made the mistake, and
19 he counted on these bank statements that he
20 said to you.  The IRS sent us a letter saying
21 there is a discrepancy of $60,000.  Then,
22 George learned the lesson not to count on the
23 bank accounts, but to count only on the
24 summation of the processing.
25   **Q.  Who would receive those documents, the**

10 (Pages 37 to 40)

Juravin

FTC v. Roca Labs, Inc., et al.                                    2/15/2017

---

41

1    1099s you're referring to?
2        A.  Irrelevant because you take them from
3    -- you download them.
4        Q.  Were they direct -- who downloaded them?
5        A.  I don't know.  But we -- myself,
6    George.  Whatever.  The bottom line is that's
7    why it took us so long to do the '14 and '15
8    tax returns to provide the FTC.  So, we ask
9    them for the 1099.  We have to wait for a
10   long time for them to give it to us.  When we
11   got them, that's the only thing you rely on,
12   whether you got the money or not.
13       Q.  So, the only thing you could rely on is
14   you're talking about looking at calculating
15   revenues.  Is that correct?
16       A.  Correct.  So, the big number of the
17   revenue is coming from the 1099, not from
18   what you see here.  They sent the money.
19   They're supposed to always match.  Always
20   match.  But why go through so much work if
21   anyway this is what the IRS knows about, the
22   number from 1099.
23       Q.  Let's take a couple minute break.
24   I'm going to see what next batch of documents
25   we can look at.

---

42

1            (Short recess taken from 1:16 p.m.
2    to 1:23 p.m.)
3            (Plaintiff's Exhibit Nos. 28 and 29 were
4    marked for identification.)
5            MS. MARTENY:  Defendants will
6        stipulate that Exhibit 28 is a true and
7        accurate copy of Roca Labs, Inc. 2012
8        amended tax return, and the information
9        that's in Exhibit 28 is correct.
10           Defendants will also stipulate that
11       Exhibit 29 is a true and correct copy of
12       Roca Labs, Inc.'s 2013 tax return,
13       and that the information in Exhibit 29
14       is also correct.
15           MR. SETTLEMYER:  Thank you.  Back off.
16           (Off the record from 1:24 p.m.
17   to 1:25 p.m.)
18   BY MR. SETTLEMYER:
19       Q.  Mr. Juravin, please take a look at the
20   document that's been marked as Exhibit 17.
21       A.  Okay.
22       Q.  Just look all the way through the
23   document.  I want to make sure that you'll be
24   able to answer the question, which is:  Did you
25   personally put the information into this

---

43

1    application?
2        A.  Merchant processing.  Yes.  And, of
3    course -- okay.  What is the question?
4        Q.  The question is:  Did you put the
5    information about Roca Labs, Inc. into this
6    application and the forms that are associated
7    with it in Exhibit 17?
8        A.  I think so.  And I remember it was a
9    problematic one.  Yes.
10       Q.  You do remember doing it though.  Correct?
11       A.  Yeah.  Because -- no.  I don't
12   remember doing it.  But I remember that it
13   went back and forth.  Yes.
14       Q.  Okay.  So, it wouldn't have been anybody
15   else from the Roca Labs side?
16       A.  No.  It's mine.
17       Q.  Thank you.  Done with that one.
18   Off the record again.
19           (Off the record from 1:27 p.m. to 1:41 p.m.)
20           (Plaintiff's Exhibit Nos. 30, 31,
21   32, 33, 34, 35, 36, 37, 38 and 39 were marked
22   for identification.)
23           MS. MARTENY:  Defendants will stipulate
24       that Exhibits 30 through 39 are true
25       and accurate representations or copies

---

44

1        of what the document purports to be and
2        that the information contained in those
3        exhibits is accurate.
4    BY MR. SETTLEMYER:
5        Q.  Okay.  Thank you.  I'm going to have a few
6    questions about some of them.  But, hopefully, we
7    can get through that quickly.  Mr. Juravin, you
8    are, at this point in time, the sole owner of
9    Must Cure Obesity Company.  Is that correct?
10       A.  Yes.
11       Q.  You have at all times been the sole
12   owner of Must Cure Obesity Co.  Is that
13   correct?
14       A.  Yes.
15       Q.  You are at this point the sole
16   signatory n the Must Cure Obesity bank
17   account with Bank of America ending 9288?
18       A.  It's closed.
19       Q.  During the time it was open, you
20   were the sole signatory for that account?
21       A.  Yes.
22       Q.  And you're the one who opened that
23   account.  Is that correct?
24       A.  What was the name of the account?
25   Must Cure Obesity?

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-23

Juravin

FTC v. Roca Labs, Inc., et al.                                              2/15/2017

---

45

1    Q. This was Must Cure Obesity --
2    A. Yes.
3    Q. -- ending in 9299. Is that correct?
4    A. Then, yes.
5    Q. Turn with me, please, to Exhibit
6    No. 34. So, Exhibit 34 is an American
7    Express statement from Must Cure Obesity, and
8    that's got a statement close date of --
9    doesn't say. It's got a minimum --
10   A. Yeah. Closing date is February 22nd,
11   2015.
12   Q. Okay. February 22nd? That's the next
13   closing date, it says, up at the top.
14   A. You're right.
15   Q. But this basically is for January 2015
16   expenses?
17   A. Exactly. January 2015.
18   Q. Okay. And this is account ending 3-01005.
19   Correct?
20   A. Yes.
21   Q. So, what was this account, the American
22   Express account, being used for in January 2015?
23   A. Like all along, for Must Cure Obesity
24   Company.
25   Q. For what type of expenses was this being

---

46

1    used for?
2    A. Everything that I could not do between
3    2009 and 2014. All the expenses of the
4    company. As I mentioned earlier, I couldn't
5    use airline tickets, food, Internet, and
6    whatever. And now the company is mine, I can
7    do it.
8    Q. Okay.
9    A. So, it's everything that is business
10   expense.
11   Q. All right. And is this the first
12   American Express statement that Must Cure
13   Obesity had?
14   A. I think it's the only one that it had.
15   Q. No. Is this the first month of the
16   statement for this company?
17   A. You're asking me when it was open?
18   I believe so.
19   Q. Okay.
20   A. Because in '14 it was Nutraceutical.
21   So, I believe so.
22   Q. Okay. I'm also noticing it doesn't show
23   -- it doesn't show any payments on this
24   statement.
25   A. So, you're right.

---

47

1    Q. So, let's look at --
2    A. Are we done with --
3    Q. We're done with No. 34 for now. Let's
4    look at No. 35. So, No. 35 is a Chase bank
5    statement or set of them from July 1, 2015.
6    A. Okay.
7    Q. Through the end of December 2015.
8    Do you agree with that?
9    A. Yeah.
10   Q. And turn, please, to the page marked at
11   the bottom right-hand corner, Roca-000065.
12   A. I'm there.
13   Q. Okay. You see all those entries for
14   PayPal?
15   A. PayPal automatic. It's a transfer of
16   money. Again, let's call it processing or
17   the merchant services.
18   Q. Okay. And all of these processing
19   deposits in Exhibit 35 on that page we're looking
20   at and throughout that are from PayPal, those
21   represent, in the aggregate, consumer purchases
22   of the Roca Labs regimen. Is that correct?
23   A. Yes.
24   Q. Okay.
25   A. Because at this time, it's not -- no

---

48

1    longer the name Roca Labs. But yes.
2    Q. So, the company Must Cure Obesity has a
3    PayPal account. Is that correct?
4    A. Yes.
5    Q. Okay. Just so I understand the mechanics.
6    The money that is paid by customers into the
7    PayPal account, does all of it go into the Must
8    Cure Obesity bank account, or does some of it not
9    go --
10   A. It's being transferred every night or
11   something to the bank account.
12   Q. Okay. So, aside from reserves that
13   PayPal holds --
14   A. Which go back -- okay.
15   Q. Which eventually would come to Must
16   Cure Obesity --
17   A. Not really. Because it always
18   balances with another customer that has a
19   charge back and another customer. So, it's
20   dead money.
21   Q. But, in theory, the hold back that
22   PayPal has, if the reserve it holds,
23   eventually, if Must Cure Obesity were to stop
24   doing business, that money would eventually
25   come to Must Cure

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-24

FTC v. Roca Labs, Inc., et al.                                      2/15/2017

---

53

1  you see on your charge a month later, and you
2  said you did not buy it from them.
3      Q.  Thank you.  The other question I have for
4  the PayPal account is whether there is a specific
5  unique e-mail address or other identifier for the
6  account to allow PayPal to consistently know
7  whose account it is?
8      A.  Only the EIN.  That's the main thing.
9  EIN.
10     Q.  The EIN for Must Cure Obesity is
11 associated with this PayPal account?
12     A.  Yes.  It must be.
13     Q.  And there are no other PayPal accounts
14 associated with Must Cure Obesity?
15     A.  We have the one that we are using.
16     Q.  Okay.
17     A.  You're asking for unique identifier.
18     Q.  Yes.
19     A.  The EIN, you cannot go by e-mail.
20 Because an account can have many e-mails.
21 An account can have many e-mails and three
22 e-mails.
23          Sharon King has the name next to
24 it.  So, Sharon King has also e-mail that has
25 been access to it.  You cannot go by that.

---

54

1  By the EIN if you're looking for unique
2  identifier.
3      Q.  Is there a master account holder, perhaps
4  yourself, with a unique e-mail address?
5      A.  There is no master.  Only the EIN is
6  the unique identifier.  Unique identifier is
7  not master.  Because I can have a master
8  which means it's an administrator.  But my
9  programmer will have it because they need
10 access to things.  So don't go by it.  Go by
11 the EIN.  EIN is only one.
12     Q.  What's the administrator e-mail
13 designation for that PayPal account?
14     A.  I'm using Don@obesity.global.
15     Q.  Thank you.  I want to look at what's been
16 marked as Exhibit 36, I believe.  Done with 37.
17 I'm sorry.  Thirty-five for the moment.
18          Actually, I take that back.
19 There's one question I had about 35.  Look at
20 the October 2015 statement on 35.  Under
21 "electronic withdrawals" towards the bottom of
22 the page.
23     A.  October.
24     Q.  October, 2015.  You see an entry for --
25     A.  What page are you on?  Two of four?

---

55

1      Q.  Two of four.  Yes.
2      A.  Okay.
3      Q.  There's a 10/27 on-line ACH payment to
4  Opinion for $40,000.  Do you see that?
5      A.  Yes.  I am familiar with it.
6      Q.  Tell me what that payment was for.
7      A.  I think you know.
8      Q.  Well, tell me on the record.
9      A.  I paid for something that the FTC
10 should have corrected long ago.  It's a
11 company that's -- I can't find the words
12 without cursing.  It's called Opinion Corp.
13 And what else?
14     Q.  They run the Web site Pissed Consumer?
15     A.  Yes.
16     Q.  What is the service for which you paid
17 $40,000 or Must Cure Obesity paid $40,000 on
18 October 27, 2015?
19     A.  Advertising services.
20     Q.  Okay.  Can you describe what types
21 of advertising services?  What exactly did
22 Must Cure Obesity expect to get in return
23 from Opinion Corp in exchange for $40,000?
24     A.  I don't even know what we paid for.
25 I just know that it was like -- making us look

---

56

1  better for something that -- making us look
2  better for call-ins that were any way not
3  real, on the Google search.  I don't know how
4  to describe it.
5      Q.  Well, suppose they hadn't done it?
6  What would you call them up and say they had
7  failed to do?
8      A.  I cannot think.  Because they don't
9  think they failed to do anything.  Because
10 they have the two or three C.  So, they
11 don't think they failed to do anything.
12     Q.  You're talking about the Communication
13 Decency Act, Section 230?
14     A.  230.  Yes.
15     Q.  In terms of the service that you
16 expected to get from them, is there any sort
17 of service package you --
18     A.  To make the bad, not the obvious on
19 the Web.  Not to make bad comments which we
20 absolutely did not recognize, not to be seen
21 in the front.
22     Q.  Okay.  Why did you pay $40,000 for that
23 service?
24     A.  Because the FTC did not do whatever
25 the FTC needs to do to protect us.

---

14 (Pages 53 to 56)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555          PX6-25

FTC v. Roca Labs, Inc., et al.                                          2/15/2017

57

1    Q. What benefit did you have from getting
2    that service?
3    A. Making the false comments not show up
4    up front.
5    Q. What impact were the false comments having
6    that would require a payment of $40,000?
7    A. Whatever false comments will do. They
8    will create the wrong impression.
9    Q. And when you say "false comments," that's
10   your opinion about what the comments are.
11   Correct?
12   A. No. It's comments that we don't like
13   -- okay. Let's define what false comments
14   are. False comments is, I don't recognize
15   the name of the person in our system, and if
16   we recognize the name, then they haven't used
17   the regimen for at least a month and a half.
18   They haven't called our customer service, and
19   they haven't followed all the instructions.
20   If somebody on the Web writes, "My
21   name is John Smith, I've used the regimen for
22   one and a half months, I followed all the
23   instructions, I followed the rules, I
24   contacted customer service, and yet, I lost
25   two pounds, and it's a shitty regimen, don't

58

1    buy it," that's not false. That's absolutely
2    okay. Absolutely okay. That's not
3    considered negative. That's considered the
4    truth.
5    Q. Well, the truth can be negative. Right?
6    A. If the person followed the terms, the
7    clear terms. I don't believe in terms in
8    small letters. I don't believe in it. I
9    believe in terms that the customer
10   understands. So, if the customer
11   one-and-a-half months for contact customer
12   service for help, and followed the
13   instructions and rules, and got help from our
14   answers page, and yet the customer, for any
15   reason in the world, feels that the product,
16   the regimen, does not work, that's okay.
17   Q. In terms of what you expected to
18   get from Opinion Corp., were you expecting
19   somebody -- what were you expecting to happen
20   to -- I'll use my term -- the negative
21   comments?
22   A. It's not negative. It's false.
23   Negative is okay. But false is not okay.
24   Q. Let's just agree on the term "disputed
25   comments." You say they would be false.

59

1    I might say they're negative. But let's just
2    use --
3    A. It's my deposition. It's my words.
4    The false -- what I considered false --
5    Q. Yes.
6    A. According to my definition of false.
7    Q. Okay.
8    A. And I expected for the false not to be
9    obvious up front.
10   Q. What would be obvious up front?
11   How would they accomplish that?
12   A. By hiding them. Making them there,
13   but not visible.
14   Q. What would be there instead?
15   A. They're simply not easily visible.
16   Instead of being straight in your face, if
17   you want to see them, you need to click
18   another click, another click, another click.
19   You would not.
20   Q. Were any reviews submitted by people being
21   paid by Roca Labs being elevated in the display
22   of search results that --
23   A. You are asking me about the terms and
24   conditions of Opinion Corp.?
25   Q. I'm asking you about the practical effect

60

1    of what would you see when you go to the page
2    after you pay $40,000.
3    A. Just for the false comments? To not
4    be easily accessible to ordinary customers.
5    I think you're referring to something
6    else, and I'll help you with that.
7    Q. Okay.
8    A. I'll help you with that. I know where
9    you are going with it. You're asking me,
10   "Don, did you ask Roxie to pay $5 a month to
11   express her opinion with consumer, why we
12   were in a fight with this consumer," I was
13   desperate because extremely frustrating to
14   see so much false comments, that I knew it's
15   not ours. And they are not real.
16   I asked anybody I could, "Please,
17   take $5 times twelve, go and tell your story.
18   I don't need to approve. I don't need to look
19   at it. Just take $60, and put your story so
20   it will get there."
21   Q. By virtually paying $40,000 to this
22   consumer, aka, Opinion Corp., do comments like
23   Roxie's or other testimonials become elevated?
24   A. No. It's a different service.
25   Opinion Corp. used to have a service that

15 (Pages 57 to 60)

Juravin

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017

---

61

1    anybody can go on the -- on their site and say
2    "Hey, Roca Labs was really helpful." Okay.
3    "In losing the weight. So helpful that I'm
4    willing to pay $5 to put my picture and my
5    video there." Okay? That's the service that
6    I ask Roxie to do.
7        Q. And you don't think the $40,000 payment
8    has anything to do with whatever prominence would
9    be afforded by Opinion Corp. to comments like
10   Roxie's?
11       A. It's a different procedure.
12       Q. It's a yes or no question.
13       A. Ask me again.
14           MR. SETTLEMYER: Please read the
15   question back.
16           (Last question read back as requested.)
17       A. I don't understand what prominence is.
18   BY MR. SETTLEMYER:
19       Q. How up front something is. How buried
20   or up front something is to maybe use your
21   terms.
22       A. I don't -- I don't care about it. I
23   didn't look at it. I just cared about the
24   false comments not to be visible.
25       Q. Okay. Well, are the false comments bad

---

62

1    for Roca Labs business?
2        A. Yes. They are false.
3        Q. Do they hurt Roca Labs sales?
4        A. Very much.
5        Q. More than $40,000 worth of sales you
6    think?
7        A. Yes.
8        Q. Okay. And was there any kind of written
9    document, or click through agreement that Must
10   Cure Obesity entered into with Opinion in the
11   process of agreeing to pay the $40,000?
12       A. Yes.
13       Q. Okay. Is that one of the documents we
14   will receive this afternoon?
15       A. I don't know. But I do have it.
16       Q. Okay.
17       A. I do have it. I remember when they
18   make me sign on it, it was a lot of
19   stipulation. I didn't even read the
20   document. It happened immediately when we
21   lost the case against them on a summary
22   judgment. And I remember, it was a lot of
23   stipulations there as far as you will not
24   discover this document, you will not this.
25   But I think it doesn't apply to this.

---

63

1    Right now, we have to give it to them.
2        Q. We have requested it.
3        A. So I need to give it.
4            MS. MARTENY: You need to give it to me.
5        A. You will have it this afternoon. I
6    guess it's probably the stipulation is they
7    don't want this document to be seen by
8    anybody and stuff. But it doesn't apply
9    here. So, you understand, I mean there
10   conflict between somebody --
11           MS. MARTENY: Let's produce the
12   document, and then we'll talk about it.
13       A. It'll be done today.
14   BY MR. SETTLEMYER:
15       Q. What was the duration of the service for
16   the October 2015 payment of $40,000?
17       A. I'm glad that you asked. I'm glad
18   that you asked. It was for one year.
19   Obviously, we cannot pay anymore after the
20   one year.
21       Q. So, let me just clarify. No further
22   payment was made after the expiration of that one
23   year for the continuation of the service being
24   provided?
25       A. Because there is nobody.

---

64

1        Q. But that's -- I take that as, in fact, no
2    payment of that sort has been made in 2016?
3        A. No payment was made aside from this
4    40,000.
5        Q. Okay.
6        A. Mike doesn't know why I'm laughing all
7    the time. Because we had this conversation.
8        Q. We've touched on the subject various
9    times.
10       A. Touched on the subject. And you know
11   where I stand on it.
12       Q. I appreciate that. We're trying to
13   clarify the facts.
14       A. Sure.
15       Q. Okay. The next document I'd like you
16   to look at is Exhibit 36. You're done with
17   35. And would you agree with me that Exhibit
18   36 is a collection of Must Cure Obesity Co.
19   Chase Bank accounts for the account ending
20   7028 for the period January 1, 2016 through
21   December 31, 2016?
22       A. Okay.
23       Q. That's a yes?
24       A. Yes.
25       Q. Okay. I'm sorry. December 30, 2016

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-27

Juravin

FTC v. Roca Labs, Inc., et al.                                                  2/15/2017

---

65

1    to be -- there is no December 31.  All right.
2    All right.  I don't have any questions about
3    that beyond just one.  And I think we've
4    touched on it before.  And that is:  Again,
5    the PayPal money that's represented in the
6    2016 Must Cure Obesity Chase Bank statements
7    for account ending 7028 are also card
8    processing deposits resulting from sales of --
9        A.  Yes.
10       Q.  -- Roca Labs product?  Thank you.
11   Let's go to Exhibit 37.  This is the Must Cure
12   Obesity Co. 2014 income tax return.  Correct?
13       A.  Yes.
14       Q.  Okay.  You see in line one gross receipts
15   for sales is zero.
16       A.  Yes.
17       Q.  Yes?  So, for 2014, there were no
18   receipts for Must Cure Obesity Co.  Is that
19   correct?
20       A.  Correct.
21       Q.  Okay.  What company was receiving money
22   for Roca Labs product in 2014?  Was that
23   Roca Labs, Inc.?
24       A.  No.  Probably Nutraceutical.
25       Q.  Nutraceutical we already know had

---

66

1    a zero --
2        A.  So, Roca Labs.
3        Q.  So, it was Roca Labs.  Okay.
4        A.  Yes.
5        Q.  Let's look at Exhibit 38, which is --
6        A.  Let me explain why.
7        Q.  Go ahead.  You're explaining why what?
8        A.  Why everything is -- what do you call
9    it -- streamlined to Roca Labs.  Because Roca
10   Labs has the agreement with Don, the inventor.
11   You must stream this because Don can get the
12   money only from Roca Labs.  So, it's must
13   streamline this for Don to receive his money
14   as an inventor.
15       Q.  So, you're saying that money that came
16   in and was paid -- well, go on to Exhibit 38.
17   Because this is --
18       A.  So, that's what the accountants do.
19   That's as much as I understand.
20           MS. MARTENY:  I'll tell you what
21       streamline means.  If you just answer
22       the question.
23   BY MR. SETTLEMYER:
24       Q.  We'll get to that streamline discussion
25   momentarily.  But Exhibit 38, this is a tax

---

67

1    return for Must Cure Obesity Co.  This is for
2    2015.  We already have established that receipts
3    were coming in from PayPal to Must Cure Obesity
4    in 2015.  Yet there is on line one zero dollars
5    in gross receipts.  Is that correct?  Yes or no?
6        A.  Not really.  I'll explain.
7        Q.  Okay.  Please.
8        A.  We thought --
9        Q.  "We" being?
10       A.  Myself, George, and the accountant.
11       Q.  Okay.
12       A.  That the money we collected was Must
13   Cure Obesity.  Okay?  But we couldn't do it
14   because PayPal issued a 1099 to another
15   company.  So, you cannot put money that they
16   received because the 1099 is there.
17       Q.  To whom did PayPal issue the 1099?
18       A.  Probably to Nutraceutical.  Because I
19   did not change the EIN.
20       Q.  With regard to --
21       A.  By the way, it was changed later.
22   It was changed.  But if PayPal is
23   issuing 1099 to a company, you must report
24   under the same company.  And, then, I ask
25   PayPal to change it.  But the monies reported

---

68

1    either this company, this company, or that
2    company.
3            Let's say that we collected money
4    and we thought that it's Must Cure Obesity.
5    But PayPal had a different EIN.  So, they will
6    issue the 1099 under the other EIN.
7        Q.  Understood.  I just want to make sure that
8    we are clear that again, no 1099s from PayPal or
9    any other payment process would have been made
10   available to the FTC, and those would be
11   documents that were responsive to our older
12   request, and we would like to see those.
13       A.  It's -- and I know that we made the
14   change.  Because we had to file something
15   according to the 1099.
16           MS. MARTENY:  He's not asking you a
17       question.
18           THE WITNESS:  He's not?
19           MS. MARTENY:  No.  That's not a question.
20           THE WITNESS:  How come he's allowed
21       to make statements and I'm not?
22           MR. SETTLEMYER:  Well, we want to end on
23       time and I want to accommodate that.
24           THE WITNESS:  I don't want to keep him
25       guessing.

---

17 (Pages 65 to 68)

Juravin

FTC v. Roca Labs, Inc., et al.                                                2/15/2017

---

69

1    MS. MARTENY:  Trust me, Carl is going
2    to ask you a question if he does not
3    understand.
4        MR. SETTLEMYER:  I will ask you a question.
5        THE WITNESS:  But Carl and I are
6    on the same side.  We want to know the
7    truth.
8        MS. MARTENY:  Understood.
9    BY MR. SETTLEMYER:
10       **Q.  Let's turn to Exhibit 39.  Now, Exhibit 39**
11   **is the Must Cure Obesity's statement from**
12   **December 31, 2016.**
13       A.  Yes.  It is December 2000 --
14       **Q.  2016 through January 31, 2017.**
15       A.  It's January 2017.
16       **Q.  Yes.  And once again, on the second page**
17   **of this document, there are PayPal deposits that**
18   **reflect consumer payments for Roca Labs regimen.**
19       A.  Same.
20       **Q.  Okay.  All right.  I believe that's all**
21   **for those documents.**
22       MR. SETTLEMYER:  So, why don't we go
23   off the record, and I'll see if I can
24   tee up some more stuff?
25       (Off the record from 2:17 p.m. to 2:35 p.m.)

---

70

1        (Plaintiff's Exhibit Nos. 40, 41, 42, 43,
2    44, 45, 46, 57 and 48 were marked for identification.)
3        MS. MARTENY:  So, defendants will
4    stipulate that Exhibit Nos. 40 through
5    48 are true and correct copies of
6    various documents that have been filed
7    in court cases, although we note that
8    some of the exhibits may be missing
9    exhibits that were also filed in
10   connection with the court filings that
11   they represent.
12   BY MR. SETTLEMYER:
13       **Q.  I'm going to have a few questions about a**
14   **few of the documents.  But not taking a lot of**
15   **time on these.**
16       **The document marked as Exhibit 40,**
17   **Mr. Juravin, would you please take a look at**
18   **that, the complaint in Zero Calorie Labs and**
19   **Roca Labs, Inc. versus Vishal -- V-i-s-h-a-l**
20   **-- Sidhwani -- S-i-d-h-w-a-n-i?  And look at**
21   **the third page of that document and look at**
22   **paragraph 15, please.**
23       A.  Okay.
24       **Q.  Where it says that agreement of the**
25   **termination by either party that Mr. Sidhwani**

---

71

1    **would immediately provide any user names and**
2    **passwords used while working with Roca Labs, what**
3    **sorts of user names and passwords was he --**
4        A.  Database.
5        **Q.  Hmm?**
6        A.  Database.  These guys controlled the
7    database.  And -- you know.
8        **Q.  So, this lawsuit was about him not**
9    **terminating those database passwords?**
10       A.  No.
11       **Q.  Or in part related to that?**
12       A.  No.
13       **Q.  No?**
14       A.  Volunteer information.
15       **Q.  What was the lawsuit about -- well,**
16   **the lawsuit speaks for itself.**
17       A.  Okay.
18       **Q.  We'll skip that.  Just what was the nature**
19   **of the database in question that he would have**
20   **had access to?**
21       A.  Database of -- I don't remember what
22   we had at that time.  But database to -- I
23   don't know if it was a database for the
24   customers or which database at that time.
25   But I need to tell you the purpose of that.

---

72

1    The purpose is basically to send a message to
2    the rest of the programmers.  It doesn't
3    matter what country you are.  If you don't
4    comply with and take care of our database,
5    and backups, and everything else, if you just
6    don't take care of the company, you cannot
7    assume that because you are in a different
8    country, we will not pursue.  We wanted to
9    send a message.  And the same with the next
10   one.  Because sometimes they think if they are
11   in a different country, and they can just
12   disappear and hurt the business.
13       **Q.  Let's just be clear of that by the next**
14   **one.  We're talking about Exhibit 41.  So, that**
15   **is Zero Calorie Labs and Roca Labs versus --**
16       A.  That's the only purpose of these two.
17       **Q.  I don't want to interrupt.  I don't want**
18   **to talk over you.  I want to make the record.**
19   **Zero Calorie Labs and Roca Labs versus**
20   **Charmaine -- C-h-a-r-m-a-i-n-e, Novelo,**
21   **N-o-v-e-l-o.**
22   **And look at the third page, paragraph 13,**
23   **you'll see, again, a reference to user names**
24   **and passwords.**
25       **What sort of user names and passwords**

---

18 (Pages 69 to 72)

Juravin

FTC v. Roca Labs, Inc., et al.                                                                2/15/2017



73

1   did Charmaine Novelo have?
2       A. I don't know.  It's not -- we never
3   acted upon it.  That was not the purpose of
4   the lawsuit.  The purpose of the lawsuit is
5   to explain that this is a service person.
6   They did support.  And, suddenly, they don't
7   show up.  And they don't tell us.  Because
8   they say, "Hey, I'm in the Philippines.  I
9   cannot show up to work."
10          I wanted to send a message, then,
11  to others and say, "We will sue even in a
12  different country.  You do need to give us two
13  weeks notice."
14      Q. So, the reference in here to Novelo
15  needing to provide any user names and passwords
16  used while working at Roca Labs, you don't know
17  what those were?
18      A. No.  I don't think that she was
19  privileged to something unique.  She was a
20  support person.
21      Q. Did she create any blogs or anything like
22  that she would have had access to?
23      A. No.  No.
24      Q. All right.  Let's --
25      A. It's mainly for disappearing without

74

1   giving notice.
2       Q. Let's go to Exhibit 45.  Let's turn
3   to a few pages in.  One of the documents in
4   that is an amended complaint.
5       A. Can you give me a hint on the top?
6       Q. Yes.
7       A. 719?  725?
8       Q. Yes.  I'm sorry.  715.  Upper right-hand
9   corner.
10      A. Right.  Okay.  I'm there.
11      Q. This is a lawsuit between Roca Labs and
12  Jennifer Schaive, Melissa Richmond, and Lauren
13  Maccaro.
14      A. Yes.
15      Q. Turn to page 716, and you'll see that the
16  markings -- and I can tell you that we put these
17  there that are the word redacted.
18      A. Okay.
19      Q. That refer to the residents.  And, then, I
20  want to know -- just go to 719.
21      A. What do you want me to do?
22      Q. Go to page 719.
23      A. Okay.
24      Q. Okay.  So, we have, again, marked
25  certain items as redacted.  But do you agree

75

1   that the information that's redacted from
2   paragraphs 26, 27, 28 would -- and 29 were
3   information that was provided by Ms. Schaive
4   in the health questionnaire when she purchased
5   Roca Labs products?
6       A. We don't have a health questionnaire.
7   I hear it again, again.  We have only
8   qualification form.
9       Q. So, let's use the term qualification
10  form.  Was the information that was recited in
11  paragraphs 26 through 29 of this complaint
12  information Ms. Schaive entered in her health
13  qualification form?
14      A. Qualification.
15      Q. Qualification form?
16      A. Okay.  It's different.  We don't do
17  health.  Qualification is only to see if we
18  are willing to sell her.
19      Q. Okay.  But it was information she entered
20  in the qualification form.  Correct?
21      A. Yes.
22      Q. About her health.  Correct?
23      A. No.  Not -- about her -- about her
24  condition at the time.
25      Q. Including her weight?

76

1       A. Yes.
2       Q. Including information she provided about
3   why she wanted the product?
4       A. Yes.
5       Q. Okay.  Let's go to page 722, same question
6   with Ms. Richmond as to the information that
7   we've redacted from paragraphs 38 through 41.
8   The redacted information --
9       A. Yes.
10      Q. -- was information that Ms. Richmond
11  would have entered into the qualification form
12  when she purchased the product.  Correct?
13      A. Yes.
14      Q. Okay.  Let's turn to page 724.
15      A. Somebody's weight is not a secret.  I
16  mean, everybody can see their weight.  If
17  somebody is 200 pounds, whether you retract
18  it or not, everybody can see.  It's not a
19  hidden secret.
20      Q. Paragraph 48 through 52 on page 724,
21  again that represents information Ms. Maccaro
22  -- M-a-c-c-a-r-o -- entered into the
23  qualification form.  Correct?
24      A. No.  That's shipping information.  48.
25      Q. 48.  Okay.  I'm sorry.

19 (Pages 73 to 76)

Juravin

FTC v. Roca Labs, Inc., et al.                                                2/15/2017

77

1    A. Shipping information.
2    Q. So, 50 through 53, however, would be
3  qualification?
4    A. Which one?
5    Q. Paragraphs 50 through 53 on 724?
6    A. Yes.
7    Q. The redacted information is information
8  she input into the health -- I'm sorry -- to the
9  qualification form.
10    A. Yes.
11    Q. And let's move on to -- let's look at
12  Exhibit 46, please. I'm sorry. We'll skip.
13  47 is what I'm thinking of.
14    A. They named themselves Superior Corp.
15  Seriously.
16    Q. All right. Could you please look at
17  pages two and three, I guess, and the fourth
18  page of Exhibit 47. Do you recognize this
19  document?
20    A. No. But I know about it.
21    Q. This is a declaration that you signed.
22  Correct?
23    A. Okay.
24    Q. Well, look at page -- the fourth
25  page of the document. Does that have your

78

1  signature?
2    A. It doesn't, but -- yes. Okay. It
3  doesn't look like mine really. But I guess
4  -- maybe I did it on the computer. Just
5  doesn't look exactly like mine.
6    Q. Okay.
7    A. I don't think Larry would treat me.
8    Q. Larry being the attorney who filed this?
9    A. Yeah. So I guess it is. I don't know
10  what to say.
11    Q. And turn a couple more pages to
12  Exhibit A in that document. The next page.
13  And the page after that.
14    A. Yeah.
15    Q. Okay. Look at the bottom of that page,
16  the bottom of the page that has the marking
17  FTC-Prod--20094. And there's the wording,
18  Mmale 212, basic plan, 857, basic male, 116.
19    A. What number are you?
20    Q. I'm sorry. I'm looking at the wrong
21  item. I'm actually looking at -- I wanted to
22  look at paragraph -- I'm sorry. Page -- the
23  next page, FTC-Prod-020095 and 096. I'm
24  sorry. So, where it begins qualification
25  form --

79

1    A. Okay.
2    Q. -- starting at the bottom of that 95,
3  going on to 96, the information shown in this
4  qualification form section is information that
5  Zachary Lake entered in the qualification form
6  when purchasing Roca Labs product. Is that
7  correct?
8    A. Yes.
9    Q. And that's true of the information going
10  from 2 -- I'm sorry -- 095 to 096. Right?
11    A. Yeah.
12    Q. Okay. And the date of this declaration,
13  looking back on your signature page, was November
14  28, 2016. Correct? Going further up.
15    A. Okay. But this was lately --
16  recently.
17    Q. But you look at the signature page.
18  This is November 28, 2016 you signed that.
19  Correct?
20    A. Okay. Yes.
21    Q. Then, it was subsequently filed
22  with the Superior Court of California for
23  Los Angeles County. Correct?
24    A. Yes.
25    Q. Let's look at Exhibit 48, please.

80

1  Exhibit 48 is a Roca Labs, Inc. voluntary
2  notice of dismissal in the case Roca Labs,
3  Inc. and Roca Labs Nutraceutical versus
4  iPayment, Inc.
5    A. Okay.
6    Q. You see that?
7    A. Yes.
8    Q. And this basically dismissed the case --
9    A. Okay.
10    Q. -- from Roca Labs and all claims by Roca
11  Labs -- by plaintiff, Roca Labs, Nutraceutical,
12  Inc. in the action remain pending. Correct?
13    A. Yes.
14    Q. Okay. So, just to be clear, Roca Labs,
15  Inc., withdrew from this -- dismissed itself
16  from this action, and Roca Labs Nutraceutical
17  remained in it, and the agreement with
18  iPayment was between iPayment and Roca Labs
19  Nutraceutical. Correct?
20    A. Correct.
21    Q. Okay. Why don't we take a break?
22  I'll tee up some more documents. I'm done
23  with these for now.
24      (Off the record from 2:50 p.m. to 2:59 p.m.)
25      (Plaintiff's Exhibit Nos. 49, 50, 51,

20 (Pages 77 to 80)

FTC v. Roca Labs, Inc., et al.                                          2/15/2017

81

1   52 and 53 were marked for identification.)
2   BY MR. SETTLEMYER:
3       Q.  Back on.  We've had marked as Exhibits 49
4   through 53 several documents that I'm going to
5   ask Mr. Juravin about.  Mr. Juravin, I want to
6   ask if you recognize Exhibit 49.
7       A.  Not the details, but in general, yes.
8       Q.  In general, yes.  This is a copy of the
9   terms and conditions that were used for the Roca
10  Labs Web site at the period of time.  Is that
11  correct?
12      A.  Yes.  If it says Version 1.2 from May
13  2011.
14      Q.  How long was this particular version of
15  the terms and conditions in use?
16      A.  I don't know because we changed them
17  all the time.  Not all the time.  But I would
18  say two, three times a year maybe.
19      Q.  Do you think generally this would have
20  been in effect until sometime into 2012?
21      A.  You have the answer.  One is 1.2 in
22  May 2011.  The next one is 1.8 in September
23  2012.  So, you can assume that we had a few
24  of them in between.
25      Q.  Okay.

82

1       A.  But the principle always remain the
2   same.
3       Q.  Let's just talk about the principle.
4   So, one of them is that there would be --
5   I'm going to focus on one particular thing.
6       THE WITNESS:  Do I get to depose him
7   sometime?
8   BY MR. SETTLEMYER:
9       Q.  In Version 1.2, Exhibit 49 --
10      A.  Yes.
11      Q.  -- there is an agreement -- language
12  stating an agreement by the customer not to
13  comment negatively about the product.  Is that
14  right?
15      A.  In principle.  Can you point me to it,
16  please?  Yes.  Agreement not to contact -- to
17  comment negatively.
18      Q.  Where do you see that?
19      A.  Let's go to 423.
20      Q.  Okay.
21      A.  You will miss the heading.  But -- to
22  drink large quantity of -- yes.  This is what
23  I was looking for.
24      Q.  So, the language, the
25  announcement/writing/publication of any such or

83

1   other claim in any media or form will constitute
2   a breach of agreement, to which the customer
3   entered willingly and with full knowledge the
4   components of the formula.
5       A.  I don't see.
6       Q.  The top of the page of 423.
7       A.  I'm in 423.
8       Q.  Yes.  423.
9       A.  So, the customer understands and he is
10  aware that he's required to dose the formula.
11  I will not continue to read, but --
12      Q.  The next sentence after that.
13      A.  "Therefore" -- starts with
14  "therefore."
15      Q.  "No claim and/or complaint will be
16  accepted.
17      A.  Oh, therefore.  Therefore, based on
18  the previous sentence, no claim and/or
19  complaints will be accepted regarding the
20  lack of success of the formula creating a
21  lack of appetite.  Bad English.  But the
22  meaning is that you must follow everything,
23  and if you don't follow everything, you don't
24  have the right to place a bad comment.
25      Q.  Okay.  That's the next sentence.  "The

84

1   announcement/writing or publication of any such
2   or other claim in any media or forum will
3   constitute a breach of contract."  Correct?
4       A.  Yes.  So, in other words, we tell the
5   customers, "You must follow everything.  If
6   you don't follow everything, you don't have
7   the right to comment."
8       Q.  Let me just isolate the one component
9   that we can just do some of these more
10  quickly.  That concept of the customer
11  would be in breach of the agreement were
12  they to post a negative comment about the
13  product in a public forum as a component
14  are the terms and conditions of Roca Labs
15  sales from 2011 through the filing of our
16  lawsuit in 2015.  Is that right?
17      A.  No.  Because I think that my bad
18  English confuses.  Bad English that I'm
19  responsible for.  The idea is that the
20  customer required to use correctly the
21  formula, to drink large amount of money to
22  avoid --
23      Q.  Drink a large amount of water you mean?
24      A.  Water.  The quantity of liquids.  We
25  called it liquids.  To avoid calorie rich

21 (Pages 81 to 84)

Juravin

FTC v. Roca Labs, Inc., et al.                                    2/15/2017

---

85

1    foods.  To overcome psychological obstacles.
2    And so on and so on.  And then not to
3    comment.
4        Q.  Okay.  Let's go to 425.
5        A.  Basically, what I'm saying is that if
6    somebody commented, as I mentioned earlier,
7    and followed everything, that's not a
8    negative comment.  It's the meaning is -- the
9    title is confusing.  I understand what you
10   say.
11       Q.  Why don't we go with the premise to an
12   extent -- I don't want to have you sit here and
13   interpret the documents.  I want to try to
14   isolate this feature.
15           Let's look at page 425, about a
16   third of the way down, begins the paragraph,
17   "If for whatever reason you become
18   dissatisfied with the formula or the support,
19   you agree not to make, write, post, distribute
20   or disseminate in any way any negative
21   comments about or relating to Roca Labs, the
22   formula or the support.  This includes writing
23   anything on the Internet or making a complaint
24   with PayPal, your credit card company, the
25   Better Business Bureau, et cetera.  Doing so,

---

86

1    in light of these clear terms and conditions,
2    would constitute breach of contract and
3    defamation, and would be actionable in Florida
4    court."
5           So, a statement like this is
6    in every version of the terms and conditions
7    that were used to sell Roca Labs products from
8    2011 through 2015 when the lawsuit is filed.
9    Right?
10       A.  I need to talk to Suzie for a second.
11   Because I want to tell you something, and I
12   need her permission.  It's possible.  Or you
13   not?  I will go on a limb.  This is wrong.
14   And if it's up to me, it should not be here.
15   This is the advice of the attorneys.
16           MS. MARTENY:  Wait.  Wait.
17   BY MR. SETTLEMYER:
18       Q.  Let's not talk about the advice of
19   attorneys.  I just want a yes or no.  Was
20   something like this --
21       A.  I don't know.  But this is not my
22   language.  This is not my language.
23           MS. MARTENY:  Stop.  The question is
24   different.
25       A.  If it's all the way through the '15,

---

87

1    I don't know.  I'm jumping to '14.
2    BY MR. SETTLEMYER:
3        Q.  Let's pause a second.  So, my question and
4    maybe your answer at this point, it sounds like,
5    is you don't know was whether language of what I
6    just quoted or very similar to it was present in
7    these agreements throughout 2011 up till the
8    lawsuit was filed in 2015.
9        A.  If I can open -- look at 15.
10       Q.  Let's go to 50.  And we'll just verify
11   what these things are.  Let's start with the
12   basics.
13       A.  But I look at it, and I myself don't
14   like it.
15       Q.  I'm not asking whether you like it.
16   I'm asking whether it was there.
17       A.  I understand.
18       Q.  Exhibit 50 is another version of
19   the terms and conditions that was -- the first
20   page indicates it's USC 1.8 September 2012.
21   Is that correct?
22       A.  Yes.
23       Q.  So, this would have been terms and
24   conditions that were being used around September
25   of 2012.

---

88

1        A.  Yes.  I see that.  And I'm going to be
2    looking, to look for that paragraph.
3        Q.  There's a heading on page ending in 016,
4    agreement not to comment negatively.
5        A.  One second.  I see.
6        Q.  Yes?  Okay.  So, this version of
7    the terms and conditions was in effect for
8    some period of time going into at least 2013,
9    it would appear, based on there's a footer at
10   the bottom of November 25, 2013.  Do you see
11   that?
12       A.  Yes.  November.
13       Q.  Would that indicate that it would
14   have been in effect at least until 2013, do
15   you think?
16       A.  No.  It doesn't mean that.  I have no
17   idea what's on the footer because it's not
18   part of the site.
19       Q.  Okay.
20       A.  No.  It's not an indication.  It
21   means that it started September 2012.  But
22   it's not an indication that it continued.
23   I don't know who -- you know.
24       Q.  I'll just say that's not our marking.
25   That's not a marking the FTC put on there.

---

22 (Pages 85 to 88)

Juravin

FTC v. Roca Labs, Inc., et al.                                                  2/15/2017

89

1    A. No. It's not.
2    Q. The marking of FTC-SKing numbering, and
3  that is our marking.
4    A. Sure.
5    Q. Let's turn to Exhibit 50 now.
6  51. I'm sorry. 51.
7    A. Sorry. But can we look if I have
8  this sentence?
9    Q. Let's go back --
10    A. Because I don't find that particular
11  paragraph there. You asked me earlier if it
12  was the way for '15.
13    Q. Sure.
14    A. And I don't see it there. I already
15  told you on the record that I really don't
16  like that paragraph.
17    Q. Let's see. Number -- page 016,
18  agreement not to comment negatively.
19    A. Are we on 50?
20    Q. We are on 50. Yes.
21    A. Which page you want me to go to?
22    Q. 1-6, the bottom right-hand corner.
23    A. I'm there.
24    Q. Okay. So, after the bold print,
25  "The customer is also aware that the

90

1  company does not guaranty success," there
2  is the language, "Therefore, unless the
3  customer purchased the formula at full
4  price, no claim or complaint whatsoever
5  will be accepted regarding the lack of
6  success of the formula." Two, the
7  announcement, writing or publication of
8  any such or other claim in any media or
9  forum will constitute a breach of this
10  agreement, to which the customer willingly
11  and with false knowledge of the components
12  of formula and its properties and it's
13  support, you -- 3, you agree that any
14  such negative claim will constitute
15  defamation, per se.
16    A. Okay.
17    Q. All right. So, again, this type of
18  provision is --
19    A. Is different than the previous one.
20    Q. Different language. But the concept is
21  very similar. You understand? You agree?
22    A. The concept? No. It means you can
23  pay the full price. If you don't pay the
24  full price. The idea behind it is that the
25  more the customer pays, the more the customer

91

1  feels obligated to succeed.
2    Q. All right. And let's go down to
3  page 19, and look at the bottom.
4    A. Page 19?
5    Q. Yes. There's a bold language, "You
6  further agree that any report of any kind
7  on the Web will constitute defamation/slander,
8  and you agree to a predetermined compensation
9  of $100,000. You agree and understand that
10  you cannot talk badly about the formula
11  because of any frustration you might have
12  with the support department or your
13  misunderstanding." You see that?
14    A. Yes.
15    Q. Okay.
16    A. Do I need to comment on this?
17    Q. You don't need to comment on it.
18  No. Let's try to move through. I'm hoping
19  we can go through these quickly and maybe
20  let the documents speak for themselves, I
21  suppose. Exhibit Number 51 is a version of
22  the terms and conditions that is USV 2.0,
23  June 2014. You see that?
24    A. Yes.
25    Q. So, generally, this document was

92

1  in effect until some later time, and --
2    A. I cannot -- I can tell you when it
3  started. I cannot tell you --
4    Q. You don't know when it ended. Okay.
5  But usually you can tell, it certainly ended
6  by approximately the time the next one went
7  into effect.
8    A. Especially if we made the mistake and
9  it's still V.2. You see it's V.20, and the
10  other one is V.20.
11    Q. So, this one started June 2014,
12  Exhibit Number 51. Correct?
13    A. Yes.
14    Q. Let's look at Exhibit 52.
15    A. I think here you want to show me
16  inside.
17    Q. I don't think we're going to be
18  doing more than reading language, and the
19  document will say what it says.
20    A. Sure.
21    Q. Let's look at Exhibit 52. That's,
22  again, terms and conditions of use,
23  version 2.0, August 2014. You see that?
24    A. Yes.
25    Q. Again, this is one where it's still

23 (Pages 89 to 92)



93

1    version 2.0, but it's still apparently in
2    effect of August of 2014.  Correct?
3        A.  Yes.
4        Q.  Let's look at Exhibit 53.  Another
5    version of the terms and conditions, version
6    2.3.1 that was effective, apparently, as of
7    December 2014.  You agree with that?
8        A.  I see that.  Yes.
9        Q.  Okay.  Now, do you have any reason
10   to think there was any point in time at which
11   Roca Labs, Inc., Roca Labs Nutraceutical, or
12   up until the lawsuit was filed, did not have
13   language in its terms that would restrict
14   consumers' ability to comment negatively in a
15   public forum about the company or its
16   products?
17       A.  If we had the distinction between
18   paying full price or paying partial price,
19   we had that language.  So, for as long as we
20   sold the full price and the discounted price,
21   we did have that language.
22       Q.  Is there any time at which you did not
23   have that language between 2011 and when the
24   lawsuit was filed in 2015?  Yes or no?
25       A.  When you describe the lawsuit, did you

94

1    see the full price and the partial price?
2        Q.  You're not answering my question.
3    Can I have the question read back, please?
4        A.  I don't have another indication to
5    know.  So, my answer is that I don't have any
6    indication, because that provision went along
7    with full price, discounted price.  All
8    along.  So, if we have full price and
9    discounted price, by the time that you sued
10   us, then I did have it.  And otherwise --
11       Q.  Okay.  So you have been designated as the
12   person who's speaking on behalf of Roca Labs,
13   Inc., Roca Labs Nutraceutical, and Must Cure
14   Obesity.  But certainly, Roca Labs Nutraceutical
15   and Roca Labs, Inc. come into play here as to the
16   topic of --
17       A.  I don't see here in this starting
18   2014.  Can you tell me you sued us in '15?
19   Correct?
20       MS. MARTENY:  Mmm-hmm.
21   BY MR. SETTLEMYER:
22       Q.  Yes.  Lawsuit of September 2015.
23       A.  I don't see that it's there.  I don't
24   see it in '15.
25       Q.  You don't see it in the Exhibit 53 you're

95

1    looking at?
2        A.  Yes.  I don't see it.  And if you can
3    show me, please.
4        Q.  So, if you look at the page --
5        A.  Which one?
6        Q.  8 of 14, upper right-hand corner.
7        A.  Let's see.  I'm looking now.
8        Q.  Eight of 14 onto 9 of 14, there's a
9    provision, Non-disparagement.  You see that?
10       A.  I'm looking.  It's different language.
11       Q.  The language is slightly different.
12       A.  It's more than slightly.  It's -- it's
13   more than slightly.  It doesn't include the
14   discounted, and it's different.  So, it's not
15   all the way.  So, that's why I wanted to look
16   at the -- it's not all the way through the
17   lawsuit.  It's already different in 2014.
18   So, it is different in '14.
19       Q.  So, in this Exhibit 53 on Page 814,
20   towards the bottom, it says, "This means
21   that you will not" -- okay.  "You agree that
22   regardless of your personal experience with
23   RL, you will not disparage RL and/or any of
24   its employees, products, or services.  This
25   means that you will not speak, publish, cause

96

1    to be published, print, review, log, or
2    otherwise write negatively about RL or its
3    products or employees in any way.  This
4    encompasses all forms of media, including
5    and especially the Internet."
6        A.  I see that.
7        Q.  That type of language was still
8    present, then, in 2014 and --
9        A.  Let's continue.  It's different.
10   It's not exactly the same.  It's different.
11       Q.  I'll grant you it's not exactly the
12   same.
13       A.  It's different.  Let's not get into
14   the --
15       Q.  I'm trying to find out is there
16   any point at which --
17       A.  It's different because we didn't
18   have the discounted already.  That's why
19   the languages are so different.  Okay?
20   So, let's say it is different.  It's
21   different.  It's still non-disparagement,
22   but it's different.
23       Q.  Let's say it's still non-disparaging.
24   Let's focus on that.  Is there any time
25   between 2011 and when the lawsuit was filed

24 (Pages 93 to 96)

Case 8:15-cv-02231-MSS-TBM   Document 141-6   Filed 03/24/17   Page 37 of 258 PageID 3208
Juravin
FTC v. Roca Labs, Inc., et al.                                                2/15/2017

97
1    that Roca Labs and Roca Labs Nutraceutical
2    did not have a non-disparagement provision in
3    its terms?
4       A. Probably one way or another we did
5    have it.
6       Q. At all those times. Correct?
7       A. In this one form or another we did
8    have a non-disparagement -- non-disparagement
9    clause.
10      Q. So the answer is yes?
11      A. But not the first version.
12      Q. But not the first version. The
13   versions -- language which it is stated
14   changed, but the non-disparagement concept
15   was consistent.
16      A. Yes. Which was not illegal at the
17   time.
18      Q. All right. I'm done with these exhibits
19   for now. I'm going to try to pull together some
20   additional set of documents. Let me see if I
21   can talk about them for one minute before I
22   hand them to Mr. Juravin.
23      MS. MARTENY: Okay.
24      (Plaintiff's Exhibit Nos. 54, 55,
25   56 and 57 were marked for identification.)

98
1    BY MR. SETTLEMYER:
2       Q. Back on the record. So, we've marked some
3    documents as Exhibits 54, 55, 56 and 57, that I'm
4    going to ask you about, Mr. Juravin. They're in
5    front of you. Take a look first, please, at
6    Exhibit 54. Are you familiar with what's in
7    Exhibit 54?
8       A. Not everything. But it's mine.
9       Q. But you're generally familiar with what
10   these are?
11      A. Generally familiar. Yes.
12      Q. These are ads that the company is
13   either in 2014, that Roca Labs, Inc. or Roca
14   Labs Nutraceutical was attempting to place
15   or did place with Facebook. Correct?
16      A. Correct.
17      Q. And the way one can distinguish
18   between ads that actually ran on Facebook
19   and those that did not is those that have
20   likes and comments --
21      A. Yes.
22      Q. -- are ones that actually ran on
23   Facebook. Correct?
24      A. Yes. It might be also that it
25   ran for an hour and then blocked.

99
1       Q. Okay. But if there were -- the
2    more likes and comments and shares of the ad,
3    the more likely it is that it was actually
4    run. Correct?
5       A. If it gets a like, it's more likely.
6    I explain how it works.
7       Q. So let's look at the first page --
8    I'm sorry. Say that again for the court
9    reporter.
10      A. I said if it has more likes, it's
11   likely.
12      Q. Sorry.
13      A. I said yes.
14      Q. Let me just point you to the first
15   page of Exhibit 54.
16      A. Yes.
17      Q. That ad is one that actually ran,
18   you believe. Correct?
19      A. Correct.
20      Q. When an ad would run for Roca Labs
21   on Facebook, a consumer would click on that,
22   and what would happen?
23      A. They will start -- our job is just to
24   open their eyes so they will land on a page.
25      Q. They'll land -- that was my --

100
1       A. They'll land on the page that will
2    make them be familiar with it.
3       Q. So, the page would likely be Roca
4    Labs.com or another page other than the home
5    page on the Roca Labs.com Web site. Is that
6    right?
7       A. It would be an educational page.
8       Q. But often, it would be the Roca
9    Labs.com Web page?
10      A. Possibly. Yes.
11      Q. What other pages than the Roca
12   Labs.com Web page or pages on that site or
13   Mini Gastric Bypass.me?
14      A. An FAQ.
15      Q. An FAQ page hosted where?
16      A. Anywhere where it's educational.
17   Nobody buys it directly immediately. On the
18   average you need 3.2 clicks to make a
19   purchase.
20      Q. Where would the first click after --
21      A. It doesn't work like that.
22      Q. Where would a consumer be directed
23   after clicking the ad, typically?
24      A. Education.
25      Q. Give me specifics, please, in terms

25 (Pages 97 to 100)

FTC v. Roca Labs, Inc., et al.                                                                              2/15/2017

101

1    of a domain name --
2        A.  Watching a video.
3        Q.  I'm watching a video from Roca Labs?
4        A.  Yes.  Or getting frequently asked
5    questions.  Or anything educational.  Nobody
6    buys immediately.  They need on average about
7    three months -- about three months and about
8    3.2 clicks to buy it.  So, somebody will
9    click, would learn, would go to search on the
10   Web about us, and then come back, then,
11   again, suddenly see another ad.  Then, again,
12   and again.  At least three months, and at
13   least 3.2 clicks.
14       Q.  So, the content of which people would be
15   directed from these Facebook ads would, however,
16   be content owned by Roca Labs.  Is that right?
17       A.  Correct.
18       Q.  Let's look at Exhibit 55.
19       A.  I want to explain something.
20       Q.  About 54?
21       A.  Yes.
22       Q.  Okay.
23       A.  If we wrote here -- if we wrote here,
24   "You will win $1 million dollars if you" --
25       Q.  By "here," you're pointing to the ad.

102

1    Correct?
2        A.  To the ad.  Anything that is
3    completely off, absolutely not -- that I
4    should be jailed for on this one, it still
5    doesn't matter, because they will never buy
6    on an impulse $600.  They will wait three
7    months, they will ask friends.  They will go
8    again and again.  They will need 3.2 clicks
9    to really eventually purchase from us.
10   Nobody buys immediately because of an ad.
11       Q.  Thank you.  Exhibit 55, that, again,
12   same concept.  These are Facebook ads.
13   Right?
14       A.  Yes.
15       Q.  These were placed in 2015 or proposed
16   to be presented, served in 2015.  Correct?
17       A.  Yes.
18       Q.  All right.  Again, if there are, as
19   on the first ad, say, 1,000 likes, 119
20   comments, that would suggest an ad that was
21   actually run on Facebook.  Correct?
22       A.  Correct.
23       Q.  And in 2015, these ads would have been
24   placed at the direction of Roca -- I'm sorry --
25   Must Cure Obesity or Roca Labs?

103

1        A.  I don't know I see the relevance.  It
2    was under my responsibility.  So, it doesn't
3    matter which one.
4        Q.  Got it.  Let's look at Exhibit 56.
5    So, the -- the Exhibit 56, again, these are
6    Facebook ads proposed, and actual, in 2016, I
7    believe, even though the date isn't on here,
8    I believe the date these were produced --
9    I'm just representing this for the record --
10       A.  Exhibit 56.
11       Q.  Exhibit 56.  Yes.  Was in February of
12   2016.  And given that there's no year on here --
13       A.  Okay.
14       Q.  -- would that suggest to you that these
15   were run in 2016?
16       A.  It's the same ads.  It doesn't seem to
17   change.  No.  The same things.
18       Q.  Okay.  In terms of the likes and the
19   shares for these different ads, was Roca
20   compensating anybody to like or share or comment
21   on these ads?
22       A.  I don't know how it's possible.  I
23   don't think it's possible.  Not that I know.
24   And aside from that, let me teach you
25   something.  It's really bad to do artificial

104

1    likes.  Because Facebook is checking the
2    ratio between the likes, the shares, and the
3    interest.  So, let's say you have 100,000.
4    That's if they could have bought likes.
5    And it's 100 likes, but only two shares,
6    Facebook will say there's no interest
7    in it.
8        Q.  So, the answer is no, the company
9    was not paying for those, or --
10       A.  For the likes?
11       Q.  For the likes, and shares, and comments.
12       A.  Please.  This is -- this is an ad that
13   we pay money.  So, if every click we pay
14   money, we will not pay for artificial clicks.
15   It doesn't make sense.
16       Q.  So, the answer is no, the company was not
17   paying.
18       A.  No.  It doesn't make sense.
19       Q.  No.  I'm asking did it happen?
20       A.  No.
21       Q.  Thank you.
22       A.  It doesn't make sense.  I'm teaching
23   just in case you will have a bigger fish than
24   me to fry, so you will know.  No.
25       Q.  Thank you.

26 (Pages 101 to 104)

Juravin

FTC v. Roca Labs, Inc., et al.                                        2/15/2017

105

1           MR. DAVIS:  And may I mention,
2    perhaps for the sake of the court
3    reporter, that in the dialog between
4    the two of you, it might help if you
5    were to pause ever so slightly to be
6    sure if the question is answered -- if
7    the question has been asked fully or if
8    an answer has been finished.
9           THE WITNESS:  I will.
10          MR. DAVIS:  I'm just noticing a
11   potential over talk possibility.
12          MS. MARTENY:  You're so optimistic.
13          MR. SETTLEMYER:  He's very diplomatic.
14          THE WITNESS:  Give me positive
15   reinforcement that I was so good for so
16   many hours.
17   BY MR. SETTLEMYER:
18       Q.  He's also talking to me, too.  Let's look
19   at Exhibit 57, please.  And Mr. Juravin, do you
20   recognize what's in Exhibit 57?  There's a lot of
21   different things in this long document.
22       A.  Look at the format.
23          MR. DAVIS:  I just wonder if this
24   is an illustration when I interrupt, to
25   ask whether perhaps the dialog couldn't

106

1    include some pauses so that the
2    questioner can finish with the
3    question.
4           THE WITNESS:  I will try harder.
5           MR. DAVIS:  I'm just noticing that it's --
6           THE WITNESS:  I will try harder.
7           MR. DAVIS:  -- occurring a little.
8    Thank you.
9    BY MR. SETTLEMYER:
10       Q.  So, there's a lot of different categories
11   within this fairly lengthy document that was
12   produced to us, I believe, back in February 2016.
13   But do you recognize, sir, what is in Exhibit 57?
14       A.  For the most part, I did directly,
15   indirectly -- I recognize it for the most
16   part.
17       Q.  Okay.  So, the first several pages
18   appear to be urls for Facebook ads.  Is that
19   correct?
20       A.  Okay.
21       Q.  I'm asking:  Is that correct?  Yes?
22       A.  You're asking me to recognize all of
23   these long numbers?
24       Q.  I'm asking you to recognize this as a
25   category.  Are these urls for Facebook ads?

107

1       A.  Yes.
2       Q.  Okay.  Let's go, I think, six pages in,
3    there's a heading "sidebar ads."  Let me know
4    when you see that.
5       A.  Yes.
6       Q.  Okay.  What are sidebar ads?  Where do
7    those appear?
8       A.  I don't know.
9       Q.  Do you know if those appeared in
10   Facebook or on the Web generally?
11      A.  I think sidebar means desktop.
12      Q.  Okay.
13      A.  You cannot have desk -- a side desk
14   form.
15      Q.  So, it would be on a desktop.  I
16   guess the question is:  Would it appear
17   in a particular context like Facebook, or
18   would it appear through like a display ad
19   network that would be delivered to other
20   Web sites hosting or delivering ads --
21      A.  I don't -- I don't think Facebook
22   has affiliates.  I'm not familiar with it.
23      Q.  I'm just wondering just again, in
24   terms of what this document, this heading
25   represents, whether sidebar ads represent a

108

1    subset of Facebook ads, or is it an all
2    together different delivery platform?
3       A.  My guess that it's desktop.
4       Q.  Okay.  Not Facebook?
5       A.  Facebook desktop.
6       Q.  Facebook desktop.  Thank you.
7       A.  Only the desktop.  Because it requires
8    the space.
9       Q.  Understood.  That helps.  Let's go a
10   couple of pages in, and then there are sidebar
11   ad visuals with a number of pages of pictures
12   following.
13      A.  I'm afraid that the word sidebar may
14   be a name that we gave the campaign.  If we
15   gave the campaign, we could have called it
16   Popeye.  Popeye with the spinach.
17      Q.  So, my question, then, is:  This,
18   regardless of what the term is, sidebar ad
19   visuals, that's the term that's there, what
20   does that delineation in this document ahead
21   of these different picture display ads, these
22   different images, what does that signify in
23   terms of where and on what platform these ads
24   were run?
25          MS. MARTENY:  Object to the form.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-38

Juravin

FTC v. Roca Labs, Inc., et al.                                        2/15/2017

---

109

1    BY MR. SETTLEMYER:
2       Q.  You can answer.
3          MS. MARTENY:  Yes.  If you understand
4    the question, answer it.
5          THE WITNESS:  I didn't understand the one
6    word.
7          MS. MARTENY:  Delineations.
8       A.  Yeah.  Because this might be that your
9    programmer -- it might be that it was just a
10   logo or something art, one piece to compose
11   the ad, and when you printed it, it just
12   throw it up.  But it doesn't look like an ad
13   to me.  This is an ad.  I'm pointing to a
14   real ad.  This is an ad.  This one doesn't
15   look like an ad.
16   BY MR. SETTLEMYER:
17      Q.  Okay.
18      A.  It looks like some art that we had
19   that was about to be incorporated somewhere.
20      Q.  So, some of the first pages --
21      A.  See, all of this are not ads.
22      Q.  This isn't going to show up on the
23   transcript, all the pointing that we're doing
24   right now.  I see that there's certain, like
25   this first page, with the words sidebar ad

---

110

1    visuals, there is a Gastric Bypass Alternative
2    logo that you're saying may not have been a
3    standalone ad, but artwork in part of an ad.
4    Is that right?
5       A.  It means a call for action.  That's
6    the term you're looking for.  An ad must have
7    a call for action.  If it doesn't have, it's
8    nothing.  It's just some art.  It never -- it
9    cannot be advertising.
10      Q.  My question is very simple.  For the
11   first few pages, you think that was just
12   art --
13      A.  Yes.
14      Q.  -- until we get to another page,
15   which is -- there's a page, a few pages
16   before where you're looking at --
17      A.  I know.
18      Q.  -- that has Google banner ads.  Right?
19   So, the pages that come after that, those
20   include looking through many pages of what I
21   will ask you whether or not these are banner
22   ads that were run through Google's ad network.
23      A.  Correct.  These are real ads.
24   So, you will note -- you will notice that
25   these ads incorporates all of this artwork in

---

111

1    them.
2       Q.  Okay.  So, these Google banner ads ran on
3    the Google display network for around what time
4    period?
5       A.  All the way till they banned us.
6    About a year ago.
7       Q.  Okay.
8       A.  Half a year ago.
9       Q.  So, starting around when?
10      A.  2009.
11      Q.  Okay.  So --
12      A.  I don't know which one what.  But we
13   ran Google from 2009 till a year ago about.
14      Q.  So, these banner ads, when the consumer
15   would click on them, where would those consumers
16   be directed?
17      A.  Educational.
18      Q.  So, Roca Labs content.  Correct?
19      A.  Some educational about the concept of
20   Gastric Bypass Alternative.
21      Q.  Just to be clear, I'm not trying to be
22   tricky with this.  They wouldn't be directed to a
23   Department of Education Web site.  Right?  They
24   would be directed to some content, a video or a
25   Web page that was run by Roca Labs.  Correct?

---

112

1       A.  Educational about a Gastric Bypass
2    Alternative that belongs to Roca Labs.
3       Q.  That belongs to Roca Labs.  Thank you.
4       A.  That belongs to Roca Labs.
5       Q.  So the answer is yes.  Right?
6       A.  Yes.
7       Q.  Following the display ads, there's a
8    heading "Text Ads."  Do you see that?
9       A.  I'm familiar with it.  Yeah.
10      Q.  So, there are many, many pages of text
11   ads.
12      A.  May I --
13      Q.  I just want to note that they go from
14   number one through and running up to 1,393, I
15   believe.  Do you see that?
16      A.  Yes.
17      Q.  Okay.  These are text ads that ran on
18   Google when people searched.  Is that right?
19      A.  Ad words.
20      Q.  And in ad words.
21      A.  Yes.
22      Q.  So, this would be in both context.
23   Both search and ad words.
24      A.  Correct.
25      Q.  The ad words, just to be clear for the

---

28 (Pages 109 to 112)

Juravin

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017

---

113

1    record, those are display ads that are run on
2    third-party sites, on a sidebar, or as a banner,
3    or something.  Correct?
4        A. Not really.
5        Q. No?
6        A. No.  These are text ads that we --
7    that must -- that the person who searches
8    needs to search something relevant to the key
9    words that we gave.  And the reason that I'm
10   giving you information that you dismiss or
11   you don't like, it's important to remember,
12   nobody -- nobody buys an ad after clicking on
13   it.  They don't even remember where they
14   clicked on it.
15       Q. Nobody buys an ad?
16       A. I'm sorry.  Nobody buys the products.
17   The regimen after clicking on an ad.  Nobody.
18       Q. You mean immediately after clicking on an
19   ad?
20       A. Exactly.  They need -- nobody spend
21   $500 -- nobody spends $600 on the spot
22   because they saw.  They don't remember where
23   they saw the ad.  They need to read.  They
24   need to search.  They need to come back.
25   They need to ask friends.  Nobody buys it.

---

114

1        So, it doesn't -- so much -- so much, that
2    at one time we advertised on sex sites, because
3    I didn't care where they click on it.  Because
4    they don't remember.  I just want them to read
5    the concept.
6        Q. So, part of it is perhaps advertising for
7    brand recognition and for concept recognition,
8    not just --
9        A. Concept.  Not brand.
10       Q. Let's be --
11       A. Concept.  I want them to open their
12   eyes to the possibility.  That's all.
13       Q. I want to make sure we're clarifying
14   something.  I'm advised that when we've used the
15   word text ads, maybe the pronunciation was not
16   clear.  It's t-e-x-t, not t-e-s-t, in case
17   there's any question.
18       At the end of the text ads, 1393,
19   there's another heading that's Yahoo.
20   Correct?
21       A. Yes.
22       Q. There's a subheading text ads under Yahoo
23   that run from 1 through above 2000.  Let me keep
24   going here.  Through --
25       A. 2000.

---

115

1        Q. Through 2,289.  Correct?
2        A. Okay.  Yes.
3        Q. So, these are text ads that ran on Yahoo
4    when people were searching.  Is that correct?
5        A. Yes.
6        Q. Okay.  And then after the Yahoo section,
7    there is a section of Bing banner ads.  Do you
8    see that?
9        A. Yes.
10       Q. These are display ads that ran on the
11   Microsoft Bing search network.  Is that right?
12       A. Ran or supposed to run.
13       Q. What is your distinction you're trying to
14   draw?
15       A. We submit on all networks you
16   basically submit.  They approve or
17   disapprove.  And even if they approve, they
18   can disapprove it after an hour or a week.
19       Q. Okay.
20       A. So, it might be that many of them
21   simply were disapproved.
22       Q. But it's possible that many of these
23   were approved and were accepted.  Correct?
24       A. Exactly.
25       Q. Okay.

---

116

1        A. Definitely.
2        Q. Let me back up and ask something
3    about the Yahoo text ads just briefly.
4    When people clicked on a Yahoo text ad,
5    to what destination were they directed at
6    that point?  To a Roca Labs content of some
7    sort?  Is that correct?
8        A. Educational.
9        Q. I understand the concept you're trying to
10   get at.  I'm just trying to find out who's
11   responsible for that educational content.  It's
12   Roca Labs educational content.  Correct?
13       A. Yes.  They will land in a place that
14   will allow them to learn about the concept.
15   And there is no distinction between clicking
16   on the text or clicking on display.
17       Q. But the destination for all of the Yahoo
18   text ads will be a Roca Labs controlled site or
19   video.  Correct?
20       A. Yes.
21       Q. And, then, the same is true for the Google
22   search ads, text ads.
23       A. All of them.
24       Q. All of them.  And the same would be true
25   for the Bing display ads.  Correct?

---

29 (Pages 113 to 116)

Juravin

FTC v. Roca Labs, Inc., et al.                                                2/15/2017

117

1     A.  Yes.
2     Q.  When we get to the end of this document,
3  there are a few text ads under the Bing section
4  at the very last two pages, going from one
5  through twelve, those would be, as with Yahoo and
6  Google search ads that ran in the context of
7  searching Google.  I'm sorry.  Searching Bing.
8  Correct?
9     A.  Yes.  Advertisements.  Any
10  advertisements.
11     Q.  And these ads would, again, link to what
12  you refer to as educational material, but
13  controlled by Roca Labs.  Is that correct?
14     A.  Yes.
15     Q.  Okay.  So -- and I'm going to turn now,
16  let's look at actually Exhibit Number 2, which is
17  right here.  Exhibit Number 2 is the FTC's first
18  amended complaint.  I'd like you to look, please,
19  at page -- pages 8 and 9.  I want you to take a
20  look at the ads shown in paragraph 23A through H.
21  Do the ads shown in Exhibit 2, paragraph 23 A
22  through H look like the type of ads that would be
23  run for Roca Labs in the March 2015 time frame on
24  Bing, Google -- on Bing, Yahoo, and Google?
25     A.  Yes.

118

1     Q.  Yes.  Thank you.
2     A.  You can ask me don't you recognize
3  your children?  So, yes.  They look like my
4  children.
5     Q.  Let me ask you this.  These ads would have
6  led to a Roca Labs Web page at that time.
7  Correct?
8     A.  Roca Labs control page.  Because Roca
9  Labs.com.  And there you will see many sites.
10  The reason we created the site, because we
11  didn't communicate too well with Google, and
12  and Google blocked us.  So we tried to
13  understand why Google blocked us.  What did
14  we do wrong?
15        We open another site.  We say, "Okay.  We
16  will improve.  Maybe we need privacy."  They
17  didn't talk to us.  Then, that's why we
18  created all of these, trying to understand.
19  All of them controlled by Roca Labs.  All of
20  them supposed to be education.  And our
21  philosophy was if we educate them, they'll
22  eventually buy.
23     Q.  So, the answer is yes?
24     A.  Yes.  Control.  Roca Labs control like
25  this.

119

1     Q.  Let's see.  Let's take a quick break.  I
2  can label some other stuff, and maybe we can do
3  some more stipulations on these Web pages.
4        MS. MARTENY:  Okay.
5     A.  I'm sorry.
6  BY MR. SETTLEMYER:
7     Q.  You want to stay on the record?  You want
8  to correct yourself?
9     A.  I'm sorry.  See, here, the
10  reason the landing site --
11     Q.  What are you pointing to?
12     A.  I'm pointing to 23C.  So, all the time
13  I said it's good that I corrected myself to
14  Roca Labs control site because I see
15  something like iNews Wire.  We tried for a
16  few days to do like a press release as part
17  of the education.  And tell people, "Go and
18  just read the press release, and if it's
19  interesting, go and find it on the Web."
20  So, it wasn't always a site, Roca Labs site.
21  But it was educational.  This is an example.
22     Q.  But the content that was in the iNews
23  Wire site --
24     A.  We are responsible for.
25     Q.  Okay.  "We" being Roca Labs.  Right?

120

1     A.  Roca Labs.  Yes.  It's good that I
2  paid attention.
3        (Off the record from 4:05 p.m. to 4:14 p.m.)
4        (Plaintiff's Exhibit Nos. 58, 59,
5  60, 61, 62 and 63 were marked for
6  identification.)
7  BY MR. SETTLEMYER:
8     Q.  Back on the record.  We've marked a number
9  of documents as Exhibits 58 through 63.  Mr.
10  Juravin, I'd like you to look first at Exhibit
11  58, which I believe we retrieved from a large
12  computer file that was produced to us several
13  weeks back, and I believe had a You Tube file
14  marking on the digital copy that we received.
15  Can you tell me if you recognize exhibit -- the
16  documents in Exhibit 58?
17     A.  Yes.
18     Q.  What are the documents in Exhibit 58?
19     A.  I'll call it satellite sites.  It's
20  not something active.  It's not something --
21  people don't really see.  It doesn't have any
22  activity.  It's just out there because we
23  experimented with something.
24     Q.  So, you don't think that the images in
25  Exhibit 58 appeared as the cover photos for Roca

30 (Pages 117 to 120)

Juravin

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017

---

121

1     Labs You Tube channels?
2         A. I didn't say that. I said people are
3     not exposed to it.
4         Q. I'm not asking what they were exposed to.
5     I'm just asking you where this was physically or
6     virtually present. These are photos that
7     appeared on this cover page of Roca Labs You Tube
8     pages. Is that correct?
9         A. No.
10        Q. No?
11        A. They were -- when you have a site like
12    Gastric Bypass Alternative.com.
13        Q. Okay.
14        A. Which we experimented with it, it's
15    only the landing page. I want to
16    differentiate between a site and a landing
17    page. The landing page is like one page,
18    nothing more. It links them to a site. A
19    site is a site with many pages. When you
20    have a landing site like Gastric Bypass
21    Alternative.com, You Tube issues you
22    immediately a You Tube with that. But you
23    don't upload videos. You don't do anything
24    there.
25             You really need to look for

---

122

1     it to find something like that. Because there
2     is no activity. There is no exposure to it.
3         Q. Let me back up. Roca Labs, Inc. and Roca
4     Labs Nutraceutical, at various times, had
5     channels on You Tube. Correct?
6         A. Only one that I'm -- only one I think
7     that we have. It's You Tube. You
8     Tube.com/Roca Labs. You Tube.com/Roca Labs
9     Reviews. That's it. I'm not familiar --
10        Q. All right. And those You Tube channels
11    had some sort of image associated with them that
12    would be a cover photo of sorts. Correct?
13        A. Yes.
14        Q. Okay. So, were these images shown in 58
15    ever the cover photos --
16        A. No.
17        Q. -- used on You Tube?
18        A. No. Not this. Not this -- I'm not
19    familiar with it. Again, it's not. It's not
20    a cover that will really -- that we will use.
21    Okay? It's not the cover. I don't remember
22    it, and it's not something I will use. But
23    it's something that we uploaded to a
24    satellite, to something that Google required
25    us to do on Gastric Bypass Alternative.com,

---

123

1     for example.
2         Q. This first one, then, would have some sort
3     of image that was used in connection with the
4     Gastric Bypass Alternative.com site.
5         A. Correct. Sort of.
6         Q. This particular image would have actually
7     been used on the Web. Correct?
8         A. No. This is experimental and
9     something that maybe Google required us to
10    do. I don't remember this one as being like
11    something that people really was exposed to,
12    what ended up with a sale. Okay?
13        Q. Let's move on to Exhibit 59 then.
14    Are you familiar with the images taken from
15    Exhibit 59? Again, this is from a recently
16    produced computer file.
17        A. Yes.
18        Q. What are the images in Exhibit 59?
19        A. Let's start with the font, which shows
20    Alfonso in a red shirt.
21        Q. With the arrow?
22        A. Yes.
23        Q. Okay.
24        A. What is the question?
25        Q. The question is: What is this -- where

---

124

1     was this used? Was it used on Facebook as a
2     cover page for a while?
3             MS. MARTENY: Object to form.
4         A. Facebook?
5     BY MR. SETTLEMYER:
6         Q. Was the image shown on page one of Exhibit
7     59 a Facebook cover photo for Roca Labs at any
8     point in time?
9         A. I don't think so. I don't remember
10    this as such. It might be that it was. I
11    personally don't remember it.
12        Q. What about the second page? Was that used
13    as a Facebook cover page by Roca Labs at any
14    point?
15        A. It looks more like something that we
16    will use. I'm not saying, by the way, that
17    this one was not. I just don't remember
18    doing something like this.
19        Q. By "this one," you're pointing to the
20    first page again. Correct?
21        A. Yes. If you tell me you took it from,
22    I'll say yes. You know what? It looks like
23    the same size as the next one. And I do
24    recognize page number two, so maybe it was.
25        Q. What about page number three?

---

31 (Pages 121 to 124)

FTC v. Roca Labs, Inc., et al.                                              2/15/2017

---

125

1    A. It looks like a potential.  Yes.
2    Q. And page four?
3    A. I definitely remember that.  Number
4  four.
5    Q. Number four, so you definitely remember
6  that was used as a Facebook cover photo?
7    A. Yes.
8    Q. And page five?
9    A. I do remember something like that,
10  also.
11    Q. As a cover photo for --
12    A. Facebook.
13    Q. Facebook.  Okay.  Page six?
14    A. It looks like it.  Even if I don't
15  remember, it looks like it was ours.
16    Q. What about the last page?
17    A. It looks like ours.
18    Q. Okay.  So, all of these, then, with the
19  possible exception of number one, you recall as
20  being, at some point, the Facebook cover photo
21  for the Roca Labs Facebook page.  Right?
22    A. Yes.
23    Q. Okay.  Let's turn now to Exhibit 60.
24  Do you recognize the images on the two page
25  exhibit, Exhibit 60?

---

126

1    A. From the very, very first disc.
2    Q. Around when would that have been?
3    A. I don't know.  2009.
4    Q. Okay.  So, I'll tell you these are pages
5  we pulled from two of the trademark applications
6  in 2011.  Does that refresh your recollection
7  about when these would have appeared?
8    A. No.  If that's what you took.  So,
9  it's between '9 and '11.
10    Q. And these images would have come from
11  pages on a Roca Labs Web site.  Is that correct?
12    A. Yes.  I think so.  Yes.
13    Q. Okay.  And let's look at Exhibit 61 then.
14  Do you recognize the text and images in Exhibit
15  61?
16    A. Yes, I do.
17    Q. What is Exhibit 61?
18    A. It looks like a home page that I will
19  design.  I would design.
20    Q. Okay.  Do you think that would have been
21  around November of 2012?
22    A. Possible.
23    Q. Okay.  And I notice there's a marking in
24  the lower right-hand corner, if you kind of
25  glanced, of 11/8/2012.  Also, at the top a court

---

127

1  filing legend.
2    A. Okay.  Who's -- who does --
3    Q. I'm not sure what this suit is -- this is
4  from.  This may be from Roca Labs versus Pissed
5  Consumer.
6    A. Okay.  So, it does look like something
7  that would be on the home page.
8    Q. Okay.  Then, let's look at Exhibit 62.
9  Now, up in the upper right-hand corner, if you
10  turn to landscape, Exhibit 62 has a marking Web,
11  at archive.org, and then it has a url that
12  includes, I'll just state from experience, 2012,
13  1103.  Does this look like Exhibit 62 --
14    A. Yes.
15    Q. -- in the text that was included on the
16  Roca Labs Web page in late 2012?
17    A. Yes.
18    Q. Okay.  So, make sure you flip through the
19  entire exhibit.
20    A. I'm familiar with it.  When I am
21  familiar with a child, I --
22    Q. Okay.  Let's then look at Exhibit 63,
23  speaking of a child.
24    A. Yes.
25    Q. Do you recognize Exhibit 63?

---

128

1    A. Yes.
2    Q. And, again, this has a legend at the top,
3  weigh back machine, with a date shown in the
4  upper right-hand corner of March 2013.  Do you
5  think that Exhibit 63 looks like what a child --
6  "Can my child take the formula?" page looked like
7  in March 2013?
8    A. Yes.
9    Q. Let's move on to Exhibits 64 through 68,
10  which I will hand you, and we can go off the
11  record for a moment while you look at those.
12    (Off the record from 4:24 p.m. to 4:26 p.m.)
13    (Plaintiff's Exhibit No. 64, 65, 66,
14  67 and 68 were marked for identification.)
15  BY MR. SETTLEMYER:
16    Q. Back on the record.  Mr. Juravin, we've
17  handed you documents marked as Exhibit 64 through
18  68.  I'd like you to look at Exhibit 64, please.
19  And can you tell me if you recognize Exhibit 64?
20    A. Yes.
21    Q. What is Exhibit 64?
22    A. It looks like a home page.
23    Q. From the Roca Labs Web site?
24    A. Yes.  And I do recognize it.
25    Q. And this would be approximately February

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-43

Juravin

FTC v. Roca Labs, Inc., et al.                                                      2/15/2017

129

1    2013, do you think?
2        A.  Yes.
3        Q.  Okay.  Let's look at Exhibit 65.
4        A.  I don't know the date, but it's ours.
5    And we used it at one time or another.
6        Q.  Okay.  But does the time frame of early
7    2013 sound about right?
8        A.  I don't know.  I don't know.  But it's
9    ours.
10       Q.  Okay.
11       A.  It's ours.
12       Q.  And Exhibit 65.  Do you recognize Exhibit
13   65?
14       A.  Yes.
15       Q.  What is Exhibit 65?
16       A.  Looks like a home page.  Again, I
17   recognize it as ours.
18       Q.  This would have also potentially been from
19   February 2013.  Correct?
20       A.  Potentially.  Yes.
21       Q.  This url is not Roca Labs.com.
22   This is the url Roca
23   Labs.com/gastric-bypass-surgery-guide.
24       A.  Yes.
25       Q.  Let's look at Exhibit 66, please.  Do you

130

1    recognize Exhibit 66?
2        A.  Yes.
3        Q.  What is Exhibit 66?
4        A.  It looks again like a home page.
5        Q.  This one has a different home page.
6    Mini-gastric-bypass.me.
7        A.  Yes.
8        Q.  Again, you think this would have been from
9    early 2013 possibly?
10       A.  Possible.  Yes.
11       Q.  And Mini-gastric-bypass.me is one of the
12   domains that Roca Labs used to advertise.
13   Is that correct?
14       A.  Yes.
15       Q.  Okay.  And paragraph -- I'm sorry.
16   Exhibit 67, can you take a look at that,
17   please?  You recognize Exhibit 67?
18       A.  Yes.
19       Q.  What is Exhibit 67?
20       A.  Probably one of the educational pages
21   where you land and you learn.
22       Q.  So, potentially, say a search ad or a
23   Facebook ad, maybe this time more a search ad
24   might have directed somebody to this particular
25   page.  Is that right?

131

1        A.  You're not a good student.  Landing
2    page.
3        Q.  Landing page.
4        A.  This is a possible landing page.
5    Definitely.
6        Q.  Okay.  So -- and this was live on line.
7    Correct?
8        A.  We will not waste time to that landing
9    page, does not make money.
10       Q.  So the answer is yes, it was live on line?
11       A.  Yes.
12       Q.  Let's look at Exhibit 68 now.  Now, items
13   one and two in the upper part of Exhibit 68, do
14   you recognize those as ads that would have been
15   placed by Roca Labs?
16       A.  Are you referring to item one and two?
17       Q.  Yes.  Mmm-hmm.
18       A.  Okay.  Yes.  Because number three is
19   not.  Yes.
20       Q.  Okay.  So, items one and two would have,
21   if I'm reading these ads correctly, item one
22   would have directed someone from the ad to the
23   Mini-gastric-bypass.me/Roca Labs page.  Correct?
24       A.  Yes.
25       Q.  And item two would have directed to --

132

1        A.  A different landing page.
2        Q.  A different landing page.  And that would
3    have been www.RocaLabs.com/approved.  Correct?
4        A.  Yes.
5        Q.  Okay.  Thank you.  Done with those.
6    We'll move on to some others.  Let's take a
7    quick break and do that.
8            (Off the record from 4:30 p.m. to
9    4:35 p.m.)
10           (Plaintiff's Exhibit No. 69 was marked
11   for identification.)
12   BY MR. SETTLEMYER:
13       Q.  Just take a moment and look at that.  So,
14   Mr. Juravin, I just handed you a document marked
15   as Exhibit 69.  And can you tell me what Exhibit
16   69 is?
17       A.  It looks like part of a site we used
18   to have.
19       Q.  Okay.  So part of the site?
20       A.  Of the Roca Labs site.
21       Q.  Roca Labs.com site.  Correct?
22       A.  It might be that it was just
23   experimental because if I see old dot Roca
24   Labs, this is what we used to experiment
25   with.

33 (Pages 129 to 132)

Juravin

FTC v. Roca Labs, Inc., et al.                                2/15/2017

137

1    A.  He sent it to me.  I forward it to
2  Vishal.
3    Q.  Vishal being a designer, for example.
4    A.  Yes.  I'm not reading it.
5    Q.  So, then, who within the company would be
6  able to provide the answer as to what privacy
7  policy language was on the site?  Because I'll
8  mention that we did designate as one of our
9  topics for 30(b)(6) the Roca Labs
10  non-disparagement policies, terms and conditions,
11  privacy representations, and privacy policies
12  related to sales of localized products.  So, we
13  want to have an answer as to what language was on
14  the site.
15       So, is there somebody you could
16  consult or some record you could consult to
17  give you that answer?
18    A.  I'm willing to stipulate that anything
19  that was on the site is my responsibility,
20  whether I read it, not read it.  It's there.
21  It's not.  If I'm ashamed of it or not.  If
22  it's there, it's mine.  So whether I read it
23  or not, I'm responsible for it.
24       MS. MARTENY:  That's not the question.
25  BY MR. SETTLEMYER:

138

1    Q.  That's not my question.  My question is:
2  Was it on the site?
3    A.  Was it exposed to the public?  Neither
4  Vishal nor Michael Schloss, the attorney,
5  could tell me that.  You found it on the
6  site.  If it was ever produced, then it was
7  on the site.
8    Q.  Well, this is on the old Roca Labs.com
9  site.  And you were earlier saying that you
10  weren't sure that all of the text that was shown
11  in the old .RocaLabs.com was on the public.  And
12  you weren't sure whether text from the site was
13  on or not.  But do you have an understanding of
14  whether this language was on the Roca Labs Web
15  site at any point in time?
16    A.  Do you have by any chance the privacy
17  that we had in 2015 or '16?
18    Q.  I don't know.
19    A.  I can see if you show me.
20    Q.  I guess my -- I want you to answer my
21  question.
22    A.  I'll tell you why I'm asking.  Because
23  I don't think we ever changed it.  I don't
24  remember changing.  So, if '16 looks like
25  this, then, I'll tell you this one was, also.

139

1  I don't think we ever changed it.  I don't
2  remember ever asking anybody.  It was just a
3  procedural thing.
4       So, if we didn't change it, and if '16
5  looks like '12, then it is.  It might be a
6  different possibility, it says Roca Labs on
7  it, but I don't remember ever changing it.
8  I'm willing to stipulate that this is ours.
9    Q.  Are you willing to stipulate that it was
10  -- this language was publicly on the Roca
11  Labs.com Web site?
12    A.  It would be because there would be
13  nobody else to do it.  So, I'm willing to do
14  that.  Okay?  Let's move on, and I will
15  stipulate.  Otherwise, if somebody would show
16  me '15 or '16, they would look the same, I
17  will tell you why.
18    Q.  I'm asking you as the witness to tell me
19  what your Web site looked like.
20    A.  Let's move on --
21       MS. MARTENY:  Don, stop.
22  He's asking you whether or not -- if
23  you don't think so.
24       THE WITNESS:  There was nobody else to
25  say --

140

1       MS. MARTENY:  How about this?  If we're
2  coming back tomorrow, consult with
3  Vishal.
4       THE WITNESS:  Somebody from six
5  years ago.  I don't know.  Vishal I
6  think would tell me, yes.  Let's move
7  on.  Yes.
8       (Plaintiff's Exhibit No. 70 was
9  marked for identification.)
10  BY MR. SETTLEMYER:
11    Q.  Let's move on.  So, I'm going to go to
12  Exhibit 70.  We'll go off the record for a
13  moment.  Take a look at Exhibit 70.
14       MR. SETTLEMYER:  I just handed the
15  witness Exhibit 70.
16  BY MR. SETTLEMYER:
17    Q.  Mr. Juravin, take a moment, please, and
18  tell me if you recognize the documents in
19  Exhibit 70.
20    A.  I recommend it is a landing page.
21    Q.  You recognize it as a landing page?
22    A.  Yes.
23    Q.  So, this is a -- so, you're looking at the
24  very first page of Exhibit 70?
25    A.  Yes.

FTC v. Roca Labs, Inc., et al.                                          2/15/2017

---

141

1       Q. Flip through and just tell me whether you
2    agree that the text and images shown in Exhibit
3    70 are text and images from the Roca Labs.com Web
4    site from approximately September 2014?
5       A. It looks like it.  Yes.
6       Q. Okay.  Keep going all the way through the
7    document, and let me just make sure you don't
8    disagree.  And I guess I'll note that I've
9    actually put together into Exhibit 70, the last
10   few pages are from the Mini-gastric-bypass.me Web
11   site.  Do you see that?
12      A. Yes.  I do recognize that.
13      Q. But those also are pages from September
14   2014.  Correct?
15      A. I don't know the dates.  But it's
16   ours.  And I do recognize it.
17      Q. Okay.
18      A. I do recognize Exhibit 70.
19      Q. One second.
20          (Plaintiff's Exhibit No. 71 was
21   marked for identification.)
22          MS. MARTENY:  Let him ask a question.
23      A. I do recognize Exhibit 71 as being
24   part of the Roca Labs site.
25   BY MR. SETTLEMYER:

---

142

1       Q. And this would have been from September of
2    2014 as well, approximately?
3       A. It looks correct.
4       Q. Okay.
5       A. This one I can more know the date
6    because of the images.  And so, yes.
7          (Plaintiff's Exhibit No. 72 was
8    marked for identification.)
9          MR. SETTLEMYER:  I'm handing Exhibit
10   No. 72 to the witness.
11   BY MR. SETTLEMYER:
12      Q. And Mr. Juravin, please look at Exhibit 72
13   and tell me if you recognize it.
14      A. I recognize Exhibit 72 as a landing
15   page on the Roca Labs site from approximately
16   2014.
17      Q. Okay.  This I think has a date on it,
18   January 28, 2015.
19      A. This date I don't recognize because
20   it's --
21      Q. It's from the printout.
22      A. Yeah.
23      Q. Not from the site?
24      A. Correct.
25      Q. But does that look like it's approximately

---

143

1    the right date for this content?
2       A. I don't know.  It looks more like '14
3    to me.  But, then, I don't know.  I don't
4    know.
5       Q. Okay.  Let's see.
6          MR. SETTLEMYER:  Let's take a quick
7       break.  And I'm going to do another
8       exhibit real quick.
9          (Off the record from 4:49 p.m.
10   to 4:52 p.m.)
11          (Plaintiff's Exhibit No. 73 was marked
12   for identification.)
13   BY MR. SETTLEMYER:
14      Q. Back on the record.  Mr. Juravin, you've
15   had a chance to look at Exhibit 73.  Correct?
16      A. Yes.
17      Q. Do you recognize the documents in Exhibit
18   73 from the Roca Labs.com Web site?
19      A. It looks like -- it looks like ours.
20   It looks like something from our site.  And I
21   also recognize that we wrote presenter is not
22   medical professional.
23      Q. You're looking at page one on Exhibit 73?
24      A. Yes.
25      Q. And when was that added?

---

144

1       A. I don't know.  '14 or '15.
2       Q. So, the images of this young woman in that
3    video box, for example, prior to that time, would
4    not have been shown with that legend.  Correct?
5       A. I don't know.  I just see it -- you
6    know, I just see it here for me.  Anyways, I
7    don't know.  I think it's from 2014.  And it
8    says "Presenter is not a medical
9    professional."  I recognize the rest of it.
10      Q. Okay.  "It" being Exhibit 73.  Correct?
11      A. Yes.
12      Q. Okay.  One moment.  That's all I have
13   right now for 73.  Let's move on to -- let's go
14   off the record for a moment.
15          (Off the record from 4:54 p.m.
16   to 5:05 p.m.)
17          (Plaintiff's Exhibit Nos. 74, 75 and
18   76 were marked for identification.)
19          MS. MARTENY:  Defendants will
20      stipulate that the information
21      contained in Exhibits 74, 75 and 76 is
22      accurate.
23   BY MR. SETTLEMYER:
24      Q. All right.  So, Mr. Juravin, in Exhibit
25   74, the registrant name for the domain Roca

---

36 (Pages 141 to 144)

Juravin

FTC v. Roca Labs, Inc., et al.                                                           2/15/2017

---

145

1    Labs.com is listed as Juravin, Incorporated.  Do
2    you see that?
3        A.  Yes, I do.
4        Q.  Now, according to the stipulation, that
5    was true as of January 2015, which is the date of
6    the e-mail containing the information.  Is that
7    still true, that Juravin, Inc. is the domain name
8    registrant for Roca Labs.com?
9        A.  I don't think I changed anything.
10       Q.  Okay.
11       A.  I don't remember changing anything.
12       Q.  Okay.  And is -- would it still be true
13   that Roca Labs -- I'm sorry.
14           Would it still be true that Juravin,
15   Incorporated is the registrant for the domain
16   mini-gastric-bypass.me?
17       A.  Yes.  I don't remember changing
18   anything.
19       Q.  Okay.  And would it still be true that
20   Juravin Incorporated is the registrant for
21   gastric bypass.me?
22       A.  Yes.
23       Q.  Okay.  And, then, on Exhibit Number --
24   Exhibit Number 76, the first page, page number
25   875 at the bottom, the very first entry under

---

146

1    account information and pay information in one of
2    the middle columns near the top is the name Teddy
3    Juravin.  Who is Teddy Juravin?
4        A.  My brother.
5        Q.  Your brother?
6        A.  Yes.
7        Q.  Is he still in Israel?
8        A.  Yes.  He's only in Israel.  He was
9    never here.
10       Q.  Can you explain what his role was in
11   connection with the Roca Labs business, if any?
12       A.  No.  It's something from 2005, 2000
13   and -- it's just something very, very long
14   ago.  No.  It's -- you're looking at billing.
15       Q.  I think this is 2008.  Yes.  This
16   is pay information.
17       A.  But it's nothing to do with Roca Labs.
18   Nothing.  It's with an Israeli domain called
19   Walcoff or Vishal.com.  Nothing to do with
20   here in 2004.  Just we used the same account.
21   That's all.
22       Q.  Okay.
23       A.  When I was in Israel, I tried to help
24   him to do some business.  So, I registered a
25   domain for him.  And nothing happened.  And

---

147

1    that's it.
2        Q.  Okay.  So, to the extent you were
3    active in trying to develop and sell your
4    invention in Israel prior to 2009, Teddy
5    Juravin was not involved with that are you
6    saying?
7        A.  No.  It's my invention.  And I just
8    wanted to help him to write a domain on his
9    name.  But it didn't succeed.  And that's
10   it.
11       Q.  Okay.  So, Teddy Juravin has no
12   ownership interest in --
13       A.  No.  No.  No.
14       Q.  -- your invention?
15       A.  No.
16       Q.  No ownership interest at all in
17   any Roca Labs business.
18       A.  No.
19       Q.  Okay.  You did, I believe, file a
20   lawsuit against somebody Teddy Zoragin.
21   Is that the same individual?
22       A.  The same.  Yes.
23       Q.  Do you recall what that lawsuit
24   was about?
25       A.  It was basically the lawsuit was

---

148

1    about me consulting and helping and doing
2    things and asking for the money.
3        Q.  Okay.  Was that work you were doing
4    at all related to the Roca Labs business?
5        A.  No.
6        Q.  Okay.  Let's move on to No. 75.
7    Actually, I'm getting sloppy.  Let's go back
8    to -- yes.  Let's go back to 75.  Is 75 --
9    Exhibit 75 showing an account that's being
10   actively used by you at this point?  This is
11   denominated as a Roca Labs account as distinct
12   financial from 76, which is the Diet Labs
13   account.
14       A.  Yes.  Diet Labs is something very old
15   that I don't even remember much.  The Roca
16   Labs, yes.  It's a more new, active account.
17       Q.  Because I believe that the domain name
18   Roca Labs.com was first registered in April
19   2009 under the Diet Labs account.  Let's take
20   a look.
21       A.  Yeah.  It might be.
22       Q.  Okay.  Same with the Juravin.com
23   originally registered under Diet Labs?
24       A.  It might be.
25       Q.  You think it might have gone on at that

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-47

Juravin

FTC v. Roca Labs, Inc., et al.                                          2/15/2017

---

149

1    point, the active Roca Labs account shown in
2    Exhibit 75.
3         A. I don't know. I have to check. It's
4    not something that came with me today.
5         Q. But if it's listed in 75 under the Roca
6    Labs account, you think that might be the
7    current situation of ownership?
8         A. I think so.
9         Q. Let me just -- I believe in December
10   2012 Roca Labs.com was registered under the
11   Roca Labs account. See if I can point you to
12   that. Actually, I'm in '14. July 2014. So,
13   yes. If you look at page 851 in the lower
14   right-hand corner of Exhibit 75.
15        A. Yes.
16        Q. I believe you'll see at the bottom
17   half of the page transaction under the date
18   July '10, there's a list of domain names
19   including Roca Labs.com,
20   mini-gastric-bypass.me.
21        A. Okay.
22        Q. So, that would tell you, then, that the
23   Roca Labs account shown on Exhibit 75 is the
24   current one. Right?
25        A. Are you asking me if the domain Roca

---

150

1    Labs.com moved from one account to another
2    within the same name.com?
3         Q. I'm just wanting to know whether
4    the Roca Labs account is the current account
5    you're using to register domain names?
6         A. Account?
7         Q. I'm talking with the name .com service
8    under the account where all these?
9    registrations come.
10        A. Probably don't put the same importance
11   as you. Maybe if you help me to understand
12   what exactly you're trying to get to, I can
13   help you with it. Because for me, it's not
14   something that even I -- you know.
15        Q. I'm not really trying to be
16   complicated here. I just want to make
17   sure we understand --
18        A. I'll tell you what. When I log in,
19   there is something that I don't even see
20   where I log in. I go to name.com, the
21   password is in, I log in, I see. I never
22   look where do I log in. I didn't change it.
23   It's a big deal to move it from one account
24   to another. From one ownership to another.
25   I don't think I did it.

---

151

1         Q. You don't think you changed probably
2    since before -- in the past couple of years
3    since 2014, for example?
4         A. Ownership or account? Log in account
5    or ownership?
6         Q. Log in accounts.
7         A. I don't think so. No.
8         Q. Okay.
9         A. Again, I don't think I know what to
10   do. Again, if something is registered to me,
11   what does it matter if it's a log-in account
12   or this log-in account? To me.
13        Q. I'm just trying to keep straight what's
14   happening with that part of the business.
15        A. Sure.
16        Q. Okay. Let's look at another exhibit that
17   we will have marked.
18              (Plaintiff's Exhibit No. 77 was
19   marked for identification.)
20              MS. MARTENY: Don, let's talk about
21        this later. Let's get through this.
22        And then we'll talk about anything
23        else.
24   BY MR. SETTLEMYER:
25        Q. I had a document marked as Exhibit 77,

---

152

1    Mr. Juravin. I'd like you to take a look at
2    Exhibit 77 and ask you about the screen shots
3    shown in Exhibit 77.
4         A. Where am I to identify?
5         Q. I'll get to that in a minute. I want you
6    to go through the entire document for a moment,
7    make sure you look at each page.
8         A. Okay.
9         Q. Okay. So, keep going through the whole
10   thing. I want to make sure.
11        A. I recognize the qualifications for --
12        Q. Let's get back on the record.
13        A. Yes.
14        Q. Mr. Juravin, you've looked at Exhibit 77.
15   And you recognize what's shown in the screen
16   shots in Exhibit 77?
17        A. Yes.
18        Q. Okay. So, looking at the second page.
19        A. Any importance to the first page?
20        Q. Well, let's ask about the first page.
21   The upper right-hand ad on this page shows a
22   -- does it show a Roca Labs ad?
23        A. Yes.
24        Q. And it shows that that ad appearing in
25   response to the search terms of gastric bypass.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-48

Juravin

FTC v. Roca Labs, Inc., et al.                                              2/15/2017

153

1    Correct?
2       A. Okay. Yes.
3       Q. Okay. So, when Roca Labs had and has had
4    ads being displayed on Google that have been
5    triggered by search terms, some of those terms
6    have included terms like gastric bypass.
7    Correct?
8       A. Yes.
9       Q. What are some other terms that Roca Labs
10   frequently would use to trigger delivery of
11   search advertising?
12      A. Anything to do with bariatric surgery.
13      Q. Can you just give me a list of some that
14   are more frequently used and frequently been used
15   to generate ads?
16      A. Bariatric surgery basically means all
17   the -- all the gastric bypass, lap band, all
18   the surgeries all together are called
19   bariatric surgery. So, we will use any one
20   of the surgeries, whatever it's called, lap
21   band, sleeve, all the bariatric surgeries.
22   Gastric bypass is only one of them. These
23   are -- this is what I was after. Not weight
24   loss. The word past the weight loss.
25      Q. Also, some of the search terms used to

154

1    trigger ads would also be particular to Roca Labs
2    as well. Correct?
3       A. Yes. My name. Yes.
4       Q. So, let's look at page two, and does that
5    screen shot look to you like --
6       A. Yes. It looks like it's our home
7    page.
8       Q. So, that's Roca Labs.com. This would have
9    been approximately the second half of October of
10   2014. Correct? Or you don't know?
11      A. I'm laughing because you're saying
12   about. But you're so exact. So, different
13   than about. '14 sounds okay.
14      Q. Let's look at page three. What is page
15   three of Exhibit 77?
16      A. Qualifying order.
17      Q. Explain what that is. What happened on
18   this form for a consumer?
19      A. Okay. Basically, my job here in the
20   qualification is to -- the qualification,
21   basically, I want to filter people that I
22   don't have to do business with and I don't
23   want to take their money because I don't
24   think it would be good for them and not good
25   for me.

155

1          If somebody has a kidney problem,
2    I don't want to sell them. If somebody has
3    allergic to wheat, I don't want to sell them.
4    If somebody has less than 40 pounds to lose, I
5    don't want to sell them. If somebody doesn't
6    think that fat is unhealthy and ugly, it means
7    they're not in the frame of mind of losing
8    weight. I don't want to sell them. Because I
9    want to keep a very high success rate.
10         And I think the other ones will
11   be trouble. So, their qualification is
12   filtering. I will ask them if they have
13   health insurance which will indicate to me
14   that they are serious about their health.
15   Okay?
16         So, this is their -- this is the
17   idea of qualification form.
18      Q. Let's look at the particulars of the
19   qualification form.
20      A. At this time. This.
21      Q. As of --
22      A. 2014.
23      Q. Late 2014.
24      A. I don't know if it's late. But 2014.
25   Yes.

156

1       Q. So, the language in the box under the
2    words "qualify" and "order" this form is designed
3    to filter out those with limited chance of being
4    successful and who are absolutely not suited to
5    use the strong formula or handle the regimen
6    successfully. This form is not replacing your
7    personal physician who can relate specifically to
8    your medical situation.
9       A. Exactly.
10      Q. "This information will be kept
11   confidential and will not be shared for the
12   length of the privacy policy."
13         So, this language about this information
14   will be kept confidential and will not be shared, was
15   that on the qualify and order page prior to 2014?
16      A. I think it was there all the time.
17   And the idea is that people are afraid to
18   give their e-mail, and then we say, "We sell
19   the e-mail to somebody else and say, "Hey,
20   this is the e-mail of overweight people."
21   So, that's the idea of we are not sharing
22   your information.
23      Q. But the words "This information will be
24   kept confidential and will not be shared" were on
25   the site on the qualify and order page in 2014

39 (Pages 153 to 156)

Juravin

FTC v. Roca Labs, Inc., et al.                                           2/15/2017

157

1      and before this.  Correct?
2          A.  I remember writing it always.  You
3      know.  So --
4          Q.  Well, let's look at what information gets
5      put into the form on this page and subsequently.
6      So, you'll agree a customer, prospective customer
7      would have to enter their name, their gender,
8      their age, their weight and their height.
9      Correct?
10         A.  Yes.
11         Q.  They would indicate whether or not they
12     have health insurance.  Correct?
13         A.  Health insurance.  Correct.
14         Q.  Let's look at the next page.  And people
15     had the option of watching a short video.
16     Correct?
17         A.  Which we later I remember placing
18     forcing them almost to watch it.  Because
19     this video told them why not to buy.  I
20     wanted to discourage them from buying.  Okay?
21     Because I wanted only the serious people to
22     buy.
23         Q.  Then, after they watched or the case could
24     have been did not watch the video at this period
25     of time, they would go onto another page where

158

1      they would be asked to enter additional
2      information such as do you have any kidney
3      problems, are you allergic to wheat grain, and do
4      you have a problem with drinking plenty of water
5      or swallowing.  Correct?
6          A.  Yes.
7          Q.  Then, they would go on to another screen
8      where they would have to answer questions about
9      reason for your overweight issues, what medical
10     issues do you have that might be related to your
11     excess fat, and listing the non-effective weight
12     loss methods they have tried.  Is that correct?
13         A.  Yes.
14         Q.  Then, they would go on, after entering
15     information in that page, they would go to a page
16     asking them to mark familiar psychological
17     obstacles that you need to overcome.  Correct?
18         A.  Yes.
19         Q.  Okay.  Then they would proceed to fill
20     out information or select information --
21         A.  I challenge them.
22         Q.  Okay.  So, there's wheat question.  Your
23     commitment to win the fight and lose weight.  And
24     they would be asked to enter information to a box
25     with the legend, "Are you truly committed to lose

159

1      your weight this time around?  If so, why?"
2      Correct?
3          A.  Yes.
4          Q.  And this would be information that a user,
5      prospective customer would fill in themselves.
6      Correct?
7          A.  Yes.
8          Q.  And, then, they would have to get
9      to a box at the bottom where they would have
10     to select whether they would say either, "I
11     agree, fat is unhealthy and ugly and I'm going
12     to fight and change it," or "I don't think
13     that being fat is bad, being overweight is not
14     the end of the world, being overweight is not
15     so bad, and your approach is completely wrong.
16     I'd like to cancel this application."
17             They would have to select one
18     of those options.  Correct?
19         A.  Yes.
20         Q.  And, then, they would go to a screen that
21     would start to get their order information for
22     shipping address and associated information.
23     Correct?
24         A.  Yes.
25         Q.  Okay.  And, then, they would go on to

160

1      another screen as shown on the next page of this
2      exhibit and its following page that has at the
3      top, "Select procedural kit."  Correct?
4          A.  Yes.
5          Q.  And they would -- the consumer would then
6      click on which option they wanted to order.
7      Correct?
8          A.  Yes.
9          Q.  And a page like this would show the full
10     range of different types of kits available at
11     that time.  Correct?
12         A.  Yes.
13         Q.  And, then, at the bottom of that screen,
14     there would be a selection to choose how quickly
15     they wanted the shipment under priority.
16     Correct?
17         A.  Yes.
18         Q.  And, then, under that, there would be an
19     unchecked box with the statement, "I have
20     checked, and do not have any medical reasons
21     that could prevent me from using the Roca Labs
22     Gastric Bypass Alternative procedure, and I
23     have read  and agreed to the terms, privacy,
24     and money back  reward/return policy."
25     Correct?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Juravin

FTC v. Roca Labs, Inc., et al.                                                    2/15/2017

---

161

1    A. Yes.
2    Q. So, people would have to check that box to
3  be able to submit their form. Correct?
4    A. Yes.
5    Q. But people would not have to actually
6  click on the terms and read them in order to
7  click the box and to send it. Correct?
8    A. No.
9    Q. Okay. I want to back up and just ask --
10    A. I'm sorry.
11    Q. Go ahead.
12    A. The answer is yes. You're asking me
13  they don't have. And I agreed with you. So,
14  the answer is yes, I agree with you.
15    Q. All right. Well, let me ask you this.
16  Did the order process force a user to actually
17  click and read the terms before they clicked, "I
18  have checked and do not have any medical reason"
19  box and hit submit?
20    A. Your question earlier was clear. I
21  agree with you. Earlier you said they don't
22  have to. And I said no. Meaning I don't
23  agree. I agree with you.
24    Q. I'm not asking whether you agree with me.
25  I'm going to ask you a yes or no question.

---

163

1  in collecting their information anymore. From
2  now on, just don't let them continue. Don't
3  collect information because anyway, we will
4  not sell them.
5        So, we started blocking everybody
6  that says, "Kidney." We put a note, "You
7  cannot continue."
8    Q. So, you tried to measure that approval
9  rate in the early days you said. What time frame
10  are you talking about?
11    A. Whenever it is that we started with
12  it. It was only a period for about a week or
13  something. And, then, I said, "You don't
14  want to collect anymore data of people that
15  we will not sell to."
16    Q. So, this test period of approximately one
17  week where you were data gathering, what year was
18  that?
19    A. I don't remember when we started that.
20  But it was at least 500. Because
21  statistically, I need to collect at least 530
22  statistically to know, to get this number.
23  It was more than 1,000. If we started 2013,
24  then 2013.
25    Q. When you say "if," do you recall starting

---

162

1    A. So it's a yes. It's a yes.
2        MR. SETTLEMYER: Let's have the
3    question read back.
4        (Testimony read back as requested.)
5    A. No.
6  BY MR. SETTLEMYER:
7    Q. All right. So, backing up to the third
8  page of Exhibit 77, underneath, "This information
9  will be kept confidential and not be shared"
10  language, there's a statement, "53 percent are
11  approved." Do you see that?
12    A. Yes.
13    Q. What is the basis for the "53 percent are
14  approved" statement?
15    A. At the early stages, for a period of a
16  few days, we saw how many people are marking
17  kidney, or wheat, or fat is unhealthy and
18  ugly. And for a few days we did it, and,
19  then, we blocked them and didn't -- we didn't
20  let them continue. And I saw the number.
21  I saw the numbers.
22        Because I asked my guys, "How
23  many people are we losing?" And they told me,
24  "We are losing about 40 something, 47
25  percent." And I told them I'm not interested

---

164

1  the qualifying order form in 2013 or before that?
2    A. I don't remember when.
3    Q. Is there anybody within the organization
4  who would remember when or have information to
5  answer that question of when that began?
6    A. I need to -- no. I don't remember
7  when. I would say 2013.
8    Q. Okay. And was that information still
9  current as of late 2014 about the percentage of
10  approval?
11    A. Things like this don't change.
12    Q. But you didn't check?
13    A. No. Statistics like this normally
14  doesn't change. Because the -- the size of
15  the obese population is so large that it
16  doesn't -- it doesn't change.
17    Q. And the qualify and order form --
18    A. I'm sorry. One more thing that I want
19  to say. And the 53 percent is a number that
20  I know. But the whole format here was to
21  discourage people from buying. Because I
22  know that the brain has super ego and the
23  ego. And I'm afraid that people buying here
24  to buy -- the super ego is coming to buy. In
25  other words, the doctor sent them here. I

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-51

Case 8:15-cv-02231-MSS-TBM   Document 141-6   Filed 03/24/17   Page 53 of 258 PageID 3224
Juravin
FTC v. Roca Labs, Inc., et al.                                          2/15/2017

165

1  don't want it.  I want to make sure that the
2  ego cooperates with them.
3        I want to discourage them.
4  If they weren't discouraged, then, it was
5  great.
6     Q.  Let's focus a little more on the mechanics
7  of the qualify and order form.
8     A.  Sure.
9     Q.  Was this questionnaire, the qualify and
10  order form process required for a consumer to be
11  able to purchase Roca Labs products?
12     A.  They couldn't even complete it.  If
13  they would say, "I don't think fat is
14  unhealthy and ugly," we would not -- they
15  would be kicked out.  We would not collect
16  information.
17     Q.  So, the answer is yes, the completion of
18  this form and process was required for consumers
19  to purchase.  Correct?
20     A.  Absolutely.
21     Q.  And that was the case from at least 2013
22  through 2015?  Is that correct?
23     A.  Through now.
24     Q.  But at least through 2015, the qualify and
25  order process --

166

1     A.  Yes.
2     Q.  -- was similar to what we saw in this
3  exhibit?
4     A.  Yes.
5     Q.  Okay.
6        MR. SETTLEMYER:  So, I'd like to
7     have the next document marked as
8     Exhibit 78.
9        (Plaintiff's Exhibit No. 78 was
10  marked for identification.)
11  BY MR. SETTLEMYER:
12     Q.  Mr. Juravin, take a look at Exhibit 78,
13  and let me know if you recognize that, please.
14     A.  I do recognize it.
15     Q.  What is exhibit 78?
16     A.  Something that's been sent in the box
17  along with the -- with the formula.
18     Q.  Okay.  So, how long was a form that
19  basically is shown in Exhibit 78 being used to
20  put into packages of Roca Labs formula --
21  strike that.  Let me start over again.
22        So, Exhibit 78 was sent in a
23  package to purchasers.  Correct?
24     A.  Yes.
25     Q.  Okay.  And we'll note that there would

167

1  have been perhaps, I suppose, other things
2  in the box as well.  There would be the
3  formula.  There would be scoops, an activator,
4  and flavoring package.  Is that right?
5     A.  Yes.  I'm laughing that you said that.
6  Using our terms.
7     Q.  I'm trying to be precise here.  But the
8  activator is, of course, a small plastic cup with
9  a threaded lid.  Correct?
10     A.  Yes.
11     Q.  Yes.  All right.  And instructions printed
12  on the outside.  Correct?
13     A.  Yes.
14     Q.  So, among the package inserts for someone
15  who purchased from Roca Labs would be a handout
16  like --
17     A.  Yes.
18     Q.  -- Exhibit 78.  Okay.  For about what
19  duration?  Do you recall when Exhibit 78 started
20  to be used in packages for Roca Labs product?
21     A.  Almost from the very beginning.  Even
22  now.
23     Q.  During what time period -- that continued
24  at least through 2015?
25     A.  All the time.  Even now.

168

1     Q.  So, there's a page -- the second page of
2  -- I'm sorry.  Let's look at the first page.
3  I'm sorry.  It's on the second page.  Middle
4  of second page there's a heading, "Discount
5  policy."  You see that?
6     A.  Yes.
7     Q.  I'm going to read it to you.  We believe
8  -- "Discount policy.  We believe in our customers
9  and that word of mouth is the best promotion.  We
10  are here to help you.  You were given a discount
11  off the unsubsidized price of $1,580 in exchange
12  for your agreement to promote our products, and
13  when possible, share your weight loss success
14  with us.  (Keep the You Tube videos coming.)
15  As part of this endorsement, you also agree
16  not to write any negative reviews about RLN or
17  our products.  In the event that you do not
18  honor this agreement, you may owe immediately
19  the full price of $1,580."
20        Mr. Juravin, how long was language
21  like that in this discount policy used in
22  handouts put into packages to purchasers of
23  Roca Labs product?
24     A.  I think for a period of about -- I
25  think that particular one for about nine

169

1   months or a year.  I remember because it was
2   something I didn't like.  And I said, "Let's
3   remove it."  But I think we experimented with
4   it for like about six months.  I'm not sure.
5   You see these things are -- I go into the
6   Word Press and I change or whatever -- it's
7   fluid.  Okay?  It's fluid.  So, I don't know
8   how long.
9       Q.  But you think it was six months to a year.
10  Is that correct?
11      A.  I don't know.  It's -- I'm throwing --
12  I don't know.
13      Q.  Do you know who within your organization
14  would know or would be able to find out that
15  information?
16      A.  No.  Only me.
17      Q.  Are there records within the computer
18  system that would show different iterations of
19  the handout?
20      A.  No.  Because I can tell them, "You
21  change it on your computer.  You change it on
22  your computer.  Change this one."  I would
23  not know how long this one -- that this one
24  was available.  If it was one month, two
25  years, one year.  It's fluid.  I can tell

170

1   them, "Take it out.  Take it in.  Remove it."
2   So fluid.
3       Q.  Do you know how long the statement
4   to the effect that negative reviews would be a
5   failure to honor the purchase agreement, how
6   long language like that was in the package
7   inserts?
8       A.  That's what you asked me.  And I said
9   I think I tested it for a few months.  But I
10  don't know how many.  If it's five, six, nine
11  months, or something.
12      Q.  Okay.  Thank you.  And by the way,
13  who is "them," you're talking about?  Who are
14  you talking about specifically when you're
15  talking about these changes?  Who are you
16  talking about?
17      A.  It's -- either I change it, or I asked
18  somebody, "Hey, you have the document, take
19  it out."  Or somebody in the warehouse that
20  needs to print them.  If it's Ania, I will
21  tell her, "Ania, you see this paragraph,
22  remove it."  Something like that.  But it's
23  not -- it was fluid.
24      Q.  And the people who would be responsible
25  for making that edit, would they be typically

171

1   based locally and near the warehouse, or would
2   they be people working in a foreign country, for
3   example, like some of the programmers?
4       A.  It's such a complex document.  So, it
5   might be tell Connie in the warehouse,
6   "Change it."  It might be that I say to
7   Vishal, "Remove it."  Or change -- you know?
8       Q.  But it's your final decision --
9       A.  Absolutely.
10      Q.  -- as to whether it's in?
11      A.  Absolutely.  So, whether somebody
12  changed it and even if you will ask Ania, she
13  will not know whether -- it will not register
14  in her mind, you know, a time period when
15  it's in or out.
16      Q.  Okay.  Let's move on to some other
17  things.  Go off the record for a moment.
18          (Off the record from 5:41 p.m. to 5:42 p.m.)
19          (Plaintiff's Exhibit No. 79 was marked
20  for identification.)
21  BY MR. SETTLEMYER:
22      Q.  We've had a document marked as Exhibit 79.
23  Mr. Juravin, I'd like you to look at Exhibit 79.
24      A.  I see that.
25      Q.  And we can ask you a few questions about

172

1   it when you're done looking at it.
2       A.  Okay.  I'm familiar with it.
3       Q.  You're familiar with Exhibit 79?
4       A.  Yes.
5       Q.  What is Exhibit 79?
6       A.  Instructions.
7       Q.  And when were these instructions shown in
8   Exhibit 79 put into -- these were put into
9   packages shipped to consumers.  Is that right?
10      A.  Yes.
11      Q.  And when would -- and specifically,
12  purchasers of Roca Labs products.  Correct?
13      A.  Yes.
14      Q.  And what time frame was this particular
15  version of instructions for gastric bypass effect
16  used?
17      A.  I would say 2011, 2012.  Very
18  beginning.
19      Q.  Okay.  And up at the top of the first
20  page of Exhibit 79, there is a reference to
21  Roca Labs USA Nutraceuticals, Paris, Florida,
22  Tokyo.  Do you see that?
23      A.  Yes.
24      Q.  What presence did Roca Labs have in
25  Paris in 2011 and 2012?

43 (Pages 169 to 172)

Juravin

FTC v. Roca Labs, Inc., et al.                                          2/15/2017

173

1      A.  Virtual office.  I think we got the
2    virtual office.  I think we paid -- I think
3    we got a number.  And I think maybe an
4    address or something.  We never used it.  The
5    idea was to look serious.
6      Q.  What about Tokyo?  Was there any presence
7    in Tokyo?
8      A.  Virtual office.
9      Q.  Okay.
10     A.  Again, the idea was to look serious so
11   they can take it seriously.
12     Q.  What do you mean look serious?  To whom?
13     A.  In the entire weight reduction
14   business, it's important that they are
15   believing in the regimen, that they believe
16   -- they need to believe in it.  Part of
17   believing is looking as serious as possible.
18   In the beginning, we didn't have the
19   reputation that we have today.  We had to do
20   a lot of things in the beginning to jump
21   start the business.
22         Today, we have a lot of
23   testimonial, endless testimonials, but we
24   didn't have in the beginning.
25     Q.  Let me just stop for a moment and

174

1    ask you:  Were you personally responsible for
2    the content of Exhibit 79?
3      A.  I'm responsible for everything.
4      Q.  Okay.  Let's do one more quickly.
5    Exhibit 80.
6         (Plaintiff's Exhibit No. 80 was
7         marked for identification.)
8    BY MR. SETTLEMYER:
9      Q.  Mr. Juravin, I'm going to hand you a
10   document marked as Exhibit 80.  Please take a
11   look at it and let me know if you recognize it.
12     A.  Yes, I do.
13     Q.  What is Exhibit 80?
14     A.  As I mentioned earlier, my job was to
15   educate and scare people about the gastric
16   bypass surgery because it's a bad thing, and
17   I don't think the doctors are really telling
18   patients the truth.  And I came up with the
19   idea of let's make a site that really tells
20   them the truth so we can be a viable option
21   for them.
22     Q.  Okay.  So, this -- the images and text
23   in Exhibit 80 were used on an a Roca Labs
24   controlled Web site.  Correct?
25     A.  Yes.

175

1      Q.  And that Web site was --
2      A.  Gastric.me.
3      Q.  Gastric Bypass.me?
4      A.  Gastric.me.
5      Q.  You think it was gastric.me?  And this
6    was live on line.  Correct?
7      A.  Yes.
8      Q.  And would search ads that Roca Labs
9    placed lead sometimes to this site?
10     A.  Yes.
11     Q.  Okay.  And, then, the second and third
12   pages of this show pages from the -- with the
13   heading "Surgical Alternatives."  Correct?
14     A.  Correct.
15     Q.  And the only one discussed there is
16   Roca Labs.  Correct?
17     A.  Yes.
18     Q.  And the only -- and there's no
19   indication on here, or is there, that Roca
20   Labs is responsible for the content of
21   this surgical alternatives page?
22     A.  I didn't see any value.  And I don't
23   think there is any value saying, "Hey, we are
24   Roca Labs."  Because as I mentioned earlier,
25   nobody buys it as an impulse.  They search

176

1    and they learn, and -- do you have, by
2    chance, the privacy for this site?  Because I
3    think it will say Roca Labs there for the
4    terms of the site.
5      Q.  All I have in this exhibit is these pages.
6      A.  So, maybe in the terms.  Maybe in the
7    privacy it did mention that the site belongs
8    to Roca Labs.
9      Q.  But not on these pages shown in Exhibit
10   80.  Correct?
11     A.  No.  Because I wanted them to look at
12   it objectively.
13     Q.  Are you sure that the domain name
14   in which this appeared was not, at least
15   as of April 2015, and the months before that
16   gastric bypass.me?
17     A.  One more time.
18     Q.  Gastric Bypass.me.
19     A.  What about the site?
20     Q.  Was that the domain name in which the
21   images and text for Exhibit 80 were shown?
22     A.  I don't know.  I can't tell you.  I
23   can tell you that many sites that come into
24   our renewal.  I just didn't want to pay the
25   money, and I let them expire.

44 (Pages 173 to 176)

Juravin

FTC v. Roca Labs, Inc., et al.                                2/15/2017

177

1      Q.  But you do agree it was a Roca Labs
2   controlled site.  Correct?
3      A.  Yes.  And I, also, for the most part,
4   I am responsible for the content.
5      Q.  Okay.  Thank you.  So the -- I think that
6   that's all we're going to be able to get through
7   today.  I'm hoping we're having a much shorter
8   day tomorrow.
9      A.  Please.
10     Q.  I will endeavor to make that happen.
11     A.  Because I will make Friday --
12        MR. SETTLEMYER:  Let's not go on
13     the record about promising about
14     Friday.  Let's reserve the rest of the
15     time to maybe Suzie take a few minutes,
16     look through the exhibits that have
17     been released, and read off which ones
18     are confidential so we have a record of
19     that.
20        (Off the record from 5:49 p.m. to 5:56 p.m.)
21        MS. MARTENY:  We want to have marked
22     as confidential Exhibit Nos. 6 through
23     10, Exhibit Nos. 15 through 20, 22
24     through 29, 33 through 39, and 75 and
25     76.  And that should do it.

178

1        (Whereupon, at 5:57 p.m., there
2   were no further questions propounded to this
3   witness.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

179

1          C E R T I F I C A T E
2      I, DEBRA deHAAS, a Notary Public, do hereby
3   certify that prior to the commencement of the
4   examination
5          DON JURAVIN
6   was sworn by me to testify to the truth, the
7   whole truth and nothing but the truth.
8       I DO FURTHER CERTIFY that the
9   foregoing is a true and accurate transcript
10   of the testimony as taken stenographically by
11   and before me at the time, place and on the
12   date hereinbefore set forth.
13       I DO FURTHER CERTIFY that I am
14   neither a relative of nor employee nor
15   attorney nor counsel for any of the parties to
16   the action, and that I am neither a relative
17   nor employee of such attorney or counsel, and
18   that I am not financially interested in the
19   action.
20
21
22
23   Debra deHaas
     Notary Public
24   Commission #FF08705
     Expires: March 7, 2018
25

45 (Pages 177 to 179)

# In the Matter of:

# FTC v. Roca Labs, Inc., et al.

*February 16, 2017*
*Don Juravin*
*Vol. 2*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. Roca Labs, Inc., et al.                                                2/16/2017

---

180

```
 1                I N D E X
 2
    WITNESS                          PAGE NO.
 3
      DON JURAVIN
 4
         By Mr. Settlemyer:              184
 5
 6  EXHIBITS      DESCRIPTION          PAGE NO.
 7    81      Amex Statement #2-21002     184
      82      BOA Statement #5833         185
 8    83      Amex Statement #2-23008     185
      84      Chase Statement #8193       185
 9    85      Fligman Communication       189
      86      Scripts                     189
10    87      Scripts - Roca Labs         189
      88      Dispute to Payment Processor 198
11    89      Dispute to Payment Processor 198
      90      King E-mail - 12-18-13      238
12    91      King E-mail - 10-6-14       245
      92      King E-mail - 10-10-14      246
13    93      BBB E-mail - 10/14          249
      94      King E-mail - 7-2-15        251
14    95      Roca Labs Advertising       254
      96      Blogs                       256
15    97      Blogs                       261
      98      Blogs                       264
16    99      Blogs                       265
      100     Blogs                       266
17    101     Blogs                       270
      102     Blogs                       271
18    103     Blogs                       272
      104     Blogs                       275
19    105     Blogs                       277
      106     Facebook Post - 9-25-14     278
20    107     Blogs - FTC-PROD-005065     279
      108     FTC-PROD-005072             280
21    109     Photograph                  289
      110     FTC-PROD-005903             291
22    111     FTC-PROD-005148             291
      112     FTC-PROD-005174             293
23    113     Extortion Document          295
      114     ROCA-00584-85               297
24    115     Hensley Production          301
      116     Hensley Production          302
25    117     "How to Identify FB Posts"  302
```

---

181

```
 1  EXHIBITS      DESCRIPTION          PAGE NO.
 2    118     "Scott's Plan"              305
      119     Blogs                       308
 3    120     Agora Rules                 311
      121     Script                      314
 4    122     Script                      316
      123     Pissed Consumer             317
 5    124     Coach Mgmt Version 2.0      326
      125     Directions to Roca Staff    329
 6    126     Script                      330
      127     Video - FTC-PROD-004550     333
 7    128     "Forward Money to King"     368
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

182

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                     TAMPA DIVISION
 3          CIV No. 8:15-cv-02231-MSS-TBM
 4
    FEDERAL TRADE COMMISSION,
 5
               Plaintiff,
 6
    vs.
 7
    ROCA LABS, INC., a corporation;
 8  ROCA LABS NUTRACEUTICAL USA, INC.,
    a corporation; MUST CURE OBESITY, CO.,
 9  a corporation; JURAVIN INCORPORATED,
    a corporation; ZERO CALORIE LABS, INC.,
10  a corporation; DON JURAVIN, individually
    and as an office of Roca Labs, Inc.,
11  Roca Labs Nutraceutical USA, Inc.;
    Must Cure Obesity, Co., and Juravin,
12  Incorporated; and GEORGE WHITING,
    individually and as an officer of Roca
13  Labs, Inc., Roca Labs Nutraceutical
    USA, Inc., and Zero Calories Labs, Inc.,
14
               Defendants.
15  _____/
16
         30(b)(6) DEPOSITION OF DON JURAVIN
17
         Taken on Behalf of the Plaintiff
18
19  DATE TAKEN:  Thursday, February 16, 2017
20  TIME:        9:35 A.M. - 4:58 P.M.
21  PLACE:       101 E. Kennedy Boulevard
                 Suite 2800
22               Tampa, Florida  33602
23
    STENOGRAPHICALLY REPORTED BY:
24  Tracy Lyn Fazio, FPR
    Notary Public, State of Florida
25
```

---

183

```
 1  APPEARANCES FOR THE PLAINTIFF:
 2    CARL H. SETTLEMYER, III, ESQ.
      MICHAEL J. DAVIS, ESQ.
 3    FEDERAL TRADE COMMISSION
      600 Pennsylvania Avenue, N.W.
 4    Maildrop CC-10528
      Washington, DC  20580
 5    1.202.326.2019
      csettlemyer@ftc.gov
 6    mdavis@ftc.gov
 7
 8  APPEARANCES FOR THE DEFENDANTS:
 9    SUZETTE MARTENY, ESQ.
      SHUMAKER, LOOP & KENDRICK, LLP
10    101 E. Kennedy Boulevard, Suite 2800
      Tampa, Florida  33602
11    1.813.229.7600
      smarteny@slk-law.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

1 (Pages 180 to 183)

FTC v. Roca Labs, Inc., et al.                                        2/16/2017

184

P R O C E E D I N G S
- - -
1    (Thereupon, the witness, DON JURAVIN, was
2  previously sworn under oath and testified as
3  follows:)
4    MR. SETTLEMYER:  Good morning.  We're back
5  on the record for the 30(b)(6) deposition of
6  Muscular Obesity Co., Roca Labs Nutraceutical
7  and Roca Labs, Inc.  And with us here today is
8  Mr. Juravin who I understand is still the
9  witness designated to testify about most of the
10 topics or all of the topics in the Notice of
11 Deposition, except for those for which
12 Mr. Whiting had overlapped yesterday.
13    Mr. Juravin, you understand that you are
14 still under oath; is that correct?
15    THE WITNESS:  Yes.
16    (Thereupon, Plaintiff's Exhibit Nos. 81-84
17 were marked for identification.)
18    MR. SETTLEMYER:  At this point, counsel I
19 believe has a stipulation to offer as to some
20 of the documents that have been marked as
21 Exhibits 81 through 84.
22    MS. MARTENY:  Yes.  Defendants will
23 stipulate that Exhibit 81 is a series of AmEx

185

1  statements for card ending in 2-21002 covering
2  February 19th, 2014 through January 22nd, 2015.
3    Defendants are also going to stipulate
4  that Exhibit 82 is in fact the Bank of America
5  bank statements for Juravin Inc. account number
6  ending in 5833, covering March 2014 through
7  February 2015.  And that Exhibit 83 is AmEx
8  statements for Don Juravin account ending
9  2-23008.
10    MR. SETTLEMYER:  Is that for Don Juravin
11 or Juravin, Inc.?
12    MS. MARTENY:  Juravin, Inc.  Sorry.
13    THE WITNESS:  Can we pause for a second?
14    MS. MARTENY:  Wait, wait, wait.  No.  Let
15 me just stipulate to these things.  Let me
16 finish my stipulation.  I'll start over.
17    Defendants will stipulate that Exhibit 83
18 is an American Express statement for Juravin,
19 Inc., account ending in 2-23008 covering
20 October 22nd, 2015 through September 2015.
21    Exhibit 84 is Juravin, Incorporated Chase
22 statement for September 2015, account ending in
23 8193.  And all of those exhibits are true and
24 accurate copies of those documents.
25    MR. SETTLEMYER:  Okay.  And one thing I'll

186

1  note is I think 81 is AmEx statements for
2  Juravin, Incorporated; is that correct?
3    MS. MARTENY:  That's correct.
4    MR. SETTLEMYER:  And the additional
5  request that I have is are the Defendants
6  willing to stipulate that the expenditures
7  shown in the AmEx statements 81 and 83 to
8  Google, Microsoft, --
9    THE WITNESS:  Advertisers.
10    MR. SETTLEMYER:  -- Yahoo and Facebook are
11 advertising expenditures on behalf of the Roca
12 Labs business?
13    MS. MARTENY:  Yes.
14    THE WITNESS:  Yes.
15    MS. MARTENY:  We will stipulate to that.
16    MR. SETTLEMYER:  And the Defendants are
17 willing to stipulate to the fact that payments
18 to the Bank of America account in Exhibit 82,
19 and the Chase account in Exhibit 84 from
20 account ending 5888 are from Roca Labs
21 Nutraceutical and the deposit portion of those
22 statements?
23    MS. MARTENY:  Deposits.  Is that what
24 you're talking about?
25    MR. SETTLEMYER:  Yes.  Not all of them,

187

1  but many of them are from account checking
2  5888, and that's the Roca --
3    MS. MARTENY:  Nutraceutical.
4    THE WITNESS:  RLN.
5    MR. SETTLEMYER:  RLN, yes.
6    MS. MARTENY:  If we stipulate that the
7  5888 number is the RLN bank account?
8    MR. SETTLEMYER:  That's right.
9    MS. MARTENY:  Yes, we can stipulate to
10 that.
11    MR. SETTLEMYER:  And that further I
12 believe in the last statement -- I'm sorry --
13 in 84, maybe in 82, but I think mostly in 84
14 there are payment deposits from an account
15 ending in 7028, and those are from Muscular
16 Obesity, correct?
17    THE WITNESS:  Yes.
18    MS. MARTENY:  Yes, we can stipulate to
19 that.
20    MR. SETTLEMYER:  We're done with those
21 exhibits.
22 CONTINUED DIRECT BY MR. SETTLEMYER:
23    Q  Mr. Juravin, over the course of yesterday
24 and just momentarily with the stipulation, we talked
25 about a variety of expenditures that were made for

2 (Pages 184 to 187)

Juravin

FTC v. Roca Labs, Inc., et al.                                    2/16/2017

188

1     advertising on behalf of the Roca Labs business with
2     Google, Yahoo, Facebook and Microsoft.
3            Would it be correct to say that the amount
4     of money spent by Roca Labs, Inc., Roca Labs
5     Nutraceutical and MCO between 2009 and early 2015
6     was more than $3.25 million?
7        A   I will -- I will agree that it's more.
8     It's definitely more.  And can we please call them
9     advertisers like we said yesterday and then
10    corporate Defendants.
11       Q   We can do that.  I just want to make sure
12    when we're talking particularly about the
13    stipulation about line items in a bank statement
14    that we all have a common understanding of what
15    those are.
16       A   So advertisers.
17       Q   Right.  So we'll refer to those as -- I
18    will refer to the advertising platforms, Google,
19    because I think the advertiser is who is selling
20    product.  So I think that would be the Defendants.
21       A   The platforms, yes.
22       Q   So how much money have the corporate
23    Defendants spent to advertise through the
24    advertising platforms between 2009 and 2015?
25       A   I will not be able to tell you that

189

1     because -- but I will be able to tell you another
2     number.
3        Q   Can you give me an approximation of the
4     number I've asked for?
5        A   No.  But I will be able to tell you that
6     normally advertisement, the cost of advertisement is
7     roughly 35 to 40 percent of the income -- of the
8     revenues.  Normally the advertisements in one form
9     or another is about 35 to 40 percent.  It's a big
10    chunk.
11       Q   Would you say that it's likely that
12    between January of -- or between 2009 and September
13    of 2015, corporate Defendants paid more than $5
14    million to the advertising platforms?
15       A   I would say that it's more than
16    10 million.  I would estimate it at more than
17    30 percent definitely.
18       Q   So more than 10 million is a likely ball
19    park figure?
20       A   We live with the number of 35 percent as
21    an okay number.
22       Q   I'd like to have these next two documents
23    marked as Exhibits 85 and 86, please.
24            (Thereupon, Plaintiff's Exhibit Nos. 85 &
25            86 were marked for identification.)

190

1            Mr. Juravin, could you please look at
2     Exhibits 85 and 86.  I'll explain the header on
3     those reflects e-mail header information for
4     transmissions from Mr. Fligman to our attorney, Mike
5     Davis.  And then the line below -- the text below
6     the line forwarded messages, message on 85 and 86 is
7     what I'd like you to focus on, please.
8            MS. MARTENY:  Let me just take a look at
9     this.
10           THE WITNESS:  Okay.
11    BY MR. SETTLEMYER:
12       Q   So you've had a chance to look at Exhibits
13    85 and 86?
14       A   Yes.
15       Q   What I want to ask is whether the text
16    below the forwarded message line on page one through
17    the end --
18       A   You're referring to 85?
19       Q   Yes, page 85.  The text below the
20    forwarded message line on 85 represents what would
21    be -- would have been sent by Roca Labs, Inc. to
22    purchasers when their orders were being prepared for
23    shipment in the middle part of 2011?
24       A   Okay.
25       Q   You agree with that?

191

1            MS. MARTENY:  Listen to the question.  Do
2     you understand the question?
3            THE WITNESS:  I understand the questions,
4     but I don't recognize it.
5     BY MR. SETTLEMYER:
6        Q   You don't recognize the text in Exhibit
7     85?
8        A   We sent so many messages, so many variety
9     of messages that if you are asking me is it possible
10    that we sent it, I will say it's possible.  Do I
11    recognize each one of the lines in each one of the
12    messages?  No.
13       Q   So you're not sure then whether these
14    pages represent information text that was e-mailed
15    to purchasers in 2011?
16       A   I recognize the flavor, not the exact
17    content.  If somebody change few words here, like
18    for example, we will never say that it's an FDA
19    approved facility.  We don't use this language.
20    It's very clear from day one that it's an FDA
21    registered facility.  And I don't think anybody on
22    my team will ever make this mistake, because we are
23    very, very you know clear about it.  We never will
24    say FDA approved.  That's why I don't recognize that
25    this is my language.

3 (Pages 188 to 191)

Juravin

FTC v. Roca Labs, Inc., et al.                                                    2/16/2017

204

1    A   I'm looking at 87.
2    Q   Okay. Flip through that. There's
3  multiple pages. This is a composite exhibit. It's
4  not meant to be -- that's true of 88 and 89 as well.
5  They're different individual pages.
6    A   Okay.
7    Q   So do you recognize what the documents in
8  Exhibit 87 are?
9    A   I think it's an answer for a dispute
10 originated by the customer claiming that we did an
11 illegal, unauthorized charge.
12   Q   So this is basically communication between
13 Roca Labs, Inc. and the payment processor; is that
14 correct?
15   A   Yes.
16   Q   And the information that's included in the
17 bullet points in the middle or the top third of each
18 of the pages in Exhibit 87 that shows height,
19 weight, age, sex and declaration, that's all
20 information that came from customers who input that
21 information into the Roca Labs qualification form to
22 purchase the product; is that correct?
23   A   Mr. Settlemyer, I told you something
24 earlier, but I think you were ready with the next
25 question and I'm not sure that you listened to what

205

1  I said earlier. So I would like to repeat it.
2    Q   Please.
3    A   Okay. That's because I said something and
4  I meant what I said. The document that I see in
5  front of me, Exhibit 87, is a document that I was a
6  part of it, part of approving it, that was designed
7  to show the processor that we did not commit fraud
8  of doing an unauthorized charge. So at this stage,
9  at this stage, the customer that you call a
10 customer, he says that he did not do that. So it's
11 not really this is not the customer. The one that
12 we charge the money does not claim that this is not
13 him. So now we have to prove that this -- that the
14 information we have belongs to the guy that was
15 charged. So this is what it is. At this stage, we
16 are not sure if we actually the right customer -- am
17 I explaining it correctly?
18   Q   You're not answering my question.
19      MS. MARTENY:   You have to listen to the
20 question, Don. So maybe, Carl, do you want to
21 refresh his memory on this side of the table
22 what the question is.
23 BY MR. SETTLEMYER:
24   Q   So the question about 87 is particular
25 pieces of information shown on those pages,

206

1  motivation aside, everything else, those particular
2  pieces of information are the height, weight, age,
3  sex and declaration typed into a Roca Labs
4  qualification form by someone purchasing the
5  product; is that correct?
6    A   Yes, but it's not this one.
7    Q   What do you mean by this one? This one
8  particular example you're pointing to, the first
9  page of 87?
10   A   Yes. Somebody claimed that --
11      MS. MARTENY:   No, no, no. Where did you
12 get this information, that's what he's asking,
13 to put it in this form?
14      THE WITNESS:   By somebody who came online,
15 gave a certain credit card.
16 BY MR. SETTLEMYER:
17   Q   Where did this information get populated
18 from, the height, weight, age, sex and declaration?
19   A   From a qualification form.
20   Q   Okay, thank you. That's the answer to my
21 question. So let's go through.
22      So without regard to whatever the
23 particulars are of the dispute, that's the source of
24 the information in the height, weight, age, sex and
25 declaration?

207

1    A   But you don't know if it was the customer
2  that was charged.
3      MS. MARTENY:   When Carl asks the question,
4  answer that question. But then let him ask a
5  different question. You're making this very
6  long and complex.
7      THE WITNESS:   But it will bite us in the
8  ass later if we are not clear.
9  BY MR. SETTLEMYER:
10   Q   Just to be clear about Exhibit 87. First
11 of all, as corporate representative, you're
12 acknowledging I take it that the documents in
13 Exhibit 87 are authentic records of Roca Labs'
14 business, correct?
15   A   It looks like it.
16   Q   And you don't have any reason to think
17 that these are not, correct?
18   A   It looks like something that we will send.
19   Q   So let's look at Exhibit 88. And I just
20 have really the same question about 88. Just how is
21 the -- first of all, you agree that 88 are examples
22 again of dispute forms submitted by Roca Labs to a
23 payment processor, correct?
24   A   No.
25   Q   How would you characterize it?

7 (Pages 204 to 207)

FTC v. Roca Labs, Inc., et al.                                    2/16/2017

208

1    A  It's us being accused of illegal activity
2  of unauthorized charging a card -- of a stolen card.
3  We are being accused of stealing a credit card.
4  Only then we do that.  We're being accused.  This is
5  what I'm trying to say all along.  This is us being
6  accused of stealing a card.  This is what I tried 10
7  minutes ago to explain.
8    Q  Regardless of the motivation, it's still
9  generally speaking a variation of a dispute with a
10  payment processor about whether or not Roca Labs
11  should receive money from the account in question,
12  correct?
13    A  No.  If somebody disputes, they don't get
14  this form.
15    Q  If somebody disputes, they get a different
16  form?
17    A  I see.
18    Q  So you're saying that the form used in --
19  let me ask this.  The form shown in Exhibit 88 is a
20  communication from Roca Labs to a payment processor,
21  correct?
22    A  Yes.
23    Q  This communication includes height,
24  weight, age, sex, declaration information, correct?
25  Yes or no?

209

1    A  Yes.
2    Q  And that height, weight, age, sex,
3  declaration information shown in the pages in
4  Exhibit 88 was populated from information entered
5  into a qualification form through Roca Labs; is that
6  correct?
7    A  By a stranger.
8    Q  By someone?
9    A  That we have no idea who it is.
10    Q  But it was entered in by somebody not at
11  Roca Labs who's going through the purchase process
12  steps and entering this information, correct?
13    A  Somebody.
14    Q  Somebody.  Okay.
15    A  Accusing us of -- and this is the place
16  where I can explain?
17    Q  I don't need you to explain.  I'm just
18  trying to get information about the documents so
19  that we can be efficient here today.
20       Exhibit 89, my question again is the same.
21  The documents shown in Exhibit 89 are communications
22  from Roca Labs to a payment processor, correct?
23    A  For accusing us of stealing a card.
24    Q  Yes or no, they're communications --
25    A  Yes.

210

1    Q  -- from Roca Labs?  Yes.
2       And the information in each of these forms
3  for height, weight, age, sex, but perhaps not
4  declaration was populated from information entered
5  into a qualification form online for Roca Labs in
6  the purchase process; is that correct?
7    A  By a stranger, yes.
8    Q  And the declaration I'll note in No. 89
9  appears to be identical in each of the pages.  Do
10  you see that?
11    A  What do you mean identical?
12    Q  Go through Exhibit 89, and look at the
13  middle of the page.  There's the statement
14  declarations, bulleted point.  Declarations begins,
15  "I want to be better and healthier".  And that
16  information is the same on each page for each --
17    A  I see that.  I see what you describe.
18    Q  Yes.
19    A  And if this is authentic, it shouldn't be
20  like this.  It's wrong.
21    Q  Do you know why that would be in there,
22  the same in each one?
23    A  I did the document you present to me.
24  Three options.  Either it's not the real document.
25  It's fabricated.  Number two, while printing it out,

211

1  somebody made a mistake with the variables.  Okay.
2  Sometimes there is a glitch in the variables or my
3  programmers made the mistake with the variables.  So
4  either it's fabricated or the person that printed
5  it, something changed, or my team did a big mistake.
6    Q  So if I were to tell you that the
7  documents in Exhibit 89 were produced by Ms. King
8  from her hard drive in a production of documents
9  responsive to our subpoena, do you have any reason
10  to think that would be fabricated?
11    A  No.  If King did it, no.  I would rule out
12  the fabrication.
13    Q  Okay.
14    A  I will rule out the fabrication and I will
15  still tell you this was supposed to be a
16  variable coming from the qualification form and not
17  being identical in all of them.  It is wrong.
18    Q  Thank you.  And let me just go back to
19  Exhibit 87, and just let me see if you agree that
20  the dates shown on Exhibit 87 for those documents is
21  from 2013 and into 2014, correct?  You'll have to
22  page through it to confirm that.
23    A  I'm sorry, one second.  Earlier you asked
24  me something about Sharon King.  Sharon King doesn't
25  have these documents in her hard drive.

8 (Pages 208 to 211)

Juravin

FTC v. Roca Labs, Inc., et al.                                          2/16/2017

212

1    Q   Or her e-mail.  Maybe I'm misstating it.
2    A   She doesn't have it.
3    Q   Well, okay, I think we're talking about
4  two different things.  87 has come from -- I will
5  tell you that this is a document we received from
6  First Data pursuant to a CID in the investigation.
7  So I'm talking -- I was talking previously about 89,
8  and also 88 have markings showing that that they
9  originated from Sharon King's production just to be
10  clear.
11    A   Exactly.  Because Sharon King, this is an
12  automated script and it doesn't exist in any e-mail.
13    Q   Let's look at though at 87.  I just want
14  to get clear.  You agree that the date of those
15  communications shown in Exhibit 87 are from 2013 and
16  2014?
17    A   So at this stage I can tell you that it's
18  absolutely a computer glitch on our hand.
19    Q   You're not answering my question.  You're
20  talking about something else.  Can you answer the
21  question to whether the dates for the transmissions
22  in Exhibit 87 are from 2013 and 2014?
23    A   Looks right.  It looks right, yes.  It
24  looks right.  I see that.  It looks right.
25    Q   So, yes, you think that is the correct

213

1  date range to characterize what's in Exhibit 87?
2    A   Yes.
3    Q   Let's look at Exhibit 88.  Would you agree
4  that the dates --
5    MR. DAVIS:  Excuse me.  I think we're on
6  88.
7  BY MR. SETTLEMYER:
8    Q   We're turning to 88, correct.
9    Would you agree that the dates for the
10  document shown in Exhibit 88 are in 2014,
11  November 15, 2014 and April 21, 2015?
12    A   It looks right because we probably use the
13  same format all the way till now.
14    Q   And then let's look at Exhibit 89.  Would
15  you agree that the dates on the documents shown in
16  Exhibit 89 are from December 2015 through August 17,
17  2016?
18    A   It looks right.
19    Q   Is Roca Labs or Muscular Obesity,
20  whichever operating entity controls this process at
21  this point still using the same template for
22  communications with payment processors in the
23  situations you describe?
24    A   Only when somebody accuses us of stealing
25  their card.

214

1    Q   But the answer is, yes, it's still in use?
2    A   Yes, when being accused only of stealing a
3  card.
4    Q   Those communications include height,
5  weight, age, sex information that was entered into a
6  qualification form on the Roca Labs site; is that
7  correct?
8    A   At this stage for a different person.  We
9  don't know if this is the same person.
10    Q   I'm asking about where the information is
11  coming from and if it's being transmitted to a
12  payment processor.  Is it in fact being taken from a
13  qualification form and transmitted to the processor?
14    A   From a qualification form.  From a
15  qualification form.  Not from the study of that
16  person.
17    Q   So the answer is yes?
18    A   If you tell me it's from a qualification
19  form, yes.
20    Q   Do you know when the last time that type
21  of information would be transmitted to a payment
22  processor?  Was it February 2017?
23    A   Possibly.
24    MR. SETTLEMYER:  I think we're done with
25  these for now.  Let's take a quick break and I

215

1  can get some more exhibits ready and we can go
2  to some more questions.
3    (A brief recess.)
4  BY MR. SETTLEMYER:
5    Q   Mr. Juravin, let's talk just for a minute
6  about some additional people we understand have done
7  work for Roca Labs over the years.  I want to very
8  briefly just get confirmation from a company's
9  perspective, these people did in fact do work for
10  the company and talk a little bit about what their
11  duties were.
12    So Sharon Hensley, also known as Roxy, is
13  someone who Roca Labs and then Muscular Obesity paid
14  to do work for the company; is that right?
15    A   Yes.
16    Q   She was a success coach and/or manager of
17  success coaches at various times; is that correct?
18    A   Yes.
19    Q   And Ross Finesmith, he is someone whom --
20    A   Dr. Finesmith.
21    Q   Dr. Ross Finesmith, he was an individual
22  who was paid by Roca Labs and paid through Zero
23  Calorie Labs at times to perform work for the Roca
24  Labs business, correct?
25    A   Yes.  I'm laughing because at this stage I

9 (Pages 212 to 215)

FTC v. Roca Labs, Inc., et al.                                              2/16/2017

---

220

1   photographer to their city, and it will be between
2   the photographer and the person.  Sharon King or
3   Roxy, their job is just to make sure that the
4   success story is not shy.  So that's why they will
5   ask to rehearse.  But their success story will say
6   whatever they want.  It's not something that I will
7   approve, disapprove or even see till such time that
8   the video is already done.  When the video is done,
9   sometimes I say, I want this part instead of this
10  part.  From the raw footage I might decide, but it
11  seldomly happens.  Normally Jenna will do it or --
12      **Q   So in terms of the professional**
13  **testimonials, professionally produced testimonials,**
14  **did Carla DaSilva create one of those?**
15      A   No.
16      **Q   What did Carla DaSilva create, if you**
17  **know?**
18      A   If she created something, it will be
19  either the sporadic or the adopted.  If it exists on
20  the Roca Labs reviews, then it's adopted.
21      **Q   In terms of the professional videos in**
22  **addition to paying for the videographer and so**
23  **forth, Roca Labs also paid for someone to digitally**
24  **edit the footage; is that correct?**
25      A   The photographer will do it.

---

221

1       **Q   But there's some individual employed to**
2   **edit that footage, right?**
3       A   The photographer.
4       **Q   Okay.**
5       A   And there are three -- two or three and I
6   can give you their names.
7       **Q   Okay.**
8       A   Sharon King will know.  We have only two.
9       MR. DAVIS:  Could we go off the record for
10  a moment while you think of those names.
11      THE WITNESS:  Sure.
12      MR. DAVIS:  Thank you.
13      (A brief recess.)
14      MR. SETTLEMYER:  Back on the record.
15      THE WITNESS:  I remember that Brad is the
16  name for one of them.  So Brad will go there
17  and Brad will do the job of making them feel
18  comfortable in front of the camera saying
19  whatever.  And Brad is one and we have another
20  young guy.  I forgot his name for a second.
21  BY MR. SETTLEMYER:
22      **Q   Ronen Marcovich?**
23      A   Say again.
24      **Q   Ronen Marcovich.**
25      A   Ronen is a friend from Israel for many,

---

222

1   many years ago who is also an accountant.
2   Marcovich, Ronen Marcovich is an accountant from
3   Israel, a friend many, many, many years ago.  Far
4   from being a photographer.
5       **Q   You don't think he did any sort of video**
6   **work for Roca Labs?**
7       A   Who?
8       **Q   Ronen.**
9       A   Number one, I didn't talk to him for six
10  years, seven years.  I have no idea how many years.
11  Number two, I don't know if he knows even what a
12  video looks like.  He's a numbers guy.
13      **Q   Let's switch gears a little bit.  In terms**
14  **of the adopted videos, correct me if I'm**
15  **mischaraterizing this, but you're saying that if**
16  **there were videos that someone put on the web that**
17  **were you're saying not solicited by Roca Labs?**
18      A   Nothing solicited by -- nothing is -- if I
19  see -- okay.  The way that it works is like this.
20  Sharon King sends me a link.
21      **Q   Yes.**
22      A   And says, look at this, I like it.  And I
23  say, nice, upload it to Roca Labs reviews.
24      **Q   So there's no interaction with the actual**
25  **testimonialist up front, right?**

---

223

1       A   Not just that.  We sometimes don't know
2   who it is.  When I say I don't know what it is, it
3   means I cannot match between the name of the YouTube
4   to our record that we have.
5       **Q   Understood.  Okay.**
6       **So with the -- there's another category of**
7   **videos, however, that sound like they're**
8   **testimonials, but in fact there were videos that**
9   **featured actors paid by Roca Labs, correct?**
10      A   Let's talk about them.
11      **Q   Well, correct?  Yes or no?**
12      A   In the very, very early time we jump
13  started with three of them, two or three of them
14  that were absolutely -- no, I'll say differently.
15  They haven't even seen the regimen.  They did not
16  just try, they haven't seen it even.  Okay.  They
17  didn't see the regimen.  I wrote the entire script.
18  And in the beginning I said to Sharon, we need to
19  start with testimonials.  Sharon said, I have a hard
20  time starting finding people to do it.  I said, let
21  me be creative and let me hire people to do it.
22  These people never seen the regimen, never tried it.
23  They followed my script.  We tried it for a month or
24  two.  We got the real ones and we dropped them.
25      **Q   These were paid actors to read the words**

---

11 (Pages 220 to 223)

Juravin

FTC v. Roca Labs, Inc., et al.                                                2/16/2017

236

1   information that deals with frequently asked
2   questions for example?
3       A   It will send them to the FAQ page.
4       Q   Of the website?
5       A   Yes.
6       Q   But it's not a distinct set of answers
7   within the hub.  It's a cross reference to the Roca
8   Labs website, correct?
9       A   Yes.  It's very different than what you
10  guys are used to of kissing the ass of the customer,
11  being nice to the customer.  We don't do that.  Mine
12  is a boot camp.
13          MR. SETTLEMYER:  We'll get into that
14  later.  But let's move along to some exhibits.
15  Can we go off the record for just 10 seconds.
16          (A brief recess.)
17  BY MR. SETTLEMYER:
18      Q   Mr. Juravin, we were talking about a
19  variety of things, but I wanted to make sure that we
20  didn't lose in the conversation some questions I had
21  about Charmaine Novelo.  Now Charmaine Novelo I
22  think you said worked for Roca Labs for a while.
23  Was she a nurse?
24      A   Most of them are.
25      Q   What would the nurses in particular do

237

1   with respect to customers or respective customers?
2       A   They will not really exercise their
3   nursing.  It's just that I thought it's worth paying
4   a little bit more and have somebody more
5   responsible.
6       Q   In terms of Charmaine Novelo's activities
7   in particular, did she comment on blogs and forum
8   posts?
9       A   I don't remember Charmaine.  Charmaine or
10  anybody else were all the same.  There's nothing in
11  particular about Charmaine.  I don't even know who
12  she is.  She's just one of the guys from the
13  Philippines that were Customer Service.  There's
14  nothing in particular about her that's different
15  than the others.
16      Q   Was Charmaine Novelo and the others, were
17  they paid to put comments on blog posts and
18  websites?
19      A   I think that at a certain point I
20  suggested to Sharon King that she should instruct
21  the Customer Service people that when they have a
22  down time, they should go to posts, and think about
23  customers that they helped with success people that
24  they worked with and kind of tell their story on the
25  other blogs.

238

1       Q   Kind of tell their story.  Meaning they
2   being customers that the Customer Service people had
3   dealt with?
4       A   Yes.
5       Q   So the Customer Service people were not
6   telling their own stories in the forum post,
7   correct?
8       A   You could -- yeah.
9       Q   Let's look at some exhibits here.  I'm
10  going to have -- well, I've had marked as Exhibits
11  90 through 94 some documents I am going to hand you,
12  and would like you to review and we'll talk about
13  them in a moment.
14          (Thereupon, Plaintiff's Exhibit Nos. 90
15          through 94 were marked for identification.)
16      A   They were never asked to create a story,
17  but to represent what they heard from others.
18      Q   Mr. Juravin, look at Exhibit No. 90.
19      A   Okay.
20      Q   Which is the e-mail from Sharon King to
21  Sharon Hensley dated December 18, 2013.  Do you see
22  that?
23      A   Yes.
24      Q   And do you see the subject is "blogs to
25  promote"?

239

1       A   Yes.
2       Q   So Sharon King writes to Sharon Hensley
3   who's known as Roxy.  "Roxy, have the team comment
4   on these blogs and keep them promoting on good
5   YouTube videos."  Do you see that?
6       A   Yes.
7       Q   Does that reflect your instructions?
8       A   Yes.
9       Q   So the blogs listed in Exhibit No. 90,
10  let's just start with the first one.
11  Gastricbypassalternative.wordpress.com.
12      A   I will not recognize any one of them.
13      Q   Do you know if that's a blog that Roca
14  Labs paid to have someone create?
15      A   I will not recognize.  Because if I would
16  have recognized them, I would be very proud of them
17  because I was absolutely not successful with any SEO
18  that I did.  So I'm not familiar with them, but I
19  definitely wanted to promote anything positive.
20      Q   Let me ask you this.  Did Roca Labs pay to
21  have anyone create blogs?
22      A   I cannot recall a situation that we
23  paid -- I can tell you that if I would have found
24  somebody that could invest the time in one of the
25  success stories, and I could have him create a blog,

15 (Pages 236 to 239)

Juravin

FTC v. Roca Labs, Inc., et al.                                              2/16/2017

---

280

1  where they came from in case anybody wants to keep
2  track of this and pull up from your own copy of our
3  production. 107 is FTC-PROD-005065. 108 is same
4  sequence, 5072. 109 is a photograph we pulled from
5  the 26-Gigabyte production that we got about a month
6  ago at this point from Roca Labs.
7      A   Okay.
8      Q   110 is FTC-PROD-005093. 111, 5148. And
9  112 is 5174.
10     I want to draw your attention to the
11 second page of Exhibit 107. Do you see the comments
12 by someone whose name is Mae Olevon, O-L-E-V-O-N?
13     A   Okay.
14     Q   You see there's multiple comments on those
15 pages of comments going through the end of that
16 document by Mae Olevon, correct?
17     A   Okay.
18     Q   Is this Charmaine Novelo using her last
19 name spelled backwards commenting on this blog?
20     A   I have no idea. I have never seen it. I
21 have no idea what these people and what username
22 they are using. They don't register with us. I
23 don't know if somebody did it private time, working
24 time; when they did; what's the benefit. I don't
25 know who is reading even these little comments. Why

---

281

1  would people comment here? No idea what's the
2  benefit to the company even. No idea. No idea. No
3  idea.
4      Q   So let's look at the last page, second to
5  last page of Exhibit 107. You see there's a comment
6  by someone named Alessandra Ricci Novelo?
7      A   Okay.
8      Q   Is that somebody who worked for Roca Labs?
9      A   No idea. I don't recognize the name.
10     Q   If that name shows up in bank statements
11 of Zero Calorie Labs, will that refresh your
12 recollection?
13     A   Maybe. But right now when I look at it,
14 as hard as I'm trying to look to recognize, I don't.
15 If you show me that it was paid, I might not still
16 remember. Because the way that it works, the end of
17 the month Sharon King says, these are the people
18 that you paid. This is how much you transfer. I
19 said, okay, and I pay. The fact that I don't
20 recognize them does not mean that they did not work
21 or do something on behalf of Roca Labs. If I don't
22 recognize doesn't mean that somebody -- that this
23 person did not --
24     Q   So it's possible then that as part of
25 general activities of the company, someone else like

---

282

1  Sharon King supervised the creation of blogs or
2  comments on blogs like this without you personally
3  being aware of the specific URL is what you're
4  saying?
5      A   Possible. But the way that it would work
6  is that I will say, Sharon, there is a good blog
7  that I saw. Okay. Normally Sharon will see things
8  on her own. But we were both very frustrated that
9  the Google search did not reflect the true success
10 of the company and the people that use the regimen.
11 So we tried to do everything we can. It's possible
12 that I told her, Sharon, identify good blogs and try
13 to help us promote them to the top. And Sharon will
14 do everything that she needs to do. Whatever it is
15 that she can. But at no time we will tell people
16 what to write. The only thing that we will tell
17 people, say from your personal experience. And if
18 it's somebody from the Philippines, then we will
19 tell them, you watch a video and you be like a mouth
20 for that person. So you watch a video of somebody
21 saying, I went to the gym and I also used Roca Labs,
22 and I lost so and so much. You take only that and
23 you can place it as a comment. But don't create on
24 your own anything.
25     Q   Let's move on to Exhibit No. 108. Do you

---

283

1  recognize the?
2      A   I want to be clear on something.
3      Q   Sure.
4      A   Very clear. If Sharon did something and
5  she did it because she believed that this is my
6  instructions, I'm responsible as if I did it. If I
7  tell you, I recognize, I don't recognize. Even if I
8  don't recognize, I am still responsible for it as if
9  I instructed. Because Sharon was not a crazy person
10 going off and doing things on her own. Not that I
11 know of. For the six years she's responsible. And
12 if she did something it's because she understood
13 that this is what I'm asking for or because she
14 thought that this is the right thing to do. I'm
15 still responsible for it.
16     Q   Let me ask you just generally about one of
17 the ways that Roca Labs would operate internally.
18 My understanding from other depositions is that Roca
19 Labs has used a time tracking and screen shot saving
20 program called Hubstaff. Are you familiar with
21 Hubstaff?
22     A   Yes. But not really -- I told them that
23 there is a time tracking, but it wasn't really. I
24 didn't want to pay for it, because I never looked at
25 them.

---

26 (Pages 280 to 283)

FTC v. Roca Labs, Inc., et al.                                         2/16/2017

---

292

1    work named Bri.
2         MS. MARTENY:  Wait, wait, wait, wait.
3    BY MR. SETTLEMYER:
4         Q   You're looking at still at 110, and
5    someone has used the name I think Bri, B-R-I.
6         A   We had somebody who lost 250 pounds.
7         Q   I know who Bri is; the success coach.
8         MS. MARTENY:  Wait till he asks the
9    questions and then answer them so we can speed
10   this up.
11        THE WITNESS:  Fine.
12   BY MR. SETTLEMYER:
13        Q   Do you recognize Exhibit 111?
14        A   First time in my life that I see it.
15        Q   So that's a no.  And you don't recognize
16   then perhaps on page two there is another comment
17   from someone using the name Mae Olevon discussing
18   their weight loss with Roca Labs?
19        A   But once again it might be that Mae worked
20   for us.  And it might be that her instructions were
21   at downtime, go and write something positive
22   referring to Roca Labs, and she did it.  So the fact
23   that I don't recognize it doesn't mean that it's not
24   a person, you know.  But I can tell you another
25   thing.  Okay.  And I'm telling you, you will miss

---

293

1    me, a guy like me everywhere because I'm
2    volunteering a lot of information.
3         This is wrong if she wrote "I lost".  I
4    don't know of any Philippine worker that tried the
5    product aside from Marg, I think.  If not Marg, no
6    Philippine person used the regimen and no Philippine
7    person was allowed to say words like as if they used
8    it.
9         Q   Let's move to Exhibit 112.
10        MS. MARTENY:  Don, can you please just
11   answer the question.
12        THE WITNESS:  Yes.
13   BY MR. SETTLEMYER:
14        Q   Do you recognize Exhibit 112?
15        A   First time in my life that I see it.
16        Q   This has mybariatricsurgery.com as a
17   domain name.  Page three of this document, again,
18   there's another comment by Mae Olevon dated July 16,
19   2012 talking about Roca Labs.  Do you see that one?
20        A   I see it, yes.
21        Q   And it says, "I am using the Roca Labs
22   formula, too, since my Dr. Ross told me that I have
23   to lose weight to help me manage my diabetes.  And
24   so with the Roca Labs formula, I lost 30 pounds in
25   three months and my blood sugar levels went down to

---

294

1    150 milligrams per DL from my previous.  I also
2    incorporated jogging as my form of exercise to aid
3    me on my weight loss journey."  Do you see that?
4         A   Yes.
5         Q   Now there's Dr. Ross Finesmith who is
6    working with Roca Labs in 2012, correct?  Yes?
7         A   Yes.
8         Q   And there is also --
9         A   There is Dr. Finesmith.
10        Q   So does this suggest to you that somebody
11   associated with Roca Labs wrote that comment?
12        A   No.  It suggests to me that somebody that
13   knows of Roca Labs that may be if somebody wanted to
14   hurt Roca Labs, somebody might write something.
15   But, again, if I did it, it's a person of Roca -- if
16   it's a real person associated with Roca Labs, the
17   rules were very simple.  You cannot write things on
18   your own unless you experienced it.  And the
19   Philippines never experienced Roca Labs.  The only
20   thing they could do is listen to a video, a real
21   video, and then they can say something exactly the
22   same thing as the other person said.  They can just
23   give them a voice.  They cannot create something
24   from nothing?
25        MR. SETTLEMYER:  Okay.  I think we covered

---

295

1    that.  I think we're done with these exhibits
2    for now.  We can take a quick break and I can
3    get to maybe hoping a near the end-ish chunk of
4    exhibits.
5         (A brief recess.)
6         (Thereupon, Plaintiff's Exhibit No. 113
7    was marked for identification.)
8    BY MR. SETTLEMYER:
9         Q   We've had some additional documents marked
10   as exhibits.  Mr. Juravin, I'd like you to look at
11   Exhibit 113, and tell me if you recognize Exhibit
12   113, please.
13        A   Yes.
14        Q   What is Exhibit 113?
15        A   It's a document that one of the attorneys
16   wrote to us -- wrote for us long, long ago about
17   people that are trying to extort us.
18        Q   What would be done with this document?
19        A   If somebody is trying to extort or
20   slander, we will inform them about the law.
21        Q   When did this document come into use by
22   the company?
23        A   When somebody is trying to extort or
24   threatens with slander.
25        Q   That's not what I mean.  I mean,

---

29 (Pages 292 to 295)

PX6-66

Juravin

FTC v. Roca Labs, Inc., et al.                                      2/16/2017

---

296

1  chronologically in terms of what year was this first
2  being used?
3      A   I remember this document for a long time.
4  I don't know exactly when.
5      Q   So several years would you agree?
6      A   Possible.
7      Q   Is it still in use?
8      A   Yes.
9      Q   When was the last time this was used?
10     A   Maybe I used it even -- maybe I even used
11  it I remember a few months ago.
12     Q   So this is a current -- do other people
13  have access to be able to use this document?
14     A   Yes.
15     Q   Who else has access to be able to send
16  this document?
17     A   It's not access to it.  It's like if they
18  copied it from other documents, they will have
19  access.
20     Q   But who?
21     A   Right now?
22     Q   Yes.
23     A   Priscilla.
24     Q   Who's Priscilla?
25     A   Priscilla is the woman that is responsible

---

297

1  for support.
2      Q   What's her full name?
3      A   Priscilla Cucuta, C-U-C-U-T-A.
4      Q   She was responsible for support you're
5  saying?
6      A   Yes.
7      Q   She works under your supervision, correct?
8      A   Yes.
9      Q   Would she be authorized to use language
10  like what's shown in 113 without your authorization?
11     A   That would be a saved answer that we
12  will -- that the attorneys then, I don't remember
13  which one of them, told us that if somebody is
14  trying to extort, this is the language we should
15  use.
16     Q   Let's look at Exhibit 114.
17     A   Only, only for extortion.  Nothing -- only
18  for extortion.  And we have a very clear definition
19  of what extortion is.
20     Q   What do you mean by extortion?  As you're
21  sitting here today and you use the word extortion,
22  what do you mean specifically?
23     A   Extortion and slander.
24     Q   Let's take extortion first.  What do you
25  mean by extortion?

---

298

1      A   If somebody will ask for money or money
2  equivalent or any favor in return for not doing
3  something that they're legally supposed to do,
4  that's an extortion.  In other words, if somebody
5  will say, if you don't give me refund on my money.
6  If you don't -- for example, I don't want to make a
7  payment.  And if I have to make the payment, I will
8  report to the BBB.  That's an extortion.  Because if
9  they need to report something to any authority, they
10  need to do it regardless of money or not money.
11  They cannot ask us for money in return to not
12  reporting.  They need to do it anyways.  If somebody
13  says, if you don't give me -- if you don't send
14  it -- asking some benefit or I will write negative
15  about you, that's also that's a slander.  So we just
16  want to scare them enough so they will not get into
17  a situation of -- just for them to learn about the
18  law.  And they can learn about what we said about
19  the paragraph, and they can say, I still want to do
20  it.  They've learned -- I learned that a lot of
21  customers, if I would give them something like this,
22  it either calms them down or it makes them learn the
23  law.  And if they learn the law and they said
24  whatever we got is nonsense, and we still want to
25  write everything negative and we want to ask for the

---

299

1  money and everything, go ahead and do it.  I just
2  want to slow them before they do something that I
3  will have to respond with a lawsuit because they did
4  slander and defamation and so on.  So this is my way
5  of like, calm down, read it, and think if you want
6  to continue.  And if they want to continue, that's
7  fine.
8      (Thereupon, Plaintiff's Exhibit No. 114
9  was marked for identification.)
10     Q   Let's look at an exhibit that's been
11  marked as 114.  Tell me if you recognize Exhibit
12  114.
13     A   What year is it?  It doesn't matter.  I
14  just wondered.  It doesn't matter.  I just wondered.
15  No, I don't personally recognize it.
16     Q   Do you recognize the language going from
17  the pages marked Roca-00584 through 85.  The first
18  two pages of the document as being an example of the
19  language in Exhibit 113.
20     A   Yes.
21     Q   And this Exhibit 114 was directed to Alice
22  Cinotto, also known as Dusty King.  Do you see that?
23     A   Okay.
24     Q   On the first page?
25     A   Okay, Dusty.  Okay.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-67

Juravin

FTC v. Roca Labs, Inc., et al.                                        2/16/2017

364

1  the Vimeo service that are set for private, but
2  still stored there?
3      A   Trick question.  You promised no trick
4  questions.
5      Q   I'm hoping it's not a trick question.  I
6  want to know whether the Vimeo videos are presently
7  stored.
8      A   Number, one, I don't know.  Number two,
9  let me try and know.  It was a paid account with
10 certain storage amount.  I stopped paying them.  And
11 I stopped accessing the account and we are not using
12 the account.  So I will have to find the password to
13 log in and see if they delete it because I don't pay
14 or maybe it's still within the free account and it's
15 still there.  But whether or not it's the same
16 duplication of the YouTube.  It's no different.
17 They don't have --
18     Q   So it's just a different service platform
19 to provide the videos.  It was not different
20 content?
21     A   Because we try to have it on the search,
22 on the Google search maybe to show page one, page
23 three like Google would.
24     Q   So the answer is those videos are
25 preserved on YouTube set for private I believe?

365

1      A   Almost for sure.  And on Vimeo, I just
2  told them I don't want to pay the amount.
3      Q   Did Roca Labs since the lawsuit by the FTC
4  was filed communicate with the Internet Archive to
5  ask them or instruct them to take down any content?
6      A   What is internet archive?
7      Q   Wayback Machine, archive.org?
8      A   Number one, no.  Number two, you don't
9  instruct them to remove it.  You instruct them to
10 stop archiving.  Number three, it was done because
11 of this consumer.  Paul Berger advised to do it and
12 we did it.  I don't remember why and how.  But I
13 think it was done whenever it is --
14     MS. MARTENY:  If it's attorney/client
15 privilege.
16 BY MR. SETTLEMYER:
17     Q   Yeah, don't tell me what the instruction
18 was.  But if Mr. Berger had a communication with
19 Internet Archive, you can talk about what his
20 communication to them would have been I think.
21     MS. MARTENY:  Yes.
22     MR. SETTLEMYER:  Yes.  Okay.
23     THE WITNESS:  Okay.  So we didn't do
24 something since.  Okay.  We didn't do anything
25 since the lawsuit.  But as far as I remember,

366

1  we asked them to stop archive because something
2  would be said.  I don't remember why.
3  BY MR. SETTLEMYER:
4      Q   Did you in addition to asking them to stop
5  archiving, was there also a takedown notice to
6  remove content from the archive.org website from
7  being able to be displayed publicly?
8      A   One more time.
9      MR. SETTLEMYER:  Can we have the question
10 read back, please.
11     (Thereupon, the previous question was read
12 back.)
13     THE WITNESS:  I don't know.  You need to
14 try and go on the website and see.
15 BY MR. SETTLEMYER:
16     Q   I think we've asked for it and I would
17 like to get the communications that were sent to
18 Internet Archive, and we can disambiguate --
19     A   Permission to help you again?
20     MS. MARTENY:  Wait.  No, no, no.
21     MR. SETTLEMYER:  You don't need to.
22     THE WITNESS:  I think I need to really.
23     MR. SETTLEMYER:  If it affects the truth
24 of your testimony --
25     THE WITNESS:  Yes, it is affecting.  Is

367

1  there any help that doesn't affect the truth?
2      MR. SETTLEMYER:  I don't want to --
3      THE WITNESS:  You guys will be sorry later
4  if you don't let me --
5      MR. SETTLEMYER:  If you need to clarify
6  your testimony, please do.
7      THE WITNESS:  We are using now -- because
8  the Roca Labs name is so damaged, I think we
9  told you in the past that I'm trying to build a
10 brand new name, and we are working on the site
11 gastric.care.  So when people go to Roca Labs
12 and click rocalabs.com/FAQ, it will take you to
13 gastric.care.
14 BY MR. SETTLEMYER:
15     Q   So that's a newer development?
16     A   It's a few months old, a couple of months
17 old.  So you can see on the machine, whatever you
18 call it, the back machine, you can see on that
19 Michael Fox machine the history maybe.
20     Q   Do you mean the Wayback Machine?  You said
21 Michael Fox machine.
22     A   Because of the movie.
23     Q   Okay.  Back to the Future.
24     A   So you will see there maybe the
25 gastric.care.  Even if you don't see -- because the

47 (Pages 364 to 367)

Juravin

FTC v. Roca Labs, Inc., et al.

2/16/2017

368

1  important thing that customers see are on
2  gastric.care.  Is that helpful?
3      Q   It perhaps is.  But let's move on to some
4  additional topics.  I want to try to get us over the
5  goal line here.
6          (Thereupon, Plaintiff's Exhibit No. 128
7      was marked for identification.)
8          Will you please look at Exhibit 128, and
9  tell me if you recognize Exhibit 128.  Actually, can
10 I have that back.
11         Mr. Juravin, tell me if you recognize
12 Exhibit 128, please.  It's a composite exhibit with
13 two separate one page documents.
14     A   Looks the same to me.
15     Q   These are coming from the Sharon King
16 production.  Do you recognize Exhibit 128?
17     A   Yes.
18     Q   What is Exhibit 128?
19     A   Forwarding money to Sharon King.
20     Q   Who forwarding money to Sharon King?
21     A   Me.
22     Q   By what means?
23     A   Either the bank or PayPal.
24     Q   So this is -- the first page is a July 1,
25 2016 transfer of $1,600 to Sharon King; is that

369

1  correct?
2      A   Yes.
3      Q   And is this money coming from Muscular
4  Obesity?
5      A   Always.
6      Q   And it's coming from the Muscular Obesity
7  PayPal account in this case?
8      A   I don't remember, but I think so.
9      Q   Let's look at the second page.  What is
10 the second page of Exhibit 128?
11     A   The second page is giving Sharon King an
12 advance.
13     Q   Of how much money?
14     A   Eight thousand.
15     Q   On what date?
16     A   August 15.
17     Q   2016, correct?
18     A   Yes.
19     Q   What was this an advance for?
20     A   I don't remember.  But I think it was a
21 combination of things.  Number one, Sharon King
22 needed the money.  I don't remember if it was
23 something with her son's school.  I don't remember
24 what it was.  But I know the main thing I wanted
25 to -- we discussed her having forward expenses with

370

1  the FTC, maybe legal, things that she will need to
2  prepare for.  And I said, you know what, I don't
3  know what expenses you will have.  Printing papers,
4  preparing.  We knew that, you know -- we knew that
5  it will come to that she will have to prepare.  And
6  I said, you know what, I don't -- let me forward you
7  some money.  See what expenses that you will have
8  during August, and the rest please return to us
9  let's say within a month.
10     Q   Was she also still working for Roca Labs
11 at the time, right?
12     A   Yes.
13     Q   And her normal pay would come from PayPal,
14 correct?
15     A   She could normally earn about 2,000 or
16 something.  So I figured out that maybe she's
17 getting an advance for the next couple of months.
18 Plus, she will have a lot of expenses of papers and
19 time and a lot of things.  Then she needed some
20 money because she was moving to another job and she
21 didn't have.  And I said, you know what, you worked
22 for me for six years, I'm giving you an advance.
23 Anyway you work for it.  So look at it like I paid
24 you three months in advance.  So either you return
25 the difference.  Use it for whatever you need.  We

371

1  know each other for six years.  And you'll give me
2  back in the next couple of months.
3      Q   So this $8,000 advance of course was done
4  on August 15th, which is the date that the FTC filed
5  a motion for an asset freeze.  You recall that?
6      A   Nothing to do with that.
7      Q   But it was the same date, correct?
8      A   I don't even recall the asset freeze and
9  the time.
10     Q   So did Ms. King in fact earn and record
11 hours for the $8,000?
12     A   No.  No.
13     Q   What do you mean no?
14     A   The $8,000 was advance.  It's marked
15 advance.
16     Q   No, not as of August 15th.  But did she
17 subsequently work and collect the money, earn the
18 money, work the hours, record the hours?
19     A   If she worked the hours in September,
20 October, and so on or before?
21     Q   In August, the remainder of August,
22 September and October, yes.
23     A   She never gave me the balance.
24     Q   No.  Did she record the hours that she
25 worked?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-69

Juravin

FTC v. Roca Labs, Inc., et al.                                                  2/16/2017

384

1    Q   Felicia E'bara?
2    A   Felicia is somebody that I think Sharon
3    tried to train to help her.  Tried to duplicate
4    Sharon a few times unsuccessfully.  So I think
5    Felicia was one of them.
6    Q   Josh Roth?
7    A   Yes.  He's a guy from Boston that helped
8    me with English, and he will help me to write
9    something on the web.
10   Q   He helped writing the scripts for the lab
11   coat videos, correct?
12   A   No.  Lab is completely me.  He will maybe
13   do editing, maybe fix, but the lab is totally me.
14   The lab people represented me, what I wanted to say.
15   Q   So the lab people I think in Sharon King's
16   deposition, she referred to one as a woman named
17   Morgan; is that correct?
18   A   Yes, Morgan.  And the other guy is Brian.
19   Brian and Morgan.
20   Q   What was Morgan's last name?
21   A   No idea.
22   Q   What was Brian's last name?
23   A   No idea.  But he's the guy from the
24   hair -- the one that dyed their hair for the Hair
25   for Men; Only for Men.

385

1    Q   So he's in a different commercial?
2    A   He's a commercial guy.
3    Q   Who did you hire -- what production
4    company did you hire to create the lab coat videos?
5    A   It's a guy from Coconut.
6    Q   Coconut, Florida, a town?
7    A   Yeah, Coconut something in Miami, near
8    Miami, and he's the guy that did it.  But everything
9    was completely based on the script that I gave them,
10   because I could not stand in front of the camera.
11   So I did the script that I wanted.
12   Q   But do you remember what his name was?  Do
13   you remember what the --
14   A   No.
15   Q   Do you remember what the name of the
16   company was?
17   A   No.  But to save time, every word that
18   they said was mine rough only fix my English, that's
19   all.  They really represented what I wanted to say.
20   Q   Jacqueline Eiffle, do you recognize that
21   name?
22   A   Yes, from New Jersey.  She's the same as
23   Felicia, trying to do what Sharon is doing.
24   Q   So I believe that Sharon King described
25   Jacqueline Eiffle and perhaps also Felicia as

386

1    secretaries.  Does that sound --
2    A   The same thing as I said.  The same thing.
3    Q   What were generally their duties?
4    A   Sharon needed help.  And I said, Sharon,
5    duplicate yourself.  So she looked for -- she tried
6    to do it with those people.  She will say secretary.
7    I say duplication; the same.
8    Q   Then you mentioned the name Priscilla
9    Cucata Laporte?
10   A   I did not say the last one.
11   Q   It's on the list here.  Priscilla Cucata
12   Laporte, L-A-P-O-R-T-E.  She's someone you plan to
13   have testify next week; is that correct?
14   A   Yes.
15   Q   But she's currently working for Roca Labs;
16   is that right?
17   A   For Muscular Obesity, MCO.
18   Q   As part of the Roca Labs business?
19   A   There is no Roca Labs business.
20   Q   In selling the Roca Labs brand?
21   A   There is no Roca Labs brand.
22   Q   As of when?
23   A   As of when you killed it.
24   Q   So there's no rocalabs.com website
25   anymore?

387

1    A   There is.
2    Q   That's what I mean.  In association with
3    things sold through the rocalabs.com website.
4    A   The formula is the same formula.  But we
5    are moving away from the Roca Labs name because you
6    guys killed it.  By you guys, I mean the FTC, Carl
7    and Paul.
8    Q   Editorializing aside, what does
9    Priscilla -- when did Priscilla start working with
10   MCO?
11   A   I don't remember.  Six months ago maybe.
12   Q   What are her -- there's some duties listed
13   in the interrogatory response.  What is it --
14   A   Support, Facebook, and a little bit
15   helping my wife in the warehouse.
16   Q   So what does she do on Facebook?
17   A   Answer comments.  Priscilla has two hats.
18   There's Priscilla, the individual who lost she says
19   100 pounds, 80 pounds, whatever, which I never deal
20   with because it's her personal life.  It's personal.
21   And there is Priscilla that works in the company and
22   she manages the -- she manages the Facebook support,
23   and all the customer and non-customer interaction.
24   Q   In terms of current programmers and
25   designers working with MCO, who's in that line-up at

52 (Pages 384 to 387)

Juravin

FTC v. Roca Labs, Inc., et al.                                                2/16/2017

---

388

1  the moment?
2      A   Just one I have.
3      Q   Who is that?
4      A   Mac.
5      Q   And that's someone just to spell out the
6  name in full.
7      A   M-A-C.
8      Q   I thought it was M-A --
9      A   I'm sorry, M-A-K.
10     Q   It was an acronym for if I'm not mistaken,
11  and correct me if I'm wrong --
12     A   Now I see your point, yes.  I did not know
13  that by the way, but yes.
14     Q   He's not Mussa --
15     A   No.  It's Mussa Azhar Kamal, correct?
16     Q   And that's M-U-S-S-A, A-Z-H-A-R,
17  K-A-M-A-L, correct?
18     A   Yes.
19     Q   And he's based in Pakistan?
20     A   Yes.
21     Q   And he's been working with Roca Labs and
22  Muscular Obesity for a number of years?
23     A   Only Muscular Obesity.
24     Q   When did he start working with Muscular
25  Obesity?

---

389

1      A   I don't know.  A year ago, year and a half
2  ago.
3      Q   Is Fahad Uden, formerly known as Jack,
4  still doing any work with Muscular Obesity?
5      A   No.
6      Q   And Mussa is also --
7      A   No.
8      Q   Prashant Patel, Peter?
9      A   Peter, no.
10     Q   Let me go through just a few clean up
11  questions in different categories and see if we can
12  get towards the end.
13         One question I was asking Mr. Whiting
14  yesterday is whether he could say from a corporation
15  standpoint how much money was paid from Roca Labs,
16  Inc., Roca lab Nutraceutical and Muscular Obesity to
17  Don Juravin?
18     A   For the invention?
19     Q   How many dollars between 2009 and
20  September 2015 went from those businesses to Don
21  Juravin for any reason at all total?  How much
22  approximately, if you can tell me?
23     A   I will throw a number that will be maybe
24  seven million.  Because I lost in the stock about --
25     Q   I'm not asking what you lost in the stock.

---

390

1      A   I'm trying to see how I got it.  I would
2  guesstimate it about seven.
3      Q   About how many total customers have bought
4  from the rocalabs.com website between 2009 and
5  September 2015?
6      A   How many years is it?
7      Q   Approximately --
8         MS. MARTENY:  Six.
9         MR. SETTLEMYER:  -- five or six.
10        THE WITNESS:  50 to 60,000 customers.  80
11     to 90,000 users.
12  BY MR. SETTLEMYER:
13     Q   There was in the documents produced to us
14  probably last year one human clinical study of the
15  Roca Labs product.  What I want to know is since
16  that one was produced, have any others been
17  commissioned?  Any other human clinical studies of
18  the product?
19     A   Number one, no.  Number two, it's only for
20  the morning dose.  I think it was only the morning
21  dose.
22     Q   I'm just trying to identify, were there
23  any other clinical trials subsequent to the one that
24  was produced?
25     A   No.

---

391

1      Q   I want to ask about your education.  I've
2  already asked Mr. Whiting.  I've already asked
3  Dr. Finesmith about his.
4         What is your educational background?  I
5  know that you went to -- I believe you went to
6  Gonzaga University in Washington for a time?
7      A   I studied economics in Tel Aviv and don't
8  remember how much.  I transferred the credits to --
9  I studied a little in Germany, which is nothing.
10  Shouldn't be mentioned.  And I studied pre-med in
11  Gonzaga.
12     Q   So what sort of classes did you take in
13  the pre-med curriculum in Gonzaga?
14     A   It's biology chemistry.  Mainly biology
15  chemistry and a little bit of psychology.
16     Q   Did any of that involve assessing clinical
17  studies of substances and their affect on human
18  beings?
19     A   Even if it did, it's nothing that can
20  allow me to be an expert in any field.  Nothing.
21     Q   So I want to move on to and just ask do
22  you have any sort of certification or degree that
23  you earned at any point based on the college
24  courses?
25     A   Nothing that I have as a formal education

---

53 (Pages 388 to 391)

Juravin

FTC v. Roca Labs, Inc., et al.                                    2/16/2017

392

1    that will allow me to use any title of a doctor or
2    understanding how to read the clinical or give
3    psychological advice or give any medical advice.
4    And I'm actually an expert in one thing, what not to
5    do in a marriage.  Aside from that, I'm not expert
6    in anything else.  By now, by the way, and now I'm
7    not kidding, I do consider myself an expert in the
8    field of weight reduction just because I've gained
9    so much experience with so many people that I
10   believe that I can -- just because I have so much
11   experience, I do believe I can advise.  But not
12   psychological, not medical, or anything like it.
13       Q   Have you published any sort of articles
14   relating to weight loss other than what has been put
15   on to the rocalabs.com website?
16       A   I do have about 58 of them that I worked
17   on -- okay.  I didn't publish, but I worked on many
18   since I started with Roca Labs.  In other words,
19   every time that I will search on a certain
20   ingredient, I will do a whole search on it.  I never
21   put it in writing all the pieces together.  So I
22   will search an ingredient, what does it do and the
23   side effects, and read articles and read research,
24   and consult with doctors and pharmaceutical.  Many,
25   many, many people.  But I never put it in writing.

393

1    In the last year and a half, I did put a thing
2    together and I asked them to follow my lead as far
3    as creating reviews.  It's called reviews.  So I do
4    have the reviews here.
5        Q   And I think you produced some of those to
6    us previously if I'm not mistaken?
7        A   I think I have the whole folder here.
8        Q   Those reviews are -- let me ask.  Who's on
9    the team?
10       A   Harvard, a doctor, a neurologist.  Harvard
11   fellow, Moteie, M-O-T-E-I-E.
12       Q   Okay.
13       A   Then there are two pharmacists from the
14   Far East.  Kelley from England, a dietician.  And
15   that's it.  And myself.  I'm directing them what I
16   want.  I challenge them.  And I'm kind of the
17   director of the entire thing.
18       Q   Are any of them independently doing
19   literature research to create the reviews that
20   you're asking them to put together?
21       A   I don't understand the question.
22       Q   Well, are you giving them articles to
23   summarize and to create the reviews or are they
24   independently searching for the articles they're
25   using --

394

1        A   Completely independent.  I just give them
2    the subject.  I give them the goals.  I challenge
3    them.  I re-challenge their results.  And then we
4    create a review that it's basically we think it's
5    always the most comprehensive possible, because I
6    give them a lot of time to really search the entire,
7    you know, everything possible.
8        Q   How do you communicate with members of
9    this research team?  Is it by e-mail or some other
10   means?
11       A   On Skype.  Mainly meeting on Skype.  Less
12   writing and more talking to them.
13       Q   Do you only speak with them on Skype?
14       A   Yes.  It's Skype and then we share a
15   document.  So I see what they are doing.  So when I
16   see what they are doing, I will tell them, I don't
17   like the direction here, I think you should look in
18   that direction.
19       Q   So the document is shared through images
20   on Skype; is that correct?  Like a screen sharing --
21       A   Yes, we share.  Yes.  We share, I look, I
22   comment, we change.  And then -- but they have a
23   normally independent work.  They work completely
24   independently.  Sometimes I will give them a subject
25   and they will come back after a few days and say we

395

1    found nothing.
2        Q   Do you keep any copies of what they are
3    working on in terms of drafts that you comment on?
4        A   No, it's verbally.  It's a lot of facts
5    and issues.  They don't type fast.  We all with
6    different accents and we try to understand each
7    other.  But the results are quite impressive I
8    think.
9        MS. MARTENY:  It's 4:48.  We're running
10   out of time.
11       MR. SETTLEMYER:  I'm going to try to wrap
12   up momentarily here.
13       THE WITNESS:  But there is almost nothing
14   in what I have in the research that I haven't
15   done years ago.  Just the first time I do them
16   in writing.
17   BY MR. SETTLEMYER:
18       Q   I want to talk about the current practices
19   of Muscular Obesity with respect to qualification,
20   customer qualification to order the product.
21       Is there still a qualification process
22   that perspective customers have to go through by
23   entering information on the web to purchase the
24   product?
25       A   Yes.

Juravin

FTC v. Roca Labs, Inc., et al.                                                    2/16/2017

396

1    Q   Is there still health information being
2  elicited from perspective customers to allow them to
3  qualify to purchase?
4    A   Not as elaborate as before.  But if
5  somebody has kidney issues, we will not sell them
6  wheat.  So, yes, we do qualify them.
7    Q   So what are the criteria?  What's the
8  information being requested at this point?
9    A   I don't recall for some reason, but
10  similar information.  Similar information.  Mainly
11  we're trying to disqualify them.  The main goal is
12  to try and disqualify them.
13    Q   So is there height, weight and age
14  information elicited?
15    A   Age, yes.
16    Q   Height?
17    A   Yes.
18    Q   Weight?
19    A   Yes.  Oh, and a lot of what you eat.  We
20  help them -- yes, how can I forget.  Yes, I'm sorry.
21  It's not only trying to disqualify them.  It's a
22  complete weight analysis that trying to open their
23  eyes to what's the reasons for them being
24  overweight.
25    Q   On how many occasions would you

397

1  estimate -- change topics -- over the past year MCO
2  has communicated with any purchasers of Roca Labs
3  product about alleged law violations, contractual
4  provisions and making negative comments?
5    A   We don't -- how many times did we have to
6  threaten somebody that we will sue them if they will
7  do something negative?
8    Q   In the past year, yes.
9    A   Not even once.  I think they brought to my
10  attention once or twice.  Maybe then I sent
11  something and I said, listen, you cannot ask for
12  your money back if this one.  The customers are so
13  happy and so understanding.  I don't think even
14  once, twice maybe.
15    Q   Since the lawsuit was filed by the FTC in
16  September of 2015, has Roca Labs filed any new
17  lawsuits against customers for any reason?
18    A   There is almost no Roca Labs.
19    Q   Well, Muscular Obesity.
20    A   No.  With customers?
21    Q   Yes.
22    A   No, no, no.  Even the ones that we did in
23  the past, we did only to show as an example to
24  others --
25    Q   You're not answering my question now.  I'm

398

1  trying to --
2    A   But no.  The answer is no.  By the way,
3  you're not trying hard enough.
4    Q   In the past couple of weeks, on what I'm
5  hoping is my last topic, some documents were
6  produced to us that were exports of Google Adwords
7  and analytics information.  Are you familiar with
8  those documents?
9    A   Yes.  It's really from the past.
10    Q   One of the questions I had is whether --
11  in some of those documents there were no date ranges
12  provided or evident in the spreadsheets.
13    A   They are dead accounts.  We don't use them
14  anymore.
15    Q   From what time period were those accounts?
16    A   Stopped about a year ago.  I would look up
17  maybe something got messed up in Excel, because they
18  should have dates.
19    Q   Some of the documents do have dates, but
20  others don't.  And that's just why I want to know
21  just generally if you recall.  I'm assuming you had
22  some involvement --
23    A   2009 till 2015, '16.  You shut us down
24  after the FTC.
25    Q   Right.  The account that that's under,

399

1  what name is that under?  How is that accessed just
2  mechanically?
3    A   It's like something from the past.  We had
4  one or two.  And whatever it is I transferred, I
5  just followed your lead and I transferred everything
6  all at once to you guys.  The dates should be there.
7  What dates did you try to find?  What relations
8  between the dates and the -- you wanted to know
9  what played when?
10    Q   I'm trying to ascertain what ads were run
11  at what times --
12    A   All the time all the ads.
13    Q   What key words were being used?
14    A   All the time the same.  We never change
15  it.  Never.  All the time all the key words --
16    Q   Yes.
17    A   -- that relate to bariatric surgery in all
18  formats.  Never, almost never weight loss, diet.
19  That's word that we completely -- that's bad for us.
20    Q   Had they been used in the past however?
21    A   Diet?
22    Q   Yes.
23    A   Maybe, maybe 2009 when the price was
24  cheap.  We maybe competed.  But when you say the
25  word diet, it's 40, $50.  We are dealing with, you

55 (Pages 396 to 399)

FTC v. Roca Labs, Inc., et al.                                            2/16/2017

---

400

1    know, an alternative to the surgery.  So no diet,
2    weight loss and stuff.  Bariatric surgery, that's
3    what we are after.  Maybe the first few days.  And
4    don't get confused if the name of the group is
5    weight loss or diet lab.  That just names -- no key
6    words.
7        Q   That may not correlate?
8        A   No, it doesn't correlate.
9        Q   So the ad groups would have different --
10   I'm trying to use the Google terminology.  So you
11   would create ad groups, correct?  Yes?
12       A   Yes.  And the programmer can give you that
13   name.
14       Q   But the ad groups would have, for example,
15   a dozen different ads that would be in an ad group,
16   right, or maybe hundreds?
17       A   Yes.  They mix all the time between them.
18   Between the ads and between the key words.  And we
19   did it on a Google automate, because I didn't have
20   the personnel to do it.  So we didn't have the
21   personnel.  We just threw all the ads.  And that's
22   why it was like 35, 40 percent of the cost.  Because
23   we threw all the key words, all the ads, and we let
24   them mix.
25       Q   In some of the Google ads that we looked

---

401

1    at in the paper production yesterday, it looked like
2    there were placeholders in some of the ad copy for
3    key words to be inserted.  Does that sound correct?
4        A   It doesn't matter.  I'll explain.
5        Q   Okay.
6        A   I'll explain.  I'll explain it like this.
7    You say like this.  I still -- okay.  I'm saying
8    like this.  The ad will read do you want
9    placeholder.
10       Q   Yes.
11       A   But then again we say only bariatric
12   surgery words.  Gastric bypass, lap band.  So you
13   said lap band.  So it says, "Do you want lap band?"
14       Q   So if the key word -- if the search term
15   of the user were lap band, and the Google
16   advertising system recognized that and placed in the
17   Google ad -- the Roca Labs ad, it would insert the
18   word lap band into the ad?
19       A   Yes.  But we will not give it words like
20   diet or weight loss.
21       Q   So really whenever we see those listings
22   in the ad in that exhibit we looked at yesterday
23   with the Google text ads, any time there's a
24   placeholder that would say I think key word, right,
25   that would be the key word of the user would be

---

402

1    inserted, and that would be what the user sees,
2    correct?
3        A   Yes, but only the key word.
4        Q   Only the key words that you had been
5    bidding on?
6        A   Exactly.
7        Q   Which would be the bariatric surgery terms
8    that you were --
9        A   Exactly.
10       MS. MARTENY:  I really do have a hard
11   stop.  I have to go get my kid.
12       MR. SETTLEMYER:  What time is it?
13       MS. MARTENY:  I don't think that we would
14   be going this long.  It's 4:58.
15       MR. SETTLEMYER:  4:58.  Okay.  Give me 10
16   seconds to converse with Mike.
17       (A brief recess.)
18       Aside from the topics we've reserved to
19   talk about tomorrow and I guess subject to any
20   subsequent disclosures of information that we
21   might need to pick up relating to the
22   companies, I don't have any further questions
23   for the corporate representative here.
24       MS. MARTENY:  Okay.  Good deal.  So we'll
25   see you tomorrow and then talk about more

---

403

1    stuff.  I just wanted to put on the record that
2    Exhibit 123, we would like to have marked
3    confidential.
4        (Thereupon, the proceedings concluded for
5    the day at 4:58 P.M.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX6-74

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>     v.<br><br>ROCA LABS, INC., a corporation;<br><br>ROCA LABS NUTRACEUTICAL USA, INC., a corporation;<br><br>MUST CURE OBESITY, CO., a corporation;<br><br>JURAVIN, INCORPORATED, a corporation;<br><br>ZERO CALORIE LABS, INC., a corporation;<br><br>DON JURAVIN, individually and as an officer of Roca Labs, Inc., Roca Labs Nutraceutical USA, Inc., Must Cure Obesity, Co, and Juravin, Incorporated; and<br><br>GEORGE C. WHITING, individually and as an officer of Roca Labs, Inc., Roca Labs Nutraceutical USA, Inc., and Zero Calorie Labs, Inc.<br><br>    Defendants. | Case No.  8:15-cv-02231-MSS-TBM<br><br>**FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**<br><br>**<u>INJUNCTIVE RELIEF SOUGHT</u>** |

  Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

  1.  The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, in connection with Defendants' deceptive and unfair advertising, marketing, and sale of

1



weight-loss products.  Defendants represent that ingesting these products will substantially limit a user's stomach capacity and cause dramatic weight loss, and that this effect is scientifically proven to have a ninety-percent success rate.  Defendants offer to pay purchasers to provide "success story" testimonial videos claiming significant weight loss, and use webpages that masquerade as independent information sources to tout their products.  Defendants deceptively fail to disclose the material connections between them and these sources.  Defendants also unfairly use non-disparagement, or "gag," clauses in their sales contracts, and sue, or threaten to sue, purchasers for breach of contract if they complain or threaten to complain to third parties, such as the Better Business Bureau, or post negative comments about the Defendants or their products on internet websites, including for truthful or non-defamatory negative comments.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (b)(3), (c)(1), (c)(2), (c)(3), and (d) and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b) and 56(a)(2)(A).

2

PX6-76

## DEFENDANTS

6.      **Defendant Roca Labs, Inc.** ("RLI") is a corporation with an office or place

of business at 7261A, Tamiami Trail S, Sarasota, Florida 34231.  RLI also uses the mailing

address PO Box 5309, Sarasota, Florida 34277 in conducting business.  At times relevant to

this Complaint, RLI has advertised, marketed, promoted, and sold dietary supplements and

food products, including, from approximately 2009 through the present, the Roca Labs

"Formula" and the Roca Labs "Anti-Cravings" powder, to consumers throughout the United

States.  RLI has sold the Roca Labs "Formula," and "Anti-Cravings" powder directly to

consumers via the internet, including through websites accessible at the domains

RocaLabs.com, Mini-Gastric-Bypass.me, and GastricBypassNoSurgery.com.  RLI owns, or

has owned, various federally registered trademarks, including ROCA LABS, used by the

Defendants in connection with the advertising, marketing, promotion, and sale of their

dietary supplements and food products.  RLI transacts or has transacted business in this

district and throughout the United States.

7.      **Defendant Roca Labs Nutraceutical USA, Inc.** ("RLNU") is a corporation

with an office or place of business at 7261A, Tamiami Trail S, Sarasota, Florida 34231.

RLNU also uses the mailing address PO Box 5309, Sarasota, Florida 34277 in conducting

business.  From approximately 2013 through the present, RLNU has advertised, marketed,

promoted and sold dietary supplements and food products, including the Roca Labs

"Formula" and "Anti-Cravings" powder to consumers throughout the United States.  RLNU

has sold the Roca Labs "Formula" and "Anti-Cravings" powder directly to consumers via the

internet, including through websites accessible at the domains RocaLabs.com, Mini-Gastric-

Bypass.me, and GastricBypassNoSurgery.com.  RLNU transacts or has transacted business

in this district and throughout the United States.

8.      **Defendant Must Cure Obesity, Co.** ("MCO") is a corporation with an office

or place of business at 7259 S. Tamiami, Sarasota, Florida 34231.  At times relevant to this

complaint, including in 2015, MCO has advertised, marketed, and promoted dietary

3

PX6-77

supplements and food products, including the Roca Labs "Formula" and "Anti-Cravings" powder, to consumers throughout the United States, has accepted consumer payments to the Defendants for such products, and paid operational expenses on behalf of the Defendants in connection with the advertising, marketing, promotion, and sale of such products.

9.    **Defendant Juravin, Incorporated** ("JI") is a corporation with an office or place of business at 4136 Roberts Point Circle, Sarasota, Florida 34242.  JI owns various federally registered trademarks, including GASTRIC BYPASS NO SURGERY and GASTRIC BYPASS ALTERNATIVE, used by the Defendants in connection with the advertising, marketing, promotion, and sale of their dietary supplements and food products. At times relevant to this complaint, including 2014-2015, JI has advertised, marketed, and promoted dietary supplements and food products, including the Roca Labs "Formula" and "Anti-Cravings" powder, to consumers throughout the United States, and paid operational expenses on behalf of the Defendants in connection with the advertising, marketing, promotion, and sale of such products.

10.    **Defendant Zero Calorie Labs, Inc.** ("ZCL") is a corporation with an office or place of business at 5849 Lynn Lake Drive South, St. Petersburg, Florida 33712.  ZCL has paid personnel to perform services on behalf of RLI and Don Juravin.  At times relevant to this complaint, including 2011-2013, ZCL has advertised, marketed, and promoted dietary supplements and food products, including the Roca Labs "Formula" and "Anti-Cravings" powder, to consumers throughout the United States, and paid operational expenses on behalf of the Defendants in connection with the advertising, marketing, promotion, and sale of such products.

11.    **Defendant Don Juravin** ("Juravin") (also known as Don Adi Juravin and Don Karl Juravin) has owned and has served, during times relevant to this Complaint, as President of RLNU, has been an owner of and "Vice President and Director of Marketing" for RLI, has owned and served as President, Secretary, Treasurer, and Director of both MCO and JI, and has served as a "representative" of ZCL.  From 2009 through the present, Juravin

4

has exercised authority and control over RLNU, RLI, MCO, JI, and ZCL's advertising, marketing, promotion, and sales of dietary supplements and food products, including the Roca Labs "Formula" and "Anti-Cravings" powder, to consumers throughout the United States. Juravin has engaged in business activities on behalf of RLI, RLNU, MCO, JI, and ZCL, including corporate and administrative work, and some distribution of Roca Labs products to consumers, from his personal residence in this district. From 2009 through the present, acting alone or in concert with others, Juravin has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Juravin transacts and, in connection with the matters alleged herein, has transacted business in this district and throughout the United States.

12.     **Defendant George C. Whiting** ("Whiting") (also known as "Dr. George Whiting" and "George C. Whiting, Ph.D.") has served as President, Secretary, Treasurer, and Director of RLI. Whiting has served as President, Secretary, Treasurer, and Director of RLNU since approximately December 2014. From 2009 through the present, Whiting has exercised authority and control over RLI. At times relevant to this Complaint, Whiting has engaged in business activities on behalf of RLI, including corporate and administrative work, from his personal residence in this district. From 2009 through the present, acting alone or in concert with others, Whiting has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Whiting has also, at times relevant to this Complaint, served as President, Secretary, Treasurer, and Director of ZCL. Whiting transacts and, in connection with the matters alleged herein, has transacted business in this district and throughout the United States.

13.     Defendants RLI, RLNU, MCO, JI, and ZCL have operated as a common enterprise while engaging in the deceptive acts and practices alleged below. These defendants have conducted the business practices described below through interrelated companies that have common control, officers, business functions, employees, and office locations. Because these defendants have operated as a common enterprise, each of them is

5

PX6-79

jointly and severally liable for the acts and practices alleged below.  Defendants Juravin and
Whiting have formulated, directed, controlled, had the authority to control, or participated in
the acts and practices of RLI, RLNU, MCO, JI, and ZCL that constitute the common
enterprise.

## COMMERCE

14.     At all times material to this Complaint, Defendants RLI, RLNU, MCO, JI,
ZCL, Juravin, and Whiting (collectively, "Defendants") have maintained a substantial course
of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15
U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### Defendants' Products

15.     Defendants have advertised, marketed, promoted, offered for sale, sold, and
distributed weight-loss products since at least 2009.  These products have included Roca
Labs "Formula" – which Defendants sometimes refer to as the "Mixture," or "Silica" –
("Roca Labs Formula") and Roca Labs "Anti-Cravings" ("Roca Labs Anti-Cravings").  The
products are powders that Defendants suggest users mix with water or some other beverage
and then drink.  Defendants also suggest that users eat Roca Labs Formula as a gel.
Defendants often market their weight-loss products to consumers who wish to lose a
significant amount of weight (fifty or more pounds), and tout it as a safe and cost- effective
alternative to gastric bypass surgery to achieve substantial weight loss and combat obesity.

16.     Defendants list the Roca Labs Formula ingredients as "Beta Glucan, Guar
Gum, Xanthan Gum, Konjac, Inulin, Natural Color, Sucralose, Vitamin C, B6, B12, Fruit
Flavor."  Defendants have displayed the label and described the Roca Labs Formula on their
RocaLabs.com website as a "proprietary combination" of ingredients, including
"quantitatively-strong, natural galactomannan and glucomannans ingredients, which are
highly effective substances."

6

17.      Defendants list the Roca Labs Anti-Cravings ingredients as Beta Glucan and Fibersol®-2, and state: "FDA approved Beta Glucan helps lower cholesterol and blood pressure as part of a healthy diet for the heart.  Used by Roca Labs to balance blood sugar levels and decrease desire for snacking.  [C]ontrol your cravings for dramatic weight loss."

18.      Defendants sell the Roca Labs products for at least $480 for a 3-4 months' supply.  Defendants' revenues since 2010 are at least $20 million.

## Defendants' Marketing and Product Claims

19.      Defendants have advertised, marketed, and promoted their products, including Roca Labs Formula and Roca Labs Anti-Cravings, through a variety of methods, including the websites RocaLabs.com, Mini-Gastric-Bypass.me, and others ("Roca Labs Websites"). Defendants frequently style different amounts or configurations of their products, or their use, as different "procedures," such as "Gastric Bypass No Surgery" or "Gastric Bypass Alternative."

20.      A substantial majority of Defendants' product sales are generated through Roca Labs Websites.

21.      Defendants' advertising and marketing have conveyed the core messages that:

    a.   Roca Labs products cause users to reduce food intake dramatically and to lose substantial amounts of weight quickly, including as much as 21 pounds in one month, and as much as 100 pounds in seven to ten months;

    b.   Users of Roca Labs products have a ninety-percent success rate in achieving substantial weight loss;

    c.   Defendants' products, including Roca Labs Formula and Roca Labs Anti-Cravings, are comparable or superior to bariatric surgery in providing weight-loss benefits; and

    d.   The efficacy of Roca Labs products for achieving substantial weight loss is scientifically proven.

PX6-81

<u>Defendants' Search and Social Media Advertising</u>

22.     In numerous instances, Defendants have directed consumers to Roca Labs Websites using online advertising.  Defendants have spent millions of dollars since at least 2011 to serve online advertisements through Google, Yahoo, Bing, and Facebook, including text advertisements directed to consumers using the Google, Bing, and Yahoo search engines ("Search Ads").

23.     For example, Google, Bing, and Yahoo searches for terms relating to Roca Labs, bariatric surgery, or weight loss, have led to the display of Defendants' Search Ads, including:

a.   [Google, search term "Roca Labs," March 24, 2015]

Roca Labs® Official Site - RocaLabs.com
Ad  www.rocalabs.com/USA-Official-Site ▾
Gastric Bypass No Surgery® at $480 World Powerful Extreme Weight Loss
4,314 followers on Google+
Women: 50-120 lbs to loss - 90% Success Rate

b.   [Google, search term "gastric bypass," March 24, 2015]

No Surgery solution $480
www.rocalabs.com/†NO-surgery ▾
Better than Gastric bypass
Roca Labs® has 90% success

c.   [Google, search term "lap band surgery cost," March 24, 2015]

NO surgery 86 lbs loss
health.i-newswire.com/ ▾
Avoid surgery - Read first!
Gastric bypass effect No surgery

d.   [Google, search term "Roca Labs reviews," March 24, 2015]

Roca Labs Reviews here - Gastric bypass replacement?
Ad  www.youtube.com/rocalabsreviews ▾
Really? 90,000 Roca Labs video reviews
4,448 followers on Google+

Research Center                    Order Now - Only $480.00
Roca Labs Cost                     Success Stories

8

PX6-82

e.   [Bing, search term "gastric sleeve," March 25, 2015]

**Better than Surgery**
Ad · RocaLabs.com/APPROVED · 33,500+ followers on Twitter
Extreme-Fast Weight Loss NO Surgery Immediate Small Stomach - only $480
Roca Labs Better, Safer & Cheaper than Gastric Bypass | Official Site

| | |
|---|---|
| Am I qualified? | Gastric Bypass Costs |
| Gastric Bypass NO surgery WIKI | Success Before and After Videos |
| 90% Success Rate | Ask the Doctor |

f.   [Bing, search term "Roca Labs," March 25, 2015]

**Roca Labs® Gastric Bypass**
Ad · RocaLabs.com/Approved · 33,500+ followers on Twitter
No Surgery Weight Loss Formula Get Fast Results - Order Now $480
Gastric Bypass NO Surgery $480 | Roca Labs

| | |
|---|---|
| Gastric Bypass No Surgery Formula | Success Stories |
| Weight Loss Surgery Alternative | Research Center |
| Reduces Stomach Size | Order Now - Only $480.00 |

g.   [Yahoo, search term "Roca Labs," March 26, 2015]

**Roca Labs® Gastric Bypass**
ǁ RocaLabs.com/Approved Ad
No Surgery Weight Loss Formula Get Fast Results - Order Now $480

| | |
|---|---|
| Gastric Bypass No Surgery Formula | Success Stories |
| Weight Loss Surgery Alternative | Research Center |
| Reduces Stomach Size | Order Now - Only $480.00 |

h.   [Yahoo, search term "gastric bypass surgery," March 26, 2015]

**Dangerous Gastric Surgery**
RocaLabs.com/Surgery-Alternative Ad
+New: Safer Cheaper Alternative non-surgical small stomach $740

| | |
|---|---|
| Am I qualified? | Gastric Bypass Costs |
| Gastric Bypass NO surgery WIKI | Success Before and After Videos |
| 90% Success Rate | Ask the Doctor |

24.     Defendants also advertise, market, and promote their products, and direct
consumers to Roca Labs Websites, through:  banner and text advertisements displayed on
third-party websites and in third-party mobile applications; social media and video sites,
including Facebook, Twitter, Pinterest, Google+, YouTube, and Vimeo; and via news
releases that Defendants distribute or cause to be distributed.

PX6-83

<u>Claims on Defendants' Roca Labs Websites</u>

25.     When clicking on Defendants' online advertisements, accessing them through organic search results or social media sites, or typing the sites' URLs directly into their browsers, consumers have been directed to pages on Roca Labs Websites.  On these Websites, Defendants make a variety of representations about the purported effectiveness of Roca Labs products for weight loss.

26.     For example, Roca Labs Websites and Defendants' other advertising and marketing materials have in numerous instances prominently featured this illustration to summarize how the Roca Labs Formula can be used to cause or help cause users to lose substantial amounts of weight:



(Image from:  Exhibit A at 1, https://rocalabs.com, May 11, 2015; and Exhibit A at 5, https://rocalabs.com/gastric-bypass-no-surgery, May 6, 2015.)

27.     Roca Labs Websites also have included the following representations:

   a.  Roca Labs is the world's strongest, most effective weight loss regimen based on the Gastric Bypass NO surgery and Anti-Cravings inventions.  It can help people lose 100 lb or more without surgery.  *Results may vary

       (From Exhibit A at 4, https://rocalabs.com/gastric-bypass-no-surgery, May 6, 2015.)

10

PX6-84

b. **How does it work?**

NEW: a dose of the Roca Labs formula is mixed with water and turns into 350cc stomach-sized red mixture. Successful users report that when consumed in the morning, the Regimen creates a feeling akin to limiting functional stomach volume for the duration of your day. This result is achieved **without** surgical procedures, including cutting parts of the digestive system.

With limited stomach volume, you eat much less. . . . Bariatric surgery does not eliminate your cravings; Roca Labs Anti-Cravings can reduce your urge for sweets and snacks and other foods that prevent your weight loss success enhancing the loss of an additional 5 to 8 pounds a month! Learn more

(From Exhibit A at 4-5, https://rocalabs.com/gastric-bypass-no-surgery, May

6, 2015.)

c. **How much weight can I expect to lose?**

The weight loss can be **immediate** with the Roca Labs' regimen, just as if you had undergone a bariatric surgery, and within few days the cravings should be diminished significantly. Depending on your commitment to the recommended rules for suggested use, a loss of **21 lb a month** is possible; however, realistically, it may take 7 to 10 months to lose 100 lb.

(From Exhibit A at 5, https://rocalabs.com/gastric-bypass-no-surgery, May 6,

2015.)

d. **No Menus, No Diet Restrictions**

Unlike weight loss pills or diet programs, Roca Labs® Formula **does not require a strict menu or calorie restrictions**. It practically FORCES you to eat **HALF** the food you ate before, so you will automatically lose weight without having to keep track of every calorie you consume.

\*        \*        \*        \*

One reason the Formula is so successful is that you can **continue to eat what you like**, and without tracking everything you put in your mouth. You can still have a slice of chocolate cake or a bowl of ice cream, but with the gastric bypass effect, you'll feel satisfied before you even finish it. You'll eat the foods you want, but in smaller portions.

11

       *      *      *      *

Instead of counting the calories you eat, let's look at the calories you'll automatically spare your body with Roca Labs® Formula. From day one, you will eat HALF the portions you are used to, and begin to burn more calories than you consume. . . . Many users eat as much as 2,000 fewer calories a day while using the Formula, which translates to 17 lbs. a month!

(From Exhibit A at 11-12, https://rocalabs.com/faq/general/no-diet-

restrictions, May 6, 2015.)

e. **GASTRIC BYPASS ALTERNATIVE**

**100 to 200 lb Weight Loss for Men and Women**

Better, safer and cheaper than bariatric surgery, the Roca Labs regimen can limit your functional stomach volume and help you **lose up-to 21 lb a month**. Your addiction for sweets and snacks is crucial and surgery cannot resolve that issue. The Anti-Cravings formula can diminish your cravings, which can account for an additional 5 to 8 lb weight loss each month. Highly successful users lose **100 lb over 7 to 12 month** period. Your full commitment is necessary along with a daily exercise routine. Losing even 20 lb will **stimulate sex hormones**, making you feel more vibrant and losing 50 lb can even add years to your life.

*Result may vary – not typical or common and mostly depends on the user

(From Exhibit A at 13; https://rocalabs.com/regimen/gastric-bypass-

alternative, May 6, 2015.)

f. **90% Success Rate**

**Roca Labs™ Natural Formula forces you to eat HALF**

The formula has been used in Europe for 6 years, and is scientifically proven to have a **90% success rate**. It will always achieve a mini gastric bypass effect by PHYSICALLY occupying your stomach, leaving only **a small limited stomach volume available for 10-16 hours**. Then, with a smaller stomach size you will eat HALF, and can spare your body as much as 2,000 unnecessary calories a day without feeling any urge for food – that equals **15 lbs per month!**

12

(From Exhibit B at 6, http://mini-gastric-bypass.me/answers/maximizing-

success/90-success-rate, April 22, 2015.)

g. **Shrinking Stomach**

During a 3 to 6 month regimen, you will find that your stomach is "shrinking" in capacity and you are naturally are [sic] eating smaller quantities of food and refraining from fatty, unhealthy foods. Your use of the Silica® mixture will be diminishing in frequency and dose quantities throughout the Shrinking Stomach® process.

With only 20% stomach available, you eat less and can lose 4-7 lbs/wk.

(From Exhibit B at 9, http://mini-gastric-bypass.me/orders, March 27, 2015.)

h. **Can My Child Take the Formula?**

Many children have used the Formula successfully and safely. All active ingredients are 100% natural and based on healthy fibers. There are no known related risks from the Formula, but you must consult a doctor before you begin the procedure if you have any questions, and children should not take more than a low dose.

(From Exhibit A at 18, http://rocalabs.com/faq/medical/weight-loss-for-kids,

May 6, 2015.)

i. **Fighting child obesity**

As a parent, your child's health and happiness are a top priority. Your child is overweight, and you're probably aware of the many negative effects it can have on his or her life – both health-wise and socially.

Roca Labs® Natural Formula can help your child lose weight **safely and naturally**. Its active ingredients are natural healthy fibers, and it's safe for children ages 6 and up with a parent's supervision. It works by physically expanding in the stomach to leave only a very limited space available for food intake. Throughout the day, your child will eat HALF the food they used to, without hunger. The Formula has almost no flavor and adapts to the taste of your child's favorite non-carbonated, non-dairy drink.

PX6-87

(From Exhibit A at 18; http://rocalabs.com/faq/medical/weight-loss-for-kids,

May 6, 2015.)

28.     Roca Labs Websites and social media pages also include videos describing the

purported effectiveness of Roca Labs products for weight loss.  Defendants' representations

about the products in these videos include:

a.   What is the Formula?  Roca Labs' Formula is a medical innovation that
     creates a natural gastric bypass effect in the stomach.  It's based on healthy
     fibers, and it's classified as a food supplement.  Just mix with water, take it
     each morning, and it immediately expands to physically fill your stomach.
     For the next 10 to 16 hours, only 20% of your stomach will be available for
     food intake.  Your new, small stomach will force you to eat 50% less from
     day one.

        *        *        *        *

     The Formula has been used in Europe for six years, and has a 90% success
     rate.  Compared to gastric bypass surgery, the Formula is less risky, faster,
     healthier, and has almost no side effects or complications.  And, at the low
     price of $480, it's a fraction of the cost of gastric bypass surgery, which can
     be $8000 or more.  The Formula also includes the unique ingredient, beta
     glucan, which balances blood sugar levels and fights your cravings for sweets
     and snacks, something that surgery isn't capable of doing.  You'll not only eat
     less food without feeling hungry, you'll eat healthier too.  The Formula is
     kosher, and it's manufactured in an FDA compliant facility, under GMP rules.

     (From https://rocalabs.com/gastric-bypass-no-surgery and

     https://rocalabs.com/faq/general/what-is-roca-labs-procedure - "What is the

     Roca Labs Procedure" video.)

b.   Well I'm sure you're wondering, what is the success rate?  Roca Labs'
     Formula is scientifically proven to have a 90% success rate.  It will always
     achieve a gastric bypass effect by physically occupying your stomach, leaving
     only 20% available space for 10-16 hours.  You'll eat 50% less, and can spare
     your body as much as 2,000 unnecessary calories a day without feeling any
     urge to overeat.  That equals 15 pounds a month.

14

(From https://rocalabs.com/faq/general/roca-labs-success-rate, "What is the

Success Rate?" video.)

c.   Sorry for being so direct, but you've been obese for a long time.  Friends, and
doctors, have advised you to do something about it.  You don't like the way
you look, and your health is suffering.  Your weight has affected your love
life, self-esteem, and advancement in life.  Of course you want to have a
normal weight.  Your willpower is strong.  But you never had a strong enough
weapon to defeat your over-eating disorder.  You've probably tried
everything: diets, pills, maybe exercise.  Now you feel you have no choice
but to do something extreme to turn your life around.  You've thought about
surgery, but worry about the complications, expense, and restrictions.

\*       \*       \*       \*

Before choosing surgery, you should know that there is an alternative, a
natural, healthy formula that creates an effect similar to a gastric bypass.
Though the Formula is very strong, it doesn't have the complications of
surgery.

\*       \*       \*       \*

The Formula contains an FDA-approved ingredient called beta glucan.  Beta
glucan has many benefits, including lowering cholesterol and blood pressure,
and strengthening your immune system.  But it also balances blood sugar
levels, and this lowers or eliminates your need for sweets and snacks.

(From https://rocalabs.com/regimen/gastric-bypass-alternative, "Fat is

unhealthy and ugly. - Gastric Bypass Alternative ® can".)

29.     Defendants' pages on third-party sites, including YouTube.com and

Facebook.com, also include weight-loss claims about their products, have repeated claims

Defendants have made about their products on Roca Labs Websites, or linked to Defendants'

Roca Labs Website pages that make or have made such claims.  For example, the top portion

of a YouTube page with links to Defendants' videos includes this ad:



15

(Image from www.youtube.com/user/RocaLabs, March 24, 2015.)

30.      The Roca Labs Websites include documents purporting to be authored by a doctor, or other medical professional, describing the health and weight reduction benefits of the Roca Labs products, and summarizing the scientific literature evidencing those benefits.

31.      Defendants have included on the RocaLabs.com website, accessible under a "Medical questions" link, a document titled "Letter to Your Doctor V1-Aug12," with the subheading, "Health benefits and weight reduction in medical terms." The "Letter to Your Doctor" has, at times, been attributed to "Dr. Ross, Director of Medical Team," "Ross Finesmith, MD, Medical Consultant," or "an independent medical consultant." Defendants have included a similar document on the Mini-Gastric-Bypass.me website, under an "Ask the Doctor, Medical Evidence for Success" link. Among other statements, the "Letter to Your Doctor" and "Medical Evidence for Success" document describes Dr. Finesmith's, or the "independent medical consultant's," experience with the Roca Labs Formula, and discusses the purported efficacy of the Roca Labs Formula for weight loss, including as follows:

a. I am an independent medical consultant and I'm writing this letter to describe the weight management regimen from Roca Labs® that your patient is interested in.

The Roca Labs Formula® is a mixture of natural ingredients that have been shown in multiple medical studies to provide euglycemic control, early and prolonged satiety, and a reduced desire to consume the amount of food your patient is currently eating. Although the ingredients are available separately, it is the proprietary combination that provides the greatest benefit.

*        *        *        *

I am not an employee of Roca Labs and I have formed an independent conclusion based on the available medical information. I have had many patients on the Roca Labs Procedure and all have been satisfied with the immediate reduction in appetite, cravings and weight loss. I tried the formula myself and can confirm these findings. I hope you consider trying the Roca Labs Formula before prescribing risky medications or surgery.

(From Exhibit A at 23-25, May 6, 2015.)

PX6-90

b.  My research has not found any other weight loss that has the efficacy, or biological potential, to help those with obesity lose weight. This is why we can make the statement that "the Roca Labs Formula is probably the strongest weight loss pharmaceutical agent on the market today." Successfully following the Roca Labs guidelines has consistently resulted in clients losing 5% of their body weight every month. This is accomplished primarily by not feeling hungry and the severe reduction in cravings for snacks. Therefore, the clients calorie intake is reduced significantly. Most report a 50% reduction in the amount of food they eat. Those that exercise daily, experience even faster weight loss.

\*          \*          \*          \*

There is considerable medical and scientific research to support the health and weight loss benefits of the active ingredients in the Roca Labs Formula. Below is a summary of the literature that supports the ingredients in the Roca Labs proprietary formula as effective in weight loss and additional health benefits. Please review and let me know if you have any questions.

(From Exhibit B at 11-12, May 11, 2015.)

32.     None of the literature cited or summarized in the "Letter to Your Doctor" or the "Medical Evidence for Success" documents reports or describes any study or clinical trial of Roca Labs Formula or Roca Labs Anti-Cravings. Indeed, in the fine print of the "Terms and Conditions" on the RocaLabs.com website, Defendants indicate that their statements about their products' efficacy are "based on the known activity of the specific ingredients" in the products and state: "No clinical study has been performed on this product." In the "Letter to Your Doctor" and "Medical Evidence for Success" documents, however, Defendants reference the cited literature in a way that suggests that it constitutes convincing evidence of the weight-loss benefits Defendants claim consumers can achieve by using Roca Labs Formula or Roca Labs Anti-Cravings.

33.     Defendants have included in Roca Labs Websites medical images and terminology, and references suggestive of medical treatment and scientific research, including:

- The company name, "Roca Labs";

17

- Use of the caduceus symbol in versions of the Roca Labs logo, and in videos;
- Videos featuring spokespersons wearing white lab coats;
- Photos of persons wearing white lab coats and stethoscopes, and persons wearing white lab coats appearing to mix chemicals in a laboratory;
- References to the Roca Labs "Medical Team";
- Reference to Roca Labs Formula as a "medical innovation";
- References in search ads to a "Research Center";
- Use of health insurance company names and logos and the offering of reduced prices to prospective purchasers who have medical insurance;
- Requiring prospective purchasers to complete a "Health Application"; and
- Use of the FDA logo, references to FDA "compliance" and "registration," and to FDA approval of beta glucan.

Defendants' use of these images and terminology in their advertising and marketing fortify the net impression that the literature referenced in the "Letter to Your Doctor" and "Medical Evidence for Success," and the purportedly numerous consumer testimonials (discussed below), scientifically establish the weight-loss benefits Defendants claim for Roca Labs Formula and Roca Labs Anti-Cravings.

<u>Defendants' Use of Testimonials and Purported Third-Party Reviews</u>

34.     Defendants also promote their products by touting "Success Videos," purporting to show the weight-loss success numerous users have achieved using Roca Labs products.  A Roca Labs Webpage discussing "Before and After Testimonials Videos" touts "Real Testimonials of 100,000 Users."  Defendants represent, on their websites and social media sites, that the content and quantity of these videos evidence the efficacy of Defendants' products for weight loss, stating, "With so many success videos wherein people document an immediate gastric bypass effect without a surgery, it is evident that Roca Labs® procedure really works."

18

35.     Defendants solicit "Success Videos" from purchasers by offering to pay them up to fifty percent of their money back for providing videos documenting their weight loss:

> You can earn money back as a reward for losing weight. Simply document your weight loss from your starting weight to achieving your weight loss goal. Demonstrate your weight loss with smaller size clothing, using the Success Belt or show your body in a clear convincing way. When you achieve your weight loss goal and send us the video, you will receive Money Back Reward or up to $1,000.00 within 10 days conditional and based on:
>
> 1. You must have passed the 3 stage goal
> 2. Your documented success is inspirational & convincing
> 3. Your claimed weight loss is evident in the "before & after"

The weight loss goal for purchasers will vary by individual and the information they provide in Defendants' Health Application, but the goal may be a substantial amount of weight. For example, the Defendants may assign to a person stating that they weigh approximately 240 pounds a total "weight loss goal" of more than 120 pounds, with four intermediate goals in excess of 20 pounds each.

36.     Defendants set out criteria for videos they deem acceptable, and prescribe the types of positive comments it should include:

> In short, to get this reward, film yourself now, during and after you've reached your goal. The video should be about 10 minutes long, talk about your past eating problems, the ease of using the Program, how much weight you've lost and how your life has changed. You can tell us about improvements in your health, self-esteem, relationships and love life, and even compliments you've received about your new look. Your video must be real, convincing and of good quality.

37.     Other than some possibility of obtaining money-back rewards for submitting "Success Videos," purchasers have few options to obtain money back for products they order from the Defendants due to Defendants' general refusal to refund money once orders are deemed placed.

19

38.     Neither the testimonial videos about weight loss resulting from use of Defendants' products, nor the Roca Labs Websites, social media pages, or other advertisements that include or lead to them, adequately disclose that the persons depicted in the videos were offered or paid any compensation in exchange for their testimonial.

39.     In addition to the Roca Labs Websites described above, Defendants also post, or cause to be posted, purportedly objective or independent information favorably discussing Roca Labs products on one or more internet websites.  For example, Defendants, or persons hired to work on behalf of Defendants, post testimonials or other information touting Roca Labs products on third-party blogging platforms or websites without disclosing their affiliation with Defendants.  Defendants also operate the website Gastricbypass.me, which purports to offer information about bariatric surgery:

> Here at GastricBypass.me, we want every person who visits this site to know everything there is to know about bariatric surgery by providing the necessary tools.  Throughout this site, we'll offer articles with loads of information about each bariatric surgery, insurance information, surgeon information, alternatives to surgery and everything in between – we look forward to serving anyone seeking answers before undergoing surgery.

(From Exhibit C at 1; http:\\Gastricbypass.me, April 3, 2015.)

40.     Gastricbypass.me includes, among other content, a lengthy "Surgery Failures" page, and a "Surgical Alternatives" page.  The "Surgical Alternatives" page is devoted to discussing favorably the "Roca Labs Surgery Alternative® Solutions."  The Roca Labs products are the only surgical "alternative" the site discusses.  For example, the page states that its authors have "challenged the company's claim to a '90% success rate' by checking some of the 654,000 video results we got when searching for, 'YouTube Roca Labs'."  The "Surgery Alternatives" page embeds videos also found on RocaLabs.com.  It states that "[i]n 97% of the videos provided, evidence that the surgical alternative is successful is evident from day one.  With some averaging weight loss of 0.5 to 1 pound per day, the Roca Labs Surgery Alternative® Solution is quite impressive."  It further states that the site's "panel of experts" say that the Roca Labs claims are trustworthy "for the most part," and that the Roca

20

Labs "[m]edical claims are correct, FDA regulations are observed, but not all the articles on the site are updated." (From Exhibit C at 2-3, http:\\gastricbypass.me\surgical-alternatives, April 3, 2015). There is no disclosure on the GastricBypass.me site that it is operated by the Defendants, is affiliated with RLI or RLNU, or that the site's owners or operators sell Roca Labs products.

### Defendants' Purchase Process

41.     Defendants advertise that a "Basic" package of their products, for "Up to 80 lbs to lose," costs $480 (in a single payment) for purchasers with "valid health insurance," including a "3-4 months supply" of Roca Labs Formula and an approximately three-month supply of Roca Labs Anti-Cravings. Purchasers also are given the option to pay in installments. Defendants charge non-insured consumers $640 for the same package. Defendants advertise other packages featuring larger quantities of product and greater levels of customer service, for higher prices, and indicate that larger quantities of product can cause, or help cause, weight loss of more than 120 pounds. Defendants' web pages describing the price of Roca Labs products have prominently featured the names and logos of multiple insurance companies and emblems of branches of the United States military.

42.     To purchase the products via Defendants' Roca Labs Websites, consumers must enter information through "Qualify & Order" pages on the sites. The first screens presented include videos about the "qualification" process. Defendants' "Qualify & Order" pages have stated that the information consumers provide will be kept confidential and will not be shared. Exhibit A at 28.

43.     Prospective purchasers must enter personal information on one or more forms, including the Defendants' "Health Application." Prospective purchasers must enter their full name, gender, age, weight, height, and insurance carrier. Purchasers then are prompted to watch a video and to respond to Defendants' Health Application questions about various conditions, including issues with cholesterol, high blood pressure, diabetes, and digestion. The Health Application also prompts prospective purchasers to give information about

PX6-95

psychological or emotional issues relating to their weight, including past weight-loss failures, depression, and binge eating.

44.     After entering shipping, order, and billing information, purchasers must check a box next to a statement, which reads in part, "I have read and agree to the terms, privacy, and money back reward / return policy[.]" The "terms" and other referenced documents are accessible at that point via hyperlinks in the words, but are not presented in the purchase process otherwise.

45.     When Defendants ship their products to purchasers, they enclose with the package items used to measure and mix Roca Labs Formula, a "Success Belt" tape measure, and documents titled "Thanks for purchasing Roca Labs®," "Summary Suggested Use," and "Roca Labs Procedure Rules & Diet." Among other statements, the "Summary" document reiterates that Defendants "will not share your private information with anyone" and states that "[o]nce purchased and shipped, [RLNU] products cannot be returned and NO refunds will be given." The "Thanks for purchasing" insert warns purchasers that "[t]here are **NO** returns or refunds as stated on RocaLabs.com/Terms." It further states that installment payments cannot be cancelled or disputed, and that users who do so may face legal action and charges of $3500 or more.

46.     The "Roca Labs Procedure Rules & Diet" insert states that the "Rules & Diet **MUST BE FOLLOWED ENTIRELY** while using the procedure unless any rule compromises your health or is not approved by your doctor, as stated in the Terms." The first "rule" listed is: "Limited Eating Interval$^{TM}$ between 11am and 8pm ONLY." "You may choose any 9 hour interval for your daily food consumption. No deviation is allowed. Before 11am, you may have a healthy snack limited to 100 calories. Between 8-10pm, you may snack on vegetables like carrots, celery or occasionally, low calorie popcorn." Among other instructions, purchasers are advised: "To maintain the **gastric bypass effect**, drink at least six ½ liter bottles of water a day." Purchasers are advised to "[e]xercise to shock your body," and that "Roca Labs' procedure requires that you exercise 5+ times a week. If

PX6-96

necessary, start slowly and gradually increase to at least 30 minutes daily." Purchasers are also urged to "video document [their] success" once a week, including "evidence of weight loss," to get "up to 50% Money Back." The insert states that purchasers "have 73% more chance to succeed when" they visually document their progress. Aside from its inclusion in shipped packaging, the "Roca Labs Procedure Rules & Diet" insert is only accessible to prospective purchasers on Roca Labs Websites via a "Support" link.

### Defendants' Gag Clauses and Legal Threats

47.   Defendants have warned purchasers, through package inserts included in product shipments, that they agreed not to write any negative reviews about the Defendants or their products and would owe Defendants hundreds of dollars should they do so. Defendants have also issued legal threats and filed lawsuits against complaining purchasers, alleging that the purchasers would violate or had violated the "Terms and Conditions" to which they purportedly agreed when ordering Defendants' products (the "Terms"). These threats and lawsuits have included allegations that purchasers would violate or had violated provisions in the Terms purporting to prohibit purchasers from publishing disparaging comments about Roca Labs or its products ("Gag Clause(s)"). These practices, described more fully below, have caused or are likely to cause purchasers to refrain from commenting negatively about the Defendants or their products. By depriving prospective purchasers of this truthful, negative information, Defendants' practices have resulted or are likely to result in consumers buying Roca Labs products they would not otherwise have bought.

48.   The Terms are accessible to prospective purchasers via hyperlinks on Roca Labs Websites. The restrictions set forth in the Gag Clauses are disclosed to prospective purchasers during the Roca Labs product purchase process only in the Terms. Defendants have used multiple versions of the Terms that include Gag Clauses, including the versions attached as Exhibits D-G, since at least September 2012.

49.   Versions of the Terms used since December 2014 include a Gag Clause purporting to prohibit purchasers from disparaging Roca Labs, its products, and its

23

PX6-97

employees, regardless of the purchasers' outcomes. The Terms have also purported to require purchasers to pay the "full price" should the purchaser breach the Gag Clause or other provisions of the Terms:

> You agree that regardless of your personal experience with RL, you will **not** disparage RL and/or any of its employees, products or services. This means that you will not speak, publish, cause to be published, print, review, blog, or otherwise write negatively about RL, or its products or employees in any way. This encompasses all forms of media, including and especially the internet. This paragraph is to protect RL and its current and future customers from the harm of libelous or slanderous content in any form, and thus, your acceptance of the [Terms] prohibits you from taking any action that negatively impacts RL, its reputation, products, services, management, or employees. We make it clear that RL and its Regimen may not be for everyone, and in that regard, the foregoing clause is meant to prevent "one person from ruining it for everyone." Should any customer violate this provision, as determined by RL in its sole discretion, you will be provided with seventy-two (72) hours to retract the content in question. If the content remains, RL would be obliged to seek all legal remedies to protect its name, products, current customers, and future customers.

> If you breach this Agreement, as determined by RL in its sole discretion, all discounts will be waived and you agree to pay the full price for your product. In addition, we retain all legal rights and remedies against the breaching customer for breach of contract and any other appropriate causes of action.

(From Exhibit D at 8-9).

50. Versions of the Terms Defendants used prior to December 2014 also included similar Gag Clauses and legal sanctions for breach, including paying the purported full product price. Exhibits E-G.

51. The Terms Defendants have used since December 2014 (Exhibit D at 7) state that "[t]he full price for your custom Regimen and RL support is $1580" and that purchasers agree to the Gag Clause, and to promote Roca Labs and its products, in exchange for a "discount" (i.e., the $480 advertised price). This purported "full price" is not revealed to potential purchasers except in the Terms. Previous versions of the Terms (Exhibits E-G) had

24

PX6-98

also stated that the "full price" for the Roca Labs products and support is $1580, and characterized the lower, advertised prices that purchasers had actually been charged as "conditional," "discounted," or "subsidized" prices afforded to purchasers in exchange for their agreement to the Gag Clause and to other provisions in the Terms. An August 2014 court filing on behalf of RLI, verified by Juravin, asserts that the "discount price" for Roca Labs products is "optional," but that "99%" of purchasers agree to the Terms in exchange for the "discount price."

52.     A version of the Terms Defendants used prior to December 2014 (Exhibit E at 9-10) provided that Defendants, in the event a purchaser violated the Gag Clause, had the right to sue purchasers for an injunction, immediately bill them for $3500 in court costs and legal fees until they are determined in court, and immediately revoke all "discounts" that purchasers purportedly received. This version of the Terms further provided that Defendants could, after thirty days, report any such charge that remained unpaid to consumer reporting agencies, and forward the unpaid charges to a collection agency. This version of the terms also provided that Defendants could require purchasers who violated the Gag Clause to execute a notarized affidavit stating that their "disparaging remarks or review contained factually inaccurate material, was incorrect and breached [the Terms]." A version of the Terms used from approximately September 2012 into mid-2014 (Exhibit G at 10) provided that the purchaser further agreed that "any report of any kind on the web will constitute defamation/slander," and agreed "to a predetermined compensation of $100,000. You agree and understand that you can not [sic] talk badly about the Formula because of any frustration you might have with the support department or your misunderstanding."

53.     Defendants also send purchasers a two-page, large-print "Summary" of the Terms with their orders. The summary states, in pertinent part:

> Discount Policy. We believe in our customers and that word of mouth is the best promotion. **We are here to help you.** You were given a discount off the unsubsidized price of $1580 in exchange for your agreement to promote our products and when possible share your weight loss success with us (keep the youtube videos coming). **As**

25

PX6-99

**part of this endorsement you also agree not to write any negative reviews about RLN or our products.** In the event that you do not honor this agreement, you may owe immediately the full price of $1,580.

(From Exhibit H at 2 (emphasis in original).)

54.    In numerous instances, Defendants have threatened to sue, for breach of the Gag Clauses, purchasers who stated that they had or would complain to third parties, such as the Better Business Bureau, or post negative comments about Defendants, their products, or their employees on internet websites. Defendants have also threatened complaining purchasers who have sought refunds by telling them that they would be subject to liability for extortion or defamation for threatening to post, or posting, truthful negative reviews about the Defendants, their products, or employees, or that their "discounts" would be revoked and that they would owe Defendants the "full" price of the Defendants' products.

55.    Defendants in some instances have filed lawsuits against purchasers who have posted such negative comments, alleging breach of the Gag Clauses. Defendants also have sued, for allegedly inducing purchasers to breach the Gag Clauses, a company that runs an online site that allows consumers to post complaints about businesses, including the Defendants' business, online.

56.    Lawsuits the Defendants have filed against purchasers have included, and made public, information those purchasers provided in response to the Defendants' Health Application. Defendants also have disclosed information purchasers submitted in response to the Defendants' Health Application to credit card processors and banks in disputes with purchasers over credit card chargebacks.

## VIOLATIONS OF THE FTC ACT

57.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts of practices in or affecting commerce."

58.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

26

PX6-100

59.     Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics.  For the purposes of Section 12 of the FTC Act, 15 U.S.C. § 52, Roca Labs "Formula," and Roca Labs "Anti-Cravings" are either "foods" or "drugs" as defined in Sections 15(b) and (c) of the FTC Act, 15 U.S.C. §§ 55(b) and (c).

60.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers themselves cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I
## DECEPTIVE WEIGHT-LOSS CLAIMS

61.     Through the means described in Paragraphs 15-43, Defendants have represented, expressly or by implication, that:

   a.  Use of Defendants' products, including Roca Labs Formula and Roca Labs Anti-Cravings, enables the user to reduce food intake by fifty percent and to lose substantial amounts of weight quickly, including as much as 21 pounds in one month, and as much as 100 pounds in seven to ten months;

   b.  Ninety percent of users of Defendants' products, including Roca Labs Formula and Roca Labs Anti-Cravings, will lose substantial amounts of weight;

   c.  Defendants' products, including Roca Labs Formula and Roca Labs Anti-Cravings, are comparable or superior to bariatric surgery in providing weight-loss benefits; and

   d.  Defendants' products, including Roca Labs Formula and Roca Labs Anti-Cravings, are safe and effective for weight loss in children as young as six years old.

PX6-101

62.    The representations set forth in Paragraph 61 are false or misleading, or were not substantiated, at the time the representations were made.

63.    Therefore, the making of the representations set forth in Paragraph 61 constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT II
## FALSE ESTABLISHMENT CLAIM

64.    Through the means described in Paragraphs 15-43, Defendants have represented, expressly or by implication, that use of Defendants' products, including Roca Labs Formula and Roca Labs Anti-Cravings, is scientifically proven to have a ninety-percent success rate in forcing users to eat half their usual food intake and cause substantial weight loss.

65.    In fact, use of Defendants' products, including Roca Labs Formula and Roca Labs Anti-Cravings, is not scientifically proven to have a ninety-percent success rate in forcing users to eat half their usual food intake and cause substantial weight loss.

66.    Therefore, the representation set forth in Paragraph 64 is false or misleading, and constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT III
## UNFAIR USE OF NON-DISPARAGEMENT PROVISIONS

67.    As described in paragraphs 15-45 and 47-55, in numerous instances, Defendants have used in the sale of their products, and purported to bind purchasers to, contractual provisions that prohibit purchasers from speaking or publishing truthful or non-defamatory negative comments or reviews about the Defendants, their products, or their employees.

PX6-102

68.     Defendants' practices as described in paragraph 67 have caused or are likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and that is not outweighed by countervailing benefits to consumers or competition.

69.     Defendants' practices as described in paragraph 67 therefore constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and (n).

**COUNT IV**
**MISREPRESENTATIONS ABOUT GASTRICBYPASS.ME**

70.     Through the means described in Paragraphs 39-40, Defendants have represented, expressly or by implication, that Gastricbypass.me is an independent, objective resource for research and information related to bariatric surgery and alternatives to bariatric surgery for weight loss, and about Roca Labs products.

71.     In fact, Gastricbypass.me is not an independent, objective resource for research and information related to bariatric surgery and alternatives to bariatric surgery for weight loss, or about Roca Labs products.

72.     Therefore, the representation set forth in Paragraph 70 is false or misleading, and constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT V**
**FAILURE TO DISCLOSE MATERIAL CONNECTIONS**

73.     Through the means described in Paragraphs 34-40, Defendants have represented, expressly or by implication, that:

  a. persons who have posted or provided testimonials or other information about Defendants' products, including Roca Labs Formula and Roca Labs Anti-Cravings, are satisfied users of the products; and

  b. Gastricbypass.me provides research and information related to bariatric surgery and alternatives to bariatric surgery for weight loss, including an alternative sold by Roca Labs.

29

PX6-103

74.     In numerous instances in connection with these endorsements, Defendants failed to disclose, or disclose adequately, that:

    a.   Defendants promised or paid the persons referred to in their advertising financial compensation or other incentives for their testimonials or other postings about Defendants' products; and

    b.   Defendants own or operate Gastricbypass.me, and sell Roca Labs Formula and Roca Labs Anti Cravings.

This additional information would be material to consumers in deciding to purchase and use Defendants' products, including Roca Labs Formula and Roca Labs Anti-Cravings.

75.     Defendants' failure to disclose the material information described in Paragraph 74, in light of the representations described in Paragraph 73, constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VI
## DECEPTIVE PRIVACY CLAIM

76.     Through the means described in Paragraphs 41-45, Defendants have represented, expressly or by implication, that Defendants keep confidential and do not disclose consumer information, including health information, submitted in the purchasing process.

77.     In fact, Defendants disclose or have disclosed in public court filings, and to payment processors and banks, consumer health information submitted in the purchasing process.

78.     Therefore, the representation set forth in Paragraph 76 is false or misleading, and constitutes a deceptive act or practice, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

PX6-104

## COUNT VII
## DECEPTIVE DISCOUNT CLAIM

79.     Through the means described in Paragraphs 47-56, Defendants have represented, expressly or by implication, that purchasers have agreed to pay the difference between the purported "discount" price charged and the purported "full price" if they post negative comments or reviews about the Defendants, their products, or employees.

80.     In fact, purchasers have not agreed to pay the difference between the purported "discount" price charged and the purported "full price" if they posted negative reviews about the Defendants or their products.

81.     Therefore, the representation set forth in Paragraph 79 is false or misleading, and constitutes a deceptive act or practice, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

82.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

83.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

PX6-105

**PRAYER FOR RELIEF**

84.    WHEREFORE, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15

U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.    Enter a temporary, preliminary, and permanent injunction to prevent future

violations of the FTC Act by Defendants;

B.    Award such relief as the Court finds necessary to redress injury to consumers

resulting from Defendants' violations of the FTC Act, including, but not limited to, rescission

or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of

ill-gotten monies; and

C.    Award Plaintiff the costs of bringing this action, as well as such other and

additional relief as the Court may determine to be just and proper.

Respectfully submitted,

JONATHAN E. NUECHTERLEIN
General Counsel


Dated:  February 18, 2016          /s/ Carl H. Settlemyer, III
                                   CARL H. SETTLEMYER, III (Trial Counsel)
                                   PAUL B. SPELMAN
                                   Federal Trade Commission
                                   600 Pennsylvania Avenue, NW
                                   Mail Drop CC-10528
                                   Washington, DC 20580
                                   (202) 326-2019, -2487 (Tel.)
                                   (202) 326-3259 (Fax)
                                   csettlemyer@ftc.gov
                                   pspelman@ftc.gov

                                   Attorneys for Plaintiff Federal Trade Commission

PX6-106

## Trademark/Service Mark Application, Principal Register

## TEAS Plus Application

Serial Number: 85418359
Filing Date: 09/09/2011

*NOTE: Data fields with the \* are mandatory under TEAS Plus. The wording "(if applicable)" appears where the field is only mandatory under the facts of the particular application.*

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| TEAS Plus | YES |
| **MARK INFORMATION** | |
| *MARK | Roca Labs |
| *STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | Roca Labs |
| *MARK STATEMENT | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| REGISTER | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | Roca Labs, Inc. |
| *STREET | P.O. Box 20631 |
| *CITY | Tampa |
| *STATE (Required for U.S. applicants) | Florida |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants only) | 33622 |





| | |
|---|---|
| PHONE | 773-800-0055 |

## LEGAL ENTITY INFORMATION

| | |
|---|---|
| *TYPE | CORPORATION |
| * STATE/COUNTRY OF INCORPORATION | Florida |

## GOODS AND/OR SERVICES AND BASIS INFORMATION

| | |
|---|---|
| *INTERNATIONAL CLASS | 005 |
| IDENTIFICATION | Food supplements for weight loss |
| *FILING BASIS | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 01/01/2011 |
| FIRST USE IN COMMERCE DATE | At least as early as 01/01/2011 |
| SPECIMEN FILE NAME(S) | |
| ORIGINAL PDF FILE | spec-6622921532-082224079 . Roca_Labs_screen_shot.PDF |
| CONVERTED PDF FILE(S) (1 page) | \\TICRS\EXPORT11\IMAGEOUT11\854\183\85418359\xml1\FTK0003.JPG |
| SPECIMEN DESCRIPTION | Example of website screen print showing recurring use of mark |

## ADDITIONAL STATEMENTS INFORMATION

| | |
|---|---|
| *TRANSLATION (if applicable) | |
| *TRANSLITERATION (if applicable) | |
| *CLAIMED PRIOR REGISTRATION (if applicable) | |
| *CONSENT (NAME/LIKENESS) (if applicable) | |
| *CONCURRENT USE CLAIM (if applicable) | |

## ATTORNEY INFORMATION

| | |
|---|---|
| NAME | D. Michael Schloss, Esq. |
| INTERNAL | 1844 N. Nob Hill Road, #303 |

| | |
|---|---|
| **ADDRESS** | |
| **STREET** | 1844 N. Nob Hill Road, #303 |
| **CITY** | Plantation |
| **STATE** | Florida |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 33322 |
| **PHONE** | 954-554-1751 |
| **FAX** | 954-756-7228 |
| **EMAIL ADDRESS** | michael@dmichaelschloss.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |

## CORRESPONDENCE INFORMATION

| | |
|---|---|
| **\*NAME** | D. Michael Schloss, Esq. |
| **INTERNAL ADDRESS** | 1844 N. Nob Hill Road, #303 |
| **\*STREET** | 1844 N. Nob Hill Road, #303 |
| **\*CITY** | Plantation |
| **\*STATE** (Required for U.S. applicants) | Florida |
| **\*COUNTRY** | United States |
| **\*ZIP/POSTAL CODE** | 33322 |
| **PHONE** | 954-554-1751 |
| **FAX** | 954-756-7228 |
| **\*EMAIL ADDRESS** | michael@dmichaelschloss.com |
| **\*AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |

## FEE INFORMATION

| | |
|---|---|
| **NUMBER OF CLASSES** | 1 |
| **FEE PER CLASS** | 275 |
| **\*TOTAL FEE PAID** | 275 |

## SIGNATURE INFORMATION

FTC-PROD-002764
PX6-109

| | |
|---|---|
| * SIGNATURE | /D. Michael Schloss/ |
| * SIGNATORY'S NAME | D. Michael Schloss |
| * SIGNATORY'S POSITION | Attorney of record |
| * DATE SIGNED | 09/09/2011 |

FTC-PROD-002765

PX6-110

## Trademark/Service Mark Application, Principal Register

### TEAS Plus Application

Serial Number: 85418359
Filing Date: 09/09/2011

## To the Commissioner for Trademarks:

**MARK:** Roca Labs (Standard Characters, see mark)
The literal element of the mark consists of Roca Labs.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Roca Labs, Inc., a corporation of Florida, having an address of
P.O. Box 20631
Tampa, Florida 33622
United States
requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

**For specific filing basis information for each item, you must view the display within the Input Table.**
International Class 005: Food supplements for weight loss

In International Class 005, the mark was first used at least as early as 01/01/2011, and first used in commerce at least as early as 01/01/2011, and is now in use in such commerce. The applicant is submitting one specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) Example of website screen print showing recurring use of mark.

**Original PDF file:**
spec-6622921532-082224079 . Roca_Labs_screen_shot.PDF
**Converted PDF file(s) (1 page)**
Specimen File1

The applicant's current Attorney Information:
D. Michael Schloss, Esq.
1844 N. Nob Hill Road, #303
1844 N. Nob Hill Road, #303
Plantation, Florida 33322
United States

The applicant's current Correspondence Information:

    D. Michael Schloss, Esq.

    1844 N. Nob Hill Road, #303

    1844 N. Nob Hill Road, #303

    Plantation, Florida 33322

    954-554-1751(phone)

    954-756-7228(fax)

    michael@dmichaelschloss.com (authorized)

A fee payment in the amount of $275 has been submitted with the application, representing payment for 1 class(es).

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

Signature: /D. Michael Schloss/    Date Signed: 09/09/2011
Signatory's Name: D. Michael Schloss
Signatory's Position: Attorney of record

RAM Sale Number: 7454
RAM Accounting Date: 09/09/2011

Serial Number: 85418359
Internet Transmission Date: Fri Sep 09 08:35:27 EDT 2011
TEAS Stamp: USPTO/FTK-66.229.215.32-2011090908352788
3450-85418359-480ca36e9fd51985cca4c1df6c
f3abafce-CC-7454-20110909082224079719

# Roca Labs

FTC-PROD-002768

 Nutraceutica's
ROCA LABS™

healthy, fast and strong natural solutions

## choose your department









Gastric Bypass Effect - NO surgery

**drugs**
Inventing strong natural drugs for immediate results

**breastfeeding**
Testing mothers milk for quality

**research**
Advance global research approach for healthy results

Copyright © 2008-2011 Roca Labs USA All rights reserved

Home | Order | Questions | Customer Care | Research | Instructions | Ingredients | Terms | FDA disclaimer | Doctor | Send to a friend

*DISCLAIMER: Roca Labs is a special Formula designed to create a "gastric bypass effect" or "gastric bypass results" without the need for a gastric bypass surgery. Statements on this site have not been evaluated by the FDA. The Formula does not diagnose, treat, cure, or prevent any disease. This food supplement should be taken with at least 8 ounces of liquid. Consuming the Formula(s) without sufficient liquid may cause craving or other complications. Do not consume or use the Formula if you have difficulty in swallowing. Consult your doctor before trying/using the Formula, especially if you have ever had any medical and/or health related condition. All purchases are governed by our Terms Page. This site is using visualization and persuasion that we consider appropriate to psychologically aid users in the important process of weight loss. Some of these offers utilize paid actors. The information on this site supersedes any verbal information received from sales agents via phone or elsewhere. Support for our clients are on the Research page and are supplied by our users, as seen on YouTube. The use of the term "gastric bypass", and any other similar terminology, is meant only to illustrate the desired effect of the Formula which consists of herbs/food supplements. The various logos displayed on our site belongs to their respective trade mark holders and do not imply any endorsement.

 Nutraceuticals
**ROCA LABS**™ USA | Paris | Australia | Sweden | Florida

healthy, fast and strong natural solutions

## choose your department




gastric bypass effect

**weight loss**

Gastric Bypass Effect - NO surgery



**drugs**

Inventing strong natural drugs for immediate results



**breastfeeding**

Testing mother's milk for quality



**research**

Advance global research approach for healthy results

Copyright © 2008-2011 Roca Labs USA All rights reserved

Home | Order | Questions | Customer Care | Research | Instructions | Ingredients | Terms | FDA disclaimer | Doctor | Send to a friend

*DISCLAIMER: Roca Labs is a special Formula designed to create a "gastric bypass effect" or "gastric bypass results" without the need for a gastric bypass surgery. Statements on this site have not been evaluated by the FDA. The Formula does not diagnose, treat, cure, or prevent any disease. This food supplement should be taken with at least 8 ounces of liquid. Consuming the Formula(s) without sufficient liquid may cause choking or other complications. Do not consume or use the Formula if you have difficulty in swallowing. Consult your doctor before buying/using the Formula, especially if you have ever had any medical and/or health related condition. All purchases are governed by our Terms Page. This site is using visualization and persuasion that we consider appropriate to psychologically aid users in the important process of weight loss. Some of these efforts utilize paid actors. The information on this site supposedly any verbal information received from sales agents via phone or elsewhere. Support for our claims are on the Research page and are supplied by our users - as seen on YouTube. The use of the term "gastric bypass", and any other similar terminology, is meant only to illustrate the desired effect of the Formula which consists of herbs/food supplements. The various logos displayed on our site belongs to their respective trade mark holders and do not imply any endorsement.

## Trademark/Service Mark Application, Principal Register

## TEAS Plus Application

Serial Number: 85418376
Filing Date: 09/09/2011

*NOTE: Data fields with the \* are mandatory under TEAS Plus. The wording "(if applicable)" appears where the field is only mandatory under the facts of the particular application.*

---

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| TEAS Plus | YES |
| **MARK INFORMATION** | |
| *MARK | <u>Gastric Bypass NO Surgery</u> |
| *STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | Gastric Bypass NO Surgery |
| *MARK STATEMENT | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| REGISTER | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | Roca Labs, Inc. |
| *STREET | P.O. Box 20631 |
| *CITY | Tampa |
| *STATE (Required for U.S. applicants) | Florida |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants only) | 33622 |





| | |
|---|---|
| **PHONE** | 773-800-0055 |

## LEGAL ENTITY INFORMATION

| | |
|---|---|
| **\*TYPE** | CORPORATION |
| **\* STATE/COUNTRY OF INCORPORATION** | Florida |

## GOODS AND/OR SERVICES AND BASIS INFORMATION

| | |
|---|---|
| **\*INTERNATIONAL CLASS** | 005 |
| **IDENTIFICATION** | Food supplements for **weight loss** |
| **\*FILING BASIS** | SECTION 1(a) |
| **FIRST USE ANYWHERE DATE** | At least as early as 01/01/2011 |
| **FIRST USE IN COMMERCE DATE** | At least as early as 01/01/2011 |
| **SPECIMEN FILE NAME(S)** | |
| **ORIGINAL PDF FILE** | spec-6622921532-090812829 . Gastric_Bypass_NO_Surgery.PDF |
| **CONVERTED PDF FILE(S) (1 page)** | \\TICRS\EXPORT11\IMAGEOUT11\854\183\85418376\xml1\FTK0003.JPG |
| **SPECIMEN DESCRIPTION** | Example of recurring use of mark from a screen print of Owner website |

## ADDITIONAL STATEMENTS INFORMATION

| | |
|---|---|
| **\*TRANSLATION** (if applicable) | |
| **\*TRANSLITERATION** (if applicable) | |
| **\*CLAIMED PRIOR REGISTRATION** (if applicable) | |
| **\*CONSENT (NAME/LIKENESS)** (if applicable) | |
| **\*CONCURRENT USE CLAIM** (if applicable) | |

## ATTORNEY INFORMATION

| | |
|---|---|
| **NAME** | D. Michael Schloss, Esq. |
| **INTERNAL** | 1844 N. Nob Hill Road, #303 |

| | |
|---|---|
| **ADDRESS** | |
| **STREET** | 1844 N. Nob Hill Road, #303 |
| **CITY** | Plantation |
| **STATE** | Florida |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 33322 |
| **PHONE** | 954-554-1751 |
| **FAX** | 954-756-7228 |
| **EMAIL ADDRESS** | michael@dmichaelschloss.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |

## CORRESPONDENCE INFORMATION

| | |
|---|---|
| *****NAME** | D. Michael Schloss, Esq. |
| **INTERNAL ADDRESS** | 1844 N. Nob Hill Road, #303 |
| *****STREET** | 1844 N. Nob Hill Road, #303 |
| *****CITY** | Plantation |
| *****STATE** (Required for U.S. applicants) | Florida |
| *****COUNTRY** | United States |
| *****ZIP/POSTAL CODE** | 33322 |
| **PHONE** | 954-554-1751 |
| **FAX** | 954-756-7228 |
| *****EMAIL ADDRESS** | michael@dmichaelschloss.com |
| *****AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |

## FEE INFORMATION

| | |
|---|---|
| **NUMBER OF CLASSES** | 1 |
| **FEE PER CLASS** | 275 |
| *****TOTAL FEE PAID** | 275 |

## SIGNATURE INFORMATION

FTC-PROD-002781
PX6-118

| * SIGNATURE | /D. Michael Schloss/ |
| * SIGNATORY'S NAME | D. Michael Schloss |
| * SIGNATORY'S POSITION | Attorney of record |
| * DATE SIGNED | 09/09/2011 |

## Trademark/Service Mark Application, Principal Register

## TEAS Plus Application

Serial Number: 85418376
Filing Date: 09/09/2011

## To the Commissioner for Trademarks:

**MARK:** Gastric Bypass NO Surgery (Standard Characters, see mark)
The literal element of the mark consists of Gastric Bypass NO Surgery.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Roca Labs, Inc., a corporation of Florida, having an address of
    P.O. Box 20631
    Tampa, Florida 33622
    United States
requests registration of the trademark/service mark identified above in the United States Patent and
Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051
et seq.), as amended, for the following:

**For specific filing basis information for each item, you must view the display within the Input Table.**
    International Class 005:  Food supplements for weight loss

In International Class 005, the mark was first used at least as early as 01/01/2011, and first used in
commerce at least as early as 01/01/2011, and is now in use in such commerce. The applicant is
submitting one specimen(s) showing the mark as in commerce on or in connection with any item in
the class of listed goods and/or services, consisting of a(n) Example of recurring use of mark from a
screen print of Owner website.

**Original PDF file:**
spec-6622921532-090812829 . Gastric_Bypass_NO_Surgery.PDF
**Converted PDF file(s) (1 page)**
Specimen File1

The applicant's current Attorney Information:
D. Michael Schloss, Esq.
    1844 N. Nob Hill Road, #303
    1844 N. Nob Hill Road, #303
    Plantation, Florida 33322
    United States

The applicant's current Correspondence Information:

D. Michael Schloss, Esq.
1844 N. Nob Hill Road, #303
1844 N. Nob Hill Road, #303
Plantation, Florida 33322
954-554-1751(phone)
954-756-7228(fax)
michael@dmichaelschloss.com (authorized)

A fee payment in the amount of $275 has been submitted with the application, representing payment for 1 class(es).

## Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

Signature: /D. Michael Schloss/    Date Signed: 09/09/2011
Signatory's Name: D. Michael Schloss
Signatory's Position: Attorney of record

RAM Sale Number: 7647
RAM Accounting Date: 09/09/2011

Serial Number: 85418376
Internet Transmission Date: Fri Sep 09 09:23:59 EDT 2011
TEAS Stamp: USPTO/FTK-66.229.215.32-2011090909235959
6642-85418376-480e7b702c422e22bd478e072e
5b0dbcd-CC-7647-20110909090812829412

FTC-PROD-002784

# Gastric Bypass NO Surgery



Nutraceuticals
**ROCA LABS™**

 Chat

gastric bypass effect NO surgery

Order Now

Basic

## What is "gastric bypass NO surgery"?

**Gastric bypass with no surgery - see video**
Used successfully in Europe for 6 years, this medical innovation is an easy-to-use formula that creates a natural GASTRIC BYPASS EFFECT in the stomach. Mixed with water and taken in the morning, it immediately expands in your stomach, leaving only a small limited stomach available for food intake and practically forcing you to eat half.

The result: an immediate calorie deficiency and weight loss from day one. To accelerate the process, the formula includes the patented ingredient β-Glucan®, which balances blood sugar levels and fights your cravings for sweets and snacks - something that surgery isn't capable of. You'll not only eat less food without feeling hungry, you'll eat healthier too.

**Eat half from day one**
While in the past you required a full meal to fill your stomach and satisfy your hunger, once you're using the formula, you can take half a portion and still feel satisfied after. Since the formula PHYSICALLY fills your stomach, you have neither the need nor the space for more. At the end of the day, you'll find that even though you ate very little, you felt satisfied and your energy level remained high. Without realizing you entered a state of calorie deficiency, where you ate fewer calories than you burned.

**Safer and healthier than gastric bypass**
With over 27,000 YouTube and testimonial results, the formula is probably the strongest and fastest method in the world to lose weight giving it a 90% success rate. In comparison to gastric bypass surgery, the formula is less risky, faster, healthier, and has almost NO SIDE EFFECTS or complications. And at the low cost of $640, it's a fraction of the cost of gastric bypass surgery, which can be $15,000 or more.

With Roca Labs™ Natural Gastric Bypass Formula, you finally have the weapon you need to win the fight against hunger, cravings and obesity. You'll lose weight, look better, and improve your health easily and naturally. The power to succeed is in your hands.

Here are some Before & After videos from satisfied users: Tanya, Lanon, Jodi, Donna

Instructions  |  Terms  |  FDA disclaimer  |  Customer Care  |  Becki  |  Send to a friend

### POWERFUL -
### physically prevents you from eating

A dose of the Formula mixed in water and taken in the morning creates an immediate gastric bypass effect leaving only a small limited stomach size available for food intake, practically forcing you to eat HALF and lose weight from day one. Without Gastric Bypass surgery.



20%

The patented *β-Glucan®* ingredient regulates your blood sugar levels and helps you overcome cravings.



how to use    what is it





### ASK US
If your question isn't answered here

name

email

question

ask us

Copyright © 2008-2011 Roca Labs USA All rights reserved

Home  |  Order  |  Customer  |  Customer Care  |  Research  |  Instructions  |  Ingredients  |  Terms  |  FDA disclaimer  |  Contact  |  Send to a friend

Nutraceuticals
ROCA LABS™ USA

Paris
Australia
London
London

Chat

Video          FAQ          Success Stories          **Order Now**

Basic | Monitoring Success | Medical | Ordering | Video

## What is "gastric bypass NO surgery" ?

**Gastric bypass with no surgery - see video**
Used successfully in Europe for 6 years, this medical innovation is an easy-to-use formula that creates a natural GASTRIC BYPASS EFFECT in the stomach. Mixed with water and taken in the morning, it immediately expands in your stomach, leaving only a small limited stomach available for food intake and **practically forcing you to eat half.**
The result: an immediate calorie deficiency and **weight loss from day one.** To accelerate the process, the formula includes the patented ingredient β-Glucan®, which balances blood sugar levels and fights your cravings for sweets and snacks – something that surgery isn't capable of. You'll not only eat less food without feeling hungry, you'll eat healthier too.

**Eat half from day one**
While in the past you required a full meal to fill your stomach and satisfy your hunger, once you're using the formula, you can take half a portion and still feel satisfied after. Since the formula PHYSICALLY fills your stomach, you have neither the need nor the space for more. At the end of the day, you'll find that even though you ate very little, you felt satisfied and your energy level remained high. Without realizing, you entered a state of calorie deficiency, where you ate fewer calories than you burned.

**Safer and healthier than gastric bypass**
With over 27,000 YouTube and testimonial results, the formula is probably the strongest and fastest method in the world to lose weight giving it a 90% success rate. In comparison to gastric bypass surgery, the formula is less risky, faster, healthier, and has almost NO SIDE EFFECTS or complications. And at the low cost of $640, it's a fraction of the cost of gastric bypass surgery, which can be $15,000 or more.

With RocaLabs™ Natural Gastric Bypass Formula, you finally have the weapon you need to win the fight against hunger, cravings, and obesity. You'll lose weight, look better, and improve your health easily and naturally. The power to succeed is in your hands.

Here are some **Before & After** videos from satisfied users: Tanya, Loren, Jodi, Donna

Instructions | Terms | FDA disclaimer | Customer Care | Doctor | Send to a friend

---

gastric bypass effect NO surgery

Questions          Customer Care          Research

## POWERFUL –
### physically prevents you from eating

A dose of the Formula mixed in water and taken in the morning creates an immediate gastric bypass effect leaving only a small limited stomach size available for food intake, practically forcing you to eat HALF and lose weight from day one. Without Gastric Bypass surgery.

**20%**
Reduced Stomach size available

The patented β-Glucan® ingredient regulates your blood sugar levels and helps you overcome cravings.



how to use          what is it

### ASK US
If your question isn't answered here

name

email

question

ask us

Copyright © 2006-2011 Roca Labs USA All rights reserved

Home | Order | Questions | Customer Care | Research | Instructions | Ingredients | Terms | FDA's disclaimer | Doctor | Send to a friend

*DISCLAIMER: Roca Labs is a special formula designed to create a "gastric bypass effect" or "gastric bypass results" without the need for a gastric bypass surgery. Statements on this site have not been evaluated by the FDA. The Formula does not diagnose, treat, cure, or prevent any disease. This food supplement should be taken with at least 8 ounces of liquid. Consuming the Formula(s) without sufficient liquid may cause choking or other complications. Do not consume or use the Formula if you have difficulty in swallowing. Consult your doctor before buying/using the Formula, especially if you have ever had any medical and/or health related condition. All purchases are governed by our Terms Page. This site is using visualization and persuasion that we consider appropriate to psychologically aid users in the important process of weight loss. Some of these efforts utilize paid actors. The information on this site supersedes any verbal information received from sales agents via phone or elsewhere. Support for our claims comes from Research page and are supplied by our users, as seen on YouTube. The use of the term "gastric bypass", and any other similar terminology, is meant only to illustrate the desired effect of the Formula which consists of herbal food supplements. The various logos displayed on our site belong to their respective trade mark holders and do not imply any endorsement.*

**P00000048375**

---

(Requestor's Name)

(Address)

(Address)

(City/State/Zip/Phone #)

☐ PICK-UP   ☐ WAIT   ☐ MAIL

(Business Entity Name)

(Document Number)

Certified Copies _____   Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



**200267714262**

12/24/14--01012--003   **35.00

14 DEC 24 AM 11: 09
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

DEC 30 2013

C. CARROTHERS



PLAINTIFF'S EXHIBIT
30
2/15/17
PENGAD 800-631-6989

PX6-125

## COVER LETTER

**TO:** Amendment Section
      Division of Corporations

**NAME OF CORPORATION:** Bridge Global Health Corporation

**DOCUMENT NUMBER:** P00000048375

The enclosed *Articles of Amendment* and fee are submitted for filing.

Please return all correspondence concerning this matter to the following:

Don K Juravin
_____
Name of Contact Person

Juravin Incorporated
_____
Firm/ Company

4136 Roberts Point Cir
_____
Address

Sarasota, FL 34242
_____
City/ State and Zip Code

Don@Juravin.com
_____
E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

Don K Juravin _____ at ( 773 ) 800-0055
Name of Contact Person                  Area Code & Daytime Telephone Number

Enclosed is a check for the following amount made payable to the Florida Department of State:

☑ $35 Filing Fee   ☐ $43.75 Filing Fee &      ☐ $43.75 Filing Fee &      ☐ $52.50 Filing Fee
                      Certificate of Status        Certified Copy              Certificate of Status
                                                   (Additional copy is         Certified Copy
                                                   enclosed)                   (Additional Copy
                                                                               is enclosed)

**Mailing Address**                **Street Address**
Amendment Section                  Amendment Section
Division of Corporations           Division of Corporations
P.O. Box 6327                      Clifton Building
Tallahassee, FL 32314              2661 Executive Center Circle
                                   Tallahassee, FL 32301

**Articles of Amendment**
to
**Articles of Incorporation**
of

## Bridge Global Health Corporation

(Name of Corporation as currently filed with the Florida Dept. of State)

## P00000048375

(Document Number of Corporation (if known))

Pursuant to the provisions of section 607.1006, Florida Statutes, this *Florida Profit Corporation* adopts the following amendment(s) to its Articles of Incorporation:

**A.  If amending name, enter the new name of the corporation:**

## Must Cure Obesity, Co.
_____ *The new*

name must be distinguishable and contain the word "corporation," "company," or "incorporated" or the abbreviation "Corp.," "Inc.," or Co.," or the designation "Corp," "Inc," or "Co". A professional corporation name must contain the word "chartered," "professional association," or the abbreviation "P.A."

**B.  Enter new principal office address, if applicable:**
*(Principal office address MUST BE A STREET ADDRESS )*

**C.  Enter new mailing address, if applicable:**
*(Mailing address MAY BE A POST OFFICE BOX)*

**D.  If amending the registered agent and/or registered office address in Florida, enter the name of the new registered agent and/or the new registered office address:**

Name of New Registered Agent _____

_____
*(Florida street address)*

New Registered Office Address: _____, Florida _____
*(City)*                                                    *(Zip Code)*

**New Registered Agent's Signature, if changing Registered Agent:**
*I hereby accept the appointment as registered agent.   I am familiar with and accept the obligations of the position.*

_____
*Signature of New Registered Agent, if changing*

**Page 1 of 4**

**If amending the Officers and/or Directors, enter the title and name of each officer/director being removed and title, name, and address of each Officer and/or Director being added:**

*(Attach additional sheets, if necessary)*
*Please note the officer/director title by the first letter of the office title:*
*P = President; V= Vice President; T= Treasurer; S= Secretary; D= Director; TR= Trustee; C = Chairman or Clerk; CEO = Chief Executive Officer; CFO = Chief Financial Officer. If an officer/director holds more than one title, list the first letter of each office held. President, Treasurer, Director would be PTD.*
*Changes should be noted in the following manner. Currently John Doe is listed as the PST and Mike Jones is listed as the V. There is a change, Mike Jones leaves the corporation, Sally Smith is named the V and S. These should be noted as John Doe, PT as a Change, Mike Jones, V as Remove, and Sally Smith, SV as an Add.*

**Example:**

| X Change | PT | John Doe |
| X Remove | V | Mike Jones |
| X Add | SV | Sally Smith |

| Type of Action (Check One) | Title | Name | Address |
|---|---|---|---|
| 1) ☐ Change | ____ | _____ | _____ |
| ☐ Add | | | _____ |
| ☐ Remove | | | _____ |
| 2) ☐ Change | ____ | _____ | _____ |
| ☐ Add | | | _____ |
| ☐ Remove | | | _____ |
| 3) ☐ Change | ____ | _____ | _____ |
| ☐ Add | | | _____ |
| ☐ Remove | | | _____ |
| 4) ☐ Change | ____ | _____ | _____ |
| ☐ Add | | | _____ |
| ☐ Remove | | | _____ |
| 5) ☐ Change | ____ | _____ | _____ |
| ☐ Add | | | _____ |
| ☐ Remove | | | _____ |
| 6) ☐ Change | ____ | _____ | _____ |
| ☐ Add | | | _____ |
| ☐ Remove | | | _____ |

**Page 2 of 4**

PX6-128
FTC-PROD-008788

**E. If amending or adding additional Articles, enter change(s) here:**
    (Attach *additional sheets, if necessary).*   *(Be specific)*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**F. If an amendment provides for an exchange, reclassification, or cancellation of issued shares, provisions for implementing the amendment if not contained in the amendment itself:**
    *(if not applicable, indicate N/A)*

_____

_____

_____

_____

_____

_____

_____

**Page 3 of 4**

The date of each amendment(s) adoption: _____, if other than the
date this document was signed.

Effective date if applicable: _____
<em>(no more than 90 days after amendment file date)</em>

**Adoption of Amendment(s)**          <u>**(CHECK ONE)**</u>

☑ The amendment(s) was/were adopted by the shareholders.  The number of votes cast for the amendment(s)
by the shareholders was/were sufficient for approval.

☐ The amendment(s) was/were approved by the shareholders through voting groups. *The following statement*
*must be separately provided for each voting group entitled to vote separately on the amendment(s):*

"The number of votes cast for the amendment(s) was/were sufficient for approval

by _____."
<em>(voting group)</em>

☐ The amendment(s) was/were adopted by the board of directors without shareholder action and shareholder
action was not required.

☐ The amendment(s) was/were adopted by the incorporators without shareholder action and shareholder
action was not required.

Dated _____December 22, 2014_____

Signature _____*DON K J*_____
(By a director, president or other officer – if directors or officers have not been
selected, by an incorporator – if in the hands of a receiver, trustee, or other court
appointed fiduciary by that fiduciary)

Don K. Juravin
(Typed or printed name of person signing)

President
(Title of person signing)

**Page 4 of 4**

P00000048375

_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

[ ] PICK-UP    [ ] WAIT    [ ] MAIL

_____
(Business Entity Name)

_____
(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



400269220764

02/03/15--01039--023  **35.00

15 FEB -9 PM 3: 39

SECRETARY OF STATE
DIVISION OF CORPORATIONS



PLAINTIFF'S
EXHIBIT
81
2/15/17

C L -15
2-16-15

PX6-131
FTC-PROD-008793

# COVER LETTER

**TO:**    Amendment Section
Division of Corporations

**SUBJECT:** _MUST CURE OBESITY, Co._
Name of Corporation

**DOCUMENT NUMBER:** _P00000048375_

The enclosed Statement of Change of Registered Office/Agent and fee are submitted for filing.

Please return all correspondence concerning this matter to the following:

_DON JURAUEN_
Name of Contact Person

_MUST CURE OBESITY CO._
Firm/Company

_P.O. BOX 5267_
Address

_SARASOTA, FL 34277_
City/State and Zip Code

_DON @ JURAUEN.COM_
E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

_DON JURAUEN_ at (_813_) _810-5100_
Name of Contact Person          Area Code & Daytime Telephone Number

Enclosed is a $35.00 check made payable to the Department of State.

| **Mailing Address:** | **Street Address:** |
|---|---|
| Amendment Section | Amendment Section |
| Division of Corporations | Division of Corporations |
| P.O. Box 6327 | Clifton Building |
| Tallahassee, FL 32314 | 2661 Executive Center Circle |
|  | Tallahassee, FL 32301 |

CR2E045 (03/12)

## STATEMENT OF CHANGE OF REGISTERED OFFICE OR REGISTERED AGENT OR BOTH FOR CORPORATIONS

*Pursuant to the provisions of sections 607.0502, 617.0502, 607.1508, or 617.1508, Florida Statutes, this statement of change is submitted for a corporation organized under the laws of the State of* **FL**

_____ *in order to change its registered office or registered agent, or both, in the State of Florida.*

1. The name of the corporation: *MUST CURE OBESITY, CO.*

2. The principal office address: *4136 ROBERTS POINT CTR*
   *SARASOTA, FL 34277.*

3. The mailing address (if different): *SAME AS ABOVE ADDRESS.*

4. Date of incorporation/qualification: *5/16/2000*   Document number: *P00000048375*

5. The name and street address of the current registered agent and registered office on file with the Florida Department of State: (If resigned, enter resigned)

   *JURAVIN, INCORPORATED*
   *4136 ROBERTS POINT CTR.*
   *SARASOTA, FL 34242*

6. The name and street address of the new registered agent (if changed) and /or registered office (if changed):

   **REGISTERED AGENTS INC.**

   **3030 N. Rocky Point Drive, STE 150A**

   P.O. Box NOT acceptable

   **Tampa, FL 33607**

The street address of its registered office and the street address of the business office of its registered agent, as changed will be identical.

Such change was authorized by resolution duly adopted by its board of directors or by an officer so authorized by the board, or the corporation has been notified in writing of the change.

_____          _____
Signature of an officer or director          *DON KARL JURAVIN*
                                             Printed or typed name and title

*I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligation of my position as registered agent. Or, if this document is being filed merely to reflect a change in the registered office address, I hereby confirm that the corporation has been notified in writing of this change.*

_____          *Jan. 31. 2015*
Signature of Registered Agent          Date

If signing on behalf of an entity:

**Bill Havre - President**

Typed or Printed Name

* * * FILING FEE: $35.00 * * *

MAKE CHECKS PAYABLE TO FLORIDA DEPARTMENT OF STATE
MAIL TO: DIVISION OF CORPORATIONS, P.O. BOX 6327, TALLAHASSEE, FL 32314

CR2E045 (03/12)

## 2015 FLORIDA PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P00000048375

**Entity Name:** MUST CURE OBESITY, CO.

**FILED**
**Apr 30, 2015**
**Secretary of State**
**CC8526131673**

**Current Principal Place of Business:**

7259 S. TAMIAMI
SARASOTA, FL 34231

**Current Mailing Address:**

PO BOX 5267
SARASOTA, FL 34277 US

**FEI Number:** 59-3658482                    **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

REGISTERED AGENTS INC.
3030 N. ROCKY POINT DRIVE
SUITE 150A
TAMPA, FL 33607 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:

_____
            Electronic Signature of Registered Agent                                    Date

**Officer/Director Detail :**

Title                 PSTD

Name              JURAVIN, DON K

Address           4136 ROBERTS POINT CIR

City-State-Zip:   SARASOTA FL 34242

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: DON JURAVIN                              PSTD                      04/30/2015
_____
            Electronic Signature of Signing Officer/Director Detail                      Date



PX6-134
FTC-PROD-008792

## 2016 FLORIDA PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P00000048375

**FILED**
**Apr 24, 2016**
**Secretary of State**
**CC0818071624**

**Entity Name:** MUST CURE OBESITY, CO.

**Current Principal Place of Business:**

15118 PENDIO DR.
MONTVERDE, FL 34756

**Current Mailing Address:**

PO BOX 560150
MONTVERDE, FL 34756 US

**FEI Number: 59-3658482**                                      **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

REGISTERED AGENTS INC.
3030 N. ROCKY POINT DRIVE
SUITE 150A
TAMPA, FL 33607 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

          Electronic Signature of Registered Agent                                      Date

**Officer/Director Detail :**

Title          PSTD

Name          JURAVIN, DON K

Address       15118 PENDIO DR

City-State-Zip:  MONTVERDE FL 34756

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: DON K. JURAVIN                          PRESIDENT                    04/24/2016

          Electronic Signature of Signing Officer/Director Detail                                      Date

Filing # 17128454 Electronically Filed 08/15/2014 08:08:14 AM

IN THE CIRCUIT COURT OF THE
12TH JUDICIAL CIRCUIT, IN AND
FOR SARASOTA COUNTY, FLORIDA

CASE NO.  *2014 CA 004769nc*

Roca Labs, Inc.
      Plaintiff,

vs.

Consumer Opinion Corp. and
Opinion Corp. d/b/a PissedConsumer.com

      Defendants,
_____/

## COMPLAINT

The Plaintiff, ROCA LABS, INC. ("Roca"), a Florida Corporation, by and through its

undersigned counsel, files this Complaint against Defendants, CONSUMER OPINION CORP., a

New York Corporation ('Opinion") and OPINION CORP. d/b/a PISSEDCONSUMER.COM a

New York Corporation ("Pissed") (Collectively herein known as "Defendants").

## JURISDICTION & VENUE

1.     This is an action for injunctive relief, declaratory relief, and for damages in excess of

$15,000, exclusive of interest, costs and attorneys' fees.

2.     Venue is proper in this Honorable Court as this is an action under the Florida Deceptive

and Unfair Trade Practices Act, seeking permanent injunctive relief and an award of money

damages, including actual damages and reasonable attorneys' fees and costs; an award of

compensatory damages under common law claim of tortious interference with a contractual

relationship; an award of compensatory damages under common law claim of tortious



PLAINTIFF'S
EXHIBIT
42
2/15/17
PX6-136
FTC-PROD-019145

interference with a prospective relationship, an award of compensatory damages under common law claim of defamation all stemming from conduct that occurred in Sarasota, Florida.

3.    ROCA is a Florida for-profit corporation with its principal place of business at 7261A Tamiami Trail S, Sarasota, FL 34231.

4.    Defendant CONSUMER OPINION CORP. is a New York for profit corporation with it's principal place of business at 1204 Avenue U, Suite 1080, Brooklyn, NY 11229.  Upon information and belief CONSUMER OPINION CORP. is the owner of the trademark Pissed Consumer (U.S. Reg. No. 3679454) and owns and/or operates the website "pissedconsumer.com."

5.    Defendant OPINION CORP. is a New York for profit corporation with its principal place of business at Gravesend Neck Rd., Brooklyn, NY 11223.  Upon information and belief OPINION CORP. owns and/or operates the website "pissedconsumer.com".

6.    Pursuant to Florida Statutes Section 48.193 Florida Statutes, the Defendants are subject to personal jurisdiction in Florida because Defendants by and through their website pissedconsumer.com operate and engage in a business in Florida by selling services to Florida residents and corporations.

7.    Pursuant to Florida Statutes Section 48.193 Florida Statutes, the Defendants are subject to personal jurisdiction in Florida because Defendants by and through their website pissedconsumer.com violated Florida Deceptive and Unfair Trade Practices Act in the State of Florida.

8.    Pursuant to Florida Statutes Section 48.193 Florida Statutes, the Defendants are subject to personal jurisdiction in Florida because Defendants by and through their website

pissedconsumer.com are accessed and used in Florida and have committed tortious acts against Plaintiff.

9.      Pursuant to Florida Statutes Section 48.193 Florida Statutes, the Defendants are subject to personal jurisdiction in Florida because Defendant allows users to geo-target a Florida company by location and to post complaints via location and search via location.

10.     Pursuant to Florida Statutes Section 48.193 Florida Statutes, the Defendants are subject to personal jurisdiction in Florida because Defendants offer a service to contact Plaintiff and other Florida Companies in Florida to resolve alleged disputes.

11.     Pursuant to Florida Statutes Section 48.193 Florida Statutes, the Defendants are subject to personal jurisdiction in Florida because Defendants offer a manner for companies to respond to Complaints.

12.     Pursuant to Florida Statutes Section 48.193 Florida Statutes, the Defendants are subject to personal jurisdiction in Florida because Defendants market and sells reputation management services to Florida companies.

13.     Pursuant to Florida Statutes Section 48.193 Florida Statutes, Defendants are subject to personal jurisdiction in Florida because Defendants market and sells portions of its pissedconsumer.com homepage via its premium reviews service to Florida residents.

## GENERAL ALLEGATIONS

14.     ROCA is a Florida for profit corporation that was formed in 2006 as Appealing Ventures, Inc. It changed its name to ROCA LABS, INC. in 2009.

15.    ROCA manufactures dietary supplements (sometimes referred to a nutraceuticals) and is the inventor of our proprietary Gastric Bypass Alternative® that is an effective weight loss option for people who are trying to lose more than 50 pounds.

16.    ROCA markets and sells its products through its website www.rocalabs.com, where information on its products are available and consumers can purchase the product directly.

17.    Roca's products have been safely and successfully used by tens of thousands of people as surgery free alternative to gastric bypass.

18.    ROCA has made significant investments in product development and in its intellectual property rights.

19.    ROCA owns numerous registered trademarks including: Roca Labs®, Gastric Bypass Alternative®, Gastric Bypass Surgery Alternative®, Gastric Bypass Effect®, Gastric Bypass Results®, Natural Gastric Bypass®, Gastric Bypass No Surgery® and Anti Cravings®.

20.    ROCA's trademarks are inherently distinctive.

21.    ROCA has monetarily invested heavily in an online marketing and advertising program that has run in Florida and across the United States.

22.    ROCA competes with Defendants for consumers when individuals conduct online searches on Google, Bing, Yahoo! and other search engines.

23.    ROCA relies upon its reputation and the weight loss success of its customers to generate new business and attract new customers.

24.    In exchange for a significant discount (discounts average $800) customers contractually agree that, regardless of their outcome, they will not speak, publish, print, blog or write

negatively about ROCA or its products in any forum  (See ROCA purchase terms attached as

Exhibit "A").

25.     This contractual agreement would restrict ROCA's customers from posting complaints on

Defendants' website:  pissedconsumer.com.

26.     Defendants OPINION and PISSED are owners of a multifaceted Internet and service

business "PissedConsumer.com" ("Pissed Consumer") that generates revenues from multiple

avenues including, but not limited to (1) developing, creating, publishing and marketing online

content; (2) maintaining a web platform for third party users / subscribers to post content; (3)

selling/leasing a portion of its internet sites to third parties; (4) operating a service to resolve

complaints for consumers; and (5) selling online reputation management services to individuals

and business.

27.     Defendants collectively own, operate and maintain the website "pissedconsumer.com"

("subject website"), which according to its marketing materials is a "consumer advocacy and

customer complaint" website.  (See Marketing Materials attached as Composite Exhibit

"B").  This is Defendants primary internet platform and revenue generating website.

28.     Defendant, OPINION owns the registered trademark Pissed Consumer®.

29.     Pissedconsumer.com by and through Defendants, functions in part as a platform for

individuals to complain about people, products and/or businesses.  Complaints have been made

on pissedconsumer.com by individuals residing in Florida and about Florida residents and

businesses.

30.     Pissedconsumer.com, by and through Defendants, co-develop complaints with users and

then assumes ownership of the content.  In order for an individual to post a complaint on

pissedconsumer.com, she must go through the following steps (See Printout of Defendants

complaint generator (www.pissedconsumer.com/post-complaint.html) attached as Exhibit

"C"):

    A.  Access the page pissedconsumer.com

    B.  Select the Submit Complaint button at the top of the homepage.

    C.  Follow a page that includes content boxes (* are mandatory boxes):

        1. What happened*

        2. Details* (at least 100 words)

        3. Option to add images or videos and share on YouTube

        4. Company*

        5. Category* (this is a mandatory drop down menu)

        6. Location

        7. Product or Service

        8. Value of loss

        9. Tags

        10. Radial buttons for I am pissed, I am neutral, or I am pleased

        11. An option to pay and make this is "premium listing"

        12. An agreement to the terms and services*

        13. An option to be contacted by company

31.    As a user writes a complaint, pissedconsumer.com, by and through Defendants, monitors completeness and informs the user on the completeness of their complaint.  A prominent display monitors the progress. Users cannot leave certain items blank, must write a review of at least 100 words, and can select an option identifying themselves as "pissed".

32.    Pissed consumer, by and through Defendants, also offers tips on how to write "Tips for a Great Review" and "Tips that Will Make Your Review More Popular for Free."

33.    In essence, pissedconsumer.com, by and through Defendants, functions as a complaint generator as it instructs or co-authors the post on its website by ensuring that users write content in a certain manner, select from a list of business categories, fill in pre-defined information and select radial buttons.

34.    When writing a post, users are given the option to pay for a "Premium Review."  Under this option a user can pay Defendants a fee to have their posting prominently displayed on pissedconsumer.com's homepage.  According to Defendants, more people see Premium Reviews.

35.    Pissedconsumer.com, by and though Defendants, is functioning as an advertising platform where people can pay to have their complaints seen by individuals who access the pissedconsumer.com site and other websites and marketing programs of Defendants.

36.    Pissedconsumer.com, by and through Defendants, also provides the option for users to have the Company in which they are complaining about contact them.  According to Defendant's marketing materials "PissedConsumer.com Helps Consumers Get More From Consumer Complaints."  (See Exhibit B).

37.  Pissed Consumer describes itself as a consumer advocacy business and represents to users that it can resolve their complaints with Companies.

38.  Defendants misleads pissedconsumer.com users into thinking that it can resolve complaints and has a service or system to assist consumers in complaint resolution.  In truth it offers no complaint resolution services.

39.  ROCA has not received any communication from Defendants attempting to mediate or resolve complaints.

40.  Pissedconsumer.com, by and through Defendants, publishes that it is a consumer advocacy site and that it will attempt to bring complaints to a resolution, when in truth it does nothing.

41.  Defendants will not release the names of any of its posters to ROCA, and ROCA cannot attempt to resolve complaints.

42.  According to their marketing materials, Pissed Consumer, by and through Defendants, "offers a set of free tools necessary to bring customer disputes to a fast and successful resolution, including a consumer complaint letter generator and collection of consumer tips and advice in the site's consumer advocacy section" (See Exhibit B).

43.  In generating complaint letters Defendants are the author or at a minimum the co-author of the content.  In their marketing materials, Defendants states:

"Complaint letters still have the power to effectively bring a resolution to the problem, if they're written in a serious and professional manner detailing the precise problem and exactly what the consumer would like the company to do to rectify the situation, rather than simply exchanging

FTC-PROD-019152

heated words. Our free tool aims to help consumers achieve exactly that; a successful resolution

to their complaints

The computer-generated consumer complaint letters contain all vital information, including:

    1. Date of the complaint filing

    2. Complainant's name and address

    3. Name and address of the recipient of the complaint

    4. Complaint title and details

    5. Information for the recipient of the complaint regarding how to proceed in resolving

    the issue to the satisfaction of the complainant"

**(See Exhibit B)**

44.    There is essentially no difference between Defendants' complaint letter generator and

their online complaint form.

45.    In creating a system to generate a complaint letter or a complaint form Defendants

become the co-author or developer of the user's content.

46.    Upon completion of a posting, Defendants assumes ownership of the posting.  According

to pissedconsumer.com Terms and Conditions "By posting information or content to any public

area of www.PissedConsumer.com, you automatically grant, and you represent and warrant that

you have the right to grant, to PC an irrevocable, perpetual, fully-paid, worldwide exclusive

license to use, copy, perform, display and distribute such information and content and to prepare

derivative works of, or incorporate into other works, such information and content, and to grant

and authorize sublicenses of the foregoing. You also expressly authorize PC to share any posted

information with third parties at PC's own discretion."  (Terms & Conditions attached as Exhibit "D").

47.    Pissed Consumer, by and through Defendants, exercises the grant of this license and develops a new and distinct version of the posting for dissemination on Twitter via its Twitter account @PissedConsumer.

48.    Twitter is a unique social media platform, with established user guidelines, character limits, and best practices that are separate and distinct from other social media platforms and consumer review sites.

49.    Twitter (NYSE: TWTR) is a public company and according to public records it is not affiliated with Defendants.

50.    Each Twitter post by Defendants is a unique statement authored and made directly by Defendants and can be accessed by any one of Twitter's 271 million subscribers.

51.    Pissed Consumer's Tweets are separate and distinct from user postings on pissedconsumer.com

52.    Tweets are sent as if they were written by Defendants from Defendant's unique Twitter handle @PissedConsumer.

53.    Defendants Tweets about ROCA include but are not limited to:

    a.  "@RocaLabs Don't buy anything from Roca Labs they just sell a regular shake",

    b.  "Doesn't Work!!! I can't believe I really thought this would work! Save your money"

c. WILL NOT PROCESS PROMISED REFUND, LIED TO BY CUSTOMER

SERVICE AGENTS REGARDING PROMISED REFUND" (See Exhibit "E" Twitter

Postings).

54.    Defendants Tweets about ROCA were created and developed by Defendants.

55.    Defendant's Tweets come directly from @PissedConsumer without any third party

attribution.

56.    In making a Tweet, Defendants may use the term @RocaLabs and adds a tinyurl.com

link.

57.    Defendants are the author/creator/developer, publisher and marketer of its Tweets.

58.    Defendants, wrote, Tweeted, and published false and defamatory statements about ROCA

for their own financial gain.

59.    According to Terms and Conditions on pissedconsumer.com, users "will NOT post on PC

any defamatory, inaccurate, abusive, obscene, profane, offensive, threatening, harassing, racially

offensive, spam, or illegal material, or any material that infringes or violates another party's

rights (including, but not limited to, intellectual property rights, and rights of privacy and

publicity). You will use PC in a manner consistent with any and all applicable laws and

regulations. By posting information on PC, you warrant and represent that the information is

truthful and accurate" (See Exhibit D).

60.    Defendants allow pissedconsumer.com users to violate its Terms and Conditions and post

defamatory, inaccurate, abusive, offensive material about ROCA on its website.

61.    ROCA has contacted Defendants on numerous occasions to complain about these types

of postings, but Defendants have refused to take any action or remove these postings.

62.     Defendants continue to unfairly and maliciously publish these false, defamatory, inaccurate, abusive, offensive material about Roca despite requests to have them removed.

63.     Defendants deliberately publishes false, defamatory, misleading, false, and inaccurate content on pissedconsumer.com that is created by Defendants.  Pissedconsumer.com publishes that "Roca Labs has been on the market since 1988", that ROCA's average customer has suffered $279 in losses and that total customer losses exceed $9,500.

64.     According to Defendants more than 72,000 people have viewed the postings on pissedconsumer.com about ROCA.

65.     Defendants have developed its business to maximize the exposure of complaints to as wide an audience as possible.

66.     Defendants monetize this audience and profits from complaints.

67.     Defendants co-author with its users false and defamatory complaints about ROCA to increase their revenue and profits.

68.     Defendants sell reputation management to companies to assist them in maintaining their online reputation.

69.     Defendants recognize the damage that a posting on its site can have on the reputation, brand, sales, revenue, customer base and goodwill of a company.

70.     Defendants profit off complaints that it co-authors with users by selling reputation management services.

71.     Defendants will not allow ROCA to communicate to its users unless it subscribes to Defendant's reputation management services.

72.   Defendants statements about its ability to resolve complaints and act as a consumer advocate are false and misleading as they incorrectly lead users to believe that Defendants will help to resolve the issue complained, when in fact Defendants are using complaints to generate new reputation management customers

73.   Defendants employees, servants, agents all acted within the course and scope of their respective employment herein.

## COUNT I

## DECEPTIVE & UNFAIR TRADE PRACTICES

## AGAINST CONSUMER OPINION CORP:

ROCA realleges and incorporates the allegations of paragraphs 1 through 73 as though fully set forth herein and sues Defendant CONSUMER OPINION CORP ("Opinion") for Deceptive and Unfair Trade Practices as follows:.

74.   Pursuant to Florida Statute Section 501.204(1) as part of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), it is unlawful for any party to engage in unfair or deceptive acts or practices in the conduct of any trade or commerce.

75.   Defendant OPINION, falsely purports to serve the community as a reputable consumer advocacy group via its website pissedconsumer.com ("subject website")

76.   The subject website states their purpose is to allow users to "get your whole issue resolved and share your experience with the world."

77.   The subject website claims that it can help bring consumer disputes to a "fast and successful resolution" (See Exhibit B).

78.   Instead, Defendant OPINION uses complaints to sell advertising space on its subject website to its users and sell reputation management services to companies.

79.   Defendant OPINION states that it will contact the company against whom a complaint is being made.

80.   Defendant OPINION has never contacted ROCA to attempt to resolve any complaints and instead, the Defendant OPINION has taken the opposite action and has rebuffed communications from ROCA to resolve problems.

81.   Defendant OPINION further states that pissedconsumer.com "improves the interactive relationship between corporation and consumer, thereby improving the clients' bottom line."

82.   Defendant OPINION's subject website has done nothing to improve the relationship between ROCA and its customers and has only hurt ROCA's monetary profits and reputation.

83.   By publishing false statements about its services on the subject website, the Defendant OPINION engages in deceptive and unfair practices.

84.   Additionally, through their Terms and Conditions posted on their subject website Defendant OPINION states that it "will not publish false, defamatory, inaccurate or other types of statements."

85.   Defendant OPINION knowingly and intentionally violates this policy and allows false, defamatory and inaccurate statements about ROCA on its subject website.

86.   Statements on pissuedconsumer.com about ROCA include, but are not limited to:

    a.   This product sucks. It's expensive, horrible to drink & doesn't do nothing (See Review #506944 by anonymous).

    b.   This business is a total fraud. BEWARE! (See Review #490848 by anonymous).

FTC-PROD-019158

c. Roca Labs - Got scammed and sick from this JUNK (See Review #482648 by anonymous).

d. Roca Labs - Run don't walk away from this one! SCAM!! (See Review #487885 by anonymous).

e. The Company is full of lies and deceit (See Review #482585 by anonymous).

f. DO NOT TRUST THESE PEOPLE. They are CROOKS (See Review #480448 by anonymous).

g. Roca Labs - Don't buy anything from Roca Lab they just sell a regular shake they are stealing your money (See Review #475672 by anonymous).

h. I have a friend working in the warehouse of this product, he told me that is unsanitary they don't use gloves and hair nets to assemble the packages which comes with containers and spoons, and the product is a fraud doesn't work! (See Review #475672 by anonymous).

i. Roca Labs is a SCAM (See Review #432655 by anonymous).

j. Roca Labs- Product and company are PURE SCAM (See Review #413698 by anonymous).

k. You have a better chance of feeling full if you swallowed a glass of liquid cement and let it harden in your stomach. Do not waste your time, energy or money on them. (See Review #413698 by anonymous).

**(See Exhibit F Content/ Postings on Pissedconsumer.com)**

87. By publishing these statements on the subject website, the Defendant OPINION violates its own Terms and Conditions published on subject website and engages in deceptive and unfair practices.

88. Additionally, Defendant OPINION has made false and defamatory statements about ROCA via Twitter. Statements include but are not limited to:

a. @RocaLabs Don't buy anything from Roca Labs they just sell a regular shake

b.    Doesn't Work!!! I can't believe I really thought this would work! Save your money

c.    WILL NOT PROCESS PROMISED REFUND, LIED TO BY CUSTOMER SERVICE AGENTS REGARDING PROMISED REFUND

(See Exhibit E)

89.    By publishing these statements on Twitter the Defendant OPINION, engages in deceptive and unfair practices.

90.    Defendant OPINION claims that it "has been a leader in customer service and consumer advocacy since 2006 and that it "operates the consumer review site PissedConsumer.com, one of the highest ranking and best regarded consumer review sites on the Internet" (See Exhibit B).

91.    Pissedconsumer.com was in fact removed from Google's index for violations of Google's policies, they have been repeatedly sued for their business practices, there are hundreds of negative articles about Pissed Consumer online and in *Ascentive v. Opinion Corp.*, 842 F Supp. 2d 450, Dist. Court, ED NY the Court found that aspects of Pissed Consumers business were "troubling and perhaps unethical."

92.    By publishing false statements about its own esteem and reputation, the Defendant OPINION, engages in deceptive and unfair practices.

93.    Defendant OPINION markets and promotes pissedconsumer.com as an unbiased consumer review site and that it allows consumers to "make better choices" about companies and products (See Exhibit B).

94.    The subject website is in fact a "gripe site" and is a broad forum for posting false, inaccurate, malicious and defamatory content.

95.    On its face, the name "pissed consumer" is not unbiased, but is clear statement that a consumer is mad or "pissed" at someone or something.

96.    By publishing false statements about its business purpose, Defendant OPINION engages in deceptive and unfair practices.

97.    Defendant OPINION via its subject website claims that "Roca's customers have lost $9,500 and that our average customer has lost $279.00."

98.    This information posted by Defendant OPINION is false and to the best of ROCA's knowledge, the Defendant OPINION has done nothing to verify the claims of any user.

99.    By publishing false statements that it monitors consumer losses, determines the average loss per customer, Defendant OPINION engages in deceptive and unfair practices.

100.    Pursuant to Florida Statutes Section 501.211(1), "anyone aggrieved by a violation" of the FDUTPA may bring a claim under FDUTPA to enjoin a party that has violated, is violating, or is likely to violate FDUTPA.

101.    As a result of Defendant OPINION's unfair and deceptive practices, ROCA has incurred damages.

102.    Pursuant to Florida Statutes Section 501.211(2) provides that any action brought by an aggrieved party, wherein such party has suffered a loss as a result of violation of FDUTPA, such party may recover actual damages, plus attorneys' fees and court costs.

    WHEREFORE, Plaintiff ROCA LABS, INC. respectfully requests that this Honorable Court declare that Defendant CONSUMER OPINION CORP's conduct violates FDUTPA, and further grant temporary and permanent injunctive relief against the violating conduct, and award ROCA LABS, INC. with an amount fair and just to account for its money damages in excess of

one million dollars ($1,000,000.00), interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this court deems just and proper.

## COUNT II

### DECEPTIVE AND UNFAIR TRADE PRACTICES

### AGAINST OPINION CORP. D/B/A PISSEDCONSUMER.COM.

ROCA realleges and incorporates the allegations of paragraphs 1 through 102 as though fully set forth herein and sues Defendant OPINION CORP. d/b/a PISSEDCONSUMER.COM ("Pissed") for Deceptive and Unfair Trade Practices as follows:

103.   Pursuant to Florida Statute Section 501.204(1) as part of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), it is unlawful for any party to engage in unfair or deceptive acts or practices in the conduct of any trade or commerce.

104.   Defendant PISSED falsely purports to serve the community as a reputable consumer advocacy group via its website pissedconsumer.com ("subject website")

105.   The subject website states their purpose is to allow users to "get your whole issue resolved and share your experience with the world."

106.   The subject website claims that it can help bring consumer disputes to a "fast and successful resolution" (See Exhibit B).

107.   Instead, Defendant PISSED uses complaints to sell advertising space on its subject website to its users and sell reputation management services to companies.

108.    Defendant PISSED states that it will contact the company against whom a complaint is being made.

109.    Defendant PISSED has never contacted ROCA to attempt to resolve any complaints and instead, the Defendant PISSED has taken the opposite action and has rebuffed communications from ROCA to resolve problems.

110.    Defendant PISSED further states that pissedconsumer.com "improves the interactive relationship between corporation and consumer, thereby improving the clients' bottom line."

111.    Defendant PISSED's subject website has done nothing to improve the relationship between ROCA and its customers and has only hurt ROCA's monetary profits and reputation.

112.    By publishing false statements about its services on the subject website, the Defendant PISSED engages in deceptive and unfair practices.

113.    Additionally, through their Terms and Conditions posted on their subject website Defendant PISSED states that it will not publish false, defamatory, inaccurate or other types of statements.

114.    Defendant PISSED knowingly and intentionally violates this policy and allows false, defamatory and inaccurate statements about ROCA on its subject website.

115.    Statements on pissuedconsumer.com about ROCA include, but are not limited to:

    a.    This product sucks. It's expensive, horrible to drink & doesn't do nothing (See Review #506944 by anonymous).

    b.    This business is a total fraud. BEWARE! (See Review #490848 by anonymous).

    c.    Roca Labs - Got scammed and sick from this JUNK (See Review #482648 by anonymous).

    d.     Roca Labs - Run don't walk away from this one! SCAM!! (See Review #487885 by anonymous).

    e.     The Company is full of lies and deceit (See Review #482585 by anonymous).

    f.     DO NOT TRUST THESE PEOPLE. They are CROOKS (See Review #480448 by anonymous).

    g.     Roca Labs - Don't buy anything from Roca Lab they just sell a regular shake they are stealing your money (See Review #475672 by anonymous).

    h.     I have a friend working in the warehouse of this product, he told me that is unsanitary they don't use gloves and hair nets to assemble the packages which comes with containers and spoons, and the product is a fraud doesn't work! (See Review #475672 by anonymous).

    i.     Roca Labs is a SCAM (See Review #432655 by anonymous).

    j.     Roca Labs- Product and company are PURE SCAM (See Review #413698 by anonymous).

    k.     You have a better chance of feeling full if you swallowed a glass of liquid cement and let it harden in your stomach. Do not waste your time, energy or money on them. (See Review #413698 by anonymous).

**See Exhibit F for Content/Postings on pissedconsumer.com**

116.    By publishing these statements on the subject website, the Defendant PISSED violates its own Terms and Conditions that it publishes on subject website and engages in deceptive and unfair practices.

117.    Additionally, Defendant PISSED has made false and defamatory statements about ROCA via Twitter. Statements include but are not limited to:

    a.     @RocaLabs Don't buy anything from Roca Labs they just sell a regular shake

    b.     Doesn't Work!!! I can't believe I really thought this would work! Save your money

FTC-PROD-019164

c.   WILL NOT PROCESS PROMISED REFUND, LIED TO BY CUSTOMER
SERVICE AGENTS REGARDING PROMISED REFUND

**(See Exhibit E)**

118.   By publishing these statements on Twitter, the Defendant PISSED engages in deceptive
and unfair practices.

119.   Defendant PISSED claims that it "has been a leader in customer service and consumer
advocacy since 2006 and that it "operates the consumer review site PissedConsumer.com, one of
the highest ranking and best regarded consumer review sites on the Internet" (See Exhibit B).

120.   Pissedconsumer.com was in fact removed from Google's index for violations of Google's
policies, they have been repeatedly sued for their business practices, there are hundreds of
negative articles about Pissed Consumer online and in *Ascentive v. Opinion Corp.*, 842 F Supp.
2d 450, Dist. Court, ED NY the Court found that aspects of Pissed Consumers business were
"troubling and perhaps unethical."

121.   By publishing false statements about its own esteem and reputation, the Defendant
PISSED engages in deceptive and unfair practices.

122.   Defendant PISSED markets and promotes pissedconsumer.com as an unbiased consumer
review site and that it allows consumers to "make better choices" about companies and products.

123.   The subject website is in fact a "gripe site" and is a broad forum for posting false,
inaccurate, malicious and defamatory content.

124.   On its face, the name "pissed consumer" is not unbiased, but is clear statement that a
consumer is mad or "pissed" at someone or something.

125.    By publishing false statements about its business purpose, Defendant PISSED engages in deceptive and unfair practices.

126.    Defendant PISSED via its subject website claims that "Roca's customers have lost $9,500 and that our average customer has lost $279.00."

127.    This information posted by Defendant PISSED is false and to the best of ROCA's knowledge, the Defendant PISSED has done nothing to verify the claims of any user.

128.    By publishing false statements that it monitors consumer losses, determines the average loss per customer, Defendant PISSED engages in deceptive and unfair practices.

129.    Pursuant to Florida Statutes Section 501.211(1), "anyone aggrieved by a violation" of the FDUTPA may bring a claim under FDUTPA to enjoin a party that has violated, is violating, or is likely to violate FDUTPA.

130.    As a result of Defendant PISSED's unfair and deceptive practices, ROCA has incurred damages.

131.    Pursuant to Florida Statutes Section 501.211(2) provides that any action brought by an aggrieved party, wherein such party has suffered a loss as a result of violation of FDUTPA, such party may recover actual damages, plus attorneys' fees and court costs.

WHEREFORE, Plaintiff ROCA LABS, INC. respectfully requests that this Honorable Court declare that Defendant OPINION CORP d/b/a/ PISSEDCONSUMER.COM conduct violates FDUTPA, and further grant temporary and permanent injunctive relief against the violating conduct, and award ROCA LABS, INC. with an amount fair and just to account for its money damages in excess of one million dollars ($1,000,000.00), interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this court deems just and proper.

## COUNT III

## TORTIOUS INTERFERENCE WITH ROCA's CONTRACTUAL RELATIONSHIPS

## AGAINST CONSUMER OPINION CORP;

ROCA realleges and incorporates the allegations of paragraphs 1 through 128 as though fully set forth herein and sues Defendant CONSUMER OPINION CORP. ("OPINION") for Tortious Interference with Roca's Contractual Relationship with ROCA's clients as follows:

129    ROCA has a valid contractual relationship with its customers to purchase weight loss products at a significant discount.

130    As partial consideration for the discounted price, ROCA's customers contractually agree ("subject contract") to the following language:

"You agree that regardless of your outcome, you WILL NOT speak, publish, print, blog or write negatively about The Product or The Company in any way.

Any violation of this provision of the Agreement is deemed a material breach and you agree that The Company has no adequate remedy at law.  You further consent to and agree to entry of an injunction by a Court of competent jurisdiction in enforcement of your violation of this term and condition" (See Exhibit A).

131.    The subject contract further includes a provision that the customer will pay full price for the product should they violate this term.

132.    ROCA's customers willingly entered into this subject contract and willingly received the discount by making their purchase.

FTC-PROD-019167

133. ROCA's terms have posted anonymously on Defendant Opinion subject website "pissedconsumer.com" (See **Exhibit F**).

134. Defendant OPINION knows the identity of ROCA's customers that have posted negative comments on their subject website, but Defendant OPINION has refused to identify same to ROCA.

135. ROCA has notified Defendant OPINION of the subject terms of ROCA's contractual relationship with its customers (See notice attached as **Exhibit "I"**).

136. Evidence of the Defendant OPINION's knowledge of said contractual terms is further reflected through posts on its subject website including: "EVERYONE INTERESTED IN THIS PRODUCT PLEASE READ ROCA LABS terms and conditions agreement that they claim everyone must agree to when ordering the product!!!!!! MANY fees involved, such as the agreement NOT to COMMENT NEGATIVELY OR full price of product will be due which is $1,580, disputing future transactions (with your debit/credit card) fee up to $3,200 and commenting negatively on web defamation/slander fee of $100,000!!!!!!!!!!!!!!!!!!!" (**See Review #485660 by anonymous part of Composite Exhibit F**).

137. Defendant OPINION intended to convince and induce ROCA's customers to breach their contract with ROCA by posting negative comments on their subject website and in exchange Defendant OPINION represented it would resolve the customer's problem with ROCA.

138. Defendant OPINION encouraged ROCA's customers to "get your whole issue resolved and share your experience with the world" in direct breach of ROCA's contractual relationship.

139. Defendant OPINION in fact announced to the world via Twitter statements about ROCA, but did nothing to resolve the issue between ROCA and its customers.

140.   Defendant OPINION was not authorized nor has any legal right to claim privilege for inducing the breach of ROCA and its customers valid contractual agreement.

141.   As a direct and proximate result of the Defendant OPINION's actions, ROCA's customers breached their valid contract by placing negative postings on pissedconsumer.com.

142.   As a direct and proximate result of the Defendant OPINION's intentional and unjustified interference, ROCA has suffered non-monetary and monetary damages.

WHEREFORE, Plaintiff ROCA LABS, INC. respectfully requests that this Honorable Court declare that Defendant CONSUMER OPINION CORP. has tortiously interfered with ROCAa's valid contractual relationship with its customers, and further grant temporary and permanent injunctive relief against the violating conduct, and award ROCA LABS, INC. with an amount fair and just to account for its money damages in excess of one million dollars ($1,000,000.00), interest, reasonable attorneys' fees,  and costs incurred herein, and for such other relief as this court deems just and proper.

## COUNT IV

### TORTIOUS INTERFERENCE WITH  ROCA's CONTRACTUAL RELATIONSHIPS

### AGAINST OPINION CORP. D/B/A PISSEDCONSUMER.COM.

ROCA realleges and incorporates the allegations of paragraphs 1 through 142 as though fully set forth herein and sues Defendant OPINION CORP d/b/a PISSEDCONSUMER.COM ("Pissed") for Tortious Interference with ROCA's Contractual Relationship with ROCA's clients as follows:

143.     ROCA has a valid contractual relationship with its customers to purchase weight loss products at a significant discount.

144.     As partial consideration for the discounted price, ROCAs customers contractually agree to the following language ("subject contract"):

"You agree that regardless of your outcome, you WILL NOT speak, publish, print, blog or write negatively about The Product or The Company in any way.

Any violation of this provision of the Agreement is deemed a material breach and you agree that The Company has no adequate remedy at law.  You further consent to and agree to entry of an injunction by a Court of competent jurisdiction in enforcement of your violation of this term and condition" (See Exhibit A).

145.   The subject contract further includes a provision that the customer will pay full price for the product should they violate this term.

146.   ROCA's customers willingly entered into this contract and willingly received the discount by making their purchase.

147.   A number of ROCA's customers, have posted anonymously on Defendant PISSED subject website "pissedconsumer.com" (See Exhibit F).

148.   Defendant PISSED knows the identity of ROCA's customers that have posted negative comments on their subject website, but Defendant PISSED has refused to identify same to ROCA.

149.   ROCA notified Defendant PISSED of the subject terms of ROCA's contractual relationship with its customers (See Exhibit "I")

150.   Evidence of the Defendant PISSED knowledge of said contractual terms is further reflected through posts on its subject website including:  "EVERYONE INTERESTED IN THIS PRODUCT PLEASE READ ROCA LABS terms and conditions agreement that they claim

everyone must agree to when ordering the product!!!!!! MANY fees involved, such as the agreement NOT to COMMENT NEGATIVELY OR full price of product will be due which is $1,580, disputing future transactions (with your debit/credit card) fee up to $3,200 and commenting negatively on web defamation/slander fee of $100,000!!!!!!!!!!!!!!!!!!!" **(See Review #485660 by anonymous in Exhibit F).**

151.    Defendant PISSED intended to convince and induce ROCA's customers to breach their contract with ROCA by posting negative comments on their subject website and in exchange Defendant PISSED misrepresented it would resolve the customer's problem with ROCA.

152.    Defendant PISSED encouraged ROCA's customers to "get your whole issue resolved and share your experience with the world" in direct breach of ROCA's contractual relationship.

153.    Defendant PISSED in fact announced to the world via Twitter statements about ROCA, but did nothing to resolve the issue between ROCA and its customers.

154.    Defendant PISSED was not authorized nor has any legal right to claim privilege for inducing the breach of ROCA and its customers valid contractual agreement.

155.    As a direct and proximate result of the Defendant PISSED's actions, ROCA's customers breached their valid contract by placing negative postings on pissedconsumer.com.

156.    As a direct and proximate result of the Defendant PISSED's intentional and unjustified interference, ROCA has suffered non-monetary and monetary damages.

WHEREFORE, Plaintiff ROCA LABS. INC. respectfully requests that this Honorable Court declare that Defendant OPINION CORP d/b/a PISSEDCONSUMER.COM has tortiously interfered with ROCA's valid contractual relationship with its customers, and further grant temporary and permanent injunctive relief against the violating conduct, and award ROCA

LABS, INC. with an amount fair and just to account for its money damages in excess of one million dollars ($1,000,000.00), interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this court deems just and proper.

## COUNT V

## TORTIOUS INTERFERENCE WITH A PROSPECTIVE ECOMONIC RELATIONSHIP

## AGAINST CONSUMER OPINION CORP:

ROCA realleges and incorporates the allegations of paragraphs 1 through 156 as though fully set forth herein and sues Defendant CONSUMER OPINION CORP ("Opinion") for Tortious Interference with ROCA's Prospective Economic Relationships as follows:

157.    ROCA derives it revenues through online sales of it product to consumers looking to lose weight.

158.    ROCA has an actual prospective economic relationship with internet users that search for ROCA and its products on search engines.

159.    ROCA's consumer view the prominent internet displays of Defendant OPINION via its subject website, pissedconsumer.com. Tweets posted by Pissed Consumer, and other social media postings (Facebook, YouTube, etc.) and/or visit pissedconsumer.com.

160.    ROCA had an actual prospective economic relationship with numerous consumers including but not limited to: Roger Mealey, Jr., Shellie Brady, Angela Harnage, LaTanya Barreno, Roswitha Stone, and Kim Tarmann (collectively "Interfered Customers").

161.    Defendant OPINION is aware of the existence of ROCA's prospective economic relationship with internet users who desire to purchase ROCA's weight loss products.

FTC-PROD-019172

162.    Defendant OPINION, by and through its agents, servants, employees, whom acted within the course and scope of their employment, intentionally solicit and interfere with ROCA's prospective economic relationship with customers by actively soliciting, and then co-authoring negative posts and tweets against ROCA on its subject website.

163.    Defendant OPINION generates revenues from multiple avenues including, but not limited to (1) developing, creating, publishing and marketing online content; (2) maintaining a web platform for third party users / subscribers to post content; (3) selling/leasing a portion of its internet sites to third parties; (4) operating a service to resolve complaints for consumers; and (5) selling online reputation management services to individuals and business economic gain.

164.    Interfered Customers have refused to order or cancelled orders from ROCA as a direct and proximate result of Defendant OPINION's intentional interference with said relationships via Defendant OPINION's negative postings against ROCA on its subject website and Tweets.

165.    The Interfered Customers indicated their willingness to purchase weight loss products from ROCA (i.e. enter purchase order agreements).

166.    ROCA would have sold products to the Interfered Customers (entered into our purchase order agreement), however the Interfered Customers indicated that they would not purchase ROCA's products because negative reviews on Defendant OPINION's subject website or Tweets by Defendant.

167.    Defendant OPINION was not authorized nor has any legal right to claim privilege for inducing the disruption of ROCA and its prospective customers economic relationship.

168.    As a direct and proximate result of the Defendant OPINIONs intentional and unjustified interference, ROCA has suffered non-monetary and monetary damages.

PX6-164

FTC-PROD-019173

WHEREFORE, Plaintiff ROCA LABS, INC. respectfully requests that this Honorable

Court declare that Defendant CONSUMER OPINION CORP. has intentionally

disrupted/interfered with Roca's prospective economic relationships, and further grant temporary

and permanent injunctive relief against the violating conduct, and award ROCA LABS, INC.

with an amount fair and just to account for its money damages in excess of one million dollars

($1,000,000.00), interest, reasonable attorneys' fees, and costs incurred herein, and for such

other relief as this court deems just and proper.

## COUNT VI

## TORTIOUS INTERFERENCE WITH A PROSPECTIVE ECOMONIC RELATIONSHIP

## AGAINST OPINION CORP:

ROCA realleges and incorporates the allegations of paragraphs 1 through 168 as though

fully set forth herein and sues Defendant OPINION CORP d/b/a PISSEDCONSUMER.COM

("Pissed") for Tortious Interference with ROCA's Prospective Customer Economic

Relationships as follows:

169.    ROCA derives it revenues through online sales of it product to consumers looking to lose

weight.

170.    ROCA has an actual prospective economic relationship with internet users that search for

ROCA and its products on search engines.

171.    ROCA's consumer view the prominent internet displays of Defendant PISSED  via its

subject website, pissedconsumer.com, Tweets posted by Defendants, and other social media

postings (Facebook, YouTube, etc.) and/or visit pissedconsumer.com.

172.    ROCA had an actual prospective economic relationship with numerous consumers including but not limited to: Roger Mealey, Jr., Shellie Brady, Angela Harnage, LaTanya Barreno, Roswitha Stone, and Kim Tarmann (collectively "Interfered Customers").

173.    Defendant PISSED is aware of the existence of ROCA's prospective economic relationship with internet users who desire to purchase ROCA's weight loss products.

174.    Defendant PISSED, by and through its agents, servants, employees, whom acted within the course and scope of their employment, intentionally solicit and interfere with ROCA's prospective economic relationship with customers by actively soliciting, and then co-authoring negative posts and tweets against ROCA on its subject website.

175.    Defendant PISSED generates revenues from multiple avenues including, but not limited to (1) developing, creating, publishing and marketing online content; (2) maintaining a web platform for third party users / subscribers to post content; (3) selling/leasing a portion of its internet sites to third parties; (4) operating a service to resolve complaints for consumers; and (5) selling online reputation management services to individuals and business economic gain.

176.    Interfered Customers have refused to order or cancelled orders from ROCA as a direct and proximate result of Defendant PISSED's intentional interference with said relationships via Defendant PISSED's negative postings against ROCA on its subject website and Tweets.

177.    The Interfered Customers indicated their willingness to purchase weight loss products from ROCA (i.e. enter purchase order agreements).

178.    ROCA would have sold products to the Interfered Customers (entered into our purchase order agreement), however the Interfered Customers indicated that they would not purchase ROCA's products because negative reviews on Defendant PISSED's subject website or Tweets.

179.   Defendant PISSED was not authorized nor has any legal right to claim privilege for inducing the disruption of ROCA and its prospective customers economic relationship.

180.   As a direct and proximate result of the Defendant PISSED's intentional and unjustified interference, ROCA has suffered non-monetary and monetary damages.

WHEREFORE, Plaintiff ROCA LABS, INC. respectfully requests that this Honorable Court declare that Defendant OPINION CORP d/b/a PISSEDCONSUMER.COM has intentionally disrupted/interfered with Roca's prospective economic relationships, and further grant temporary and permanent injunctive relief against the violating conduct, and award ROCA LABS, INC. with an amount fair and just to account for its money damages in excess of one million dollars ($1,000,000.00), interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this court deems just and proper.


## COUNT VII

### DEFAMATION AGAINST CONSUMER OPINION CORP via Pissedconsumer.com;

Roca realleges and incorporates the allegations of paragraphs 1 through 180 as though fully set forth herein and sues Defendant CONSUMER OPINION CORP. ("OPINION") for Defamation via Pissedconsumer.com as follows:

181.   Statements that tend to injure one's business may be charged as defamatory.

182.   Communications that describe one's conduct, characteristics or condition as incompatible with the appropriate exercise of one's business or trade qualifies as defamation per se.

183.   The statements which were co-authored or generated by Defendant OPINION via their subject website "pissedconsumer.com", which impute the unsatisfactory conduct, characteristics

and conditions of ROCA constitute defamatory statements concerning ROCA per se.  See

paragraph 88 herein for said statements.

184.   The variety of statements co-authored or generated by Pissed Consumer as detailed in

Paragraph 88 herein are false in their entirety.

185.   All of the false statements as detailed in Paragraph 88 herein are defamatory and libelous

on their face.

186.   Defendant OPINION further states that "Roca's customers have lost $9,500 and that our

average customer has lost $279.00."   This statement is made by Defendant OPINION without

any knowledge of actual losses.

187.   According to Defendant OPINION's subject website "as a rule it does not edit, confirm

or vet the content of users posts for accuracy."

188.   ROCA has suffered significant loss of reputation as well as business opportunities as a

direct and proximate result of Defendant OPINION's false, reckless, wrongful and malicious

statements.

189.   ROCA's losses include, without limitation, the failure of ROCA to sell its product to

numerous identifiable potential customers as well as significant lost revenues from other

potential customers.

190.   The above alleged statements contained in paragraph 88 herein were seen and read by

potentially millions of people who reside in Florida and elsewhere.

191.   Defendant OPINION authored, co-authored, generated or published these statements with

the knowledge that they were false or with reckless disregard as to their truth and falsity.

FTC-PROD-019177

192.   In the event that Defendant OPINION is a considered to be a media outlet, it is alleged that Defendant OPINION acted without reasonable care as to the truth or falsity of its statements, and that actual damages were sustained by ROCA.

WHEREFORE, Plaintiff ROCA LABS, INC. respectfully requests that this Honorable Court declare that Defendant CONSUMER OPINION CORP. has defamed ROCA, and further grant temporary and permanent injunctive relief against the violating conduct, and award ROCA LABS, INC. with an amount fair and just to account for its money damages in excess of one million dollars ($1,000,000.00), interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this court deems just and proper.


## COUNT VIII

### DEFAMATION AGAINST OPINION CORP via Pissedconsumer.com

ROCA realleges and incorporates the allegations of paragraphs 1 through 192 as though fully set forth herein and sues Defendant OPINION CORP d/b/a PISSEDCONSUMER.COM ("Pissed") for Defamation via Pissedconsumer.com as follows:

193.   Statements that tend to injure one's business may be charged as defamatory.

194.   Communications that describe one's conduct, characteristics or condition as incompatible with the appropriate exercise of one's business or trade qualifies as defamation per se.

195.   The statements which were co-authored or generated by Defendant PISSED via their subject website "pissedconsumer.com", which impute the unsatisfactory conduct, characteristics and conditions of ROCA constitute defamatory statements concerning ROCA per se.   See paragraph 88 herein for said statements.

196.    The variety of statements co-authored or generated by Pissed Consumer as detailed in Paragraph 88 herein are false in their entirety.

197.    All of the false statements as detailed in Paragraph 88 herein are defamatory and libelous on their face.

198.    Defendant PISSED further states that "Roca's customers have lost $9,500 and that our average customer has lost $279.00."   This statement is made by Defendant PISSED without any knowledge of actual losses.

199.    According to Defendant PISSED's subject website "as a rule it does not edit, confirm or vet the content of users posts for accuracy."

200.    ROCA has suffered significant loss of reputation as well as business opportunities as a direct and proximate result of Defendant PISSED's false, reckless, wrongful and malicious statements.

201.    ROCA's losses include, without limitation, the failure of ROCA to sell its product to numerous identifiable potential customers as well as significant lost revenues from other potential customers.

202.    The above alleged statements contained in paragraph 88 herein were seen and read by potentially millions of people who reside in Florida and elsewhere.

203.    Defendant PISSED authored, co-authored, generated or published these statements with the knowledge that they were false or with reckless disregard as to their truth and falsity.

204.    In the event that Defendant PISSED is a considered to be a media outlet, it is alleged that Defendant PISSED acted without reasonable care as to the truth or falsity of its statements, and that actual damages were sustained by Roca.

FTC-PROD-019179

WHEREFORE, Plaintiff ROCA LABS, INC. respectfully requests that this Honorable

Court declare that Defendant OPINION CORP d/b/a/ PISSEDCONSUMER.COM has defamed

ROCA, and further grant temporary and permanent injunctive relief against the violating

conduct, and award ROCA LABS, INC. with an amount fair and just to account for its money

damages in excess of one million dollars ($1,000,000.00), interest, reasonable attorneys' fees,

and costs incurred herein, and for such other relief as this court deems just and proper.

## COUNT IX

### DEFAMATION AGAINST CONSUMER OPINION CORP (via Twitter)

ROCA realleges and incorporates the allegations of paragraphs 1 through 204 as though

fully set forth herein and sues Defendant CONSUMER OPINION CORP. ("OPINION") for

Defamation via Twitter as follows:

205.    Statements that tend to injure one's business may be charged as defamatory.

206.    Communications that describe one's conduct, characteristics or condition as incompatible

with the appropriate exercise of one's business or trade qualifies as defamation per se.

207.    The statements which were authored by Defendant OPINION and placed on Twitter,

which impute the unsatisfactory conduct, characteristics and conditions of ROCA constitute

defamatory statements concerning ROCA per se.

208.    These statements as previously detailed in Paragraph 53 herein, include but are not

limited to:

a.      @RocaLabs Don't buy anything from Roca Labs they just sell a regular shake

b.      Doesn't Work!!! I can't believe I really thought this would work! Save your
money

c.   WILL NOT PROCESS PROMISED REFUND, LIED TO BY CUSTOMER
SERVICE AGENTS REGARDING PROMISED REFUND

**(See Exhibit E)**

209.   The statements authored and Tweeted by Defendant OPINION are false in their entirety.

210.   All of the false statements are defamatory and libelous on their face.

211.   To the best of ROCA's knowledge Defendant OPINION has never purchased products
from ROCA, tested or tried any of our products, had any communication with anyone at ROCA
about ordering our products, or have been refused a refund.

212.   ROCA has suffered significant loss of reputation as well as business opportunities as a
direct and proximate result of Defendant OPINION's false, reckless, wrongful and malicious
statements.

213.   The losses include, without limitation, the failure of ROCA to sell its product to
numerous identifiable potential customers as well as significant lost revenues from other
potential customers.

214.   The above alleged statements were seen and read by potentially millions of people who
reside in Florida and elsewhere.

215.   Defendant OPINION made these statements with the knowledge that they were false or
with reckless disregard as to their truth and falsity.

216.   In the event that Defendant OPINION is a considered to be a media outlet, it is alleged
that Defendant OPINION acted without reasonable care as to the truth or falsity of its statements,
and that actual damages were sustained by ROCA.

WHEREFORE, Plaintiff ROCA LABS, INC. respectfully requests that this Honorable

Court declare that Defendant CONSUMER OPINION CORP. has defamed ROCA and further

grant temporary and permanent injunctive relief against the violating conduct, and award ROCA

LABS, INC. with an amount fair and just to account for its money damages in excess of one

million dollars ($1,000,000.00), interest, reasonable attorneys' fees, and costs incurred herein,

and for such other relief as this court deems just and proper.


## COUNT X

## DEFAMATION AGAINST OPINION CORP (via Twitter)

ROCA realleges and incorporates the allegations of paragraphs 1 through 216 as though fully set

forth herein and sues Defendant OPINION CORP d/b/a PISSEDCONSUMER.COM ("Pissed")

for Defamation via Twitter as follows:

217.   Statements that tend to injure one's business may be charged as defamatory.

218.   Communications that describe one's conduct, characteristics or condition as incompatible

with the appropriate exercise of one's business or trade qualifies as defamation per se.

219.   The statements which were authored by Defendant PISSED and placed on Twitter, which

impute the unsatisfactory conduct, characteristics and conditions of ROCA constitute defamatory

statements concerning ROCA per se.

220.   These statements as previously detailed in Paragraph 53 herein, include but are not

limited to:

    a.   @RocaLabs Don't buy anything from Roca Labs they just sell a regular shake

b.    Doesn't Work!!! I can't believe I really thought this would work! Save your
money

c.    WILL NOT PROCESS PROMISED REFUND, LIED TO BY CUSTOMER
SERVICE AGENTS REGARDING PROMISED REFUND

(See Exhibit E)

221.    The statements authored and Tweeted by Defendant PISSED are false in their entirety.

222.    All of the false statements are defamatory and libelous on their face.

223.    To the best of ROCA's knowledge Defendant PISSED has never purchased products
from ROCA, tested or tried any of our products, had any communication with anyone at ROCA
about ordering our products, or have been refused a refund.

224.    ROCA has suffered significant loss of reputation as well as business opportunities as a
direct and proximate result of Defendant PISSED's false, reckless, wrongful and malicious
statements.

225.    The losses include, without limitation, the failure of ROCA to sell its product to
numerous identifiable potential customers as well as significant lost revenues from other
potential customers.

226.    The above alleged statements were seen and read by potentially millions of people who
reside in Florida and elsewhere.

227.    Defendant PISSED made these statements with the knowledge that they were false or
with reckless disregard as to their truth and falsity.

FTC-PROD-019183

228.   In the event that Defendant PISSED is a considered to be a media outlet, it is alleged that Defendant PISSED acted without reasonable care as to the truth or falsity of its statements, and that actual damages were sustained by ROCA.

WHEREFORE, Plaintiff ROCA LABS, INC. respectfully requests that this Honorable Court declare that Defendant OPINION CORP d/b/a PISSEDCONSUMER.COM has defamed ROCA, and further grant temporary and permanent injunctive relief against the violating conduct, and award ROCA LABS INC. with an amount fair and just to account for its money damages in excess of one million dollars ($1,000,000.00), interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this court deems just and proper.

## COUNT XII

## DECLARATORY RELIEF AGAINST DEFENDANTS

ROCA, by and through undersigned counsel, seek declaratory judgment relief pursuant to Chapter 86 of the Florida Statutes, prevailing Florida law, against Defendants and they re-allege all preceding paragraphs herein and state:

229.   This is an action for declaratory relief pursuant to Florida Statutes Section 86.011.

230.   There is a bona fide, actual, present practical need for declaratory relief pursuant to Florida Statutes Section 86.011 and present controversy with ascertainable facts between the parties herein.

231.   The Defendants, by and through their agents, servants and employees, own, maintain and control the website pissedconsumer.com.

232.    The Defendants, by and through their agents, servants, and employees have authored, co-authored and/or co-developed negative complaints with users against ROCA and then the Defendants assume ownership of the content via pissedconsumer.com and Twitter.

233.    The Defendants, by and through their agents, servants and employees fail to verify their posted negative internet content against ROCA that Defendants authors, co-authors and/or co-develops via pissedcomsumer.com and Twitter.

234.    The Defendants have intentionally tortiously interfered with both ROCA's contractual relationship with existing customers and its economic relationship with potential customers.

235.    The Defendants conduct has directly and proximately caused ROCA to continue to accrue monetary damages and present ongoing damages to ROCA's reputation.

236.    ROCA is in doubt as to their rights and obligations under Florida Statute Section 501.204(1) as part of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and ROCA is in need of a present declaration of the applicability and/or preclusion of said Statute against Defendants herein and their rights under Florida law.

237.    ROCA is in doubt as to their rights under FDUTPA and Florida law and is in need of a present declaration whether Defendants conduct alleged herein constitutes false and misleading advertising against ROCA.

238.    ROCA is in doubt as to their rights under Florida law and is in need of a present declaration whether Defendants conduct alleged herein tortiously interfered with ROCA's contractual agreements with their customers.

FTC-PROD-019185

239.   ROCA is in doubt as to their rights under Florida law and is in need of a present declaration whether Defendants conduct alleged herein tortiously interfered with ROCA's prospective economic relationship with potential customers.

240.   ROCA is in doubt as to their rights under Florida law and is in need of a present declaration whether Defendants defamed ROCA per se.

241.   There is a bona fide, actual dispute between the parties based on the Defendants refusal to cease and desist it's conduct after ROCA has requested same.

242.   There is a bona fide, actual dispute between the parties based on the Defendants refusal to provide the alleged "dissatisfied customer" information to ROCA so that ROCA can verify the veracity of said content.

243.   There is a bona fide, actual dispute between the parties whether the Defendants in Fact author, co-author and/or develop the negative content against ROCA via pissedconsumer.com and Twitter.

244.   ROCA seeks relief in order to enforce contractual/legal rights and not to merely seek legal advice from this Honorable Court.

245.   ROCA's right to recovery is dependent upon the Court's finding of facts and/or application of same to Florida law.

246.   As a result of this dispute, it has become necessary for the Plaintiff, Roca, to retain services of counsel.

247.   Defendants are obligated to pay a reasonable fee for the undersigned services in bringing this action, plus necessary costs.

FTC-PROD-019186

248.   Defendants' interests in this declaration of rights are actual, present, adverse and antagonistic of fact and/or law to ROCA's interests.

WHEREFORE Plaintiff, ROCA, requests the Court to:

a.   Take jurisdiction of the subject matter and parties hereto.

b.   Determine applicable law, including the provision of Florida Statutes that apply to the parties.

c.   Declare that the Defendants have violated FDUTPA against ROCA.

d.   Declare that the Defendants have intentionally tortiously interfered with ROCA's contractual agreements with customers.

e.   Declare that the Defendants have intentionally tortiously interfered with ROCA's economic relationship with consumers.

f.   Declare that the Defendants have defamed ROCA.

g.   Declare that ROCA has suffered economic damages as proximate result of Defendants conduct.

h.   Declare that ROCA is entitled to attorneys' fees and costs against the Defendants and determine the amounts thereto.

i.   Declare that ROCA's are entitled to award of monetary damages and determine the amounts thereto;

j.   Declare that Defendants cease and desist their conduct against ROCA and for them to remove all negative content from their website and twitter.

FTC-PROD-019187

k.    Declare that Defendants provide the names and addresses of all alleged ROCA customers

who have helped in posting negative content on Defendants website.

l.    Award damages, interest, and taxable costs against Defendants.

m.    Award any other relief this Court deems just and proper against the Defendants.

   WHEREFORE, Plaintiff ROCA further demands entry of judgment against Defendants

for all damages, attorneys' fees, and costs.


Roca Labs, Inc.                          Nicole Freedlander, P.A.

P.O. Box 7898                            P.O. Box 402653

Delray Beach, FL 33482-7898             Miami Beach, FL 33140

Tel. 305-998-6150                        Tel. 305-674-4844

Fax 954-341-5215


By: _____              By: _____

Paul Berger, Esq.                        Nicole Freedlander, Esq.

FL Bar No. 4413                          FL Bar No. 2150

Legal5@rocalabs.com                     nicole@freedlanderlaw.com

# EXHIBIT A

# ROCA PURCHASE TERMS

FTC-PROD-019189

# PERSONAL TERMS, CONDITIONS & DISCLAIMERS AGREEMENT

USV2.0  June 2014

---

## SUMMARY

- Roca Labs believes that all means are Kosher in the fat fight and the "straight in your face" attitude is the only way: Fat is Unhealthy & Ugly. If you feel insulted, you should not consider buying.

- The Roca Labs Mixture ALWAYS works in limiting stomach space and it is UP TO YOU to decide on dosage and frequency, to serve/feed yourself small food quantities and avoid any fatty or high calorie foods in a similar fashion to post bariatric surgery. Success depends on following Instructions and being tuned to Suggested Use.

- You may choose to pay the full $1,580 price ("Full Price") for the Procedure or enjoy a "Subsidy" based on Terms such as: devotion to losing weight, making timely payments, approaching Roca Labs first and never be responsible for commenting anywhere negatively in any fashion. Failure to comply and you agree to pay immediately the Full Price and face legal demand for damages in the State of Florida.

- Roca Labs loves rewarding for success so failure is not rewarded and Money Back policy is for proven success only - no returns are accepted once ordered.

- Health Application questions can only detect obvious factors to deny you the purchase of the procedure but can NOT pertain or cover your PERSONAL medical or psychological obstacles.

- The Procedure is VERY STRONG but your mind is stronger. You commitment to follow Instructions and be tuned to Suggested Use is crucial. Unless you can call yourself "Fat" and feel that fat is ugly, we don't think you should buy the Procedure.

- Results may vary and mainly depends on your commitment and medical condition. Before purchasing you should check Instructions, Suggested Use, Side Effects and consult with your doctor if necessary.
- Statements, other than clinical, have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.

---

FTC-PROD-019190

This website, through the manufacturer and/or the distributor, jointly and individually ("The Website" or "The Company" or "We") are marketing The Company's products and offerings, which include, but are not limited to, the Roca Labs Procedure ("Procedure") and support services ("Support"). The Procedure and Support are available to Purchasers ("The Customer" or "You"), under all of the following personal terms, conditions and disclaimers ("Terms") and on these terms alone. Everything that The Company represents in the Terms and conditions or on The Website is accurate to the best of Company's knowledge. Customer will print and save the Agreement. You agree that the use of The Website is at your sole risk. Neither The Website, nor any of The Company's officers, directors, employees, agents, third party content providers, merchants, sponsors, licensors, contractors or affiliates warrants that The Website will be error-free or uninterrupted. The Company is clear that results depend on YOU and therefore DOES NOT guarantee any personal result or outcome resulting from the use of this Website, The Procedure or Support.

**YOU ACKNOWLEDGE THAT YOU HAVE CAREFULLY READ THE TERMS BEFORE MAKING A PURCHASE AND AGAIN PRIOR TO USING THE PROCEDURE/SUPPORT. PLACING AN ORDER INDICATES THE UNCONDITIONAL ACCEPTANCE OF THE TERMS. DO NOT PURCHASE THE PROCEDURE IF YOU DO NOT AGREE TO BE BOUND BY THE ALL TERMS.**

# Privacy

Your information will not be shared or sold for as long as you do not breach the Terms and we will have to use the information provided. See Privacy.

# Health Disclaimer

The Procedure, Website and Support provide limited, non-medical, weight loss management assistance. Testimonials, experiences, videos and related content intended only to assist users in their personal weight loss efforts. The Company is not a medical organization and it's staff cannot give you medical advice or diagnosis. Nothing contained in The Website should be construed as medical advice or diagnosis and should not be interpreted as a substitute for physician consultation, evaluation, or treatment.

**The Formula should be purchased ONLY after reading the possible Side Effects and the Instructions. You are urged and advised to seek the advice of a physician before beginning any weight loss effort or regimen and to direct the physician to review The Website. The Website and The Formula are intended for use only by healthy individuals. Customers with health conditions are specifically warned to seek professional medical advice prior to initiating any form of weight loss effort or regimen.**

The Customer agrees to make proper use of The Formula according to the instructions of use, which are

provided with The Formula and appear on The Website, in order to maximize your results. The Company has no knowledge of The Formula causing any serious side effects. If The Customer has any medical-related complaint after using The Formula, the Customer agrees to provide us with the following information:

1. A physician's report stating that your reaction/symptoms are a direct result of using the Formula;
2. All medical and other related records relating to the issues you had with the product;
3. All of your medical records relating in any way to health, weight-loss, weight, digestion and nutrition issues for the last five years;
4. A sworn and notarized statement by you containing the following:

i. A breakdown of your exact diet, including amount and times of water and food intake, during the entire time you used The Formula;

ii. A breakdown of the exact schedule, dosage and manner in which you took the Formula every day that you took it;

iii. Your age, weight and height at the time you began using the Formula.

By purchasing the Formula you agree to these specific terms and acknowledge that the Company would not have sold The Formula without your agreement to same.

The Company cannot guarantee results because your success depends on your usage in accordance with Suggested Use and your successful adaptation to new eating habits. You agree that, because The Company makes NO guarantees regarding results, and because of The Company's clear No Return/No Refund policy, you have NO right to dispute any payment. You agree that disputing any payment causes damage to The Company and gives The Company the right to seek compensation from you for The Company's damages. In the event that you dispute payment, then The Company has the unfettered right to revoke the discount you were awarded and you shall be liable to the Company for the full sales price of $1,580 .

You agree that if there is a problem with shipping, you will contact The Company via Customer Care on The Company's Website, in writing, and allow The Company 7 days to research and address the shipping issue. You also agree that if there is a shipping issue, you will file a claim with the United States Postal Service and keep The Company apprised of your efforts so The Company may help you address the issue and reship the Formula, if necessary. You agree, however, that a shipping issue does not give you the right to withhold or dispute the charge with your credit card

company or with PayPal. You agree that doing so would cause damage to The Company and will give The Company the right to seek compensation from you for The Company's damages.

## Your Commitments

By purchasing the Procedure at the you have obligated

## Conditional Discounted Price

The price for The Formula and The Support is $1,580.00. You may purchase The Formula and The Support at full price and without conditions, or you may elect to purchase The Formula at a reduced subsidised rate ("Conditional Price"). The marketing department allocates funds from its marketing budget to subsidise the Formula instead of spending the money on advertising because it hopes to gain more positive "word to mouth" customers by making the Formula more affordable. The Subsidy ("Subsidy") is the the difference between what you pay and $1,580. We are also providing this deeply discounted Conditional Price because The Company can better manage its risks and resources, and reduce The Company's legal expenses. In exchange for this Conditional Price, you explicitly agree to all of the following:

(1) You are representing to The Company that you are suitable to use The Formula and The Support, based upon the terms, conditions and instructions contained in this Agreement, and that you do not have any psychological or physical disorders that may interfere with your success in using The Formula and The Support.

(2) You will follow the Suggested Use that come with The Formula and that are explained in detail on The Website. We will support you.

(3) You expect to have a positive outcome by reducing food consumption and improving your eating habits and you will avoid eating ANY fatty or high calorie foods and will restrict yourself to eating less than 1,500 calories a day. You will also engage in daily 20-30 minutes exercise.

(4) You agree that we can use any and all information relating to your success in the Company's marketing efforts. This can be done with a screen name of your choice but with real pictures and video.

(5) You agree that regardless of your outcome, you WILL NOT speak, publish, print, blog or write negatively about The Product or The Company in any way.

Any violation of this provision of the Agreement is deemed a material breach and you agree that The Company has no adequate remedy at law. You further consent to and agree to entry of an injunction by a Court of competent jurisdiction in enforcement of your violation of this term and condition.

(6) You agree that your Last Payment ("Last Payment") in the amount equals to the Subsidy (the difference between the Conditional Price and $1,580) will occur 30 days from your last payment. Roca Labs agrees to waive this last payment if you make all your payments on time, avoid any public negative comments and comply with the Terms herein. Roca Labs will exercise this right within 12 months from the time the Last Payment is due.

(7) If you breach this Agreement, you agree to pay the full price for The Formula within 3 business days of demand, plus any expenses we incur in resolving the issue. In addition, we retain all legal rights and remedies against you for breach of contract and any other appropriate causes of action.

# Terminology

*Roca Labs® terminology is used to simplify understanding, visualizing and believing in your success based on the Terms, Roca Labs® Mission Statement and doctrine to success*

- **Roca Labs® Procedure** refers to the entire program for losing weight, and includes our trademarked Formula, Anti-Cravings®, supplies, recommendations, guidelines and reward system for the weight loss process.
- **Roca Labs® Formula** is the powder prepared with liquid to create the Roca Labs® Mixture that, when ingested, results in the gastric bypass effect to limit stomach space and food intake.
- **Activator** is the container used to activate the Formula and turn it into a Roca Labs® Mixture dose.
- **Anti-Cravings®** is the proprietary formula intended to balance blood sugar levels and diminish cravings for snacks or sweets. This may be particular benefit during pregnancy and for diabetics.
- **Small Stomach** term is used to describe the feeling of a smaller stomach space with a lower threshold for satiety, even though the physical pouch size remains unchanged.
- **Shrinking Stomach™** trademark process describing the need for less food to reach a feeling of "being full". It can help reset the "appetite thermostat" so one won't feel as hungry. Over a period of 3 to 6 months one's stomach feels smaller with smaller food quantities needs to reach satiety. The physical stomach pouch size in unchanged without a surgery.
- **Stomach Space** available is a self estimate intended to create a visualization in order to determine the dosage and mainly the commitment to eating much smaller portions that day.
- **FDA Approved** Roca Labs® believes in following FDA guidelines in production and even more, in making medical claims. Though Roca Labs® Formula is extremely effective and should be used carefully as you would a drug, it does not require a prescription as it is classified as a food supplement.
- **Results may vary. Description/Facts/Statistics refer to a successful regime.**
- **Success Rate** and stats are either based on clinical studies of the formula's ingredients or the general experiences of more than 100,000 applicants.

FTC-PROD-019194

# General

Once you place an order, you are entitled to Customer Care /Support.  Generally, Customer Care/Support is available 24 hours, 7 days a week. We will make every effort to respond to you within 24 hours of any written contact. **For the protection of The Company and you, The Customer, after your order has shipped The Company requires that all contact between you and The Company must be in writing with Customer Care /Support through The Website ONLY.**

The Formula is not a drug, medical treatment or a surgery. Rather, it is a natural alternative that causes people to eat less by reducing available stomach capacity, providing a sensation of fullness, and creating an opportunity for psychological strengthening.

**The Formula is intended for healthy persons in general and is not suited  for those with sensitivity to barley or to dietary fibers.  You agree that  prior to ordering the The Formula, you have consulted with and have advised your physician that The Formula components are: Guar Gum, Konjac, Inulin, Beta Glucan, Xanthan Gum, Maltodextrin, Natural and Artificial Flavors, Vitamins B-6, B-12 and C.**

After your initial purchase, you may purchase The Support alone and/or additional one-month supplies of The Formula for the separate low price of $50.00.

## General Advice Only

Any verbal answers or information provided by order representatives or support staff (whether on the telephone or via electronic mail, or otherwise) are general and are specifically not intended to constitute medical or personal advice. Answers and comments from The Company staff members shall be limited solely to addressing questions and concerns as they relate to information contained on the Website, The Formula, and its usage.  The Company representatives are not doctors. Any personal or medical questions should be directed to your personal physician.  You should disregard any any such answer or remark that may be construed as medical or personal advice.

## Concurrent Use of Medication

Please direct to your physician all questions about the proper use of your medication while using The Formula. The Website and the information contained on it should not be relied upon under any circumstances

as it relates to the use, combination, or cessation of use of your personal medication.

## FDA Information

The Formula is manufactured in an FDA-compliant facility. The Formula is categorized as a "food additive" according to the definitions of the FDA and is approved for use without a prescription. The Formula contains only certified ingredients. These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease. This product should not be used in place of or as a substitute for recommendations by your healthcare professional. These statements are based on the known activity of the specific ingredients in this product. No clinical study has been performed on this product. The Company believes that the information provided hereunder complies with all federal laws and regulations.

## Declaration, Purchase Agreement and Exceptions

You hereby affirm that, prior to using The Formula, you have read, agreed to, and fully understand the instructions and specific directions regarding the daily mode of use for The Formula. Additionally, you affirm that you have read and examined all of the components of the Formula and you are aware of the components, and that the components are not in contradiction with, or incompatible with your current health regiment, nor do the components interfere with, or alter the effectiveness of any medication or advice you have received from your physician.

The act of purchase constitutes an Agreement between you and The Company, whether the order was carried out via the Website or via the phone number provided on the Website. All communications, order requests, service requests, etc. are based on the regulations and instructions as stated on the Website.

You do not have permission or the right to sell, transfer and/or gift The Formula to any other person or entity. If, contrary to the terms herein, you sell, transfer or gift The Formula to another person, you will remain responsible for any breach of these Terms and Conditions by that person, and you agree to indemnify The Company against any claims brought by, or damages awarded to that person.

## Updated Website Instructions

You commit to make use of the Formula according to the instructions, which are occasionally updated on The Website. The instructions on the Website are considered the most current and accurate, even to the exclusion of any other printed material, including labels printed on the Formula package. All communications, order requests, service requests, etc. are based on the regulations and instructions as stated on the

FTC-PROD-019196

Website.

## Drinking Plenty of Fluids

You understand that The Formula requires drinking larger than normal quantities of liquids; to prevent potential dehydration, which may lead to headaches. In extreme cases, additional complications may develop. You must drink no less than 3 glasses of water immediately after each dose of The Formula, and 6-8 additional glasses of water throughout the day for each dose of The Formula. It is emphasized that given The Formula's strength, you are solely responsible for drinking adequate amounts of liquids according to your bodily needs and with reactions changing in real time. Furthermore, you understand that The Formula will not work without drinking liquids as directed.

## Formula Success

The expansion action of the active ingredients within the stomach is physical and conditional upon many factors, including drinking plenty of liquids. Despite the Formula being a physical aid (which is intended to decrease stomach space availability and leave the user with a feeling of fullness), the Customer hereby agrees to avoid consuming calorie-rich foods and/or overeating, so as to avoid expanding the stomach via forced consumption. The Formula will assist in weight loss as long as the diet process is dependent upon appetite and not upon psychological issues (such as depression, boredom, sadness, etc...) that may lead to overeating. **The Formula is not being sold to you on a trial basis. The Company makes no guarantee regarding the degree of success you will experience, if any.**

## Personal Dosage

You hereby agree that by the act of purchasing the Formula, you are aware that prior to its regular use, you must carry out personal trials to determine the appropriate dosage for your body, which will aid in achieving a lack of appetite at a level, quantity and duration that you wish and is appropriate for your situation. You determine the level and duration of the lack of appetite according to individual will and physical ability.

## Agreement Not to Comment Negatively

You understand and are aware that you are required to dose the formula, to drink large quantities of liquids, to avoid calorie-rich foods, to avoid overeating and to overcome psychological obstacles in order to achieve results. **You are also aware that The Company does not guarantee success.** Therefore, unless you purchased The Formula at full price, (1) no claim or complaint whatsoever will be accepted regarding the lack of success of The Formula, the service provided, the price, or any other negative comments relating to your purchase; (2) the announcement, writing, or publication of any such or other claim in any media or forum will constitute a breach of this agreement, to which you entered willingly and with full knowledge of the components of The Formula and its properties and The Support; (3) You agree that any such negative claim will constitute defamation per se, entitling The Company to injunctive relief and damages;

You agree that this clause is a material clause, and The Company relies on your agreement to these terms as a condition to offering and accepting from you a discounted price. **Do not purchase the Formula or Support if you do not agree to this "No Negative Comment Clause."**

# The Order

After you have read the Terms, Conditions and Disclaimer and filled out the required order form and/or contacted the central phone service Order Department, a representative of the Order Department will contact you to verify and confirm the details of delivery. Answers given by Representatives are not a substitute for information contained on the Website, these Terms and Conditions, or any medical advice. If you provide incorrect identification details while carrying out the order, The Company cannot guarantee that the products will be delivered. You must confirm that you have provided updated and precise details. You agrees to pay the cost to re-ship and order If Customer provides incorrect or false information.

The Company's refund/return policy is explained fully below. Pursuant to Florida law, checks that are not honored for any reason will incur a Customer charge of $25-$40, or 5% of the amount of the check, whichever is greater. Should The Company institute legal or collection proceedings regarding returned/cancelled checks or cancelled/disputed credit cards/PayPal, the Customer will be responsible for all <u>collection costs</u> and attorney's fees, plus filing fees, for each returned or cancelled check or for each cancelled credit card/PayPal payment. You agree that you will not file a charge-back or dispute with the credit card company. Other than the above listed allowance for attorney's fees relating to payment/collection issues, neither you nor The Company shall be entitled to attorney fees for other disputes between the parties. Invoices are sent directly to the electronic mail boxes supplied by you and it is the your responsibility to provide an active/working email account.

# Order Choice

<u>Introductory Offer</u>: You pay the deeply discounted Conditional Price for the Formula and The Support, and will receive Support from 8 AM to 8 PM Mon-Fri, within 24 hours of request, and $100-$200 money back for success video. There is no warranty and no guarantee as part of this price option.

<u>Warranty Offer</u>: You pay an extra $180 for The Formula and The Support and will receive: (1) 24/7 Support, response within 5 hours of request; and (2) 50% refund if you contact Customer Care within 30 days and prove that you have any material side effects or you didn't lose at least 20 pounds; and (3) $200-$350 money back for success video.

PX6-189

FTC-PROD-019198

Unconditional Offer: The price for The Formula and The Support is $1580. You receive (1) 24/7 Support, response within 5 hours of request; and (2) 50% refund for any reason if you contact Customer Care within 30 days; (3) $200-$350 money back for success video; and (4) the Agreement not to Comment Negatively does not apply to you.

## Service Hours

**After your order has been shipped, the handling of the order goes to the Customer Care Department, which operates only in writing via The Website on the Customer Care page.** The dedicated professionals who respond to inquiries understand the importance of providing accurate, timely and detailed responses. Therefore, all communication between you and The Service Department will be via electronic mail, which will allow the service professional time to research the issue and provide an appropriate response. Also, because the response might be lengthy, written communication will allow you to review and revisit the response throughout the process. This will also help to ensure the success of The Formula. Answers to inquiries are generally provided within 24 hours. If inquiries are made on a non-business day, responses are usually made by the end of the next business day.

## Shipping and Delivery Times

The Company makes reasonable efforts to ship orders by the next business day. You are responsible for any taxes imposed, inside or outside of the United States. Orders are generally shipped via United States Postal Service (USPS) 2nd day service and follow the USPS Terms of Use. Once your order has been submitted, NO changes can be made to the order. At peak holiday times, shipping may take 1-2 days longer than usual.

If you choose the option to sign for the package, you must choose "signature required" when ordering. If the "signature required" option is chosen, The Company will guarantee delivery and will reship at no extra charge if the package is not received by you.

The Company offers waiver of signature solely for your convenience. You understand that if you waive signature for delivery of the product, The Company is without recourse in the event of loss or theft of The Formula once USPS confirms delivery. Therefore, if you waive signature and The Company receives confirmation of delivery from USPS, then you agree to bear the burden of loss or theft and to pay the charges for The Formula as agreed and will not to dispute payment for the product against The Company, and your recourse does not include the right to file a charge-back claim to your credit card company. If this occurs, The Company will reship the product for an additional charge of $150 to cover The Company's expenses.

You acknowledge that The Company has no control over the delivery schedules of the USPS or any other

FTC-PROD-019199

delivery service. The Customer will have no claim against The Company due to delivery disruptions.

On occasion, The Company's orders surpass The Company's production capabilities and your order may enter a short waiting list. Generally, this information is posted as soon as you enter the site.

# Merchandise Return & Refund Policy

If you wish to cancel your order before it has been shipped, you must immediately contact the Customer Care Department via the Website in writing for a full refund. You agree that you WILL NOT contact your credit card company or PayPal in these instances, as you agree that the charge was valid and authorized at the time you placed your order. Refunds may take up to 10 days to process. Greater delays in refunds are likely to occur if you dispute a charge with PayPal as the funds are automatically put on hold until the dispute has been resolved.

**You agree to CONTACT US FIRST with ANY QUESTION OR CONCERN before contacting your credit card company or PayPal to cancel or dispute payment. The Company retains the right to remedy any concerns you may have and you do not have the right to file a credit card or PayPal dispute. In the event that you file a credit card or PayPal dispute, you agree to authorize The Company to contact the credit card company or PayPal with your express authority to withdraw your dispute with the credit card company or PayPal.**

**An order is considered "shipped" once a tracking number has been assigned.** If you cancel your order once the product has been shipped, then The **Formula can be returned only in its original unopened shipping/delivery package,** as stated explicitly on the package itself.

**There will be no refund under any circumstances once the outer shipping package has been opened, even if none of the packages inside the box have been opened.**

Customer returns of an unopened shipping package **must be made within 3 days of the receipt of the order.** Prior to return, you must (1) send The Company photographs of the shipping box clearly showing that the box has not been opened, and (2) obtain return shipping authorization from The Company in writing. You agree to provide The Company with a return tracking number as soon as you ship the product. The refund will

be limited only to the cost of The Formula minus the shipping charges and a 15% restocking fee. You will be solely responsible for the charges to ship the product back to The Company. There will be no refund of the cost of The Support under any circumstances.

As with any food, food supplement, diet aid or even gastric bypass surgery, it is expected that a certain number of users might not have a positive reaction to The Formula. It is also expected that, just like with any food, food supplement, diet aid or even gastric bypass surgery, there are a certain number of users who will not achieve the desired results. **Nonetheless, similar to purchasing an over-the-counter product or having gastric bypass surgery, no refunds will be considered under these circumstances.**

## Responsibility

Use of The Formula should be made according to the instructions of use written on The Website. The Company is not accountable for your failure to follow the instructions. You will not have any claim, allegation or demand against the Company or its manufacturer due to the qualities of The Formula, its abilities, limitations or suitability to your needs and demands. The Company is not responsible for a measure of weight loss accompanying The Formula and The Support, since The Formula's success depends on external circumstances, such as instructed use, and personal physical limitations, outside The Company's control. Results, therefore, lie entirely in your hands.

## Content Ownership

All of the content and products on The Company's Website are owned by The Company. The Company claims all property rights, including intellectual property rights, to its content and no person/entity is permitted to infringe upon those rights. The Company will prosecute to the fullest extent of the law anyone who attempts to use or copy The Company's property. You agree not to copy content from The Company's Website without The Company's permission. Any requests to use The Company's content should be submitted to The Company by e-mail from The Company's contact page.

## Disclaimers of Warranties

PLEASE NOTE THE FOLLOWING IMPORTANT DISCLAIMERS OF WARRANTIES: THE FORMULA AND SUPPORT ARE PROVIDED "AS IS" AND WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED. THE COMPANY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF TITLE OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, COMPATIBILITY, SECURITY, ACCURACY OR NON-INFRINGEMENT. NEITHER THE COMPANY NOR ANY OF THE COMPANY'S AFFILIATES, LICENSORS, LICENSEES, SERVICE PROVIDERS OR SUPPLIERS WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE USE OR THE RESULTS OF THE USE OF THE FORMULA &

THE SUPPORT IN TERMS OF THEIR CORRECTNESS, ACCURACY, RELIABILITY, SUCCESS, OR OTHERWISE. NO ADVICE OR INFORMATION, OBTAINED BY YOU FROM THE COMPANY'S PERSONNEL OR THROUGH THIS WEBSITE SHALL CREATE ANY WARRANTY NOT EXPRESSLY PROVIDED FOR IN THIS AGREEMENT.

If your jurisdiction does not allow limitations on warranties, this limitation may not apply to you. Your sole and exclusive remedy relating to your use of the site shall be to discontinue use of the site.

## Limitation of Liability

You acknowledge your use of this Website is at your sole risk and that you assume full responsibility for all the risks associated with any of your use of this Website

YOU EXPRESSLY UNDERSTAND AND AGREE THAT THE COMPANY AND THE COMPANY'S AFFILIATES SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, OR ANY OTHER DAMAGES WHATSOEVER, INCLUDING BUT NOT LIMITED TO, DAMAGES FOR LOSS OF PROFITS, GOODWILL, USE, DATA OR OTHER INTANGIBLE LOSSES (EVEN IF THE COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING OUT OF, OR RESULTING FROM, (A) THE USE OR THE INABILITY TO USE THIS WEBSITE; (B) THE USE OF THE FORMULA OR THE SUPPORT; OR (C) ANY OTHER MATTER RELATING TO THIS WEBSITE.

IN NO EVENT SHALL THE COMPANY'S TOTAL LIABILITY TO YOU FOR ALL DAMAGES, LOSSES, AND CAUSES OF ACTION (WHETHER IN CONTRACT, TORT, FOR NEGLIGENCE OR OTHERWISE) EXCEED THE AMOUNT PAID BY YOU, IF ANY, FOR THE FORMULA & SUPPORT. IF YOU ARE DISSATISFIED WITH ANY PORTION OF THE COMPANY'S WEBSITE, FORMULA OR SUPPORT, OR WITH ANY OF PROVISION OF THIS AGREEMENT, YOUR SOLE AND EXCLUSIVE REMEDY IS THE DISCONTINUATION OF YOUR USE OF THIS WEBSITE, THE FORMULA &/OR THE SUPPORT. IF ANY PORTION OF THIS LIMITATION OF LIABILITY IS FOUND TO BE INVALID, LIABILITY IS LIMITED TO THE FULLEST EXTENT PERMITTED BY LAW.

## Indemnification

You agree to indemnify, hold harmless and, at The Company's option, defend The Company and The Company's affiliates, officers, directors, employees, stockholders, agents and representatives from any and all third party claims, liability, damages and/or costs (including, but not limited to, reasonable attorney's fees and expenses) arising from your improper or unauthorized use of this Website, The Company's Formula, or The Company's Support, your violation of this Agreement, or your infringement, or the infringement or use by any other user of your account, of any intellectual property or other right of any person or entity. Your breach of the Agreement as it relates to your obligation to refrain from making, posting, or otherwise commenting negatively about the Formula, Website, or The Company, is deemed a material breach of the Agreement,

PX6-193

FTC-PROD-019202

and you agree to pay all costs and attorney's fees related to The Company's subsequent efforts to enforce this term of the Agreement.

## Testimonials, Pictures, & Demonstratives

The Customer's success in achieving their weight loss goal is very important to The Company. We know that visualization, instilling confidence and encouraging results is of the highest importance. Therefore, Along with the hundreds of actual Customers who have posted their success stories on YouTube and other media outlets, The Company invested in reproducing some of the successful results of our Customers. The Company utilized the work of some paid actors so the user can experience some of these success stories and use them as incentives to achieve their own weight loss goals. These testimonials and endorsements reflect the experience that many of our customers have reported to The Company. All content on the Website, whether text, image, or video, belongs to The Company and no one can use, transfer, or link to any part without express written permission.

## Legal Jurisdiction

These Terms and Conditions will be governed by and construed in accordance with the laws of the State of Florida, without giving effect to any principles of conflicts of laws. Any action seeking legal or equitable relief arising out of or relating to this Website will be brought only in the federal or state courts of the State of Florida. You hereby consent and submit to the personal jurisdiction of such courts for the purpose of litigating any such action. A printed version of these Terms, Conditions and Disclaimer and related materials will be admissible in judicial and administrative proceedings based upon or relating to these Terms, Conditions and Disclaimer to the same extent and subject to the same conditions as other business documents and records originally generated and maintained in printed form. For purposes of the litigation issues addressed herein, you waive any right to confidentiality.

## Severability of the Terms & Conditions

If any part of these Terms and Conditions, and/or Disclaimers of use are determined by a court of competent jurisdiction to be invalid or unenforceable, then the remaining provisions shall be deemed enforceable, valid and in full effect. The remainder of these Terms and Conditions, and Disclaimers are fully enforceable and legally binding.

**BY CHECKING THE REQUIRED BOX PRIOR TO PLACING YOUR ORDER, YOU AGREE THAT YOU HAVE READ THE COMPANY'S AGREEMENT IN ITS ENTIRETY AND AGREE TO BE BOUND COMPLETELY BY ITS TERMS AND CONDITIONS.**

PX6-194

FTC-PROD-019203

IN THE CIRCUIT COURT OF THE

12TH JUDICIAL CIRCUIT, IN AND

FOR SARASOTA COUNTY, FLORIDA

Roca Labs, Inc.                                    CASE NO. 2014 CA 004769 NC

        Plaintiff,

vs.

Consumer Opinion Corp. and

Opinion Corp. d/b/a PissedConsumer.com

        Defendants,

_____/

## PLAINTIFF'S VERIFIED MOTION FOR ENTRY OF A TEMPORARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW

The Plaintiff, ROCA LABS, INC. ("Roca"), by and through its undersigned counsel, and

pursuant to the Florida Rules of Civil Procedure 1.610 files this Motion for Entry of a Temporary

Injunction (the "Motion") seeking to require CONSUMER OPINION CORP., a New York

Corporation ("Opinion") and OPINION CORP. d/b/a PISSEDCONSUMER.COM a New York

Corporation ("Pissed") (Collectively herein known as "Defendants") moves this Court for immediate

temporary injunctive relief against Defendants to remove from their public website located at

www.pissedconsumer.com (the "subject website") defamatory posts that presently tortiously interfere

with Roca's contractual relationships with its customers and for Defendants to remove from its subject

website defamatory posts that tortiously interfere with Roca's prospective relationships, and for

Defendants to stop their violations of the Florida Deceptive and Unfair Trade Practices Act.

1



PLAINTIFF'S
EXHIBIT
43
2/15/17

PENGAD 800-631-6989

PX6-195

## I.    Introduction

Roca filed a lawsuit contemporaneous with this Motion which involves Defendants violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), tortious interference with a contractual relationship, tortious interference with a prospective relationship, and a common law claim for defamation and further seeks injunctive relief.

As detailed in the Complaint, Defendants own and operate pissedconsumer.com, a consumer "gripe" website.  Roca is a Sarasota based company that manufactures dietary supplements (sometimes referred to a nutraceuticals) and is the inventor of the Gastric Bypass Alternative® that is an effective weight loss option for people who are trying to lose more than 50 pounds.  Roca sells its products directly to the public and in exchange for a discounted price[1], Roca's customers agree under the terms and conditions of said purchase that regardless of their outcome, they will not speak, publish, print, blog or write negatively about Roca or its products in any forum.

Defendants deliberately and tortiously interfere with Roca Lab's customers by encouraging them to breach their customer agreement with Roca as Defendants author or co-author false, malicious and negative posts about Roca that are published on their subject website and Tweeted to Twitter's 271 million users.

All the necessary elements are present for the Court to issue the injunctive relief.

---

[1] The discount price and terms for the discounted price are optional, but the vast majority of Roca customers (99%), agree to the terms in exchange for the discount.

2

PX6-196
FTC-PROD-019305

## II. Facts Supporting Injunctive Relief

## A. The Parties

Roca Labs, Inc. is a Sarasota based small business. Roca's products have been safely and successfully used by tens of thousands of people as surgery free alternative to gastric bypass. In marketing its products, Roca relies heavily on "word of mouth" marketing and customers sharing their weight loss success stories online. Roca's relationship with its customers and their success stories are highly valuable.

Defendants operate the well known consumer gripe site, pissedconsumer.com. Defendants generate revenues from multiple avenues including, but not limited to (1) developing, creating, publishing and marketing online content; (2) maintaining a web platform for third party users / subscribers to post content; (3) selling/leasing a portion of its internet sites to third parties; (4) operating a service to resolve complaints for consumers; and (5) selling online reputation management services to individuals and business.

Defendants generate or co-author with consumers complaints about Roca. These posts are published on the subject website alongside additional content that is created by Defendant. The purpose of the content is to generate advertising revenue through pageviews. Defendant encourages people to contribute or co-author content to increase page views by misleading individuals to believe that their postings will result in resolution of their complaint. The subject website states their purpose is to allow users to "get your whole issue resolved and share your experience with the world."

Statements on pissedconsumer.com about Roca allegedly by Roca's clients include, but are not limited to:

3

FTC-PROD-019306

a.    This product sucks. It's expensive, horrible to drink & doesn't do nothing (See Review #506944 by anonymous).

b.    This business is a total fraud. BEWARE! (See Review #490848 by anonymous).

c.    Roca Labs - Got scammed and sick from this JUNK (See Review #482648 by anonymous).

d.    Roca Labs - Run don't walk away from this one! SCAM!! (See Review #487885 by anonymous).

e.    The Company is full of lies and deceit (See Review #482585 by anonymous).

f.    DO NOT TRUST THESE PEOPLE. They are CROOKS (See Review #480448 by anonymous).

g.    Roca Labs - Don't buy anything from Roca Lab they just sell a regular shake they are stealing your money (See Review #475672 by anonymous).

h.    I have a friend working in the warehouse of this product, he told me that is unsanitary they don't use gloves and hair nets to assemble the packages which comes with containers and spoons, and the product is a fraud doesn't work! (See Review #475672 by anonymous).

i.    Roca Labs is a SCAM (See Review #432655 by anonymous).

j.    Roca Labs- Product and company are PURE SCAM (See Review #413698 by anonymous).

k.    You have a better chance of feeling full if you swallowed a glass of liquid cement and let it harden in your stomach. Do not waste your time, energy or money on them. (See Review #413698 by anonymous).

According to the subject website it has more than 5 million page views per month and approximately 1,000 people per week see the above false, malicious and defamatory postings about Roca. In order to maximize revenue, Defendants take false complaints and also Tweets them to Twitter's 271 million users. Tweets include but are not limited to:

4

FTC-PROD-019307

a.    @RocaLabs Don't buy anything from Roca Labs they just sell a regular shake

b.    Doesn't Work!!! I can't believe I really thought this would work! Save your money

c.    WILL NOT PROCESS PROMISED REFUND, LIED TO BY CUSTOMER SERVICE AGENTS REGARDING PROMISED REFUND

**B. The Agreement**

Roca relies upon its reputation and the weight loss success of its customers to generate new business and attract new customers. To foster, encourage and protect its customer relationship, Roca has developed a special incentive/discount program, where it rewards its customers for positive reviews and to refrain from making any negative postings.

In exchange for a significant discount (discounts average $800) customers contractually agree that, regardless of their outcome, they will not speak, publish, print, blog or write negatively about Roca or its products in any forum (*See* Exhibit A of Complaint for complete contract terms).

The agreement also contains an injunctive relief provision, which states that "[A]ny violation of this provision of the Agreement is deemed a material breach and you agree that The Company has no adequate remedy at law. You further consent to and agree to entry of an injunction by a Court of competent jurisdiction in enforcement of your violation of this term and condition."

Defendants are aware of the terms of the subject agreement by Roca via written correspondence wherein Roca notifies Defendants that "[P]ursuant to Section 5 of said contract, the consumers agreed they WILL NOT speak, publish, print, blog or write negatively about Roca Labs or its products in any forum (*See* Exhibit G of Complaint for copy of letter to Defendants)". Moreover, on the Defendants subject website a user made the following post: "EVERYONE INTERESTED IN THIS PRODUCT PLEASE READ ROCA LABS terms and conditions agreement that they claim

5

PX6-199
FTC-PROD-019308

everyone must agree to when ordering the product!!!!!! MANY fees involved, such as the agreement NOT to COMMENT NEGATIVELY OR full price of product…" (*See* Exhibit F of Complaint).

## C. Conduct of Defendants Consumer Opinion Corp. and Opinion Corp.

Defendants describe themselves as a "gripe" site operator, where they make money by helping "pissed" consumers share complaints with the world. Pissedconsumer.com essentially functions as a complaint generator, where users freely and routinely post false, malicious and defamatory statements about individuals and businesses. The subject website generates or co-develop complaints with users and then Defendants assume ownership of the content.

When writing a post, users are given the option to pay for a "Premium Review." Under this option a user can pay Defendants a fee to have their posting prominently displayed on pissedconsumer.com's homepage. According to Defendants, more people see Premium Reviews. Thus, the subject website is functioning as an advertising platform where people can pay to have their complaints seen by individuals who access the pissedconsumer.com site and other websites and marketing programs of Defendants.

Defendants falsely describe themselves as a consumer advocacy business and intentionally misrepresent that the subject website can resolve complaints with Companies. The subject website provides the option for users to have the company in which they are complaining about contact them. Defendants misleads pissedconsumer.com users into thinking that it can resolve complaints and has a service or system to assist consumers in complaint resolution. In truth it offers no complaint resolution services.

6

Defendants unfairly, maliciously and with reckless regard for the truth publish and continue to publish along with Roca's customers, factually inaccurate postings about Roca. Roca's clients have contractually agreed not to make these types of postings, but Defendants encourage Roca's clients to breach their agreement with Roca for Defendants' own financial gain. Defendant misleads our customers into believing that by breaching their agreement with the Company, it will resolve their dispute with Roca.

According to Terms and Conditions on the subject website users "will NOT post on PC any defamatory, inaccurate, abusive, obscene, profane, offensive, threatening, harassing, racially offensive, spam, or illegal material, or any material that infringes or violates another party's rights (including, but not limited to, intellectual property rights, and rights of privacy and publicity)." Defendants allow pissedconsumer.com users to violate its Terms and Conditions and post defamatory, inaccurate, abusive, offensive material about Roca on its website. Roca has contacted Defendants on numerous occasions to complain about these types of postings, but Defendants have refused to take any action or remove these postings. Removing postings that violate their own terms and conditions would remove all negative postings about Roca from pissedconsumer.com. It is likely that if Defendants followed their own terms and conditions the vast majority of postings on their site would be removed.

The Defendants falsely represent that pissedconsumer.com is a consumer advocacy site and that it will attempt to bring complaints to a resolution, when in truth it does nothing. Roca has not received any communication from Defendants attempting to mediate or resolve complaints. Defendants will not release the names of any of its posters to Roca, and Roca cannot attempt to resolve complaints. In fact, Defendants use complaints as an opportunity to sell "reputation management" services to businesses.

7

PX6-201
FTC-PROD-019310

Essentially Defendants co-author false complaints about legitimate businesses and then try to charge businesses to have these complaints removed. Courts have called their business practices "troubling and perhaps unethical" *See Ascentive v. Opinion Corp.*, 842 F Supp. 2d 450, Dist. Court, (E.D.N.Y. 2011).

It is apparent from the numerous false statements about Roca on pissedconsumer.com, that Defendant is encouraging Roca's customers to breach their agreement with Roca and for potential customers to avoid making purchases. Defendants falsely publish that Roca's average customer has suffered $279 in losses and that total customer losses exceed $9,500. These statements that Roca's customers sufferer on average a $279 loss are blatantly false and along with the postings have a chilling effect on potential new customers.

ROCA had an actual prospective economic relationship with numerous consumers including but not limited to: Roger Mealey, Jr., Shellie Brady, Angela Harnage. LaTanya Barreno, Roswitha Stone, and Kim Tarmann. These customers all cancelled their orders or refused to purchase products from Roca because of reviews or statements made by Defendants.

## MEMORANDUM OF LAW

### I. Law and Analysis

Temporary injunctions have long been recognized as a viable form of relief in a suit for tortious interference with a contract. See, e.g., *Heavener, Ogier Services. Inc. v R.W. FLA Regionno*, 418 So.2d 1074, 1077 (1982), *Knight v. City of Miami*. 127 Fla. 585, 173 So. 801 (1937); *Dade Enterprises. Inc. v. Wometco Theaters, Inc.*, 119 Fla. 70, 160 So. 209 (1935); *see also* Restatement (Second) of Torts § 766 cmt. u (1979).

8

PX6-202
FTC-PROD-019311

Injunctive relief is also an appropriate remedy for violations under Florida Deceptive and Unfair Trade Practices Act. In accordance with Florida Statutes § 501.211 "anyone aggrieved by a violation of this part [FDUTPA] may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part".

A preliminary injunction is properly entered when the moving party demonstrates:

(1)   a substantial likelihood of success on the merits;

(2)   a substantial threat of irreparable injury if the injunction is not granted;

(3)   that the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant; and

(4)   the granting of an injunction would not disserve the public interest. *Church v. City of Huntsville*, 30 F. 3d 1332, 1342 (11th Cir. 1994). *Naegel Outdoor Advertising Co., Inc. v. City of Jacksonville*, 659 So.2d 1046, 1047 (Fla. 1995).

As a general rule, a trial court has sound discretion to grant injunctions. *Precision Tune Auto Case, Inc. v. Radcliff*, 731 So.2d 744, 745 (Fla. 4th DCA 1999). The facts demonstrate that all of the elements are easily satisfied, and the requested injunction should be issued by this honorable Court.

A. There is substantial likelihood of success on the merits

1. Tortious Interference

The common law elements of tortious interference with business relationship are (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the

9

relationship. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1995). Each of these elements is present here.

### a. Business Relationship

Roca maintains a business relationship with its customers. Roca's customers have entered into valid purchase agreements with Roca (a copy of Agreement was attached as Exhibit A to Complaint), have purchased products from Roca and tendered payment for these products at a negotiated price (average sale approximately $600). Moreover after a customer makes a purchase, Roca monitors their success and rewards weight loss by offering special rewards and financial incentives to Roca's customers for sharing their success stories online. Thus, there can be no dispute that Roca maintains a business relationship with its customers.

The postings on the subject website further acknowledge this business relationship as they are in general complaining about their purchase or Roca's products. Roca's products are only available from Roca and cannot be purchased at any retail outlets. Thus, the only way for someone to have tried Roca's product is for that person to have been a Roca customer and to have purchased a product from Roca.

### b. Defendant's knowledge of the relationship

Defendants are aware of Roca's business relationships. As described above Roca sent defendant a letter notifying them of the business relationship and users have posted Roca's terms and conditions on the subject website and multiple posts have made reference to a contractual relationship between the poster and Roca. Defendant cannot claim that it is not aware of what is posted on its own website.

10

Case 8:14-cv-02019-WWC-EAJ   Document 51   Filed 03/26/14   Page 120 of 128 PageID 295

### c. Interference

Defendants efforts to co-author with Roca's customers false and malicious statements about Roca and then publish them on the subject website and Twitter constitutes intentional and unjustified interference with Roca's relationships. Defendants interfered with the agreement between Roca and its customers for their own financial gain. According to Defendant's statistics more than 70,000 people have read false and negative reviews about Roca on pissedconsumer.com. Defendant makes money from each person who reads a review about Roca. Where a defendant has no prior economic interest of his own to safeguard but only a prospective business advantage that is not yet realized, the defendant has no such privilege to interfere with an existing contract. *Heavener, Ogier Servs., Inc.,* 418 So. 2d at 1077.

Defendants intended to convince and induce Roca's customers to breach their contract with Roca by posting negative comments on their subject website and in exchange Defendants misrepresented they would resolve the customer's problem with Roca. Defendants encouraged Roca's customers to "get your whole issue resolved and share your experience with the world" in direct breach of Roca's contractual relationship. Defendants in fact announced to the world by posting false, negative and misleading statements on pissedconsumer.com and also via Twitter. These postings and Tweets were a direct interference with Roca's contractual agreement with its customers not to make negative reviews about Roca or its products.

### d. Damage

Roca's reputation and its ability to transact business has been damaged by the actions of Defendant and if Defendant is not enjoined from its current actions, the damage to Roca will be severe

11

FTC-PROD-019314

as its reputation will be irreparably harmed, customers will continue to breach their contract with Roca and new customers will not purchase from Roca.

## 2. FDUTPA

Plaintiff has a substantial likelihood of succeeding on the merits in pursuant to the FDUTPA action in the complaint. The courts have identified three elements that must be alleged and proven to prevail on a claim pursuant to the Florida Deceptive and Unfair Trade Practices Act: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1073 (Fla.App 5 Dist. 2008)(citing *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350 (M.D. Fla. 2007). Based on the facts as they are alleged in the Complaint, Plaintiffs have a substantial likelihood of prevailing on the merits of their claim under FDUTPA.

Plaintiffs have clearly established a likely success on the first element of their claim. A practice is unfair when it "offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious…" *See Suris v. Gilmore Liquidating, Inc.* 651 so. 2d 1282, 1283 (Fla. 3rd DCA 1995)(citing *Spiegel, Inc. v. Federal Trade Comm'n*, 540 F.2d 287, 293 (7th Cir. 1976)). Florida courts have construed FDUTPA broadly to address unfair business practices. *See Day v. Le-Jo Enterprises, Inc.* 521 So.2d 175, 178 (Fla. Disct. Ct. App. 1988)(reversing the lower court's entry of a directed verdict dismissing plaintiff's FDUTPA unfair competition claim and holding that the concept of "unfair and deceptive," as used in FDUTPA, was "extremely broad" and included practices that offended established public policy and that were immoral, unethical, oppressive, unscrupulous, or substantially injurious to competitors)(citation omitted). In *D.L.A. v. Father & Sons Moving & Storage*, 643 So. 2d 22, 24 (Fla. 4th DCA 1994), the court stated that "a specific rule or regulation is not necessary to determine of what constitutes an unfair or

12

deceptive practice act under section 504.204(1).  Rather, "the proscriptions against unfair and

deceptive acts are flexible and are to be defined with flexibility by the myriad of cases from the field of

business." *Id.* (citing *F.T.C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 85 S,CT. 1035 (1965)).

Defendants' intentional tortious interference is clearly unethical, oppressive, unscrupulous, or

substantially injurious to Plaintiff and for the reasons stated above Defendants continued interference will

be injurious to Roca if not enjoined.

Defendants are knowingly, intentionally and willfully generating and publishing false statements

about Roca to profit.  Defendants then use these false statements to sell "reputation management

services" to Roca and other similarly situated companies.  These business practices and other by

Defendants have been highly criticised as unethical, oppressive, unscrupulous, or substantially injurious.

It is these types of actions that the Court in *Ascentive v. Opinion Corp.*, 842 F Supp. 2d 450, Dist.

Court, (E.D.N.Y. 2011) found were "troubling and perhaps unethical." Defendants' actions are clearly

unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and for the reasons stated

above Defendants continued actions will be injurious to Roca if not enjoined.

The unfairness and unscrupulous nature of Defendants' conduct is further demonstrated by their

complete and utter disregard for the truth in the actions that they have taken against Roca.  Defendants

announced via Twitter "@RocaLabs Don't buy anything from Roca Labs they just sell a regular shake"

and "Doesn't Work!!! I can't believe I really thought this would work! Save your money".  Defendants

have never purchased a product from Roca, yet represent to Twitter's 271 million users that they have

tried Roca products, they are "regular", do not work and are a waste of money.  By any standards

these tactics are unfair and unscrupulous.  It would be unfair and unconscionable to allow Defendants to

13

PX6-207
FTC-PROD-019316

continue to act in a manner with total disregard and disdain for the truth. Defendants continued actions will be injurious to Roca if not enjoined.

Defendants actions in duping individuals, including thousands of Floridians, into believing that if they write a negative post about a business Defendants will take action to resolve their complaint is also unethical, oppressive, unscrupulous, or substantially injurious. Defendants hold themselves out to the world as a consumer advocate, when they do nothing to resolve complaints. In fact, they take the opposite approach and use complaints to try to generate revenue by selling reputation management services. Defendants prey on individuals whom believe that they have been harmed by a business and make false promises to enhance their own bottom line. Roca has never been contacted by Defendants to resolve any type of consumer complaint.

The Plaintiffs has also demonstrated a likelihood of success on the second element "causation". There can be little doubt that Defendants authoring, co-authoring, and dissemination of negative posts about Roca on its subject website and Twitter have proximately caused damages/harm to Roca's reputation and ability to do business.

The Plaintiffs has also demonstrated a likelihood of success on the third element "damages". Defendants actions have proximately caused and continue to cause both non-economic and economic damages against Roca by their dissemination of negative posts via the subject website and Twitter and Roca has and continues to lose prospective clients.

14

FTC-PROD-019317

### B. There is a Substantial Threat of Irreparable Injury if Defendants are not Enjoined

If the injunction is not granted, Roca will face a substantial threat of irreparable injury. Roca has already suffered harm to its reputation and its ability to conduct business and will continue to be injured if Defendant does not cease interfering with Roca's contractual relationships and stop its actions that violate FDUTPA. Each week approximately one thousand people see the false and malicious negative reviews about Roca on pissedconsumer.com. More than 70,000 people have seen these postings to date. Moreover, Defendants have Tweeted statements about Roca to Twitter's 271 million subscribers. Unless injunctive relief is provided, Roca will continue to be irreparably harmed.

A preliminary injunction will stave off this irreparable harm. The purpose of a preliminary injunction is to prevent future harm. *Advantage Digital Sys., Inc. v. Digital Imaging Servs., Inc.*, (870 So. 2d 111, 116 (Fla. Dist. Ct. App. 2004)("By its nature, an injunction restrains commission of a future injury; a court cannot prevent what has already occurred."). It is not necessary for a party seeking a preliminary injunction to wait until harm has occurred: such a delay would defeat the purpose of injunctive relief.

Irreparable injury is an injury which is of a peculiar nature, so that compensation in money cannot atone for it. *Mullinix v. Mullinix*, 182 So. 2d 268 (Fla. Dist. Ct. App. 4th Dist. 1966); *First Nat. Bank n St. Petersburg v. Ferris*, 156 So. 2d 421 (Fla. Dist. Ct. App. 2d Dist. 1963). Once a posting is made on pissedconsumer.com or a Twitter message is sent, damage to Roca's repution is done and Plaintiffs can never be made whole. Due to the nature of the Internet, postings can take on a life of their own and it is nearly impossible to remove all negative comments once they appear on the

15

FTC-PROD-019318

Internet. In essence postings are viral and take on an existence independent of pissedconsumer.com. According to the MIT Technology Review "it's hard to imagine a system that could index all of the world's information thoroughly enough to allow someone exercising the "right to be forgotten" to track down and eradicate every regrettable message or photo." *How to Delete Regrettable Posts from the Internet*, Simson Garfinkel, October 2012.

### C. The Threatened Injury to the Plaintiff Outweighs the Harm an Injunction May Cause the Defendants

Defendants will suffer little or no harm by ceasing to interfere with our contractual relationships and removing the interfering postings about Roca and Defendants' Tweets about Roca. Moreover, Defendants are obligated to comply with FDUTPA. According to Defendants the subject website receives 5,000,000 pageviews a month. Roca labs accounts for approximately 4,000 of these page views or .08% of their total views. Based on an industry average CPM of $4.00 the cost to Defendants for lost advertising revenue is a mere $16 per month. Enjoining these postings for a temporary period of time will have minimal impact of Defendants business.

As set forth above, thousands of people every month are seeing the false reviews about Roca. Roca believes that it is losing millions of dollars in revenue a month due to these postings. Moreover, once the posting is distributed on the Internet, it is next to impossible to remove. Irreparable harm to Roca's reputation and its ability to conduct business occurs when Defendant interferes with Roca's relationship with its clients.

16

PX6-210
FTC-PROD-019319

### D. The Granting of an Injunction Would Not Disserve the Public Interest

It is against public interest to allow an organization, especially one capable of commanding public attention like Defendants, to interfere with contracts and post information like the false, negative and malicious postings on pissedconsumer.com. Moreover, the public interest is served by parties being able to rely on their contracts without fear of tortious interference from outsiders. *See North Am. Products Corp. v. Moore,* 196 F. Supp. 2d 1217, 1231 (M.D. Fla. 2002).

Moreover, the purpose of FDUTPA is to "protect the consuming public and legitimate business enterprise from those who engage in unfair methods of competition, deceptive or unfair acts or practices in the conduct of any trade or commerce" *See* Fla Stat § 501.202(2). Thus, it serves the public interest to prevent the actions of Defendant.

17

PX6-211
FTC-PROD-019320

<u>CONCLUSION</u>

WHEREFORE, Roca, by and through undersigned counsel, moves this Court to enjoin Defendants from further interfering with Roca's customers to induce them to breach the terms of their agreement with Roca and to cease and desist all actions that violate FDUTPA.

CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of this Motion was submitted for service of process with the Complaint this 21st day of August, 2014 to: Michael Podolsky, 1204 Avenue U, Suite 1080, Brooklyn NY 11229 for Consumer Opinion Corp.; and   National Registered Agents Inc., 111 Eight Avenue, New York New York 10011 for Opinion Corp d/b/a Pissedconsumer.com.

Respectfully Submitted,

Roca Labs, Inc.
P.O. Box 7898
Delray Beach, FL 33482-7898
Tel. 305-998-6150
Fax 954-341-5215

Nicole Freedlander, P.A.
P.O. Box 402653
Miami Beach, FL 33140
Tel. 305-674-4844

By: /s/
Paul Berger, Esq.
FL Bar No. 4413
Legal5@rocalabs.com

By:    /s/
Nicole Freedlander, Esq.
FL Bar No. 2150
nicole@freedlanderlaw.com

PX6-212
FTC-PROD-019321

## VERIFICATION

I, DON JURAVIN, have reviewed the foregoing and acknowledge that the matters raised are true and correct and irreparable harm and damage will result if the relief is not granted.

DATED this 21st day of August, 2014

_____

DON JURAVIN

SWORN AND SUBSCRIBED before me
this 21st day of August, 2014.

_____
Notary Public (signature)

JOHN CUNNINGHAM, III
Notary Public State of Florida
Commission# EE 128389
My comm. expires Sept. 7 2015

My Commission Expires: Sept 7th, 2015

_____ Personally Known or

_____ Produced Identification

_____ Type of Identification Produced: Florida Driver L

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROCA LABS, INC.,

      Plaintiff,

Vs.

CONSUMER OPINION CORP. and
OPINION CORP. d/b/a
PISSEDCONSUMER.COM

      Defendants.

_____/

MOTION FOR LEAVE OF COURT
TO FILE AFFIDAVIT IN SUPPORT
OF MOTION FOR ENTRY OF A
TEMPORARY INJUNCTION

Case No: 8:14-cv-2096-T-33EAJ

## MOTION FOR LEAVE OF COURT TO FILE AFFIDAVIT IN SUPPORT OF MOTION FOR ENTRY OF A TEMPORARY INJUNCTION

COMES NOW, the Plaintiff, ROCA LABS, INC., who through undersigned counsel, files this Motion for Leave of Court to File Affidavit in Support of Motion for Entry of a Temporary Injunction, and in support thereof states as follows:

1. ROCA LABS, Inc., originally filed this action in the Circuit Court of the Twelfth Judicial Circuit in Sarasota County as *Roca Labs, Inc. v. Consumer Opinion Corp. and Opinion Corp. d/b/a Pissedconsumer.com, 2014 CA 4769 CA* on August 15, 2014.

2. In addition to the original Complaint, ROCA LABS, Inc. filed Plaintiff's Verified Motion for Entry of a Temporary Injunction and Supporting Memorandum of Law on August 20, 2014.



PLAINTIFF'S
EXHIBIT
44
2/15/17

PX6-214
FTC-PROD-019292

3. Defendants, CONSUMER OPINION CORP. and OPINION CORP. D/B/A PISSEDCONSUMER.COM, filed to remove this action from the Circuit Court on or about August 27, 2014.

4. This Court scheduled Plaintiff's Verified Motion for Entry of a Temporary Injunction for hearing on October 8, 2014.

5. Plaintiff seeks leave of this Court to have the attached affidavit filed in support of their motion in lieu of amending the motion or further delaying the proceedings.

6. Defendants are in no way prejudiced by the Plaintiff being permitted to file this affidavit.


WHEREFORE, Plaintiff, ROCA LABS, INC., requests that this Court grant leave to file the attached affidavit in support of the Plaintiff's Verified Motion for Entry of a Temporary Injunction.


Date: September 29, 2014                    Respectfully Submitted,

                                            _____
                                            Jeffrey C. Young, Bar No.
                                            Coyne & Young, P.A.
                                            1620 Main Street, Suite 6
                                            Sarasota, FL 34236
                                            (941) 953-5333
                                            jcyoungda@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been filed with the Clerk of Court using CM/ECF, which will transmit the motion to all counsel of record including Marc Randazza, ecf@randazza.com, Randazza Legal Group, 3625 S. Town Center Drive, Las Vegas, Nevada 89135 this 29th day of September, 2014.

Jeffrey Q. Young, Bar No.
Coyne & Young, P.A.
1626 Main Street, Suite 6
Sarasota, FL 34236
(941) 953-5333
jcyoungda@gmail.com

## AFFIDAVIT DON JURAVIN

STATE OF FLORIDA            )
                            )
COUNTY OF SARASOTA          )

BEFORE ME, the undersigned authority, personally appeared Don Juravin, upon being duly sworn, deposes and states:

1. I am over the age of 18 and have personal knowledge of all matters contained in this affidavit.

2. I am a resident of Sarasota, FL.

3. I am the Vice President and Director of Marketing for Roca Labs, Inc.   I started working for Roca Labs in 2009.

4. Roca Labs developed, produced and markets an all-natural weight loss product (the "Formula") that is design for individuals who need to lose a significant amount of weight (fifty or more pounds).   It was developed as a safe and cost effective alternative to gastric bypass surgery.

5. Roca Labs first developed and marketed its Formula in 2009. Since introducing the Formula has safely been used by tens of thousands of individuals.

6. I am not aware of any verified medical issue due to the use of the Formula and Roca Labs has never received one negative letter or complaint from any medical professional about the Formula or its use by any individual.

7. Roca Labs has suffered irreparable harm from the false, defamatory and misleading posts placed on pissedconsumer.com.

8. Roca Labs has suffered irreparable harm from the false, defamatory and misleading Tweets made by Opinion Corp. using the Twitter name PissedConsumer.

9. The postings and Tweets present with false, defamatory and misleading information

about Roca Labs by Opinion Corp. (pissedconsumer.com).

10. This false, defamatory and misleading information discourages customers from buying the Formula and discourages customers who purchased the Formula from continuing with it.   This is irreparable harm to Roca Labs.

11. Once posts and Tweets are made they become viral on the Internet.   Each day that passes the harm continues to grow as the virus of false, misleading and defamatory information spreads.

12. Opinion Corp. is the developer and host of the virus.   Opinion Corp. has created and optimized the functionality of pissedconsumer.com to spread the virus of false, defamatory and misleading information for its own financial gain.

13. Opinion Corp. makes Tweets to further spread the virus.

14. One only needs to search Google to see proof of this virus and how it has spread across the Internet.   Despite tens of thousands of customers and countless positive reviews, pissedconsumer.com is in the top of Google searches. It presents its results as Complaints.

15. Pissedconsumer.com only has a "Submit Complaint" button on its website and does not have any home page mechanism for positive reviews (*See* Exhibit A attached).

16. Pissedconsumer.com does not have a "neutral" submission form, but only a form for submitting complaints.

17. There is only one button that is involved in registering a post and that is "Submit Complaint" (*See* Exhibit B attached).

18. Pissedconsumer.com only has the option to search for "complaints" and does not have the

option to search for positive reviews (*See* Exhibit A).

19. Opinion Corp. and its website pissedconsumer.com have caused irreparable harm to Roca Labs by engineering complaints and creating false, malicious and defamatory information about Roca Labs.

20. Opinion Corp. is not "agnostic" and blocks positive reviews and comments from pissedconsumer.com.

21. On September 22, 2014 I purchased a promoted review on pissedconsumer.com for a monthly fee of $5.99 (*See* Exhibit C attached).

22. I placed an approved statement by television celebrity Alfonso Riberio who is currently a contestant on Dancing with the Stars about Roca Labs (*See* Exhibit D attached).

23. On September 22, 2014 I received a notice from Pissedconsumer.com that my review was canceled (*See* Exhibit E attached).   I received no explanation of why it was canceled.

24. My post complied with all Terms and Conditions of pissedconsumer.com, but was blocked because pissedconsumer.com will not allow positive information to come forward.

25. Despite its representations, Opinion Corp. and pissedconsumer.com do not want consumers to have the ability to make informed decisions, but merely want to provide false, misleading and defamatory information about Roca Labs.

26. Postings made on Twitter about the Roca Labs by Opinion Corp are not third party posts, but are posts made by Pissed Consumer.

27. According to Twitter's Terms and Conditions, the Tweets that are made by

26. Postings made on Twitter about the Roca Labs by Opinion Corp are not third party posts, but are posts made by Pissed Consumer.

27. According to Twitter's Terms and Conditions, the Tweets that are made by PissedConsumer (@PissedConsumer Twitter ID) are the content and responsibility of the poster which is Opinion Corp.

28. When making a Tweet about Roca Labs, Opinion Corp. added the term @RocaLabs. This term was designed to enhance search functionality and distribution on Twitter.

29. I have read all reviews posted on pissedconsumer.com and not one review contained the term @RocaLabs.


FURTHER AFFIANT SAYETH NAUGHT.

> RYAN CORTES
> Notary Public - State of Florida
> My Comm. Expires Nov 20, 2017
> Commission # FF 072171
> Bonded Through National Notary Assn.

Don Juravin

Sworn To and subscribed before me on this 25th day of September, 2014, by Don Juravin, who is personally known to me or who has produced     FLDL     as identification.


NOTARY PUBLIC, State of Florida

My Commission Expires  Nov 20, 2017

# EXHIBIT A



# EXHIBIT B

EXHIBIT C

# Subscription Receipt for Pissed Consumer Promoted Article FP

Hello Roca Labs Pharmaceuticals USA,

You have successfully signed up for a subscription to Pissed Consumer Promoted Article FP using PayPal. Your first subscription payment, for $5.99 USD, has already been sent to Opinion Corp.

**Subscription Details**

| | |
|---|---|
| Date of sign up: | Sep 22, 2014 |
| Subscription Name: | Pissed Consumer Promoted Article FP |
| Subscription Number: | S-3KD74890JB858553S |
| Item Number: | pc-fp2-2008 |
| Subscription Terms: | $5.99 USD for each month |

Your subscription will automatically renew at the rates stated above unless you cancel prior to the end of the billing period.
If you have any questions or concerns about this subscription, please contact Opinion Corp.

**Contact Information**

| | |
|---|---|
| Business Name: | Opinion Corp |
| Contact Email: | support@pissedconsumer.com |
| Contact Phone: | |

**Notification Preferences**
Your Email Notification Preferences are currently set so that you will not receive an email receipt each time a payment is sent for this subscription. If you would like to receive an email receipt each time payment is sent for this subscription, log in to your PayPal account and go to your Profile to update your settings.

**Cancelling Your Subscription**
If you would like to cancel this subscription, log in to your PayPal account and go to the "History" subtab of the "My Account" tab. Choose "Subscriptions" from the pull-down "Show" menu and press the "Submit" button. Choose this subscription, and click on its "Details" link. You will be taken to a Transaction Details page from which you may cancel your subscription. Cancelling your subscription will immediately stop all future scheduled payments for this subscription.

## EXHIBIT D





## Alfonso Ribeiro Amazed by Roca Labs

1 of 37 Roca Labs Reviews

♥ Tampa, Florida   Entertainment





Alfonso Ribeiro and Dancing With The Stars celebrities have reviewed the invention that can help you lose 100 pounds without surgery. He had met and reviewed 4 users who lost about 100 pound without a surgery:

> Chris (Texas) has lost 98 lb

> Richard (Oregon) has lost 105 lb

> Roxie (Ohio) diabetic has lost 83 lb



FTC-PROD-019302

# EXHIBIT E

From: service@paypal.com <service@paypal.com>
Date: Mon, Sep 22, 2014 at 8:20 PM
Subject: Your subscription to Pissed Consumer Promoted Article FP has been cancelled
To: don@juravin.com


Hello Roca Labs Pharmaceuticals USA,

Your subscription to Pissed Consumer Promoted Article FPhas been cancelled by Opinion Corp.

You will not be billed for this subscription again.


```
------------------------------------
```
Cancellation Details
```
------------------------------------
```


Cancellation Date:   Sep 22, 2014
Subscription Name:   Pissed Consumer Promoted Article FP
Subscription Number:   S-3KD74890JB858553S
Item Number:   pc-fp2-2008


```
------------------------------------
```
Contact Information
```
------------------------------------
```


If you have any questions about this subscription, please contact Opinion Corp.


Business Name:   Opinion Corp
Contact Email:   support@pissedconsumer.com
Contact Phone:

Sincerely,
PayPal


```
---------------------------------------------------------
```
PROTECT YOUR PASSWORD

NEVER give your password to anyone, including PayPal employees. Protect yourself against fraudulent
websites by opening a new web browser (e.g. Internet Explorer or Firefox) and typing in the PayPal URL
every time you log in to your account.

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ROCA LABS, INC.,                                  Case No:  8:14-cv-2096-T-33EAJ

        Plaintiff,

    v.

CONSUMER OPINION CORP. and
OPINION CORP.,

        Defendants.

_____/

## AMENDED NOTICE OF RELATED CASES

      DEFENDANTS, OPINION CORP & CONSUMER OPINION CORP. (collectively "Opinion Corp."), hereby file its Amended Notice of Related Cases.

      On 10 September 2014, Opinion Corp. filed its Notice of Related Cases, notifying this Court of the case of *Opinion Corp. v. Roca Labs, Inc.*, Case No.: 1:14-CV-06396-LGS, currently pending in the United States District Court, Southern District of New York.  See ECF 008.

      Since that time, additional cases have been filed, which are related to this case, and should be brought to this Court's attention.

      Attached hereto as Exhibit 1 is the operative complaint filed by Roca Labs in the case *Roca Labs, Inc. v. Schaive et al.*, Circuit Court of the 17th Judicial Circuit, in and for Broward County, Florida, Case No.: CACE 14-020786.  This is a complaint filed by Roca Labs against Jennifer Schaive, a witness in this case, as contemplated in ECFs 015 and 019, as well as two other parties.



PLAINTIFF'S
EXHIBIT 22
45
2/15/17     PX6-226

Attached hereto as Exhibit 2 is a complaint filed by Roca Labs in the case *Roca Labs, Inc. v. King*, Circuit Court of the 12th Judicial Circuit, in and for Sarasota County, Florida, Case No.: 2014-CA-005489 NC.  This is a complaint filed by Roca Labs against a former customer for negatively commenting about her experiences with Roca Labs.

Attached hereto as Exhibit 3 is the complaint filed by Roca Labs in the case *Roca Labs, Inc. v. Marc Randazza*, Circuit Court of the 13th Judicial Circuit, in and for Hillsborough County, Florida, Case No.: 2014-CA-011251.  This is a complaint filed by Roca Labs against the undersigned, suing for defamation and tortious interference based on statements made during the course of this litigation.

Attached hereto as Exhibit 4 is the complaint Don Juravin, Vice President of Roca Labs, filed with the Nevada Attorney General's Office against the undersigned, accusing the undersigned of engaging in bribery of a public official.  Attached hereto as Exhibit 5 is the Attorney General's Office's letter determining that the complaint was unfounded and the matter has been closed.

Respectfully Submitted,

*Marc J. Randazza*
_____
Marc J. Randazza, Esq.
Florida Bar No. 625566
RANDAZZA LEGAL GROUP
3625 S. Town Center Drive
Las Vegas, Nevada 89135
Tele:  702-420-2001
Fax: 305-437-7662
Email: ecf@randazza.com

RANDAZZA | LEGAL GROUP

PX6-227

CASE NO.: 8:14-cv-2096-T-33EAJ

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on 11 November 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a true and correct copy of the foregoing document is being served upon: Paul Berger, Esq. and James Hetz, Esq., counsel for Plaintiff, via transmission of Notices of Electronic Filing generated by CM/ECF.

T. Kaar
_____
An employee / agent of
RANDAZZA LEGAL GROUP

RANDAZZA | LEGAL GROUP

PX6-228

# EXHIBIT 1

IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA

ROCA LABS, INC.

       Plaintiff,

vs.

JENNIFER SCHAIVE; MELISSA

RICHMAN and LOREN MACCARO

       Defendants.

CASE NO CACE 14-020786

_____/

## AMENDED COMPLAINT  and VERIFIED\* MOTION FOR TEMPORARY INJUNCTION

      The Plaintiff, ROCA LABS, INC. (**"ROCA"**), a Florida Corporation, by and through

its undersigned counsel, files this Amended Complaint, Verified\* Motion for Temporary

Injunction and  Declaratory Action against Defendants, JENNIFER SCHAIVE (**"SCHAIVE"**);

MELISSA RICHMAN (**"RICHMAN"**) and LOREN MACCARO (**"MACCARO"**)

(collectively **"DEFENDANTS"**) and states (\**See* Affidavit of **ROCA** attached hereto as

**Exhibit 17**):

## JURISDICTION & VENUE

1.   This is an action for injunctive relief, declaratory relief, and for breach of contract involving

     damages in excess of $15,000, exclusive of interest, costs and attorneys' fees.

2.   Venue and Jurisdiction are proper in this Honorable Court as this is an action for breach of

     contract seeking permanent injunctive relief and an award of money damages, including

     actual damages and reasonable attorneys' fees and costs; an award of compensatory damages

     under common law claim of tortious interference with a contractual relationship; an award of

     compensatory damages under common law claim of tortious interference with a prospective

     relationship, an award of compensatory damages under common law claim of defamation and

     injunctive and declaratory relief as **ROCA** and **DEFENDANTS** contractually agreed to a

mandatory jurisdiction provision as follows:   *See* **Contract** attached as Exhibit "1"  Also see

*Weisser v PNC Bank NA*, 967 So.2d 327 (Fla 3d DCA 2007); *Regal Kitchens Inc. v O'Connor*

*& Talyor Condominium Const. Inc.*, 894 So.2d 288 (Fla 3d DCA 2005):

> *Legal Jurisdiction*
> *These Terms and Conditions will be governed by and construed in*
> *accordance with the laws of the State of Florida, without giving effect to any*
> *principles of conflicts of laws. Any action seeking legal or equitable relief*
> *arising out of or relating to this Website will be brought only in the federal or*
> *state courts **of the State of Florida. You hereby consent and submit to the***
> ***personal jurisdiction of such courts for the purpose of litigating any such***
> ***action.*** *A printed version of these Terms, Conditions and Disclaimer and*
> *related materials will be admissible in judicial and administrative proceedings*
> *based upon or relating to these Terms, Conditions and Disclaimer to the*
> *same extent and subject to the same conditions as other business documents*
> *and records originally generated and maintained in printed form (emphasis*
> *added)* .

3. Plaintiff **ROCA** is a Florida for-profit corporation with its principal place of business at

   7261A Tamiami Trail S, Sarasota, FL 34231.

4. Defendant **SCHAIVE** is an individual residing at ~~REDACTED~~ Springfield, IL

   ~~REDACTED~~.

5. Defendant **RICHMAN** is an individual residing at ~~REDACTED~~ Sayre PA

   ~~REDACTED~~.

6. Defendant **MACCARO** is an individual residing at ~~REDACTED~~ North Las

   Vegas, NV ~~REDACTED~~.

7. Pursuant to Florida Statutes Section 48.193(2), **DEFENDANTS** are subject to personal

   jurisdiction in Florida because they committed a tortious act within the State of Florida.

8. Pursuant to Florida Statutes Section 48.193(7), Defendant **DEFENDANTS** are subject to personal jurisdiction in Florida because they breached her contract with Plaintiff **ROCA** within the State of Florida.

9. Joinder of **DEFENDANTS** herein is permissive as this action arises out of the same contractual obligation under the agreed terms of purchase, the parties have united interest, joinder herein would result in expeditious disposition of litigation without any hardship to DEFENDANTS and same would avoid the multiplicity of suits.

## GENERAL ALLEGATIONS

### A. PLAINTIFF/ROCA

10. **ROCA** is a Florida for profit corporation that was formed in 2006 as Appealing Ventures, Inc.  It changed its name to Roca Labs, Inc. in 2009.

11. **ROCA** manufactures food additives (sometimes referred to a nutraceuticals) and is the inventor of the proprietary Gastric Bypass Alternative® that is an effective weight loss option for people who are trying to lose more than 50 pounds.

12. **ROCA's** products have been purchased and used by thousands of people as a surgery free alternative to gastric bypass.

13. **ROCA** markets and sells its products through its website "www.rocalabs.com", where information on its products is available and consumers can purchase the product directly.

14. **ROCA** has made significant investments in product development and in its intellectual property rights.

15. **ROCA** owns numerous registered trademarks including: Roca Labs®, Gastric Bypass Alternative®, Gastric Bypass Surgery Alternative®, Gastric Bypass Effect®, Gastric

Bypass Results®, Natural Gastric Bypass®, Gastric Bypass No Surgery® and Anti
Cravings®. Roca's trademarks are inherently distinctive.

16. **ROCA** has invested heavily in an online marketing and advertising program that has run
in Florida and across the United States.

17. **ROCA** has a unique Money Back Reward program, where **ROCA** pays individuals for
sharing their weight loss success stories.

18. **ROCA** relies upon its reputation and the weight loss success of its customers to generate
new business and attract new customers.

19. A search for Roca Labs on YouTube, pulls up more than 6,000 results, most of which are
weight loss videos shared by individuals.

20. **ROCA** sells its products to nearly all of its consumers at a discounted price in
consideration for the consumers' agreement to help promote ROCA's weight loss
program.

21. In consideration for a significant product discount (discounts average $800),
**DEFENDANTS** herein, agreed as part of their purchase, that regardless of their outcome,
**DEFENDANTS** would not speak, publish, print, blog or write negatively about **ROCA** or
its products in any forum (*See* **Exhibit "1"**):

> *Conditional Discount Price*
>
> *(5) If you purchased the Formula at a conditional discounted rate, you agree
> that you WILL NOT speak or publish, in any forum, criticism of the Product or the
> Company, and that any published statements will be immediately removed upon the
> Company's Request. You agree that any published opinion by you about the Product
> or the Company will not carry with it advertisements of any kind or result in any
> financial benefit to you unless pre-approved by the Company.*
>
> *Agreement not to Comment Negatively*
> *(2) the announcement, writing, or publication of any such or other claim in any
> media or forum will constitute a breach of this agreement, to which The Customer*

*entered willingly and with full knowledge of the components of The Formula and its*
*properties and TheSupport; (3) You agree that any such negative claim will constitute*
*defamation per se; (4)Do not purchase the Formula or Support if you do*
*not agree to this "No Negative Comment Clause."*

22. The agreement is part of **DEFENDANTS'** purchase orders and is a binding contract

between **ROCA** and **DEFENDANTS**.

23. This contractual agreement would restrict **DEFENDANTS** from posting negative/critical

comments online.

**B.  <u>DEFENDANT SCHAIVE</u>**

24. Defendant **SCHAIVE** is an individual residing at ████ REDACTED ████ Springfield, IL
████ REDACTED ████.

25. On March 25, 2014 Defendant **SCHAIVE** contacted Plaintiff **ROCA** to inquire about

purchasing products from **ROCA**.

26. Defendant **SCHAIVE** completed a questionnaire in which she wrote that she weighed ██ REDACTED ██
████████ REDACTED ████████
████████ REDACTED ████████  *See* **Exhibit "2"**

**SCHAIVE Questionnaire**.

27. Defendant **SCHAIVE** further complained that ████ REDACTED ████
████ REDACTED ████  *See* **Exhibit "2"**

28. Defendant **SCHAIVE** further complained that ████ REDACTED ████
████████ REDACTED ████████  *See*

**Exhibit "2"**

29. In essence Defendant **SCHAIVE** was ████████ REDACTED ████████
████ REDACTED ████

30. On March 25, 2014 Defendant **SCHAIVE** purchased a gastric bypass alternative program from Plaintiff **ROCA** a in the amount of $582.00. Defendant paid this amount via credit card. *See* **Exhibit "3" SCHAIVE Purchase Order**.

31. Defendant **SCHAIVE** purchased the product at a discounted amount in consideration for her agreement to help promote Plaintiff **ROCA** products and not to speak negatively about **ROCA**. *See* Exhibit "1".

32. On April 9, 2014 Defendant **SCHAIVE** contacted Plaintiff **ROCA** seeking receive a refund for the product. *See* Exhibit "4"/**SCHAIVE Communication Log**.

33. Defendant **SCHAIVE** was aware that the product she purchased was customized and had a no return / refund policy and agreed to this term at the time of purchase: *See* Exhibit "1"

> ### *Return and Refund Policy*
>
> *However, cancelation or refund are NOT possible once the Formula preparation has begun which is immediately when the doctor approves the qualification form and within 24 hours of submitting the application.(no cancellations for Rush/Urgent orders) The safety sticker on the box calls for your attention to the Terms of the use of the Formula but not to the Terms of the purchase. If you do not agree, do not use the Formula, but as stated herein, no refund is available.*

34. On May 19, 2014 Defendant **SCHAIVE** filed a public complaint against Plaintiff **ROCA** with the Better Business Bureau of West Florida (hereinafter **"BBB"**). In her online complaint, Defendant **SCHAIVE** wrote in part "I learned the main ingredient in the product is sand" and "It was the equivalent to eating silly putty." *See* Exhibit "5" **Copy of SCHAIVE BBB Complaint and image below.**



35. Defendant **SCHAIVE** breached her contract with Plaintiff **ROCA** by reason of posting her negative comments online and by doing so admitted to committing defamation *per se* under the terms of the subject contract (*See* Exhibit "1" & "3")

*Agreement not to Comment Negatively*

*(2) **the announcement, writing, or publication of any such or other claim in any media or forum will constitute a breach of this agreement**, to which The Customer entered willingly and with full knowledge of the components of The Formula and its properties and The Support; (3) You agree that any such negative claim will constitute **defamation per se**; (4)Do not purchase the Formula or Support if you do not agree to this "No Negative Comment Clause."(emphasis added)*

## C. **DEFENDANT RICHMAN**

36. Defendant **RICHMAN** is an individual residing at REDACTED Sayre PA REDACTED.

37. On February 26, 2014 Defendant **RICHMAN** contacted Plaintiff **ROCA** to inquire about purchasing products from **ROCA**.

38. Defendant **RICHMAN** completed a questionnaire in which she wrote that she was REDACTED

    REDACTED weighed REDACTED wanted to lose REDACTED

    REDACTED *See*

    **Exhibit "6" RICHMAN Questionnaire.**

39. Defendant **RICHMAN** further complained that REDACTED

    REDACTED *See* **Exhibit "6"**

40. Defendant **RICHMAN** further complained that REDACTED

    REDACTED

    *See* **Exhibit "6"**

41. In essence Defendant **RICHMAN** was REDACTED

    REDACTED

42. On February 27, 2014 Defendant **RICHMAN** purchased a gastric bypass alternative

    program from Plaintiff **ROCA** a in the amount of $535.50. Defendant paid this amount

    via credit card. *See* **Exhibit "7" RICHMAN Purchase Order.**

43. Defendant **RICHMAN** purchased the product at a discounted amount in consideration for

    her agreement to help promote Plaintiff **ROCA** products and not to speak negatively about

    **ROCA.** *See* Exhibit "1" and paragraph 21 herein.

44. On April 13, 2014 Defendant **RICHMAN** contacted Plaintiff **ROCA** seeking receive a

    refund for the product. *See* Exhibit "8"/**RICHMAN Communication Log.**

45. Defendant **RICHMAN** was aware that the product she purchased was customized and had
    a no return / refund policy and agreed to this term at the time of purchase: *See* Exhibit "1"

    > **Return and Refund Policy**
    >
    > *However, cancelation or refund are NOT possible once the Formula preparation
    > has begun which is immediately when the doctor approves the qualification form
    > and within 24 hours of submitting the application.(no cancellations for
    > Rush/Urgent orders) The safety sticker on the box calls for your attention to*

*the Terms of the use of the Formula but not to the Terms of the purchase. If you do not agree, do not use the Formula, but as stated herein, no refund is available.*

46. On April 16, 2014 Defendant **RICHMAN** filed a public complaint against Plaintiff **ROCA** with the Better Business Bureau of West Florida (hereinafter **"BBB"**).  In her online complaint, Defendant **RICHMAN** wrote in part "this product made me physically sick" and the "product is clearly a scam" and "junk". *See* Exhibit "9" **Copy of RICHMAN Complaint and image below.**

## BBB CASE#: 67277302

| Complaint filed by: | Melissa Richman   **(More)** |
|---|---|
| Complaint filed against: | Roca Labs Nutraceutical USA   **(More)** |
| Complaint status: | Send Business' Rebuttal Response to Consumer   **(More)** |
| Case Description: | This product left me physically sick after following all directions to the letter and the company does not respond to...   **(More)** |
| Category: | Product Issues |
| Case opened date: | 04/16/2014 |
| Case closed date: | 05/30/2014 |
| Desired Resolution: | What would be best would be an apology from the company for selling me something that made me sick, just...   **(More)** |

**Download a copy of this complaint so you can print it for your records**

47. Defendant **RICHMAN** breached her contract with Plaintiff **ROCA** by reason of posting her negative comments online and by doing so admitted to committing defamation *per se* under the terms of the subject contract (*See* Exhibit "1" & "7")

> ***Agreement not to Comment Negatively***
>
> *(2) **the announcement, writing, or publication of any such or other claim in any media or forum will constitute a breach of this agreement**, to which The Customer entered willingly and with full knowledge of the components of The Formula and its properties and The Support; (3) You agree that any such negative claim will constitute **defamation per se;** (4)Do not purchase the Formula or Support if you do not agree to this "No Negative Comment Clause."(emphasis added)*

## D. DEFENDANT MACCARO

48. Defendant **MACCARO** is an individual residing at REDACTED North Las

Vegas NV REDACTED.

49. On February 16, 2014 Defendant **MACCARO** contacted Plaintiff **ROCA** to inquire about

purchasing products from **ROCA**.

50. Defendant **MACCARO** completed a questionnaire in which she wrote that she was REDACTED

REDACTED weighed REDACTED wanted to lose REDACTED

REDACTED.

*See* **Exhibit "10" MACCARO Questionnaire.**

51. Defendant **MACCARO** further complained that REDACTED

REDACTED *See* **Exhibit "10"**

52. Defendant **MACCARO** further complained that REDACTED

REDACTED *See*

**Exhibit "10"**

53. In essence Defendant **MACCARO** had REDACTED

REDACTED

54. On February 17, 2014, Defendant **MACCARO** purchased a gastric bypass alternative

program from Plaintiff **ROCA** a in the amount of $631.50 payable in three installments.

Defendant paid $210.50 this amount via credit card. Defendant failed to pay the remaining

installments on March 19, 2014 and April 18, 2014 per contractual agreement. *See*

**Exhibit "11" MACCARO Purchase Order.**

55. Defendant **MACCARO** purchased the product at a discounted amount in consideration

for her agreement to help promote Plaintiff **ROCA** products and not to speak negatively

about **ROCA**. *See* Exhibit "1".

56. Defendant **MACCARO** was aware that the product she purchased was customized and
had a no return / refund policy and agreed to this term at the time of purchase: *See* Exhibit
"1"

> **Return and Refund Policy**
>
> *However, cancelation or refund are NOT possible once the Formula preparation
> has begun which is immediately when the doctor approves the qualification form
> and within 24 hours of submitting the application.(no cancellations for
> Rush/Urgent orders) The safety sticker on the box calls for your attention to
> the Terms of the use of the Formula but not to the Terms of the purchase. If
> you do not agree, do not use the Formula, but as stated herein, no refund is
> available.*

57. On February 28, 2014 Defendant **MACCARO** filed a public complaint against Plaintiff

**ROCA** with the Better Business Bureau of West Florida (hereinafter **"BBB"**).  In her

online complaint, Defendant **MACCARO** wrote in part she was charged for the product

without her consent and that "she would not remove the complaint, sue me".  *See* Exhibit

"12" **Copy of MACCARO Complaint and image below.**

# BBB CASE#: 67273013

| | |
|---|---|
| Complaint filed by: | Loren Maccario    **(More)** |
| Complaint filed against: | Roca Labs, Inc.    **(More)** |
| Complaint status: | No Further Comments from Business      **(More)** |
| Case Description: | Did Gave CC info 4 $17.00 app fee. Next day Called 2 cancel couldn't get through. Next day product...    **(More)** |
| Category: | Billing or Collection Issues |
| Case opened date: | 02/28/2014 |
| Case closed date: | |
| Desired Resolution: | I have not opened the package or used any of the product. I would just like to return the product...    **(More)** |

58. Defendant **MACCARO** breached her contract with Plaintiff **ROCA** by reason of posting

her negative comments online and by doing so admitted to committing defamation *per se*

under the terms of the subject contract (*See* Exhibit "1" & "11")

    *Agreement not to Comment Negatively*

    *(2) **the announcement, writing, or publication of any such or other claim in any** **media or forum will constitute a breach of this agreement**, to which The Customer entered willingly and with full knowledge of the components of The Formula and its properties and The Support; (3) You agree that any such negative claim will constitute **defamation per se;** (4)Do not purchase the Formula or Support if you do not agree to this "No Negative Comment Clause."(emphasis added)*

### COUNT 1
### SCHAIVE BREACH OF CONTRACT

The Plaintiff **ROCA** realleges and incorporates the allegations of paragraphs 1 through 35 as

though fully set forth herein and sues Defendant **SCHAIVE** for Breach of Contract as follows:

59. On March 25, 2014 Plaintiff **ROCA** entered a contract with Defendant **SCHAIVE** for the

purchase and sale of weight loss products.

60. Plaintiff shipped product to the Defendant **SCHAIVE** and Plaintiff **ROCA** received

payment from the Defendant **SCHAIVE**.

61. As consideration of the contract and receipt of discount, Defendant **SCHAIVE** agreed to

the Terms and Condition of the sale, which are attached herein as Exhibit "1".

62. The terms and conditions included an agreement that Defendant **SCHAIVE** would not

post anything negative about the Plaintiff **ROCA** online. *See* Exhibit "1"

63. On May 19, 2014 Defendant **SCHAIVE** knowingly and willfully breached this agreement

by making a negative, false and malicious report about the **ROCA** to the **BBB** which was

published on the **BBB's** website and is available for viewing by anyone with internet

access. *See* Exhibit "5"

64. Defendant **SCHAIVE** breached her agreement with Plaintiff **ROCA** in making these

statements.  Plaintiff **ROCA** demanded that Defendant **SCHAIVE** cure this breach and

remove the posting, but Defendant refused to do so.   *See* Exhibit "13" herein.

65. As a direct consequence of Defendant **SCHAIVE's** actions, the Plaintiff **ROCA** has been

harmed and was forced to retain counsel to bring this action against **SCHAIVE**.

WHEREFORE, Plaintiff **ROCA LABS, INC.** respectfully requests that this Honorable

Court declare that Defendant **JENNIFER SCHAIVE** breached her contractual agreement,

and further grant temporary and permanent injunctive relief against the breach, and award

ROCA LABS, INC. with an amount fair and just to account for its money damages, interest,

reasonable attorneys' fees, and costs incurred herein, and for such other relief as this court

deems just and proper.

## COUNT II
### SCHAIVE TORTIOUS INTERFERENCE WITH  ROCA's
### PROSPECTIVE ECONOMIC RELATIONSHIPS

**ROCA** realleges and incorporates the allegations of paragraphs 1 through 35 and 59

through 65 as though fully set forth herein and sues Defendant **SCHAIVE** for Tortious

Interference with Plaintiff **ROCA's** Contractual Relationship with Plaintiff **ROCA's** prospective

economic relationship as follows:

66. Plaintiff **ROCA** derives it revenues through online sales of it product to consumers

looking to lose weight.

67. Plaintiff **ROCA** has an actual prospective economic relationship with internet users that

search for Plaintiff **ROCA** and its products on search engines.

68. Defendant **SCHAIVE** is aware of the existence of Plaintiff **ROCA's** prospective economic relationship with internet users who desire to purchase **ROCA's** weight loss products as Defendant **SCHAIVE** discovered **ROCA** herself by using the internet.

69. **ROCA's** potential consumers view false, negative and misleading statements made by Defendant **SCHAIVE** when they search the internet using search engines such as Google, Yahoo! Or Bing or visit the **BBB's** website.

70. **ROCA** had an actual prospective economic relationship with numerous consumers including but not limited to: Alicia Moralez Abu Saleh (**"Interfered Customer"**).

71. As a direct and proximate result of **SCHAIVE's** posting on **BBB**, interfered customer did not purchased **ROCA** products.  For example following Defendants post, Alicia Moralez Abu Saleh posted on Facebook "Bad reviews at Better business bureau ..... I will pass on this" *See* **Exhibit "14"**.

72. Defendant **SCHAIVE's** statements include but are not limited to part "I learned the main ingredient in the product is sand" and "It was the equivalent to eating silly putty." *See* Exhibit "5" **Copy of BBB Complaint**.

73. Defendant **SCHAIVE** knowingly and intentionally has instructed Internet users not to purchase **ROCA** products as it is sand and silly putty.

74. Interfered Customers have refused to order from **ROCA** as a direct and proximate result of Defendant **SCHAIVE's** intentional interference with said relationships via her negative postings against **ROCA**.

75. The Interfered Customers indicated their willingness to purchase weight loss products from **ROCA** (i.e. enter purchase order agreements).

76. **ROCA** would have sold products to the Interfered Customer (entered into our purchase order agreement), however the Interfered Customer indicated that she would not purchase **ROCA's** products because negative reviews on **BBB**.

77. Defendant, **SCHAIVE** was not authorized nor does she have any legal right to claim privilege for her actions.

78. As a direct and proximate cause of Defendant **SCHAIVE's** negative posting, individuals have not purchased Plaintiff **ROCA** products.

79. As a direct and proximate cause of the Defendant **SCHAIVE's** intentional and unjustified tortious interference, **ROCA** has suffered non-monetary and monetary damages.

WHEREFORE, Plaintiff **ROCA LABS, INC.** respectfully requests that this Honorable Court declare that Defendant **JENNIFER SCHAIVE** has intentionally disrupted/interfered with **ROCA's** prospective economic relationships, and further grant temporary and permanent injunctive relief against the violating conduct, and award **ROCA LABS, INC.** with an amount fair and just to account for its money damages, interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this Court deems just and proper.

## <u>COUNT III</u>
## <u>SCHAIVE DEFAMATION PER SE</u>

Plaintiff **ROCA** realleges and incorporates the allegations of paragraphs 1 through 35 and 59 through 79 as though fully set forth herein and sues Defendant **Jennifer Schaive** for Defamation Per Se as follows:

80. Defendant **SCHAIVE** and Plaintiff **ROCA** entered into a contractual agreement herein. *See* Exhibit "1" and "3" herein.

81. Defendant **SCHAIVE's** posted online to **BBB** statements that include, but are not limited

to: part "I learned the main ingredient in the product is sand" and "It was the equivalent to

eating silly putty." *See* Exhibit "5" **Copy of BBB Complaint.**

82. As partial consideration of a substantial discount provided to Defendant **SCHAIVE** by

Plaintiff **ROCA**, the terms of the contract mandate that the Defendant **SCHAIVE** agree

that if she ever posted any negative/critical comment against Plaintiff **ROCA** her action

would be deemed defamation per se (*See* exhibit "1 and "3).

> ***Agreement not to Comment Negatively***
>
> *(2) **the announcement, writing, or publication of any such or other claim in any media or forum will constitute a breach of this agreement,** to which The Customer entered willingly and with full knowledge of the components of The Formula and its properties and The Support; (3) You agree that any such negative claim will constitute **defamation per se;** (4)Do not purchase the Formula or Support if you do not agree to this "No Negative Comment Clause."(emphasis added)*

83. The statements which were authored by Defendant **SCHAIVE** and posted on the **BBB's**

website which impute the unsatisfactory conduct, characteristics and conditions of **ROCA**

constitute defamatory statements concerning **ROCA** per se.   See Exhibit "5" for said

statements.

84. **ROCA** has suffered significant loss of reputation as well as business opportunities as a

direct and proximate result of Defendant **SCHAIVE** reckless, wrongful and malicious

statements posted on **BBB.**

85. **ROCA's** losses include, without limitation, the failure of **ROCA** to sell its product to

identifiable potential customers as well as significant lost revenues from other potential

customers.

86. The above alleged statements contained in Exhibit "5" herein were seen and read by potentially millions of people who reside in Florida and elsewhere.

87. Defendant **SCHAIVE** authored the online posts with the knowledge that she had admitted as partial consideration for a substantial discount that the negative comments were "defamation per se".

WHEREFORE, Plaintiff **ROCA LABS, INC.** respectfully requests that this Honorable Court declare that Defendant **SCHAIVE** has defamed **ROCA** per se and award **ROCA LABS, INC.** with an amount fair and just to account for its money damages, interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this court deems just and proper.

## <u>COUNT IV</u>
## <u>RICHMAN BREACH OF CONTRACT</u>

The Plaintiff **ROCA** realleges and incorporates the allegations of paragraphs 1 through 23 and 36 through 47 as though fully set forth herein and sues Defendant **RICHMAN** for Breach of Contract as follows:

88. On February 27, 2014 Plaintiff **ROCA** entered a contract with Defendant **RICHMAN** for the purchase and sale of weight loss products. See Exhibit "7"

89. Plaintiff shipped product to the Defendant **RICHMAN** and Plaintiff **ROCA** received payment from the Defendant **RICHMAN**.

90. As consideration of the contract and receipt of discount, Defendant **RICHMAN** agreed to the Terms and Condition of the sale, which are attached herein as Exhibit "1".

91. The terms and conditions included an agreement that Defendant **RICHMAN** would not post anything negative about the Plaintiff **ROCA** online. *See* Exhibit "1"

92. On April 16, 2014 Defendant **RICHMAN** knowingly and willfully breached this agreement by making a negative, false and malicious report about the **ROCA** to the **BBB** which was published on the **BBB's** website and is available for viewing by anyone with internet access. *See* Exhibit "9"

93. Defendant **RICHMAN** breached her agreement with Plaintiff **ROCA** in making these statements. Plaintiff **ROCA** demanded that Defendant **RICHMAN** cure this breach and remove the posting, but Defendant refused to do so. *See* Exhibit "15" herein.

94. As a direct consequence of Defendant **RICHMAN's** actions, the Plaintiff **ROCA** has been harmed and was forced to retain counsel to bring this action against **RICHMAN**.

WHEREFORE, Plaintiff **ROCA LABS, INC.** respectfully requests that this Honorable Court declare that Defendant **MELISSA RICHMAN** breached her contractual agreement, and further grant temporary and permanent injunctive relief against the breach, and award **ROCA LABS, INC.** with an amount fair and just to account for its money damages, interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this court deems just and proper.

## COUNT V
### RICHMAN TORTIOUS INTERFERENCE WITH  ROCA's
### PROSPECTIVE ECONOMIC RELATIONSHIPS

**ROCA** realleges and incorporates the allegations of paragraphs 1 through 23 and 36 through 47 and 88 through 94 as though fully set forth herein and sues Defendant **RICHMAN** for Tortious Interference with Plaintiff **ROCA's** Contractual Relationship with Plaintiff **ROCA's** prospective economic relationship as follows:

95. Plaintiff **ROCA** derives it revenues through online sales of it product to consumers looking to lose weight.

96. Plaintiff **ROCA** has an actual prospective economic relationship with internet users that search for Plaintiff **ROCA** and its products on search engines.

97. Defendant **RICHMAN** is aware of the existence of Plaintiff **ROCA's** prospective economic relationship with internet users who desire to purchase **ROCA's** weight loss products as Defendant **RICHMAN** discovered **ROCA** herself by using the internet.

98. **ROCA's** potential consumers view false, negative and misleading statements made by Defendant **RICHMAN** when they search the internet using search engines such as Google, Yahoo! Or Bing or visit the **BBB's** website.

99. **ROCA** had an actual prospective economic relationship with numerous consumers including but not limited to: Alicia Moralez Abu Saleh (Collectively "**Interfered Customer**").

100. As a direct and proximate result of **RICHMAN** s posting on **BBB**, interfered customers have not purchased **ROCA** products.  For example following Defendants post, Alicia Moralez Abu Saleh posted on Facebook "Bad reviews at Better business bureau ..... I will pass on this" *See* **Exhibit "14"**.

101. Defendant **RICHMAN's** statements include but are not limited to part  the product make her "sick",  "the product is clearly a scam" and "junk." *See* Exhibit "9" **Copy of RICHMAN BBB Complaint**.

102. Defendant **RICHMAN** knowingly and intentionally has instructed Internet users not to purchase **ROCA** products as it is sand and silly putty.

103. Interfered Customer refused to order from **ROCA** as a direct and proximate result of Defendant **RICHMAN's** intentional interference with said relationships via her negative postings against **ROCA**.

104. The Interfered Customers indicated their willingness to purchase weight loss products from **ROCA** (i.e. enter purchase order agreements).

105. **ROCA** would have sold products to the Interfered Customer (entered into our purchase order agreement), however the Interfered Customer indicated that she would not purchase **ROCA's** products because negative reviews on **BBB**.

106. Defendant, **RICHMAN** was not authorized nor does she have any legal right to claim privilege for her actions.

107. As a direct and proximate cause of Defendant **RICHMAN's** negative posting, individuals have not purchased Plaintiff **ROCA** products.

108. As a direct and proximate cause of the Defendant **RICHMAN's** intentional and unjustified tortious interference, **ROCA** has suffered non-monetary and monetary damages.

WHEREFORE, Plaintiff **ROCA LABS, INC.** respectfully requests that this Honorable Court declare that Defendant **MELISSA RICHMAN** has intentionally disrupted/interfered with **ROCA's** prospective economic relationships, and further grant temporary and permanent injunctive relief against the violating conduct, and award **ROCA LABS, INC.** with an amount fair and just to account for its money damages, interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this Court deems just and proper.

## <u>COUNT VI</u>
## <u>RICHMAN DEFAMATION PER SE</u>

Plaintiff **ROCA** realleges and incorporates the allegations of paragraphs 1 through 23 and 36 through 47 and 88 through 94 as though fully set forth herein and sues Defendant **MELISSA RICHMAN** for Defamation Per Se as follows:

**109.** Defendant **RICHMAN** and Plaintiff **ROCA** entered into a contractual agreement herein.
*See* Exhibit "1" and "7" herein.

**110.** Defendant **RICHMAN's** posted online to **BBB** statements that include, but are not
limited to: the product made me "sick"; the "produce is clearly a scam" and "junk" *See*
Exhibit "9" **Copy of RICHMAN BBB Complaint**.

**111.** As partial consideration of a substantial discount provided to Defendant **RICHMAN** by
Plaintiff **ROCA**, the terms of the contract mandate that the Defendant **RICHMAN** agreed
that if she ever posted any negative/critical comment against Plaintiff **ROCA** her action
would be deemed defamation per se (*See* exhibit "1 and "7").

> *Agreement not to Comment Negatively*
>
> *(2) the announcement, writing, or publication of any such or other claim in any
> media or forum will constitute a breach of this agreement, to which The
> Customer entered willingly and with full knowledge of the components of The
> Formula and its properties and The Support; (3) You agree that any such negative
> claim will constitute **defamation per se**; (4)Do not purchase the Formula or
> Support if you do not agree to this "No Negative Comment Clause."(emphasis
> added)*

107. The statements which were authored by Defendant **RICHMAN** and posted on the **BBB's**
website which impute the unsatisfactory conduct, characteristics and conditions of **ROCA**
constitute defamatory statements concerning **ROCA** per se.   See Exhibit "9" for said
statements.

**112.** **ROCA** has suffered significant loss of reputation as well as business opportunities as a
direct and proximate result of Defendant **RICHMAN** reckless, wrongful and malicious
statements posted on **BBB**.

113. ROCA's losses include, without limitation, the failure of **ROCA** to sell its product to identifiable potential customers as well as significant lost revenues from other potential customers.

114. The above alleged statements contained in Exhibit "9" herein were seen and read by potentially millions of people who reside in Florida and elsewhere.

115. Defendant **RICHMAN** authored the online posts with the knowledge that she had admitted as partial consideration for a substantial discount that the negative comments were "defamation per se".

WHEREFORE, Plaintiff **ROCA LABS, INC.** respectfully requests that this Honorable Court declare that Defendant **MELISSA RICHMAN** has defamed **ROCA** per se, and further grant temporary and permanent injunctive relief against the violating conduct, and award **ROCA LABS, INC.** with an amount fair and just to account for its money damages, interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this court deems just and proper.

### COUNT VII
### MACCARO BREACH OF CONTRACT

The Plaintiff **ROCA** realleges and incorporates the allegations of paragraphs 1 through 23 and 48 through 57 as though fully set forth herein and sues Defendant **MACCARO** for Breach of Contract as follows:

116. On February 17, 2014 Plaintiff **ROCA** entered a contract with Defendant **MACCARO** for the purchase and sale of weight loss products. See Exhibit "11"

117. Plaintiff shipped product to the Defendant **MACCARO** and Plaintiff **ROCA** received payment from the Defendant **MACCARO**.

118. As consideration of the contract and receipt of discount, Defendant **MACCARO** agreed to the Terms and Condition of the sale, which are attached herein as Exhibit "1".

119. The terms and conditions included an agreement that Defendant **MACCARO** would not post anything negative about the Plaintiff **ROCA** online. *See* Exhibit "1"

120. On February 28, 2014 Defendant **MACCARO** knowingly and willfully breached this agreement by making a negative, false and malicious report about the **ROCA** to the **BBB** which was published on the **BBB's** website and is available for viewing by anyone with internet access. *See* Exhibit "12"

121. Defendant **MACCARO** breached her agreement with Plaintiff **ROCA** in making these statements. On April 11, 2014,   Plaintiff **ROCA** demanded that Defendant **MACCARO** cure this breach and remove the posting, but Defendant refused to do so.   *See* Exhibit "16" herein.

122. Defendant **MACCARO** further breached her agreement with Plaintiff **ROCA** by failing to make agreed to installment payments of 3/18/14 and 4/18/14 totaling $421 due and owing.

123. As a direct consequence of Defendant **MACCARO'** actions, the Plaintiff **ROCA** has been harmed and was forced to retain counsel to bring this action against **MACCARO**.

WHEREFORE, Plaintiff **ROCA LABS, INC.** respectfully requests that this Honorable Court declare that Defendant **LOREN MACCARO** breached her contractual agreement, and further grant temporary and permanent injunctive relief against the breach, and award **ROCA LABS, INC**. with an amount fair and just to account for its money damages, interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this court deems just and proper.

## COUNT VIII
### MACCARO TORTIOUS INTERFERENCE WITH  ROCA's
### PROSPECTIVE ECONOMIC RELATIONSHIPS

ROCA realleges and incorporates the allegations of paragraphs 1 through 23 and 48 through 57 and 116 through 123 as though fully set forth herein and sues Defendant MACCARO for Tortious Interference with Plaintiff ROCA's Contractual Relationship with Plaintiff ROCA's prospective economic relationship as follows:

124. Plaintiff ROCA derives it revenues through online sales of it product to consumers looking to lose weight.

125. Plaintiff ROCA has an actual prospective economic relationship with internet users that search for Plaintiff ROCA and its products on search engines.

126. Defendant MACCARO is aware of the existence of Plaintiff ROCA's prospective economic relationship with internet users who desire to purchase ROCA's weight loss products as Defendant MACCARO discovered ROCA herself by using the internet.

127. ROCA's potential consumers view false, negative and misleading statements made by Defendant MACCARO when they search the internet using search engines such as Google, Yahoo! Or Bing or visit the BBB's website.

128. ROCA had an actual prospective economic relationship with numerous consumers including but not limited to: Alicia Moralez Abu Saleh ("Interfered Customer").

129. As a direct and proximate result of MACCARO posting on BBB, interfered customer have not purchased ROCA products.  For example following Defendants post, Alicia Moralez Abu Saleh posted on Facebook "Bad reviews at Better business bureau ..... I will pass on this" See Exhibit "14".

130. Defendant MACCARO's statements include but are not limited to part she was charged for the product she did not order and that she would "not remove complaint, sue me" See Exhibit "12" Copy of MACCARO BBB Complaint.

131. Defendant **MACCARO** knowingly and intentionally has instructed Internet users not to purchase **ROCA** products as it is sand and silly putty.

132. Interfered Customers have refused to order from **ROCA** as a direct and proximate result of Defendant **MACCARO** intentional interference with said relationships via her negative postings against **ROCA**.

133. The Interfered Customers indicated their willingness to purchase weight loss products from **ROCA** (i.e. enter purchase order agreements).

134. **ROCA** would have sold products to the Interfered Customers (entered into our purchase order agreement), however the Interfered Customers indicated that they would not purchase **ROCA**'s products because negative reviews on **BBB**.

135. Defendant, **MACCARO** was not authorized nor does she have any legal right to claim privilege for her actions.

136. As a direct and proximate cause of Defendant **MACCARO's** negative posting, individuals have not purchased Plaintiff **ROCA** products.

137. As a direct and proximate cause of the Defendant **MACCARO's** intentional and unjustified tortious interference, **ROCA** has suffered non-monetary and monetary damages.

WHEREFORE, Plaintiff **ROCA LABS, INC.** respectfully requests that this Honorable Court declare that Defendant **LOREN MACCARO** has intentionally disrupted/interfered with **ROCA's** prospective economic relationships, and further grant temporary and permanent injunctive relief against the violating conduct, and award **ROCA LABS, INC.** with an amount fair and just to account for its money damages, interest, reasonable attorneys' fees, and costs incurred herein, and for such other relief as this Court deems just and proper.

## COUNT IX

## MACCARO DEFAMATION PER SE

Plaintiff **ROCA** realleges and incorporates the allegations of paragraphs paragraphs 1

through 23 and 48 through 57 and 116 through 123 as though fully set forth herein and sues

Defendant **LOREN MACCARO** for Defamation Per Se as follows:

138. Defendant **MACCARO** and Plaintiff **ROCA** entered into a contractual agreement

   herein. *See* Exhibit "1" and "11" herein.

139. Defendant **MACCARO's** posted online to **BBB** statements that include, but are not

   limited to: she was charged for the product without her consent and she would "not

   remove her complaint, sue me" *See* Exhibit "12" **Copy of MACCARO BBB Complaint**.

140. As partial consideration of a substantial discount provided to Defendant **MACCARO** by

   Plaintiff **ROCA**, the terms of the contract mandate that the Defendant **MACCARO**

   agreed that if she ever posted any negative/critical comment against Plaintiff **ROCA** her

   action would be deemed defamation per se (*See* exhibit "1 and "11).

   *Agreement not to Comment Negatively*

   *(2) the announcement, writing, or publication of any such or other claim in any*
   *media or forum will constitute a breach of this agreement, to which The*
   *Customer entered willingly and with full knowledge of the components of The*
   *Formula and its properties and The Support; (3) You agree that any such negative*
   *claim will constitute **defamation per se**; (4)Do not purchase the Formula or*
   *Support if you do not agree to this "No Negative Comment Clause."(emphasis*
   *added)*

141 The statements which were authored by Defendant **MACCARO** and posted on the

   **BBB's** website which impute the unsatisfactory conduct, characteristics and conditions of

   **ROCA** constitute defamatory statements concerning **ROCA** per se.  See Exhibit "12" for

   said statements.

142. **ROCA** has suffered significant loss of reputation as well as business opportunities as a
direct and proximate result of Defendant **MACCARO** reckless, wrongful and malicious
statements posted on **BBB.**

143. **ROCA's** losses include, without limitation, the failure of **ROCA** to sell its product to
identifiable potential customers as well as significant lost revenues from other potential
customers.

144. The above alleged statements contained in Exhibit "12" herein were seen and read by
potentially millions of people who reside in Florida and elsewhere.

145. Defendant **MACCARO** authored the online posts with the knowledge that she had
admitted as partial consideration for a substantial discount that the negative comments
were "defamation per se".

WHEREFORE, Plaintiff **ROCA LABS, INC.** respectfully requests that this Honorable Court
declare that Defendant **LOREN MACCARO** has defamed **ROCA** per se and award **ROCA
LABS, INC.** with an amount fair and just to account for its money damages, interest, reasonable
attorneys' fees, and costs incurred herein, and for such other relief as this court deems just and
proper.

### COUNT X
### DECLARATORY RELIEF AGAINST DEFENDANTS

**ROCA,** by and through undersigned counsel, seek declaratory judgment relief
pursuant to Chapter 86 of the Florida Statutes, prevailing Florida law, against **DEFENDANTS** and
they re-allege all preceding paragraphs herein and state:

146. This is an action for declaratory relief pursuant to FS 86.011.

147. There is a bona fide, actual, present practical need for declaratory relief pursuant to

FS 86.011 and present controversy with ascertainable facts between the parties herein.

148.     The **DEFENDANTS** have authored negative complaints against **ROCA** on BBB.

149.     The **DEFENDANTS** have intentionally tortiously interfered with **ROCA's** economic relationship with potential customers.

150.     The **DEFENDANTS'** conduct has directly and proximately caused **ROCA** to continue to accrue monetary damages and present ongoing damages to **ROCA's** reputation.

151.     **ROCA** is in doubt as to their rights under Florida law and is in need of a present declaration whether **DEFENDANTS** conduct alleged herein tortiously interfered with **ROCA's** prospective economic relationship with potential customers.

152.     **ROCA** is in doubt as to their rights under Florida law and is in need of a present declaration whether **DEFENDANTS** defamed **ROCA** *per se.*

153.     There is a bona fide, actual dispute between the parties based on the **DEFENDANTS** refusal to cease and desist their conduct after **ROCA** has requested same.

154.     **ROCA** seeks relief in order to enforce contractual/legal rights and not to merely seek legal advice from this Honorable Court.

155.     **ROCA's** right to recovery is dependent upon the Court's finding of facts and/or application of same to Florida law.

156.     As a result of this dispute, it has become necessary for the Plaintiff, **ROCA**, to retain the services of the undersigned counsel.   Defendant is obligated to pay a reasonable fee for the undersigned services in bringing this action, plus necessary costs.