# PX7

# Excerpts from Don Juravin's Individual Deposition (2/17/17)

# In the Matter of:

# FTC v. Roca Labs, Inc., et al.

*February 17, 2017*
*Don Juravin - Confidential*
*Vol. 3*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. Roca Labs, Inc., et al.                                    2/17/2017

---

405

```
 1                    I N D E X
 2
    WITNESS                              PAGE NO.
 3
       DON JURAVIN
 4
          By Mr. Settlemyer:               409
 5        By Ms. Marteny:                  601
          By Mr. Settlemyer:               613
 6        By Ms. Marteny:                  620
 7
 8  EXHIBITS        DESCRIPTION          PAGE NO.
 9    129      Roca Labs Corp Filing       420
      130      Zero Calorie Corp Filing    424
10    131      BOA Acct #3195              436
      132      2011 Roca Labs Tax Return   440
11    133      2014 Roca Labs Tax Return   443
      134      2015 Roca Labs Tax Return   445
12    135      Zero Calorie Labs           456
      136      Roca Labs Acct #8933        459
13    137      Juravin Inc.                473
      138      BOA Acct #5833              473
14    139      2014 Juravin Tax Return     474
      140      2015 Juravin Tax Return     477
15    141      Answer to Amended Complaint 478
      142      Agreement of Services       487
16    143      Agreement of Services       487
17           CONFIDENTIAL EXHIBITS
18        Exhibits 131-136, 142, 143
19
20           CONFIDENTIAL PORTIONS
21   Page 487, Line 5 through Page 495, Line 16
     Page 541, Line 4 through Page 549, Line 11
22   Page 560, Line 4 through Page 566, Line 16
23
24
25
```

---

406

```
 1            UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
 2                 TAMPA DIVISION
 3            CIV No. 8:15-cv-02231-MSS-TBM
 4
    FEDERAL TRADE COMMISSION,
 5
              Plaintiff,
 6
    vs.
 7
    ROCA LABS, INC., a corporation;
 8  ROCA LABS NUTRACEUTICAL USA, INC.,
    a corporation; MUST CURE OBESITY, CO.,
 9  a corporation; JURAVIN INCORPORATED,
    a corporation; ZERO CALORIE LABS, INC.,
10  a corporation; DON JURAVIN, individually
    and as an office of Roca Labs, Inc.,
11  Roca Labs Nutraceutical USA, Inc.;
    Must Cure Obesity, Co., and Juravin,
12  Incorporated; and GEORGE WHITING,
    individually and as an officer of Roca
13  Labs, Inc., Roca Labs Nutraceutical
    USA, Inc., and Zero Calories Labs, Inc.,
14
              Defendants.
15  _____/
16
            DEPOSITION OF DON JURAVIN
17
         Taken on Behalf of the Plaintiff
18
19  DATE TAKEN:  Friday, February 17, 2017
20  TIME:        9:45 A.M. - 5:14 P.M.
21  PLACE:       101 E. Kennedy Boulevard
                 Suite 2800
22               Tampa, Florida  33602
23
    STENOGRAPHICALLY REPORTED BY:
24  Tracy Lyn Fazio, FPR
    Notary Public, State of Florida
25
```

---

407

```
 1  APPEARANCES FOR THE PLAINTIFF:
 2  CARL H. SETTLEMYER, III, ESQ.
    MICHAEL J. DAVIS, ESQ.
 3  FEDERAL TRADE COMMISSION
    600 Pennsylvania Avenue, N.W.
 4  Maildrop CC-10528
    Washington, DC  20580
 5  1.202.326.2019
    csettlemyer@ftc.gov
 6  mdavis@ftc.gov
 7
 8  APPEARANCES FOR THE DEFENDANTS:
 9  SUZETTE MARTENY, ESQ.
    SHUMAKER, LOOP & KENDRICK, LLP
10  101 E. Kennedy Boulevard, Suite 2800
    Tampa, Florida  33602
11  1.813.229.7600
    smarteny@slk-law.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

408

```
 1              P R O C E E D I N G S
 2                    - - -
 3       MR. SETTLEMYER:  We are here today for the
 4  deposition of Defendant, Don Juravin, in his
 5  individual capacity and per agreement of
 6  parties yesterday for purposes of some
 7  follow-up and additional questioning on the
 8  30(b)(6) deposition of Muscular Obesity Co.,
 9  Roca Labs, Inc. and Roca Labs Nutraceutical.
10  Mr. Juravin is here also as necessary in his
11  capacity as representative for those
12  corporations.  I will try to when I'm asking a
13  question of him as a corporate representative,
14  state that clearly on the record so we can keep
15  track of that to the extent there's any
16  difference between what his individual and
17  corporate answer might be.
18       Mr. Juravin, why don't we have you sworn
19  in and we'll do introductions after that.
20       (Thereupon, the witness, DON JURAVIN, was
21  duly sworn under oath and testified as
22  follows:)
23       MR. SETTLEMYER:  I'm Carl Settlemyer.  I'm
24  an attorney for the Federal Trade Commission.
25  With me is Mike Davis, another attorney for the
```

---

1 (Pages 405 to 408)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                    2/17/2017

409

1    Federal Trade Commission.
2         MS. MARTENY: I'm Suzette Marteny. I'm an
3    attorney for the Defendants and I'm here with
4    Don Juravin.
5         DIRECT EXAMINATION
6    BY MR. SETTLEMYER:
7    Q   Good morning, Mr. Juravin.
8    A   Good morning.
9    Q   I know you have of course been deposed
10   previously in this case, including yesterday. So
11   I'm going to be probably repetitive in what I'm
12   asking you to acknowledge in terms of general
13   instructions of the deposition.
14        First of all, I noticed that your voice is
15   fairly weak today. We will try to go slowly enough
16   that you can give an answer so that the court
17   reporter can hear you.
18   A   I'm fine. I'm fine.
19   Q   So you understand of course you have taken
20   an oath to tell the truth, correct?
21   A   Yes.
22   Q   I'm going to try to finish my questions
23   before you begin your answer. And I'll try to let
24   you finish your answer before I ask my question.
25   You will need to answer audibly with words, not nods

410

1    or uh-huhs. Do you understand?
2    A   Yes.
3    Q   If you don't understand a question, please
4    tell me. And if you answer, I'll assume you
5    understood. Do you understand?
6    A   Yes.
7    Q   If you hear your attorney make an
8    objection to a question, you should go ahead and
9    answer the question unless it is about a matter of
10   privilege. And in that case, she will instruct you
11   not to answer and we'll discuss the appropriateness
12   of an answer. Otherwise, she will make an objection
13   and you will need to just answer the question.
14   A   Okay.
15   Q   If later in the deposition you remember
16   additional information or want to clarify an answer,
17   you can tell me. Do you understand?
18   A   Yes.
19   Q   And if you need a break, you can just ask.
20   As long as we're not in the middle of a pending
21   question, we should be able to accommodate that. Do
22   you understand?
23   A   Yes.
24   Q   Is there any reason today that you can't
25   proceed with the deposition to give your best

411

1    testimony for reasons relating to medicine or any
2    other factor that would impair your ability to
3    testify truthfully?
4    A   I'm not more delusional than normally.
5    Q   So the answer is no?
6    A   The answer is no.
7    Q   Do you have any illness or hearing problem
8    that would prevent you from hearing any of the
9    questions or answers?
10   A   Selective sometimes, but normally okay.
11   Q   But physically you're fine?
12   A   Physically fine.
13   Q   And you understand the instructions I've
14   just given you, right?
15   A   Yes.
16   Q   I know we've talked before, but I'll ask
17   again. Your primary language in business dealings
18   is English; is that correct?
19   A   Yes.
20   Q   I know that you were not born in the
21   United States and that you also speak Hebrew; is
22   that correct?
23   A   Yes.
24   Q   Is that your first language?
25   A   I speak Hebrew. Hebrew and German. But

412

1    English is now my main one.
2    Q   How long ago did you first learn English?
3    A   Learn?
4    Q   Just generally when did you learn to
5    speak --
6    A   Generally we learn English from the age of
7    five.
8    Q   So it's most of your life then?
9    A   Yeah. It's just that I'm lacking on
10   vocabulary when I compare myself to people like you.
11   So I'm missing the vocabulary.
12   Q   What is your current residential address?
13   A   15118 Pendio Drive.
14   Q   Mount Verde?
15   A   Mount Verde, yes.
16   Q   In Florida?
17   A   Yes.
18   Q   What was your residential address prior to
19   that?
20   A   In Sarasota. In Sarasota it was Roberts
21   Point Circle and the zip code was 34242-3914.
22   Q   And what was your residential address
23   prior to the Sarasota address?
24   A   We playing memory games now? I don't
25   remember the number, but it was Americana Drive in

2 (Pages 409 to 412)

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

417

1    the content in it. You're the manager. I mean,
2    you're the boss. You're everything. If you don't
3    like something that I do, don't work with me
4    anymore. I will be a good soldier. I will follow.
5    And then we started working and that's it.
6        Q   What did you tell him about the invention
7    and the type of business that you wanted to start?
8        A   Not much in the beginning. He more --
9    than my personality. Only a year later when he
10   learned to work with me and he learned about the
11   business. But at first he just knew that I'm a
12   creative guy capable of doing business. But we
13   didn't go into details. He didn't check on the
14   invention or anything like that.
15       Q   When did you first meet Mr. Whiting?
16       A   Almost as soon as I came off the boat.
17       Q   So it would have been in 2009 at some
18   point?
19       A   Yes.
20       Q   What steps did you and Mr. Whiting take
21   after meeting when you were starting the business to
22   start bringing the invention to market?
23       A   It wasn't like this like -- it wasn't like
24   the main thing is the invention. I basically told
25   him, listen, I'm a creative guy. I know how to do

418

1    business. I know how to do marketing. I need
2    somebody to run the company. I need somebody to own
3    the company. I need somebody to balance decisions
4    with me. And it wasn't necessarily just the Roca
5    Labs. It wasn't -- it came about only a year later
6    that I said this is what I want to focus on.
7        Q   A year later would have been 2010; is that
8    correct?
9        A   Maybe, yes.
10       Q   So at a certain point a business called
11   Roca Labs, Inc. was created, correct?
12       A   About 2009 -- '10. That's when we really
13   started.
14       Q   Who picked the name Roca Labs?
15       A   I did.
16       Q   Roca Labs, Inc. was incorporated at that
17   point, correct?
18       A   Yes.
19       Q   There was another business created in
20   around that time called Zero Calorie Labs, Inc.,
21   correct?
22       A   Yes.
23       Q   What was the purpose of Zero Calorie Labs?
24       A   Dr. Whiting didn't want to have any
25   employees in Roca Labs. And Zero Calorie Labs were

419

1    to have independent contractors work for it.
2        Q   Dr. Whiting is George Whiting; is that
3    correct?
4        A   I'm sorry. Yes. I'm not sure that in the
5    beginning Zero Calorie Labs had the purpose of being
6    like an HR. I don't remember what it was in the
7    beginning.
8        Q   HR meaning human relations, hiring
9    personnel?
10       A   Human Resource.
11       Q   Human Resources. Okay. Thank you.
12       A   If it was relations, it would have nothing
13   to do with me.
14       Q   So at the time Roca Labs, Inc. was formed,
15   was there already a product ready to sell?
16       A   No. No.
17       Q   What year did Roca Labs, Inc. first start
18   selling anything to the public?
19       A   Maybe 2010, I think.
20           (Thereupon, Plaintiff's Exhibit No. 129
21       was marked for identification.)
22       Q   Mr. Juravin, could you take a look at
23   Exhibit 129, and let me know if you recognize it,
24   please. While you're looking at that, I want to
25   just go on the record and say we're starting with

420

1    No. 129. We're continuing the numbering sequence
2    from the 30(b)(6) deposition that was commenced on
3    Wednesday and continued through yesterday.
4        A   I don't know what it is. I mean, it looks
5    like corporate papers, but I don't really know what
6    it is.
7        Q   Look at the fourth page of Exhibit 129,
8    please.
9        A   I'm there.
10       Q   You'll see that there was an August 5,
11   2009 addition of the bottom of Don Juravin as the
12   Vice-President. Do you see that?
13       A   Yeah, I see that.
14       Q   Do you agree that you were added as
15   Vice-President to Roca Labs, Inc. at the time?
16       A   No, I wasn't aware of it. And I think
17   only with Roca Labs, the only time that I don't know
18   even how it came about that Dr. Whiting was not
19   available to me like 2013, when his situation
20   deteriorated. I asked him to make me assignee and
21   we did it I think in the corporate office maybe in
22   2013 for a short period of time. But I am not aware
23   that I was even added here. This is not to say that
24   I was not involved in the company. But I was not
25   assignee or I was not --

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555                          PX7-4

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

425

1  up with ideas and George will say, yes, no.  If he
2  says no, I can one time try to say why I think.  And
3  then whatever -- he has the final say.
4      Q   But you think you came up with the name
5  Zero Calorie Labs; is that right?
6      A   Yes, I think so.
7      Q   So in terms of the activities of Roca
8  Labs, Inc., were you personally in charge of
9  selecting which individuals would perform work on
10 behalf of the company?
11     A   Yes.
12     Q   With respect to Zero Calorie Labs, Inc.,
13 you were personally responsible for selecting who
14 would be hired by or retained through contract by
15 Zero Calorie Labs?
16     A   Yes.
17     Q   What would you describe as the business of
18 Roca Labs, Inc. as of the 2010 to 2011 time frame?
19     A   Promoting the same concept as earlier.
20 Promoting the same concept as I mentioned earlier.
21 An alternative to a gastric bypass surgery.  But we
22 weren't pinpointed so much then.  It was more into
23 the weight reduction.  I didn't have still the guts
24 to say this can be a replacement.
25     Q   A replacement for what?

426

1      A   For a bariatric surgery.
2      Q   What other activity of course would have
3  been selling products to consumers, correct?
4      A   Yes.
5      Q   Were you personally responsible for the
6  product formulas that were sold by Roca Labs?
7      A   Yes.
8      Q   You were personally responsible for the
9  product ideas of Roca Labs, Inc.?
10     A   Yes.
11     Q   You were personally responsible for the
12 product packaging of Roca Labs, Inc.?
13     A   Yes.
14     Q   You were personally responsible for
15 managing sales by Roca Labs, Inc.?
16     A   Yes.
17     Q   You were personally responsible for
18 product pricing for Roca Labs, Inc.?
19     A   Yes.
20     Q   You were personally responsible for the
21 retail channels Roca Labs, Inc. would use, correct?
22     A   Yes.
23     Q   You were personally responsible for the
24 advertising media that Roca Labs, Inc. used,
25 correct?

427

1      A   Yes.
2      Q   You were personally responsible for the
3  advertising content of Roca Labs, Inc., correct?
4      A   Yes.
5      Q   You were personally responsible for
6  research and development related to the products
7  Roca Labs sold, correct?
8      A   Yes, but not under -- everything to do
9  with formulation.  It was me doing it for myself,
10 not for the company.
11     Q   But you were personally responsible for
12 the formulation of the products that Roca Labs sold,
13 correct?
14     A   Yes.
15     Q   And you were personally responsible for
16 determining what substantiation the company Roca
17 Labs, Inc. had for the products it was selling,
18 correct?
19     A   Yes.
20     Q   You were personally responsible for
21 finding supplies of ingredients for the Roca Labs
22 products, correct?
23     A   Raw materials, yes.
24     Q   Raw materials.  Okay.
25         You were personally responsible for

428

1  agreements with venders, correct?
2      A   I'm sorry.  Raw materials for the most
3  part.
4      Q   Why do you caveat with "for the most
5  part"?  Was somebody else involved with that?
6      A   Yes.  Because when you go to an FDA
7  registered facility, you cannot just bring whatever
8  you want.  You can say this is what I want.  But
9  then the importer needs to coordinate with the
10 facility to see if the facility agrees, because the
11 facility is obligated to the FDA.  I can ask
12 anything I want.  But they can say no because
13 whatever reason.
14     Q   But you were the one who would be saying
15 this is what I want; is that correct?
16     A   But I have the option to bind myself or I
17 tell them, this is what I want, you find it.
18     Q   I just want to confirm.  You're the one
19 who did make that request of what it is that Roca
20 Labs wanted to put into the product?
21     A   Yes.
22     Q   You were personally responsible for
23 shipping the product for consumers.  Not that you
24 personally did it, but were overall responsible for
25 that?

6 (Pages 425 to 428)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                2/17/2017

429

1    A   Yes.
2    Q   And you were personally responsible for
3  again, in an oversight capacity, receiving the
4  shipments from your packagers or suppliers, correct?
5    A   Not directly, but in general, yes.
6    Q   You were personally responsible for
7  obtaining insurance for Roca Labs, Inc.?
8    A   George and I.
9    Q   You were personally responsible for
10 maintenance of any customer information submitted to
11 Roca Labs, Inc.?
12   A   Yes.
13   Q   You were personally responsible for
14 overseeing responses to complaints from Roca Labs,
15 Inc. customers or issues that they had?
16   A   Ultimately I'm responsible.
17   Q   Maybe not on a day-to-day basis, but
18 overall you had oversight over that?
19   A   Yes.
20   Q   In terms of banking, you controlled how
21 Roca Labs, Inc.'s funds were spent on a day-to-day
22 basis, correct?
23   A   I had to follow guidelines of George.  I
24 followed George's guidelines.  But on a day-to-day,
25 it was me.

430

1    Q   So you were the one who was actually
2  initiating any electronic fund transfers for
3  example, correct?
4    A   Yes.  If it falls within the guidelines
5  that George gave me, yes.
6    Q   You would be the one who wrote checks on
7  the day-to-day basis for Roca Labs, Inc., correct?
8    A   Yes.
9    Q   You were responsible for determining
10 whether or not refunds would be given to Roca Labs,
11 Inc. customers, correct?
12   A   I sent the general policy, but Sharon King
13 would be the one that will make a decision
14 day-to-day without consulting me, without talking to
15 me, without -- I just set the general guidelines.
16   Q   Would you be generally responsible for
17 addressing complaints submitted by Better Business
18 Bureau?
19   A   No.
20   Q   Who would be?
21   A   I never did.  Sharon King.  From now on I
22 will say Sharon.  It means Sharon King.
23   Q   Would Sharon King in responding to the
24 Better Business Bureau complaints be following
25 general guidelines that you set?

431

1    A   Very general.
2    Q   But the answer is yes?
3    A   Yes, very general.
4    Q   Were you personally responsible for making
5  sure that the Roca Labs products were compliant with
6  FDA guidelines?
7    A   I relied on the facility.  The assumption
8  is when the facility gives it to me, they made sure
9  that everything -- I'm a marketer.  I'm not a
10 manufacturer.  Roca Labs is not a manufacturer.
11 Roca Labs is a marketer.
12   Q   But you would be responsible for making
13 sure that the manufacturer was an FDA --
14   A   Register.
15   Q   -- compliant facility?
16   A   Not compliance, register.  Because I don't
17 know if their in compliance.  They're registered.
18 Yes, once I chose them, my assumption was that I can
19 ask them anything in the world.  And if they allow
20 it, it means that the FDA allows it.
21   Q   Would you be -- were you personally
22 responsible for authorizing the filing of lawsuits
23 in the name of Roca Labs, Inc.?
24   A   Yes.
25   Q   Were you personally responsible for

432

1  overseeing the defense of lawsuits against Roca
2  Labs, Inc.?
3    A   Yes.
4    Q   Did Roca Labs, Inc. ever have any Board of
5  Director meetings?
6    A   I did not do that administrative of Roca
7  Labs.  So I would not know.  That's the reason why I
8  didn't want to run the company, because I'm failing
9  to do this administrative things, and that's why
10 George did it.  I have no idea.
11   Q   Go through a similar list of questions,
12 but for Zero Calorie Labs, Inc. to see what your
13 personal responsibility was.
14   A   Sure.
15   Q   You were personally responsible for
16 determining which people Zero Calorie Labs, Inc.
17 retained?  I think you already testified, correct?
18   A   Yes.
19   Q   Were you personally responsible for
20 initiating fund transfers from Zero Calorie Labs'
21 bank accounts?
22   A   Yes.
23   Q   Were you personally responsible for
24 determining how much people retained in the name
25 Zero Calorie Labs were paid?

7 (Pages 429 to 432)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

---

433

1    A   I didn't understand the word retained.
2    Did I determine how much they would be paid?
3    Q   Yes.
4    A   Yes.
5    Q   Were you the sole -- I'll get to that in a
6    moment.  Strike that.
7    A   I have a soul, yes.
8    Q   I hadn't gotten to the verb yet.  Were you
9    responsible for writing checks on behalf of Zero
10   Calorie Labs?
11   A   Yes.
12   Q   Aside from being a Human Resources company
13   that worked on behalf of Roca Labs, are you aware of
14   any other clients of Zero Calorie Labs, Inc.?
15   A   I know that George wanted all along to do
16   something with it for his own accounting purposes,
17   and he talked about it a few times.  I don't know if
18   he did something or if something was done.  But Zero
19   Calorie Labs was supposed to do additional HR, I
20   think for George and maybe other things.
21   Q   Do you know if in fact Zero Calorie Labs
22   did do such activity for others?
23   A   I don't know.  I don't think so.  But the
24   intent was to do.
25        MR. SETTLEMYER:  Take a two minute break.

---

434

1    I'm going to pull out some documents.
2        (A brief recess.)
3    BY MR. SETTLEMYER:
4    Q   Mr. Juravin, I've just handed you a
5    document that was marked previously as Exhibit 16.
6    Take a look at Exhibit 16, please.
7    A   Yes.
8    Q   Are you familiar with Exhibit 16?
9    A   Looks like my signature.
10   Q   This is a -- correct me if I'm wrong, a
11   signature card for Bank of America account for Roca
12   Labs, Inc. for an account ending 3550, correct?
13   A   Yes.
14   Q   You submitted this signature card,
15   correct?
16   A   Yeah.  But why October 2006?
17   Q   Are you looking at the second page of the
18   document?
19   A   Yeah.  Okay.
20   Q   Is the date there the date that the shelf
21   corporation that came Roca Labs, Inc. was created?
22   A   Maybe, yes.  Thank you.
23   Q   But you personally submitted this
24   signature card?
25   A   Looks like my signature, yes.

---

435

1    Q   Were there any other signatories on this
2    account?
3    A   No.
4    Q   I'd like to have another document marked
5    as Exhibit 131.
6    A   By the way --
7    Q   Wait, wait, wait.
8        MS. MARTENY:  Put that one back.
9        THE WITNESS:  I have a question.
10       MS. MARTENY:  Wait.
11       (Thereupon, Plaintiff's Exhibit No. 131
12   was marked for identification.)
13   BY MR. SETTLEMYER:
14   Q   Mr. Juravin, could you take a look please
15   at Exhibit 131.
16   A   Okay.
17   Q   Let me know if you recognize that
18   document.
19   A   Not really.
20   Q   Do you see your handwriting or signature
21   on the document anywhere?
22   A   No, I don't.
23   Q   Look at the last page, page numbering 2245
24   at the bottom?
25   A   I do see that George opened the account

---

436

1    and allowed me to be assignee.
2    Q   So this is -- let me just state what I
3    think this is and you can tell me if you agree.
4    This is a set of Bank of America documents for Zero
5    Calorie Labs, Inc., and includes a last page, a
6    corporate signature card for an account ending 3195
7    for Zero Calorie Labs, Inc.  Do you agree?
8    A   Yes.
9    Q   And you agree this made you a signatory
10   for the Zero Calorie Labs, Inc.?
11   A   Yes.
12   Q   You were the only signatory on the Zero
13   Calorie Labs, Inc., correct?
14   A   I don't know.  I see only my name.  I see
15   that George Whiting opened it.  In other words,
16   George Whiting can at any minute close the account
17   and take the money.  So in other words, my
18   understanding is that he controls the account, but
19   I'm the one that can work with the money.
20   Q   Are you aware of anybody else who was a
21   signatory on the Zero Calorie Labs account?
22   A   Day-to-day it was only me.  And that's why
23   number 16 is a little bit surprising to me, because
24   it should be like 17, like 21.  That's why I'm
25   missing something here that basically says that

---

8 (Pages 433 to 436)

FTC v. Roca Labs, Inc., et al.                                                           2/17/2017

445

1      Q   Thank you for clarifying that.  Let's look
2   at Exhibit 134 for the Roca Labs, Inc., 2015 tax
3   return.  And you agree that this is Roca Labs,
4   Inc.'s 2015 tax return, correct?
5      A   That's what I see.  It's gibberish to me.
6      Q   I just want to make sure that the record
7   is clear that we're all looking at the same document
8   when I ask the question.
9        Are you aware of any revenue other than
10  what's shown on this 2015 tax return that Roca Labs
11  received in 2015?
12     A   No, I don't.
13     Q   And, again, the overwhelming majority of
14  any revenue received by Roca Labs, Inc. in 2015
15  you're saying would be reflected on the 1099 from
16  card processors, correct?
17     A   Yes.
18     Q   Other than that, there's no income aside
19  from maybe these one off checks from customers that
20  would be -- have been received by Roca Labs in 2015;
21  is that right?
22     A   Yes.  My numbers from yesterday were not
23  off; the advertisement.
24     Q   Sounds like you're clarifying some
25  testimony from yesterday.  Do you want to elaborate?

446

1      A   I'm just saying that my gut feeling was
2   right, that it's about 35, 40 percent advertisement
3   versus revenues.
4      Q   So if we looked at total revenues of Roca
5   Labs, Inc. over the entire period of 2010 through
6   2015, approximately 35 percent of those revenues --
7      A   More.
8      Q   Or more?
9      A   About more.  Because I know more expenses.
10  I know the numbers day-to-day.
11     Q   Let me just finish so we got a clear
12  record.  So about 35 percent of the total revenue
13  for the 2010 through 2015 revenue period for Roca
14  Labs would be advertising expenditures?
15     A   My guess, yeah.  Rough, the numbers, yes.
16  It's more than that.
17     Q   So Mr. Juravin, you're making this current
18  statement about your recollection of what the
19  advertising revenue for -- I'm sorry -- the
20  advertising expenditures for Roca Labs, Inc. based
21  on your review today of these tax returns we've just
22  looked at, correct?
23     A   Yes.
24     Q   And what is your current best estimate --
25  and if you need to take a minute to think about it

447

1   some more, please do.  But what's your current best
2   estimate of the total advertising expenditures by
3   Roca Labs, Inc. from 2010 to 2015?
4      A   About $12 million.
5      Q   You think the advertising expenditures for
6   Roca Labs, Inc. over the course of 2010 through 2015
7   was $20 million?
8      A   Twelve.
9      Q   $12 million.  Okay, thank you.  I'm sorry,
10  I couldn't hear you.
11     A   It's me.  Yes, 12.
12     Q   Now of the money that was received as
13  revenue from Roca Labs, Inc. from 2010 to 2015, if
14  12 million was for -- roughly was for advertising
15  expenditures, what's your understanding of what the
16  breakdown was of the remaining?
17     A   Twelve.  24 minus 12.
18        MS. MARTENY:  Listen.  Not the amount of
19     the remaining.
20  BY MR. SETTLEMYER:
21     Q   Let's go this way.  What is your -- let's
22  do the math.  What do you think the total revenues
23  were based on your review just now of Roca Labs,
24  Inc. from 2012 through 2015?
25     A   I think the number was 24 or 27 million.

448

1      Q   Did you just do a calculation?
2      A   I count up the money that we spend.  But
3   you provided in the claim the number of about 25, 24
4   point something.
5      Q   So would you then estimate that there was
6   a remaining 12 million that was not spent on
7   advertising for Roca Labs, Inc.?
8      A   Correct.
9      Q   So how much of that $12 million that was
10  not spent on advertising did you personally receive
11  from Roca Labs in the years 2010 through 2015 in
12  whatever capacity that you personally received?
13     A   My guess was like yesterday, about seven.
14     Q   How would you derive a concrete number
15  about that if you wanted to come up with a
16  definitive answer?
17     A   Let me start with the bottom.
18     Q   Okay.
19     A   And the bottom has two meanings.  I am in
20  the bottom.
21     Q   I'm sorry.  Say that again, please.
22     A   I said let's start from the bottom.
23     Q   Okay.
24     A   Because I am in the bottom.
25     Q   Okay.

11 (Pages 445 to 448)

FTC v. Roca Labs, Inc., et al.                                           2/17/2017

---

453

1    A  Yes.  And it's incorrect from all
2  procedures, not just from Whiting's.
3    Q  After the turn of 2013, there was a new
4  bank account opened for Zero Calorie Labs, Inc. at
5  Wells Fargo, correct?
6    A  Yes.
7    Q  Were you personally responsible for
8  authorizing expenditures from the Zero Calorie Labs
9  Wells Fargo account?
10    A  Yes.
11    Q  And, again, any payments authorized from
12  that account, you would have been personally
13  responsible for authorizing?
14    A  Yes.
15    Q  Did Zero Calorie Labs make payments to
16  individuals performing work for Roca Labs through
17  purchases of money orders from Wal-Mart?
18    A  I'm not clear.  Say it again, please.  I
19  don't think you worded -- you did not word it right.
20    Q  I probably did not.
21    A  We did not have money orders.  But what
22  you read is us sending money through Money Gram or
23  Western Union.
24    Q  So let me ask the question.
25    A  That's why I got confused.  We don't have

---

454

1  this.
2    Q  Then that may be more of a succinct way to
3  put it.  So Zero Calorie Labs would send payments to
4  individuals who performed work for Roca Labs by
5  using money grams?
6    A  I'm sorry, but you all the time saying
7  that the work was -- they were contracted by Zero
8  Calorie Labs, and the beneficiary was Roca Labs.
9    Q  But they did the work for the benefit of
10  Roca Labs?
11    A  Yes.
12    Q  The question is still Zero Calorie Labs
13  would make payments to those individuals who worked
14  for the benefit of Roca Labs, Inc.?
15    A  Yes.
16    Q  Made them by money gram?
17    A  Yes, Western Union.
18    Q  By Western Union as well.  Thank you.
19      In terms of Zero Calorie Labs'
20  expenditures, did Zero Calorie Labs have a -- in the
21  2012 time frame a bank card that was used for
22  expenditures?
23    A  What is bank card?  Debit or credit or
24  either you mean?
25    Q  Or either.

---

455

1    A  That's okay.  Either is okay.  Yes.
2  Either is okay.
3    Q  So for any -- why don't I go ahead just
4  for clarity and introduce this document as an
5  exhibit.
6      (Thereupon, Plaintiff's Exhibit No. 135
7      was marked for identification.)
8      Mr. Juravin, I've had marked as Exhibit
9  135 a document that you've just been handed.  Can
10  you take a look and tell me if you recognize Exhibit
11  135, please.
12    A  We never met, but yes.  Just a second.
13  Yeah.
14      MS. MARTENY:  The question is whether you
15  recognize it?
16      THE WITNESS:  Yes.
17  BY MR. SETTLEMYER:
18    Q  So what is Exhibit 135?
19    A  Looks like a bank statement for June
20  through July.
21    Q  Well, there's several different statements
22  all together as a composite exhibit.  Would you
23  agree that they run from the June 20, 2012 period
24  through December -- actually, there's not a
25  consecutive set.  But they include one going up

---

456

1  through January 2014.
2    A  Yes, I agree.
3    Q  These are all statements for Zero Calorie
4  Labs, Inc. account; is that correct?
5    A  Yes.
6    Q  So would you agree that looking at as an
7  example of a page marked at the bottom 1441 that I
8  marked as a red flag that you can turn to, that
9  expenditures from this account going to Facebook are
10  expenditures that you personally authorized?
11    A  Yeah, and I see that Dr. Whiting was also
12  using it; that George also used it.  And maybe I was
13  wrong earlier and he did authorize.  And he did want
14  to use this account for other purposes.  So maybe I
15  was wrong.
16    Q  But at least the expenditures for Facebook
17  were for advertising for Roca Labs, correct?
18    A  Yes.
19    Q  We're done with that one.
20    A  And also for buying raw materials.
21    Q  And you see -- what expenditure are you
22  looking at there?
23    A  Raw materials.
24    Q  What particular line are you talking?
25    A  TIC Gums.

---

13 (Pages 453 to 456)

FTC v. Roca Labs, Inc., et al.

2/17/2017

457

1    **Q    TIC Gums is a raw materials provider for**
2  **Roca Labs, Inc.?**
3    A    Yeah.
4    **Q    And that was an expenditure that you**
5  **authorized as well, correct?**
6    A    Yeah.  We didn't buy bubblegum for
7  $12,000.
8          MS. MARTENY:  We're done with that.
9          THE WITNESS:  Since I see that we used it
10        for business expenditure more than just HR, I
11        have to revise what I told you earlier.  So
12        probably my memory did not serve me well, and
13        we did use it more extensively than I thought.
14  BY MR. SETTLEMYER:
15    **Q    By it you mean Zero Calorie Labs?**
16    A    Yes.
17    **Q    Let's take a look at a couple of exhibits**
18  **that we have previously been introduced.  We're**
19  **going to look at Exhibits 18, 19 and 20 again.**
20          **Mr. Juravin, take a moment and just look**
21  **through those three exhibits and tell me if you**
22  **recognize --**
23    A    It looks like -- it looks like Amex credit
24  card expenditures for the cards ending with 006, and
25  for the periods of 2014, 2013.  And another card I

458

1  see here 009.
2    **Q    And you recognize those statements?**
3    A    I guess they are authentic statements from
4  Amex.
5    **Q    Would you agree that you were the one who**
6  **personally authorized any expenditures for**
7  **advertising platforms Google Yahoo, Facebook, and**
8  **Microsoft that are reflected in those three sets of**
9  **statements?**
10    A    Yes.  And we agreed to call them
11  advertisement platforms or platforms one word.
12    **Q    I didn't want to assume that carried over.**
13  **I just want to be very clear.**
14    A    Yes.
15    **Q    Mr. Juravin, a little while ago we talked**
16  **about a Bank of America account for Roca Labs, Inc.**
17  **that ends with the number 3550.  Do you recall that?**
18    A    Yes.
19    **Q    Any expenditures by Roca Labs, Inc. from**
20  **that bank account would have been expenditures that**
21  **you personally authorized, correct?**
22    A    Yes.
23    **Q    So any expenditures for -- strike that.**
24    A    By the way, no disrespect on the phone.
25  It's regarding the case and me transferring

459

1  information regarding this case.  I'm not doing
2  anything disrespectful.
3    **Q    You don't need to apologize to me.  If it**
4  **becomes a distraction, I'll let you know.**
5          **Mr. Juravin, in 2013, did Roca Labs, Inc.**
6  **open a bank account with Wells Fargo?**
7    A    If you have something in your hands, you
8  know better than me.
9    **Q    Well, tell you what --**
10    A    Why would you make me guess?
11    **Q    I'm asking your recollection.  Why don't**
12  **we simplify things by introducing exhibits.**
13    A    By now you know how many bank accounts.
14          (Thereupon, Plaintiff's Exhibit No. 136
15        was marked for identification.)
16    **Q    Okay.  Mr. Juravin, do you recognize the**
17  **document that I marked as Exhibit 136?**
18    A    Yes.  It looks like Roca Labs bank account
19  relating to the period of 2013, and account ending
20  with 8933.
21    **Q    With Wells Fargo, correct?**
22    A    With Wells Fargo.
23    **Q    Yes.  And you recognize this as a bank**
24  **account that Roca Labs, Inc. used?**
25    A    Yes.

460

1    **Q    Were you the sole signatory on this bank**
2  **account?**
3    A    I think so.
4    **Q    So any expenditures from this account**
5  **would have been expenditures that you personally**
6  **authorized, correct?**
7    A    Yes.  This is something you guys printed?
8  You guys use quality paper.
9    **Q    Might have been.  I don't know.  Oh, you**
10  **mean the actual physical document?**
11    A    Yeah.  We just bought for the company a
12  ream, a box.
13          MR. DAVIS:  Would you like go to off the
14        record, Carl?
15          MR. SETTLEMYER:  Yeah.  We're off the
16        record.
17          (A brief recess.)
18  BY MR. SETTLEMYER:
19    **Q    Mr. Juravin, I think we spoke yesterday**
20  **about a company, another Defendant, Roca Labs**
21  **Nutraceutical, correct?**
22    A    Yes.
23    **Q    That's a company that you personally**
24  **helped to create; is that correct?**
25    A    I created.

14 (Pages 457 to 460)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                    2/17/2017

461

1    Q   I want to ask you to look at several
2  documents that were previously marked as Exhibits
3  21, 22 and 23. Let's start with No. 21. I'm going
4  to ask you if you recognize Exhibit 21.
5    A   And we decided to call it RLN to keep it
6  short.
7    Q   I'll try to use that as an acronym.
8    A   Yeah. Okay. I see documents from SunBiz.
9    MR. DAVIS: I just handed the documents
10  21, 22 and 23.
11    MR. SETTLEMYER: Thank you.
12    THE WITNESS: Okay.
13  BY MR. SETTLEMYER:
14    Q   So you agree that you submitted the
15  documents or asked someone to submit the documents
16  to create Roca Labs -- RLN, correct?
17    A   Yes.
18    Q   Let's look at Exhibit 22, please. Tell me
19  please if you recognize Exhibit 22.
20    A   Yes, I do.
21    Q   What is Exhibit 22?
22    A   Looks like RLN opened a business account
23  and I'm the sole signature.
24    Q   And this is a Bank of America account
25  ending in 5888, correct?

462

1    A   Yes.
2    Q   Let's look at Exhibit 23, please. Do you
3  recognize Exhibit 23?
4    A   Yes.
5    Q   Do you recognize these as bank statements
6  for RLN with the Bank of America account ending
7  5888, correct?
8    A   Yes.
9    Q   And these would run from it appears
10  March 2014 through February 2015, correct?
11    A   Yes.
12    Q   You would agree that the expenditures made
13  from this bank account are expenditures that you
14  personally authorized, correct?
15    A   Yes.
16    (A brief recess.)
17    Q   Mr. Juravin, I've handed you several
18  exhibits that were marked previously Exhibits 33,
19  34, 35, 36 and 39. So we have the same --
20    A   Yes, we do.
21    Q   -- number two. So before I get into the
22  details on that, let me just ask more generally.
23    You've testified previously both today and
24  in your September 2016 deposition about the company,
25  Must Cure Obesity Co., correct?

463

1    A   Yes.
2    Q   We've referred to that for short as MCO,
3  correct?
4    A   Yes.
5    Q   My understanding is that you have at all
6  times been the sole owner of MCO, correct?
7    A   Yes.
8    Q   And you created MCO, correct?
9    A   Yes.
10    Q   And you're the sole office of MCO,
11  correct?
12    A   Yes.
13    Q   I'd like to have you look at Exhibit 33,
14  and tell me if you recognize the documents in
15  Exhibit 33.
16    A   Yes, I do.
17    Q   What is Exhibit 33?
18    A   Opening of a bank account with me being as
19  sole signature.
20    Q   This is a bank account with Bank of
21  America in the name of Must Cure Obesity Co. with
22  the account ending in 9288, correct?
23    A   Yes.
24    Q   Is that account still in use today?
25    A   No.

464

1    Q   It's not?
2    A   No.
3    Q   And this was created in December, end of
4  December 2014, correct, this bank account?
5    A   Yes.
6    Q   Let's move on to Exhibit No. 34, please.
7  Do you recognize Exhibit 34?
8    A   It looks like -- I'm sorry. It looks like
9  MCO AmEx card ending with 005 for February 2015.
10    Q   And this is Amex account ending 01005,
11  correct?
12    A   Yes.
13    Q   Expenditures made on this card are those
14  that you personally authorized, correct?
15    A   Yes.
16    Q   Was anybody else authorized to use this
17  card?
18    A   There are a couple of them. Sharon King
19  had a card and my wife, Anna Juravin, had a card.
20  And they used it also for the business expenditures,
21  but it's still in my responsibility.
22    Q   Let's look at Exhibit No. 35, please. Do
23  you recognize Exhibit 35?
24    A   Yes.
25    Q   What is Exhibit 35?

15 (Pages 461 to 464)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

465

1      A   Chase Bank account for MCO account ending
2   7028 for the period of July 2015 all the way till
3   the end of 2015.
4      Q   You agree that any expenditures off of
5   this account shown in these statements would be
6   those you personally authorized?
7      A   Yeah, I guess so.  I'm the one who has
8   access to it, yes.
9      Q   Would anybody else have ability to
10   authorize any transactions on this account without
11   your approval?
12      A   No, it's me.
13      Q   Let's look at Exhibit 36, please.  Can you
14   identify Exhibit 36?
15      A   Yes.  Chase Bank account ending with 7028
16   for the year 2016 ending with 7028.
17      Q   For Must Cure Obesity?
18      A   Must Cure Obesity, MCO.
19      Q   Again, for this time period, you would
20   have been the person to authorize any expenditures
21   from this account, correct?
22      A   Yes.
23      Q   Would anybody else have been personally
24   authorized to make expenditures off this account
25   without your approval?

466

1      A   No.
2      Q   Let's look at Exhibit No. 39, please.  Can
3   you identify Exhibit 39, please?
4      A   Chase Bank account ending with 7028 for
5   MCO, January 2017.  How did I do?
6      Q   You would have been the sole person to
7   authorize the expenditures shown on this statement?
8      A   Yes.
9      Q   Mr. Juravin, I've handed you a document
10   marked as Exhibit 30 previously.  Do you recognize
11   Exhibit 30?
12      A   Yes.
13      Q   What is Exhibit 30?
14      A   It's a document from SunBiz and it shows
15   the formation of MCO.
16      Q   You were responsible for the formation of
17   MCO, correct?
18      A   Yes.
19      Q   Mr. Juravin, earlier you discussed the
20   fact that you personally were authorizing lawsuits
21   on behalf of Roca Labs, Inc.  I'm going to hand you
22   a couple of documents that we have looked at
23   previously and ask you if you can identify pages --
24   I'm going to ask you if you can identify documents
25   and then we'll turn to certain pages.  These are

467

1   documents previously marked as Exhibits 43 and 44.
2   One of the things I'm going to ask you is whether
3   you recognize these documents as having your
4   signature on the verification?
5      A   Yes, it does.
6      Q   Let's start --
7      A   The document Exhibit 43, Roca Labs versus
8   Consumer Opinion Court, and the case number is
9   2014-CA-04769-NC, and it has my signature on it.
10      Q   And your signature is on the last page,
11   the verification page?
12      A   Correct.
13      Q   Let's look at Exhibit 44.  Do you
14   recognize Exhibit 44?
15      A   Yes.  Exhibit 44 is Roca Labs versus
16   Consumer Opinion Corp, Case No.
17   8:14-cv-2096-T33-EAJ, and it has my signature as
18   the -- yes, it has my signature.
19      Q   And that's on page 19298?
20      A   Yes.  That's what you do in law school?  I
21   didn't really need to read the entire case number,
22   right?
23      Q   That you probably didn't?
24      A   No, I didn't.
25      Q   Mr. Juravin, since the FTC filed its

468

1   lawsuit against Roca Labs in September of 2015, we
2   know you've been deposed on September 2016 in
3   connection with this case as well as testifying
4   Wednesday and yesterday.  There were also I believe
5   a couple of depositions of you taken in another
6   litigation involving Jody Barnes; is that correct?
7      A   Yes, but not in the last few months or
8   something.
9      Q   Well, I'm just going to ask you.  Do you
10   recall there was a deposition of you in Sarasota in
11   March of 2016 in connection with the Barnes case,
12   correct?
13      A   For some reason I don't recall it.  But if
14   you have it there, then yes we did.
15      Q   Do you recall having been deposed in the
16   Jody Barnes case?
17      A   Yes, yes, yes.  Now I do recall.  It was
18   in the courthouse and I do recall now.
19      Q   And that would have been in March of 2016?
20      A   Yes.
21      Q   There was another date in April of 2016,
22   correct?
23      A   I'm not sure about the date.  I just
24   remember I was deposed and it was long ago.
25      Q   But it was twice in 2016, do you recall

16 (Pages 465 to 468)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                          2/17/2017

469

1    that?
2        A    No, don't test my memory.  If you have it
3    there, then that's what it is.  If not, Attorney
4    Whitney Coin will give you the transcripts.
5        Q    Did April Goodwin represent you at those
6    depositions?
7        A    I think it was Whitney.  I think it was
8    Whitney Coin.  Maybe April.  I think both of them.
9        Q    You say that you thought the deposition or
10   depositions in the Barnes case were long ago.  How
11   long ago do you think they were?
12       A    It's my mind.  When I say long ago, you
13   know, sometimes I can remember something when I was
14   18.  But I would not remember something from six
15   months ago.  It's the human brain, you know, it's
16   selective.
17       Q    Well, let me just say I'm not trying to
18   test your, you know, memory of the specific date.
19   I'm just trying to overall understand all of the
20   occasions in the past two years on which you were
21   deposed in any other case or have given any sworn
22   statements in other cases?
23       A    I got it.  So Barnes is one.
24       Q    Barnes is one?
25       A    But if you would not have reminded me, I

470

1    would say no.  Barnes is one.  No, but if my
2    attorney can ask April.  April maybe knows.
3        Q    Do you recall being deposed on two
4    separate dates in the Barnes case?
5        A    Yes, I think so.  I think it was more than
6    one day.
7        Q    The class action lawsuit in California,
8    the Lake versus Roca Labs, Inc., you also within the
9    past year gave a declaration that we looked at
10   yesterday, correct?
11       A    Okay.
12       Q    I mean, I can find it if you would like me
13   to --
14       A    Larry sends me the papers and says sign
15   here, here and here.
16       Q    Aside from the Barnes depositions and the
17   depositions you've given in the FTC case, are there
18   any other times in any other cases in the past two
19   years where you've been deposed?
20       A    I don't think so.  But as I mentioned
21   earlier, I told you earlier that if you would not
22   have said Barnes, I would say no.  And you mentioned
23   Barnes.  So I think the safe things to do is to ask
24   April if she knows.  Because April almost for sure
25   will know.

471

1        Q    So in terms of our ability to obtain any
2    transcripts of any depositions that you've been --
3    that you've given in the past two years, are you
4    saying that your counsel would be able to search for
5    and provide those to you us?
6        A    She will know better than me.  She will
7    remember it better.
8        Q    Is there anybody else who would remember
9    better than her?
10       A    No.
11       Q    In terms of any sort of declarations,
12   affidavits or other sworn written statements you've
13   given in any case in the past two years other than
14   in this case, and I'm not sure if there are any
15   other than the one we referred to in the Lake case,
16   are there any other sworn written statements you
17   provided in litigation in the past two years?
18       A    I give my wife at least once a week a
19   sworn statement, but it's orally.  I will ask April
20   and I will try to search if I have something like
21   that.  But I don't know the definitions of the
22   documents that I sign.  So I don't know if it's
23   called declarations or whatever it is that you call
24   it.  I don't know.  But I can search for it.  It's
25   part of hallmark.

472

1        Q    But as you're sitting here today, you
2    don't recall any other documents like that, that
3    you've done in the past two years, correct?
4        A    No, I don't.
5        Q    There's another company that I believe
6    you've probably testified about on your September
7    deposition called Juravin Incorporated, correct?
8        A    Yes.
9        Q    You're the sole owner of Juravin
10   Incorporated, correct?
11       A    Yes.
12       Q    You've been at all times the sole owner of
13   Juravin Incorporated; yes?
14       A    Yes.
15       Q    And you founded Juravin Incorporated,
16   correct?
17       A    Yes.
18       Q    I'm going to have some exhibits marked and
19   I'll have you take a look at all of them on a short
20   break, and then we'll just talk about them briefly I
21   hope.  I'll have these marked and then we'll hand
22   them to you.
23       A    It's not I hope.  You are in complete
24   control.  You make the decisions if it's short or
25   long.  And I think I'm doing better and less

17 (Pages 469 to 472)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                    2/17/2017

473

1    lengthier than yesterday.  By the way, the fact that
2    I got from my eye doctor the prescription and go
3    online and buy whatever I want --
4           (A brief recess.)
5           (Thereupon, Plaintiff's Exhibit Nos. 137 -
6    141 were marked for identification.)
7    BY MR. SETTLEMYER:
8        Q   So Mr. Juravin, we handed you some
9    documents that have been marked as Exhibits 137
10   through 141.  Let's start with Exhibit 137.  Do you
11   recognize Exhibit 137?
12       A   It is the incorporation of Juravin Inc.
13   And I see my signature there.  That's mine.
14       Q   And you're personally responsible for
15   having submitted that paperwork, right?
16       A   Yes.
17       Q   And then let's look at Exhibit 138.  Do
18   you recognize Exhibit 138?
19       A   Yes.
20       Q   What is Exhibit 138?
21       A   The opening of bank account ending with
22   5833 in Bank of America for Juravin Incorporated,
23   and I'm the sole signee.
24       Q   Is this account still in use?
25       A   No.

474

1        Q   Let's go to Exhibit 139.
2        A   Okay.
3        Q   Do you recognize Exhibit 139?
4        A   It looks like a tax return, 2014, for the
5    company Juravin Incorporated.
6        Q   Did you provide the information used to
7    prepare the tax return for Juravin Incorporated for
8    2014?
9        A   Either yes or no.  I'm responsible for it.
10       Q   I'm trying to just find out first of all
11   if you have a personal specific understanding of
12   what documents were provided I'm assuming to an
13   accountant to generate this tax return?
14       A   I am.  But I'm not providing.  I'm just
15   giving access to the bank account to George and
16   George does the rest.  So I'm not really giving or
17   providing, but I am responsible.  I am signing on
18   it.  I'm responsible one way or another.
19       Q   I just want to make sure that I'm
20   understanding.  So did George Whiting prepare this
21   tax return, 139?
22       A   I think that this one, the '14 and '15,
23   this is the four, five, six months that we work
24   diligently and everybody was doing everything
25   together, gathering information, and putting all

475

1    together.
2           MS. MARTENY:  Listen to the question.
3    BY MR. SETTLEMYER:
4        Q   Do you believe Mr. Whiting prepared the
5    2014 tax return for Juravin Incorporated; yes or no?
6        A   He was involved.
7        Q   Was the accountant, Mr. Hershkowitz also
8    involved?
9        A   No.
10       Q   So it would have been primarily then you
11   and Mr. Whiting preparing this tax return?
12       A   No.
13       Q   Who else?
14       A   Nathan Smith.
15       Q   Who is he?
16       A   Another accountant.
17       Q   Is he with Hershkowitz or some other?
18       A   Some other.
19       Q   So you, Mr. Whiting, and Mr. Smith from
20   your recollection were involved in preparing the
21   Juravin Incorporated 2014 tax return, correct?
22       A   Yes.
23       Q   What sources of information were used to
24   calculate the amounts shown in this tax return?
25       A   Everything I have they ask for all the

476

1    information, and I just acted upon it and gave them
2    everything.
3        Q   What is everything?  Can you be more
4    specific.
5        A   Bank account, 1099's, expenditures,
6    whatever necessary to prepare this tax return.
7        Q   You see on line six of the 2014 tax
8    return, Exhibit 139, that there is total income
9    shown of $665,209.87, correct?
10       A   Yes.
11       Q   What is the source of that income?
12       A   The source of that income -- I'm trying to
13   say it without being too lengthy -- is reimbursement
14   for advertisement.  Juravin Incorporated is supposed
15   to do advertisement and hold the trademarks.  So
16   some of the advertisement I'm trying to establish it
17   as an advertisement company.  So instead of Roca
18   Labs paying directly to Google let's say, Juravin
19   Incorporated will pay to Google and Roca Labs will
20   reimburse or pay 10 percent override to Juravin.
21       Q   So then the entities paying money to
22   Juravin Incorporated that are reflected in that
23   income number would have been either Roca Labs
24   Nutraceutical or Roca Labs, Inc or Muscular Obesity?
25   Is that your testimony?

18 (Pages 473 to 476)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX7-14

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                                                    2/17/2017

---

477

1    A   Not Muscular Obesity, but the other two.
2    Q   2014 Muscular Obesity didn't exist,
3  correct?
4    A   Yes.
5    Q   Let's move on to Exhibit 140.  Tell me if
6  you recognize Exhibit 140, please?
7    A   The same as earlier, but for 2015.  Tax
8  return for Juravin Incorporated, 2015.
9    Q   Was it you and Mr. Whiting, and what's the
10 other gentleman's name?
11   A   Nathan Smith.
12   Q   Nathan Smith who prepared this 2015 tax
13 return?
14   A   Yes.
15   Q   What information went into -- was used to
16 prepare the figures shown in the 2015 tax return?
17   A   Bank records, expenditures, credit cards,
18 everything necessary to prepare it.
19   Q   And you personally made that information
20 available to the team preparing this?
21   A   Yes.
22   Q   The gross receipts shown on the 2015 tax
23 return of $1,435,758.98, what was the source of
24 those gross receipts?
25   A   I think you read it incorrectly.

---

478

1    Q   Please read it correctly.
2    A   I think you read line 1C instead of six.
3    Q   Well, let's -- I see, you're correct.
4  Let's look at line six total income.  That's
5  $1,722,218.29; is that correct?
6    A   Yes.
7    Q   What's the source of that income?
8    A   One of the other companies paying for the
9  advertisements.
10   Q   So in 2015, one of the other companies
11 would have either been Muscular Obesity or Roca Labs
12 Nutraceutical?
13   A   MCO, RL or RLN.
14   Q   By RL you mean Roca Labs, Inc., correct?
15   A   Yes.
16   Q   Look at Exhibit 141, please.  And I don't
17 have really have any question about this.  But you
18 recognize this as the answer filed by Juravin
19 Incorporated to the FTC's First Amended Complaint in
20 this case, correct?
21   A   Okay.
22   Q   You agree with that?
23   A   Yes.
24   Q   Let's take a look at some documents that
25 have been introduced previously.  I'm done with that

---

479

1  one.  I'm going to hand Mr. Juravin documents that
2  were previously marked as Exhibits 81 through 84.
3  If you could take a moment and look through those.
4  I'll have a couple of questions.
5        Mr. Juravin, do you recognize the document
6  that's been marked as Exhibit 81?
7    A   Yes.
8    Q   What is Exhibit 81?
9    A   It's a Plum card AmEx belonging to the
10 card Juravin, card ending with 002, and it's for the
11 period of 2014.
12   Q   Are you the sole signatory on this
13 account?
14   A   Yes.
15   Q   So any expenditures shown in these
16 statements would be authorized by you, correct?
17   A   Yes.
18   Q   And those include expenditures for
19 advertising platforms, correct?
20   A   Yes.
21   Q   Let's take a look at Exhibit 82.  Tell me
22 if you recognize Exhibit 82, please.
23   A   Exhibit 82 belongs to the company Juravin,
24 Bank of America, account ending 5833.  And it's from
25 March 2014 till the end of 2000 -- I'm sorry.

---

480

1  March 2014 till end of February 2015.
2    Q   Are you the sole signatory on this
3  account?
4    A   Yes.
5    Q   Any expenditures made on this account
6  would have been authorized by you, correct?
7    A   Yes.
8    Q   Let's go to Exhibit 83.  Do you recognize
9  Exhibit 83?
10   A   Exhibit 83, Plum card AmEx, Juravin,
11 ending with 008 for the period of September
12 through -- just for September.
13   Q   Of 2015, correct?
14   A   Yes.
15   Q   So, yes, you recognize it, right?
16   A   Yes.
17   Q   You're the sole signatory on this account?
18   A   Yes.
19   Q   And any expenditures on that account would
20 have been authorized by you, correct?
21   A   Yes.
22   Q   Let's look at Exhibit No. 84, please.
23   A   Chase account ending 8193, Juravin
24 Incorporated, period of September 2015.
25   Q   You recognize this account?

---

19 (Pages 477 to 480)

FTC v. Roca Labs, Inc., et al.                                    2/17/2017

481

1      A   Yes.
2      Q   You're the sole signatory on this account,
3  correct?
4      A   Yes.
5      Q   And any expenditures shown on this
6  statement you would have authorized, correct?
7      A   Yes.
8      Q   I'm going to back up to ask you about 83,
9  just one additional question.  Is the American
10  Express account in Exhibit 83 still in use?
11      A   Yes.  Yes.
12      MR. SETTLEMYER:  Why don't we take a two
13  minute break and I'll gather up some additional
14  documents.
15      (Thereupon, a brief recess was held off
16  the record and the proceedings continued as
17  follows:)
18  BY MR. SETTLEMYER:
19      Q   Mr. Juravin, I want to hand you documents
20  18, 19 and 20.  Exhibits 18, 19 and 20.  Just to
21  refresh your recollection if you need that.  The
22  American Express accounts for those statements, are
23  they still active accounts?
24      A   No.
25      Q   Are either one active?

482

1      A   No.
2      Q   Okay.  Thank you.
3      Mr. Juravin, I want to ask you about the
4  types of -- some of the activities of companies
5  you've been involved with.  We talked about Roca
6  Labs, Inc., Roca Labs Nutraceutical and Muscular
7  Obesity.  I want to ask this in terms of your -- in
8  your capacity as a corporate representative in light
9  of just one or two documents that we understand are
10  being produced to us today just so I understand what
11  we're getting.  I understand we're getting one
12  document produced to us that is a set of customer
13  information from a platform called Infusionsoft; is
14  that correct?
15      A   Yes.
16      Q   Can you describe for me what that
17  Infusionsoft record is that's being produced to us?
18      A   And I would like also to explain why you
19  didn't have it before.
20      Q   Okay, that's fine, too.  But start with
21  what is it we're getting.
22      A   You're getting the customer database of
23  name of the customer -- I'm sorry.  You're getting a
24  database.
25      Q   Okay.

483

1      A   It has customers.
2      Q   Yes.
3      A   And it has people that just inquired and
4  they are not customers.
5      Q   Okay.
6      A   More than half of them of course not
7  customers.  They just inquired.  And at that time,
8  as we are as a small business we all the time
9  evolved all the time ideas.  At that time we wanted
10  to see if people are serious.  So we asked them to
11  place a credit card.  And we charged their credit
12  card one dollar to see that it's valid; to see if
13  they are serious about the purchase.  And then at a
14  later time we learned that the one dollar always the
15  credit card goes through.  So then we charge $17.
16  And then we apply those amounts to the purchase.
17  And if they decided not to purchase, it was just
18  returned to them.  It's called capture.  We capture
19  it and return it.
20      So when you look at all of them, not all
21  of them are real customers.  Only those that you
22  will see that paid $300, $400, $500, and so on.  And
23  only those are customers.  The reason that it wasn't
24  available earlier is because as far as we were
25  concerned, we don't have it.  And the reason we

484

1  didn't migrate or take it is because it had credit
2  card information in it and security and so on.  We
3  didn't want to mess with it.  But the class action,
4  they subpoenaed the information.  So as soon as it
5  was made available a few days ago, a week ago or
6  something, it was made available.  So immediately I
7  send it to you guys.
8      Q   Let me just understand.  What's the time
9  frame this database covers?
10      A   I think '13, '14.
11      Q   2013, 2014?
12      A   About.  Whatever it is that they have,
13  they gave it.  So you have it.
14      Q   Does the database indicate whether someone
15  purchased or didn't purchase?
16      A   You will have to find out either by
17  customer status or by the amount.  That's how you
18  will know.
19      Q   And that's a, yes, there's an indication
20  in a column of the spreadsheet that would suggest
21  that?
22      A   Yes, but it's not obvious.
23      Q   Okay.  Thank you for explaining that.  And
24  then these are purchasers of Roca Labs' products,
25  correct, that we're talking about?

20 (Pages 481 to 484)

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

537

1    Q   I'm not asserting that you have detailed
2  information about each customer in your head.  I'm
3  just saying you're generally familiar with the types
4  of records those businesses have kept about
5  customers over the years; is that correct?
6    A   No.
7    Q   You're not generally familiar with the
8  records that have been kept by the business about
9  customers?
10   A   Not the customers.  I became forced to
11 deal with social media only after Jenna --
12      MS. MARTENY:  That's not the question.
13 BY MR. SETTLEMYER:
14   Q   I'm not asking about social media.  I'm
15 asking about the customer records that have been
16 maintained about people who purchased the product?
17   A   So I am not familiar.  Only after the
18 incident with Jenna that I made myself much more
19 familiar.  Till then, only Sharon King and Roxy were
20 really going into the database, communicating with
21 customers and being familiar.  I'm not familiar with
22 the customers.
23   Q   I'm not asking about the customers.  I'm
24 asking are you just generally familiar with the
25 overall types and systems of information that --

538

1    A   Yes.
2    Q   -- the business has used to collect from
3  the customer?
4    A   Yes.
5    Q   So do any of those records include any
6  systematic monitoring about which customers have
7  lost weight after using Roca Labs product; yes or
8  no?
9    A   No.
10   Q   And then in terms of your explanation a
11 few moments ago about the basis for asserting that
12 the formula is scientifically proven to have a 90
13 percent success rate, is there any other information
14 that you can think that substantiates or provides a
15 basis for that statement?
16   A   More than the four reasons I mentioned?
17   Q   Yes.  Are there anymore?
18   A   I don't think it's possible to have more.
19   Q   The answer is then no.
20   A   No.
21   Q   So let me look at a different statement.
22 I'm looking specifically -- we'll stick on page 14,
23 Item B.  It goes on to say, "It", referring to Roca
24 Labs' formula, "will always achieve a gastric bypass
25 affect by physically occupying your stomach leaving

539

1  only 20 percent available space for 10 to 16 hours."
2  Do you see that?
3    A   Yes.
4    Q   What is the basis for the assertion that
5  only 20 percent of stomach space will be available
6  for 10 to 16 hours?
7    A   Let's divide it into two.  The 20 percent
8  is easy because when the stomach is the size of
9  about a fist and let's say 500-milliliter.  And when
10 I give them 450-milliliter of the activator with the
11 morning dose, all by itself that's it.  I mean, it
12 leaves no room available.  So that's an easy one.
13      As far as the claim for the 10 to 16
14 hours, it's intended for psychological reasons.  And
15 this is -- I would like to reveal as much as I can
16 to you about what I do, but we need to go
17 confidential on that.
18   Q   Let me get the answer to my specific
19 question.  What is the basis -- is there any basis
20 for the claim that 20 percent of the stomach will
21 be -- only 20 percent of the stomach will be
22 available for 10 to 16 hours?
23   A   For the 20 percent, definitely yes.  For
24 the 10 to 16 hours, not completely.
25   Q   To what extent is there basis for the 10

540

1  to 16 hours assertion?
2    A   I would ask that we go confidential and I
3  will explain everything if possible, because this is
4  my trade secret.  This is absolutely my trade secret
5  and I would love to reveal it to you if I don't want
6  anybody else to know about it.
7      MS. MARTENY:  And before you do that, can
8  we talk for one second.  Because I'd like to
9  know a little bit more about this.
10     THE WITNESS:  I think I explained to you
11 about it.
12     MR. SETTLEMYER:  At this point we've got a
13 question pending and I want to get his answer.
14     MS. MARTENY:  No, I understand.  Go ahead.
15     MR. SETTLEMYER:  We'll designate this
16 portion of the record coming up as
17 confidential.  Please give me your answer.
18     (Thereupon, the NON-CONFIDENTIAL portion
19 of the transcript ended.)
20 ///
21 ///
22 ///
23
24
25

34 (Pages 537 to 540)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                          2/17/2017

541

1               C O N F I D E N T I A L
2          (Thereupon, the CONFIDENTIAL portion of
3    the transcript started:)
4          THE WITNESS:  When you deal with people
5    that are obese and morbid obese, there is a
6    psychological defect.  Because as I see it,
7    they have a self destruction.  It's people that
8    have self destruction, they know that they eat
9    something for the pleasure of the moment and
10   they know that their life will shorten, and
11   they know that they will have complications.
12   There is a problem.  I have to work with a lot
13   of psychology here; a lot of psychology.
14          If you look at the early terms that we had
15   on-site, the very, very early from the very
16   beginning, I was very clear with the customers,
17   I think from 2010.  And what I told the
18   attorneys to do is to tell them, if you come to
19   my site, if you come to my Facebook boot camp.
20   It's called boot camp.
21   BY MR. SETTLEMYER:
22      Q   Currently it's called Facebook boot camp
23   or it was back in 2010?
24      A   2010 it was the site.  Today I say out
25   loud with a lot of confidence.  In 2010, I implied.

542

1    I basically told them, if you come here, if you want
2    to work with me, if you want my regimen, I'm allowed
3    to tell you anything I want; to do anything I want
4    with you that would lead you to a healthy weight;
5    anything.  I can tell you that you will grow hair on
6    palm of your hand.  Anything I want I can do with
7    you.  And I will bring you to a healthy weight.
8    Please pay attention that I didn't say lose weight,
9    because I don't care about losing weight.  I care
10   about bringing them to a healthy weight.  Okay.  In
11   other words, I will not be happy if somebody tells
12   me, I lost 20 pounds in five days.  Show me that you
13   have achieved healthy weight.
14          So basically I will show them any images I
15   want.  I will do anything I want for them for as
16   long as I lead them to achieve a healthy weight.
17   Okay.  Now part of writing to them like this --
18      Q   You're pointing to the statement on page
19   14?
20      A   I'm pointing to the statement.
21      Q   With the 10, 16 hours?
22      A   Yes.  And I will explain the psychology
23   behind it.  And that's the reason why I have
24   trademarked gastric bypass effect.  I need a
25   psychological effect.  And I will explain to you

543

1    where I trick the customer's psyche.  There is a
2    scientific proof.  Absolutely no question about it.
3    It's called fasting 16 hours.  If you fast for 16
4    hours, you will definitely, definitely lose weight.
5    Because the body gets into a mechanism of fasting 16
6    hours.  You can see it in the black folder.  Your
7    experts will agree with it.  Everybody knows it.
8    Fasting 16 hours.  I need to make my fat customer, I
9    need to make them fast 16 hours.  I cannot be direct
10   with them, and say, hey, you're going to fast 16
11   hours.  Just listening to that is scary.  I have to
12   trick the customer with love.  Okay.  I don't want
13   to say trick.  Like doesn't sound good trick the
14   customer.  But I don't have any vocabulary to
15   explain it differently.
16          So the way it works is like this.  I tell
17   them when you wake up in the morning, you will
18   consume the gastric bypass effect.  Okay.  No big
19   deal.  They consume it.  I know from scientific
20   reasons, I know from the research, I just know that
21   it will remain in the stomach a long time.  Not 16
22   hours, not 10 hours.  It will remain three and a
23   half hours, maybe four.  That's all I need to keep
24   them to eat after four hours according to the
25   instructions.  That's all I want the formula to do.

544

1    But I want to stick in their mind, you have no room
2    in your stomach.  It's part of the psychology.  You
3    took a gastric bypass effect.  You feel like this.
4    There is no room.  But between you and I, it leaves
5    the digestive system after three and a half hours.
6          Next, I tell them, your last calorie
7    intake, not food.  I call it calorie intake.  I
8    don't want them to trick me with drinking things
9    with calories.  Your last calorie intake is four
10   hours before you go to sleep.  And then I continue
11   to give them remedies, like the pills, anti-cravings
12   and other things.  And if I can continue like this
13   all day giving them the pill that can sustain them a
14   few hours and give them again the gastric bypass
15   effect all the way four hours before they fall
16   asleep, guess what I did?  I got my 16 hours
17   fasting.  But I can never tell them that.  I can
18   never reveal to them or to anybody else that this is
19   what I do with them.
20          So when I tell them the 20 percent is a
21   given, because you just fill up the stomach with the
22   morning dose.  But the 10 to 16 hours, no.  I know
23   that it's only four hours.  But I tell them 10 to 16
24   hours because of the psychological effect.  All of
25   that is a lot of psychological.  Showing them images

35 (Pages 541 to 544)

545

1   is a psychological thing. Everything they can.
2   When they come to my boot camp, when they buy from
3   me, they permit me to do anything possible with them
4   to achieve the results.
5         So basically the bottom line is the
6   morning dose, which the main thing is carried them
7   only four hours, and then another pill carried them
8   and carried them and carried them, and then four
9   hours before they go to sleep, and I got my 16 hours
10  fasting. Which you will find a ton of evidence for
11  that to work.
12        One more thing. I not just force them to
13  drink three liters. I scare the hell out of them if
14  they don't drink it. I say, if you don't drink the
15  three liters, you will have complications and you
16  will have this one. It's true in part. It's true
17  in part. But it doesn't -- the person doesn't need
18  to drink three liters. But they do need to drink a
19  liter. But I tell them three. Why? Because I have
20  scientific evidence that if you drink three liters,
21  you will lose a few more pounds a month.
22        Q   Are you saying there's scientific evidence
23  that they would lose those pounds if they drank
24  three liters without the formula?
25        A   Yes. If they do the three liters on their

546

1   own, they would lose. If they do exercise, they
2   would lose. If they do the 16 hours on their own,
3   they would lose. If they do this -- I put
4   everything all together, including scaring them,
5   that if they don't succeed now, they will go to a
6   surgery. I could do everything possible from my
7   team, which I treat like a family. I treat them the
8   way that I will treat Anna and my kids. The way
9   that I would treat myself with the language, with
10  everything. I'm willing -- if I'm right now
11  110 pounds, trick me, do with me whatever you want,
12  just get me to be a healthy weight. I don't care
13  what you do to me. This is the situation of these
14  people.
15        To give you an example, if somebody tells
16  me, yeah, I'll go for it; I'm going to try it. We
17  have a saved answer that you will see. The answer
18  try. Are you going to waste $600 for a try? Let's
19  do a deal. You keep your $600. I'm keeping my high
20  success rate. Come back when you are sure. When
21  somebody says good luck to each other, they can be
22  vamped out of the group. What do you mean good
23  luck? Don't you trust that this person can really
24  succeed? Why do you think he needs to talk to God?
25  And then I tell them, by the way, I was born 40

547

1   minutes from Jesus. God and I talked last night.
2   God brought that person here to this group. God
3   told me that he's done. God told me that he's done.
4   He introduced already us and that's it. You are on
5   your own. And you will see everything in the group.
6   I don't have to tell you. You will see everything.
7   This is part of the saved answer. And this is the
8   way -- this is my methodology that I'm using.
9         That's why I think that the FTC came to us
10  and judging me. We are not a normal group. I don't
11  act normally with the group. And I don't have
12  normal people. They have 110 pounds. So this is
13  basically my answer to you. So the 10 to 16 hours
14  is a psychology. S is the stomach that I showed.
15        Q   The image?
16        A   The image of the stomach full and I tell
17  them you don't have a room.
18        Q   Are you talking about the image that
19  appears in Exhibit 2, page 10, in paragraph 26?
20        A   Yes, I am. Psychology, psychology,
21  psychology with these people. I don't -- there is
22  no science to what -- only psychology. A ton of
23  psychology, including scaring the hell out of them.
24  I brought somebody to the group that told them how
25  terrible the surgery is. And by the way, we have in

548

1   the group I would say 40, 50, 60 people, it's a
2   guess, that underwent the surgery. Of course they
3   didn't succeed because the surgery doesn't take care
4   of cravings. And the people in the group are
5   telling other people, make it work. You will go to
6   a surgery and they tell them you lose hair, you lose
7   whatever it is. And these people, by the way, if
8   you're going to ask me next about better than
9   gastric bypass surgery, I don't need to say it
10  anymore. They say it. And I placed another poll in
11  asking only users that underwent the surgery, tell
12  me, is the gastric bypass alternative better,
13  cheaper, faster than a surgery? Only those. And
14  they answer. They say, yes, it is. I didn't et '90
15  percent there. I got 70, 80 percent. I don't
16  remember what. And you can see the people that
17  underwent the surgery.
18        Mary Williams, for example, I think from
19  Texas, and Nancy N. We wanted to bring her here,
20  but her husband has a surgery on the 22nd. Mary
21  Williams. You just go online and you will see those
22  people. And they say to other people, listen, this
23  is beautiful. I wish I knew it before I cut my
24  stomach and before I started losing teeth. And they
25  say, it is better, safer, cheaper than the surgery.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555                    PX7-19

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                              2/17/2017

---

549

1        MR. DAVIS:  May I ask for the sake of
2   clarity on the record of this deposition
3   whether the trade secret is still being
4   discussed and whether this is still
5   confidential.
6        THE WITNESS:  I will stop here.
7        MR. DAVIS:  I'm not asking you to stop.
8   I'm curious whether the trade secret -- the
9   discussion of the trade secret has ended.  I
10  can't tell.
11       MS. MARTENY:  I think it is.
12       THE WITNESS:  It is now because I stopped
13  talking about psychology.
14       MR. SETTLEMYER:  So we'll leave the
15  confidential portion of the record.
16       MR. DAVIS:  Thank you.
17       (Thereupon, the CONFIDENTIAL portion of
18  the transcript ended.)
19  ///
20  ///
21  ///
22
23
24
25

---

550

1        (Thereupon, the NON-CONFIDENTIAL portion
2   of the transcript continued as follows:)
3   DIRECT EXAMINATION BY MR. SETTLEMYER:
4        Q   You had mentioned in a few -- I believe it
5   was yesterday in terms of talking about your
6   training and experience that you had taken some
7   courses in psychology, is that correct, in college?
8        A   Yes.  But this is really not the way that
9   I -- I don't consider myself a professional
10  psychologist.  Not a professional.  Not a doctor.
11  Not professional in anything.  I consider myself
12  very, very street smart; no more than that.  And I'm
13  very clear on the group every time I give them an
14  advice, I say, I'm not a doctor.  I'm not a
15  psychologist, but I have experience of eight years
16  and 80,000 users.
17       Q   Let me move over to another topic
18  momentarily.  When the websites for the Roca Labs
19  products have referred to Roca Labs being better
20  than gastric bypass surgery.  Better in what way
21  would you say?
22       A   The main, main big thing, cravings.
23  Cravings is not what people think.  It's not mind
24  over matter.  Cravings is a sickness.  It's a
25  condition.  It means when your body is used like

---

551

1   drugs to spikes of sugar.  Anti-cravings, our
2   anti-cravings balances the sugar levels and helps
3   people to overcome cravings.
4        Q   Let me ask you this.
5        A   The surgery does not do it.  And that's
6   the main, main reason why it's better.  There are
7   many more.  But that's the main, main reason why
8   it's better.
9        Q   Let me ask you specifically.  What is the
10  basis for any assertion that Roca Labs is better
11  than gastric bypass surgery in terms of helping an
12  individual lose weight?
13       A   Wow, where do I start?  Number one,
14  because people tell me.  Because the group tells me.
15  People in the group tell me I had the surgery.  I
16  hate the surgery.  It was not successful.  I
17  regained the weight because I couldn't overcome the
18  cravings.  Now I'm overcoming the cravings.  So it's
19  better.
20       It's also better because you don't cut
21  your stomach.  You don't lose all the Vitamin B's.
22  Because once you cut your stomach, you don't have
23  Vitamin B's.  As a result you lose teeth, you lose
24  hair.  You have a million complications.  You don't
25  have it with the regimen.  The regimen actually

---

552

1   makes you feel better, energetic.  Everything that
2   you will find in the group.
3        The group today is an easy way for me to
4   see a mirror -- not a mirror, but to reflect the
5   reality.  Earlier I knew it because Roxy told me,
6   because Sharon told me, because people that
7   testimonials.  It was more difficult to collect
8   data.  Today I see that what I claimed earlier that
9   took me two years to claim, today I can claim it in
10  one day.  Because I will ask something and
11  immediately 20, 30 40 people will tell me that.  So
12  it's definitely, definitely better than the surgery.
13  It costs less.  It's immediate and everything.
14       Q   I want to speak specifically on what
15  basis, if any, additional is there for any assertion
16  that it's better at achieving -- helping someone
17  achieve the result of losing weight of actually
18  creating a change in weight?
19       A   Okay.  Average bariatric surgery patient
20  would lose six to 11 pounds a month based on Web MD.
21  If you go on the Facebook Loss 100 group, you will
22  see the average weight reduction.  Number one,
23  everybody is losing weight from day one.  The change
24  in their habits occurs almost on day one.  The
25  ability to overcome cravings is after a few days.

---

37 (Pages 549 to 552)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                    2/17/2017

553

1    But let's talk about the average weight reduction.
2    Our average weight reduction -- forget about the
3    crazy things like 50 pounds in a month.  You see
4    things like this, but they are abnormal.  The
5    average is probably 25 to 30 pounds.  One pound a
6    day.  Almost one pound a day.  Not everybody.
7    Almost one pound a day.  And they maintain this for
8    a month, for two months and so on.  So the average
9    weight reduction in the group, probably 25 pounds a
10   month.  At least, at least, at least twice as much
11   as the surgery; at least.
12       Q   What sort of information other than the
13   information people are telling you through Facebook
14   does Muscular Obesity collect in any kind of
15   systematic way about the starting and ongoing and
16   end point weights of the people providing this
17   information?
18       A   We cannot force us to give them
19   information.  If they want -- if they are in the
20   group, they volunteer the information.  Those that
21   don't want to be part of volunteering information
22   are not there.  I cannot collect -- everybody's
23   participating in the early stages.  Those that
24   normally achieve a 40-pound weight reduction, 50,
25   tend to disappear from the group because they got

554

1    what they wanted from the group and they start
2    disappearing.  They come back and suddenly, hey, I
3    lost 80 pounds.  Hey, I lost 90 pounds.  But they
4    are not part --
5        Q   What effort, if any, is there being made
6    to collect and analyze the information that is
7    received?
8        A   I cannot send them a message and tell them
9    how much you lost.
10       Q   I'm asking what information you are
11   gathering.  Is it being kept and is it being
12   analyzed?
13       A   The group.  Just the Facebook group.
14       Q   Let me ask you to turn to -- before we get
15   there, I had a couple of other questions about some
16   earlier testimony which you mentioned the rules.
17   What are you referring to by the rules?
18       A   Is he married?
19       Q   I'm asking about the rules that you
20   referred to in the --
21       A   That's the first thing that comes to my
22   mind.
23       Q   It's a long day.  I understand.
24           Are you referring to some sort of rules
25   associated with Roca Labs?

555

1        A   In capital letters.
2        Q   What are those?
3        A   No coffee.  Coffee creates --
4        Q   You don't need to explain them.  I just
5    want to know what the rules are.
6        A   Sorry.  No coffee.  No dairy of any type.
7    No dairy, including cheeses.  No dairy.
8        Q   Okay.
9        A   No greasy food.  No greasy food.  Anything
10   that is oily, greasy, fried, no.  Your first food
11   intake is four hours from the time you wake up.
12   Your last food intake is four hours before you fall
13   asleep.  My trick for the --
14       Q   Those are the rules?
15       A   Yes.  Must exercise; you must.
16       Q   How much?
17       A   What?
18       Q   How much exercise?
19       A   How much?  As much as I want to see
20   consistency.  And in exercise we have three types.
21   The best is dancing with youngsters in front of the
22   TV, because it's activity.  Let's not get into that.
23       Q   Sure.
24       A   Dancing.  Then you have the gym.  And
25   jogging is not good for them, because of the

556

1    pressure on the joints.  But they must do it.  And
2    if somebody tells me, I exercised, I don't approve
3    the post.  Unless I know that it's consistent four
4    days a week.  That's what's important.  And if
5    somebody will say, I have a stand still in my weight
6    reduction and they don't -- they must show that they
7    exercised for example.  So exercising is a must.
8        Then the next thing, they cannot eat
9    pastry, like pasta, bread.  They are limited to 10
10   slices of bread a week.  Pasta I think two or three
11   times.  The next thing, no soda of any kind.  No
12   bubbly things because it doesn't interact well.  It
13   doesn't interact well with our -- they need to
14   maintain less than 1,200 calories a day.  Most of
15   them are doing 800 to 1,000.  So less than 1,200 a
16   day.  Three liters of water.  At least six bottles
17   of water a day.  And I think that's it.
18       Q   What are the instructions that you
19   referred to?
20       A   Instructions is prepare your morning dose
21   the night before.  It must be refrigerated, number
22   one.  You consume as much as you can in the morning.
23   The morning dose you consume as much as you can and
24   then you take two more spoons.  Two hours later you
25   will take the red pill, the yellow pill together.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555          PX7-21

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                              2/17/2017

557

1   Four hours from the time you woke up you will eat
2   your first meal.  Oh, I'm sorry.  I must jump back
3   to the rules.  When you eat, you take a very
4   measured proportion in front of you.  You cannot go
5   to a buffet.  It must be measured.  You will take a
6   small bite.  You will chew for 20 seconds.  You will
7   put your fork and knife and you will wait for 30
8   seconds before the next bite.  After eight, nine
9   bites, check and see if you're really full.  By the
10  way, this is another scientific thing.  So, again,
11  eating slowly let's call it.  Back to the
12  instructions.
13       Two hours later after you ate your first
14  meal, you will take the anti-cravings drink.  Two
15  hours later you will take again the yellow and the
16  red pill.  Two hours later you will take one more
17  anti-cravings.  And then you will take the
18  remainders of the morning dose which you did not
19  finish in the morning.  And then it's already four
20  hours before bedtime.  It's not bedtime.  It's the
21  time you fall asleep.  Because a lot of people go to
22  bed earlier.  So they have a lot of rules to follow,
23  a lot of rules.  Like most of the them will tell you
24  it is a lifestyle.  They changing their lifestyle.
25  They cannot just take a pill and think it's magic.

558

1   And if somebody would come to the group, and say,
2   does it work?  I say, no, it doesn't work.  The
3   regimen without your determination is worthless.
4   That's what I called the regimen.  It's worthless.
5   Save your money.  If you're not determined, save
6   your money.
7        Q   You mentioned just a moment ago that under
8   certain circumstances, and you gave an example of
9   somebody talking about an exercise level, that you
10  don't approve the post.  Are you talking about posts
11  to the Facebook group?
12       A   Yes.  We approve only maybe less than half
13  the posts, a third of the posts.  If somebody posts,
14  I lost a lot of weight, I want proof.  I want to see
15  the scale and other people will challenge them.
16  There are some things I would look at it, and I
17  said, we don't approve it.  And we wait for two
18  weeks until the person corresponds with us and we
19  identify them in the system.  The person needs to be
20  identified in our system to see that it's a real
21  person.  We check on them.  We double-check on them.
22  We don't allow posts that are -- they must be
23  inspirational and educational.
24       Q   But in other words, you or someone working
25  for Muscular Obesity will approve or disprove a post

559

1   to the Facebook group Lost 100; is that correct?
2        A   Yes.
3        Q   And you referred also to the pills.  What
4   are the pills?
5        A   There is a red pill.  And we call it
6   reinforcement of the morning dose.
7        Q   What's in it?  What are the ingredients?
8        A   Can we go again.
9        MR. SETTLEMYER:  We can be on the
10  confidential record, yes.
11       (Thereupon, the NON-CONFIDENTIAL portion
12  of the transcript ended.)
13  ///
14  ///
15  ///
16
17
18
19
20
21
22
23
24
25

560

C
O
N
F
I
D
E
N
T
I
A
L

39 (Pages 557 to 560)

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

569

1    group were users --
2        A   No.
3        Q   -- of the product?  No?
4        A   No.  Some of them users.  Some of them
5    want to be users.
6        Q   So perspective --
7        A   Users and perspective users.
8        Q   They interact?
9        A   Yes.
10       Q   And the users include people who are just
11   other customers who are not being paid by Roca Labs?
12       A   We don't need paid people.
13       Q   I'm just asking a question.  They're users
14   who are not being paid by Roca Labs?
15       A   I know where you're going with it.  I'll
16   make it clear.  The group has active users of the
17   regimen and has people that want to buy the regimen.
18   Either they don't have the money or they want to be
19   still convinced.  When somebody is successful, let's
20   say not just losing their weight, but they are
21   successful with reversing their diabetes.  Because
22   we have people that were cured.  The use is not
23   cured.  It was reversed.  They were reversed.  They
24   were at 400 and now they're at 100.  Then they tell
25   us, I stopped using insulin because of the gastric

570

1    bypass alternative regimen.  So they do a post.  We
2    approve the post.  And then other diabetes people
3    talk to each other.  They just talk to each other.
4    We don't have to say anything.  If they ask us, we
5    say we cannot give you an answer because we are not
6    doctors.
7            Now what happened with time is that there
8    is so much activity, so much help is needed, that I
9    approached one or two people, a couple of people,
10   and I said, listen, you help in the group.  They
11   help anyway each other.  They help.  They talk and
12   they help and stuff.  But I said, what about if you
13   devote a few more hours.  Here is $50 a week.  Just
14   continue to do whatever it is that you do.  I don't
15   even know what they do.  I don't know what they do,
16   what they say.  There is no agreement.  There is no
17   conditions.  There is nothing.  Take $50.  But when
18   people are asking or something, just put whatever it
19   is that you normally do, just continue to do.  In a
20   way, by the way, it's no different than other people
21   that were working on a payroll in quotations were
22   doing.  Because what I told Roxy is just take money
23   just to talk to people.  Just talk from your
24   experience.  Roxy for example was not allowed to
25   sell.  Nobody was allowed to sell.  Okay.  No sales

571

1    is necessary.  Just tell your story.  So there are
2    two people that take $50.  Just talk to people.
3        Q   Who are those two people?
4        A   One is Jessica and the other one is
5    Suzanne.  So Jessica and Suzanne -- there is no
6    hours.  There is no monitoring.  There is nothing.
7    What is help?  What is help?  If somebody comes to
8    us and says, how do I use it, or I don't know how to
9    use it in the morning, or how much should I take in
10   the morning.  They're job is to say, don't dare
11   asking in the group.  It shows that you are not
12   committed.  Go to slash ingredients or slash -- I'm
13   sorry, slash instructions.  That's their job.  Not
14   to promote; not to sell; no nothing.  Just to help
15   by directing them.  Go to your hub; go here.  They
16   already know that people are asking some stupid
17   questions.  Stupid -- the definition of stupid is
18   you could have found it on your own in the hub.
19   Don't bother 13,000 people with your question.
20   Okay.  So what they do, they direct to the site.
21   That's all they do.
22       Q   Have there been any changes to the
23   products that Muscular Obesity is selling since the
24   lawsuit was filed?
25       A   I don't know if we had the right pill.  I

572

1    don't remember.
2        Q   Okay.
3        A   I think we did.  We added the yellow pill.
4    And lately we added another one called white pill.
5    Just we testing it.  It's for stress and better
6    sleeping.
7        Q   What are the ingredients of the white
8    pill?
9        A   I think it's already on the web.  I didn't
10   release it to everybody.  What I first did, I gave
11   it to 10 people.  They used it.  The results were
12   excellent.  And then I allowed another 100 people to
13   use it.  So it's not really widely spread right now,
14   but the ingredients are already up.
15       Q   Do you recall what the ingredients are?
16       A   If I will tell you, it will not sound
17   right; the spelling.  We will waste time on
18   spelling.
19       Q   But it's on the gastric.care website?
20       A   Yes.
21       Q   What's the purpose of the white pill?
22       A   Stress and sleep.
23       Q   Has there been any change in the marketing
24   channels that MCO has used since the lawsuit was
25   filed?

42 (Pages 569 to 572)

FTC v. Roca Labs, Inc., et al.                                        2/17/2017

---

573

1    A   For some reason we stop selling to the
2  Gulf country; the Gulf.  We used to sell to
3  hospitals in the Gulf countries.
4    **Q   You're talking about in Saudia Arabia**
5  **Gulf?**
6    A   South Arabia, Qatar.  The four rich Arab
7  countries in the Middle East.  We used to sell much
8  more over there and to hospitals, two or three
9  hospitals that use it again and again.  We stopped
10  selling there.  We just simply don't put the efforts
11  into the Arab.
12    **Q   So those are the markets.  I'm talking**
13  **about the marketing channels in terms of are you --**
14  **say for example are you still using Google search**
15  **ads?**
16    A   Google blocked us long ago.
17    **Q   So the answer is no, right?**
18    A   Yeah, long ago.
19    **Q   Are you using Bing still to advertise?**
20    A   Very little.
21    **Q   What about Yahoo?**
22    A   It's the same all of this, Bing, Yahoo.
23    **Q   I'm trying to break them out?**
24    A   No.  We don't -- what we use is very
25  little Facebook.  I don't have the money.  So I'm

---

574

1  forced to do much more social.  I just don't have
2  the money to do it.
3    **Q   Is that primarily Facebook?**
4    A   Facebook.
5    **Q   Would you say you've increased the use of**
6  **Facebook since the lawsuit was filed?**
7    A   I'm saying we don't have the money to
8  advertise.  So we're doing social and a little bit
9  advertisement on Facebook.
10    **Q   I'm talking in terms of --**
11    A   Advertisement.
12    **Q   In terms of any marketing.  So you're just**
13  **making greater use of Facebook in general as a**
14  **company since the lawsuit was filed?**
15    A   Yes.
16    **Q   In terms of what you are doing, are you**
17  **interacting with customers on Facebook?**
18    A   As much as I can.
19    **Q   Perspective customers?**
20    A   Sometimes 10 hours a day.  Sometimes if
21  I'm here not, but as much as I can.
22    **Q   Are you doing live chat with them, the**
23  **customers?**
24    A   I do more than that.
25    **Q   What do you do?**

---

575

1    A   When you say live chat, you mean talking
2  to them?
3    **Q   Well, there's the chat with the text,**
4  **right, that's one thing?**
5    A   And then --
6    **Q   What else are you doing?**
7    A   Video.
8    **Q   You do video?**
9    A   I do video.  It's being recorded and then
10  thousands watch it.
11    **Q   So it's like a Facebook live video?**
12    A   Which later becomes a video that people
13  re-watch and re-watch and re-watch.
14    **Q   So you leave that up on the --**
15    A   Yes.
16    **Q   The Lost 100 site?**
17    A   Yes.
18    **Q   Group site?**
19    A   Yes.
20    **Q   Now is the Lost 100 group a public group?**
21    A   Public.
22    **Q   So anybody who's a Facebook user could log**
23  **into Facebook and be able to go to that group and**
24  **see the communications back and forth; is that**
25  **correct?**

---

576

1    A   Yes, you can do it.  But if you want to be
2  a -- if you want to be a member, you need to ask
3  permission.  But I don't really need.  If you just
4  want to check what we are doing, if you want to
5  check what we are doing, you don't have to be a
6  member.  You can just see.  But if you want to check
7  if people are real.  If people say, I lost five
8  pounds in two days.  If you want to check if they
9  are real, you do need to be a member so you can
10  communicate.
11    **Q   How does one become a member?**
12    A   Just ask I want to be a member.  We don't
13  really -- we cannot screen people.
14    **Q   In terms of asking to be a member, is that**
15  **just -- what additional capabilities does one have**
16  **to interact with the group by virtue of becoming a**
17  **member?  What more can you do?**
18    A   It's a complex question.  You're asking,
19  if I'm not a member, you can see everything.  If you
20  don't want to interact with people, you don't need
21  to be a member.
22    **Q   But if you want to interact with people --**
23    A   You do need to be a member.
24    **Q   You do need to be a member.  Okay.**
25    A   We used to check each person.  We cannot

---

43 (Pages 573 to 576)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                        2/17/2017

---

577

1    do it anymore because it's so massive. We have
2    14,000 right now I think. We kicked out about 2,000
3    people that were kicking out, because people that
4    are asking questions about instructions; that they
5    need to read alone and things like that or don't
6    respect the house rules. But overall it's called a
7    boot camp and I'm handling it as a boot camp.
8         Q    In addition to moderating the comments,
9    you also moderate the membership; is that correct?
10        A    No, anybody can be.
11        Q    But you kick people out you say?
12        A    Based on the comments.
13        Q    But what I mean is --
14        A    I can block.
15        Q    You can grant a membership or deny
16   membership; is that correct?
17        A    Yes. Everybody almost is accepted. But
18   if somebody is suddenly doing things that are not to
19   the benefit of the group achieving a healthy weight,
20   they'll be kicked out. If somebody will say, yeah,
21   one coffee a day is no big deal; bang, out.
22        Q    Do you have a list have written rules for
23   what would get people kicked out of the membership?
24        A    I think it's part of the files. There is
25   a section called files. For some reason everybody

---

578

1    knows it.
2         Q    By section you mean in the group page?
3         A    Yes. It's called files. It's called,
4    "Democracy, Not In My Group".
5         Q    In terms of the perspective customer --
6         A    I'm sorry. Yes, there are rules. When a
7    new member comes, if they approach, we send them
8    something that says welcome to the boot camp.
9         Q    And then there's that message has the
10   rules of that group; is that correct?
11        A    It's mainly my group. It's mainly my
12   rules, yes.
13        Q    But that's what you would communicate to
14   people?
15        A    Yes.
16        Q    That's where the rules are at least
17   initially communicated; is that correct?
18        A    Yes.
19        Q    And then if a perspective customer who's
20   not a member wants to ask a question of somebody
21   who's in the group, does the person who wants to ask
22   the question have to become a member?
23        A    Tricky question. I don't think so. You
24   don't have to necessarily. Because if you see a
25   person that says, yeah, I lost five pounds and I'm

---

579

1    from Texas. And you say, yeah, me too. They text
2    message behind -- they don't need us.
3         Q    So in theory they could Messenger each
4    other through Facebook?
5         A    Not in theory. They do it all day.
6         Q    But they could not post a comment within
7    the group?
8         A    You got it.
9         Q    Correct?
10        A    You got it.
11        Q    That other group members could see --
12        A    You got it.
13        Q    -- unless they're a member?
14        A    You got it.
15        Q    Okay. Thank you.
16             Who are the -- have there been any changes
17   in terms of the ingredients of the formula since the
18   lawsuit?
19        A    You cannot say formula because we have
20   about six or seven variations. Okay.
21        Q    All right.
22        A    Because people buy different -- okay.
23   People buy custom, premium, basic, advanced. Before
24   you guys sued us, we had enough volume of business
25   to really provide three or maybe four different

---

580

1    strength of formulas, okay, and really provide them
2    according to what they paid. After you guys sued
3    us, our volume went down so much that I'm forced to
4    use probably the top one, okay, the most expensive
5    one, and give it to others without telling them.
6             So, in other words, if somebody buys
7    basic. Okay. This is number four, three, two and
8    one. Basic on the bottom. Not basic, but advanced.
9    They would probably get what this guy is getting.
10        Q    In the premium category?
11        A    Yeah. They will get on the top because I
12   don't have a choice. I cannot do them -- I cannot
13   do like 12,000 production, you know. So I'm forced
14   to chose one of them. So basically we are losing
15   more money if somebody is choosing to buy only
16   advanced instead of premium.
17        Q    Let me ask this. Have there been any --
18   so it sounds like there have been reductions in the
19   number of different formula options that are
20   available?
21        A    To us behind the scenes.
22        Q    But in terms of the formulas that are now
23   available, they are essentially the same as the ones
24   that were available before?
25        A    Pretty much with a little bit

---

44 (Pages 577 to 580)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                      2/17/2017

581

1    improvements. Like I decide, okay, we will lower
2    the L-Carnitine, one of the ingredients. We would
3    lower it a little. We did another trick. I'm
4    sorry. I don't know any other word. Trick means
5    that it's something to shorten. I don't have any
6    other word in English to know that. But trick is
7    just not to make money off somebody. It's just to
8    make it shorter. So we did another thing. From now
9    on when somebody orders -- not from now. A year ago
10   almost. They get it almost like a prescription.
11   Each regimen gets its own -- a name of the person.
12   A personalized label with their goals, weight
13   reduction goals. Because we want them to look at it
14   very personal. We want them to look at it like a
15   prescription. We want them to look at it like, wow,
16   it's made for me. Again, I will do everything
17   possible, everything that I can imagine to make sure
18   that they take it very, very, very seriously. Just
19   for the same reason that Brian was wearing a white
20   robe.
21        Q    Brian the man who appeared in the lab coat
22   videos?
23        A    Yes. Everything possible. Because in my
24   mind there is no difference between a white coat or
25   putting colors in your web that look serious or

582

1    changing the font to look like CNN fonts. There is
2    no difference. You're trying to look serious in
3    front of the customer.
4         So the same thing that I did. We did
5    labeling. Each product is labeled. So when they
6    show it later on Facebook or something, they have
7    their name. They have their goals. They know that
8    it's personalized. And by the way, our systems do
9    personalize it. In other words, we will give
10   sometimes more anti-cravings if we see that you a
11   problem with anti-cravings.
12        Another thing we didn't do since the
13   lawsuit is the weight analysis. It's a big deal.
14   Part of my psychology is I'm saying you eat a lot
15   and you get overweight because you don't pay
16   attention to the label. You don't understand how
17   many calories here. But if I will tell you and I'll
18   make you conscious of it, maybe you will change your
19   way.
20        Q    Describe for me what you mean by the
21   weight analysis. Is this something that is done
22   when you're getting perspective customers entering
23   information in order to purchase the product?
24        A    Yes, but that's the qualification. The
25   weight analysis is that I'll basically when you are

583

1    done answering all the information -- it's lengthier
2    than before. I'll ask you how many pastries do you
3    eat a week; how many sodas; how many pizza; how many
4    this; how many that. And then I give you a list and
5    I say, listen, you have 8.2 pounds a month of
6    cravings that you can cut. 2.8 is from Coke. Okay.
7    1.2 from pizza. And the donuts are 2.2. And I will
8    make you aware of all of that. I will tell you how
9    many calories you do need to eat a day in order to
10   not gain weight.
11        Q    So is the weight analysis something that's
12   done prior to purchase?
13        A    Yes.
14        Q    Okay. And it's done from the perspective
15   customer entering information online, correct?
16        A    Yes.
17        Q    And how is the weight analysis that's
18   performed for them communicated to them? Is that
19   done online or --
20        A    Online. As soon as they are done entering
21   the information, they see -- we call it results
22   page.
23        Q    Okay. So it will be a page that's
24   displayed on the web?
25        A    The results.

584

1         Q    Not a separate message?
2         A    Correct.
3         Q    In terms of --
4         A    I need to correct myself on something.
5         Q    Go ahead.
6         A    Yesterday you asked me if the -- and I
7    kind of -- I didn't know what to answer you. You
8    said, okay, when somebody -- terms. Are they really
9    forced to read the terms when they do the V.
10        Q    When they click check box?
11        A    Check box. I said, no, they're not
12   forced. But I forgot to tell you that they get an
13   e-mail and they got an e-mail all along with
14   everything, with all the terms. So they see it.
15   It's in their e-mail. They have a chance to cancel
16   from the e-mail. They can cancel in the hub and
17   just say, I don't want the deal. Another way that
18   they can cancel, if they don't open the package. On
19   the package they say, do not open this package if
20   you don't agree to the terms.
21        Q    And it said that on the tape for the
22   package, correct?
23        A    Tape.
24        Q    But the e-mail that would come with the
25   terms came after the person had entered their

45 (Pages 581 to 584)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555                   PX7-26

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

---

585

1    purchase information, correct?
2        A   And they can cancel.
3        Q   But it's correct that it was post purchase
4    that e-mail came, correct?
5        A   Yes.
6        Q   How long do they have to cancel?
7        A   I think less than a day.  Less than a day.
8    They can cancel and forget about it.
9        Q   Would you say it was a couple of hours?
10       A   No.  No, no, no, no.  No.  I think now
11   it's about eight hours and before no.  Two hours is
12   nothing.  And even let's say we produced it, and
13   somebody says I want to cancel or something, we
14   wouldn't mess with it.  We wouldn't mess because we
15   would lose on the dispute.  We would lose on the
16   dispute.
17       Q   Let's turn back to the current operations.
18   And I think we're getting close to being done.
19       A   By the way, every time that somebody
20   cancels before they open the package and they tell
21   the PayPal, I didn't even open.  It doesn't matter
22   what we write in the terms.  We would lose.  From
23   the very beginning Sharon knows take the money.
24       Q   Who are the current personnel working for
25   Muscular Obesity aside from yourself?

---

586

1        A   Anna is managing the warehouse.  She works
2    with one more person.  Her name is Sonya.  Then
3    there is Priscilla and Sean.
4        Q   Who is Sean?
5        A   He's doing what Priscilla is doing.  She's
6    just doing support.  And then just Mac, he's my
7    programmer, and myself.
8        Q   When did Priscilla start to work with
9    Muscular Obesity?
10       A   July, August last year maybe.  I don't
11   remember exactly.
12       Q   When did Sean start to work with Muscular
13   Obesity?
14       A   Really a few months ago.
15       Q   Is there anyone else who's doing any work
16   for Muscular Obesity at the moment?
17       A   I cannot think right now.  I don't know
18   why.  I drew a blank.
19       Q   Has there been anybody working previously
20   for Muscular Obesity who's left in the past couple
21   of months?
22       A   Somebody that was working with us that
23   left in the last couple of months?  No.  Everything
24   is kind of -- everything is on low.  We don't have
25   too much of activities.  While you're doing your

---

587

1    packing your, you know, checking, I'll think about
2    it.
3        Q   Let me ask this.  So Mac is located in
4    Pakistan; is that correct?
5        A   Yes.
6        Q   And Priscilla is located in the U.S.?
7        A   In Orlando.
8        Q   Sean is located in the U.S.?
9        A   Orlando.
10       Q   Orlando.  And who is the person, Jessica?
11       A   Sonya.
12       Q   Sonya who's working with --
13       A   Orlando.
14       Q   So is there anybody else working in the US
15   aside from those folks and you?
16       A   No.  Who works and who left, no.  And the
17   two people that I told you that they get $50 a week,
18   they just direct people go to the hub; go to the
19   instructions; go here.  No terms, no hours, no
20   nothing, just whatever they want.
21       Q   Do you know where they're based
22   geographically?
23       A   Out of their laptop.  I don't know what
24   state, what country.
25       Q   Is there anyone else in the U.S. who's

---

588

1    working with Muscular Obesity?
2        A   It doesn't come to my mind.  But when you
3    guys do your stuff, I'll think.
4        Q   And then what's the basis for compensation
5    for the people working for Roca Labs other than
6    yourself?  Is it an hourly?
7        A   Hourly.
8        Q   Nobody is working on commission?
9        A   I don't think we ever had somebody on
10   commission.  I had a thought a couple of times in
11   the last eight years about it.  But I don't think it
12   ever consummate ever, you know.
13       Q   So now working for MCO is working on
14   commission; is that correct?
15       A   No.  We don't need to sell.  We don't
16   push.  We don't need to sell.  We don't need to
17   push.
18       Q   But the answer is no?
19       A   No.
20       Q   These individuals other than yourself are
21   working and I guess Anna, who is your wife, are
22   working pursuant to independent contractor
23   agreements?
24       A   Wife and boss.
25       Q   Huh?

---

46 (Pages 585 to 588)

FTC v. Roca Labs, Inc., et al.                                    2/17/2017

597

```
1     that correct?
2         A   Yes, yes, yes.  I confused with lending
3     site.
4             MR. DAVIS:  So the yeses and nos aren't
5     clear.
6             THE WITNESS:  I'm sorry.  There is no
7     other place to buy it other than gastric.care.
8     BY MR. SETTLEMYER:
9         Q   Are there places other than rocalabs.com
10    and gastric.care that MCO uses to advertise the
11    product?
12        A   No.
13        Q   I guess you mentioned -- just to be clear,
14    you mentioned a Facebook page, Lost 100; is that
15    correct?
16        A   That's a group where people just talk.
17        Q   Is there a Roca Labs Facebook page or
18    Gastric Care Facebook page?
19        A   Yes, there is another page.
20    Facebook.com/Lost180.
21        Q   What about YouTube, what's currently up on
22    YouTube now?
23        A   We don't use YouTube.  It's not active.
24    We don't use it.  We don't promote it.  We don't
25    nothing with it.
```

598

```
1         Q   Is it still up?  Is there still a Roca
2     Labs channel?
3         A   It's still up.  It might be that naturally
4     people go there.  But we don't promote.  We don't
5     add actively.  We don't do anything there.  Because
6     the group, people add everything on the group.
7         Q   But I just want to be clear.  The Roca
8     Labs YouTube page would be a way in which people if
9     they were on the page could click through to
10    rocalabs.com; is that right?
11        A   Yes.
12        Q   So aside from --
13        A   No.  There is no click from YouTube to
14    rocalabs.com.
15        Q   Nothing?
16        A   I don't think.  There is no continue to.
17    No, I don't think so.
18        Q   And if the -- so aside from the Facebook
19    pages we just discussed and the website that you
20    mentioned, are there any other web properties that
21    MCO maintains to promote its products?
22        A   No.  No.  The promote the product is only
23    I would say on the Facebook.
24        Q   Is there a Twitter account that MCO uses?
25        A   Nothing that is active.  Nothing that it's
```

599

```
1     bringing any business or anything like it.
2         Q   Is there a Pintrest page?
3         A   Maybe, but nothing that we really promote,
4     add or do something with it or care for.
5         Q   Are there any ongoing search engine
6     optimization activities that you're aware of for
7     Roca Labs?
8         A   We don't have the budget.  We don't have
9     the time, nothing.
10        Q   So the answer is no?
11        A   No.  Even when we did it four years ago we
12    were very unsuccessful.  So no efforts.
13        Q   Is anybody being compensated to maintain
14    or create any blogs about the products?
15        A   Nothing.
16        Q   And is anybody being paid to make any
17    foreign posts about the product?
18        A   Nothing.  We have no need for any of this.
19    Only --
20        Q   Only what you're doing?
21        A   Yes.
22        Q   You stopped mid sentence.
23        A   Yes.
24        Q   I want to make sure we got it.
25        A   Yes.
```

600

```
1             MR. SETTLEMYER:  I have at this time no
2     further questions except what may later relate
3     to what Ms. Marteny will ask or what we can
4     manage to ask in our limited time to ask about
5     the documents that have been produced in the
6     past couple of days.  So with that, I have no
7     further questions at this time.
8             MS. MARTENY:  Before we get started, I
9     want to note certain confidential exhibits that
10    were introduced today.  We'd like to have
11    marked as confidential Exhibits 131 through 136
12    and also Exhibits 142, 143.  I think that's
13    where we left off.
14             CROSS-EXAMINATION
15    BY MS. MARTENY:
16        Q   Don, I want to ask you some questions.
17    Can you put that aside for a second.
18        A   Do you want to sit on the other side?
19        Q   No.
20        A   I'm kidding.  Because you start having a
21    tone like him.
22        Q   So yesterday do you recall talking about
23    some credit card disputes?
24        A   Yes.
25        Q   And the corporate Defendants' response to
```

49 (Pages 597 to 600)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

613

1    Q   But for anybody who's considering it, you
2 think that the people have decided not to get it
3 because of your work with you and your product?
4    A   Big time.  Because they will first try the
5 regimen.  And if they are not successful with the
6 regimen, they will then go and undergo the surgery.
7 There are cases like this.  Somebody says, hey, I
8 want to try the alternative before I will undergo
9 the surgery.  I heard before somebody said, I tried
10 the gastric bypass alternative and it didn't work as
11 well as I thought.  I lost 50 pounds and I got
12 stuck; no more; I do need to do the surgery.
13 Possible.  But they need to first try the
14 alternative before they cut their stomachs.
15    Q   Let me go back to the discussion of the
16 Exhibits 87, 88 and 89 in terms of what you
17 testified.  And you can look at those if you want to
18 refresh your recollection.  But my question for you
19 is not related specifically to the content of the
20 documents, but more to your understanding of the
21 process of credit card disputes.  Is there a rule
22 laid out by any credit card processor that requires
23 for a dispute resolution, the merchant to present
24 information such as the height, weight and medical
25 and emotional issues being confronted by a customer?

614

1 Is there a regulation; yes or no?
2        MS. MARTENY:  Object to form.
3        THE WITNESS:  Yes.
4 BY MR. SETTLEMYER:
5    Q   Yes, there is a regulation?
6    A   Yes.
7    Q   What is that regulation?
8    A   Bring us everything to prove that you
9 didn't commit -- that you didn't do a fraudulent
10 act.  That's the way that Sharon King heard from
11 them.  That's the way that I know when I talked to
12 Adam.  Adam is my processing guy.  Show them
13 everything you can that you didn't do a fraudulent
14 act, and I will do everything that I need to support
15 to show that I didn't do a fraudulent act.  I'm
16 starting with the simple thing.  Anybody else in the
17 world can see.  Somebody is six-feet two.  Somebody
18 is 370 pounds.  Everybody can see that they are way
19 overweight.  18 years old, male.  All of these facts
20 are, you know, there is no privacy here.  People
21 know that they are 350 or 400.  Nothing private
22 here.  Male; nothing private.  And then declaration.
23 Declaration is a personal thing.  And when they see
24 the declaration, they say, I do remember it.  I will
25 withdrawal my accusation of fraudulent and

615

1 unauthorized.  If we don't do that, we might lose.
2 They will stop taking money or processing our credit
3 cards.
4    Q   What is the source that you're aware of,
5 of the information telling you that there's a rule
6 of the credit card processor to get the type of
7 information that you are providing?
8        MS. MARTENY:  Object to form.
9        THE WITNESS:  I need to provide everything
10    possible to show that it's not fraudulent.  In
11    order to do that, I'm showing the IP.  But we
12    were told before, IP is not enough.  It might
13    be that there a few people in the same room.
14    What other form can I prove that I didn't take
15    it fraudulently.
16 BY MR. SETTLEMYER:
17    Q   You're not answering my question.  My
18 question is, what is the source of information from
19 which you understand there to be a rule that
20 requires you --
21    A   PayPal.  When we talk to PayPal.  And we
22 talk numerous, numerous, numerous times with PayPal.
23 What do we do with disputes?  And the answer is
24 prove in any way that you can.  Every way that you
25 can that it's not fraudulent.  Show any unique

616

1 things that will remind the person disputing, the
2 card holder, that they are wrong and it wasn't
3 fraudulent.  All of this unique identifiers and
4 that's what we do.  If we had other unique
5 identifiers, I would use them.
6    Q   Is there anything in writing that you can
7 site that supports what you're understanding of the
8 rule is?
9        MS. MARTENY:  Object to form.
10        THE WITNESS:  No, it's talking.  We talk
11    to them.  Sharon King talked to them.  I talked
12    to them.  I talked to them numerous times.  But
13    I can do something.  I can maybe ask them
14    again, by the way, what else can I provide.  If
15    I provide everything, is it okay what I
16    provide.
17        Let me put it differently.  No credit
18    processor ever rejected this information saying
19    to us, sir, this is private, confidential, do
20    not send us anymore.  So we have been doing
21    this for years.  Nobody ever rejected it
22    saying, we don't want to have this information.
23    This is too private.  Nobody ever told us.  And
24    by the way, no customer says, do not reveal it
25    or what you did is not okay.  And something

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555                    PX7-29