UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ROCA LABS, INC., a corporation; ROCA LABS NUTRACEUTICAL USA, INC., a corporation; MUST CURE OBESITY, CO., a corporation; JURAVIN, INCORPORATED, a corporation; ZERO CALORIE LABS, INC., a corporation; DON JURAVIN, individually and as an officer of Roca Labs, Inc., Roca Labs Nutraceutical USA, Inc., Must Cure Obesity, Co., and Juravin, Incorporated; and GEORGE C. WHITING, individually and as an officer of Roca Labs, Inc., Roca Labs Nutraceutical USA, Inc., and Zero Calorie Labs, Inc.,<br><br>Defendants. | Case No. 8:15-cv-02231-MSS-TBM |

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO COUNT THREE OF THE AMENDED COMPLAINT**

# **TABLE OF CONTENTS**

I.   OVERVIEW ................................................................................................ 1

II.   MATERIAL FACTS ABOUT DEFENDANTS' GAG CLAUSE PRACTICES ............ 1

   A.   Defendants Deceptively Advertised a Weight-Loss Supplement, Not a Multi-Factor "Regimen." ................................................................................................ 1

   B.   Defendants Hid the Gag Clause During the Ordering Process. ................................. 4

   C.   The FTC's Unrebutted Expert Testimony Shows Harm from the Gag Clause Practices. ................................................................................................ 6

   D.   The FTC Disputes Defendants' Statements About the CRFA. ................................. 8

III.  LEGAL ANALYSIS ................................................................................... 9

   A.   Summary Judgment Standard ................................................................... 9

   B.   Conduct That Violates Section 5(n) Is Unlawful Even If the Conduct Does Not Violate Other Laws. ................................................................................ 9

   C.   The FTC is Not Seeking to Apply the CRFA Retroactively. ................................. 12

   D.   Defendants' Gag Clause Practices Are Unfair Under Section 5(n). ........................ 13

      1.   Defendants Ignore the Substantial Injury Their Conduct Has Caused or Is Likely to Cause. ................................................................................................ 14

      2.   Consumers Cannot Reasonably Avoid the Injury. ................................. 16

      3.   There Are No Countervailing Benefits to Consumers or Competition from Defendants' Gag Clause Practices. ................................................................ 18

i

4.     Public Policy Favors the Public's Right to Receive Truthful Commercial Information. ................................................................................................................ 19

IV.  CONCLUSION ........................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Abramson v. Gonzalez*, 949 F.2d 1567 (11th Cir. 1992) ........................................................ 20

*American Psychological Ass'n*, 115 F.T.C. 993 (1992) .......................................................... 11

*California Ass'n of Legal Support Professionals*, FTC Docket No. C-4447, Statement of the

   Commission (2013).............................................................................................................. 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................ 9

*City of Houston v. Hill,* 482 U.S. 451 (1987) ........................................................................ 15

*EEOC v. Severn Trent Svcs., Inc.,* 358 F.3d 438 (7th Cir. 2004) .......................................... 19

*Eichelkraut v. Camp*, 513 S.E.2d 267 Ga. App. 721 (Ga. App. 1999) ................................. 19

*Freelife International, Inc. v. American Educational Music Publications Inc.*, 2009 WL

   3241795 (W.D. Ariz. 2009) ............................................................................................... 19

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009)................................................. 10, 19

*FTC v. Bunte Bros.*, 312 U.S. 349 (1941).............................................................................. 10

*FTC v. Commerce Planet* 815 F.3d 593 (9th Cir. 2016)......................................................... 17

*FTC v. Commerce Planet*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012) ....................................... 17

*FTC v. Cyberspace.com,* 453 F.3d 1196 (9th Cir. 2006)........................................................ 17

*FTC v. IAB Mktg. Assoc., LP*, 746 F.3d 1228 (11th Cir. 2014)............................................. 17

*FTC v. Neovi*, 604 F.3d 1150 (9th Cir. 2010) .................................................................. 10, 15

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003)................................................................. 17

*FTC v. Wellness Support Netwk., Inc.*, Case No. 10-cv-04879, 2014 U.S. Dist. LEXIS 21449

   (N.D. Cal. Feb. 19, 2014)................................................................................................... 11

*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015) ...................... 10, 11, 13, 14

*Grayned v. City of Rockford,* 408 U.S. 104 (1972) ................................................ 15

*Haves v. City of Miami*, 52 F.3d 918 (11th Cir. 1995) ........................................... 9

*International Harvester Co.*, 104 F.T.C. 949 (1984) ............................................. 14

*Miles v. Northwestern Mutual Life Insurance Co.*, 677 F. Supp. 2d 1312 (M.D. Fla. 2009) . 19

*Norfolk Southern Railway Company v. Groves*, 586 F.3d 1273 (11th Cir. 2009) ................... 9

*Oklahoma Optometric Ass'n*, 106 F.T.C. 556 (1985) ............................................. 11

*Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354 (11th Cir. 1988) ............................... 10

*Patlovich v. Rudd*, 949 F. Supp. 585 (N.D. Ill. 1996) ............................................. 19

*POM Wonderful, LLC v. FTC*, 777 F.3d 478 (D.C. Cir. 2015) ................................. 11

*R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377 (1984) ............................................. 15

*Schaller v. Russak*, 2:11-cv-59 (M.D. Fla. Oct. 11, 2013) ...................................... 19

*Spiegel, Inc. v. FTC*, 540 F.2d 287 (7th Cir. 1976) ................................................ 10

*State v. Shank*, 795 So. 2d 1067 (Fla. Dist. Ct. App. 2001) ..................................... 15

*United States v. Borden*, 308 U.S. 188 (1939) ........................................................ 13

*United States v. Oakley*, 744 F.2d 1553 (11th Cir. 1984) ......................................... 9

*United States v. Sepulveda*, 115 F.3d 882 (11th Cir. 1997) ..................................... 12

*United States v. Tobin*, 676 F.3d 1264 (11th Cir. 2012) ......................................... 12

## **Statutes**

130 Stat. 1358, Section 2(h) .................................................................................. 12

15 U.S.C. § 45(n) ...................................................................................... 10, 14

California Civil Code Section 1670.8 ..................................................................... 19

Florida Statutes § 836.11 ............................................................................ 15

Maryland Code Section 14-1325 ................................................................. 19

Public Law 114-258 Stat. 1365 (2016) ........................................................ 8

## **Rules**

16 C.F.R. § 14.15(c)(1) .............................................................................. 11

*Credit Practices Rule, Statement of Basis and Purpose*, 49 Fed. Reg. 7740, 7762-65, 7768-70

  (1984) ......................................................................................................... 14

Federal Rules of Civil Procedure 56(c) ....................................................... 9

## **Policy**

*FTC Policy Statement on Unfairness* .................................................... 14, 17

## **Other Sources**

House Report No. 114-731 (2016) ................................................................. 8

# I.     OVERVIEW

In their motion for partial summary judgment [Dkt. 143], Defendants make numerous

unsupported factual and legal assertions. Indeed, the record is replete with facts contradicting

Defendants' position. These include many deceptive advertisements for their weight-loss

product, which plainly refute their claims that they sold a so-called diet, exercise, and

coaching "Regimen." They absurdly claim that holding them accountable for their unfair use

of non-disparagement provisions, or "gag clauses," amounts to retroactive application of a

statute enacted more than a year after the FTC filed this case. They misapply Section 5 of the

FTC Act and its unfairness elements to their conduct, ignore the unjustified suppression of

information that their practices were designed to cause, and blame their customers for not

being savvy enough to avoid the injury. The Court should deny Defendants' motion.

# II.    MATERIAL FACTS ABOUT DEFENDANTS' GAG CLAUSE
##        PRACTICES

Defendants' motion distorts the realities of what they have been selling, how they

have advertised their products, and how purchasers came to "agree" to their non-

disparagement provisions. They utterly ignore the unjustified, substantial injury that the

record shows their practices cause or likely cause consumers.

## A.  Defendants Deceptively Advertised a Weight-Loss Supplement, Not a
##     Multi-Factor "Regimen."

As detailed in the FTC's prior filings and motion for summary judgment [Dkt. 141][1],

Defendants' main product since 2009 has been Roca Labs "Formula" dietary supplements

---

[1] The undisputed evidence that Defendants made the advertising claims described herein is set forth
more fully in the FTC's motion for summary judgment, Dkt. 141, PageID 2947-52.

1

(a/k/a "Gastric Bypass NO Surgery," and "Gastric Bypass Alternative"). Dkt. 58, PageID

1722, ¶¶15, 19; Dkt. 141-6, PageID 3193(31:5-13); Dkt. 141-6, PageID 3201(70:1-11);

Dkt.141-6, PageID 3389 ¶¶4-5; Dkt. 141-6, PageID 3180(44:7-18); Dkt. 141-6, PageID

3279, 3288.[2] On their websites, *RocaLabs.com* and *mini-gastric-bypass.me*, Defendants

claimed that taking the Formula would restrict a user's stomach volume, creating a "gastric

bypass effect" without the risks and expense of surgery. Dkt. 6-2, PageID 194, 198-99, 271,

277, 300[V1]; see generally Dkt. 6-2, PageID 193-272. Defendants claimed the Formula

leaves only 20 percent of the stomach available for food intake for approximately ten to

sixteen hours and reduces cravings. As a result, it supposedly caused dramatic weight loss,

including 21 pounds per month, and 100 pounds in seven to ten months. The ads promised

that the supplements would *force* users to eat less without diet restrictions, causing

immediate weight loss, boasted a "scientifically proven" 90-percent success rate, rapid and

substantial weight loss, and effectiveness comparable to gastric bypass surgery. See, e.g.,

Dkt. 6-2, PageID 198-99, 206, 209; Dkt. 6-2, PageID 240-42; Dkt. 6-2, PageID 276-79; Dkt.

48, PageID 1667, 1672, ¶¶26, 29 (images) and Dkt. 58, Page ID 1723, ¶¶26, 29; Dkt. 6-2,

PageID 300[V1-V4]; Dkt. 141-15, PageID 4184-85(200:1-4; 201:8-202:2); Dkt. 141-15,

PageID 4173(133:7-135:8), Dkt. 141-16, PageID 4333.

---

[2] The FTC's evidence is presented in exhibits that include advertising, deposition transcripts and documents, expert reports, and discovery responses. "PX" citations refer to Plaintiff's Exhibits 1-4 hereto. Citations of the form PX#-# denote the starting page or pages of ranges in which cited transcript pages. Citations of the form PX#-## generally refer to the first pages of cited deposition exhibits, unless the context indicates that the reference is to a specific exhibit page. The FTC also relies on cited declarations and exhibits filed previously in this case. Defendants' Answers on the points cited herein are substantially identical. References to Juravin's Answer, Dkt. 58, refer also to the same statements at the same paragraph numbers in Dkt. 59-Dkt. 64.

Defendants argue, with no evidence, that they sold a "regimen," and that only one aspect was the Formula:  "the entire Regimen encompasses much more, including the terms and conditions . . . the instructions that accompany the Formula, support from 'coaches' and online support groups for users of the Regimen." Dkt. 143, PageID 5440. The ads belie this, as does the testimony of key Roca Labs personnel about the company's actions during the years in question. Dkt. 141-15, PageID 4158(35:8-16); PX2-5(51:23-52:23) (General Manager: Defendants were selling diet supplement to fill users' stomachs so they would eat less); Dkt. 141-17, PageID 4373(21:12-24; 22:6-13) (Medical Director: regimen was combination of supplements to be mixed together with liquid to expand in stomach to lead to earlier feeling of fullness and reduced food intake); PX4-8, 10(65:3-21; 101:20-102:8) (Success Coach manager: no distinction between "Formula" and "Regimen"); Dkt. 141-6, PageID 3389, ¶4 (Juravin: Roca Labs "markets an all-natural weight loss product [the 'Formula']"). Defendants have presented no evidence disputing that the core marketing message, reinforced through express claims and images of stomachs "filled" with the "Formula," was that the supplements were the primary cause of the weight loss. Defendants' own ads used the term "Regimen" to refer to ingestible substances. See, e.g., Dkt. 2, PageID 39 ("the Regimen creates a feeling akin to limiting functional stomach volume for the duration of your day"); PageID 42 ("The regimen starts at only $480 for a 3-4 month supply.").[3] There are ample facts showing that they were selling dietary fiber with supposedly incredible properties, not a complex weight-loss program.[4]

---

[3] Defendants' "coaching" during the relevant time period was to have supposedly successful users telling prospective customers about their own weight loss experiences and repeating information from RocaLabs.com. PX2-5, 7(49:16-50:16; 231:2-233:5); PX4-7, 8(51:10-52:19; 68:15-69:1).

Defendants claim that their "tough love strategy and hardline tactics" had "enabled thousands of Roca Labs Regimen users to lose more than 100 pounds and achieve healthy weights. . . ." Dkt. 143, PageID 5440. But the supposed benefits of their "Regimen" [Dkt. 143, PageID 5455-56] also are largely unadorned with record citations, are based on anecdotal accounts, and as the FTC has shown, are unsubstantiated or false. See Dkt. 141, PageID 2960-64, 2974-76.

### B.  Defendants Hid the Gag Clause During the Ordering Process.

Consumers wishing to buy Roca Labs Formula between 2011 and 2015 navigated to the "Qualify & Order" page on the RocaLabs.com website and entered personal health information on an online form. Dkt. 58 ¶43; Dkt. 6-3, PageID 338-39 ¶¶4-6, PageID 347-358; Dkt. 141-6, PageID 3221-22 (154:14-16; 155:18-25; 156:10-157:13; 157:23-159:19); Dkt. 141-10, PageID 3997-4001; Dkt. 141-6, PageID 3224 (165:9-166:4); Dkt. 141-15, PageID 4163, 4164 (85:2-86:18, 89:4-91:19), PageID 4191; PX3-5(32:2-34:4). Consumers then reached a product selection screen to complete and submit their orders. At the bottom of this screen, just above the "Submit" button, was an unchecked box next to the statement, "I

---

Defendants' use of Facebook support groups began after this lawsuit was filed. PX1-4(567:15-571:21); Dkt. 141-12, PageID 4070-71(572:23-576:10). Their self-serving conceit that their onerous, hyperlinked Terms were *a part of* the "Regimen," [Dkt. 143, PageID 5440] is unfounded and absurd.

[4] At best, Defendants' "tough love" business model emerged after the FTC filed this lawsuit. While moving away from the Roca Labs brand, Defendant Juravin is still selling the same products under the name "Gastric.care." He markets via Facebook pages that he and the Must Cure Obesity staff curate. Dkt. 141-6, PageID 3240-41(367:7-368:2), PageID 3242(386:24-387:23); Dkt. 141-12, PageID 4069, 4070-73, 4075(558:7-559:2, 572:23-582:19, 597:9-20). He styles his current marketing as "Don's Boot Camp," where he uses "a lot of psychology," and states with "a lot of confidence" what he previously "implied": "[I]f you come here, if you want to work with me, if you want my regimen, I'm allowed to tell you anything I want; to do anything I want with you that would lead you to a healthy weight; anything." Dkt. 141-12, PageID 4065-66 (541:1-548:25).

have checked and do not have any medical reason that can prevent me from using the Roca Labs Gastric Bypass Alternative procedure and I have read and agree to the terms, privacy and money back reward / return policy." Purchasers were not required to review the Terms before checking the box and clicking "Submit." Dkt. 6-3, PageID 339 ¶8, PageID 361-364; Dkt. 141-6, PageID 3220, 3222-23(152:14-17; 160:18–161:4; 161:15-162:5); Dkt. 141-10, PageID 4005; Dkt. 141-12, PageID 4073-74(584:6-585:5); PX2-6 (93:24-95:13). Consumers had no reason at the time of purchase to know that the Terms included gag clauses reciting significant legal and financial penalties for their breach.

Defendants do not dispute that these gag clauses – which required customers to agree not to publicly disparage Roca Labs, its products, or its employees, regardless of the purchasers' outcomes – were in Defendants' Terms from 2011 until the FTC filed this case. Dkt. 58, PageID 1726, ¶¶49-50, 52; Dkt. 141-6, PageID 3204(81:3-24); Dkt. 141-15, PageID 4166(99:13-23; 100:13-22); Dkt. 141-15, PageID 4200; Dkt. 141-15, PageID 4167(101:3-13); Dkt. 141-15, PageID 4217; Dkt. 144, PageID 5522; Dkt. 141-6, PageID 3205 (87:18-88:23); Dkt. 144, PageID 5532; Dkt. 141-6, PageID 3206(91:21-92:13); Dkt. 144, PageID 5546; Dkt. 141-6, PageID 3206-07(92:14-93:3); Dkt. 144, PageID 5560; Dkt. 141-6, PageID 3207(93:4-8); Dkt, 144, PageID 5574. Consumers' best opportunity to learn about the gag provisions was post-purchase, via package inserts that came in the boxes in which the Roca Labs Formula was shipped, or post-purchase emails. Dkt. 58, PageID 1726, ¶53; Dkt. 6-3, PageID 340 ¶10, 366; Dkt. 141-20, PageID 4432 ¶9, Dkt. 141-20, PageID 4443 Dkt. 141-22, PageID 4492 ¶9. Defendants' sweeping claims about the nature and frequency of disclosures to purchasers about their Terms and non-disparagement clauses [Dkt. 143, PageID 5450-51]

are not supported in the record. The facts show that, at least between 2011 and when this lawsuit was filed, Defendants' customers had no reason to be aware of the non-disparagement clauses in the hyperlinked Terms prior to purchase.[5]

### C.   The FTC's Unrebutted Expert Testimony Shows Harm from the Gag Clause Practices.

Defendants also do not dispute that they used the gag provisions to threaten and sue many customers who shared negative comments about their experiences. Based on the Terms, Defendants threatened legal action against dissatisfied consumers who said they would complain, or who did complain, to the Better Business Bureau or said that they planned to post negative comments on the internet. Dkt. 58, PageID 1726, ¶54; Dkt. 6-14, PageID 858-59, ¶¶12-14, 17; Dkt. 6-15, PageID 875, ¶12; Dkt. 141-20, PageID 4436-37 ¶¶22-24; Dkt. 141-20, PageID 4476; Dkt. 141-21, PageID 4488, ¶11; Dkt. 141-22, PageID 4493 ¶¶12-13; Dkt. 141-23, PageID 4498 ¶14; Dkt. 141-24, PageID 4505-06 ¶¶12-15; Dkt. 141-25, PageID 4631; Dkt. 141-26, PageID 4640, 4641 ¶¶8, 11. Defendants accused consumers who sought refunds of attempted "extortion," and even threatened criminal charges. Dkt. 58, PageID 1726, ¶54; Dkt. 6-14, PageID 858-59, ¶¶ 13-14, 861-65; Dkt. 141-28, PageID 4655, ¶¶12-13. Defendants sued at least four customers for violating the gag clause, among other things. Dkt. 141-6, PageID 3202-03(74:2-77:10); Dkt. 141-6, PageID

---

[5] Defendants' cites to the FTC's Complaint exhibits undercut their assertions. As an example of what they "state in big, bold letters" [Dkt. 143, PageID 5450], Defendants cite a statement occurring at the very end of what the record shows to be a version of their hyperlinked Terms and Conditions. See Dkt. 2-1, PageID 97 and Dkt. 6-2, PageID 190, 268.

3398, 3413, 3418, 3423; Dkt. 141-15, PageID 4170, 4171(124:2-7; 125:8-20); Dkt. 141-16,

PageID 4281; Dkt 6-3, PageID 340-41, ¶11; Dkt. 6-5, PageID 523-73, 579-641 (Att. M-N).[6]

The unrebutted opinion of the FTC's expert, Paul A. Pavlou, Ph.D.,[7] shows that

Defendants' gag clause practices are likely to negatively impact consumer welfare. Dkt. 141-

4, PageID 3129-30, 3133-34 ¶¶11, 17-20. Dr. Pavlou evaluated the likely impact that

Defendants' suppression of purchasers' negative online reviews – through the use of non-

disparagement provisions and related threats and warnings – would have on the welfare of

consumers who are likely to purchase those products. Dkt. 141-4, PageID 3127-29 ¶¶8-10.

Online reviews, including negative reviews, play an important informational role for

consumers. Dkt. 141-4, PageID 3130-32 ¶¶13-15. Manipulation of reviews, including

suppression, lowers their information value. Dkt. 141-4, PageID 3132-33 ¶16. In Dr.

Pavlou's opinion, Defendants' practices are likely to inflate consumers' perceptions of the

quality of Defendants and Roca Labs products, thus increasing consumers' willingness to

buy the products; and consumers are less likely to learn about previous purchasers' problems

with Defendants and Roca Labs products, thus encouraging consumers to buy inappropriate

products. See Dkt. 141-4, PageID 3129-30, 3133-34 ¶¶11, 17-20.[8] Rather than countering the

FTC's expert evidence, Defendants blame their customers for not searching the internet more

---

[6] See also Dkt. 58, PageID 1726, ¶55; Dkt. 141-6, PageID 3201(70:1-11); Dkt. 141-6, PageID 3308 (Defendant RLI sued site hosting negative reviews for inducing customers to violate gag clause).

[7] Dr. Pavlou is the Milton F. Stauffer Professor of Information Technology and Strategy at the Fox School of Business at Temple University, and the Fox School's Chief Research Officer and Associate Dean of Research, Doctoral Programs, and Strategic Initiatives. He is an expert in the field of information systems, with particular expertise in electronic commerce and emphasis on the study of consumer-generated online reviews. Dkt. 141-4, PageID 3125-27 ¶¶2-6.

[8] Juravin recognizes that bad reviews are bad for his business. Dkt. 141-6, PageID 3199(61:25-62:7).

thoroughly to find negative information (that Defendants admit they suppressed), and for not finding the gag clause buried in their websites.

### D. The FTC Disputes Defendants' Statements About the CRFA.

Defendants also make assertions about the state of federal law relating to non-disparagement clauses, and the nature of the FTC's testimony before Congress on the Consumer Review Fairness Act of 2016 ("CRFA"). See Dkt. 143, PageID 5442, items 4-7. The FTC disputes these statements. The CRFA augments the FTC's existing authority under Section 5 of the FTC Act to combat deceptive and unfair acts or practices in commerce by expressly prohibiting sellers from using form contracts to restrict individual customers from reviewing their goods, services, or conduct. P.L. 114-258, 130 Stat. 1365 (2016).[9] Even if the CRFA was passed to outlaw the type of conduct that Defendants (and others) had engaged in [Dkt. 143, PageID 5442], this is not evidence that the conduct was legal before then.[10] Nor do they have any basis for their statement that the FTC "believed the law at that time was insufficient to address such agreements[.]" Dkt. 143, PageID 5446. As evidenced by the Complaint allegations in this case, the FTC believed that Defendants' actions were unfair under Section 5 of the FTC Act.[11] Thus, Defendants' self-serving pronouncements cannot support summary judgment in Defendants' favor.

---

[9]  The President signed CRFA on December 14, 2016. The FTC and the States can enforce it starting in December 2017.

[10]  Congress was aware that the FTC was using its existing Section 5 authority against gag clauses, including in this case. *See* H. Rep. No. 114-731, at 7-8 (2016), https://www.congress.gov/congressional-report/114th-congress/house-report/731 (noting that the FTC had begun to enforce similar prohibitions under its existing authorities).

[11] Defendants mischaracterize [Dkt. 143, PageID 5446, 5457] the FTC's testimony in favor of the proposed bill in 2016. The testimony referred to this case to illustrate the use of its *existing* authority

### III.   LEGAL ANALYSIS

#### A.  Summary Judgment Standard

To prevail on a summary judgment motion, the movant bears the initial burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former version of Fed. R. Civ. P. 56(c)); *Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1277 (11th Cir. 2009). "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).[12] Defendants' motion points to nothing in the record, other than the FTC's First Amended Complaint, that supports any of their assertions. Indeed, based on the undisputed facts in the record, Defendants gag clause practices are unfair under Section 5 of the FTC Act as a matter of law.

#### B.  Conduct That Violates Section 5(n) Is Unlawful Even If the Conduct Does Not Violate Other Laws.

Defendants argue that their conduct cannot be unfair under Section 5(n) of the FTC Act because no other law expressly forbade their use of non-disparagement provisions in

---

to pursue practices like the Defendants' and said that it "would welcome" the "additional law enforcement tools" available under the proposed CRFA. Prepared Statement of the Federal Trade Commission on Legislative Hearing on 17 FTC Bills Before the Committee on Energy and Commerce, Subcommittee on Commerce, Manufacturing, and Trade, United States House of Representatives, May 24, 2016, https://www.ftc.gov/system/files/documents/public_statements/950403/160524commtestimony-17-bills.pdf, at pp. 3-4.

[12] "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984).

form agreements with consumers. [Dkt. 143, PageID 5441]. There is no legal basis for this

contention, and federal courts have squarely rejected it:

> We reject the argument. Its premise appears to be that a practice cannot be an
> unfair one unless it violates some law independent of the FTCA. But the
> FTCA imposes no such constraint. *See* 15 U.S.C. § 45(n) (setting out elements
> of an unfair practice). On the contrary, the FTCA enables the FTC to take
> action against unfair practices that have not yet been contemplated by more
> specific laws. *See Spiegel, Inc. v. FTC*, 540 F.2d 287, 291-94 (7th Cir. 1976)
> (catalog retailer's practice of suing customers in distant forum was unfair even
> if practice was perfectly proper under state law); 1 Stephanie W. Kanwit *et al.*,
> Federal Trade Commission § 4.5 (2008) (The FTC is "unfettered and free to
> proceed against practices not previously considered unlawful.").

*FTC v. Accusearch Inc.*, 570 F.3d 1187, 1194 (10th Cir. 2009).

As Supreme Court and Circuit Court precedent has made clear, Congress opted not to

attempt to enumerate all unfair acts or practices, but instead designed the term "unfair" to be

a "'flexible concept with evolving content.'" *FTC v. Wyndham Worldwide Corp.*, 799 F.3d

236, 243 (3d Cir. 2015), quoting *FTC v. Bunte Bros.*, 312 U.S. 349, 353 (1941).[13] The courts

and the FTC have applied Section 5(n) to cover a variety of injurious practices that have

emerged over the years, which were not necessarily proscribed by a more specific statute.

*See, e.g.*, *Wyndham*, 799 F.3d 240 (affirming ruling that FTC has authority to regulate

cybersecurity under unfairness authority); *FTC v. Neovi*, 604 F.3d 1150, 1153 (9th Cir. 2010)

(affirming summary judgment that creation and delivery of unverified checks at the direction

of registered users was unfair); *Accusearch*, 570 F.3d at 1190-91 (affirming summary

judgment that sale of confidential telephone records obtained in violation of the

Telecommunications Act of 1996 was unfair); *Orkin Exterm. Co., Inc. v. FTC*, 849 F.2d

---

[13] The *Wyndham* court discussed the legal background of the FTC's unfairness authority at length.
*Wyndham*, 799 F.3d at 243-44.

1354, 1356 (11th Cir. 1988) (affirming FTC holding that unilateral breach of more than

200,000 consumer contracts was unfair). Similarly, here the FTC seeks to permanently enjoin

Defendants from engaging in gag clause practices that are unfair under Sections 5(a) and (n)

of the FTC Act, regardless of whether that conduct was specifically prohibited by other

statutes or common law doctrines.

Contrary to Defendants' assertions [Dkt. 143, PageID 5446-47], the FTC was not

obligated to specifically inform them that their ongoing gag clause practices were unfair (nor

that their advertising was deceptive) before taking legal action to protect consumers by

asking this Court to enjoin those practices. *See Wyndham*, 799 F.3d at 253-54 (when federal

court is deciding in the first instance whether conduct was unfair under the FTC Act, relevant

question is not whether defendant had fair notice of the FTC's interpretation of the statute,

but whether it had fair notice of what the statute itself requires).[14] Nor have Defendants

identified any "inconsistency" [Dkt. 143, PageID 5447] in how the FTC has approached

sellers' use of contracts to restrict the flow of truthful information to consumers.[15]

---

[14] *Cf. POM Wonderful, LLC v. FTC*, 777 F.3d 478, 497 (D.C. Cir. 2015) (agency choice between adjudication and rulemaking to announce new principles that may affect agency policy and have general prospective application lies within agency's discretion) (citations omitted); *FTC v. Wellness Support Netwk., Inc.*, Case No. 10-cv-04879, 2014 U.S. Dist. LEXIS 21449, at *35-38 (N.D. Cal. Feb. 19, 2014) (choice between adjudication and rulemaking within agency discretion to allow case-by-case evolution of statutory standards) (citations omitted).

[15] The FTC's approach in this case is, in fact, consistent with how it has approached protection of consumer access to truthful information for decades. *See, e.g.*, *California Ass'n of Legal Support Professionals*, FTC Docket No. C-4447, Statement of the Commission (2013), available at http://www.ftc.gov/system/files/documents/cases/140404calassocmusicteachersstatement.pdf. (consent order) (barring restrictions on disparaging advertising); *see also Oklahoma Optometric Ass'n*, 106 F.T.C. 556 (1985) (consent order) (restrictions on truthful forms of advertising and criticizing other optometrists); *American Psychological Ass'n*, 115 F.T.C. 993, 996 (1992) (consent order) (prohibition on use of patient testimonials about the quality of services may have deterred accurate claims about psychologists' personal qualities, office hours, or perceived value of certain

### C.  The FTC is Not Seeking to Apply the CRFA Retroactively.

Defendants argue that the FTC, by challenging the gag clause practices as unfair under the FTC Act, is trying to enforce the CRFA retroactively. [Dkt. 143, PageID 5445-48.] This is false. The FTC has never alleged that Defendants are liable under the CRFA for their gag clause practices to date. Defendants' argument, moreover, is foreclosed by the CFRA's unambiguous savings provision: "Nothing in this section shall be construed to limit, impair, or supersede the operation of the Federal Trade Commission Act or any other provision of Federal law." 130 Stat. 1358, Section 2(h).[16] Although the CRFA will simplify future FTC action against businesses that use prohibited gag provisions in their consumer form contracts and provides additional remedies, including civil penalties,[17] Section 5 of the FTC Act prohibited the challenged conduct before the CRFA was enacted and it continues to do so. Application of Section 5(n) to Defendants' practices is not enforcement of the CRFA.

The enactment of a statute expressly dealing with specific conduct does not compel the conclusion that a prior statute did not already prohibit the conduct. *See United States v. Tobin*, 676 F.3d 1264, 1274-1275 (11th Cir. 2012) (even before Congress passed more explicit statute, conduct was unlawful under prior statute; enactment of newer statute did not compel conclusion that prior statute was ambiguous); *United States v. Sepulveda*, 115 F.3d

---

services); Statement of Policy Regarding Comparative Advertising, 16 C.F.R. § 14.15(c)(1) (truthful, non-deceptive advertising that disparages a seller's competitors, or their goods and services, is lawful; industry codes prohibiting such truthful advertising are subject to challenge by the FTC).

[16] *United States v. Tobin*, 676 F.3d 1264, 1274 (11th Cir. 2012) (first rule in statutory construction is to determine whether language has a plain and unambiguous meaning with regard to the particular dispute; if meaning is plain and unambiguous, there is no need for further inquiry).

[17] *See* CRFA Section 2(d)(1) (violations are treated as a violation of a rule defining an unfair or deceptive act or practice).

882, 885 n.5 (11th Cir. 1997) (amendment to statute does not necessarily indicate that the unamended statute meant the opposite). Indeed, the Third Circuit recently rejected a similar challenge to the FTC's unfairness authority. *See Wyndham*, 799 F.3d 236, 247-49(3d Cir. 2015) (enactment of subsequent legislation did not imply that the FTC lacked unfairness authority over cybersecurity; subsequent enactments expanded FTC authority and relieved the FTC of other burdensome statutory requirements).

The CRFA also did not supplant or implicitly repeal the FTC's authority to challenge Defendants' gag clause practices as unfair. "When there are two acts upon the same subject, the rule is to give effect to both if possible. . . ." *United States v. Borden*, 308 U.S. 188, 198 (1939) (citations omitted). "It is not sufficient . . . to establish that subsequent laws cover some or even all of the cases provided for by [the prior act]; for they may be merely affirmative, or cumulative, or auxiliary." *Id.* (internal quotations and citations omitted). Congress recognized that gag clauses in consumer form contracts are so pernicious as to merit a *per se* ban and enacted the CRFA, more than a year after the FTC filed this action, but that does not undercut or limit the applicability of Section 5. All it means is that Defendants' use of their gag clauses in the future would run afoul of both statutes.

### D.  Defendants' Gag Clause Practices Are Unfair Under Section 5(n).

The FTC sets out, above, many undisputed material facts about the Defendants' gag clause practices, and the Defendants are not entitled to judgment in their favor as a matter of law.[18] Section 5 of the FTC Act prohibits "unfair" acts or practices in commerce, *i.e.*, those

---

[18] The FTC's own summary judgment motion shows that the FTC is entitled to judgment as a matter of law on Count III. Dkt. 141, PageID 2957-60; 2967-68; 2974, 2979-83.

that "cause[] or [are] likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). A practice that "unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking" is unfair. *FTC Policy Statement on Unfairness*, appended to *International Harvester Co.*, 104 F.T.C. 949, 1074 (1984). This can include a seller's use of, and threats to enforce, certain contractual provisions to create such obstacles.[19] Defendants' arguments are inapposite, legally unfounded, and lack any basis in the record.

### 1.  Defendants Ignore the Substantial Injury Their Conduct Has Caused or Is Likely to Cause.

Defendants' entire argument on the element of substantial injury is that "there is no substantial harm to be found. Plaintiff has concerned itself with 'speculative harms', because there was not one instance where the consumer did not contract with Defendants with their eyes wide open." Dkt. 143, PageID 5454. Their argument ignores the fact that unfairness claims can be based on likely rather than actual injury. *Wyndham*, 799 F.3d at 246. Moreover, Defendants' assertion is bereft of record citation or factual evidence.

By contrast, the unrebutted opinion of the FTC's expert, Dr. Pavlou, shows how Defendants' gag clause practices are likely to negatively impact consumer welfare. Dkt. 141-4, PageID 3129, 3133-34, ¶¶11, 17-20. He testifies that Defendants' practices are likely to inflate consumers' perceptions of the quality of Defendants' products, thus increasing

---

[19] *Cf. Credit Practices Rule, Statement of Basis and Purpose*, 49 Fed. Reg. 7740, 7762-65, 7768-70 (1984) (prohibiting as unfair the use of certain provisions frequently included in consumer credit contracts; creditor threats to enforce them were commonplace; substantial injury caused by practices that flowed from inclusion of provisions in contracts).

consumers' willingness to buy the products; and consumers are less likely to learn about prior purchasers' problems with Defendants and the products, thus encouraging consumers to buy inappropriate products. See Dkt. 141-4, PageID 3129, 3133-34 ¶¶11, 17-20.[20]

The FTC also presents unrebutted evidence of Defendants' own conduct supporting its claim that Defendants' gag clause practices cause or are likely to cause substantial injury by keeping negative information from buyers. Defendant Juravin recognizes that negative reviews are bad for his business, Dkt. 141-6, PageID 3199(61:25-62:7); therefore, as described above (see pp. 4-7), Defendants:

- Threatened legal action against dissatisfied consumers who said they would complain, or who did complain, to the Better Business Bureau or said that they planned to post negative comments on the internet;

- Accused consumers who sought refunds of attempted "extortion," and even threatened criminal charges;[21]

- Warned purchasers post-sale via package inserts that they are contractually bound not to make negative comments;

---

[20] Dr. Pavlou's testimony by itself meets the FTC's evidentiary burden on the parties' summary judgment motions and clearly trumps the Defendants' "few bald, uncorroborated, and conclusory assertions" put forward in lieu of evidence. *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158-59 (9th Cir. 2010) (FTC's expert declaration showed that consumer injury from conduct was not outweighed by countervailing benefits to consumers or to competition; defendant failed to counter the testimony).

[21] One statute Defendants have cited against customers whom they claim to have been "extorting" them, Fla. Stat. § 836.11, bans anonymous publications which tend to expose persons to hatred, contempt, or ridicule. This provision has been ruled unconstitutional. In *State v. Shank*, 795 So. 2d 1067, 1069-70 (Fla. Dist. Ct. App. 2001), the court held that the statute was facially invalid for being content-based, overboard, and vague in contravention to Supreme Court jurisprudence on the First Amendment. *Id.*; *see also R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 382 (1984); *City of Houston v. Hill,* 482 U.S. 451, 458 (1987); *Grayned v. City of Rockford,* 408 U.S. 104, 108–09 (1972).

- Sued at least four customers for violating the gag clause, among other things; and

- Sued a review website for allegedly inducing breaches of the gag clause.

The record is therefore replete with material facts that illustrate how the Defendants' gag clause practices cause, or are likely to cause, substantial injury to consumers.

## 2.  Consumers Cannot Reasonably Avoid the Injury.

Defendants' discussion of whether consumers could reasonably avoid the substantial injury [Dkt. 143, PageID 5449-5452, 5454-55] misses the point. Defendants' gag clause practices keep a great deal of negative information from buyers, and make it difficult or impossible for them to make a truly informed choice. Defendants' prospective customers have no input into whether negative information about Defendants and their products is suppressed. Thus, the relevant inquiry is not whether customers, under contract law, assented to an online agreement to buy a product, or whether "clickwrap" agreements can, in the abstract, bind assenting customers under general contract law principles. It is whether prospective purchasers can reasonably avoid being deprived of these customers' candid feedback, and be able to make informed choices about whether to spend hundreds of dollars on Defendants' weight-loss Formula. If Defendants' practices had their intended effect, consumers clearly could not.

Prospective customers searching for information on Roca Labs or similar products would not necessarily know that previous purchasers had negative experiences, let alone their complete nature. Defendants made it difficult for consumers to find and understand the gag clause. There is no record evidence that they contracted with Defendants "with their eyes wide open." The undisputed evidence in this case (see pp. 4 - 5, above) is that purchasers had

no reason to know of Defendants' non-disparagement provisions until after they purchased the Roca Labs Formula. Purchasers were not required to review the Terms before purchasing; even if they had, the gag clause was buried behind a hyperlink, and often many paragraphs into the lengthy and dense Terms.

The manner of disclosure did not put purchasers on notice of Defendants' unusual and material gag clause provisions. *See FTC v. Commerce Planet*, 878 F. Supp. 2d 1048, 1065 (C.D. Cal. 2012) (disclosure of continuity program in separate hyperlinked "Terms of Membership" did not overcome net impression that product was free), *aff'd in part and rev'd on other grounds,* 815 F.3d 593 (9th Cir. 2016); *FTC v. Cyberspace.com,* 453 F.3d 1196, 1200-01 (9th Cir. 2006) (small-print disclosures regarding a monthly fee not sufficient to defeat net impression that a check was a refund or rebate). Defendants' extreme, and discredited, *caveat emptor* vision of online consumer contracts blames their customers for failing to overcome an obstacle to informed decisionmaking that Defendants themselves placed in their paths. *Cf. FTC v. IAB Mktg. Assoc., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014) (rejecting attempt to shift blame to customers for not reading post-purchase disclosures; post-purchase disclosures inadequate to cure misrepresentations during initial sales; caveat emptor is not the law of this circuit); *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (caveat emptor is simply not the law). As the FTC stated in its Unfairness Policy Statement, "[c]ertain types of sales techniques may prevent consumers from effectively making their own decisions. . . . leaving buyers with insufficient information for informed comparisons." 104 F.T.C. at 1074. The mere fact that Defendants included non-disparagement provisions in

their hyperlinked Terms does not make the harm from their use of such provisions, and

ensuing threats and lawsuits to suppress negative information, reasonably avoidable.

### 3.  There Are No Countervailing Benefits to Consumers or Competition from Defendants' Gag Clause Practices.

Defendants assert, without any record citations, a variety of benefits that "hundreds"

of consumers purportedly derived from use of their "Regimen." Dkt. 143, PageID 5455-56.

Even if Defendants had evidence substantiating their claims about their Formula (or even

their supposed "Regimen"), which they do not, their argument about countervailing benefits

for consumers misses the mark:  the issue before the Court on Count III is whether *their use*

*of non-disparagement provisions and threats of litigation* provides a countervailing benefit to

consumers and competition, not whether their "Regimen" provides such benefits. Defendants

do not explain what benefit consumers get from contractual obligations that gag them from

commenting negatively about Defendants or their products. These practices do not protect

any legitimate interest of either Defendants or the consumers "agreeing" to it.[22] There is no

evidence that gag clauses somehow help consumers "gain their lives back again," only

evidence that such practices help Defendants misappropriate consumers' trust and money.

See Dkt. 141-6, PageID 3371 ("Roca relies upon its reputation and the weight loss success of

its customers to generate new business and attract new customers. To foster, encourage and

protect its customer relationship, Roca has developed a special incentive/discount program,

where it rewards customers for positive reviews and to refrain from making any negative

postings."); Dkt. 141-6, PageID 3201 (70:1-11).

---

[22] Nor is there any benefit to competition. Defendants' gag clauses only distort information in the marketplace, to the detriment of other sellers who are not violating the law.

### 4.  Public Policy Favors the Public's Right to Receive Truthful Commercial Information.

While the Court can, and should, find that Defendants' practices are unfair based solely on the factors set forth in Section 5(n) of the FTC Act, the fact that Congress and two states have, within just a few short years, passed laws prohibiting use of non-disparagement provisions in consumer form contracts (*see* Cal. Civil Code Section 1670.8; MD Code Sect. 14-1325) is emphatic evidence that public policy disfavors such provisions. *See Accusearch*, 570 F.3d at 1194-95 (discussing relevance of other laws in analyzing whether a practice is unfair). The use of non-disparagement provisions in commercial, personnel, severance, or settlement agreements is of little relevance. [23] Non-disparagement clauses in those types of contracts might not cause substantial injury to consumers, or might provide the kind of countervailing benefits that are plainly absent in this case.[24]

On the other hand, the policy of protecting informed consumer decisionmaking, embodied in Section 5 of the FTC Act, is relevant and consistent with free speech interests that courts have long protected. "The Supreme Court has recognized the public's right to *receive* truthful commercial information under the *first amendment* . . . . People will perceive their own best interests if only they are well enough informed[ ]" *Abramson v. Gonzalez*, 949

---

[23] Defendants' cases discussing non-disparagement clauses illustrate these categories:  *EEOC v. Severn Trent Svcs., Inc.,* 358 F.3d 438, 440 (7th Cir. 2004) (sale of business and employment contract); *Schaller v. Russak*, 2:11-cv-59 (M.D. Fla. Oct. 11, 2013) (litigation settlement); *Freelife Int'l, Inc. v. American Educ. Music Pubs. Inc.*, 2009 WL 3241795 *2-6 (W.D. Ariz. 2009) (commercial agency contract); *Miles v. Nw. Mut. Life Ins. Co.*, 677 F. Supp. 2d 1312, 1315 (M.D. Fla. 2009) (insurance settlement);  *Patlovich v. Rudd*, 949 F. Supp. 585, 594-95 (N.D. Ill. 1996) (employment severance agreement); *Eichelkraut v. Camp*, 513 S.E.2d 267, 268-69, 236 Ga. App. 721, 722-23 (Ga. App. 1999) (litigation settlement).

[24] Defendants also cite non-disparagement clauses in contracts for political campaign staff, but do not address their enforceability or explain how they are relevant to consumer form contracts that deprive the public of truthful information about commercial products or services.

F.2d 1567, 1578 (11th Cir. 1992) (internal quotations and citations omitted). The FTC seeks to vindicate that policy goal here, in accordance with the criteria Congress set out in Section 5(n). Defendants' contention that public policy favors the Defendants' use of gag clauses in consumer contracts is unsupported.

### IV.    CONCLUSION

Defendants have not presented evidence showing that they are entitled to judgment as a matter of law on Count III of the FTC's First Amended Complaint. The undisputed facts actually show the opposite:  that their gag clause practices are unfair and thus unlawful under Section 5 of the FTC Act. Therefore, the Court should deny the Defendants' motion for partial summary judgment.

Respectfully submitted,

Dated:  April 24, 2017

/s/ *Carl H. Settlemyer, III*
CARL H. SETTLEMYER, III (Trial Counsel)
PAUL B. SPELMAN
MICHAEL J. DAVIS
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mail Drop CC-10528
Washington, DC 20580
(202) 326-2019, -2487, -2458 (Tel.)
(202) 326-3259 (Fax)
csettlemyer@ftc.gov,  pspelman@ftc.gov,
mdavis@ftc.gov

Attorneys for Plaintiff Federal Trade Commission

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on this 24th day of April 2017, I electronically filed the foregoing

"**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL**

**SUMMARY JUDGMENT AS TO COUNT THREE OF THE AMENDED**

**COMPLAINT**" with the Clerk of the Court by using the CM/ECF filing system, and this

document will be served electronically through same to counsel for all parties of record.

s/*Carl H. Settlemyer, III*
Attorney

21