# PX2

# Excerpts from Sharon King's Deposition

PX2-1

# In the Matter of:

# FTC v. Roca Labs, Inc., et al.

*January 27, 2017*
*Sharon Ann King*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

## 1

```
 1            UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
 2                 TAMPA DIVISION
 3                    - - -
 4  FEDERAL TRADE COMMISSION, :Civ. No. 8:15-cv-02231-MSS-TBM
 5        Plaintiff,         :
 6        v.                 :
 7  ROCA LABS, INC., a       :
    corporation; ROCA LABS
 8  NUTRACEUTICAL USA, INC., :
    a corporation; MUST CURE
 9  OBESITY, CO., a          :
    corporation; JURAVIN,
10  INCORPORATED, a          :
    corporation; ZERO CALORIE
11  LABS, INC., a corporation;:
    DON JURAVIN, INC.,
12  individually and as an   :
    officer of Roca Labs, Inc.,
13  Roca Labs Nutraceutical  :
    USA, Inc.; Must Cure
14  Obesity, Co., and Juravin,:
    Incorporated; and GEORGE
15  WHITING, individually and :
    as an officer of Roca Labs,
16  Inc. Roca Labs           :
    Nutraceutical USA, Inc.,
17  and Zero Calorie Labs,Inc.:
18                    - - -
19        Deposition of SHARON ANN KING, held at the U.S.
20  Attorney's Office, 401 Market Street, 4th Floor,
21  Camden, New Jersey, commencing at 9:05 a.m., on
22  Friday, January 27, 2017, before Lisa Claud Neal, R.P.R.
23  and Notary Public.
24                    - - -
25
```

## 2

```
 1  A P P E A R A N C E S :
 2  FEDERAL TRADE COMMISSION
    BY:   CARL H. SETTLEMYER, III,ESQUIRE
 3         MICHAEL DAVIS, ESQUIRE
    600 PENNSYLVANIA AVENUE
 4  WASHINGTON, DC  20580
    202-326-2019
 5  csettlemyer@ftc.gov
      -- For Plaintiff, Federal Trade Commission
 6
 7  SHUMAKER, LOOP & KENDRICK, LLP
    BY:   SUZETTE MARTENY, ESQUIRE
 8  101 East Kennedy Boulevard
    SUITE 2800
 9  TAMPA, FL  33602
    813-227-2272
10  smarteny@slk-law.com
    -- For Defendant, Roca Labs, Inc., et al.
11
12                    - - -
```

## 3

```
 1                  I N D E X
 2
 3
 4  FEDERAL TRADE COMMISSION'S EVIDENCE
 5  Witness                                         Page
 6  Sharon Ann King
 7     By Mr. Suttlemyer                               9
 8     By Ms. Marteny                                256
 9     By Mr. Suttlemyer                             262
10
11                    - - -
```

## 4

```
 1                 E X H I B I T S
 2
 3  FEDERAL TRADE COMMISSION'S
 4  Number   Description                            Marked
 5     1     Subpoena                                 13
 6     2     Subpoena                                 14
 7     3     Email                                    81
 8     4     Email                                    81
 9     5     Screen shots                             85
10     6     2011 Terms and Conditions                97
11     7     2011 Terms and Conditions                98
12     8     Terms and Conditions                     98
13     9     Terms and Conditions                     98
14    10     Terms and Conditions                     98
15    11     Terms and Conditions                     98
16    12     Terms and Conditions                     98
17    13     Customer Dispute                        102
18    14     Dispute Response                        102
19    15     Dispute Resolutions                     102
20    16     Cease and Desist letter                 111
21    17     Complaint                               111
22    18     Letter                                  112
23    19     Letter                                  112
24    20     Letter                                  112
25    21     Customer Complaint                      112
```

1 (Pages 1 to 4)

Page 5

| | EXHIBITS (Cont'd) | |
|---|---|---|
| | FEDERAL TRADE COMMISSION'S | |
| Number | Description | Marked |
| 22 | Complaint | 112 |
| 23 | Consumer Reviews | 112 |
| 24 | Website Screenshot | 130 |
| 25 | Website Screenshot | 130 |
| 26 | Website Screenshot | 130 |
| 27 | Website Screenshot | 138 |
| 28 | Website Screenshot | 138 |
| 29 | Website Screenshot | 138 |
| 30 | Website Screenshot | 138 |
| 31 | Website Screenshot | 138 |
| 32 | Website screenshot | 154 |
| 33 | Website screenshot | 155 |
| 34 | Website screenshot | 156 |
| 35 | Website screenshot | 156 |
| 36 | Website screenshot | 156 |
| 37 | Website screenshot | 156 |
| 38 | Website screenshot | 156 |
| 39 | Website screenshot | 156 |
| 40 | Website screenshot | 156 |
| 41 | Website screenshot | 164 |
| 42 | Website screenshot | 164 |

Page 6

| | EXHIBITS (Cont'd) | |
|---|---|---|
| Number | Description | Marked |
| 43 | Website screenshot | 164 |
| 44 | Website screenshot | 164 |
| 45 | Website screenshot | 164 |
| 46 | Website screenshot | 164 |
| 47 | Website screenshot | 164 |
| 48 | Website screenshot | 164 |
| 49 | Website screenshot | 171 |
| 50 | Website screenshot | 171 |
| 51 | Website screenshot | 171 |
| 52 | Website screenshot | 175 |
| 53 | Website screenshot | 175 |
| 54 | Website screenshot | 175 |
| 55 | Website screenshot | 175 |
| 56 | Website screenshot | 175 |
| 57 | Website screenshot | 175 |
| 58 | Website screenshot | 175 |
| 59 | Website screenshot | 175 |
| 60 | Website screenshot | 176 |
| 61 | Website screenshot | 176 |
| 62 | Website screenshot | 176 |
| 63 | Website screenshot | 176 |
| 64 | Website screenshot | 176 |

Page 7

| | EXHIBITS (Cont'd) | |
|---|---|---|
| | FEDERAL TRADE COMMISSION'S | |
| Number | Description | Marked |
| 65 | Website screenshot | 176 |
| 66 | Website screenshot | 176 |
| 67 | Website screenshot | 176 |
| 68 | Website screenshot | 177 |
| 69 | DVD | 183 |
| 70 | Saved Answers | 212 |
| 71 | FAQs | 212 |
| 72 | Resource Document | 212 |
| 73 | Facebook FAQ's | 212 |
| 74 | Facebook FAQ's | 212 |
| 75 | Email | 223 |
| 76 | Email | 225 |
| 77 | Email | 226 |
| 78 | Email | 228 |
| 79 | Compliment to the Business | 228 |
| 80 | Email | 230 |
| 81 | Blog | 233 |
| 82 | Blog | 233 |
| 83 | Blog | 236 |
| 84 | Review | 238 |
| 85 | Blog | 240 |

Page 8

| FEDERAL TRADE COMMISSION'S | | |
|---|---|---|
| Number | Description | Marked |
| 86 | Blog | 240 |
| 87 | Blog | 239 |
| 88 | Scott's Plan | 247 |
| 89 | Table | 248 |
| 90 | Agora | 249 |
| 91 | Script Guidelines | 250 |
| 92 | Things to remember | 252 |
| 93 | Social | 252 |

- - -

Page 9

```
 1                    - - -
 2         SHARON ANN KING, having been duly sworn, was
 3         examined and testified as follows:
 4                    - - -
 5                  EXAMINATION
 6                    - - -
 7  BY MR. SUTTLEMYER:
 8  Q.  Good morning, Ms. King.  My name is Carl
 9  Suttlemyer, I'm an attorney with the Federal Trade
10  Commission.  And with me is my colleague, Mike Davis.
11  On the phone is defendant's counsel, Suze Martney.
12          MR. SUTTLEMYER:  Suze, is there anyone
13  else on the line with you today?
14          MS. MARTENY:  Nope, just me.
15          MR. SUTTLEMYER:  Okay.
16  BY MR. SUTTLEMYER:
17  Q.  I am going to start out with some just general
18  ground rules and some preliminary questions, just to
19  make sure you understand what's going on here today.
20          So, first of all, you understand we are
21  here in connection with the case FTC versus Roca Labs
22  and other defendants; correct?
23  A.  Correct.
24  Q.  And you have taken an oath to tell the truth;
25  correct?
```

Page 10

```
 1  A.  Correct.
 2  Q.  I am going to try to finish my questions,
 3  sometimes I may pause awkwardly in the middle of them,
 4  but please try to wait until I am done before you
 5  answer, and I will try to wait until you are done
 6  before I ask the next question.  Do you understand?
 7  A.  I understand.
 8  Q.  All of your answers will need to be audible, and
 9  with words, not "uh-huh," or "uh-uhs," or nods of the
10  head and that sort of thing.  Do you understand?
11  A.  I understand.
12  Q.  And if you don't understand the question, please
13  tell me.  We are trying to just get a clear record
14  here, and I am not trying to trick you.  That doesn't
15  mean I won't say something confusing but if you don't
16  understand it, please let me know.  Okay?
17  A.  Okay.
18  Q.  And if you do answer I will assume you understand.
19          If you hear Ms. Marteny make an
20  objection, even though she is not, I guess, your
21  attorney specifically, she is representing the
22  defendant.  She may object to the form of the question,
23  for example, in which case you will be able to proceed
24  to answer if you understood the question, or if she
25  objects on the grounds of --
```

Page 11

```
 1          (Phone ringing.)
 2          MR. SUTTLEMYER:  I'm sorry.  Someone is
 3  calling me from Wyoming.  I thought I had that muted.
 4  Pardon me.
 5          (Pause.)
 6  BY MR. SUTTLEMYER:
 7  Q.  She may object to a question on privilege grounds
 8  in which case we will have to discuss whether or not
 9  you can answer that.  There may be some information
10  you've obtained in the course of your work for the
11  defendants that relates to their privilege.
12          If you need a break, please let us know.
13  We will try to not to take a break while there is a
14  question pending, but if I've come to a good stopping
15  point I'll let you take a break.
16          If later in the deposition you remember
17  any additional information that will clarify, or
18  correct anything we were talking about earlier, then
19  please feel free to let us know that.  We can, you
20  know, correct things as we go along.  Sometimes we find
21  with witnesses after they start looking at documents
22  they'll start remembering things that they might not
23  have remembered earlier in the discussion.
24          Is there any reason that you can't
25  proceed today, in terms of medications, alcohol,
```

Page 12

```
 1  illness, things like that?
 2  A.  No.
 3  Q.  Do you have any hearing problems that would
 4  prevent you from hearing any question or answering?
 5  A.  No.
 6  Q.  Do you understand the instructions I have just
 7  discussed?
 8  A.  Yes.
 9  Q.  Your primary language for use in business dealings
10  is English?
11  A.  Yes.
12  Q.  Did you do anything to prepare for this
13  deposition?
14  A.  No.
15  Q.  That was a "no"?
16  A.  (Witness nods head.)
17  Q.  Okay.
18  A.  No.
19  Q.  Did anybody else talk to you about your testimony
20  before you came in today?
21  A.  No.
22  Q.  Have you reviewed any documents, of your own
23  initiative, other than what we are going to talk about
24  in terms of what you did to produce documents to the
25  FTC?
```

Page 49

1  A. How long was that particular one in there you
2  mean?
3  Q. Right, that --
4  A. Before they stopped using it?
5  Q. Well, not necessarily the particular one about the
6  legal threat but just generally --
7  A. No, they were in there until he stopped using it
8  and moved to Team Desk.
9  Q. And that goes back to when you first started in
10 2010, or maybe shortly thereafter?
11 A. No, we didn't use Help Scout in 2010. We used
12 TeamDesk in 2010 and saved answers have always been --
13 we've always used saved answers. But, of course, if a
14 question comes in and you can't use the saved answers
15 you use your own.
16 Q. Going back to the difficult customers, I just want
17 to understand. It sounds like there were people who
18 were -- dealt with the difficult customers before the
19 difficult customers were sent to you; is that right?
20 A. Correct.
21 Q. Who were the preliminary contacts for those
22 customers?
23 A. Depends. It could have been a couch, it could
24 have been somebody from the customer care team. It
25 could have been, you know, one of the Philippines.

Page 50

1  Q. Tell me what you mean by the customer care team.
2  I want to understand what role they played and who they
3  were.
4  A. Well, essentially it's the coaches, I'm sorry, or
5  the -- or the Phili team.
6  Q. Was the customer care function different from the
7  success coach function?
8  A. Yes.
9  Q. What was the customer care function?
10 A. The customer care was supposed -- the customer
11 care was to answer the questions after they were a
12 customer.
13 Q. Okay.
14 A. The coaches were supposed to answer before they
15 were a customer. If this makes sense.
16 Q. Yes. Okay.
17       And the -- do you recall the names of
18 any customer care people who were working with you in
19 say the 2011/2012 timeframe?
20 A. I know Margaret has been there. I don't know if
21 Deborah was there.
22 Q. Let's start off with --
23 A. I apologize, but like I said, I was working with
24 the attorneys and doing all the other stuff, so like I
25 said, his secretary and all was in charge of the

Page 51

1  customer care team and all of -- I'm trying to remember
2  who else was there. I know Marcia was there.
3  Q. Marcia daSilva.
4  A. Yeah. Marcia was there. Margaret was there.
5  Q. And who is Margaret? Do you remember her last
6  name?
7  A. Suzanne Margaret -- I can't pronounce her last
8  name. It starts with a "D."
9  Q. Maybe -- well, I have a list of some names, I've
10 got, maybe we can identify --
11 A. It's Suzanne Margaret Del-la...
12 Q. We can look that up in a moment.
13 A. Yeah. She's from the Philippines. Yeah, she's
14 been there forever. I love Margaret.
15 Q. Okay.
16 A. She's been there from the beginning off and on.
17 Q. What's Margaret's role?
18 A. She's customer service.
19 Q. Does she have a title?
20 A. No. She's just customer service.
21 Q. She's in the Philippines?
22 A. Yes.
23 Q. I just want make to sure I am clear on what titles
24 you've held over the course of your work with
25 Roca Labs. Has it been general manager, or you tell

Page 52

1  me.
2  A. Don says I'm general manager but -- he has said I
3  am general manager before. He has -- before that I was
4  operations manager.
5  Q. Was there any difference, as far as you knew,
6  between the roles you were playing under the two
7  titles?
8  A. No.
9  Q. At the various times I think you signed some
10 correspondence as paralegal; is that correct?
11 A. Yes.
12 Q. Who told you to do that?
13 A. Who told me to do that? One of the attorneys, but
14 I -- I don't know what year it was so I don't know what
15 attorneys I was working with. He goes through
16 attorneys, so.
17 Q. I understand. Do you remember if Mr. Jurvain
18 approved you referring to yourself as the paralegal in
19 those communications?
20 A. Yes.
21 Q. Do you know if Mr. Jurvain was personally aware of
22 those communications that you signed as a paralegal?
23 A. Yes.
24 Q. Who was Mr. Jurvain's secretary?
25 A. I don't know.

                                                                                          93

1  Q. Did you have any involvement in creating any of
2  those type of documents that were inserted in
3  Roca Labs' packages?
4  A. I did not.
5  Q. Do you know where those would have been kept and
6  maintained?
7  A. They were on Google Docs. I did not have access
8  to them. I believe Jack worked on them. Jack worked
9  on them and the labels for the canisters and all that
10 you see, and on the bags and all those labels.
11 Q. What about -- and then turning to the last page,
12 that's just a continuation of the screen before; is
13 that correct.
14 A. (No audible response.)
15 Q. If you know.
16 A. Yes, that's just a continuation of the screen
17 showing you the screens and all, which changed. You
18 know, could change.
19 Q. So, the product selection and description could
20 change somewhat from time to time?
21 A. Yeah. Sometimes the bag color might change, the
22 teaspoon colors might change, measuring spoons might
23 change colors.
24 Q. I'm looking at the bottom of the last page of
25 Exhibit 5. There are some boxes to check, one, talking

                                                                                          94

1  about "I have check and do not have any medical
2  reasons," and then one "signature required on
3  delivery"; is that correct?
4  A. That's correct.
5  Q. The first -- can you read the statement on the top
6  box that I have checked?
7  A. The regular production?
8  Q. No, no, the -- under the word "Urgent production,"
9  there's a little check box with a little icon.
10 A. I have checked and do not have any medical reasons
11 that can prevent me from using the Roca Labs Gastric
12 Bypass Alternative procedure and I have read and agreed
13 to the terms privacy money back/return policy."
14 Q. Were consumers required to check that in order to
15 purchase?
16 A. Yes, they were.
17 Q. Were consumers required to actually read, or at
18 any point view the terms and conditions before being
19 able to purchase?
20 A. I don't know what you mean by required.
21 Q. Well, would the process have presented them with
22 an unavoidable pop up or some other way that they would
23 be forced to see the terms and conditions before
24 checking the box?
25 A. In this process? No.

                                                                                          95

1  Q. So, the answer is no they would not have to be
2  forced to see it; that's right?
3  A. No, not in this process here.
4  Q. Is there any point in which -- in the process of
5  purchasing Roca Labs products that consumers would have
6  been forced to see those terms and conditions?
7  A. They would -- they were sent an email and it's in
8  the questions, like in the FAQs and all that, they were
9  made aware of the return policy, but they weren't
10 forced.
11 Q. They weren't forced. So it was available?
12 A. It was available to them but they were not forced
13 to read it.
14 Q. Going back to the first page of Exhibit 5, I just
15 want to ask you to read the last sentence in the top
16 portion. The "This information."
17 A. "This information will be kept confidential and
18 will NOT be shared." And "Privacy Policy," and then the
19 link.
20 Q. Is it your recollection that a statement like this
21 would have been on -- presented to consumers in the
22 purchasing process throughout the time you were with
23 Roca Labs?
24 A. Yes.
25 Q. And under that there is a percent of the

                                                                                          96

1  statement: 53 percent are approved. Do you see that?
2  A. I do.
3  Q. Do you understand what the basis for that
4  statement would be?
5  A. Are you asking me do I know where they got that
6  number?
7  Q. Yes.
8  A. I do not.
9  Q. Do you think that's an accurate number based on
10 your experience working with Roca Labs?
11 A. I do not.
12 Q. What do you think a more accurate percentage would
13 be?
14 A. Ninety-five percent.
15 Q. What, in your experience, working with the company
16 to lead you to think that? What's your basis for that?
17 A. I believe that everybody was approved except if
18 they have a kidney issue and -- an allergy, or unable
19 to drink the water.
20 Q. Do you know if Roca Labs business has any data to
21 indicate one way or the other what percentage of people
22 applying to by the product were approved?
23 A. I'm not aware.
24 Q. And the next thing I want to show you, we will
25 move on to what will become Exhibit 6.

229

1  A. Yes.
2  Q. What is Exhibit 79?
3  A. This is the compliments of business. Jayme would
4  send me a copy when we got a compliment to the business
5  from the BBB.
6  Q. So, the people whose compliments are shown in
7  Exhibit 79, are they all affiliated with Roca Labs in
8  some way?
9  A. Yes.
10 Q. And they were all being paid by Roca Labs to leave
11 those comments?
12 A. They were being paid -- you are asking me if they
13 were being paid?
14 Q. That's right, yes.
15 A. (No audible response.)
16 Q. Let me ask you this: Were they generally --
17 A. No, Roger was not paid. Roger was a success user
18 and success coach. Roger was not paid to leave a
19 comment.
20 Q. He later became a success coach; right?
21 A. No, he was already a success coach when he left
22 us.
23 Q. That's what I am asking, so he was already being
24 employed in some way by Roca Labs; right?
25 A. Yes. Yes.

230

1       I believe his wife did one as well, or
2  they didn't take it because -- let me see who else was
3  on here.
4       Chris Green, I am not aware if he was
5  paid or not.
6  Q. Okay.
7  A. Tina Midgley, I don't know if she was paid. She
8  did work for Roca Labs, I don't know if she was paid.
9  Q. She was a success coach; right?
10 A. Yes. I don't know if she was paid to do that.
11 I'm not aware if Chris Green was paid. He was a user.
12 They are the only three; correct? That's all I see.
13 Q. Were you aware of any policy about whether or not
14 anybody working with Roca Labs either as a success
15 coach other otherwise would have to disclose their
16 association with Roca Labs when they were posting?
17 A. When they were posting a compliment or a blog.
18 Q. That's right.
19 A. No, I'm not aware that they had to say they were a
20 paid coach when they had to, or in the video or
21 anything. I'm not aware.
22     MR. SUTTLEMYER: Let's take another
23 quick pause.
24     (Email dated 5/2/14 marked FTC's
25     Exhibit No. 80, for identification.)

231

1  BY MR. SUTTLEMYER:
2  Q. Ms. King I handed you an exhibit marked 80, and
3  it's comprised of pages from FTC-SKING-001368, 1366,
4  1365, 1367.
5       Ms. King do you recognize what's in
6  these pages of Exhibit 80?
7  A. Yes.
8  Q. What's going on in the pages of Exhibit 80? First
9  of all, these are emails, correct, from Mr. Jurvain to
10 you and others?
11 A. Yes, it is.
12 Q. What is Mr. Jurvain emailing about?
13 A. He's emailing about a coach not following
14 instructions.
15 Q. How would he know that a coach was not following
16 instructions?
17 A. This was from -- he must have looked at a Live
18 Chat script.
19 Q. So, he would be able to monitor Live Chats?
20 A. Yes. He can monitor Live Chat, look at their --
21 you know, look at a customer email.
22 Q. So, apparently he would do that from time to time?
23 A. Yeah, he would check, sure, quality.
24 Q. And he would access Live Chat records of success
25 coaches interacting with prospective customers; is that

232

1  right?
2  A. That's correct.
3  Q. Would he review Live Chats and emails from
4  customers who purchased?
5  A. Yes.
6  Q. And in terms of last page marked 1367, about a
7  third of a way down there's a sentence, "Aside, I
8  wonder why Sharon did not offer IMMEDIATELY to use our
9  previously written manual..." Do you see that?
10 A. I do.
11 Q. What is the previously written manual he was
12 referring to, do you know?
13 A. No.
14 Q. Okay?
15 A. No, I do not.
16 Q. Going up a little further on that page there's A
17 sentence, "We already gave you the rule: You don't
18 answer differently than the site"; is that correct?
19 A. That is correct.
20 Q. Was this a rule for success coaches, as far as you
21 know?
22 A. It was a rule for everybody, yes, including the
23 coaches.
24 Q. Including customer service, customer care
25 personnel?

58 (Pages 229 to 232)

                                                                                    233
1   A.  Yes.
2   Q.  And the one exception seems to be somebody talking
3   about their own personal experience if they're a coach;
4   is that right?
5   A.  Yes.
6           MR. SUTTLEMYER:  Why don't we go off the
7   record for another minute.  I will get some more
8   documents ready.
9                       - - -
10          (Blog marked FTC's Exhibit No. 81, for
11          identification.)
12                      - - -
13          (Blog marked FTC's Exhibit No. 82, for
14          identification.)
15                      - - -
16  BY MR. SUTTLEMYER:
17  Q.  So, I have just handed you, Ms. King, two
18  documents marked Exhibits 81 and 82.
19          MR. SUTTLEMYER:  Eighty-one is a
20  document in the upper right-hand corner, that I printed
21  out yesterday.  In the upper right-hand corner is the
22  is URL "trueroca.wordpress.com/2011/11/17..." -- and
23  some other wording, and the date on the left-hand side
24  is November 17, 2011.
25

                                                                                    234
1   BY MR. SUTTLEMYER:
2   Q.  Do you see -- do you recognize the content of
3   Exhibit 81?
4   A.  I believe so, yes.
5   Q.  What do you recognize about Exhibit 81?  Where
6   have you seen it before?
7   A.  This is, I believe, a Blog by -- I think her name
8   was Deb.
9   Q.  Is it Debron Johnson?
10  A.  I believe so, yes.  I think it was
11  true.roca.wordpress or something.
12  Q.  Let's look at Exhibits 82.  Maybe looking at them
13  together 81 and 82 -- do you recognize Exhibit 82,
14  which has in the upper right-hand corner
15  "https//true.roca.wordpress.com" printed out yesterday
16  at 1:31.
17  A.  Does Roca Labs really work, that is -- yeah, that
18  was her.  I remember -- I didn't read it all (inaudible
19  reading).
20  Q.  So, do you recognize Exhibit 82?
21  A.  I recognize this being her blog site.  I don't --
22  I don't recognize all this.  I don't know why she would
23  be using the trademarks.
24  Q.  Do you know who else would have been working on
25  this blog if it wasn't her?

                                                                                    235
1   A.  We had Maddy writing -- yes, Maddy and I took over
2   the blogs for awhile.  But Don also had access to the
3   blogs.
4   Q.  Who is Maddy?
5   A.  Maddy Albright (ph), but she didn't -- we didn't
6   do the blogs long.
7   Q.  And by do the s what do you mean exactly?
8   A.  To try to keep up with them.
9   Q.  Keep up them in what way?  Writing new content for
10  the blogs?
11  A.  Yes.
12  Q.  So, what -- all of the information and experience
13  of whoever seemingly has written the blog shown on
14  Exhibits 81 and 82 isn't unnecessarily one individual;
15  is that correct?
16  A.  Debron did come back for awhile though, but I
17  don't believe in 2004 --
18  Q.  2004?
19  A.  I mean 2014, I'm sorry.  But I don't believe --
20  there's no way Debron and -- or even Madeline would
21  have used these registered trademark.  Nobody's going
22  to use their registered trademark when they're writing
23  their blog.  So, I don't -- I do not recognize this.
24  And Madeline and I worked together, we worked on the
25  blog.  This is -- I don't recognize this.

                                                                                    236
1   Q.  Is that 81 and 82?
2   A.  (No audible response.)
3   Q.  The exhibits you mean, or do you mean --
4   A.  I don't recognize these exhibits, no I do not.  I
5   mean I recognize the WordPress, the title of that
6   WordPress but I do not recognize 82.
7   Q.  And you recognize the URL "trueroca.wordpress.com"
8   from your work with Roca Labs?
9   A.  Yes.
10  Q.  And you think that was something originally
11  created by somebody associated with Roca Labs?
12  A.  Debron, I do know Debron created.  She was a
13  customer.  She did lose weight, she had a child, she
14  was a single mother, she did do true WordPress but I
15  don't recall -- again I didn't work in all the aspects
16  of it.
17  Q.  Okay.  Thank you.  Let's go to 83.
18          (Blog marked FTC's Exhibit No. 83, for
19          identification.)
20          Off the record.  Back on the record.  So
21  the exhibits we've just handed Ms. King is Exhibit 83,
22  which has, for the record, FTC-PROD-003026 is the
23  document number first page and the Bates itself.  This
24  is the native version, Suze.
25