UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No.  8:15-cv-02231-MSS-TBM |
| Plaintiff, | |
| v. | |
| ROCA LABS, INC., a corporation; ROCA LABS NUTRACEUTICAL USA, INC., a corporation; MUST CURE OBESITY, CO., a corporation; JURAVIN, INCORPORATED, a corporation; ZERO CALORIE LABS, INC., a corporation; DON JURAVIN, individually and as an officer of Roca Labs, Inc., Roca Labs Nutraceutical USA, Inc., Must Cure Obesity, Co., and Juravin, Incorporated; and GEORGE C. WHITING, individually and as an officer of Roca Labs, Inc., Roca Labs Nutraceutical USA, Inc., and Zero Calorie Labs, Inc., | |
| Defendants. | |

**PLAINTIFF'S AMENDED MOTION FOR SUMMARY JUDGMENT
AGAINST ALL DEFENDANTS AND MEMORANDUM IN SUPPORT**

**[DISPOSITIVE MOTION]**

## <u>TABLE OF CONTENTS</u>

I.   OVERVIEW ........................................................................................................... 1

II.   THE PARTIES ...................................................................................................... 2

III.   DEFENDANTS' DECEPTIVE AND UNFAIR BUSINESS PRACTICES .................... 3

   A.   Defendants' Advertising and Business Practices............................................ 3

     1.   Weight Loss Claims ............................................................................. 3

     2.   Endorsements ...................................................................................... 8

     3.   Privacy Promise ................................................................................. 11

     4.   "Discount" Pricing ............................................................................ 12

     5.   Threats and Lawsuits Based on Gag Clause in Terms and Conditions.................... 15

   B.   Consumer Harm ......................................................................................... 18

   C.   Defendants' Advertising Was Deceptive...................................................... 18

     1.   Defendants' Weight Loss Claims Were Unsubstantiated and False ........................ 18

     2.   Defendants' Endorsements Were Deceptive............................................. 22

     3.   Defendants' Privacy Promise Was False ............................................... 23

     4.   Defendants Deceptively Claimed That Consumers Agreed to a "Discount" in
Exchange for Silence ......................................................................... 23

   D.   Defendants' Unfair Gag Clause Practices Were Likely to Substantially Injure
Consumers ................................................................................................ 24

   E.   Defendants' Common Enterprise Controlled by Juravin............................... 25

     1.   Corporate Defendants Are a Maze of Interrelated Companies ................................ 25

     2.   Juravin Controlled the Corporate Defendants and Common Enterprise................. 27

IV.  THE MATERIAL FACTS ARE UNDISPUTED AND THE FTC IS ENTITLED TO
JUDGMENT AS A MATTER OF LAW ........................................................................ 29

A.  Summary Judgment Standard ........................................................................ 29

B.  Sections 5 and 12 of the FTC Act Prohibit Deceptive and Unfair Acts or Practices .. 30

1.  Deception Under Section 5 ...................................................................... 30

2.  False Advertising Under Section 12........................................................ 31

3.  Unfairness Under Section 5..................................................................... 32

C.  Defendants' Weight Loss and Success Rate Claims Are False and Deceptive (Counts
I, II)................................................................................................................ 32

D.  Defendants' Deceptive Representations and Omissions About Gastricbypass.me and
Testimonialists (Counts IV, V)..................................................................... 34

E.  Defendants' Deceptive Privacy Promises (Count VI) .................................. 35

F.  Defendants' Deceptive Representation That Consumers Agree to Pay "Full Price" for
Breach of Terms (Count VII) ........................................................................ 36

G.  Defendants Are Liable for Unfair Gag Clause Practices (Count III).......................... 37

1.  Defendants' Practices Cause or Are Likely To Cause Substantial Injury................ 37

2.  Not Reasonably Avoidable by Consumers............................................... 40

3.  Substantial Injury Not Outweighed by Countervailing Benefits ............ 41

H.  Juravin Is Individually Liable for Injunctive and Equitable Monetary Relief............. 42

I.  Whiting Is Individually Liable for Injunctive Relief .................................... 43

V.  THE COURT SHOULD ENTER A FINAL ORDER WITH INJUNCTIVE RELIEF
AGAINST ALL DEFENDANTS, AND MONETARY RELIEF AGAINST JURAVIN
AND THE CORPORATE DEFENDANTS .................................................................... 44

A.   Permanent Injunctive Relief ......................................................................... 44

B.   Monetary Relief ............................................................................................. 45

VI.  THE FTC PROPOSES APPROPRIATE PERMANENT EQUITABLE RELIEF TO
     REMEDY DEFENDANTS' FTC ACT VIOLATIONS .................................................. 46

VII. CONCLUSION .................................................................................................... 48

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................... 30

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................... 30

*Educational Research Center of America, Inc.*, FTC Dkt. No. C-4079 (2003) ..................... 36

*Facebook, Inc.*, FTC Dkt. No. C-4365 (2012) .......................................................................... 36

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989) .................................................. 42

*FTC v. Atlantex Assocs.*, No. 87-0045-CIV, 1987 WL 20384 (S.D. Fla. Nov. 25, 1987), *aff'd*,
        872 F.2d 966 (11th Cir. 1989) .......................................................................................... 42

*FTC v. Bay Area Bus. Council*, 423 F.3d 627 (7th Cir. 2005) ................................................. 31

*FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011) ................................................. 46

*FTC v. Career Assist. Planning, Inc.,* No. 96-cv-2187, U.S. Dist. LEXIS 17191 (N.D. Ga.
        Sept. 18, 1997) ................................................................................................................. 47

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965) .............................................................. 47

*FTC v. Commerce Planet*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012) ........................................ 36

*FTC v. Coorga Nutraceuticals Corp.*, No. 2:15-cv-72, 2016 U.S. Dist. LEXIS 118308 (D.
        Wy. Aug. 15, 2016) ........................................................................................................... 33

*FTC v. Cyberspace.com,* 453 F.3d 1196 (9th Cir. 2006) ................................................... 30, 37

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) .......................................................................... 44

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp.2d 502 (S.D.N.Y. 2000) ................................. 35

*FTC v. Freecom Communications, Inc.*, 401 F.3d 1192 (10th Cir. 2005) .............................. 43

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) ......................................... 42, 44, 45

*FTC v. Ivy Capital, Inc.*, Civ. No. 2:11-283, 2013 WL 1224613 (D. Nev. Mar. 26, 2013) ... 43

*FTC v. J. William Enters., LLC*, 283 F. Supp. 3d 1259 (M.D. Fla. 2017) ............................. 45

*FTC v. Kitco of Nev.*, 612 F. Supp. 1282 (D. Minn. 1985) .................................................... 42

*FTC v. Lalonde*, 545 F. App'x 825 (11th Cir. 2013) .............................................................. 44

*FTC v. LoanPointe, LLC*, No. 10-CV-225, 2011 WL 4348304 (D. Utah Sept. 16, 2011),

    *aff'd*, 525 F. App'x 696 (10th Cir. 2013)........................................................ 46

*FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283 (S.D.N.Y. 2008) ........................... 42

*FTC v. Nat'l Urological Grp., Inc.*, No. 1:04-CV-3294, 2017 U.S. Dist. LEXIS 182256 (N.D.

    Ga. Oct. 10, 2017), *appeal docketed*, No. 17-15695 (11th Cir. Dec. 21, 2017) ................ 33

*FTC v. National Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008), *aff'd,* 356 F.

    App'x. 358 (11th Cir. 2009) ...................................................... 31, 32, 33, 46

*FTC v. NPB Advert., Inc.,* No. 8:14-cv-1155, 2016 U.S. Dist. LEXIS 151840 (M.D. Fla. Nov.

    2, 2016) ................................................................................. 31, 33

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994)................................................ 31, 32, 33

*FTC v. Para-Link Int'l, Inc.*, 2001 U.S. Dist. LEXIS 17372 (M.D. Fla. 2001)..................... 35

*FTC v. QT*, 448 F. Supp. 2d 908 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008) .. 31, 32,

    33

*FTC v. Sharp*, 782 F. Supp. 1445, 1456-57 (D. Nev. 1991).................................................... 47

*FTC v. SlimAmerica*, 77 F. Supp. 2d 1263 (S.D. Fla. 1999) ....................................... 30, 31, 47

*FTC v. Standard Education Society*, 302 U.S. 112 (1937) ...................................................... 35

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003)............................................................ 30, 31

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ind. 2000) ........................... 47

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007)................. 44, 45, 47

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984)............................................. 44

*FTC v. Washington Data Resources*, 704 F.3d 1323 (11th Cir. 2013)............................ 45, 47

*FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247 (M.D. Fla. 2012), *aff'd*, 704 F. 3d

    1323 (11th Cir. 2012)................................................................................. 46

*FTC v. World Patent Mktg.*, No. 17-cv-20848, 2017 U.S. Dist. LEXIS 130486 (S.D. Fla.

    Aug. 16, 2017) ........................................................................................ 38

*Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590 (11th Cir. 1995) ........................................ 30

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992)..................................................... 30, 32, 47

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .............................. 30

*Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273 (11th Cir. 2009) ................................................ 30

*Polygram Holding, Inc.,* 136 F.T.C. 310 (2003) ...................................................................... 40

*POM Wonderful, LLC v. FTC*, 777 F.3d 478, 491 (D.C. Cir. 2015) ............................... 33, 43

*RealComp II, Ltd.*, 2009 FTC LEXIS 250 (F.T.C. Oct. 30, 2009) ......................................... 40

*Thompson Med. Co.*, 104 F.T.C. 648 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986) .............. 33

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953) ........................................................... 44

## Statutes

15 U.S.C. § 45 ........................................................................................................................... 30

15 U.S.C. § 45(a) ........................................................................................................................ 2

15 U.S.C. § 45(n) ...................................................................................................................... 32

15 U.S.C. § 45b ......................................................................................................................... 37

15 U.S.C. § 52 ....................................................................................................................... 2, 31

15 U.S.C. § 52(b) ...................................................................................................................... 32

15 U.S.C. § 53(b) ...................................................................................................................... 44

15 U.S.C. §§ 41-58 ..................................................................................................................... 2

15 U.S.C. §§ 52, 55 ................................................................................................................... 31

15 U.S.C. §§ 55(b) and (c) ........................................................................................................ 31

## Rules

16 C.F.R. § 14.15(c)(1) ............................................................................................................. 40

16 C.F.R. § 255.5 ...................................................................................................................... 35

16 C.F.R. § 456.6(a) .................................................................................................................. 39

43 Fed. Reg. 23,992, 24,001 (1978) ......................................................................................... 38

43 Fed. Reg. 23,992, 24,007 (1978) ......................................................................................... 39

49 Fed. Reg. 7740, 7762-65, 7768-70 (1984) .......................................................................... 32

Federal Rules of Civil Procedure 56(a) .................................................................................... 30

Federal Rules of Civil Procedure 56(c) .................................................................................... 30

**Policy**

*FTC Policy Statement on Unfairness*, appended to *International Harvester Co.*, 104 F.T.C.

949 (1984) .................................................................................................................. 32, 41

# I.   OVERVIEW

> *Well I'm sure you're wondering, what is the success rate? Roca Labs'*
> *Formula is scientifically proven to have a 90% success rate. It will always*
> *achieve a gastric bypass effect by physically occupying your stomach, leaving*
> *only 20% available space for 10-16 hours. You'll eat 50% less, and can spare*
> *your body as much as 2,000 unnecessary calories a day without feeling any*
> *urge to overeat. That equals 15 pounds a month.*

"What is the Success Rate?" video, Dkt. 6-2, PageID 191, Att. V2 (Dkt. 8)[1]

Defendants sold Roca Labs "Formula" dietary supplements to more than 50,000

consumers across the United States from 2009 through 2015. Using search advertising,

websites, and online videos, they claimed that the Formula worked by substantially limiting a

user's stomach capacity. Purportedly comparable to gastric bypass surgery, but without the

risk and expense, this effect supposedly caused dramatic weight loss and was scientifically

proven to have a ninety-percent success rate. What customers who paid hundreds of dollars

for this supposed "gastric bypass alternative" actually got were common dietary fibers that

have been shown to be of little, if any, help in weight loss. The undisputed facts of this case

show that Defendants leveraged these core deceptions, and several other deceptive and unfair

---

[1] The FTC's evidence is presented in exhibits that include advertising, deposition transcripts and documents, expert reports, and discovery responses. Citations often refer to relevant documents as well as authenticating testimony. "PX" citations refer to Plaintiff's Exhibits 1-26 hereto. Citations of the form PX#-#(tr:ln-tr:ln) denote the starting page or pages of ranges in which cited transcript pages appear. Citations of the form PX#-## generally refer to the first pages of cited deposition exhibits or declaration attachments (generally bookmarked in the PDFs), unless the context indicates that the reference is to a specific exhibit or attachment page. The FTC also relies on cited pleadings, declarations, and exhibits filed previously in this case ("Dkt."). Videos cited at Dkt. 6-2, PageID 300 [V1-V4] were filed as physical exhibit Dkt. 8, and are referred to in the record by other file names. PX1-2 ¶¶5-7. Defendants' Answers on the points cited herein are substantially identical to one another. References to Juravin's Answer, Dkt. 58, refer also to the same statements at the same paragraphs in Dkt. 59-Dkt. 64.

practices, to take in more than $25 million in violation of the FTC Act. Accordingly, the FTC seeks summary judgment and injunctive relief on all counts against all defendants, and $25,246,000 in monetary relief from Defendant Don Juravin and the corporate defendants.

## II.    THE PARTIES

The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.

From 2009 through the present, Defendant Don Juravin ("Juravin") has had authority and control over all five corporate defendants: Roca Labs, Inc. ("RLI"), Roca Labs Nutraceutical USA, Inc. ("RLN"), Must Cure Obesity, Co. ("MCO"), Juravin, Incorporated ("JI"), and Zero Calorie Labs, Inc. ("ZCL") (collectively, "Corporate Defendants"). Juravin owns MCO and JI and has been an officer of RLI and RLN, sometimes claiming ownership of RLN. He controlled the advertising of Roca Labs products, and directed and controlled the challenged practices. Defendant George Whiting ("Whiting") owns and has been an officer of RLI, RLN, and ZCL. The Corporate Defendants are all Florida entities[2] that operated as a common enterprise to sell Roca Labs products through deceptive and unfair practices.

---

[2] The Corporate Defendants each have a place of business in this district. Dkt. 58 ¶¶3, 6-10. Their specific roles are set forth in Section III.E, below.

2

## III.     DEFENDANTS' DECEPTIVE AND UNFAIR BUSINESS PRACTICES

### A.     Defendants' Advertising and Business Practices

#### 1.     Weight Loss Claims

Defendants' main product since 2009 has been Roca Labs "Formula" dietary supplements[3] (a/k/a "Gastric Bypass NO Surgery," and "Gastric Bypass Alternative"). Dkt. 58 ¶¶15, 19. PX6-21(31:5-13); PX6-29(70:1-11); PX6-217 ¶¶4-5; PX6-8(44:7-18); PX6-107, 116; Dkt. 6-7, PageID 670 ¶6, 683, 690; PX10-21(131:8-135:8). Defendants relied primarily on Google, Bing, Yahoo, and Facebook ads to direct consumers to their websites selling the Formula. PX6-58(187:23-189:17); PX6-5(22:15-23:9; 29:24-30:19; 31:14-32:1); PX6-13(56:22-57:8); PX9-23(171:11-172:20); PX13-8 (online ads only through Facebook Google ads, Yahoo, and Bing), PX13-10 ("all sales were made online"); PX22-1, 20. Defendants typically targeted overweight and obese consumers by delivering ads when consumers ran searches for terms relating to bariatric surgery.[4] PX6-49(153:3-24); PX6-73(398:4-402:9). Their search and Facebook ads often mentioned "Extreme Weight Loss" and a "90% Success Rate," favorably comparing their products to bariatric surgery in price and outcome. Dkt. 6-2, PageID 188; PX1-4 ¶¶ 9-11 (Att. C1, C2, D-K), PX1-11 – 35; PX2 (003769; 004692); PX10-25(151:6-152:2); PX10-189; PX13-8; PX6-36(98:2-99:13; 102:11-103:17); PX6-386;

---

[3] The Formula's ingredients are Beta Glucan, Guar Gum, Xanthan Gum, Konjac, Inulin, Natural Color, Sucralose, Vitamin C, B6, B12, Fruit Flavor. Roca Labs Anti-Cravings (ingredients of which are Beta Glucan and Fibersol®-2) was a companion product. PX1-6 ¶13; PX1-84 – 92; Dkt. 6-2, PageID 190, 230, 233.

[4] Bariatric surgical procedures, including gastric bypass surgery, cause weight loss by restricting the amount of food the stomach can hold, reducing absorption of nutrients, or a combination of both. See PX3-12 ¶20.

PX6-419; PX6-460; PX6-38(106:10-107:1); PX6-39(110:10-112:24); PX6-513; PX6-40(116:17-117:14). Defendants spent approximately $12 million on advertising from 2010 to 2015. PX7-8 (447:1-4);[5] PX24-1, 4.[6]

Defendants claimed the Formula was for consumers who wished to lose fifty or more pounds, PX6-29(70:1-11); PX6-217 ¶4; Dkt. 6-2, PageID 190, 195, and typically sold a three- to four-month supply of Formula for $480. Dkt. 6-2, PageID 190, 248. They distinguished themselves from other sellers and justified the price with a seemingly simple but remarkable mechanism of action. On their websites, *RocaLabs.com* and *mini-gastric-bypass.me* ("Roca Labs sites"), through which their sales were generated [Dkt. 58 ¶20; PX13-10; Dkt. 6-3, PageID 341 ¶11 (Att. M); Dkt. 6-5, PageID 525 ¶¶11, 14 (FTC-000339); PageID 571], Defendants claimed that taking Roca Labs Formula will restrict a user's stomach volume, creating a "gastric bypass effect" without the risks and expense of surgery. Dkt. 6-2, PageID 190-91, 194, 198-99, 271, 277, 300[V1] (Dkt. 8); PX1-2 ¶¶6-7; PX2 (004297; 004298); PX10-30(186:4-186:23; 187:18-188:15); see generally Dkt. 6-2, PageID 190, 193-272. See also PX22-1, 20; PX25-3 ¶7, PX25-13, 14. Defendants claimed the Formula leaves only twenty percent of the stomach available for food intake for approximately ten to sixteen hours and reduces cravings. Dkt. 6-2, PageID 190-91, 277, 282,

---

[5] Different Corporate Defendants paid for online ads at different times, but all to benefit the same product. PX6-9(49:2-50:16); PX6-10(53:20-54:20; 56:11-19; 59:10-14; 60:13-22); PX6-58(184:24-186:15). Defendants designated the exhibits referenced in this testimony as "confidential," but the FTC can file them under seal, upon request.

[6] PX6-6(29:24-30:19; 31:14-32:3); PX9-23(171:3-172:20); PX9-23a(175:10-176:12) (Defendants' testimony on advertising expense calculation for tax returns).

Att. V1, V2 (Dkt. 8); PX1-2 ¶¶6-7 (Att. A2, A10); PX2 (004297; 004575); PX10-34(201:10-24). As a result, it supposedly caused dramatic weight loss, including 21 pounds per month, and 100 pounds in seven to ten months. Dkt. 6-2, PageID 190, 198-99, 202. The ads promised that the supplements would *force* users to eat less without diet restrictions, causing immediate weight loss:

> **How does it work?**
> NEW: a dose of the Roca Labs formula is mixed with water and turns into 350cc stomach-sized red mixture. Successful users report that when consumed in the morning, the Regimen creates a feeling akin to limiting functional stomach volume for the duration of your day. This result is achieved **without** surgical procedures, including cutting parts of the digestive system.
>
> With limited stomach volume, you eat much less. . . .  Bariatric surgery does not eliminate your cravings; Roca Labs Anti-Cravings can reduce your urge for sweets and snacks and other foods that prevent your weight loss success enhancing the loss of an additional 5 to 8 pounds a month! Learn more

Dkt. 6-2, PageID 190, 198-99. See also Dkt. 48 ¶26 (image) and Dkt. 58 ¶26.

> **How much weight can I expect to lose?**
> The weight loss can be **immediate** with the Roca Labs' regimen, just as if you had undergone a bariatric surgery, and within a few days the cravings should be diminished significantly. Depending on your commitment to the recommended rules for suggested use, a loss of **21 lb a month** is possible; however, realistically, it may take 7 to 10 months to lose 100 lb.

Dkt. 6-2, PageID 190, 198-99. See also Dkt. 6-2, PageID 190, 209; Dkt. 6-2, PageID 191, 300[V3] (Dkt. 8); PX1-2 ¶¶6-7 (Att. A9); PX2 (004563); PX10-33(197:6-16).

> **No Menus, No Diet Restrictions**
> Unlike weight loss pills or diet programs, Roca Labs® Formula **does not require a strict menu or calorie restrictions**.  It practically FORCES you to eat **HALF** the food you ate before, so you will automatically lose weight without having to keep track of every calorie you consume.

Dkt. 6-2, PageID 190, 206; see also PX1-2 ¶6 (Att. A4); PX2 (004542); PX10-31(189:11-22).

5

The sites also featured videos of persons in lab coats reiterating the "gastric bypass effect," a "scientifically proven" ninety-percent success rate, rapid and substantial weight loss, and effectiveness comparable to gastric bypass surgery:

> Well I'm sure you're wondering, what is the success rate?  Roca Labs' Formula is scientifically proven to have a 90% success rate.  It will always achieve a gastric bypass effect by physically occupying your stomach, leaving only 20% available space for 10-16 hours.  You'll eat 50% less, and can spare your body as much as 2,000 unnecessary calories a day without feeling any urge to overeat.  That equals 15 pounds a month.

Dkt. 6-2, PageID, 191, 300[V3] (Dkt. 8); see also PageID 191, 300[V1, V2, V4] (Dkt. 8); PX1-2 ¶¶5-7; PX2 (004295); PX10-30(185:15-25); Dkt. 48 ¶29 (image) and Dkt. 58 ¶29; Dkt. 6-2, PageID 190, 240-42; Dkt. 6-2, PageID 190, 276-79.

Defendants did not limit their claims just to overweight adults. The sites also touted the efficacy and safety of their products for children as young as six. Defendants claimed that "[m]any children have used the Formula successfully and safely," with the same "gastric bypass effect," stating that it was "safe for children ages 6 and up with a parent's supervision. It works by physically expanding in the stomach to leave only a very limited space available for food intake. Throughout the day, your child will eat HALF the food they used to, without hunger." Dkt. 6-2, PageID 190, 215; see also PageID 220-21; PX10-29a(171:20-172:12); PX10-29c(180:17-21); PX10-214, 252; PX5-3 ¶2 (Att. P) (PX5-77); PX6-43(127:22-128:8); PX6-709n; PX26-2 ¶5, PX26-31, 36.

Defendants used the cachet of medicine to amplify their efficacy claims. Their webpages titled "Letter to your doctor" [Dkt. 6-2, PageID 190, 225-28; PX6-45(140:14-141:18); PX6-726; PX5-2 ¶2 (Att. C) (PX5-15)] and "Medical Evidence for Success" [Dkt. 6-2, PageID 190, 281-89; PX10-29b(174:8-17); PX10-223] feature a physician, Ross

Finesmith, extolling the products' weight-loss benefits supposedly based on his patients' and

his own use.[7] The pages refer to "multiple medical studies" or "medical and scientific

research" that supposedly prove the weight-loss benefits of the Formula. Dkt. 6-2, PageID

225, 283. Indeed, nearly every aspect of the websites' text and images – from the name Roca

"Labs," photos of lab workers and caduceus symbols, to references to FDA approval of an

ingredient, health insurance, and a (non-functioning) Doctor portal – fortify the net

impression that their weight-loss claims are scientifically proven. See, e.g., Dkt. 6-2, PageID

190-91, 194-96, 198, 201-02, 215, 248, 253, 271-75; 300[V4 at 2:04] (Dkt. 8); PX1-2 ¶¶5-7

(Att. A5); PX2 (004546); PX10-31(191:8-192:1); PX10-23(143:9-144:2), PX10-182.

Defendants made these same basic claims in their videos and websites – in varying

layouts and formats, sometimes with different stock photos, but always with the same actors

in lab coats – from at least the start of 2011 until the FTC sued them at the end of September

2015. PX10-12(86:19-87:19); PX10-31(189:5-7); PX10-33(200:1-4; 201:8-202:2); PX10-

22(133:7-135:8), PX10-181; PX6-43(125:23-126:12); PX6-705, 706; PX6-43(127:8-21),

PX6-709a, 709f; PX10-30(186:4-25; 191:13-192:1); PX10-29(165:19-166:12; 167:9-13);

PX10-199; PX10-201; PX6-46(141:1-18); PX6-718; PX11-17(117:25-120:9; 122:5-9);

PX10-180; PX10-21(131:13-132:24); PX10-185; PX10-23(143:4-144:22; 145:17-146:7);

---

[7] Juravin even rewrote what Finesmith had written without asking him, such as the claim that
Finesmith's patients successfully tried Roca Labs products, which Finesmith testified was false.
PX11-12a(86:18-87:20); PX11-13(92:22-93:6); PX11-19(132:15-134:2, 134:13-24, 135:10-136:1).

PX23-1, 6, 8-10.[8] Defendants have recently claimed that the supplements were an incidental part of a larger "program," requiring significant dietary restrictions and exercise, as well as personal "coaching," Dkt. 201, PageID 7945. The ads belie this, as does the testimony of key Roca Labs personnel. PX10-7(35:8-16); PX10-8a(51:23-52:23) (General Manager: Defendants were selling diet supplement to fill users' stomachs so they would eat less); PX11-6(21:12-24; 22:6-13) (Medical Director: regimen was combination of supplements to be mixed together with liquid to expand in stomach to lead to earlier feeling of fullness and reduced food intake); PX12-9b(65:3-21); PX12-9e(101:20-102:8) (Success Coach manager: no distinction between "Formula" and "Regimen"); PX6-29(70:1-11); PX6-217 ¶4 (Juravin: Roca Labs "markets an all-natural weight loss product [the 'Formula']"). The core marketing message, reinforced through express claims, images of stomachs "filled" with the supplements, and the product name "Gastric Bypass No Surgery," was that the supplements were the primary cause of the weight loss.[9]

## 2.    Endorsements

Defendants also promoted their product through apparently neutral or unbiased referrals. For example, Defendants operated *GastricBypass.me* [PX10-26(154:18-155:20);

---

[8] See also PX10-22a(139:19-140:24; 141:11-142:16); PX10-181d; PX10-25(152:3-153:19); PX10-190a; PX10-27(157:13-161:9; 162:13-15); PX10-193a – 198; PX1-5 ¶12 (Att. O-V); PX5-3 ¶4; PX1 6 ¶14 (Att. X-CC), PX1-93 – 135; PX5-2 ¶2 (Att. A-Q); PX5-4 – 98; PX10-29a(172:13-17); PX10-221; PX10-29c(178:4-183:10); PX10-232 – 295; PX1-7 ¶15; PX25-3 ¶8; PX25-13, 14; PX26-1 ¶4; PX26-3; PX2 (013605) at 1:30-2:06; PX26-2 ¶5, PX26-6, 34, 38-39, 42.

[9] See also PX1-3 ¶8 (Att. B); PX2 (004690); PX6-107-08("Roca Labs" 2011 trademark application for "food supplements for weight loss"); PX22-1, 3, 8 (products and services are "vitamins and supplements") (type of merchandise "vitamins and supplements"); and PX25-3 ¶7; PX25-22 (we are "weight loss supplements / diet aids").

PX10-191], a purportedly independent website providing information about bariatric surgery and "alternatives to surgery." Juravin created this site (to "educate and scare people about" gastric bypass surgery), and Defendants sometimes directed traffic to it via search advertising. PX6-54(174:9-177:4); PX6-832; PX6-46(144:19-22); PX6-816, 818; Dkt. 6-2, PageID 190, 296-97; Dkt. 6-7, PageID 672-74 ¶12; PX21-1, 16, 20, 21. It included "Surgery Failures" and "Surgical Alternatives" pages. PX6-833 – 34. Defendants portrayed this site as an objective resource for consumers seeking information on gastric bypass surgery. Dkt. 6-2, PageID 190, 293-97. In fact, Roca Labs' products are the only "alternative" the site favorably discusses. The site's purported "panel of experts" stated that Roca Labs' weight-loss claims are trustworthy "for the most part," and that the Roca Labs "[m]edical claims are correct." Dkt. 6-2, PageID 295-97. There was no disclosure on the GastricBypass.me site that it was affiliated with RLI.

Defendants promoted their products through videos of purported satisfied users.[10] For example, one video shows a woman claiming to have lost significant weight using the Formula. She was actually a paid actor who did not use it, but there is no disclosure in the video. PX1-2 ¶6 (Att. A6); PX2 (004548); PX10-31(192:5-20); see also Dkt. 6-2, PageID 190-91, 237, 299. These videos were on the RocaLabs.com site or YouTube channel from

---

[10] Defendants also posted advertising videos on YouTube channels whose content Juravin controlled. Dkt. 6-2, PageID190 ¶3, 299; PX10-30(186:21-187:15; 188:10-15). Defendants claimed to have 90 or 100,000 video testimonialists (Dkt. 6-2, PageID190 ¶3, 199-200 (at page break), 236; PX6-41(117:15-118:25); PX6-82 ¶23.d; PX6-46(143:11-144:11); PX6-753 – 754 (at page break), 768), with no apparent basis. See Dkt. 6-3, PageID 341 ¶11 (Att. M); Dkt. 6-5, PageID 526 ¶17 (FTC-000340), 571(FTC-000385); PX6-71(390:3-11); PX10-28(161:10-16); PX12-9a(51:10-16; 65:3-21; 68:4-25;117:6-23; 128:6-18).

2011-15. PX10-31(192:2-193:4; 200:5-201:7; 203:12-204:9; 207:14-208:5; 209:20-211:14); PX13-12.

Some of the "satisfied consumers" in the videos were paid independent contractors who were working for Defendants when they made their videos. One video [PX1-2 ¶6 (Att. A7); PX2 (004550)] shows "Carla," who worked for Defendants when the video was made in about 2013. PX10-32(193:11-194:10); PX12-15(168:11-169:20). Another [PX1-2 ¶6 (Att. A8); PX2 (004559)] shows "Roxie," who was working for Defendants when her video was made. PX12-8(36:3-12; 39:5-25).[11] These videos were accessible to prospective purchasers of Roca Labs products via RocaLabs.com and Roca Labs YouTube pages in 2014 and 2015. PX12-8(36:2-39:25); PX12-9a(49:10-20; 51:1-9); PX10-32(194:3-10); Dkt. 6-2, PageID 194, 237; see also PX26-2 ¶5; PX26-27, 37.

Also at Juravin's direction, Defendants had their agents create blogs [PX10-39(238:24-239:23); PX10-289; PX23-1, 3], make embellished or fictitious forum posts or reviews [PX11-19(130:2-134:24); PX11-24; PX6-64, 65(237:16-238:8; 238:16-17; 281:24-282:24], and comment on Roca Labs Facebook ads [PX10-37(226:15-227:8); PX10-297; PX12-12(138:13-140:10)], all to promote the products and direct traffic to Defendants' websites.

---

[11] PX2 (004559) and the exhibit shown at Hensley's deposition are substantially identical. PX1-3 ¶7.

### 3.      Privacy Promise

Defendants strongly implied that consumers who decide to buy Roca Labs products must meet stringent medical criteria, by requiring detailed personal information to be "evaluated" prior to purchase. This process bolstered the impression that Defendants' overpriced fiber supplement is a medically-sanctioned weight-loss intervention. Indeed, the site's order page was titled "Qualify & Order" and has videos about the "qualification" process. It stated that the questionnaire "is designed to filter out those with limited chance of being successful and who are absolutely not suited to use the STRONG Formula or handle the regimen successfully." PX6-49(154:14-156:9); PX6-821. To purchase the products, consumers entered personal health information through the "Qualify & Order" pages, including on a "Questionnaire" or "Health Application" form. Dkt. 58 ¶43. The "Qualify & Order" pages stated that information consumers provided will be kept confidential and will not be shared. Dkt. 6-2, PageID 190, 253. Similar statements appeared in the purchasing process from December 2010 through the time this lawsuit was filed. PX10-5(19:24-20:5; 25:20-26:1); PX10-14(95:14-24); PX10-40; PX6-49(156:10-157:3); PX6-821; PX10-29(166:1-12; 166:25-167:4; 167:11-168:7); PX10-204; PX22-1, 21; PX26-1 ¶4; 3; PX2 (013165) at 1:39.[12]

---

[12] Between late 2012 and 2014, the RocaLabs.com site had a privacy policy stating: "**Our Policy is SIMPLE** Just like doctor-patient confidentiality, Roca Labs does NOT share your information with any third party companies or advertisers in any way. . . . [I]nformation collected is meant only to assist you to achieve your weight-loss goal. . . ." PX10-27(158:18-159:7; 162:16-163:19); PX10-197; PX1-5 ¶12 (Att. V), PX1-82. A "Summary" document inserted in product packages stated that RLI "will not share your private information with anyone." Dkt. 6-3, PageID 340 ¶10, PageID 367.

Purchasers responded to the Questionnaire [PX6-49(154:14-155:17); PX6-821] by entering their full name, gender, age, weight, height, and insurance carrier. Dkt. 6-3, PageID 338 ¶5, 348; PX6-50(157:4-13); PX6-821. Consumers were asked about issues with cholesterol, high blood pressure, diabetes, and digestion [Dkt. 6-3, PageID 338 ¶5, 354; PX6-50(157:23-158:6); PX6-824], and weight-related psychological issues, including past weight-loss failures, depression, and binge eating. Dkt. 6-3, PageID 338 ¶¶5-6, 354, 356; PX6-50(158:7-18); PX6-825.[13]

Near the end of the form, prospective purchasers were asked to state why they were "truly committed" to losing weight "this time around," and prompted to agree with the statement that "fat is unhealthy and ugly, and I am going to fight and change it" before proceeding. Dkt. 6-3, PageID 338 ¶7, 358; PX6-50(158:22-159:19); PX6-826. Purchasers gave personal, emotional responses, such as: "Yes as this weight is taking potentially fatal toll on my life"; and "Yes, I want to be here for my son. I want to live." PX10-16(103:6-108:19); PX10-109, 121.

### 4.    "Discount" Pricing

RLI predominantly advertised that a "Basic" package of Roca Labs products, for "Up to 80 lbs to lose," costs $480 (in a single payment) for purchasers with "valid health insurance." Dkt. 6-2, PageID 190, 248.[14] Defendants frequently stated this price in:  search

---

[13] Much of the information customers had to enter was irrelevant to whether they "qualified" to buy the Formula. PX10-11(84:23-86:18; 89:4-91:19; 95:14-96:23); PX11-9, 12(59:8-60:4; 70:16-72:20).

[14] Prices would range from $80 to several hundred dollars more, depending on the quantity ordered, and whether the purchaser said they had health insurance. Dkt. 6-3, PageID 339, 362, 364; Dkt. 6-2,

ads [PX6-41(117:15-25); PX6-82, 83; PX6-39(112:7-24; 114:18–115:5); PX6-513; Dkt. 6-3,

PageID 339 ¶8, PageID 343-344]; display ads served through Google and Bing [PX6-

38(106:10-16; 110:10-23; 115:6-24); PX6-513; PX13-8]; and Facebook ads [PX6-36(98:2–

99:19; 102:11-22); PX6-386; PX6-419; PX13-8]. This price was advertised on RLI's

websites from 2012 through 2015. PX6-43(126:13-127:7; 129:12-24; 129:25-130:14;

131:12-132:4; 140:17-141:18; 141:23-142:6; 142:12-16; 143:14-144:11); PX6-707, 710, 714,

716, 719, 721, 736, 738, 741, 749, 756, 805. At the bottom of the RocaLabs.com product

selection screen, just above the "Submit" button, was an unchecked box next to the

statement, "I have checked and do not have any medical reason that can prevent me from

using the Roca Labs Gastric Bypass Alternative procedure and I have read and agree to the

terms, privacy and money back reward / return policy." Purchasers were not required to

review the Terms and Conditions before checking the box and clicking "Submit." Dkt. 6-3,

PageID 339 ¶8, PageID 361 – 364; PX6-48(152:14-17; 160:18–161:4; 161:15-162:5); PX6-

819; PX7-26(584:6-585:5).

 Purchasers only learned that they had supposedly "agreed" to a purported "discount"

when RLI sent them a two-page, large-print "Summary" of the Terms with their orders,

which stated:

> Discount Policy.  We believe in our customers and that word of mouth is the
> best promotion. **We are here to help you.**  You were given a discount off the

---

PageID 190, 248, 272; PX10-29(169:9-20); PX10-207, 210; PX5-2 ¶2 (Att. N) (PX5-69); PX6-
45(140:14-141:18; 142:12-16); PX6-718, 723, 736; PX6-745, 748.

unsubsidized price of $1580 in exchange for your agreement to promote our products . . .. **As part of this endorsement you also agree not to write any negative reviews about RLN or our products.** In the event that you do not honor this agreement, you may owe immediately the full price of $1,580.

Dkt. 6-3, PageID 340 ¶10, 367; PX6-52(166:9-24; 167:14-170:11); PX6-831; Dkt. 58 ¶53.[15]

Similarly**,** a "Thanks for purchasing" package insert warned purchasers that "[t]here are **NO** returns or refunds as stated on RocaLabs.com/Terms," and that consumers who dispute or fail to pay monthly installments face possible litigation and significant monetary damages:

> Payments can NOT be cancelled or disputed as this may result in legal action against you in Florida where you may need to hire an attorney and may face charges in excess of $3,500. . . . Our Marketing Dept. subsidized your purchase in return for your commitment to lose weight and post positive feedback. As agreed, you will owe the unsubsidized price of $1,580 if you breach the Terms.

Dkt. 6-3, PageID 340 ¶10, 366.[16] RLI (via their lawyers) threatened complaining purchasers who sought refunds that their "discounts" would be revoked and they would owe the "full" price of the Roca Labs' products. PX6-29(70:3-11); PX6-287, 290, 292. See also PX6-199,

---

[15] Defendants' shipments to customers included written package inserts that contained this statement in 2014. PX6-52(166:12-24; 167:14–170:11); PX6-830; Dkt. 6-3, PageID 338-340 and 366-367.

[16] RLI's pre- December 2014 Terms included legal sanctions for breach, including paying the purported full product price. PX6-33(87:18-88:5); PX6-329, 331; PX6-34(91:21-93:3); PX6-343, 346-47; PX6-357, 365-66. The Terms used between 2011 and 2014 consistently represented that the price purchasers were actually being charged was a "conditional," "discounted," or "subsidized" price being charged in exchange for agreement to non-disparagement and other provisions, and that the "full price" was $1,580. PX10-16(101:3-13); PX10-66; PX6-33(87:18-88:23); PX6-329; PX6-32(81:3-24); PX6-319; PX10-15(99:13-23; 100:13-22); PX10-49; PX6-29(70:3-11); PX6-139, 140, 181; PX6-34(91:21-92:13); PX6-343; PX10-16(101:14-21); PX10-80; PX6-34(92:14-93:3); PX6-357; PX6-10(101:25-102:7); PX10-94; PX5-3 ¶2 (Att. R) (PX55-99); PX6-35(93:4-8); PX6-372; PX1-7 ¶15.

213; Dkt. 6-3, PageID 341 ¶11; Dkt. 6-5, PageID 526 ¶¶18-21 (FTC-000340); PageID 571 (FTC-000385).

### 5. Threats and Lawsuits Based on Gag Clause in Terms and Conditions

Only after Defendants shipped the products did consumers learn of the onerous terms, both physical and financial, of the costly "procedure," which might lead them to want to complain publicly. Dkt. 6-3, PageID 340, 366, 371; Dkt. 6-4, PageID 372; PX1-5 ¶12 (Att. L-N), PX1-36 – 46. The "Roca Labs Procedure Rules & Diet" enclosure shipped with the products contradicted the advertised message of "automatic" weight loss:  it turns out users had to stick to a nine-hour "Limited Eating Interval," drink six half-liter bottles of water per day to "maintain the **gastric bypass effect**," and exercise at least thirty minutes five or more times per week. Dkt. 6-3, PageID 340 ¶10, 370-71; Dkt. 6-4, PageID 372. But many customers who shared negative comments about their experience faced legal threats and even lawsuits alleging that they had breached non-disparagement provisions of Defendants' Terms and Conditions.

These gag clauses, which required customers to agree not to publicly disparage Roca Labs, its products, or its employees – regardless of the purchasers' outcomes – were in Defendants' Terms from 2011 until the FTC filed this case. Dkt. 58 ¶¶49-50, 52; PX6-32(81:3-24); PX6-319 – 20; PX10-15(99:13-23; 100:16-22); PX10-49; PX10-16(101:3-13); PX10-66; PX6-33(87:18-88:23); PX6-329; PX6-34(91:21-92:13); PX6-343; PX6-34(92:14-

93:3); PX6-357; PX6-35(93:4-8); PX6-371.[17] A May 2015 version, for example, bans

negative statements, punishable by having to pay the "full price" for the products and other

legal remedies:

> You agree that regardless of your personal experience with RL, you will **not**
> disparage RL and/or any of its employees, products or services.  This means
> that you will not speak, publish, cause to be published, print, review, blog, or
> otherwise write negatively about RL, or its products or employees in any way.
> This encompasses all forms of media, including and especially the internet.
> This paragraph is to protect RL and its current and future customers from the
> harm of libelous or slanderous content in any form, and thus, your acceptance
> of the [Terms] prohibits you from taking any action that negatively impacts
> RL, its reputation, products, services, management, or employees.  We make
> it clear that RL and its Regimen may not be for everyone, and in that regard,
> the foregoing clause is meant to prevent "one person from ruining it for
> everyone."  Should any customer violate this provision, as determined by RL
> in its sole discretion, you will be provided with seventy-two (72) hours to
> retract the content in question.  If the content remains, RL would be obliged to
> seek all legal remedies to protect its name, products, current customers, and
> future customers.
>
> If you breach this Agreement, as determined by RL in its sole discretion, all
> discounts will be waived and you agree to pay the full price for your product.
> In addition, we retain all legal rights and remedies against the breaching
> customer for breach of contract and any other appropriate causes of action.

Dkt. 6-2, PageID 190, 263-64.

Based on such terms, Defendants threatened legal action against dissatisfied

consumers who said they would complain, or who did complain, to the Better Business

Bureau ("BBB") or said that they planned to post negative comments on the internet. Dkt. 58

¶54; Dkt. 6-14 ¶¶12-14, 17; Dkt. 6-15 ¶12; PX14 ¶¶22-24; PX14-47; PX15 ¶11; PX16 ¶¶12-

---

[17] Defendants sent similar gag clause warnings in post-purchase emails and package inserts at various
times since 2011. PX14 ¶9, PX14-10; PX16 ¶9.

13; PX17 ¶14; PX18 ¶¶12-15; PX18-128; PX19 ¶¶8, 11. Defendants accused consumers who sought refunds of attempted "extortion," and even threatened criminal charges. Dkt. 58 ¶54; Dkt. 6-14, PageID 858-59 ¶¶ 13-14, 861-65; PX13-10; PX6-66(295:9-297:15); PX6-855. For example, Defendants lobbed a variety of legal threats at a customer who blogged about her negative experience with Defendants' products and return policy. The blog host shut it down after notifying her that Roca Labs threatened it with a lawsuit about her posts. Dkt. 6-14, PageID 859 ¶18. Despite Defendants' attempts to stifle criticism, more than 100 consumers submitted complaints about Roca Labs to the BBB or the FTC in the years leading up to this lawsuit, including approximately twenty complaints specifically related to Defendants' legal threats, or to the negative comment prohibition. Dkt. 6-7, PageID 669 ¶4; PX25-2 ¶¶5-6.

Juravin invented his own definitions of legal terms to justify his position that any negative comment warrants threats of legal action. He testified that if consumers did not use the Formula for the six weeks and follow his draconian "Rules" and "Instructions," their comments were "false." PX6-26(57:9-58:16); PX7-21(554:14-558:6). He also believes that consumers who request a refund and say they will complain to authorities or write negative comments are committing "extortion" and "slander":

> [I]f somebody will say, if you don't give me refund on my money. If you don't – for example, I don't want to make a payment.  And if I have to make the payment, I will report to the BBB. That's an extortion. . . . If somebody says, if you don't give me – if you don't send it – asking some benefit or I will write negative about you, that's also that's a slander.

PX6-67(297:20-298:15). See also PX6-66(295:6-299:7); PX6-855; PX13-10. Defendants sued at least four customers for violating the gag clause, among other things. PX6-30(74:2-

77:10); PX6-226, 241, 246, 251; PX10-19(124:2-7; 125:8-20); PX10-129; Dkt 6-3, PageID

341 ¶11; Dkt. 6-5, PageID 523-73, 579-641.[18]

###### B.    Consumer Harm

Between 2009 and September 2015, between 50,000 and 60,000 customers purchased

from the RocaLabs.com website. PX6-71(390:3-11). Defendants' total gross receipts for

2011 through September 2015 were more than $25 million for sales of Roca Labs products.

PX6-4(14:21-15:9); PX6-7(34:9-36:23); PX6-23(42:3-14); PX9-22a(153:1-154:6; 154:19-

24); PX9-22c(167:2-168:9); PX9-23(169:9-171:3); PX9-23a(176:22-177:15) (Defendants'

testimony on 2011, 2012, 2013, 2014, and 2015 gross receipts from sales);[19] PX9-31a(245:4-

246:22); PX9-33(253:11-254:10); PX9-34(260:2-25); PX24-1, 4 ($26.6 million in gross

revenue listed in 2011-2015 RLI tax returns); PX13-10 (all sales were online).

###### C.    Defendants' Advertising Was Deceptive

###### 1.    Defendants' Weight Loss Claims Were Unsubstantiated and False

Defendants' advertising (Section III.A.1, above) made express claims that:  (i) use of

Roca Labs products enables the user to reduce food intake by fifty percent and to lose

substantial amounts of weight quickly, including as much as 21 pounds in one month, and as

much as 100 pounds in seven to ten months; (ii) ninety percent of users of Roca Labs

products will lose substantial amounts of weight; (iii) Roca Labs products are comparable or

---

[18] Defendant RLI also sued the owners of a website hosting negative reviews about Roca Labs for allegedly inducing RLI customers to violate the gag clause and tortiously interfering with prospective consumers. Dkt. 58 ¶55; PX6-29(70:1-11); PX6-136.

[19] Defendants designated the exhibits referenced in this testimony as "confidential," but the FTC can file them under seal upon request.

superior to bariatric surgery in providing weight-loss benefits; (iv) Roca Labs products are

safe and effective for weight loss in children as young as six years old; and (v) the ninety

percent success rate is scientifically proven.

Defendants had no competent and reliable scientific evidence to support any of these

claims.[20] The FTC's expert, Dr. Steven Heymsfield,[21] thoroughly reviewed relevant

scientific literature and material Defendants provided about the Roca Labs products and

ingredients. He found no scientific basis for the challenged claims. PX3-4, 42 ¶¶7-12;

PX3-93, 94.

Dr. Heymsfield opines that to substantiate Defendants' weight loss and "scientifically

proven" claims, experts in the field of weight loss and obesity would require well-designed

and properly conducted clinical trials on the Roca Labs products themselves. PX3-13 ¶¶22-

26.[22] Specifically, placebo-controlled human studies are needed to establish causation of

weight loss in humans. PX3-13 ¶22. Furthermore, according to Dr. Heymsfield, clinical trials

on the individual ingredients in the Roca Labs products—as opposed to trials on the products

themselves – cannot establish efficacy for the Roca Labs combination products; to determine

---

[20] Defendants claimed to have substantiation, specifically:  published clinical studies and articles; doctor recommendations; clinical studies for product materials; and "experience with over 80,000 users." PX13-4.

[21] Dr. Heymsfield has conducted numerous weight loss studies over the past 30 years and is an expert in obesity treatment and weight loss. PX3-3 ¶¶1-5.

[22] Dr. Ross Finesmith, the primary medical advisor to Roca Labs for its weight loss claims, also agreed that a double-blind placebo-controlled clinical trial was needed on the Roca Labs products to determine efficacy, and told Juravin so. PX11-10(64:4-66:3, 66:24-67:8).

19

efficacy for a product with multiple ingredients, Roca Labs would need a study that tests the combination. PX3-15 ¶24; PX3-32 ¶58.

Defendants possess no study or trial that substantiates their claims. They conducted one clinical study on the Roca Labs products themselves, the Clinical Study Report by the Center for Applied Health Sciences ("CAHS"), and that study was completed in September 2015 – years after Defendants had started making claims. PX3-9 ¶8(j)(xvii). The CAHS study was so flawed in its design and implementation that any findings would be highly suspect, according to Dr. Heymsfield. PX3-18 ¶32. Moreover, that study found no changes in body weight during the 28-day duration, nor were there any statistically significant findings that users felt less hungry when taking the products. PX3-17 ¶¶28-30. Thus, Dr. Heymsfield opined that the CAHS trial could not support any of the Defendants' claims. PX3-18 ¶33. Apart from the CAHS study, there are no other clinical trials or scholarly articles about the Roca Labs products. PX3-16, 18 ¶¶27, 34; PX13-4; PX6-71(390:13-25).

Dr. Heymsfield also reviewed and opined on various other research and materials about fiber and ingredients either cited by Defendants or located in the scientific literature. He reviewed more than 100 peer-reviewed published scientific articles on weight loss and individual dietary fibers, and more than 15 unpublished "research summaries" provided by Roca Labs about their "regimen" and ingredients.[23] PX3-5 ¶8. Based on his review, Dr.

---

[23] These research summaries were provided by, and in many cases co-authored by, Juravin, who is not a physician or scientist and has no expertise in obesity treatment and weight loss. PX6-71(391:12-20). They do not establish that the Roca Labs ingredients or regimen are effective at causing substantial weight loss. PX3-31 ¶¶55-59.

Heymsfield provided his expert opinion that the literature on weight loss and individual dietary fibers, and the research summaries Roca Labs provided, do not provide competent and reliable scientific evidence for the challenged claims. PX3-10 ¶¶11-12; PX3-31 ¶¶55-63.

Juravin asserted in his interrogatory answer that at least six medical doctors advised Roca Labs (PX13-4), but Defendants only produced advice or recommendations from one, Ross Finesmith, a former physician who appeared in videos and wrote material for the websites. Finesmith, however, had no special experience with weight loss or obesity patients, and never told Juravin that he did. PX11-5(17:22-19:6); PX11-20(136:23-137:1). Finesmith did not conduct a clinical trial on the Roca Labs products, did not investigate the products, and did not investigate the truth of the Roca Labs claims. PX11-7(30:1-31:18). By his own admission, much of his knowledge about how the products supposedly functioned came from Juravin. PX11-8(42:3-21); PX11-13(91:25-92:8); PX11-15(102:2-23; 110:2-111:1).[24]

Defendants further asserted that they relied on the personal experiences of Juravin and Roca Labs customers for substantiation. Yet it is well-established that anecdotal reports, such as user testimonials, are not reliable scientific evidence of the products' effect, no matter how numerous or superlative, as Dr. Heymsfield explained. PX3-16 ¶¶ 25-26.

Indeed, Juravin was well-aware that the Formula would not "physically [occupy] your stomach, leaving only 20% available space for 10-16 hours," as Defendants repeatedly advertised. He candidly testified that this is a falsehood he tells prospective customers, in the

---

[24] Finesmith never told Juravin what he thought the product could accomplish in terms of weight loss. PX11-22(174:23 – 175:1). The articles Finesmith contributed to Defendants' website do not provide competent and reliable scientific evidence for the Roca Labs claims. PX3-21 ¶¶36-54.

hope that he can trick them into fasting for sixteen hours a day and believing that his Formula

helped more than drinking a few liters of water would have by itself.

> I need to make my fat customer, I need to make them fast 16 hours. I cannot
> be direct with them, and say, hey, you're going to fast 16 hours. Just listening
> to that is scary. I have to trick the customer with love.

* * *

> Q  Are you saying there's scientific evidence that they would lose those
> pounds if they drank three liters [of water] without the formula?
> A  Yes. If they do the three liters on their own, they would lose. If they do
> exercise, they would lose. If they do the 16 hours on their own, they would
> lose. . . .  I put everything all together, including scaring them, that if they
> don't succeed now, they will go to a surgery.

PX7-18(543:8-12; 545:22-546:6). See also PX7-17(538:21-539:3; 539:18-540:1; 542:24-

544:5; 545:12-546:6). Juravin's "gastric bypass effect" is, in a word, a hoax.

## 2.      Defendants' Endorsements Were Deceptive

Defendants' endorsements were deceptive. They ran a fake "informational" website,

purporting to educate consumers about gastric bypass surgery, but in reality promoting the

Roca Labs products. In some of their videos, they used actors who had never used Roca Labs

products, reading scripts written by Juravin and those working at his direction. PX10-8

(37:18-39:1; 60:13-24; 60:25-62:13); PX6-63(223:6-24). Other videos featured testimonials

from individuals who worked for the Defendants, but with no indication of this relationship.

Defendants also generated blogs, forum posts, and Facebook comments. These endorsements

did not disclose that Roca Labs was behind them. PX10-37(226:10-228:2; 230:13-21); PX10-

211; PX11-19(132:12-134:2); PX11-24; PX12-11(135:1-8); PX6-64(238:18-239:8; 244:11-

245:11; 246:15-249:5); PX6-854a-b.

### 3.     Defendants' Privacy Promise Was False

Defendants' privacy promise was a sham. They collected highly personal information during the purchase process, expressly promising not to share it. But in direct contravention of their stated policy, RLI publicly disclosed qualification information in lawsuits against purchasers filed in 2014 and 2015, including their ages, weights, heights, the number of pounds they wanted to lose, and health conditions. PX6-30(74:2-77:10); PX6-230; PX6-31(77:16-78:10; 78:20-79:24); PX6-293; Dkt 6-3, PageID 341-42 ¶¶11-13; Dkt. 6-5, PageID 522-73; PX10-19(124:2-7; 125:8-20); PX10-129. Defendants also sent customers' qualification form information, including weight, height, age, sex, and personal reasons for purchasing Roca Labs products, in communications to payment processors about many payment card disputes between 2013 and when this lawsuit was filed, and even afterwards. PX22-26, 38-48; PX10-16(103:6-111:12); PX10-109, 111, 122; PX6-60(204:7-15; 205:24-206:19; 207:10-18; 212:19-213:2; 208:18-209:13; 213:8-13; 209:20-210:7; 211:6-17; 213:14-18; 213:19-214:23); PX6-835, 846, 848. Juravin had direct knowledge of and directed these activities. PX10-17(107:9-17; 110:5-12); PX6-60(205:4-8). He asserts that some of the information was not private, PX7-29(614:16-20), and that the customer "Declarations" are private, but necessary to share with the card processor. *Id*. (614:7-615:3). Defendants' privacy promise, however, was clear and unqualified; it was also false.

### 4.     Defendants Deceptively Claimed That Consumers Agreed to a "Discount" in Exchange for Silence

Defendants' ads prominently advertised the product at $480. According to Defendants, however, this steep price was in fact being offered as a "discount" in exchange for buyers' supposed agreement not to make negative comments. Of course, consumers never

"agreed" to this "discount"; they never even knew about it. PX12-7(30:9-18; 32:17-33:7); PX12-10(117:24-118:18); see also PX14 ¶8; PX15 ¶6; PX16 ¶5; PX17 ¶8; PX18 ¶12; PX19 ¶¶5, 11; Dkt. 6-15, PageID 874 ¶4. Defendants' websites did not offer an option to buy any quantity of their products, even without health insurance, for $1,580, the supposed "full price." Dkt. 6-2, PageID 190, 248-50; Dkt. 6-3, PageID 339 ¶8; PageID 362, 364; PX6-48(152:14-17; 159:25–160:12); PX6-828; PX12-13(160:18-161:17); PX12-18. Defendants only disclosed the purported "full price" to potential purchasers in the Terms and Conditions on their website, a lengthy, easily missed document, or after their purchase was shipped, at which point it was nonrefundable and any complaints were forbidden. Consumers never agreed to the so-called "discount," which Defendants used as a ruse to threaten and intimidate unhappy consumers.

### D.     Defendants' Unfair Gag Clause Practices Were Likely to Substantially Injure Consumers

Defendants' gag clause practices not only injured the purchasers threatened for expressing negative opinions; they adversely affect the information available to the public at large and distort the marketplace. Online reviews have become important sources of information on products and services. Because Defendants' gag clause practices, in the form of the warnings, threats, and contracts described above, limit *all* negative commentary, they suppress even truthful reviews expressing facts and genuine opinions.

Research on consumer-generated online reviews supports the conclusion that restricting consumers' ability to share truthful, negative information in the marketplace, as

Defendants' gag clause practices do, is likely to cause substantial injury. In the unrebutted

opinion of the FTC's expert, Paul A. Pavlou, Ph.D.,[25] these practices are likely to negatively

impact consumer welfare. PX4-7, 11-12, ¶¶11, 17-20. Dr. Pavlou evaluated the likely impact

that suppression of purchasers' negative online reviews about Defendants and their products

– resulting from the use of non-disparagement provisions and related threats and warnings –

would have on the welfare of consumers who are likely to purchase those products. PX4-5

¶¶8-10. Online reviews, including negative reviews, play an important informational role for

consumers. PX4-8 ¶¶13-15. Manipulation of reviews, including their suppression, lowers

their information value. PX4-10 ¶16.[26] In Dr. Pavlou's opinion, Defendants' practices are

likely to inflate consumers' perceptions of the quality of Defendants and Roca Labs products,

thus increasing consumers' willingness to buy the products; and consumers are less likely to

learn about previous purchasers' problems with Defendants and Roca Labs products, thus

encouraging consumers to buy inappropriate products. See PX4-7, 11-12 ¶¶11, 17-20.

### E.    Defendants' Common Enterprise Controlled by Juravin

#### 1.    Corporate Defendants Are a Maze of Interrelated Companies

There was no real distinction between the Corporate Defendants, which shared

officers, business functions, and assets. Juravin and Whiting have been the only owners and

---

[25] Dr. Pavlou is the Milton F. Stauffer Professor of Information Technology and Strategy at the Fox School of Business at Temple University, and the Fox School's Chief Research Officer and Associate Dean of Research, Doctoral Programs, and Strategic Initiatives. He is an expert in the field of information systems, with particular expertise in electronic commerce and emphasis on the study of consumer-generated online reviews. PX4-3 ¶¶2-6.

[26] Juravin recognizes that reviews that he broadly defined as "false" (see p.17, above) are bad for his business. PX6-27(61:25-62:7).

officers of all five Corporate Defendants. PX13-5; PX9-40 (RLI), 48 (ZCL), 57 (RLN); PX6-125, 131, 134 (MCO), PX6-857 (JI). Since 2009, practically all Roca Labs Formula sales to customers were made online via bank card transactions, and most customer payments were sent to bank accounts of either RLI or RLN. PX6-21(29:15-31:13); PX13-10. Gross revenues from sales deposited into RLN accounts were attributed to RLI for tax purposes in 2014 and 2015. PX6-22(39:3-40:1). MCO has also received money from customer card payments. PX6-24(47:3-48:4); PX6-27(64:15-65:13). Gross revenues from sales deposited into MCO accounts in 2014 and 2015 were also reported on RLI's tax returns. PX6-28(65:11-67:19).

ZCL was set up to hire independent contractors to work for RLI's benefit. PX7-4(418:10-419:10). RLI was ZCL's only client. PX9-24(208:6-11); PX7-7(433:12-24). However, ZCL was also used to pay for advertising expenditures and ingredients for the Roca Labs business. PX9-25(214:2-20; 215:20-216:9; 218:16-25); PX9-29(230:15-231:15); PX7-9(455:21-457:16). JI was created primarily as a vehicle to run advertising for Roca Labs products. PX7-14(476:12-477:1); PX13-5. During 2014 and 2015, all JI's income came from either RLI, RLN, or MCO placing online ads. PX7-14(473:17-478:15). JI became the registrant of the RocaLabs.com, Mini-Gastric-Bypass.me, and Gastricbypass.me domains. PX6-46(144:24-145:22); PX21-1, 21-22. Google search ads and keywords stayed largely the same from 2009 onward, regardless of which Corporate Defendant received consumers' payments or paid for advertising. PX6-73(398:4-399:15). The duties of Defendants' agents did not vary depending on which entity was paying them. PX10-8b(56:7-57:1; 57:24-58:5); PX12-9d(91:13-92:20).

26

### 2. Juravin Controlled the Corporate Defendants and Common Enterprise

Juravin controlled virtually every aspect of the Corporate Defendants' business, including advertising, websites, claim substantiation, expenditures, personnel, and lawsuits. PX7-3a(415:12-24); PX7-5(425:7-433:11); PX7-7a(437:6-19); PX7-9(453:3-14; 454:2-17); PX7-10(459:16-460:7); PX7-11(463:13-464:5; 464:22-466:8); PX7-15(479:21-481:7); PX7-16a(527:14-529:8); PX6-18a(13:4-14:19; 15:15-24); PX6-18b(18:5-19:13); PX6-20(25:5-26:14); PX6-21(31:20-32:25); PX6-23(44:15-45:4); PX6-37(102:11-103:3); PX6-41(117:15-118:4); PX6-45(137:5-23) ("anything that was on the site was my responsibility"); PX6-53(170:3-171:15; 171:19-172:18); PX6-54(176:13-177:4); PX6-65(283:4-15); PX9-15(70:9-71:3); PX9-16(73:7-18); PX9-17a(81:10-19; 82:10-84:5); PX9-20(135:24-25; 136:8-14) (Juravin was "in charge of everything"); PX9-22b(159:10-160:21); PX9-24a(210:5-211:12); PX9-29a(236:15-237:15); PX9-31a(248:18-252:15); PX9-32(252:20-253:10); PX9-34(259:9-23); PX9-38(277:19-278:23); PX9-39a(286:4-22); PX9-39b(290:12-21); PX13-5; PX13-7 ("I am responsible for all matters involving Roca Labs, including advertisements.").

Notwithstanding Whiting's role as owner and officer of RLI [PX9-4(16:10-14) PX9-10(50:4-8); PX6-4(15:16-22); PX9-17b(97:10-108:16); PX9-40 – PX9-47; PX13-5], Juravin controlled RLI from 2009 through 2015, carried out its marketing activities since 2009, and was in charge of its day-to-day operations. PX13-5, 7; Dkt. 58 ¶11. At times he served as one of its officers. PX6-29(70:1-11); PX6-217 ¶3; PX9-43; PX9-44; PX22-1, 2. He solely controlled RLI's main checking accounts. PX7-10(458:15-460:7). RLI bank statements were addressed to Juravin's home. PX9-32(252:20-253:10); PX9-35(261:13-262:3). Juravin personally authorized credit card expenditures for online ads. PX7-10(457:17-458:11). For

RLI, Juravin was personally responsible for virtually every operational aspect of the company, including substantiation, advertising, finances, customer complaints, and litigation. PX7-5(425:7-432:3).

Whiting was also ZCL's officer and owner, PX9-18(115:9-19); PX9-48 – 56, but Juravin was personally responsible for selecting personnel, deciding how much they were paid, transfering funds, and writing checks. PX7-6(432:15-433:11); PX7-7(435:11-437:10); PX9-24(208:16-23); PX9-24a(210:5-11; 210:21-211:12). ZCL bank statements were addressed to Juravin's home. PX9-27(221:20-24).

Despite some apparent uncertainty as to legal ownership of RLN, Juravin was responsible for everything relating to the marketing, sales, and expenditures for RLN. PX6-18(9:4-10; 11:23-12:13); PX6-20(25:1-25); PX6-10(55:11-18). Juravin created RLN, and was RLN's sole officer in 2013. PX7-10(460:19-25); PX9-57 – 64. Whiting is currently denominated as RLN's owner and was listed as its sole officer in 2014 and 2015. PX6-18(11:7-12:7); PX9-18(115:24-120:25); PX9-65; PX9-66.

Juravin incorporated JI, is its sole owner, its officer, and controls it. PX7-13(472:5-17); PX7-14(473:8-474:9); PX6-857 – 869. He is the sole signatory on JI's bank and credit card accounts. PX7-15(479:5-481:11). Juravin also incorporated MCO, and is its sole owner and officer. PX6-23(44:11-14); PX6-134 – 135. He controls MCO's bank and credit card accounts. PX7-11(462:23-466:8).

For all five corporate entities, Juravin liberally transferred funds back and forth between them, transferred substantial sums to himself, and often paid his personal expenses from the corporate accounts. PX9-30(240:9-242:20); PX9-32(249:1-252:15); PX9-34

(258:10-259:23); PX9-36(266:1-267:13); PX9-37(269:7-18); PX8-3(44:3-48:18). Juravin

personally received approximately $7 million from the Corporate Defendants from 2009 to

2015. PX7-8(446:24-450:2).

Whiting's role was more limited. He was a licensed CPA (through 2013). PX9-5

(19:12-24). He and Juravin first became acquainted in 2009 and met multiple times in 2009

and afterwards to discuss the business. PX9-6(23:9–27:22; 28:8–33:19). Whiting performed

bookkeeping and tax preparation services for some or all of the Corporate Defendants based

on information provided by Juravin. PX9-8(33:24–36:14), PX9-10(51:21–52:2); PX9-

13(63:19–72:16); PX9-17(78:2–79:25); PX9-19(118:5-9). He had exposure to other aspects

of the business,[27] but was substantially less involved with the activities at issue in this case.

PX9-12(59:25–63:23). Whiting was paid for bookkeeping services and received $42,000 in

director's fees, but he received no other compensation or distribution from the Corporate

Defendants. PX9-9(48:19–49:20); PX9-22b(159:10–160:21).

## IV.   THE MATERIAL FACTS ARE UNDISPUTED AND THE FTC IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

### A.   Summary Judgment Standard

The "court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[27] PX9-39(281:4–282:5) (photo on website); PX9-9(46:4-11) (generally how ad money would be spent); PX9-11(53:1–59:24) (saw product packaging operation in Juravin's garage; visits to warehouse and manufacturing plant); PX9-28(225:3-227:12) (had a company credit card); PX9-16, 38(74:7-9; 278:24-279:18 ) (received some consumer complaints); PX9-21(140:23-141:9), PX9-67 (signed declaration used in litigation with complaint site); see also PX6-18b(19:14-20:4) (Juravin made Whiting aware of matters that required RLI corporate approval).

law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant bears the initial burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories . . . together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former version of Fed. R. Civ. P. 56(c)); *Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1277 (11th Cir. 2009). Once the moving party has demonstrated the absence of a factual issue, the opposing party must produce specific facts showing a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995).

**B.     Sections 5 and 12 of the FTC Act Prohibit Deceptive and Unfair Acts or Practices**

### 1.     Deception Under Section 5

Acts or practices are deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45, if (1) there was a representation, (2) it is likely to mislead customers acting reasonably under the circumstances, and (3) it is material. *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). Further, a claim is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Cyberspace.com,* 453 F.3d 1196, 1201 (9th Cir. 2006) (citations omitted). Express claims, deliberately-implied claims used to induce the purchase of a product, and claims that "significantly involve health" are presumed material. *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992); *FTC v. SlimAmerica*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999). Material

30

misrepresentations or omissions constitute deceptive practices. *Tashman*, 318 F.3d at 1277;

*FTC v. Bay Area Bus. Council*, 423 F.3d 627, 635 (7th Cir. 2005); *FTC v. NPB Advert., Inc.,*

No. 8:14-cv-1155, 2016 U.S. Dist. LEXIS 151840, at *4, *13 (M.D. Fla. Nov. 2, 2016);

*SlimAmerica*, 77 F. Supp. 2d at 1272.

In determining whether an advertiser has made deceptive claims, a court must

consider the overall net impression created by the advertisement, and whether consumers

acting reasonably under the circumstances would interpret it to contain a particular message.

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008), *aff'd,* 356

F. App'x 358 (11th Cir. 2009) ("*NUG*"); *FTC v. QT*, 448 F. Supp. 2d 908, 957-58 (N.D. Ill.

2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008).[28]

### 2.      False Advertising Under Section 12

Section 12 of the FTC Act prohibits the dissemination of any false advertisement in

or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase

of food, drugs, devices, services, or cosmetics. 15 U.S.C. §§ 52, 55.[29] A false advertisement

is one that is "misleading in a material respect." 15 U.S.C. §§ 52, 55; *FTC v. Pantron I*

*Corp*., 33 F.3d 1088, 1099 (9th Cir. 1994). Courts apply the same three-prong test to

determine if a party has disseminated a "false advertisement" as to determine if an ad is

---

[28] Courts routinely determine the existence of express and implied claims on summary judgment motions, even where defendants argue that there are issues of fact as to whether they made the representations. *See NUG*, 645 F. Supp. 2d at 1189 (concluding that "the court is well-equipped to discern express claims or clear and conspicuous implied claims from the face of the advertisement").

[29] For the purposes of Section 12 of the FTC Act, Roca Labs "Formula," and "Anti-Cravings" are either "foods" or "drugs." 15 U.S.C. § 52; 15 U.S.C. §§ 55(b) and (c). *See, e.g., NUG*, 645 F. Supp. 2d at 1190 (weight-loss supplements); *SlimAmerica*, 77 F. Supp. 2d at 1266, 1272-73 (same).

deceptive under Section 5. *See NUG*, 645 F. Supp. 2d at 1188-89; *Kraft*, 970 F.2d at 314. A

violation of Section 12 is a deceptive act in violation of Section 5(a). 15 U.S.C. § 52(b).

### 3.       Unfairness Under Section 5

Section 5 of the FTC Act prohibits "unfair" acts or practices in commerce, *i.e.*, those

that "cause[] or [are] likely to cause substantial injury to consumers which is not reasonably

avoidable by consumers themselves and not outweighed by countervailing benefits to

consumers or to competition." 15 U.S.C. § 45(n). A practice that "unreasonably creates or

takes advantage of an obstacle to the free exercise of consumer decisionmaking" is unfair.

*FTC Policy Statement on Unfairness*, appended to *International Harvester Co.*, 104 F.T.C.

949, 1074 (1984). This can include a seller's use of, and threats to enforce, certain

contractual provisions to create such obstacles.[30]

### C.       Defendants' Weight Loss and Success Rate Claims Are False and Deceptive (Counts I, II)

Defendants' advertising and websites made five express weight-loss claims that the

record shows are false and deceptive. See Section III.A, above. The FTC may show that ad

claims are deceptive on the basis that:  (1) the advertiser had no reasonable basis to assert the

claims as true, or (2) the claims are false. *Pantron I*, 33 F.3d at 1096; *QT*, 448 F. Supp. 2d at

958-59. False and unsubstantiated claims are inherently "likely to mislead" consumers, and

consumers have no obligation to doubt the veracity of express claims. *Thompson Med. Co.*,

---

[30] *Cf. Credit Practices Rule, Statement of Basis and Purpose*, 49 Fed. Reg. 7740, 7762-65, 7768-70 (1984) (prohibiting as unfair the use of certain provisions frequently included in consumer credit contracts; creditor threats to enforce them were commonplace; substantial injury caused by practices that flowed from inclusion of provisions in contracts).

104 F.T.C. 648, 788, 818-19 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986). For health-related

efficacy claims, including weight-loss claims, an advertiser must possess "competent and

reliable scientific evidence" to have a reasonable basis to assert a claim as true. *NPB Adver.,*

2016 U.S. Dist. LEXIS 151840, at *4; *NUG*, 645 F. Supp. 2d at 1190; *QT*, 448 F. Supp. 2d at

961. The FTC's expert Dr. Heymsfield notes that for weight-loss claims, in the relevant

scientific community, competent and reliable scientific evidence means randomized, double-

blind, placebo-controlled human clinical trials on the product itself.[31] See Section III.C.1,

above. *See also FTC v. Nat'l Urological Grp., Inc.*, No. 1:04-CV-3294, 2017 U.S. Dist.

LEXIS 182256, at *8, 95-106 (N.D. Ga. Oct. 10, 2017), *appeal docketed*, No. 17-15695

(11th Cir. Dec. 21, 2017) (contempt ruling based on expert testimony that "the standard

applied by weight-loss experts to evaluate causal efficacy claims" is "independent, well-

designed, well-conducted, randomized, double-blind, placebo-controlled clinical trials[.]"). If

a claim suggests that a product's effectiveness or superiority has been scientifically

established or proven, the advertiser must have evidence sufficient to satisfy the relevant

scientific community of the claim's truth. *See POM Wonderful, LLC v. FTC*, 777 F.3d 478,

491 (D.C. Cir. 2015); *FTC v. Coorga Nutraceuticals Corp.*, No. 2:15-cv-72, 2016 U.S. Dist.

LEXIS 118308, at *11-12 (D. Wy. Aug. 15, 2016). Dr. Heymsfield states that these

"scientific proof" claims about weight loss also would require such clinical trials.

---

[31] *QT,* 512 F.3d at 862 (FTC Act lacks an exception for "beneficial deceit." "Since the placebo effect can be obtained from sugar pills, charging $200 for a device that is represented as a miracle cure but works no better than a dummy pill is a form of fraud."); *Pantron I*, 33 F.3d at 1097 (unlawful for seller to represent product as "effective" when its efficacy results solely from a placebo effect).

As discussed above, there are no such clinical studies on Roca Labs products, and no studies that support the rapid and sustained weight loss that Defendants promise. Nor is there any evidence comparing the results of Defendants' products to bariatric surgery, or evaluating their safety and efficacy for children. Indeed, it is simply false to say that the weight loss and success rate claims are "scientifically proven," since there are no studies supporting them. These claims, which were express and involve health, are presumptively material. It is unlikely that consumers would spend nearly $500 on Roca Labs products if Defendants had not made these extreme claims, promising significant weight loss where all other attempts had failed, and promoting their products as a viable alternative to invasive and potentially dangerous surgery. That these ads generated more than $25 million in sales over five years, Section III.B, above, confirms their importance to consumers.

      **D.**    **Defendants' Deceptive Representations and Omissions About Gastricbypass.me and Testimonialists (Counts IV, V)**

Defendants misrepresented that *Gastricbypass.me* is an independent, objective resource for research and information related to bariatric surgery and alternatives to bariatric surgery for weight loss, and about Roca Labs products. See Section III.C.2, above. They failed to disclose that they own this website and were reviewing their own products. Defendants also failed to disclose, or failed to disclose adequately, their financial ties to some of their testimonialists and to agents who posted positive blogs and comments about Defendants' products. Consumers would reasonably rely to their detriment on these material misrepresentations and omissions about the objectivity of the information presented because they would be unable to give appropriate weight or credibility to the representations. Thus, Defendants' conduct is deceptive. *See FTC v. Standard Educ. Soc'y*, 302 U.S. 112, 118

34

(1937) (use of fictitious testimonials to sell encyclopedias violated Section 5); *see generally*, 16 C.F.R. § 255.5 (FTC guidance that material connections between seller and endorser that the audience may not reasonably expect must be fully disclosed).

### E.   Defendants' Deceptive Privacy Promises (Count VI)

Defendants also misrepresent that they keep private health information confidential. See Section III.C.3, above. In lawsuits filed against purchasers for violating the gag clause, however, Defendants' court filings have published sensitive details from purchaser "qualification" responses. Similarly, in disputes over chargebacks, Defendants disclosed to payment processors this sensitive personal information ages, weights, heights, and sometimes purchasers' reasons why they needed and had the proper commitment level to buy the products, including some of the very personal responses from consumers expressing why they needed to lose weight. Indeed, Juravin continued these practices even after this Court's Preliminary Injunction (Dkt. 38, PageID 1574) forbidding him from engaging in them.

These actions blatantly violate Defendants' express privacy promise to the purchasers who reasonably entrusted them with private health information. Defendants' express privacy promises are false or misleading, and are presumed to be material, and their conduct is therefore deceptive under Section 5 of the FTC Act. *See FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp.2d 502, 528 (S.D.N.Y. 2000) ("Consumer reliance on express claims is presumptively reasonable."); *cf. FTC v. Para-Link Int'l, Inc.*, 2001 U.S. Dist. LEXIS 17372, *13 (M.D. Fla. 2001) (preliminary injunction against sellers of paralegal training

opportunities; material misrepresentations or omissions made to induce purchase of goods or services constitute deceptive acts or practices that violate Section 5(a)).[32]

### F.   Defendants' Deceptive Representation That Consumers Agree to Pay "Full Price" for Breach of Terms (Count VII)

Defendants misrepresented that customers had agreed to pay hundreds of dollars more than what they actually paid, should they post negative reviews about the products or Defendants. *After* customers had purchased, Defendants told them in package inserts and threatening letters that they had agreed to a "subsidized" price, and to pay the difference between that price and a fictitious "full price" of $1,580 if they posted negative comments. In fact, purchasers agreed to no such thing. See Section III.C.4, above.

The only pre-sale disclosure of this purported subsidy-for-silence agreement was in the Terms and Conditions. But consumers never had to read the Terms to buy the products. Defendants heavily advertised a $480 price, and consumers were offered options to pay $480, or perhaps a few hundred dollars more for installments, larger quantities, "premium" support, or other reasons. *See, e.g.*, Dkt.6-2, PageID 248. A condition hidden in the fine print of the Terms cannot change or contradict the clearly advertised prices and conditions of purchase. *See FTC v. Commerce Planet*, 878 F. Supp. 2d 1048, 1065 (C.D. Cal. 2012)

---

[32] The FTC has taken action against companies that misrepresented their privacy practices, which resulted in settlements. *See, e.g.*, *Facebook, Inc.*, FTC Dkt. No. C-4365 (2012), https://www.ftc.gov/sites/default/files/documents/cases/2012/08/120810facebookdo.pdf (consent order) (settling charges that website misrepresented that users could restrict profile information to specific groups); *Educational Rsch. Ctr. of Am., Inc.*, FTC Dkt. No. C-4079 (2003), https://www.ftc.gov/sites/default/files/documents/cases/2003/05/ercado.pdf (consent order) (settling charges that survey firm promised to share personal information it collected from students only with educational institutions, but also shared it with commercial entities for marketing).

(disclosure of continuity program in separate hyperlinked "Terms of Membership" did not overcome net impression that product was free), *aff'd in part and rev'd on other grounds,* 815 F.3d 593 (9th Cir. 2016); *see also Cyberspace.com*, 453 F.3d at 1200-01 (small-print disclosures regarding a monthly fee not sufficient to defeat net impression that a check was a refund or rebate). Moreover, having to pay over $1,000 extra for the ability to post a negative comment obviously would have been material to consumers and served as a giant red flag to many of them. Thus, Defendants' representations in post-purchase package inserts and letters that consumers had agreed to a subsidy-for-silence purchase condition are deceptive.

### G.     Defendants Are Liable for Unfair Gag Clause Practices (Count III)

Defendants' use of gag clauses, including notices, threats, and lawsuits to prevent their customers from making truthful negative comments about them or their products, thwarts informed consumer decisionmaking and is unfair under Section 5.[33]

#### 1.     Defendants' Practices Cause or Are Likely To Cause Substantial Injury

Defendants' gag clause practices cause or are likely to cause substantial injury by limiting the flow of truthful information about their products to consumers and the marketplace. Online reviews by consumers who have actually used a product or dealt with a

---

[33] Section 5(n) of the FTC Act states that public policy considerations can be considered, along with other evidence, in determining whether a practice is unfair. Enacted in December 2016, after the FTC filed this case, the Consumer Review Fairness Act invalidates and prohibits businesses from offering form agreements that restrict individuals' right to review the business or its products. 15 U.S.C. § 45b(b)(1) and § 45b(c). Although not in effect during the time the challenged conduct occurred, the prohibitions in this new federal statute indicate that public policy, in addition to the other evidence in this case, supports the FTC's contention that Defendants' use of gag clauses is unfair.

seller can be an important source of information for prospective purchasers. Negative information from purchasers can be important to prospective customers because sellers have little interest in disseminating negative, truthful criticism of themselves. Defendants gag purchasers to deprive prospective purchasers of potentially important information about the efficacy, tolerability, and side effects of Roca Labs products and about Defendants' policies and practices. Consequently, purchasers will have spent, or will likely spend, significant sums of money and forgo or delay more effective weight-loss measures. The research on consumer-generated online reviews that Dr. Pavlou discussed in his report (PX4) supports the conclusion that restricting consumers' ability to share truthful, negative information in the marketplace is likely to cause substantial injury. See Section III.A.5, above.

Negative information would be especially useful for prospective Roca Labs purchasers in light of Defendants' numerous deceptions. By depriving prospective purchasers of truthful, critical customer reviews about their products and practices, Defendants' gag clause practices enable them to reduce the harm to their reputation even after they continually misrepresent the effectiveness of their goods. They have therefore likely been able to make sales they would not have otherwise made, and charge their customers higher prices than they might have otherwise.[34]  *See FTC v. World Patent Mktg.*, No. 17-cv-20848, 2017 U.S. Dist. LEXIS 130486, at *49-53 (S.D. Fla. Aug. 16, 2017) (granting preliminary injunction)

---

[34] *Cf. Statement of Basis and Purpose, Advertising of Ophthalmic Goods and Services*, 43 Fed. Reg. 23,992, 24,001 (1978) ("[E]conomic theory indicates that if price information is not available, or if it can be obtained only at high cost, consumers are deprived of the opportunity to satisfy their needs at the lowest available price. . . .  [T]he lack of price information means that in many places prices will be higher than they would be if consumers could readily compare potential sources of supply.").

(complaint suppression tactics likely to cause substantial injury because they limit flow of truthful information about the quality of their services, thus enabling defendants to deceive more consumers than they might have otherwise).

Defendants recognize that negative reviews undercut their carefully crafted marketing campaign of promoting only positive information. They devoted significant resources to suing a review website for allegedly inducing breaches of the gag clause, PX6-29(70:1-11); PX6-136, PX6-195, suing purchasers for allegedly breaching it; threatening other purchasers for saying that they will complain publicly; and warning all purchasers post-sale via package inserts that they are contractually bound not to make negative comments. These actions, on their face, evidence that any leakage of negative purchaser information into the marketplace harms Defendants' business by reducing the volume of product that they can deceptively sell at a premium. They clearly believe that (and behave as if) negative purchaser comments cause, or are likely to cause, other consumers to doubt their deceptive claims, and thus be dissuaded from buying Defendants' products.

Similar restrictions prohibiting dissemination of truthful information by businesses aimed at competitors have been recognized to unfairly harm competition and consumers, including restraints on the dissemination of truthful information about products and services that relate to consumer health.[35] The FTC has also long recognized that agreements between

---

[35] *Statement of Basis and Purpose, Advertising of Ophthalmic Goods and Services,* 43 Fed. Reg. 23,992, 24,007 (1978) (enacting 16 C.F.R. § 456.6(a)) (declaring it an unfair act or practice for private persons to prohibit, limit, or burden the dissemination of information concerning opthalmic goods and services by any seller).

competitors to restrict truthful comparative advertising, including truthful criticism of competitors, harms competition in the marketplace.[36] The FTC has challenged and prohibited these types of restrictions in numerous cases. *See, e.g., Polygram Holding, Inc.,* 136 F.T.C. 310, 354-55 (2003) (agreement between record companies barring truthful advertising of recordings not part of their joint venture held "presumptively anticompetitive"), *aff'd*, 416 F.3d 29, 37 (D.C. Cir. 2005); *RealComp II, Ltd.*, 2009 FTC LEXIS 250, *55-56, 70-73 (F.T.C. Oct. 30, 2009) (agreement to restrict availability of real estate listings consumers use to evaluate competing providers' offerings held "inherently suspect" and "presumptively unreasonable" where it made information more difficult to obtain and tended to alleviate downward pricing pressure), *aff'd on other grounds*, 635 F.3d 815 (6th Cir. 2011).

### 2.      Not Reasonably Avoidable by Consumers

Defendants' gag clause practices cause injuries that are not reasonably avoidable by consumers. Defendants' prospective customers have no input into whether negative information about Defendants and their products is suppressed. Moreover, Defendants make it difficult for consumers to find and understand the gag clause. Prospective customers searching for information on Roca Labs or similar products would not necessarily know that previous purchasers had negative experiences. As the FTC stated in its Unfairness Policy Statement, "[i]t has long been recognized that certain types of sales techniques may prevent consumers from effectively making their own decisions. . . . Some [sellers] may withhold or

---

[36] *Statement of Policy Regarding Comparative Advertising*, 16 C.F.R. § 14.15(c)(1) (truthful, non-deceptive advertising that disparages a seller's competitors, or their goods and services, is lawful; industry codes prohibiting such truthful advertising are subject to challenge by the Commission).

fail to generate critical price or performance data, for example, leaving buyers with insufficient information for informed comparisons." 104 F.T.C. at 1074. Defendants' gag clause keeps a great deal of negative information from buyers, and makes it difficult or impossible for them to make a truly informed choice.

### 3. Substantial Injury Not Outweighed by Countervailing Benefits

The injury from Defendants' gag clause practices is not outweighed by countervailing benefits to competition or consumers. These practices do not protect any legitimate interest of either Defendants or the consumers "agreeing" to it. Defendants' practices, like the competitor advertising restrictions described above, are designed to insulate them from free competition with sellers of other weight-loss products and services. Defendants cannot state a legally cognizable, plausible competitive justification for their gag clause practices. Instead, they essentially admit that the purpose of the gag clause is to put an entirely (and misleadingly) positive spin on their products and enhance their bottom line: "Roca relies upon its reputation and the weight-loss success of its customers to generate new business and attract new customers. To foster, encourage and protect its customer relationship, Roca has developed a special incentive / discount program, where it rewards its customers for positive reviews and to refrain from making any negative postings." PX6-199, 213; PX6-29(70:1-11). These gag clause practices are "injurious in [their] net effects," "prevent consumers from effectively making their own decisions," and "undermine[] an essential precondition to . . . free and informed consumer transaction[s]." *Unfairness Policy Statement*, 104 F.T.C. at 1073, 1074. They are, therefore, unfair. *Id*.

41

**H.     Juravin Is Individually Liable for Injunctive and Equitable Monetary Relief**

The FTC's evidence establishes that the Corporate Defendants violated Sections 5(a) and 12 of the FTC Act. Once corporate liability is established, individual defendants may be held personally liable for the company's violations if they (1) "participated directly in the practices or acts or had authority to control them," and (2) "had some knowledge of the practices." *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996). In determining whether an individual defendant had the authority to control the company's unlawful practices, the court looks to the individual's exercise of control over the practices in question. *See Amy Travel*, 875 F.2d at 573. The FTC can show control through evidence that an individual "controlled the day-to-day affairs" of an operation. *Gem Merch.*, 87 F.3d at 467.[37] An individual's "degree of participation in business affairs is probative of knowledge." *Amy Travel*, 875 F.2d at 574. An individual is liable for equitable monetary relief if he "had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* at 574. The FTC need not prove subjective intent to defraud. *Id.* at 573-74.

---

[37] Probative evidence of an individual's authority to control a company's unlawful practices includes the authority to hire and fire personnel, *FTC v. Atlantex Assocs.*, No. 87-0045-CIV, 1987 WL 20384, at *11-12 (S.D. Fla. Nov. 25, 1987), *aff'd*, 872 F.2d 966 (11th Cir. 1989), the authority to write checks and authorize payments, *FTC v. Kitco of Nev.*, 612 F. Supp. 1282, 1293 (D. Minn. 1985), and the authority to write, review, and/or approve advertising, *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 319 (S.D.N.Y. 2008).

Juravin directed every aspect of the Roca Labs business. He either participated directly in the deceptive acts or practices or had authority to control them. He also possessed the requisite knowledge to warrant liability for monetary relief. Juravin was extensively involved with the day-to-day operations of the companies, including financial and business dealings. He reviewed and/or approved the advertising and website content. He directed the many deceptive and unfair practices challenged here, including the deceptive endorsements, the release of personal information, and threats and lawsuits against consumers. Finally, Juravin knew that the company had no science to support its advertising claims for the Roca Labs supplements. Juravin essentially admitted that the "10-16 hours" claim was false, that the Formula, in and of itself, does not contribute to users' weight loss, and that any weight loss they achieve is the result of their fasting to reduce their caloric intake, consumption of water, and exercise. PX7-17(538:21-539:3; 539:18-540:1; 542:24-544:5; 545:12-546:6). Juravin is thus individually liable for equitably monetary relief.

I.      **Whiting Is Individually Liable for Injunctive Relief**

Whiting's roles as owner and an officer of RLI, ZCL, and RLN gave him the authority to control the unlawful conduct alleged in this case. *See FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1204-05 (10th Cir. 2005) (substantial inference that owner of closely held company had authority to control its deceptive practices); *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 498-99 (D.C. Cir. 2015) (FTC required to show individual's knowledge only when seeking equitable monetary relief.) (citations omitted). His participation also supports holding Whiting individually liable for injunctive relief. *See FTC v. Ivy Capital, Inc.*, Civ. No. 2:11-283, 2013 WL 1224613, at *14 (D. Nev. Mar. 26, 2013)

(participation can include working at and drawing salary from company, even if individual not involved day-to-day), *aff'd*, 616 F. App'x 360 (9th Cir. 2015) (citations omitted).

## V.   THE COURT SHOULD ENTER A FINAL ORDER WITH INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS, AND MONETARY RELIEF AGAINST JURAVIN AND THE CORPORATE DEFENDANTS

This Court has the authority to grant permanent relief pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b)), and to exercise its full equitable powers under Section 13(b) to remedy violations of Section 5. *Gem Merch.*, 87 F.3d at 469-70; *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1433 (11th Cir. 1984); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1271-73 (S.D. Fla. 2007). The FTC may seek, and the district courts may grant "permanent injunctions against practices that violate any of the laws enforced by the Commission." *Gem Merch.*, 87 F.3d at 468. The power to grant ancillary equitable relief under Section 13(b) includes the power to order monetary relief for consumer redress through repayment of money, restitution, rescission, or disgorgement of unjust enrichment. *FTC v. Lalonde*, 545 F. App'x 825, 841 (11th Cir. 2013); *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997).

### A.   Permanent Injunctive Relief

Injunctive relief against Defendants is appropriate where, as here, there is a risk that harm will recur. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (court's power to grant injunctive relief survives discontinuance of the illegal conduct; purpose of an injunction is to prevent future violations.). Juravin's knowledge that key representations to consumers were false, his misuse of the legal system to intimidate his adversaries (see Dkt.

44

126, PageID 2319), and his willingness to ignore or circumvent the limits of the preliminary injunction (see Dkt.69) demonstrate the risk that he will violate the law again if not enjoined.

Moreover, while moving away from the Roca Labs brand, he is still selling the same products under the name "Gastric.care." He markets via Facebook pages that he and MCO staff curate. PX6-68(367:7-368:2); PX6-70(386:24-387:23); PX7-22, 23, 25(558:7-559:2, 572:23-582:19, 597:9-20). He fancies his current marketing as "Don's Boot Camp," where he uses "a lot of psychology" (in which he lacks formal training, PX7-20(550:4-16)), and states with "a lot of confidence" what he previously "implied": "[I]f you come here, if you want to work with me, if you want my regimen, I'm allowed to tell you anything I want; to do anything I want with you that would lead you to a healthy weight; anything." PX7-18 (541:1-548:25). Same snake oil; new bottle. Whiting, although less involved, was a corporate owner and officer for years and let Juravin use his companies to carry out these deceptive and unfair acts. Injunctive relief is appropriate against all Defendants.

### B.     Monetary Relief

Monetary remedies, including consumer redress and disgorgement, are available to the Court to remedy Section 5 violations. *See Gem Merch.*, 87 F.3d at 470; *Transnet*, 506 F. Supp. 2d at 1271.[38] The proper measure of disgorgement is the amount of the defendants' unjust gains. *FTC v. Washington Data Resources*, 704 F.3d 1323, 1326 (11th Cir. 2013). Gross receipts minus refunds is the method of calculating unjust gains. *Id.* at 1327. In

---

[38] "There is no shortage of case law recognizing the availability of the equitable [monetary] relief sought by the FTC under section 13(b)." *FTC v. J. William Enters., LLC*, 283 F. Supp. 3d 1259, 1261-62 (M.D. Fla. 2017).

determining unjust gains, this Circuit and other courts have consistently held that it is inappropriate to deduct costs associated with committing illegal acts. *See*, *e.g.*, *id.* at 1327 (upholding monetary award based on gross receipts rather than net profits); *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011) (same).

When one or more business entities operate as part of a common enterprise, each may be held liable for the deceptive acts and practices of the others under the FTC Act. *See FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012), *aff'd*, 704 F. 3d 1323 (11th Cir. 2012); *see also NUG*, 645 F. Supp. 2d at 1182. Factors that determine the existence of a common enterprise include (1) common control; (2) shared office space; (3) whether the business is transacted through a maze of interrelated companies; and (4) commingling of funds. *See*, *e.g.*, *FTC v. LoanPointe, LLC*, No. 10-CV-225, 2011 WL 4348304, at *10 (D. Utah Sept. 16, 2011), *aff'd*, 525 F. App'x 696 (10th Cir. 2013). The undisputed evidence shows that in this case, Juravin led a common enterprise whose gross receipts minus refunds equals at a minimum $25,246,000. PX9-23(169:9-171:3); PX6-4(14:21-15:9); PX6-7(34:9-36:23); see also PX24-1, 4. The Court should find the Corporate Defendants and Juravin jointly and severally liable for that amount.

## VI.    THE FTC PROPOSES APPROPRIATE PERMANENT EQUITABLE RELIEF TO REMEDY DEFENDANTS' FTC ACT VIOLATIONS

Upon request, the FTC is prepared to provide a proposed order with permanent injunctive and monetary relief. The injunctive relief would prohibit false or unsubstantiated health and non-health related claims about products or programs, including, but not limited to, the dietary supplements challenged in this case. Courts have confirmed the FTC's authority to obtain broad injunctive relief covering products and claims similar to the product

at issue and the challenged claims, when an advertiser has violated the FTC Act. *See*, *e.g.*, *FTC v. Colgate-Palmolive Co*., 380 U.S. 374, 395 (1965) ("The Commission is not limited to prohibiting the illegal practices in the precise form in which it is found to have existed in the past."); *Kraft, Inc*., 970 F.2d at 326 (multiproduct orders, known as "fencing-in," are intended to prevent violators from engaging in similar deceptive practices in the future); *SlimAmerica*, 77 F. Supp. 2d at 1275 ("Broad injunctive provisions are often necessary to prevent transgressors from violating the law in a new guise.") (citation omitted).

The proposed order would prohibit deceptive endorsements, privacy promises, and subsidy-for-silence claims like those challenged here. It would prohibit unfair use of gag clauses and related threats, including retaliation against witnesses who complained to or cooperated with the FTC. The proposed order would also require Juravin and the Corporate Defendants to pay $25,246,000, equal to consumer sales minus refunds. *See Wash. Data*, 704 F.3d at 1327. Finally, the proposed order has provisions to aid enforceability. Courts have included such provisions to ensure compliance with permanent injunctions in FTC cases. *See*, *e.g*., *FTC v. Sharp*, 782 F. Supp. 1445, 1456-57 (D. Nev. 1991) (judgment included monitoring provisions); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1018 (N.D. Ind. 2000) (ordering record retention, notification of changed employment or residence, access to premises, and monitoring); *FTC v. Career Assist. Planning, Inc.,* No. 96-cv-2187, U.S. Dist. LEXIS 17191, at *13 (N.D. Ga. Sept. 18, 1997) (Commission monitoring to ensure adequate compliance); *Transnet*, 506 F. Supp. 2d at 1274 (requiring order distribution).

## VII.    CONCLUSION

No genuine issue of material fact remains in dispute. The Court should enter

summary judgment for the FTC, impose injunctive relief to prevent future violations of the

FTC Act, and order Corporate Defendants and Juravin to pay equitable monetary relief.

Respectfully submitted,

Dated:  April 26, 2018

/s/ *Carl H. Settlemyer, III*
CARL H. SETTLEMYER, III (Trial Counsel)
PAUL B. SPELMAN
MICHAEL J. DAVIS
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mail Drop CC-10528
Washington, DC 20580
(202) 326-2019, -2487, -2458 (Tel.)
(202) 326-3259 (Fax)
csettlemyer@ftc.gov,  pspelman@ftc.gov,
mdavis@ftc.gov

Attorneys for Plaintiff Federal Trade Commission

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on this 26th day of April 2018, I electronically filed the foregoing

"**PLAINTIFF'S AMENDED MOTION FOR MOTION FOR SUMMARY JUDGMENT**

**AGAINST ALL DEFENDANTS AND MEMORANDUM IN SUPPORT**" with the Clerk

of the Court by using the CM/ECF filing system, and this document will be served

electronically through same to counsel for all parties of record.

s/<u>*Carl H. Settlemyer, III*</u>
Attorney
