# PX7

# Excerpts from Don Juravin's Individual Deposition (2/17/17)

# In the Matter of:

# FTC v. Roca Labs, Inc., et al.

*February 17, 2017*
*Don Juravin - Confidential*
*Vol. 3*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Case 8:15-cv-02231-MSS-CPT   Document 210-16   Filed 04/26/18   Page 3 of 36 PageID 9415
Juravin - Confidential
FTC v. Roca Labs, Inc., et al.                                    2/17/2017

---

**405**

1                    I N D E X
2
   WITNESS                              PAGE NO.
3
   DON JURAVIN
4
       By Mr. Settlemyer:                  409
5      By Ms. Marteny:                     601
       By Mr. Settlemyer:                  613
6      By Ms. Marteny:                     620
7
8  EXHIBITS       DESCRIPTION           PAGE NO.
9    129      Roca Labs Corp Filing       420
     130      Zero Calorie Corp Filing    424
10   131      BOA Acct #3195              436
     132      2011 Roca Labs Tax Return   440
11   133      2014 Roca Labs Tax Return   443
     134      2015 Roca Labs Tax Return   445
12   135      Zero Calorie Labs           456
     136      Roca Labs Acct #8933        459
13   137      Juravin Inc.                473
     138      BOA Acct #5833              473
14   139      2014 Juravin Tax Return     474
     140      2015 Juravin Tax Return     477
15   141      Answer to Amended Complaint 478
     142      Agreement of Services       487
16   143      Agreement of Services       487
17            CONFIDENTIAL EXHIBITS
18        Exhibits 131-136, 142, 143
19
20            CONFIDENTIAL PORTIONS
21   Page 487, Line 5 through Page 495, Line 16
     Page 541, Line 4 through Page 549, Line 11
22   Page 560, Line 4 through Page 566, Line 16
23
24
25

---

**406**

```
1        UNITED STATES DISTRICT COURT
         MIDDLE DISTRICT OF FLORIDA
2              TAMPA DIVISION
3        CIV No. 8:15-cv-02231-MSS-TBM
4
   FEDERAL TRADE COMMISSION,
5
         Plaintiff,
6
   vs.
7
   ROCA LABS, INC., a corporation;
8  ROCA LABS NUTRACEUTICAL USA, INC.,
   a corporation; MUST CURE OBESITY, CO.,
9  a corporation; JURAVIN INCORPORATED,
   a corporation; ZERO CALORIE LABS, INC.,
10 a corporation; DON JURAVIN, individually
   and as an office of Roca Labs, Inc.,
11 Roca Labs Nutraceutical USA, Inc.;
   Must Cure Obesity, Co., and Juravin,
12 Incorporated; and GEORGE WHITING,
   individually and as an officer of Roca
13 Labs, Inc., Roca Labs Nutraceutical
   USA, Inc., and Zero Calories Labs, Inc.,
14
         Defendants.
15 _____/
16
17        DEPOSITION OF DON JURAVIN
18     Taken on Behalf of the Plaintiff
19  DATE TAKEN:  Friday, February 17, 2017
20  TIME:        9:45 A.M. - 5:14 P.M.
21  PLACE:       101 E. Kennedy Boulevard
                 Suite 2800
22               Tampa, Florida  33602
23
   STENOGRAPHICALLY REPORTED BY:
24 Tracy Lyn Fazio, FPR
   Notary Public, State of Florida
25
```

---

**407**

```
1  APPEARANCES FOR THE PLAINTIFF:
2  CARL H. SETTLEMYER, III, ESQ.
   MICHAEL J. DAVIS, ESQ.
3  FEDERAL TRADE COMMISSION
   600 Pennsylvania Avenue, N.W.
4  Maildrop CC-10528
   Washington, DC  20580
5  1.202.326.2019
   csettlemyer@ftc.gov
6  mdavis@ftc.gov
7
8  APPEARANCES FOR THE DEFENDANTS:
9  SUZETTE MARTENY, ESQ.
   SHUMAKER, LOOP & KENDRICK, LLP
10 101 E. Kennedy Boulevard, Suite 2800
   Tampa, Florida  33602
11 1.813.229.7600
   smarteny@slk-law.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**408**

```
1            P R O C E E D I N G S
2                    - - -
3        MR. SETTLEMYER:  We are here today for the
4   deposition of Defendant, Don Juravin, in his
5   individual capacity and per agreement of
6   parties yesterday for purposes of some
7   follow-up and additional questioning on the
8   30(b)(6) deposition of Muscular Obesity Co.,
9   Roca Labs, Inc. and Roca Labs Nutraceutical.
10  Mr. Juravin is here also as necessary in his
11  capacity as representative for those
12  corporations.  I will try to when I'm asking a
13  question of him as a corporate representative,
14  state that clearly on the record so we can keep
15  track of that to the extent there's any
16  difference between what his individual and
17  corporate answer might be.
18       Mr. Juravin, why don't we have you sworn
19  in and we'll do introductions after that.
20       (Thereupon, the witness, DON JURAVIN, was
21  duly sworn under oath and testified as
22  follows:)
23       MR. SETTLEMYER:  I'm Carl Settlemyer.  I'm
24  an attorney for the Federal Trade Commission.
25  With me is Mike Davis, another attorney for the
```

FTC v. Roca Labs, Inc., et al.                                    2/17/2017

409

1     Federal Trade Commission.
2          MS. MARTENY: I'm Suzette Marteny. I'm an
3     attorney for the Defendants and I'm here with
4     Don Juravin.
5          DIRECT EXAMINATION
6     BY MR. SETTLEMYER:
7     Q   Good morning, Mr. Juravin.
8     A   Good morning.
9     Q   I know you have of course been deposed
10    previously in this case, including yesterday. So
11    I'm going to be probably repetitive in what I'm
12    asking you to acknowledge in terms of general
13    instructions of the deposition.
14         First of all, I noticed that your voice is
15    fairly weak today. We will try to go slowly enough
16    that you can give an answer so that the court
17    reporter can hear you.
18    A   I'm fine. I'm fine.
19    Q   So you understand of course you have taken
20    an oath to tell the truth, correct?
21    A   Yes.
22    Q   I'm going to try to finish my questions
23    before you begin your answer. And I'll try to let
24    you finish your answer before I ask my question.
25    You will need to answer audibly with words, not nods

410

1     or uh-huhs. Do you understand?
2     A   Yes.
3     Q   If you don't understand a question, please
4     tell me. And if you answer, I'll assume you
5     understood. Do you understand?
6     A   Yes.
7     Q   If you hear your attorney make an
8     objection to a question, you should go ahead and
9     answer the question unless it is about a matter of
10    privilege. And in that case, she will instruct you
11    not to answer and we'll discuss the appropriateness
12    of an answer. Otherwise, she will make an objection
13    and you will need to just answer the question.
14    A   Okay.
15    Q   If later in the deposition you remember
16    additional information or want to clarify an answer,
17    you can tell me. Do you understand?
18    A   Yes.
19    Q   And if you need a break, you can just ask.
20    As long as we're not in the middle of a pending
21    question, we should be able to accommodate that. Do
22    you understand?
23    A   Yes.
24    Q   Is there any reason today that you can't
25    proceed with the deposition to give your best

411

1     testimony for reasons relating to medicine or any
2     other factor that would impair your ability to
3     testify truthfully?
4     A   I'm not more delusional than normally.
5     Q   So the answer is no?
6     A   The answer is no.
7     Q   Do you have any illness or hearing problem
8     that would prevent you from hearing any of the
9     questions or answers?
10    A   Selective sometimes, but normally okay.
11    Q   But physically you're fine?
12    A   Physically fine.
13    Q   And you understand the instructions I've
14    just given you, right?
15    A   Yes.
16    Q   I know we've talked before, but I'll ask
17    again. Your primary language in business dealings
18    is English; is that correct?
19    A   Yes.
20    Q   I know that you were not born in the
21    United States and that you also speak Hebrew; is
22    that correct?
23    A   Yes.
24    Q   Is that your first language?
25    A   I speak Hebrew. Hebrew and German. But

412

1     English is now my main one.
2     Q   How long ago did you first learn English?
3     A   Learn?
4     Q   Just generally when did you learn to
5     speak --
6     A   Generally we learn English from the age of
7     five.
8     Q   So it's most of your life then?
9     A   Yeah. It's just that I'm lacking on
10    vocabulary when I compare myself to people like you.
11    So I'm missing the vocabulary.
12    Q   What is your current residential address?
13    A   Redacted
14    Q   Mount Verde?
15    A   Mount Verde, yes.
16    Q   In Florida?
17    A   Yes.
18    Q   What was your residential address prior to
19    that?
20    A   In Sarasota. In Sarasota it was Roberts
21    Point Circle and the zip code was 34242-3914.
22    Q   And what was your residential address
23    prior to the Sarasota address?
24    A   We playing memory games now? I don't
25    remember the number, but it was Americana Drive in

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                    2/17/2017

413

1    Tampa, 33603.
2        Q   So you moved to the Mount Verde, Florida
3    address at the end of 2015; is that correct?
4        A   Yes.
5        Q   How long were you living at the Sarasota
6    address before you moved?
7        A   I think four years.
8        Q   How long were you living at the Tampa
9    address before the Sarasota address?
10       A   I think three or four years.
11       Q   Is your residential address for those
12   different years, has that been your primary business
13   address?
14       A   For purposes of getting mail. But even if
15   we have a warehouse, I'm still using the old address
16   to receive mail.
17       Q   In terms of just your own administrative
18   personal work that's not related to a warehouse, you
19   have used your residential address as the place
20   where you've conducted business?
21       A   Yes. Myself, yes.
22       Q   I understand that at a certain point in
23   recent years you changed your name. What have you
24   changed your name from and to legally?
25       A   I added -- I just added the middle name to

414

1    Karl because of my grandfather.
2        Q   But your given name was originally I
3    believe Don Addie Juravin?
4        A   Addie was my middle name in Israel. And I
5    changed it to Karl because of my grandfather. He's
6    a Holocaust, from the Holocaust. So I change it.
7    That's it. I did it in court.
8        Q   Do you recall what year that was that you
9    changed your name legally?
10       A   The middle name? I will guess 2013 maybe.
11   I don't know. It was done in court and over a long
12   period.
13       Q   So some of the records we talked about
14   yesterday when you were appearing on behalf of the
15   corporations and we may look at today should have the
16   name Don Addie Juravin and others would have Don
17   Karl Juravin?
18       A   Same.
19       Q   And they're both you, correct?
20       A   Right.
21       Q   When did you most recently move to the
22   United States? I understand you lived in Israel
23   when you were much younger.
24       A   I'll help you out. I came to the U.S.
25   when I was about 23, and I became a citizen about 30

415

1    years ago. I lived in the U.S. And then maybe
2    about 1990 or something, I can't remember exactly, I
3    went to Israel for a trip and ended up staying there
4    much, much longer inventing things, doing things,
5    coming back to the U.S. in 2009. And for me coming
6    back in 2009 was like everything was like new again.
7    Because no credit history at all. Zero credit
8    history. Everything from scratch.
9        Q   And you've resided in the United States
10   since 2009 to the present, that's correct?
11       A   Yes.
12       Q   When you came back to the United States in
13   2009, you were already -- to pick up on your
14   testimony from yesterday, you had already been
15   selling a product working on what you described as
16   an invention. Can you describe what it is that you
17   invented in Israel and started working on even
18   further when you were in the U.S.?
19       A   Yes. First I didn't sell anything in the
20   U.S. I was just inventing it in Israel, selling
21   some in Israel. And then in the U.S. I wanted to
22   continue with it. Basically it's a method, a
23   regimen to achieve a healthy weight without
24   undergoing bariatric surgery.
25       Q   When you came to the U.S., you --

416

1        A   Came back.
2        Q   -- at a certain point met a man named
3    George Whiting; is that correct?
4        A   Yes. You mean came back?
5        Q   I'm sorry. When you came to the U.S. in
6    2009.
7        A   Yes.
8        Q   Yes. You met George Whiting, correct?
9        A   Yes.
10       Q   How did you meet Mr. Whiting?
11       A   We pass Valentine. Somebody introduced us
12   and that's all I remember.
13       Q   Do you remember talking to him about the
14   possibility of starting a business to market your
15   invention?
16       A   It didn't start like this. I don't
17   remember exactly how it started. But I told him
18   that I have ideas. I have inventions. I want to do
19   business. But I don't like and I cannot run a
20   business well. And I thought I'm not familiar
21   enough with business, how to run a business in the
22   U.S. Not even how to start a company. Things that
23   seem today very easy and trivial that I was lost and
24   I didn't want to take the time to do it. My offer
25   to him was, it's your business. You run it. I put

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX7-3a

Case 8:15-cv-02231-MSS-CPT   Document 210-16   Filed 04/26/18   Page 6 of 36 PageID 9418
Juravin - Confidential
FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

417

1  the content in it. You're the manager. I mean,
2  you're the boss. You're everything. If you don't
3  like something that I do, don't work with me
4  anymore. I will be a good soldier. I will follow.
5  And then we started working and that's it.
6      Q   What did you tell him about the invention
7  and the type of business that you wanted to start?
8      A   Not much in the beginning. He more --
9  than my personality. Only a year later when he
10  learned to work with me and he learned about the
11  business. But at first he just knew that I'm a
12  creative guy capable of doing business. But we
13  didn't go into details. He didn't check on the
14  invention or anything like that.
15     Q   When did you first meet Mr. Whiting?
16     A   Almost as soon as I came off the boat.
17     Q   So it would have been in 2009 at some
18  point?
19     A   Yes.
20     Q   What steps did you and Mr. Whiting take
21  after meeting when you were starting the business to
22  start bringing the invention to market?
23     A   It wasn't like this like -- it wasn't like
24  the main thing is the invention. I basically told
25  him, listen, I'm a creative guy. I know how to do

418

1  business. I know how to do marketing. I need
2  somebody to run the company. I need somebody to own
3  the company. I need somebody to balance decisions
4  with me. And it wasn't necessarily just the Roca
5  Labs. It wasn't -- it came about only a year later
6  that I said this is what I want to focus on.
7      Q   A year later would have been 2010; is that
8  correct?
9      A   Maybe, yes.
10     Q   So at a certain point a business called
11  Roca Labs, Inc. was created, correct?
12     A   About 2009 -- '10. That's when we really
13  started.
14     Q   Who picked the name Roca Labs?
15     A   I did.
16     Q   Roca Labs, Inc. was incorporated at that
17  point, correct?
18     A   Yes.
19     Q   There was another business created in
20  around that time called Zero Calorie Labs, Inc.,
21  correct?
22     A   Yes.
23     Q   What was the purpose of Zero Calorie Labs?
24     A   Dr. Whiting didn't want to have any
25  employees in Roca Labs. And Zero Calorie Labs were

419

1  to have independent contractors work for it.
2      Q   Dr. Whiting is George Whiting; is that
3  correct?
4      A   I'm sorry. Yes. I'm not sure that in the
5  beginning Zero Calorie Labs had the purpose of being
6  like an HR. I don't remember what it was in the
7  beginning.
8      Q   HR meaning human relations, hiring
9  personnel?
10     A   Human Resource.
11     Q   Human Resources. Okay. Thank you.
12     A   If it was relations, it would have nothing
13  to do with me.
14     Q   So at the time Roca Labs, Inc. was formed,
15  was there already a product ready to sell?
16     A   No. No.
17     Q   What year did Roca Labs, Inc. first start
18  selling anything to the public?
19     A   Maybe 2010, I think.
20     (Thereupon, Plaintiff's Exhibit No. 129
21  was marked for identification.)
22     Q   Mr. Juravin, could you take a look at
23  Exhibit 129, and let me know if you recognize it,
24  please. While you're looking at that, I want to
25  just go on the record and say we're starting with

420

1  No. 129. We're continuing the numbering sequence
2  from the 30(b)(6) deposition that was commenced on
3  Wednesday and continued through yesterday.
4      A   I don't know what it is. I mean, it looks
5  like corporate papers, but I don't really know what
6  it is.
7      Q   Look at the fourth page of Exhibit 129,
8  please.
9      A   I'm there.
10     Q   You'll see that there was an August 5,
11  2009 addition of the bottom of Don Juravin as the
12  Vice-President. Do you see that?
13     A   Yeah, I see that.
14     Q   Do you agree that you were added as
15  Vice-President to Roca Labs, Inc. at the time?
16     A   No, I wasn't aware of it. And I think
17  only with Roca Labs, the only time that I don't know
18  even how it came about that Dr. Whiting was not
19  available to me like 2013, when his situation
20  deteriorated. I asked him to make me assignee and
21  we did it I think in the corporate office maybe in
22  2013 for a short period of time. But I am not aware
23  that I was even added here. This is not to say that
24  I was not involved in the company. But I was not
25  assignee or I was not --

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555          PX7-4

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

425

1    up with ideas and George will say, yes, no.  If he
2    says no, I can one time try to say why I think.  And
3    then whatever -- he has the final say.
4        Q   But you think you came up with the name
5    Zero Calorie Labs; is that right?
6        A   Yes, I think so.
7        Q   So in terms of the activities of Roca
8    Labs, Inc., were you personally in charge of
9    selecting which individuals would perform work on
10   behalf of the company?
11       A   Yes.
12       Q   With respect to Zero Calorie Labs, Inc.,
13   you were personally responsible for selecting who
14   would be hired by or retained through contract by
15   Zero Calorie Labs?
16       A   Yes.
17       Q   What would you describe as the business of
18   Roca Labs, Inc. as of the 2010 to 2011 time frame?
19       A   Promoting the same concept as earlier.
20   Promoting the same concept as I mentioned earlier.
21   An alternative to a gastric bypass surgery.  But we
22   weren't pinpointed so much then.  It was more into
23   the weight reduction.  I didn't have still the guts
24   to say this can be a replacement.
25       Q   A replacement for what?

426

1        A   For a bariatric surgery.
2        Q   What other activity of course would have
3    been selling products to consumers, correct?
4        A   Yes.
5        Q   Were you personally responsible for the
6    product formulas that were sold by Roca Labs?
7        A   Yes.
8        Q   You were personally responsible for the
9    product ideas of Roca Labs, Inc.?
10       A   Yes.
11       Q   You were personally responsible for the
12   product packaging of Roca Labs, Inc.?
13       A   Yes.
14       Q   You were personally responsible for
15   managing sales by Roca Labs, Inc.?
16       A   Yes.
17       Q   You were personally responsible for
18   product pricing for Roca Labs, Inc.?
19       A   Yes.
20       Q   You were personally responsible for the
21   retail channels Roca Labs, Inc. would use, correct?
22       A   Yes.
23       Q   You were personally responsible for the
24   advertising media that Roca Labs, Inc. used,
25   correct?

427

1        A   Yes.
2        Q   You were personally responsible for the
3    advertising content of Roca Labs, Inc., correct?
4        A   Yes.
5        Q   You were personally responsible for
6    research and development related to the products
7    Roca Labs sold, correct?
8        A   Yes, but not under -- everything to do
9    with formulation.  It was me doing it for myself,
10   not for the company.
11       Q   But you were personally responsible for
12   the formulation of the products that Roca Labs sold,
13   correct?
14       A   Yes.
15       Q   And you were personally responsible for
16   determining what substantiation the company Roca
17   Labs, Inc. had for the products it was selling,
18   correct?
19       A   Yes.
20       Q   You were personally responsible for
21   finding supplies of ingredients for the Roca Labs
22   products, correct?
23       A   Raw materials, yes.
24       Q   Raw materials.  Okay.
25           You were personally responsible for

428

1    agreements with venders, correct?
2        A   I'm sorry.  Raw materials for the most
3    part.
4        Q   Why do you caveat with "for the most
5    part"?  Was somebody else involved with that?
6        A   Yes.  Because when you go to an FDA
7    registered facility, you cannot just bring whatever
8    you want.  You can say this is what I want.  But
9    then the importer needs to coordinate with the
10   facility to see if the facility agrees, because the
11   facility is obligated to the FDA.  I can ask
12   anything I want.  But they can say no because
13   whatever reason.
14       Q   But you were the one who would be saying
15   this is what I want; is that correct?
16       A   But I have the option to bind myself or I
17   tell them, this is what I want, you find it.
18       Q   I just want to confirm.  You're the one
19   who did make that request of what it is that Roca
20   Labs wanted to put into the product?
21       A   Yes.
22       Q   You were personally responsible for
23   shipping the product for consumers.  Not that you
24   personally did it, but were overall responsible for
25   that?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555                    PX7-5

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                          2/17/2017

429

1      A   Yes.
2      Q   And you were personally responsible for
3   again, in an oversight capacity, receiving the
4   shipments from your packagers or suppliers, correct?
5      A   Not directly, but in general, yes.
6      Q   You were personally responsible for
7   obtaining insurance for Roca Labs, Inc.?
8      A   George and I.
9      Q   You were personally responsible for
10   maintenance of any customer information submitted to
11   Roca Labs, Inc.?
12      A   Yes.
13      Q   You were personally responsible for
14   overseeing responses to complaints from Roca Labs,
15   Inc. customers or issues that they had?
16      A   Ultimately I'm responsible.
17      Q   Maybe not on a day-to-day basis, but
18   overall you had oversight over that?
19      A   Yes.
20      Q   In terms of banking, you controlled how
21   Roca Labs, Inc.'s funds were spent on a day-to-day
22   basis, correct?
23      A   I had to follow guidelines of George.  I
24   followed George's guidelines.  But on a day-to-day,
25   it was me.

430

1      Q   So you were the one who was actually
2   initiating any electronic fund transfers for
3   example, correct?
4      A   Yes.  If it falls within the guidelines
5   that George gave me, yes.
6      Q   You would be the one who wrote checks on
7   the day-to-day basis for Roca Labs, Inc., correct?
8      A   Yes.
9      Q   You were responsible for determining
10   whether or not refunds would be given to Roca Labs,
11   Inc. customers, correct?
12      A   I sent the general policy, but Sharon King
13   would be the one that will make a decision
14   day-to-day without consulting me, without talking to
15   me, without -- I just set the general guidelines.
16      Q   Would you be generally responsible for
17   addressing complaints submitted by Better Business
18   Bureau?
19      A   No.
20      Q   Who would be?
21      A   I never did.  Sharon King.  From now on I
22   will say Sharon.  It means Sharon King.
23      Q   Would Sharon King in responding to the
24   Better Business Bureau complaints be following
25   general guidelines that you set?

431

1      A   Very general.
2      Q   But the answer is yes?
3      A   Yes, very general.
4      Q   Were you personally responsible for making
5   sure that the Roca Labs products were compliant with
6   FDA guidelines?
7      A   I relied on the facility.  The assumption
8   is when the facility gives it to me, they made sure
9   that everything -- I'm a marketer.  I'm not a
10   manufacturer.  Roca Labs is not a manufacturer.
11   Roca Labs is a marketer.
12      Q   But you would be responsible for making
13   sure that the manufacturer was an FDA --
14      A   Register.
15      Q   -- compliant facility?
16      A   Not compliance, register.  Because I don't
17   know if their in compliance.  They're registered.
18   Yes, once I chose them, my assumption was that I can
19   ask them anything in the world.  And if they allow
20   it, it means that the FDA allows it.
21      Q   Would you be -- were you personally
22   responsible for authorizing the filing of lawsuits
23   in the name of Roca Labs, Inc.?
24      A   Yes.
25      Q   Were you personally responsible for

432

1   overseeing the defense of lawsuits against Roca
2   Labs, Inc.?
3      A   Yes.
4      Q   Did Roca Labs, Inc. ever have any Board of
5   Director meetings?
6      A   I did not do that administrative of Roca
7   Labs.  So I would not know.  That's the reason why I
8   didn't want to run the company, because I'm failing
9   to do this administrative things, and that's why
10   George did it.  I have no idea.
11      Q   Go through a similar list of questions,
12   but for Zero Calorie Labs, Inc. to see what your
13   personal responsibility was.
14      A   Sure.
15      Q   You were personally responsible for
16   determining which people Zero Calorie Labs, Inc.
17   retained?  I think you already testified, correct?
18      A   Yes.
19      Q   Were you personally responsible for
20   initiating fund transfers from Zero Calorie Labs'
21   bank accounts?
22      A   Yes.
23      Q   Were you personally responsible for
24   determining how much people retained in the name
25   Zero Calorie Labs were paid?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555                PX7-6

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                      2/17/2017

433

1      A   I didn't understand the word retained.
2  Did I determine how much they would be paid?
3      Q   Yes.
4      A   Yes.
5      Q   Were you the sole -- I'll get to that in a
6  moment.  Strike that.
7      A   I have a soul, yes.
8      Q   I hadn't gotten to the verb yet.  Were you
9  responsible for writing checks on behalf of Zero
10 Calorie Labs?
11     A   Yes.
12     Q   Aside from being a Human Resources company
13 that worked on behalf of Roca Labs, are you aware of
14 any other clients of Zero Calorie Labs, Inc.?
15     A   I know that George wanted all along to do
16 something with it for his own accounting purposes,
17 and he talked about it a few times.  I don't know if
18 he did something or if something was done.  But Zero
19 Calorie Labs was supposed to do additional HR, I
20 think for George and maybe other things.
21     Q   Do you know if in fact Zero Calorie Labs
22 did do such activity for others?
23     A   I don't know.  I don't think so.  But the
24 intent was to do.
25         MR. SETTLEMYER:  Take a two minute break.

434

1      I'm going to pull out some documents.
2          (A brief recess.)
3  BY MR. SETTLEMYER:
4      Q   Mr. Juravin, I've just handed you a
5  document that was marked previously as Exhibit 16.
6  Take a look at Exhibit 16, please.
7      A   Yes.
8      Q   Are you familiar with Exhibit 16?
9      A   Looks like my signature.
10     Q   This is a -- correct me if I'm wrong, a
11 signature card for Bank of America account for Roca
12 Labs, Inc. for an account ending 3550, correct?
13     A   Yes.
14     Q   You submitted this signature card,
15 correct?
16     A   Yeah.  But why October 2006?
17     Q   Are you looking at the second page of the
18 document?
19     A   Yeah.  Okay.
20     Q   Is the date there the date that the shelf
21 corporation that came Roca Labs, Inc. was created?
22     A   Maybe, yes.  Thank you.
23     Q   But you personally submitted this
24 signature card?
25     A   Looks like my signature, yes.

435

1      Q   Were there any other signatories on this
2  account?
3      A   No.
4      Q   I'd like to have another document marked
5  as Exhibit 131.
6      A   By the way --
7      Q   Wait, wait, wait.
8          MS. MARTENY:  Put that one back.
9          THE WITNESS:  I have a question.
10         MS. MARTENY:  Wait.
11         (Thereupon, Plaintiff's Exhibit No. 131
12     was marked for identification.)
13 BY MR. SETTLEMYER:
14     Q   Mr. Juravin, could you take a look please
15 at Exhibit 131.
16     A   Okay.
17     Q   Let me know if you recognize that
18 document.
19     A   Not really.
20     Q   Do you see your handwriting or signature
21 on the document anywhere?
22     A   No, I don't.
23     Q   Look at the last page, page numbering 2245
24 at the bottom?
25     A   I do see that George opened the account

436

1  and allowed me to be assignee.
2      Q   So this is -- let me just state what I
3  think this is and you can tell me if you agree.
4  This is a set of Bank of America documents for Zero
5  Calorie Labs, Inc., and includes a last page, a
6  corporate signature card for an account ending 3195
7  for Zero Calorie Labs, Inc.  Do you agree?
8      A   Yes.
9      Q   And you agree this made you a signatory
10 for the Zero Calorie Labs, Inc.?
11     A   Yes.
12     Q   You were the only signatory on the Zero
13 Calorie Labs, Inc., correct?
14     A   I don't know.  I see only my name.  I see
15 that George Whiting opened it.  In other words,
16 George Whiting can at any minute close the account
17 and take the money.  So in other words, my
18 understanding is that he controls the account, but
19 I'm the one that can work with the money.
20     Q   Are you aware of anybody else who was a
21 signatory on the Zero Calorie Labs account?
22     A   Day-to-day it was only me.  And that's why
23 number 16 is a little bit surprising to me, because
24 it should be like 17, like 21.  That's why I'm
25 missing something here that basically says that

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555         PX7-7

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                   2/17/2017

---

437

1   always George opened the account and decided if --
2   and I'm the signature -- what do you call it?
3       Q   Signatory.
4       A   Yes. It's not here and I don't
5   understand.
6       Q   Let me just be clear about what you've
7   said about Exhibit No. 131. To the best of your
8   knowledge, you were the only signatory on that Zero
9   Calorie Labs account, correct?
10      A   Yes.
11      Q   What you're saying about the Bank of
12  America Roca Labs, Inc. account ending in 3550 is
13  that to the best of your knowledge, you were the
14  only signatory on that account; is that correct?
15      A   Yes. But the deal with George in the
16  beginning, before he learned to trust me, which was
17  about 2011, '12, '13, he said at any time if he
18  doesn't like something, he can close the account.
19  And I don't see the number 16.
20      (Thereupon, Plaintiff's Exhibit Nos. 132,
21  133 and 134 were marked for identification.)
22      Q   I have some documents marked as Exhibits
23  132, 133 and 134. Mr. Juravin, could you please
24  look at Exhibits 132, 133 and 134. And I'm also
25  going to hand you two other exhibits that go with

---

438

1   these that I'll bring over in just a moment that
2   were marked yesterday. Give back to you three of
3   the exhibits, Exhibit 6, 28 and 29. I'll hand you
4   those. While you're looking at those, I'm going to
5   take a two minute break, please.
6       (Thereupon, a brief recess was held off
7       the record and the proceedings continued as
8       follows:)
9   BY MR. SETTLEMYER:
10      Q   Mr. Juravin, you had a chance to look at
11  the exhibits that I handed you a few minutes ago?
12      A   1.5 minutes, yes.
13      Q   I'm going to ask you generally. Are you
14  personally familiar with the revenues that Roca
15  Labs, Inc. took in between 2010 through 2015?
16      A   For the record, I'm Jewish. We look only
17  at profits. Seriously, no, I'm not.
18      Q   You're not familiar with the revenue
19  stream for Roca Labs, Inc. for 2010 to 2015?
20      A   You just added the word stream. This is
21  the bottom line numbers. I never deal with it. I
22  never -- I just provide them with all the
23  information. They process -- they write whatever
24  they write.
25      Q   By them, who do you mean?

---

439

1       A   George.
2       Q   So anything that would have been revenue
3   for Roca Labs, Inc. in 2010 then you would have
4   given Mr. Whiting the documents that reflected all
5   that revenue, correct?
6       A   Yes. I'll help you out. I don't even
7   know how to read it. I just learn the word
8   advertisement, because I'm trying to sum up the
9   advertising. I really don't know the rules, the
10  laws, anything to do with text.
11      Q   I'm going to ask you some just specific
12  questions about the revenue for the different years.
13      A   For the record, I'll read it to you, but I
14  absolutely don't understand about it.
15      Q   I'm going to ask you whether you believe
16  that for 2010, was there any revenue for Roca Labs,
17  Inc. that was not reflected on the 2010 tax return?
18      A   I would not have any idea. I can tell you
19  that we thought money to the company and I know
20  comes only from credit cards. There is no cash
21  deals. There is no store. There is no benefits.
22  I'm not familiar with anything like that. So every
23  penny that we have must come from 1099. And the
24  1099 must reflect here. One year it did not
25  reflect. We were off by about 60 or 70,000. The

---

440

1   IRS send us something. We got a penalty. And
2   George learned a lesson to look at 1099, and not to
3   the bank account.
4       Q   Well, let me ask you this. In terms of
5   your understanding of what you gave to Mr. Whiting,
6   did the documents that you gave to Mr. Whiting
7   reflect all the revenue that Roca Labs, Inc. earned
8   in 2010?
9       A   I don't think I even give it to him,
10  because he got a 1099 or took the 1099 on his own.
11  He has access to the bank account. Always he has
12  access to the bank account. So I don't do much.
13      Q   So is there any revenue for Roca Labs,
14  Inc. in 2010 that was not reflected on the 1099's
15  that were submitted for 2010?
16      A   Not possible.
17      Q   So the answer is no?
18      A   The answer is not possible. It's, yes,
19  it's always there.
20      Q   All of it is reflected in the 1099?
21      A   Must, yes. To the best of my knowledge
22  that's the way it works.
23      Q   So for 2011, is there any revenue for Roca
24  Labs, Inc. that is not reflected on the 2011 tax
25  return marked as Exhibit 132?

---

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX7-7a

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

---

445

1     Q   Thank you for clarifying that.  Let's look
2  at Exhibit 134 for the Roca Labs, Inc., 2015 tax
3  return.  And you agree that this is Roca Labs,
4  Inc.'s 2015 tax return, correct?
5     A   That's what I see.  It's gibberish to me.
6     Q   I just want to make sure that the record
7  is clear that we're all looking at the same document
8  when I ask the question.
9        Are you aware of any revenue other than
10 what's shown on this 2015 tax return that Roca Labs
11 received in 2015?
12    A   No, I don't.
13    Q   And, again, the overwhelming majority of
14 any revenue received by Roca Labs, Inc. in 2015
15 you're saying would be reflected on the 1099 from
16 card processors, correct?
17    A   Yes.
18    Q   Other than that, there's no income aside
19 from maybe these one off checks from customers that
20 would be -- have been received by Roca Labs in 2015;
21 is that right?
22    A   Yes.  My numbers from yesterday were not
23 off; the advertisement.
24    Q   Sounds like you're clarifying some
25 testimony from yesterday.  Do you want to elaborate?

---

446

1     A   I'm just saying that my gut feeling was
2  right, that it's about 35, 40 percent advertisement
3  versus revenues.
4     Q   So if we looked at total revenues of Roca
5  Labs, Inc. over the entire period of 2010 through
6  2015, approximately 35 percent of those revenues --
7     A   More.
8     Q   Or more?
9     A   About more.  Because I know more expenses.
10 I know the numbers day-to-day.
11    Q   Let me just finish so we got a clear
12 record.  So about 35 percent of the total revenue
13 for the 2010 through 2015 revenue period for Roca
14 Labs would be advertising expenditures?
15    A   My guess, yeah.  Rough, the numbers, yes.
16 It's more than that.
17    Q   So Mr. Juravin, you're making this current
18 statement about your recollection of what the
19 advertising revenue for -- I'm sorry -- the
20 advertising expenditures for Roca Labs, Inc. based
21 on your review today of these tax returns we've just
22 looked at, correct?
23    A   Yes.
24    Q   And what is your current best estimate --
25 and if you need to take a minute to think about it

---

447

1  some more, please do.  But what's your current best
2  estimate of the total advertising expenditures by
3  Roca Labs, Inc. from 2010 to 2015?
4     A   About $12 million.
5     Q   You think the advertising expenditures for
6  Roca Labs, Inc. over the course of 2010 through 2015
7  was $20 million?
8     A   Twelve.
9     Q   $12 million.  Okay, thank you.  I'm sorry,
10 I couldn't hear you.
11    A   It's me.  Yes, 12.
12    Q   Now of the money that was received as
13 revenue from Roca Labs, Inc. from 2010 to 2015, if
14 12 million was for -- roughly was for advertising
15 expenditures, what's your understanding of what the
16 breakdown was of the remaining?
17    A   Twelve.  24 minus 12.
18       MS. MARTENY:  Listen.  Not the amount of
19    the remaining.
20 BY MR. SETTLEMYER:
21    Q   Let's go this way.  What is your -- let's
22 do the math.  What do you think the total revenues
23 were based on your review just now of Roca Labs,
24 Inc. from 2012 through 2015?
25    A   I think the number was 24 or 27 million.

---

448

1     Q   Did you just do a calculation?
2     A   I count up the money that we spend.  But
3  you provided in the claim the number of about 25, 24
4  point something.
5     Q   So would you then estimate that there was
6  a remaining 12 million that was not spent on
7  advertising for Roca Labs, Inc.?
8     A   Correct.
9     Q   So how much of that $12 million that was
10 not spent on advertising did you personally receive
11 from Roca Labs in the years 2010 through 2015 in
12 whatever capacity that you personally received?
13    A   My guess was like yesterday, about seven.
14    Q   How would you derive a concrete number
15 about that if you wanted to come up with a
16 definitive answer?
17    A   Let me start with the bottom.
18    Q   Okay.
19    A   And the bottom has two meanings.  I am in
20 the bottom.
21    Q   I'm sorry.  Say that again, please.
22    A   I said let's start from the bottom.
23    Q   Okay.
24    A   Because I am in the bottom.
25    Q   Okay.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555            PX7-8

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                              2/17/2017

449

1    A   It's not okay.  I have zero now.  I lost
2  about $5 million I think -- no, about six or
3  $7 million in stock.  I have zero now.
4  Actually, I'm in the minus of 800,000.  I'm in the
5  minus of 800,000.
6    Q   I think you're not answering my question.
7  I don't want to cut you off because you're starting
8  off with how much money you have, and I want to just
9  make sure I understand how much Roca Labs
10  transferred to you personally.
11    A   This is how I --
12    Q   If you want to think about that for a
13  moment, just give me a bottom line number.
14    A   It's about seven.  Because I spend every
15  year half a million dollars.  I spend half a
16  million.  I had to pay tax, which I had to pay tax
17  of about a million per year.  So when you do all of
18  these numbers all together, I would guess that I
19  received about the seven million.  I lost about six.
20  I lived off the rest.  I have zero.
21    Q   I just want to make very clear that you
22  mean $7 million, correct?
23    A   Yes.
24    Q   Since we're being formal and on the
25  record.

450

1    A   Yes.  So that's why I say from the bottom.
2  I think that's what I received.
3    MR. SETTLEMYER:  Pause for a moment.  Get
4  some more documents.
5    (A brief recess.)
6  BY MR. SETTLEMYER:
7    Q   Mr. Juravin, I'm handing you a document
8  marked as Exhibit 15.  Take a look at that for a
9  moment and tell me if you recognize Exhibit 15,
10  please.
11    A   Yes, I do.
12    Q   What is Exhibit 15?
13    A   Do you like the fact --
14    Q   Tell me what you think the document is
15  without the explanation.  I just want to get a clear
16  record of what you think this is.  Very simple
17  level.
18    A   Restructuring agreement between George and
19  I.
20    Q   I just want to confirm.  You personally
21  entered into this restructuring agreement with
22  Mr. Whiting; is that correct?
23    A   Yes.
24    Q   Okay, that's all I want.  We can put it
25  away.  That's it.  I believe we have some testimony

451

1  on the record about what the meaning of the document
2  is.  So I'm not going to belabor that.
3    Mr. Juravin, you testified previously
4  about your authorizing expenditures from Zero
5  Calorie Labs' bank accounts.  I just want to ask
6  very specifically.  Were you responsible for
7  authorizing expenditures from Zero Calorie Labs'
8  bank account ending in 3195?
9    A   Yes.
10    Q   And this was with Bank of America,
11  correct?
12    A   Yes.
13    Q   So any expenditures on individuals --
14  payments to individuals listed in those bank
15  accounts for services performed for Roca Labs, Inc.
16  are the ones that you would have authorized,
17  correct?
18    A   I will authorize -- I will send them the
19  payment.
20    Q   Okay.
21    A   But it doesn't mean that I know them or
22  that I worked with them personally.  As I mentioned,
23  Sharon can tell me, you send the money to this guy.
24  I say, what is the bank account, and I will send.
25    Q   But, yes, you were the one who would have

452

1  been responsible for hitting the button to authorize
2  that?
3    A   Yes.
4    Q   Similarly, any payments to Google and
5  Facebook that would have shown up in Zero Calorie
6  Labs' Bank of America account ending in 3195, you
7  would have authorized those as well, correct?
8    A   Advertisement is not supposed to come from
9  Zero Calorie Labs, number one.  Number two, this is
10  something done automatically by the companies.  It's
11  not that I'm -- it's not automatically.  You give
12  them the card.  They take the money.  You give them
13  the card and then they take the money, whatever they
14  take.
15    Q   Let me ask the question.  If there were
16  any expenditure to Google, Inc. from the Zero
17  Calorie Labs Bank of America bank account ending in
18  3195, would you have been the one to have ultimately
19  authorized that?
20    A   Yes.  This is something that Whiting
21  probably will spank me for because it's not supposed
22  to be.
23    Q   So even if it was incorrect from your
24  internal procedures to do it that way, that would
25  still have been something you personally authorized?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555                    PX7-8a

FTC v. Roca Labs, Inc., et al.                                    2/17/2017

453

1    A   Yes.  And it's incorrect from all
2  procedures, not just from Whiting's.
3    Q   After the turn of 2013, there was a new
4  bank account opened for Zero Calorie Labs, Inc. at
5  Wells Fargo, correct?
6    A   Yes.
7    Q   Were you personally responsible for
8  authorizing expenditures from the Zero Calorie Labs
9  Wells Fargo account?
10   A   Yes.
11   Q   And, again, any payments authorized from
12 that account, you would have been personally
13 responsible for authorizing?
14   A   Yes.
15   Q   Did Zero Calorie Labs make payments to
16 individuals performing work for Roca Labs through
17 purchases of money orders from Wal-Mart?
18   A   I'm not clear.  Say it again, please.  I
19 don't think you worded -- you did not word it right.
20   Q   I probably did not.
21   A   We did not have money orders.  But what
22 you read is us sending money through Money Gram or
23 Western Union.
24   Q   So let me ask the question.
25   A   That's why I got confused.  We don't have

454

1  this.
2    Q   Then that may be more of a succinct way to
3  put it.  So Zero Calorie Labs would send payments to
4  individuals who performed work for Roca Labs by
5  using money grams?
6    A   I'm sorry, but you all the time saying
7  that the work was -- they were contracted by Zero
8  Calorie Labs, and the beneficiary was Roca Labs.
9    Q   But they did the work for the benefit of
10 Roca Labs?
11   A   Yes.
12   Q   The question is still Zero Calorie Labs
13 would make payments to those individuals who worked
14 for the benefit of Roca Labs, Inc.?
15   A   Yes.
16   Q   Made them by money gram?
17   A   Yes, Western Union.
18   Q   By Western Union as well.  Thank you.
19       In terms of Zero Calorie Labs'
20 expenditures, did Zero Calorie Labs have a -- in the
21 2012 time frame a bank card that was used for
22 expenditures?
23   A   What is bank card?  Debit or credit or
24 either you mean?
25   Q   Or either.

455

1    A   That's okay.  Either is okay.  Yes.
2  Either is okay.
3    Q   So for any -- why don't I go ahead just
4  for clarity and introduce this document as an
5  exhibit.
6       (Thereupon, Plaintiff's Exhibit No. 135
7       was marked for identification.)
8       Mr. Juravin, I've had marked as Exhibit
9  135 a document that you've just been handed.  Can
10 you take a look and tell me if you recognize Exhibit
11 135, please.
12   A   We never met, but yes.  Just a second.
13 Yeah.
14       MS. MARTENY:  The question is whether you
15 recognize it?
16       THE WITNESS:  Yes.
17 BY MR. SETTLEMYER:
18   Q   So what is Exhibit 135?
19   A   Looks like a bank statement for June
20 through July.
21   Q   Well, there's several different statements
22 all together as a composite exhibit.  Would you
23 agree that they run from the June 20, 2012 period
24 through December -- actually, there's not a
25 consecutive set.  But they include one going up

456

1  through January 2014.
2    A   Yes, I agree.
3    Q   These are all statements for Zero Calorie
4  Labs, Inc. account; is that correct?
5    A   Yes.
6    Q   So would you agree that looking at as an
7  example of a page marked at the bottom 1441 that I
8  marked as a red flag that you can turn to, that
9  expenditures from this account going to Facebook are
10 expenditures that you personally authorized?
11   A   Yeah, and I see that Dr. Whiting was also
12 using it; that George also used it.  And maybe I was
13 wrong earlier and he did authorize.  And he did want
14 to use this account for other purposes.  So maybe I
15 was wrong.
16   Q   But at least the expenditures for Facebook
17 were for advertising for Roca Labs, correct?
18   A   Yes.
19   Q   We're done with that one.
20   A   And also for buying raw materials.
21   Q   And you see -- what expenditure are you
22 looking at there?
23   A   Raw materials.
24   Q   What particular line are you talking?
25   A   TIC Gums.

13 (Pages 453 to 456)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555          PX7-9

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                   2/17/2017

457

1      Q   TIC Gums is a raw materials provider for
2   Roca Labs, Inc.?
3      A   Yeah.
4      Q   And that was an expenditure that you
5   authorized as well, correct?
6      A   Yeah.  We didn't buy bubblegum for
7   $12,000.
8         MS. MARTENY:  We're done with that.
9         THE WITNESS:  Since I see that we used it
10        for business expenditure more than just HR, I
11        have to revise what I told you earlier.  So
12        probably my memory did not serve me well, and
13        we did use it more extensively than I thought.
14   BY MR. SETTLEMYER:
15     Q   By it you mean Zero Calorie Labs?
16     A   Yes.
17     Q   Let's take a look at a couple of exhibits
18   that we have previously been introduced.  We're
19   going to look at Exhibits 18, 19 and 20 again.
20        Mr. Juravin, take a moment and just look
21   through those three exhibits and tell me if you
22   recognize --
23     A   It looks like -- it looks like Amex credit
24   card expenditures for the cards ending with 006, and
25   for the periods of 2014, 2013.  And another card I

458

1   see here 009.
2      Q   And you recognize those statements?
3      A   I guess they are authentic statements from
4   Amex.
5      Q   Would you agree that you were the one who
6   personally authorized any expenditures for
7   advertising platforms Google Yahoo, Facebook, and
8   Microsoft that are reflected in those three sets of
9   statements?
10     A   Yes.  And we agreed to call them
11   advertisement platforms or platforms one word.
12     Q   I didn't want to assume that carried over.
13   I just want to be very clear.
14     A   Yes.
15     Q   Mr. Juravin, a little while ago we talked
16   about a Bank of America account for Roca Labs, Inc.
17   that ends with the number 3550.  Do you recall that?
18     A   Yes.
19     Q   Any expenditures by Roca Labs, Inc. from
20   that bank account would have been expenditures that
21   you personally authorized, correct?
22     A   Yes.
23     Q   So any expenditures for -- strike that.
24     A   By the way, no disrespect on the phone.
25   It's regarding the case and me transferring

459

1   information regarding this case.  I'm not doing
2   anything disrespectful.
3      Q   You don't need to apologize to me.  If it
4   becomes a distraction, I'll let you know.
5         Mr. Juravin, in 2013, did Roca Labs, Inc.
6   open a bank account with Wells Fargo?
7      A   If you have something in your hands, you
8   know better than me.
9      Q   Well, tell you what --
10     A   Why would you make me guess?
11     Q   I'm asking your recollection.  Why don't
12   we simplify things by introducing exhibits.
13     A   By now you know how many bank accounts.
14        (Thereupon, Plaintiff's Exhibit No. 136
15   was marked for identification.)
16     Q   Okay.  Mr. Juravin, do you recognize the
17   document that I marked as Exhibit 136?
18     A   Yes.  It looks like Roca Labs bank account
19   relating to the period of 2013, and account ending
20   with 8933.
21     Q   With Wells Fargo, correct?
22     A   With Wells Fargo.
23     Q   Yes.  And you recognize this as a bank
24   account that Roca Labs, Inc. used?
25     A   Yes.

460

1      Q   Were you the sole signatory on this bank
2   account?
3      A   I think so.
4      Q   So any expenditures from this account
5   would have been expenditures that you personally
6   authorized, correct?
7      A   Yes.  This is something you guys printed?
8   You guys use quality paper.
9      Q   Might have been.  I don't know.  Oh, you
10   mean the actual physical document?
11     A   Yeah.  We just bought for the company a
12   ream, a box.
13        MR. DAVIS:  Would you like go to off the
14        record, Carl?
15        MR. SETTLEMYER:  Yeah.  We're off the
16        record.
17        (A brief recess.)
18   BY MR. SETTLEMYER:
19     Q   Mr. Juravin, I think we spoke yesterday
20   about a company, another Defendant, Roca Labs
21   Nutraceutical, correct?
22     A   Yes.
23     Q   That's a company that you personally
24   helped to create; is that correct?
25     A   I created.

14 (Pages 457 to 460)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555            PX7-10

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                           2/17/2017

461

1      Q   I want to ask you to look at several
2  documents that were previously marked as Exhibits
3  21, 22 and 23.  Let's start with No. 21.  I'm going
4  to ask you if you recognize Exhibit 21.
5      A   And we decided to call it RLN to keep it
6  short.
7      Q   I'll try to use that as an acronym.
8      A   Yeah.  Okay.  I see documents from SunBiz.
9      MR. DAVIS:  I just handed the documents
10  21, 22 and 23.
11      MR. SETTLEMYER:  Thank you.
12      THE WITNESS:  Okay.
13  BY MR. SETTLEMYER:
14      Q   So you agree that you submitted the
15  documents or asked someone to submit the documents
16  to create Roca Labs -- RLN, correct?
17      A   Yes.
18      Q   Let's look at Exhibit 22, please.  Tell me
19  please if you recognize Exhibit 22.
20      A   Yes, I do.
21      Q   What is Exhibit 22?
22      A   Looks like RLN opened a business account
23  and I'm the sole signature.
24      Q   And this is a Bank of America account
25  ending in 5888, correct?

462

1      A   Yes.
2      Q   Let's look at Exhibit 23, please.  Do you
3  recognize Exhibit 23?
4      A   Yes.
5      Q   Do you recognize these as bank statements
6  for RLN with the Bank of America account ending
7  5888, correct?
8      A   Yes.
9      Q   And these would run from it appears
10  March 2014 through February 2015, correct?
11      A   Yes.
12      Q   You would agree that the expenditures made
13  from this bank account are expenditures that you
14  personally authorized, correct?
15      A   Yes.
16      (A brief recess.)
17      Q   Mr. Juravin, I've handed you several
18  exhibits that were marked previously Exhibits 33,
19  34, 35, 36 and 39.  So we have the same --
20      A   Yes, we do.
21      Q   -- number two.  So before I get into the
22  details on that, let me just ask more generally.
23      You've testified previously both today and
24  in your September 2016 deposition about the company,
25  Must Cure Obesity Co., correct?

463

1      A   Yes.
2      Q   We've referred to that for short as MCO,
3  correct?
4      A   Yes.
5      Q   My understanding is that you have at all
6  times been the sole owner of MCO, correct?
7      A   Yes.
8      Q   And you created MCO, correct?
9      A   Yes.
10      Q   And you're the sole office of MCO,
11  correct?
12      A   Yes.
13      Q   I'd like to have you look at Exhibit 33,
14  and tell me if you recognize the documents in
15  Exhibit 33.
16      A   Yes, I do.
17      Q   What is Exhibit 33?
18      A   Opening of a bank account with me being as
19  sole signature.
20      Q   This is a bank account with Bank of
21  America in the name of Must Cure Obesity Co. with
22  the account ending in 9288, correct?
23      A   Yes.
24      Q   Is that account still in use today?
25      A   No.

464

1      Q   It's not?
2      A   No.
3      Q   And this was created in December, end of
4  December 2014, correct, this bank account?
5      A   Yes.
6      Q   Let's move on to Exhibit No. 34, please.
7  Do you recognize Exhibit 34?
8      A   It looks like -- I'm sorry.  It looks like
9  MCO AmEx card ending with 005 for February 2015.
10      Q   And this is Amex account ending 01005,
11  correct?
12      A   Yes.
13      Q   Expenditures made on this card are those
14  that you personally authorized, correct?
15      A   Yes.
16      Q   Was anybody else authorized to use this
17  card?
18      A   There are a couple of them.  Sharon King
19  had a card and my wife, Anna Juravin, had a card.
20  And they used it also for the business expenditures,
21  but it's still in my responsibility.
22      Q   Let's look at Exhibit No. 35, please.  Do
23  you recognize Exhibit 35?
24      A   Yes.
25      Q   What is Exhibit 35?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555                PX7-11

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                    2/17/2017

465

1    A   Chase Bank account for MCO account ending
2  7028 for the period of July 2015 all the way till
3  the end of 2015.
4    Q   You agree that any expenditures off of
5  this account shown in these statements would be
6  those you personally authorized?
7    A   Yeah, I guess so.  I'm the one who has
8  access to it, yes.
9    Q   Would anybody else have ability to
10  authorize any transactions on this account without
11  your approval?
12    A   No, it's me.
13    Q   Let's look at Exhibit 36, please.  Can you
14  identify Exhibit 36?
15    A   Yes.  Chase Bank account ending with 7028
16  for the year 2016 ending with 7028.
17    Q   For Must Cure Obesity?
18    A   Must Cure Obesity, MCO.
19    Q   Again, for this time period, you would
20  have been the person to authorize any expenditures
21  from this account, correct?
22    A   Yes.
23    Q   Would anybody else have been personally
24  authorized to make expenditures off this account
25  without your approval?

466

1    A   No.
2    Q   Let's look at Exhibit No. 39, please.  Can
3  you identify Exhibit 39, please?
4    A   Chase Bank account ending with 7028 for
5  MCO, January 2017.  How did I do?
6    Q   You would have been the sole person to
7  authorize the expenditures shown on this statement?
8    A   Yes.
9    Q   Mr. Juravin, I've handed you a document
10  marked as Exhibit 30 previously.  Do you recognize
11  Exhibit 30?
12    A   Yes.
13    Q   What is Exhibit 30?
14    A   It's a document from SunBiz and it shows
15  the formation of MCO.
16    Q   You were responsible for the formation of
17  MCO, correct?
18    A   Yes.
19    Q   Mr. Juravin, earlier you discussed the
20  fact that you personally were authorizing lawsuits
21  on behalf of Roca Labs, Inc.  I'm going to hand you
22  a couple of documents that we have looked at
23  previously and ask you if you can identify pages --
24  I'm going to ask you if you can identify documents
25  and then we'll turn to certain pages.  These are

467

1  documents previously marked as Exhibits 43 and 44.
2  One of the things I'm going to ask you is whether
3  you recognize these documents as having your
4  signature on the verification?
5    A   Yes, it does.
6    Q   Let's start --
7    A   The document Exhibit 43, Roca Labs versus
8  Consumer Opinion Court, and the case number is
9  2014-CA-04769-NC, and it has my signature on it.
10    Q   And your signature is on the last page,
11  the verification page?
12    A   Correct.
13    Q   Let's look at Exhibit 44.  Do you
14  recognize Exhibit 44?
15    A   Yes.  Exhibit 44 is Roca Labs versus
16  Consumer Opinion Corp, Case No.
17  8:14-cv-2096-T33-EAJ, and it has my signature as
18  the -- yes, it has my signature.
19    Q   And that's on page 19298?
20    A   Yes.  That's what you do in law school?  I
21  didn't really need to read the entire case number,
22  right?
23    Q   That you probably didn't?
24    A   No, I didn't.
25    Q   Mr. Juravin, since the FTC filed its

468

1  lawsuit against Roca Labs in September of 2015, we
2  know you've been deposed on September 2016 in
3  connection with this case as well as testifying
4  Wednesday and yesterday.  There were also I believe
5  a couple of depositions of you taken in another
6  litigation involving Jody Barnes; is that correct?
7    A   Yes, but not in the last few months or
8  something.
9    Q   Well, I'm just going to ask you.  Do you
10  recall there was a deposition of you in Sarasota in
11  March of 2016 in connection with the Barnes case,
12  correct?
13    A   For some reason I don't recall it.  But if
14  you have it there, then yes we did.
15    Q   Do you recall having been deposed in the
16  Jody Barnes case?
17    A   Yes, yes, yes.  Now I do recall.  It was
18  in the courthouse and I do recall now.
19    Q   And that would have been in March of 2016?
20    A   Yes.
21    Q   There was another date in April of 2016,
22  correct?
23    A   I'm not sure about the date.  I just
24  remember I was deposed and it was long ago.
25    Q   But it was twice in 2016, do you recall

16 (Pages 465 to 468)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555          PX7-12

FTC v. Roca Labs, Inc., et al.                                          2/17/2017

469

1   that?
2       A    No, don't test my memory.  If you have it
3   there, then that's what it is.  If not, Attorney
4   Whitney Coin will give you the transcripts.
5       Q    Did April Goodwin represent you at those
6   depositions?
7       A    I think it was Whitney.  I think it was
8   Whitney Coin.  Maybe April.  I think both of them.
9       Q    You say that you thought the deposition or
10  depositions in the Barnes case were long ago.  How
11  long ago do you think they were?
12      A    It's my mind.  When I say long ago, you
13  know, sometimes I can remember something when I was
14  18.  But I would not remember something from six
15  months ago.  It's the human brain, you know, it's
16  selective.
17      Q    Well, let me just say I'm not trying to
18  test your, you know, memory of the specific date.
19  I'm just trying to overall understand all of the
20  occasions in the past two years on which you were
21  deposed in any other case or have given any sworn
22  statements in other cases?
23      A    I got it.  So Barnes is one.
24      Q    Barnes is one?
25      A    But if you would not have reminded me, I

470

1   would say no.  Barnes is one.  No, but if my
2   attorney can ask April.  April maybe knows.
3       Q    Do you recall being deposed on two
4   separate dates in the Barnes case?
5       A    Yes, I think so.  I think it was more than
6   one day.
7       Q    The class action lawsuit in California,
8   the Lake versus Roca Labs, Inc., you also within the
9   past year gave a declaration that we looked at
10  yesterday, correct?
11      A    Okay.
12      Q    I mean, I can find it if you would like me
13  to --
14      A    Larry sends me the papers and says sign
15  here, here and here.
16      Q    Aside from the Barnes depositions and the
17  depositions you've given in the FTC case, are there
18  any other times in any other cases in the past two
19  years where you've been deposed?
20      A    I don't think so.  But as I mentioned
21  earlier, I told you earlier that if you would not
22  have said Barnes, I would say no.  And you mentioned
23  Barnes.  So I think the safe things to do is to ask
24  April if she knows.  Because April almost for sure
25  will know.

471

1       Q    So in terms of our ability to obtain any
2   transcripts of any depositions that you've been --
3   that you've given in the past two years, are you
4   saying that your counsel would be able to search for
5   and provide those to you us?
6       A    She will know better than me.  She will
7   remember it better.
8       Q    Is there anybody else who would remember
9   better than her?
10      A    No.
11      Q    In terms of any sort of declarations,
12  affidavits or other sworn written statements you've
13  given in any case in the past two years other than
14  in this case, and I'm not sure if there are any
15  other than the one we referred to in the Lake case,
16  are there any other sworn written statements you
17  provided in litigation in the past two years?
18      A    I give my wife at least once a week a
19  sworn statement, but it's orally.  I will ask April
20  and I will try to search if I have something like
21  that.  But I don't know the definitions of the
22  documents that I sign.  So I don't know if it's
23  called declarations or whatever it is that you call
24  it.  I don't know.  But I can search for it.  It's
25  part of hallmark.

472

1       Q    But as you're sitting here today, you
2   don't recall any other documents like that, that
3   you've done in the past two years, correct?
4       A    No, I don't.
5       Q    There's another company that I believe
6   you've probably testified about on your September
7   deposition called Juravin Incorporated, correct?
8       A    Yes.
9       Q    You're the sole owner of Juravin
10  Incorporated, correct?
11      A    Yes.
12      Q    You've been at all times the sole owner of
13  Juravin Incorporated; yes?
14      A    Yes.
15      Q    And you founded Juravin Incorporated,
16  correct?
17      A    Yes.
18      Q    I'm going to have some exhibits marked and
19  I'll have you take a look at all of them on a short
20  break, and then we'll just talk about them briefly I
21  hope.  I'll have these marked and then we'll hand
22  them to you.
23      A    It's not hope.  You are in complete
24  control.  You make the decisions if it's short or
25  long.  And I think I'm doing better and less

17 (Pages 469 to 472)

FTC v. Roca Labs, Inc., et al.                                              2/17/2017

---

473

1    lengthier than yesterday.  By the way, the fact that
2    I got from my eye doctor the prescription and go
3    online and buy whatever I want --
4         (A brief recess.)
5         (Thereupon, Plaintiff's Exhibit Nos. 137 -
6    141 were marked for identification.)
7    BY MR. SETTLEMYER:
8         Q   So Mr. Juravin, we handed you some
9    documents that have been marked as Exhibits 137
10   through 141.  Let's start with Exhibit 137.  Do you
11   recognize Exhibit 137?
12        A   It is the incorporation of Juravin Inc.
13   And I see my signature there.  That's mine.
14        Q   And you're personally responsible for
15   having submitted that paperwork, right?
16        A   Yes.
17        Q   And then let's look at Exhibit 138.  Do
18   you recognize Exhibit 138?
19        A   Yes.
20        Q   What is Exhibit 138?
21        A   The opening of bank account ending with
22   5833 in Bank of America for Juravin Incorporated,
23   and I'm the sole signee.
24        Q   Is this account still in use?
25        A   No.

---

474

1         Q   Let's go to Exhibit 139.
2         A   Okay.
3         Q   Do you recognize Exhibit 139?
4         A   It looks like a tax return, 2014, for the
5    company Juravin Incorporated.
6         Q   Did you provide the information used to
7    prepare the tax return for Juravin Incorporated for
8    2014?
9         A   Either yes or no.  I'm responsible for it.
10        Q   I'm trying to just find out first of all
11   if you have a personal specific understanding of
12   what documents were provided I'm assuming to an
13   accountant to generate this tax return?
14        A   I am.  But I'm not providing.  I'm just
15   giving access to the bank account to George and
16   George does the rest.  So I'm not really giving or
17   providing, but I am responsible.  I am signing on
18   it.  I'm responsible one way or another.
19        Q   I just want to make sure that I'm
20   understanding.  So did George Whiting prepare this
21   tax return, 139?
22        A   I think that this one, the '14 and '15,
23   this is the four, five, six months that we work
24   diligently, and everybody was doing everything
25   together, gathering information, and putting all

---

475

1    together.
2         MS. MARTENY:  Listen to the question.
3    BY MR. SETTLEMYER:
4         Q   Do you believe Mr. Whiting prepared the
5    2014 tax return for Juravin Incorporated; yes or no?
6         A   He was involved.
7         Q   Was the accountant, Mr. Hershkowitz also
8    involved?
9         A   No.
10        Q   So it would have been primarily then you
11   and Mr. Whiting preparing this tax return?
12        A   No.
13        Q   Who else?
14        A   Nathan Smith.
15        Q   Who is he?
16        A   Another accountant.
17        Q   Is he with Hershkowitz or some other?
18        A   Some other.
19        Q   So you, Mr. Whiting, and Mr. Smith from
20   your recollection were involved in preparing the
21   Juravin Incorporated 2014 tax return, correct?
22        A   Yes.
23        Q   What sources of information were used to
24   calculate the amounts shown in this tax return?
25        A   Everything I have they ask for all the

---

476

1    information, and I just acted upon it and gave them
2    everything.
3         Q   What is everything?  Can you be more
4    specific.
5         A   Bank account, 1099's, expenditures,
6    whatever necessary to prepare this tax return.
7         Q   You see on line six of the 2014 tax
8    return, Exhibit 139, that there is total income
9    shown of $665,209.87, correct?
10        A   Yes.
11        Q   What is the source of that income?
12        A   The source of that income -- I'm trying to
13   say it without being too lengthy -- is reimbursement
14   for advertisement.  Juravin Incorporated is supposed
15   to do advertisement and hold the trademarks.  So
16   some of the advertisement I'm trying to establish it
17   as an advertisement company.  So instead of Roca
18   Labs paying directly to Google let's say, Juravin
19   Incorporated will pay to Google and Roca Labs will
20   reimburse or pay 10 percent override to Juravin.
21        Q   So then the entities paying money to
22   Juravin Incorporated that are reflected in that
23   income number would have been either Roca Labs
24   Nutraceutical or Roca Labs, Inc or Muscular Obesity?
25   Is that your testimony?

---

18 (Pages 473 to 476)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

---

477

1       A   Not Muscular Obesity, but the other two.
2       Q   2014 Muscular Obesity didn't exist,
3    correct?
4       A   Yes.
5       Q   Let's move on to Exhibit 140.  Tell me if
6    you recognize Exhibit 140, please?
7       A   The same as earlier, but for 2015.  Tax
8    return for Juravin Incorporated, 2015.
9       Q   Was it you and Mr. Whiting, and what's the
10   other gentleman's name?
11      A   Nathan Smith.
12      Q   Nathan Smith who prepared this 2015 tax
13   return?
14      A   Yes.
15      Q   What information went into -- was used to
16   prepare the figures shown in the 2015 tax return?
17      A   Bank records, expenditures, credit cards,
18   everything necessary to prepare it.
19      Q   And you personally made that information
20   available to the team preparing this?
21      A   Yes.
22      Q   The gross receipts shown on the 2015 tax
23   return of $1,435,758.98, what was the source of
24   those gross receipts?
25      A   I think you read it incorrectly.

---

478

1       Q   Please read it correctly.
2       A   I think you read line 1C instead of six.
3       Q   Well, let's -- I see, you're correct.
4    Let's look at line six total income.  That's
5    $1,722,218.29; is that correct?
6       A   Yes.
7       Q   What's the source of that income?
8       A   One of the other companies paying for the
9    advertisements.
10      Q   So in 2015, one of the other companies
11   would have either been Muscular Obesity or Roca Labs
12   Nutraceutical?
13      A   MCO, RL or RLN.
14      Q   By RL you mean Roca Labs, Inc., correct?
15      A   Yes.
16      Q   Look at Exhibit 141, please.  And I don't
17   have really have any question about this.  But you
18   recognize this as the answer filed by Juravin
19   Incorporated to the FTC's First Amended Complaint in
20   this case, correct?
21      A   Okay.
22      Q   You agree with that?
23      A   Yes.
24      Q   Let's take a look at some documents that
25   have been introduced previously.  I'm done with that

---

479

1    one.  I'm going to hand Mr. Juravin documents that
2    were previously marked as Exhibits 81 through 84.
3    If you could take a moment and look through those.
4    I'll have a couple of questions.
5            Mr. Juravin, do you recognize the document
6    that's been marked as Exhibit 81?
7       A   Yes.
8       Q   What is Exhibit 81?
9       A   It's a Plum card AmEx belonging to the
10   card Juravin, card ending with 002, and it's for the
11   period of 2014.
12      Q   Are you the sole signatory on this
13   account?
14      A   Yes.
15      Q   So any expenditures shown in these
16   statements would be authorized by you, correct?
17      A   Yes.
18      Q   And those include expenditures for
19   advertising platforms, correct?
20      A   Yes.
21      Q   Let's take a look at Exhibit 82.  Tell me
22   if you recognize Exhibit 82, please.
23      A   Exhibit 82 belongs to the company Juravin,
24   Bank of America, account ending 5833.  And it's from
25   March 2014 till the end of 2000 -- I'm sorry.

---

480

1    March 2014 till end of February 2015.
2       Q   Are you the sole signatory on this
3    account?
4       A   Yes.
5       Q   Any expenditures made on this account
6    would have been authorized by you, correct?
7       A   Yes.
8       Q   Let's go to Exhibit 83.  Do you recognize
9    Exhibit 83?
10      A   Exhibit 83, Plum card AmEx, Juravin,
11   ending with 008 for the period of September
12   through -- just for September.
13      Q   Of 2015, correct?
14      A   Yes.
15      Q   So, yes, you recognize it, right?
16      A   Yes.
17      Q   You're the sole signatory on this account?
18      A   Yes.
19      Q   And any expenditures on that account would
20   have been authorized by you, correct?
21      A   Yes.
22      Q   Let's look at Exhibit No. 84, please.
23      A   Chase account ending 8193, Juravin
24   Incorporated, period of September 2015.
25      Q   You recognize this account?

---

19 (Pages 477 to 480)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                           2/17/2017

481

1      A   Yes.
2      Q   You're the sole signatory on this account,
3   correct?
4      A   Yes.
5      Q   And any expenditures shown on this
6   statement you would have authorized, correct?
7      A   Yes.
8      Q   I'm going to back up to ask you about 83,
9   just one additional question.  Is the American
10  Express account in Exhibit 83 still in use?
11     A   Yes. Yes.
12         MR. SETTLEMYER:  Why don't we take a two
13     minute break and I'll gather up some additional
14     documents.
15         (Thereupon, a brief recess was held off
16     the record and the proceedings continued as
17     follows:)
18  BY MR. SETTLEMYER:
19     Q   Mr. Juravin, I want to hand you documents
20  18, 19 and 20.  Exhibits 18, 19 and 20.  Just to
21  refresh your recollection if you need that.  The
22  American Express accounts for those statements, are
23  they still active accounts?
24     A   No.
25     Q   Are either one active?

482

1      A   No.
2      Q   Okay.  Thank you.
3          Mr. Juravin, I want to ask you about the
4   types of -- some of the activities of companies
5   you've been involved with.  We talked about Roca
6   Labs, Inc., Roca Labs Nutraceutical and Muscular
7   Obesity.  I want to ask you this in terms of your -- in
8   your capacity as a corporate representative in light
9   of just one or two documents that we understand are
10  being produced to us today just so I understand what
11  we're getting.  I understand we're getting one
12  document produced to us that is a set of customer
13  information from a platform called Infusionsoft; is
14  that correct?
15     A   Yes.
16     Q   Can you describe for me what that
17  Infusionsoft record is that's being produced to us?
18     A   And I would like also to explain why you
19  didn't have it before.
20     Q   Okay, that's fine, too.  But start with
21  what is it we're getting.
22     A   You're getting the customer database of
23  name of the customer -- I'm sorry.  You're getting a
24  database.
25     Q   Okay.

483

1      A   It has customers.
2      Q   Yes.
3      A   And it has people that just inquired and
4   they are not customers.
5      Q   Okay.
6      A   More than half of them of course not
7   customers.  They just inquired.  And at that time,
8   as we are as a small business we all the time
9   evolved all the time ideas.  At that time we wanted
10  to see if people are serious.  So we asked them to
11  place a credit card.  And we charged their credit
12  card one dollar to see that it's valid; to see if
13  they are serious about the purchase.  And then at a
14  later time we learned that the one dollar always the
15  credit card goes through.  So then we charge $17.
16  And then we apply those amounts to the purchase.
17  And if they decided not to purchase, it was just
18  returned to them.  It's called capture.  We capture
19  it and return it.
20         So when you look at all of them, not all
21  of them are real customers.  Only those that you
22  will see that paid $300, $400, $500, and so on.  And
23  only those are customers.  The reason that it wasn't
24  available earlier is because as far as we were
25  concerned, we don't have it.  And the reason we

484

1   didn't migrate or take it is because it had credit
2   card information in it and security and so on.  We
3   didn't want to mess with it.  But the class action,
4   they subpoenaed the information.  So as soon as it
5   was made available a few days ago, a week ago or
6   something, it was made available.  So immediately I
7   send it to you guys.
8      Q   Let me just understand.  What's the time
9   frame this database covers?
10     A   I think '13, '14.
11     Q   2013, 2014?
12     A   About.  Whatever it is that they have,
13  they gave it.  So you have it.
14     Q   Does the database indicate whether someone
15  purchased or didn't purchase?
16     A   You will have to find out either by
17  customer status or by the amount.  That's how you
18  will know.
19     Q   And that's a, yes, there's an indication
20  in a column of the spreadsheet that would suggest
21  that?
22     A   Yes, but it's not obvious.
23     Q   Okay.  Thank you for explaining that.  And
24  then these are purchasers of Roca Labs' products,
25  correct, that we're talking about?

20 (Pages 481 to 484)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                     2/17/2017

525

1    yes. Let's move on. I'm preserving if that's what
2    it means. I'm not deleting.
3         Q   Well, preserving doesn't mean not
4    deleting. Deleting if you're understanding is being
5    an active act of deletion of something, that's one
6    variation of which data disappears.
7         Are there other automatic processes that
8    delete messages after say 30 days or anything else
9    in place for the business communication systems?
10        A   Not familiar with some script like this,
11   and I don't have some script like this. I don't
12   have it. No. We don't do anything active like
13   that.
14        Q   So let me just clarify. You're saying
15   there is no auto delete feature that you're using in
16   the business e-mail?
17        A   No, I'm not familiar even with that.
18   Sorry. Just when you said the word preserve, it
19   sounds like I needed to do something. I'm not doing
20   something active.
21        MS. MARTENY: Don, you answered the
22   question.
23        THE WITNESS: I got it. I think we
24   understand it.
25        MR. DAVIS: While Carl gathers his

526

1    thoughts, I'd like to respond to a
2    characterization by Defense counsel about those
3    three declarations that were handed to us
4    approximately five minutes ago. One
5    declaration by a woman named Ms. Priscilla
6    Cucata is not in fact signed. There is no
7    signature anywhere in the declaration. That
8    same declaration purports to have exhibits,
9    because there is a page that has the word
10   exhibits on it as if it is a cover page, and
11   behind that cover page there is nothing. So it
12   appears that is an unsigned declaration that
13   lacks exhibits.
14        An additional declaration that was handed
15   to us by Ms. Theresa Lizotte may or may not be
16   signed. It does not look like a handwritten
17   signature and it's not on the signature line.
18   So characterization of what was handed to us
19   may be in dispute. That's all I want to say.
20        MS. MARTENY: We'll agree that the
21   documents are whatever they are.
22        THE WITNESS: Electronically signed.
23        MS. MARTENY: They are what they are.
24   They speak for themselves.
25        MR. SETTLEMYER: Yeah. We'll address it

527

1    when we go forward.
2    BY MR. SETTLEMYER:
3         Q   I think we're done with this colloquy
4    about the documents. My questions for Mr. Juravin
5    as corporate representative relating to the
6    preservation of communications.
7         Mr. Juravin, can you please look at the
8    document that's been marked as Exhibit 2. And I'm
9    asking you in your individual capacity now, not
10   necessarily as corporate representative. And take a
11   look at a statement towards the bottom of page 12 in
12   item lower case f that says 90 percent success rate?
13        A   Yes.
14        Q   Can you take a moment and read that text
15   going from the bottom of 12 up to the top of 13,
16   please. I'll note Exhibit 2 is the FTC's First
17   Amended Complaint just so you can follow along.
18        A   I read it.
19        Q   So did you write the statement shown in
20   subpart F shown on page 12?
21        A   Yes.
22        Q   You see the words -- and you also I
23   believe have acknowledged in yesterday's discussion
24   that text of this sort appeared on Roca Labs's
25   website, correct?

528

1         A   In one version. In one version. This is
2    the version before we worked on it. And I think
3    this version was online for a very short period of
4    time. Sometimes we write something and then we take
5    the time to later finalize it. So for a short
6    period of time, that was on. When I say short
7    period of time, since normally it can be days.
8         Q   Please turn to page 14. At the bottom
9    there's a subpart B. I'd like you to read that,
10   please.
11        A   I'm reading it to myself. I read it.
12        Q   You agree this is text -- and you can look
13   and see the reference that we've given on the top of
14   page 15. This is from a video that's denominated,
15   "What is a Success Rate"; is that correct?
16        A   I don't remember the video. But if you --
17   if that's what you translated, this is what it is.
18        Q   You mean transcribed?
19        A   Transcribed.
20        Q   So do you recall whether you wrote that
21   text that's spoken in the video?
22        A   Almost irrelevant, because I'm responsible
23   for it.
24        Q   I'm asking just in your personal capacity.
25   You agree that you personally were involved with

31 (Pages 525 to 528)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                                    2/17/2017

529

1    the --
2        A   Involved definitely.
3        Q   You probably sounds like wrote the text
4    and perhaps had someone else edit some of it?
5        A   Possible.  But even if Sharon wrote it for
6    me, I'm still responsible.  I'm the one uploading
7    it.  I'm responsible for things that's written on
8    the web.
9        Q   Let me ask you about a part of the
10   statement that appears on both page 14 and page 12,
11   and that is that "the formula is scientifically
12   proven to have a 90 percent success rate".
13           Do you know what the basis for that
14   assertion is?
15       A   Yes.
16       Q   What is the basis for the assertion that
17   there's a 90 percent success rate scientifically
18   proven?
19       A   Throughout the years I've accumulated
20   information whether from scientific researchers,
21   whether from the doctors, but mainly, mainly, mainly
22   from my experience with the customers.  I would say
23   the time that it was written, probably 60, 70,000
24   users at least.  I've done all the possible in my
25   opinion it is.  So I asked normally Roxy.  I will

530

1    ask Sharon.  I seldomly will talk to users directly.
2    But when I gathered all the information from
3    everybody, and when I read the articles and the
4    research, and talked to the doctors, I came up with
5    it is working from day one 90 percent of the time,
6    at least 90 percent of the time in reducing -- in
7    making people eat about half than what they ate
8    before.  It is the most scientific way possible for
9    a nutraceutical to come up with a declaration like
10   this.  And the reason I'm saying that it's the most
11   scientific, which sounds ridiculous.  I mean, how
12   can it be the most scientific?  I will explain.
13           Our average customer is 111 pounds
14   overweight.  And it's not overweight for a year,
15   two, 5 or 10.  It's probably for most of their
16   lives.  The assumption is that the overweight people
17   are also sick or they are not healthy.  They must
18   have something heart issue, cholesterol.  They have
19   diabetes.  They must have something, some condition.
20   If they have a condition, I cannot have them
21   approved by the IRB.
22           In other words, if I want to do a clinical
23   right now checking on these people and taking -- and
24   if I want to conduct a clinical, and say to the
25   clinical, find me 32 people, the minimum, 32 people

531

1    that are at least 110 pounds overweight and they
2    must be healthy.  Otherwise, the IRB will not accept
3    them.  Impossible.  They don't exist.  Because
4    overweight people for 20 years are always have a
5    condition.
6            So my next option is to review the 80,000
7    people or to review the people that are using the
8    regimen.  I've done that.  I've asked Sharon.  I
9    discussed with Roxy.  Roxy talked to let's say, in
10   her lifetime with us, I would say 5,000 people,
11   10,000 people.  Her and her group, they talked to
12   thousands.  The consensus is like, you know -- the
13   consensus is -- I don't know what the word is, the
14   adjective.  The regimen works from day one provided
15   you follow instructions and rules.  If you follow
16   instructions and rule, it does work.
17           What I did a few months ago, we have
18   13,000 people in our group.  I ask them a question.
19   I raise the poll.  Pool, poll, P-O-L-L.  And I asked
20   them -- do we have it somewhere?  Okay.  I asked
21   them -- I asked them, is it true or not?  Only users
22   answer.  Only users answer.  Does the regimen work
23   from day one in a way that it cuts in half your food
24   intake, your calorie intake.  And then I give them
25   the option.  Yes, it's absolutely true; it's true in

532

1    part; not completely, and so on.  And I just left it
2    for them to answer over a period of a month or two.
3    Anybody that wants to answer.  And only users.
4            The results were 85 percent said
5    absolutely it works from day one.  And works from
6    day one was defined I'm eating half from day one.
7    Another five percent or seven percent says it is
8    true in the most part.  And there I got my 90
9    percent that I claimed all along.
10           So if there is a short way, number one,
11   I've done all the scientific way possible.  Now the
12   folder that you got, the black folder with 58
13   researches, I will say out of 58, 48 are in my mind
14   throughout the last eight, 10 years.  But only in
15   the last year since the -- since the FTC sued me
16   that I bothered putting it on paper.  But I had the
17   same information all along, but I just didn't bother
18   putting it on a paper.
19           So the 51, I think, researches that I knew
20   or 48 or 51, I looked at them.  And about 50, I knew
21   all along the same information.  But it wasn't
22   nicely on a paper, because I didn't think I would
23   need it.  And then you will find within the 58
24   researches, you will find one research that answers
25   about how fiber can occupy the stomach and for how

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX7-16b

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                                2/17/2017

---

537

1    Q   I'm not asserting that you have detailed
2  information about each customer in your head.  I'm
3  just saying you're generally familiar with the types
4  of records those businesses have kept about
5  customers over the years; is that correct?
6    A   No.
7    Q   You're not generally familiar with the
8  records that have been kept by the business about
9  customers?
10    A   Not the customers.  I became forced to
11  deal with social media only after Jenna --
12       MS. MARTENY:  That's not the question.
13  BY MR. SETTLEMYER:
14    Q   I'm not asking about social media.  I'm
15  asking about the customer records that have been
16  maintained about people who purchased the product?
17    A   So I am not familiar.  Only after the
18  incident with Jenna that I made myself much more
19  familiar.  Till then, only Sharon King and Roxy were
20  really going into the database, communicating with
21  customers and being familiar.  I'm not familiar with
22  the customers.
23    Q   I'm not asking about the customers.  I'm
24  asking are you just generally familiar with the
25  overall types and systems of information that --

---

538

1    A   Yes.
2    Q   -- the business has used to collect from
3  the customer?
4    A   Yes.
5    Q   So do any of those records include any
6  systematic monitoring about which customers have
7  lost weight after using Roca Labs product; yes or
8  no?
9    A   No.
10    Q   And then in terms of your explanation a
11  few moments ago about the basis for asserting that
12  the formula is scientifically proven to have a 90
13  percent success rate, is there any other information
14  that you can think that substantiates or provides a
15  basis for that statement?
16    A   More than the four reasons I mentioned?
17    Q   Yes.  Are there anymore?
18    A   I don't think it's possible to have more.
19    Q   The answer is then no.
20    A   No.
21    Q   So let me look at a different statement.
22  I'm looking specifically -- we'll stick on page 14,
23  Item B.  It goes on to say, "It", referring to Roca
24  Labs' formula, "will always achieve a gastric bypass
25  affect by physically occupying your stomach leaving

---

539

1  only 20 percent available space for 10 to 16 hours."
2  Do you see that?
3    A   Yes.
4    Q   What is the basis for the assertion that
5  only 20 percent of stomach space will be available
6  for 10 to 16 hours?
7    A   Let's divide it into two.  The 20 percent
8  is easy because when the stomach is the size of
9  about a fist and let's say 500-milliliter.  And when
10  I give them 450-milliliter of the activator with the
11  morning dose, all by itself that's it.  I mean, it
12  leaves no room available.  So that's an easy one.
13       As far as the claim for the 10 to 16
14  hours, it's intended for psychological reasons.  And
15  this is -- I would like to reveal as much as I can
16  to you about what I do, but we need to go
17  confidential on that.
18    Q   Let me get the answer to my specific
19  question.  What is the basis -- is there any basis
20  for the claim that 20 percent of the stomach will
21  be -- only 20 percent of the stomach will be
22  available for 10 to 16 hours?
23    A   For the 20 percent, definitely yes.  For
24  the 10 to 16 hours, not completely.
25    Q   To what extent is there basis for the 10

---

540

1  to 16 hours assertion?
2    A   I would ask that we go confidential and I
3  will explain everything if possible, because this is
4  my trade secret.  This is absolutely my trade secret
5  and I would love to reveal it to you if I don't want
6  anybody else to know about it.
7       MS. MARTENY:  And before you do that, can
8  we talk for one second.  Because I'd like to
9  know a little bit more about this.
10       THE WITNESS:  I think I explained to you
11  about it.
12       MR. SETTLEMYER:  At this point we've got a
13  question pending and I want to get his answer.
14       MS. MARTENY:  No, I understand.  Go ahead.
15       MR. SETTLEMYER:  We'll designate this
16  portion of the record coming up as
17  confidential.  Please give me your answer.
18       (Thereupon, the NON-CONFIDENTIAL portion
19  of the transcript ended.)
20  ///
21  ///
22  ///
23
24
25

---

34 (Pages 537 to 540)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                              2/17/2017

---

541

1          C O N F I D E N T I A L
2          (Thereupon, the CONFIDENTIAL portion of
3    the transcript started:)
4          THE WITNESS:  When you deal with people
5    that are obese and morbid obese, there is a
6    psychological defect.  Because as I see it,
7    they have a self destruction.  It's people that
8    have self destruction, they know that they eat
9    something for the pleasure of the moment and
10   they know that their life will shorten, and
11   they know that they will have complications.
12   There is a problem.  I have to work with a lot
13   of psychology here; a lot of psychology.
14         If you look at the early terms that we had
15   on-site, the very, very early from the very
16   beginning, I was very clear with the customers,
17   I think from 2010.  And what I told the
18   attorneys to do is to tell them, if you come to
19   my site, if you come to my Facebook boot camp.
20   It's called boot camp.
21   BY MR. SETTLEMYER:
22       Q   Currently it's called Facebook boot camp
23   or it was back in 2010?
24       A   2010 it was the site.  Today I say out
25   loud with a lot of confidence.  In 2010, I implied.

---

542

1    I basically told them, if you come here, if you want
2    to work with me, if you want my regimen, I'm allowed
3    to tell you anything I want; to do anything I want
4    with you that would lead you to a healthy weight;
5    anything.  I can tell you that you will grow hair on
6    palm of your hand.  Anything I want I can do with
7    you.  And I will bring you to a healthy weight.
8    Please pay attention that I didn't say lose weight,
9    because I don't care about losing weight.  I care
10   about bringing them to a healthy weight.  Okay.  In
11   other words, I will not be happy if somebody tells
12   me, I lost 20 pounds in five days.  Show me that you
13   have achieved healthy weight.
14         So basically I will show them any images I
15   want.  I will do anything I want for them for as
16   long as I lead them to achieve a healthy weight.
17   Okay.  Now part of writing to them like this --
18       Q   You're pointing to the statement on page
19   14?
20       A   I'm pointing to the statement.
21       Q   With the 10, 16 hours?
22       A   Yes.  And I will explain the psychology
23   behind it.  And that's the reason why I have
24   trademarked gastric bypass effect.  I need a
25   psychological effect.  And I will explain to you

---

543

1    where I trick the customer's psyche.  There is a
2    scientific proof.  Absolutely no question about it.
3    It's called fasting 16 hours.  If you fast for 16
4    hours, you will definitely, definitely lose weight.
5    Because the body gets into a mechanism of fasting 16
6    hours.  You can see it in the black folder.  Your
7    experts will agree with it.  Everybody knows it.
8    Fasting 16 hours.  I need to make my fat customer, I
9    need to make them fast 16 hours.  I cannot be direct
10   with them, and say, hey, you're going to fast 16
11   hours.  Just listening to that is scary.  I have to
12   trick the customer with love.  Okay.  I don't want
13   to say trick.  Like doesn't sound good trick the
14   customer.  But I don't have any vocabulary to
15   explain it differently.
16         So the way it works is like this.  I tell
17   them when you wake up in the morning, you will
18   consume the gastric bypass effect.  Okay.  No big
19   deal.  They consume it.  I know from scientific
20   reasons, I know from the research, I just know that
21   it will remain in the stomach a long time.  Not 16
22   hours, not 10 hours.  It will remain three and a
23   half hours, maybe four.  That's all I need to keep
24   them to eat after four hours according to the
25   instructions.  That's all I want the formula to do.

---

544

1    But I want to stick in their mind, you have no room
2    in your stomach.  It's part of the psychology.  You
3    took a gastric bypass effect.  You feel like this.
4    There is no room.  But between you and I, it leaves
5    the digestive system after three and a half hours.
6          Next, I tell them, your last calorie
7    intake, not food.  I call it calorie intake.  I
8    don't want them to trick me with drinking things
9    with calories.  Your last calorie intake is four
10   hours before you go to sleep.  And then I continue
11   to give them remedies, like the pills, anti-cravings
12   and other things.  And if I can continue like this
13   all day giving them the pill that can sustain them a
14   few hours and give them again the gastric bypass
15   effect all the way four hours before they fall
16   asleep, guess what I did?  I got my 16 hours
17   fasting.  But I can never tell them that.  I can
18   never reveal to them or to anybody else that this is
19   what I do with them.
20         So when I tell them the 20 percent is a
21   given, because you just fill up the stomach with the
22   morning dose.  But the 10 to 16 hours, no.  I know
23   that it's only four hours.  But I tell them 10 to 16
24   hours because of the psychological effect.  All of
25   that is a lot of psychological.  Showing them images

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555                    PX7-18

FTC v. Roca Labs, Inc., et al.                                              2/17/2017

545

1   is a psychological thing. Everything they can.
2   When they come to my boot camp, when they buy from
3   me, they permit me to do anything possible with them
4   to achieve the results.
5          So basically the bottom line is the
6   morning dose, which the main thing is carried them
7   only four hours, and then another pill carried them
8   and carried them and carried them, and then four
9   hours before they go to sleep, and I got my 16 hours
10  fasting. Which you will find a ton of evidence for
11  that to work.
12         One more thing. I not just force them to
13  drink three liters. I scare the hell out of them if
14  they don't drink it. I say, if you don't drink the
15  three liters, you will have complications and you
16  will have this one. It's true in part. It's true
17  in part. But it doesn't -- the person doesn't need
18  to drink three liters. But they do need to drink a
19  liter. But I tell them three. Why? Because I have
20  scientific evidence that if you drink three liters,
21  you will lose a few more pounds a month.
22     **Q   Are you saying there's scientific evidence**
23  **that they would lose those pounds if they drank**
24  **three liters without the formula?**
25     A   Yes. If they do the three liters on their

546

1   own, they would lose. If they do exercise, they
2   would lose. If they do the 16 hours on their own,
3   they would lose. If they do this -- I put
4   everything all together, including scaring them,
5   that if they don't succeed now, they will go to a
6   surgery. I could do everything possible from my
7   team, which I treat like a family. I treat them the
8   way that I will treat Anna and my kids. The way
9   that I would treat myself with the language, with
10  everything. I'm willing -- if I'm right now
11  110 pounds, trick me, do with me whatever you want,
12  just get me to be a healthy weight. I don't care
13  what you do to me. This is the situation of these
14  people.
15         To give you an example, if somebody tells
16  me, yeah, I'll go for it; I'm going to try it. We
17  have a saved answer that you will see. The answer
18  try. Are you going to waste $600 for a try? Let's
19  do a deal. You keep your $600. I'm keeping my high
20  success rate. Come back when you are sure. When
21  somebody says good luck to each other, they can be
22  vamped out of the group. What do you mean good
23  luck? Don't you trust that this person can really
24  succeed? Why do you think he needs to talk to God?
25  And then I tell them, by the way, I was born 40

547

1   minutes from Jesus. God and I talked last night.
2   God brought that person here to this group. God
3   told me that he's done. God told me that he's done.
4   He introduced already us and that's it. You are on
5   your own. And you will see everything in the group.
6   I don't have to tell you. You will see everything.
7   This is part of the saved answer. And this is the
8   way -- this is my methodology that I'm using.
9          That's why I think that the FTC came to us
10  and judging me. We are not a normal group. I don't
11  act normally with the group. And I don't have
12  normal people. They have 110 pounds. So this is
13  basically my answer to you. So the 10 to 16 hours
14  is a psychology. S is the stomach that I showed.
15     **Q   The image?**
16     A   The image of the stomach full and I tell
17  them you don't have a room.
18     **Q   Are you talking about the image that**
19  **appears in Exhibit 2, page 10, in paragraph 26?**
20     A   Yes, I am. Psychology, psychology,
21  psychology with these people. I don't -- there is
22  no science to what -- only psychology. A ton of
23  psychology, including scaring the hell out of them.
24  I brought somebody to the group that told them how
25  terrible the surgery is. And by the way, we have in

548

1   the group I would say 40, 50, 60 people, it's a
2   guess, that underwent the surgery. Of course they
3   didn't succeed because the surgery doesn't take care
4   of cravings. And the people in the group are
5   telling other people, make it work. You will go to
6   a surgery and they tell them you lose hair, you lose
7   whatever it is. And these people, by the way, if
8   you're going to ask me next about better than
9   gastric bypass surgery, I don't need to say it
10  anymore. They say it. And I placed another poll in
11  asking only users that underwent the surgery, tell
12  me, is the gastric bypass alternative better,
13  cheaper, faster than a surgery? Only those. And
14  they answer. They say, yes, it is. I didn't et '90
15  percent there. I got 70, 80 percent. I don't
16  remember what. And you can see the people that
17  underwent the surgery.
18         Mary Williams, for example, I think from
19  Texas, and Nancy N. We wanted to bring her here,
20  but her husband has a surgery on the 22nd. Mary
21  Williams. You just go online and you will see those
22  people. And they say to other people, listen, this
23  is beautiful. I wish I knew it before I cut my
24  stomach and before I started losing teeth. And they
25  say, it is better, safer, cheaper than the surgery.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555                     PX7-19

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                   2/17/2017

549

1        MR. DAVIS:  May I ask for the sake of
2    clarity on the record of this deposition
3    whether the trade secret is still being
4    discussed and whether this is still
5    confidential.
6        THE WITNESS:  I will stop here.
7        MR. DAVIS:  I'm not asking you to stop.
8    I'm curious whether the trade secret -- the
9    discussion of the trade secret has ended.  I
10   can't tell.
11       MS. MARTENY:  I think it is.
12       THE WITNESS:  It is now because I stopped
13   talking about psychology.
14       MR. SETTLEMYER:  So we'll leave the
15   confidential portion of the record.
16       MR. DAVIS:  Thank you.
17       (Thereupon, the CONFIDENTIAL portion of
18   the transcript ended.)
19   ///
20   ///
21   ///
22
23
24
25

550

1        (Thereupon, the NON-CONFIDENTIAL portion
2    of the transcript continued as follows:)
3    DIRECT EXAMINATION BY MR. SETTLEMYER:
4        Q   You had mentioned in a few -- I believe it
5    was yesterday in terms of talking about your
6    training and experience that you had taken some
7    courses in psychology, is that correct, in college?
8        A   Yes.  But this is really not the way that
9    I -- I don't consider myself a professional
10   psychologist.  Not a professional.  Not a doctor.
11   Not professional in anything.  I consider myself
12   very, very street smart; no more than that.  And I'm
13   very clear on the group every time I give them an
14   advice, I say, I'm not a doctor.  I'm not a
15   psychologist, but I have experience of eight years
16   and 80,000 users.
17       Q   Let me move over to another topic
18   momentarily.  When the websites for the Roca Labs
19   products have referred to Roca Labs being better
20   than gastric bypass surgery.  Better in what way
21   would you say?
22       A   The main, main big thing, cravings.
23   Cravings is not what people think.  It's not mind
24   over matter.  Cravings is a sickness.  It's a
25   condition.  It means when your body is used like

551

1    drugs to spikes of sugar.  Anti-cravings, our
2    anti-cravings balances the sugar levels and helps
3    people to overcome cravings.
4        Q   Let me ask you this.
5        A   The surgery does not do it.  And that's
6    the main, main reason why it's better.  There are
7    many more.  But that's the main, main reason why
8    it's better.
9        Q   Let me ask you specifically.  What is the
10   basis for any assertion that Roca Labs is better
11   than gastric bypass surgery in terms of helping an
12   individual lose weight?
13       A   Wow, where do I start?  Number one,
14   because people tell me.  Because the group tells me.
15   People in the group tell me I had the surgery.  I
16   hate the surgery.  It was not successful.  I
17   regained the weight because I couldn't overcome the
18   cravings.  Now I'm overcoming the cravings.  So it's
19   better.
20           It's also better because you don't cut
21   your stomach.  You don't lose all the Vitamin B's.
22   Because once you cut your stomach, you don't have
23   Vitamin B's.  As a result you lose teeth, you lose
24   hair.  You have a million complications.  You don't
25   have it with the regimen.  The regimen actually

552

1    makes you feel better, energetic.  Everything that
2    you will find in the group.
3           The group today is an easy way for me to
4    see a mirror -- not a mirror, but to reflect the
5    reality.  Earlier I knew it because Roxy told me,
6    because Sharon told me, because people that
7    testimonials.  It was more difficult to collect
8    data.  Today I see that what I claimed earlier that
9    took me two years to claim, today I can claim it in
10   one day.  Because I will ask something and
11   immediately 20, 30 40 people will tell me that.  So
12   it's definitely, definitely better than the surgery.
13   It costs less.  It's immediate and everything.
14       Q   I want to speak specifically on what
15   basis, if any, additional is there for any assertion
16   that it's better at achieving -- helping someone
17   achieve the result of losing weight of actually
18   creating a change in weight?
19       A   Okay.  Average bariatric surgery patient
20   would lose six to 11 pounds a month based on Web MD.
21   If you go on the Facebook Loss 100 group, you will
22   see the average weight reduction.  Number one,
23   everybody is losing weight from day one.  The change
24   in their habits occurs almost on day one.  The
25   ability to overcome cravings is after a few days.

37 (Pages 549 to 552)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

553

1    But let's talk about the average weight reduction.
2    Our average weight reduction -- forget about the
3    crazy things like 50 pounds in a month.  You see
4    things like this, but they are abnormal.  The
5    average is probably 25 to 30 pounds.  One pound a
6    day.  Almost one pound a day.  Not everybody.
7    Almost one pound a day.  And they maintain this for
8    a month, for two months and so on.  So the average
9    weight reduction in the group, probably 25 pounds a
10   month.  At least, at least, at least twice as much
11   as the surgery; at least.
12       Q    What sort of information other than the
13   information people are telling you through Facebook
14   does Muscular Obesity collect in any kind of
15   systematic way about the starting and ongoing and
16   end point weights of the people providing this
17   information?
18       A    We cannot force us to give them
19   information.  If they want -- if they are in the
20   group, they volunteer the information.  Those that
21   don't want to be part of volunteering information
22   are not there.  I cannot collect -- everybody's
23   participating in the early stages.  Those that
24   normally achieve a 40-pound weight reduction, 50,
25   tend to disappear from the group because they got

554

1    what they wanted from the group and they start
2    disappearing.  They come back and suddenly, hey, I
3    lost 80 pounds.  Hey, I lost 90 pounds.  But they
4    are not part --
5        Q    What effort, if any, is there being made
6    to collect and analyze the information that is
7    received?
8        A    I cannot send them a message and tell them
9    how much you lost.
10       Q    I'm asking what information you are
11   gathering.  Is it being kept and is it being
12   analyzed?
13       A    The group.  Just the Facebook group.
14       Q    Let me ask you to turn to -- before we get
15   there, I had a couple of other questions about some
16   earlier testimony which you mentioned the rules.
17   What are you referring to by the rules?
18       A    Is he married?
19       Q    I'm asking about the rules that you
20   referred to in the --
21       A    That's the first thing that comes to my
22   mind.
23       Q    It's a long day.  I understand.
24            Are you referring to some sort of rules
25   associated with Roca Labs?

555

1        A    In capital letters.
2        Q    What are those?
3        A    No coffee.  Coffee creates --
4        Q    You don't need to explain them.  I just
5    want to know what the rules are.
6        A    Sorry.  No coffee.  No dairy of any type.
7    No dairy, including cheeses.  No dairy.
8        Q    Okay.
9        A    No greasy food.  No greasy food.  Anything
10   that is oily, greasy, fried, no.  Your first food
11   intake is four hours from the time you wake up.
12   Your last food intake is four hours before you fall
13   asleep.  My trick for the --
14       Q    Those are the rules?
15       A    Yes.  Must exercise; you must.
16       Q    How much?
17       A    What?
18       Q    How much exercise?
19       A    How much?  As much as I want to see
20   consistency.  And in exercise we have three types.
21   The best is dancing with youngsters in front of the
22   TV, because it's activity.  Let's not get into that.
23       Q    Sure.
24       A    Dancing.  Then you have the gym.  And
25   jogging is not good for them, because of the

556

1    pressure on the joints.  But they must do it.  And
2    if somebody tells me, I exercised, I don't approve
3    the post.  Unless I know that it's consistent four
4    days a week.  That's what's important.  And if
5    somebody will say, I have a stand still in my weight
6    reduction and they don't -- they must show that they
7    exercised for example.  So exercising is a must.
8            Then the next thing, they cannot eat
9    pastry, like pasta, bread.  They are limited to 10
10   slices of bread a week.  Pasta I think two or three
11   times.  The next thing, no soda of any kind.  No
12   bubbly things because it doesn't interact well.  It
13   doesn't interact well with our -- they need to
14   maintain less than 1,200 calories a day.  Most of
15   them are doing 800 to 1,000.  So less than 1,200 a
16   day.  Three liters of water.  At least six bottles
17   of water a day.  And I think that's it.
18       Q    What are the instructions that you
19   referred to?
20       A    Instructions is prepare your morning dose
21   the night before.  It must be refrigerated, number
22   one.  You consume as much as you can in the morning.
23   The morning dose you consume as much as you can and
24   then you take two more spoons.  Two hours later you
25   will take the red pill, the yellow pill together.

38 (Pages 553 to 556)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

557

1    Four hours from the time you woke up you will eat
2    your first meal.  Oh, I'm sorry.  I must jump back
3    to the rules.  When you eat, you take a very
4    measured proportion in front of you.  You cannot go
5    to a buffet.  It must be measured.  You will take a
6    small bite.  You will chew for 20 seconds.  You will
7    put your fork and knife and you will wait for 30
8    seconds before the next bite.  After eight, nine
9    bites, check and see if you're really full.  By the
10   way, this is another scientific thing.  So, again,
11   eating slowly let's call it.  Back to the
12   instructions.
13        Two hours later after you ate your first
14   meal, you will take the anti-cravings drink.  Two
15   hours later you will take again the yellow and the
16   red pill.  Two hours later you will take one more
17   anti-cravings.  And then you will take the
18   remainders of the morning dose which you did not
19   finish in the morning.  And then it's already four
20   hours before bedtime.  It's not bedtime.  It's the
21   time you fall asleep.  Because a lot of people go to
22   bed earlier.  So they have a lot of rules to follow,
23   a lot of rules.  Like most of the them will tell you
24   it is a lifestyle.  They changing their lifestyle.
25   They cannot just take a pill and think it's magic.

558

1    And if somebody would come to the group, and say,
2    does it work?  I say, no, it doesn't work.  The
3    regimen without your determination is worthless.
4    That's what I called the regimen.  It's worthless.
5    Save your money.  If you're not determined, save
6    your money.
7        Q   You mentioned just a moment ago that under
8    certain circumstances, and you gave an example of
9    somebody talking about an exercise level, that you
10   don't approve the post.  Are you talking about posts
11   to the Facebook group?
12       A   Yes.  We approve only maybe less than half
13   the posts, a third of the posts.  If somebody posts,
14   I lost a lot of weight, I want proof.  I want to see
15   the scale and other people will challenge them.
16   There are some things I would look at it, and I
17   said, we don't approve it.  And we wait for two
18   weeks until the person corresponds with us and we
19   identify them in the system.  The person needs to be
20   identified in our system to see that it's a real
21   person.  We check on them.  We double-check on them.
22   We don't allow posts that are -- they must be
23   inspirational and educational.
24       Q   But in other words, you or someone working
25   for Muscular Obesity will approve or disprove a post

559

1    to the Facebook group Lost 100; is that correct?
2        A   Yes.
3        Q   And you referred also to the pills.  What
4    are the pills?
5        A   There is a red pill.  And we call it
6    reinforcement of the morning dose.
7        Q   What's in it?  What are the ingredients?
8        A   Can we go again.
9            MR. SETTLEMYER:  We can be on the
10   confidential record, yes.
11           (Thereupon, the NON-CONFIDENTIAL portion
12   of the transcript ended.)
13   ///
14   ///
15   ///
16
17
18
19
20
21
22
23
24
25

560

C
O
N
F
I
D
E
N
T
I
A
L

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555          PX7-22

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                            2/17/2017

---

565

# Redacted

---

566

# Redacted

15   ///
16   ///

---

567

1     (Thereupon, the NON-CONFIDENTIAL portion
2   of the transcript continued as follows:)
3   DIRECT EXAMINATION BY MR. SETTLEMYER:
4     Q   So we just discussed a small procedural
5   thing we're going to do here.  I'm going to try to
6   finish my primary line of questioning and get
7   responses from Mr. Juravin.  And Ms. Marteny will
8   then after I'm completed do additional questioning
9   to which I may have further questions.  But at a
10  certain point we'll stop that.  And time permitting,
11  Mr. Davis and I will try to look at documents that
12  have been produced to us and may want to come back
13  on the record to ask some follow-up questions about
14  those to the extent we can.
15        With that, Mr. Juravin, just to refresh
16  your recollection.  You remember that of course the
17  FTC sued Roca Labs, and that that was in late
18  September of 2015, correct?
19    A   Yes.
20    Q   What changes in the products marketing
21  operations of Muscular Obesity have taken place
22  since September 2015 when the FTC sued the company?
23    A   The main probably many because I do it
24  incrementally day-to-day.  I cannot even think about
25  major.  The major, major thing.

---

568

1     Q   Yes.
2     A   That I don't have to answer people anymore
3   because people are talking.
4     Q   Give me an overview of not necessarily
5   each incremental step in the changes, but the
6   overall state of -- what is the company currently
7   doing that's different than what it did when the FTC
8   sued?
9     A   Before somebody will come and ask us, "I'm
10  diabetic, can I use it?"  The answer would be we are
11  not -- we cannot give you medical advice, but there
12  are many diabetics using the regimen successfully,
13  and we would leave it as that.  If you need more
14  information, consult your doctor.  And I know that
15  the regimen is excellent.  Not good, excellent for
16  diabetes.  But I cannot tell them that because I'm
17  not a doctor and I don't know their situation.
18  Today they just talk to each other.  Today they just
19  go on the Facebook and they just talk to each other.
20  If we want or if we don't want.  They just talk to
21  each other.  So we don't have to give answers to
22  anybody.
23    Q   Who do you mean by they just to clarify?
24    A   The members of the group.
25    Q   And you believe all the members of the

---

41 (Pages 565 to 568)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                                      2/17/2017

569

1   group were users --
2       A    No.
3       Q    -- of the product?  No?
4       A    No.  Some of them users.  Some of them
5   want to be users.
6       Q    So perspective --
7       A    Users and perspective users.
8       Q    They interact?
9       A    Yes.
10      Q    And the users include people who are just
11  other customers who are not being paid by Roca Labs?
12      A    We don't need paid people.
13      Q    I'm just asking a question.  They're users
14  who are not being paid by Roca Labs?
15      A    I know where you're going with it.  I'll
16  make it clear.  The group has active users of the
17  regimen and has people that want to buy the regimen.
18  Either they don't have the money or they want to be
19  still convinced.  When somebody is successful, let's
20  say not just losing their weight, but they are
21  successful with reversing their diabetes.  Because
22  we have people that were cured.  The use is not
23  cured.  It was reversed.  They were reversed.  They
24  were at 400 and now they're at 100.  Then they tell
25  us, I stopped using insulin because of the gastric

570

1   bypass alternative regimen.  So they do a post.  We
2   approve the post.  And then other diabetes people
3   talk to each other.  They just talk to each other.
4   We don't have to say anything.  If they ask us, we
5   say we cannot give you an answer because we are not
6   doctors.
7           Now what happened with time is that there
8   is so much activity, so much help is needed, that I
9   approached one or two people, a couple of people,
10  and I said, listen, you help in the group.  They
11  help anyway each other.  They help.  They talk and
12  they help and stuff.  But I said, what about if you
13  devote a few more hours.  Here is $50 a week.  Just
14  continue to do whatever it is that you do.  I don't
15  even know what they do.  I don't know what they do,
16  what they say.  There is no agreement.  There is no
17  conditions.  There is nothing.  Take $50.  But when
18  people are asking or something, just put whatever it
19  is that you normally do, just continue to do.  In a
20  way, by the way, it's no different than other people
21  that were working on a payroll in quotations were
22  doing.  Because what I told Roxy is just take money
23  just to talk to people.  Just talk from your
24  experience.  Roxy for example was not allowed to
25  sell.  Nobody was allowed to sell.  Okay.  No sales

571

1   is necessary.  Just tell your story.  So there are
2   two people that take $50.  Just talk to people.
3       Q    Who are those two people?
4       A    One is Jessica and the other one is
5   Suzanne.  So Jessica and Suzanne -- there is no
6   hours.  There is no monitoring.  There is nothing.
7   What is help?  What is help?  If somebody comes to
8   us and says, how do I use it, or I don't know how to
9   use it in the morning, or how much should I take in
10  the morning.  They're job is to say, don't dare
11  asking in the group.  It shows that you are not
12  committed.  Go to slash ingredients or slash -- I'm
13  sorry, slash instructions.  That's their job.  Not
14  to promote; not to sell; no nothing.  Just to help
15  by directing them.  Go to your hub; go here.  They
16  already know that people are asking some stupid
17  questions.  Stupid -- the definition of stupid is
18  you could have found it on your own in the hub.
19  Don't bother 13,000 people with your question.
20  Okay.  So what they do, they direct to the site.
21  That's all they do.
22      Q    Have there been any changes to the
23  products that Muscular Obesity is selling since the
24  lawsuit was filed?
25      A    I don't know if we had the right pill.  I

572

1   don't remember.
2       Q    Okay.
3       A    I think we did.  We added the yellow pill.
4   And lately we added another one called white pill.
5   Just we testing it.  It's for stress and better
6   sleeping.
7       Q    What are the ingredients of the white
8   pill?
9       A    I think it's already on the web.  I didn't
10  release it to everybody.  What I first did, I gave
11  it to 10 people.  They used it.  The results were
12  excellent.  And then I allowed another 100 people to
13  use it.  So it's not really widely spread right now,
14  but the ingredients are already up.
15      Q    Do you recall what the ingredients are?
16      A    If I will tell you, it will not sound
17  right; the spelling.  We will waste time on
18  spelling.
19      Q    But it's on the gastric.care website?
20      A    Yes.
21      Q    What's the purpose of the white pill?
22      A    Stress and sleep.
23      Q    Has there been any change in the marketing
24  channels that MCO has used since the lawsuit was
25  filed?

42 (Pages 569 to 572)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555                         PX7-23

Juravim - Confidential

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

573

1    A   For some reason we stop selling to the
2  Gulf country; the Gulf.  We used to sell to
3  hospitals in the Gulf countries.
4    Q   You're talking about in Saudia Arabia
5  Gulf?
6    A   South Arabia, Qatar.  The four rich Arab
7  countries in the Middle East.  We used to sell much
8  more over there and to hospitals, two or three
9  hospitals that use it again and again.  We stopped
10  selling there.  We just simply don't put the efforts
11  into the Arab.
12    Q   So those are the markets.  I'm talking
13  about the marketing channels in terms of are you --
14  say for example are you still using Google search
15  ads?
16    A   Google blocked us long ago.
17    Q   So the answer is no, right?
18    A   Yeah, long ago.
19    Q   Are you using Bing still to advertise?
20    A   Very little.
21    Q   What about Yahoo?
22    A   It's the same all of this, Bing, Yahoo.
23    Q   I'm trying to break them out?
24    A   No.  We don't -- what we use is very
25  little Facebook.  I don't have the money.  So I'm

574

1  forced to do much more social.  I just don't have
2  the money to do it.
3    Q   Is that primarily Facebook?
4    A   Facebook.
5    Q   Would you say you've increased the use of
6  Facebook since the lawsuit was filed?
7    A   I'm saying we don't have the money to
8  advertise.  So we're doing social and a little bit
9  advertisement on Facebook.
10    Q   I'm talking in terms of --
11    A   Advertisement.
12    Q   In terms of any marketing.  So you're just
13  making greater use of Facebook in general as a
14  company since the lawsuit was filed?
15    A   Yes.
16    Q   In terms of what you are doing, are you
17  interacting with customers on Facebook?
18    A   As much as I can.
19    Q   Perspective customers?
20    A   Sometimes 10 hours a day.  Sometimes if
21  I'm here not, but as much as I can.
22    Q   Are you doing live chat with them, the
23  customers?
24    A   I do more than that.
25    Q   What do you do?

575

1    A   When you say live chat, you mean talking
2  to them?
3    Q   Well, there's the chat with the text,
4  right, that's one thing?
5    A   And then --
6    Q   What else are you doing?
7    A   Video.
8    Q   You do video?
9    A   I do video.  It's being recorded and then
10  thousands watch it.
11    Q   So it's like a Facebook live video?
12    A   Which later becomes a video that people
13  re-watch and re-watch and re-watch.
14    Q   So you leave that up on the --
15    A   Yes.
16    Q   The Lost 100 site?
17    A   Yes.
18    Q   Group site?
19    A   Yes.
20    Q   Now is the Lost 100 group a public group?
21    A   Public.
22    Q   So anybody who's a Facebook user could log
23  into Facebook and be able to go to that group and
24  see the communications back and forth; is that
25  correct?

576

1    A   Yes, you can do it.  But if you want to be
2  a -- if you want to be a member, you need to ask
3  permission.  But I don't really need.  If you just
4  want to check what we are doing, if you want to
5  check what we are doing, you don't have to be a
6  member.  You can just see.  But if you want to check
7  if people are real.  If people say, I lost five
8  pounds in two days.  If you want to check if they
9  are real, you do need to be a member so you can
10  communicate.
11    Q   How does one become a member?
12    A   Just ask I want to be a member.  We don't
13  really -- we cannot screen people.
14    Q   In terms of asking to be a member, is that
15  just -- what additional capabilities does one have
16  to interact with the group by virtue of becoming a
17  member?  What more can you do?
18    A   It's a complex question.  You're asking,
19  if I'm not a member, you can see everything.  If you
20  don't want to interact with people, you don't need
21  to be a member.
22    Q   But if you want to interact with people --
23    A   You do need to be a member.
24    Q   You do need to be a member.  Okay.
25    A   We used to check each person.  We cannot

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555                    PX7-24

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                    2/17/2017

577

1  do it anymore because it's so massive.  We have
2  14,000 right now I think.  We kicked out about 2,000
3  people that were kicking out, because people that
4  are asking questions about instructions; that they
5  need to read alone and things like that or don't
6  respect the house rules.  But overall it's called a
7  boot camp and I'm handling it as a boot camp.
8      Q   In addition to moderating the comments,
9  you also moderate the membership; is that correct?
10      A   No, anybody can be.
11      Q   But you kick people out you say?
12      A   Based on the comments.
13      Q   But what I mean is --
14      A   I can block.
15      Q   You can grant a membership or deny
16  membership; is that correct?
17      A   Yes.  Everybody almost is accepted.  But
18  if somebody is suddenly doing things that are not to
19  the benefit of the group achieving a healthy weight,
20  they'll be kicked out.  If somebody will say, yeah,
21  one coffee a day is no big deal; bang, out.
22      Q   Do you have a list have written rules for
23  what would get people kicked out of the membership?
24      A   I think it's part of the files.  There is
25  a section called files.  For some reason everybody

578

1  knows it.
2      Q   By section you mean in the group page?
3      A   Yes.  It's called files.  It's called,
4  "Democracy, Not In My Group".
5      Q   In terms of the perspective customer --
6      A   I'm sorry.  Yes, there are rules.  When a
7  new member comes, if they approach, we send them
8  something that says welcome to the boot camp.
9      Q   And then there's that message has the
10  rules of that group; is that correct?
11      A   It's mainly my group.  It's mainly my
12  rules, yes.
13      Q   But that's what you would communicate to
14  people?
15      A   Yes.
16      Q   That's where the rules are at least
17  initially communicated; is that correct?
18      A   Yes.
19      Q   And then if a perspective customer who's
20  not a member wants to ask a question of somebody
21  who's in the group, does the person who wants to ask
22  the question have to become a member?
23      A   Tricky question.  I don't think so.  You
24  don't have to necessarily.  Because if you see a
25  person that says, yeah, I lost five pounds and I'm

579

1  from Texas.  And you say, yeah, me too.  They text
2  message behind -- they don't need us.
3      Q   So in theory they could Messenger each
4  other through Facebook?
5      A   Not in theory.  They do it all day.
6      Q   But they could not post a comment within
7  the group?
8      A   You got it.
9      Q   Correct?
10      A   You got it.
11      Q   That other group members could see --
12      A   You got it.
13      Q   -- unless they're a member?
14      A   You got it.
15      Q   Okay.  Thank you.
16          Who are the -- have there been any changes
17  in terms of the ingredients of the formula since the
18  lawsuit?
19      A   You cannot say formula because we have
20  about six or seven variations.  Okay.
21      Q   All right.
22      A   Because people buy different -- okay.
23  People buy custom, premium, basic, advanced.  Before
24  you guys sued us, we had enough volume of business
25  to really provide three or maybe four different

580

1  strength of formulas, okay, and really provide them
2  according to what they paid.  After you guys sued
3  us, our volume went down so much that I'm forced to
4  use probably the top one, okay, the most expensive
5  one, and give it to others without telling them.
6          So, in other words, if somebody buys
7  basic.  Okay.  This is number four, three, two and
8  one.  Basic on the bottom.  Not basic, but advanced.
9  They would probably get what this guy is getting.
10      Q   In the premium category?
11      A   Yeah.  They will get on the top because I
12  don't have a choice.  I cannot do them -- I cannot
13  do like 12,000 production, you know.  So I'm forced
14  to chose one of them.  So basically we are losing
15  more money if somebody is choosing to buy only
16  advanced instead of premium.
17      Q   Let me ask this.  Have there been any --
18  so it sounds like there have been reductions in the
19  number of different formula options that are
20  available?
21      A   To us behind the scenes.
22      Q   But in terms of the formulas that are now
23  available, they are essentially the same as the ones
24  that were available before?
25      A   Pretty much with a little bit

44 (Pages 577 to 580)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                      2/17/2017

---

581

1  improvements. Like I decide, okay, we will lower
2  the L-Carnitine, one of the ingredients. We would
3  lower it a little. We did another trick. I'm
4  sorry. I don't know any other word. Trick means
5  that it's something to shorten. I don't have any
6  other word in English to know that. But trick is
7  just not to make money off somebody. It's just to
8  make it shorter. So we did another thing. From now
9  on when somebody orders -- not from now. A year ago
10  almost. They get it almost like a prescription.
11  Each regimen gets its own -- a name of the person.
12  A personalized label with their goals, weight
13  reduction goals. Because we want them to look at it
14  very personal. We want them to look at it like a
15  prescription. We want them to look at it like, wow,
16  it's made for me. Again, I will do everything
17  possible, everything that I can imagine to make sure
18  that they take it very, very, very seriously. Just
19  for the same reason that Brian was wearing a white
20  robe.
21       Q   Brian the man who appeared in the lab coat
22  videos?
23       A   Yes. Everything possible. Because in my
24  mind there is no difference between a white coat or
25  putting colors in your web that look serious or

---

582

1  changing the font to look like CNN fonts. There is
2  no difference. You're trying to look serious in
3  front of the customer.
4       So the same thing that I did. We did
5  labeling. Each product is labeled. So when they
6  show it later on Facebook or something, they have
7  their name. They have their goals. They know that
8  it's personalized. And by the way, our systems do
9  personalize it. In other words, we will give
10  sometimes more anti-cravings if we see that you a
11  problem with anti-cravings.
12       Another thing we didn't do since the
13  lawsuit is the weight analysis. It's a big deal.
14  Part of my psychology is I'm saying you eat a lot
15  and you get overweight because you don't pay
16  attention to the label. You don't understand how
17  many calories here. But if I will tell you and I'll
18  make you conscious of it, maybe you will change your
19  way.
20       Q   Describe for me what you mean by the
21  weight analysis. Is this something that is done
22  when you're getting perspective customers entering
23  information in order to purchase the product?
24       A   Yes, but that's the qualification. The
25  weight analysis is that I'll basically when you are

---

583

1  done answering all the information -- it's lengthier
2  than before. I'll ask you how many pastries do you
3  eat a week; how many sodas; how many pizza; how many
4  this; how many that. And then I give you a list and
5  I say, listen, you have 8.2 pounds a month of
6  cravings that you can cut. 2.8 is from Coke. Okay.
7  1.2 from pizza. And the donuts are 2.2. And I will
8  make you aware of all of that. I will tell you how
9  many calories you do need to eat a day in order to
10  not gain weight.
11       Q   So is the weight analysis something that's
12  done prior to purchase?
13       A   Yes.
14       Q   Okay. And it's done from the perspective
15  customer entering information online, correct?
16       A   Yes.
17       Q   And how is the weight analysis that's
18  performed for them communicated to them? Is that
19  done online or --
20       A   Online. As soon as they are done entering
21  the information, they see -- we call it results
22  page.
23       Q   Okay. So it will be a page that's
24  displayed on the web?
25       A   The results.

---

584

1       Q   Not a separate message?
2       A   Correct.
3       Q   In terms of --
4       A   I need to correct myself on something.
5       Q   Go ahead.
6       A   Yesterday you asked me if the -- and I
7  kind of -- I didn't know what to answer you. You
8  said, okay, when somebody -- terms. Are they really
9  forced to read the terms when they do the V.
10       Q   When they click check box?
11       A   Check box. I said, no, they're not
12  forced. But I forgot to tell you that they get an
13  e-mail and they got an e-mail all along with
14  everything, with all the terms. So they see it.
15  It's in their e-mail. They have a chance to cancel
16  from the e-mail. They can cancel in the hub and
17  just say, I don't want the deal. Another way that
18  they can cancel, if they don't open the package. On
19  the package they say, do not open this package if
20  you don't agree to the terms.
21       Q   And it said that on the tape for the
22  package, correct?
23       A   Tape.
24       Q   But the e-mail that would come with the
25  terms came after the person had entered their

---

45 (Pages 581 to 584)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                              2/17/2017

585

1   purchase information, correct?
2       A   And they can cancel.
3       Q   But it's correct that it was post purchase
4   that e-mail came, correct?
5       A   Yes.
6       Q   How long do they have to cancel?
7       A   I think less than a day.  Less than a day.
8   They can cancel and forget about it.
9       Q   Would you say it was a couple of hours?
10      A   No.  No, no, no, no.  No.  I think now
11  it's about eight hours and before no.  Two hours is
12  nothing.  And even let's say we produced it, and
13  somebody says I want to cancel or something, we
14  wouldn't mess with it.  We wouldn't mess because we
15  would lose on the dispute.  We would lose on the
16  dispute.
17      Q   Let's turn back to the current operations.
18  And I think we're getting close to being done.
19      A   By the way, every time that somebody
20  cancels before they open the package and they tell
21  the PayPal, I didn't even open.  It doesn't matter
22  what we write in the terms.  We would lose.  From
23  the very beginning Sharon knows take the money.
24      Q   Who are the current personnel working for
25  Muscular Obesity aside from yourself?

586

1       A   Anna is managing the warehouse.  She works
2   with one more person.  Her name is Sonya.  Then
3   there is Priscilla and Sean.
4       Q   Who is Sean?
5       A   He's doing what Priscilla is doing.  She's
6   just doing support.  And then just Mac, he's my
7   programmer, and myself.
8       Q   When did Priscilla start to work with
9   Muscular Obesity?
10      A   July, August last year maybe.  I don't
11  remember exactly.
12      Q   When did Sean start to work with Muscular
13  Obesity?
14      A   Really a few months ago.
15      Q   Is there anyone else who's doing any work
16  for Muscular Obesity at the moment?
17      A   I cannot think right now.  I don't know
18  why.  I drew a blank.
19      Q   Has there been anybody working previously
20  for Muscular Obesity who's left in the past couple
21  of months?
22      A   Somebody that was working with us that
23  left in the last couple of months?  No.  Everything
24  is kind of -- everything is on low.  We don't have
25  too much of activities.  While you're doing your

587

1   packing your, you know, checking, I'll think about
2   it.
3       Q   Let me ask this.  So Mac is located in
4   Pakistan; is that correct?
5       A   Yes.
6       Q   And Priscilla is located in the U.S.?
7       A   In Orlando.
8       Q   Sean is located in the U.S.?
9       A   Orlando.
10      Q   Orlando.  And who is the person, Jessica?
11      A   Sonya.
12      Q   Sonya who's working with --
13      A   Orlando.
14      Q   So is there anybody else working in the US
15  aside from those folks and you?
16      A   No.  Who works and who left, no.  And the
17  two people that I told you that they get $50 a week,
18  they just direct people go to the hub; go to the
19  instructions; go here.  No terms, no hours, no
20  nothing, just whatever they want.
21      Q   Do you know where they're based
22  geographically?
23      A   Out of their laptop.  I don't know what
24  state, what country.
25      Q   Is there anyone else in the U.S. who's

588

1   working with Muscular Obesity?
2       A   It doesn't come to my mind.  But when you
3   guys do your stuff, I'll think.
4       Q   And then what's the basis for compensation
5   for the people working for Roca Labs other than
6   yourself?  Is it an hourly?
7       A   Hourly.
8       Q   Nobody is working on commission?
9       A   I don't think we ever had somebody on
10  commission.  I had a thought a couple of times in
11  the last eight years about it.  But I don't think it
12  ever consummate ever, you know.
13      Q   So now working for MCO is working on
14  commission; is that correct?
15      A   No.  We don't need to sell.  We don't
16  push.  We don't need to sell.  We don't need to
17  push.
18      Q   But the answer is no?
19      A   No.
20      Q   These individuals other than yourself are
21  working and I guess Anna, who is your wife, are
22  working pursuant to independent contractor
23  agreements?
24      A   Wife and boss.
25      Q   Huh?

46 (Pages 585 to 588)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                      2/17/2017

597

1  that correct?
2       A   Yes, yes, yes.  I confused with lending
3  site.
4           MR. DAVIS:  So the yeses and nos aren't
5  clear.
6           THE WITNESS:  I'm sorry.  There is no
7  other place to buy it other than gastric.care.
8  BY MR. SETTLEMYER:
9       Q   Are there places other than rocalabs.com
10 and gastric.care that MCO uses to advertise the
11 product?
12      A   No.
13      Q   I guess you mentioned -- just to be clear,
14 you mentioned a Facebook page, Lost 100; is that
15 correct?
16      A   That's a group where people just talk.
17      Q   Is there a Roca Labs Facebook page or
18 Gastric Care Facebook page?
19      A   Yes, there is another page.
20 Facebook.com/Lost180.
21      Q   What about YouTube, what's currently up on
22 YouTube now?
23      A   We don't use YouTube.  It's not active.
24 We don't use it.  We don't promote it.  We don't
25 nothing with it.

598

1       Q   Is it still up?  Is there still a Roca
2  Labs channel?
3       A   It's still up.  It might be that naturally
4  people go there.  But we don't promote.  We don't
5  add actively.  We don't do anything there.  Because
6  the group, people add everything on the group.
7       Q   But I just want to be clear.  The Roca
8  Labs YouTube page would be a way in which people if
9  they were on the page could click through to
10 rocalabs.com; is that right?
11      A   Yes.
12      Q   So aside from --
13      A   No.  There is no click from YouTube to
14 rocalabs.com.
15      Q   Nothing?
16      A   I don't think.  There is no continue to.
17 No, I don't think so.
18      Q   And if the -- so aside from the Facebook
19 pages we just discussed and the website that you
20 mentioned, are there any other web properties that
21 MCO maintains to promote its products?
22      A   No.  No.  The promote the product is only
23 I would say on the Facebook.
24      Q   Is there a Twitter account that MCO uses?
25      A   Nothing that is active.  Nothing that it's

599

1  bringing any business or anything like it.
2       Q   Is there a Pintrest page?
3       A   Maybe, but nothing that we really promote,
4  add or do something with it or care for.
5       Q   Are there any ongoing search engine
6  optimization activities that you're aware of for
7  Roca Labs?
8       A   We don't have the budget.  We don't have
9  the time, nothing.
10      Q   So the answer is no?
11      A   No.  Even when we did it four years ago we
12 were very unsuccessful.  So no efforts.
13      Q   Is anybody being compensated to maintain
14 or create any blogs about the products?
15      A   Nothing.
16      Q   And is anybody being paid to make any
17 foreign posts about the product?
18      A   Nothing.  We have no need for any of this.
19 Only --
20      Q   Only what you're doing?
21      A   Yes.
22      Q   You stopped mid sentence.
23      A   Yes.
24      Q   I want to make sure we got it.
25      A   Yes.

600

1           MR. SETTLEMYER:  I have at this time no
2  further questions except what may later relate
3  to what Ms. Marteny will ask or what we can
4  manage to ask in our limited time to ask about
5  the documents that have been produced in the
6  past couple of days.  So with that, I have no
7  further questions at this time.
8           MS. MARTENY:  Before we get started, I
9  want to note certain confidential exhibits that
10 were introduced today.  We'd like to have
11 marked as confidential Exhibits 131 through 136
12 and also Exhibits 142, 143.  I think that's
13 where we left off.
14           CROSS-EXAMINATION
15 BY MS. MARTENY:
16      Q   Don, I want to ask you some questions.
17 Can you put that aside for a second.
18      A   Do you want to sit on the other side?
19      Q   No.
20      A   I'm kidding.  Because you start having a
21 tone like him.
22      Q   So yesterday do you recall talking about
23 some credit card disputes?
24      A   Yes.
25      Q   And the corporate Defendants' response to

49 (Pages 597 to 600)

Juravin - Confidential

FTC v. Roca Labs, Inc., et al.                                                                                    2/17/2017

---

613

1    Q   But for anybody who's considering it, you
2    think that the people have decided not to get it
3    because of your work with you and your product?
4        A   Big time.  Because they will first try the
5    regimen.  And if they are not successful with the
6    regimen, they will then go and undergo the surgery.
7    There are cases like this.  Somebody says, hey, I
8    want to try the alternative before I will undergo
9    the surgery.  I heard before somebody said, I tried
10   the gastric bypass alternative and it didn't work as
11   well as I thought.  I lost 50 pounds and I got
12   stuck; no more; I do need to do the surgery.
13   Possible.  But they need to first try the
14   alternative before they cut their stomachs.
15       Q   Let me go back to the discussion of the
16   Exhibits 87, 88 and 89 in terms of what you
17   testified.  And you can look at those if you want to
18   refresh your recollection.  But my question for you
19   is not related specifically to the content of the
20   documents, but more to your understanding of the
21   process of credit card disputes.  Is there a rule
22   laid out by any credit card processor that requires
23   for a dispute resolution, the merchant to present
24   information such as the height, weight and medical
25   and emotional issues being confronted by a customer?

---

614

1    Is there a regulation; yes or no?
2        MS. MARTENY:  Object to form.
3        THE WITNESS:  Yes.
4    BY MR. SETTLEMYER:
5        Q   Yes, there is a regulation?
6        A   Yes.
7        Q   What is that regulation?
8        A   Bring us everything to prove that you
9    didn't commit -- that you didn't do a fraudulent
10   act.  That's the way that Sharon King heard from
11   them.  That's the way that I know when I talked to
12   Adam.  Adam is my processing guy.  Show them
13   everything you can that you didn't do a fraudulent
14   act, and I will do everything that I need to support
15   to show that I didn't do a fraudulent act.  I'm
16   starting with the simple thing.  Anybody else in the
17   world can see.  Somebody is six-feet two.  Somebody
18   is 370 pounds.  Everybody can see that they are way
19   overweight.  18 years old, male.  All of these facts
20   are, you know, there is no privacy here.  People
21   know that they are 350 or 400.  Nothing private
22   here.  Male; nothing private.  And then declaration.
23   Declaration is a personal thing.  And when they see
24   the declaration, they say, I do remember it.  I will
25   withdrawal my accusation of fraudulent and

---

615

1    unauthorized.  If we don't do that, we might lose.
2    They will stop taking money or processing our credit
3    cards.
4        Q   What is the source that you're aware of,
5    of the information telling you that there's a rule
6    of the credit card processor to get the type of
7    information that you are providing?
8        MS. MARTENY:  Object to form.
9        THE WITNESS:  I need to provide everything
10       possible to show that it's not fraudulent.  In
11       order to do that, I'm showing the IP.  But we
12       were told before, IP is not enough.  It might
13       be that there a few people in the same room.
14       What other form can I prove that I didn't take
15       it fraudulently.
16   BY MR. SETTLEMYER:
17       Q   You're not answering my question.  My
18   question is, what is the source of information from
19   which you understand there to be a rule that
20   requires you --
21       A   PayPal.  When we talk to PayPal.  And we
22   talk numerous, numerous, numerous times with PayPal.
23   What do we do with disputes?  And the answer is
24   prove in any way that you can.  Every way that you
25   can that it's not fraudulent.  Show any unique

---

616

1    things that will remind the person disputing, the
2    card holder, that they are wrong and it wasn't
3    fraudulent.  All of this unique identifiers and
4    that's what we do.  If we had other unique
5    identifiers, I would use them.
6        Q   Is there anything in writing that you can
7    site that supports what you're understanding of the
8    rule is?
9        MS. MARTENY:  Object to form.
10       THE WITNESS:  No, it's talking.  We talk
11       to them.  Sharon King talked to them.  I talked
12       to them.  I talked to them numerous times.  But
13       I can do something.  I can maybe ask them
14       again, by the way, what else can I provide.  If
15       I provide everything, is it okay what I
16       provide.
17       Let me put it differently.  No credit
18       processor ever rejected this information saying
19       to us, sir, this is private, confidential, do
20       not send us anymore.  So we have been doing
21       this for years.  Nobody ever rejected it
22       saying, we don't want to have this information.
23       This is too private.  Nobody ever told us.  And
24       by the way, no customer says, do not reveal it
25       or what you did is not okay.  And something

---

**For The Record, Inc.**
(301) 870-8025 - www.ftrinc.net - (800) 921-5555                    PX7-29