# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**FEDERAL TRADE COMMISSION,**

    **Plaintiff,**

**v.**
                                                            **Case No: 8:15-cv-2231-T-35TBM**

**ROCA LABS, INC., a corporation,
ROCA LABS NUTRACEUTICAL USA,
INC., a corporation, DON JURAVIN,
individually, DON JURAVIN, as an
officer of Roca Labs, Inc. and Roca
Labs Nutraceutical USA, Inc. Must
Cure Obesity, Co and Juravin, Inc.,
GEORGE C. WHITING, individually,
GEORGE C. WHITING, as an officer of
Roca Labs, Inc. and Roca Labs
Nutraceutical USA, Inc. and Zero
Calorie Labs, Inc., MUST CURE
OBESITY, CO., a corporation,
JURAVIN, INCORPORATED, a
corporation, and ZERO CALORIE
LABS, INC., a corporation,**

    **Defendants.**

_____/

## <u>ORDER</u>

    **THIS CAUSE** comes before the Court for consideration of Plaintiff's Amended Motion for Summary Judgment Against All Defendants (Dkt. 210); Defendants' response in opposition thereto (Dkt. 221); Plaintiff's reply (Dkt. 228); Defendants' [Amended] Motion for Partial Summary Judgment as to Count Three of the Amended Complaint (Dkt. 212); and Plaintiff's response in opposition thereto.  (Dkt. 216)  Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS** Plaintiff's Amended Motion for Summary Judgment (Dkt. 210) and **DENIES** Defendants' [Amended]

Motion for Partial Summary Judgment as to Count Three of the Amended Complaint. (Dkt. 212)

## I.   BACKGROUND

### A.   The Plaintiff

The Federal Trade Commission ("FTC" or "Plaintiff") is an independent agency of the United States Government established by statute.   15 U.S.C. §§ 41–58.   The FTC has the power to enforce Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce, and Section 12 of the FTC Act, 15 U.S.C. §§ 52, 55, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.

### B.   The Defendants

There are seven named defendants in this action, including five corporate defendants.   Defendants Roca Labs, Inc. ("RLI"), Roca Labs Nutraceutical USA, Inc. ("RLNU"), Must Cure Obesity, Co. ("MCO"), Juravin, Incorporated ("JI"), and Zero Calorie Labs, Inc. ("ZCL") (collectively, "Corporate Defendants") are Florida entities.   (Dkt. 48) Defendant Don Juravin ("Juravin") owns MCO and JI and has been an officer of RLI and RLNU.   (Dkts. 210, 219)   Defendant George Whiting ("Whiting") owns and has been an officer of RLI, RLNU, and ZCL.   (Id.)   The FTC alleges that the Corporate Defendants operated a common enterprise to sell Roca Labs products through deceptive and unfair practices.   (Dkt. 48)   It also alleges that Defendants Juravin and Whiting "formulated, directed, controlled, had the authority to control, or participated in the acts and practices of RLI, RLNU, MCO, JI, and ZCL."   (Id. at 6)

### C.     Factual Background

On September 24, 2015, the FTC filed this action, alleging that Defendants engaged in acts and practices that violated Sections 5 and 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45, 52, in connection with the advertising and sale of weight-loss products and the use of contractual provisions prohibiting purchasers from providing negative commentary.   (Dkt. 1)   At the same time, the FTC moved for a temporary restraining order.   (Id.)   On September 29, 2015, the Court entered a Stipulated Temporary Restraining Order ("TRO") agreed to by the FTC and Defendants Juravin, Whiting, RLI, and RLNU (collectively, "the Four Enjoined Defendants").   (Dkt. 13)   The Parties stipulated to preserve their assets while the case remained pending. (Dkt. 13-1)   On October 29, 2015, the Court issued a Preliminary Injunction, imposing various restraints against the Four Enjoined Defendants.   (Dkt. 38)

On February 19, 2016, the FTC filed an Amended Complaint for Permanent Injunction and Other Equitable Relief ("Complaint").   (Dkt. 48)   On September 13, 2016, the Court issued a Stipulated Preliminary Injunction Freezing Assets with Other Equitable Relief applicable to all Defendants, except Defendant Whiting.   (Dkt. 90)

In the Complaint, the FTC alleges the following:   Since at least 2009, Defendants have advertised, marketed, sold, and distributed weight-loss products, including Roca Labs Formula ("Formula") and Roca Labs Anti-Cravings ("Anti-Cravings").   (Dkt. 48 ¶ 15) Defendants' revenues from the sale of these products since 2010 were at least $20 million.   (Id. ¶ 18)   The products were sold in powder form that consumers could mix with water or other liquid to drink.   (Id. ¶ 15)   Defendants marketed the weight-loss products as a safe and cost-effective alternative to gastric bypass surgery to combat

obesity and achieve substantial weight loss.   (Id.)   Defendants have used the terms "Gastric Bypass No Surgery" or "Gastric Bypass alternative" in the promotions of their products.   (Id. ¶¶ 19, 23)   Defendants also have used illustrations, such as the one below, to depict how the formula is used.



(Id. at 10; Dkt. 2 at 2, 5)   Defendants also stated that the products are safe for children as young as six years old, although they recommended parental supervision and consultation with a doctor.   (Dkt. 48 at 13 ¶ 27h)

Defendants promoted their products in a variety of ways, such as through their websites, including RocaLabs.com and Mini-Gastric-Bypass.me ("Roca Labs Websites"), and by using online advertisements to direct consumers to the Roca Labs Websites.   (Id. ¶¶ 19, 22–24)   In videos on the Roca Labs Websites and Defendants' social media pages, Defendants also made representations about the Roca Labs products, such as:

> What is the Formula? Roca Labs' Formula is a medical innovation that creates a natural gastric bypass effect in the stomach. It's based on healthy fibers, and it's classified as a food supplement. Just mix with water, take it each morning, and it immediately expands to physically fill your stomach. For the next 10 to 16 hours, only 20% of your stomach will be available for food intake. Your new, small stomach will force you to eat 50% less from

day one.

(Id. ¶ 28a)   The Roca Labs Websites also included links to documents, such as "Letter to Your Doctor V1-Aug12," purportedly written by a doctor or other medical professional, that describe the benefits of Roca Labs products and summarize scientific literature regarding those benefits.   (Id. ¶¶ 30–31) At times, the Letter to Your Doctor segment was attributed to "Dr. Ross Finesmith, Director of Medical Team" or "Ross Finesmith, M.D. Medical Consultant."   (Id. ¶ 31)   Finesmith made statements regarding his experience with the Formula and the products' efficacy.   (Id.)   The Roca Labs Websites used medical images, such as the Caduceus symbol and people dressed in white lab coats, and medical terminology, including "medical team," "medical innovation," and "research center."   (Id. ¶ 33)   In fine print, as part of the "Terms and Conditions" section of the RocaLabs.com website, Defendants stated that "[n]o clinical study has been performed on this product."   (Id. ¶ 32)   The Roca Labs Websites included testimonials and third-party reviews as promotional material.   (Id. ¶ 34)   Defendants solicited the testimonials, called "Success Videos," by offering to pay customers who purchased the Roca Labs products up to $1,000.00 upon meeting certain conditions, such as achieving a certain interim weight loss goal, providing an inspirational and convincing success story, and demonstrating that the weight loss is evident in "before & after" images.   (Id. ¶¶ 35–36) Defendants did not disclose that the people in the videos were paid or received offers of pay for their testimonials.   (Id. ¶ 38)   Defendants also did not disclose that they, or someone working on their behalf, posted testimonials or other information about Roca Labs products on third-party blogs or websites.   (Id. ¶ 39)   Defendants failed to disclose that they operated Gastricbypass.me, a website that discusses bariatric surgery and

features a "Surgical Alternatives" page devoted to positive commentary on Roca Labs products and which also sells the Roca Labs products.  (Id. ¶ 40)  Defendants did not disclose that Gastricbypass.me is affiliated with RLI or RLNU.  (Id.)

Defendants advertised that the basic package of Roca Labs products costs $480.00 with "valid health insurance."  (Id. ¶¶ 18, 41)  Without insurance, the basic package costs $640.00.[1]  (Id.)  The basic package included a three to four-month supply of the Formula and an approximate three-month supply of the Anti-Cravings product.  (Id. ¶ 41)  Consumers who desired to purchase the Roca Labs products through the Roca Labs Website were required to enter their information through the "Qualify & Order" pages, which featured videos about the qualification process and stated that the information consumers provided would be kept confidential and would not be shared.  (Id. ¶ 42)  The prospective customers were required to provide complete a "Questionnaire" or "Health Application," which included questions about cholesterol, high blood pressure, diabetes, digestion, and other health conditions.  (Id. ¶ 43)  The Health Application also asked consumers about psychological or emotional issues relating to weight, past weight-loss failures, depression, and binge eating.  (Id.)

When the products were shipped to customers, Defendants included in the package, among other items and documents, a "Summary" document that stated the customers' information would not be shared with anyone.  (Id. ¶ 45)  A "Thanks for purchasing" document, also included in the shipped packaging, warned that there are no returns or refunds and that those who cancel or dispute installment payments may face legal action and $3,500 in charges.  (Id.)  The "Roca Labs Procedure Rules & Diet"

---

1 There is nothing in the record to indicate that Defendants ever billed health insurance companies.

insert listed the rules: eat between 11 a.m. and 8 p.m. only or any nine-hour interval; eat a healthy, 100-calorie snack before 11 a.m.; and eat vegetables or occasionally low-calorie popcorn as a snack between 8 p.m. and 10 p.m.   (Id. ¶ 46)   Customers also were advised that "[t]o maintain the gastric bypass effect, [they should] drink at least six ½ liter bottles of water a day," exercise at least five times a week, and document their success by video weekly.   (Id.)   The "Roca Labs Procedure Rules & Diet" insert also was available online at Roca Labs Websites to prospective customers.   (Id.)

Since at least September 2012, Defendants have included a non-disparagement clause, also known as a "gag clause," in the Terms and Conditions that prohibited customers from publishing disparaging comments about Roca Labs products.   (Id. ¶¶ 47–53)   The Terms and Conditions also indicated that the purchase price was "conditional," "discounted," or "subsidized" in exchange for the customer's agreement to the gag clause and other provisions in the Terms and Conditions.   (Id. ¶ 51)   The Terms and Conditions stated that the purchaser agrees to pay the full price of the product, $1,580.00, if the purchaser breached the gag clause.   (Id. ¶¶ 49, 51)   In the September 2012 version, the Terms and Conditions stated that customers would have to compensate Defendants $100,000 for talking "badly about the Formula."   (Id. ¶ 52; Dkt. 2-1 at 56)   In the August 2014 version of the Terms and Conditions, customers were subject to being sued for an injunction and being billed $3,500.00 for legal fees and court costs for publishing any negative comments about the Defendants' products, services, or employees.   (Dkt. 48 ¶ 52; Dkt. 2-1 at 26)   That version also provided that Defendants could force purchasers to sign a notarized affidavit stating that the disparaging remarks were incorrect, contained factually incorrect material, and breached the Terms and

Conditions.   (Dkt. 48 ¶ 52; Dkt. 2-1 at 26–27)   These alleged acts form the basis of the

FTC's seven-count Complaint.

In Count I, the FTC asserts deceptive weight-loss claims.   The FTC alleges that

Defendants have made deceptive weight-loss claims by representing that:

> a. Use of Defendants' products, including Roca Labs Formula and Roca
> Labs Anti-Cravings, enables the user to reduce food intake by fifty percent
> and to lose substantial amounts of weight quickly, including as much as 21
> pounds in one month, and as much as 100 pounds in seven to ten months;
> b. Ninety percent of users of Defendants' products, including Roca Labs
> Formula and Roca Labs Anti-Cravings, will lose substantial amounts of
> weight;
> c. Defendants' products, including Roca Labs Formula and Roca Labs Anti-
> Cravings, are comparable or superior to bariatric surgery in providing weight
> loss benefits; and
> d. Defendants' products, including Roca Labs Formula and Roca Labs Anti-
> Cravings, are safe and effective for weight loss in children as young as six
> years old.

(Id. ¶ 61)   The FTC alleges that these representations were false or misleading or were

not substantiated at the time they were made.   The representations, the FTC contends,

constitute deceptive acts or practices and false advertisement, in or affecting commerce,

in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.   (Id. ¶¶

62–63)

In Count II, the FTC asserts a false establishment claim.   Plaintiff alleges that

Defendants' representation that the use of the products, including the Formula and Anti-

Cravings, is scientifically proven to have a ninety percent success rate in forcing users to

eat half their usual food intake and cause substantial weight loss is false or misleading.

(Id. ¶ 64)   The FTC also alleges that this representation constitutes a deceptive act or

practice and a false advertisement, in or affecting commerce, in violation of 5(a) and 12

of the FTC Act, 15 U.S.C. §§ 45(a) and 52.   (Id. ¶ 66)

In Count III, the FTC contends that Defendants' use of the non-disparagement provision, or gag clause, in the sale of the products constitutes unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n).   (Id. ¶ 69)

In Count IV, the FTC alleges that Defendants misrepresented Gastricbypass.me as an independent, objective resource for information regarding bariatric surgery, alternatives to bariatric surgery for weight loss, and Roca Labs products.   (Id. ¶ 70)   The FTC alleges that this representation was false or misleading and constitutes a deceptive act or practice and a false advertisement, in or affecting commerce, in violation of Sections 5(a) of the FTC Act, 15 U.S.C. § 45(a).   (Id. ¶ 72)

In Count V, the FTC alleges that Defendants failed to disclose that people who appeared in their advertising providing testimonials were paid or received offers of pay. (Id. ¶ 74)   Plaintiff also alleges that Defendants failed to disclose that Defendants own Gastricbypass.me and that they sell the Formula and Anti Cravings products.   (Id.)   The failure to disclose this information, the FTC argues, is a deceptive act or practice and a false advertisement, in or affecting commerce, in violation of Sections 5(a) of the FTC Act, 15 U.S.C. § 45(a).   (Id. ¶ 75)

In Count VI, the FTC asserts a deceptive privacy claim.   The FTC contends that Defendants' representation that they do not disclose consumers' information, including health information, and keep consumers' information confidential is false or misleading. (Id. ¶¶ 76, 78)   Such a representation, according to the FTC, constitutes a deceptive act or practice, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).   (Id. ¶ 78)

In Count VII, the FTC asserts a deceptive discount claim.   The FTC challenges Defendants' representation that purchasers agreed to pay the difference between the "full price" and the purported "discount" price if they post negative comments or reviews about Defendants, their products, or employees.   This representation, the FTC contends, is false or misleading and constitutes a deceptive act or practice, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).   (Id. ¶¶ 79, 81)

On April 26, 2018, the FTC filed an amended motion for summary judgment on all claims.   (Dkt. 210)   Defendants moved for partial summary judgment as to Count III. (Dkt. 212)

## II.   LEGAL STANDARD

Summary judgment is appropriate when the movant can show there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)).   Which facts are material depends on the substantive law applicable to the case.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   The moving party bears the burden of showing that no genuine issue of material fact exists.   Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party.   Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356).   A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial.   Porter v. Ray, 461 F.3d 1315, 1320–1321 (11th Cir. 2006) (citation omitted).   The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.   Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value.").   "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it."   Fed. R. Civ. P. 56(e).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed."   S. Pilot Ins. Co. v. CECS, Inc., 52 F. Supp. 3d 1240, 1242–43 (N.D. Ga. 2014) (citing Am. Bankers Ins. Group v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)).   "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts."   Id. at 1243 (citing United States v. Oakley, 744 F.2d 1553, 1555–56 (11th Cir.1984)).

## III.   DISCUSSION

### A.   Deceptive and False Advertisement (Counts I, II, IV, V, VI, VII)

Section 5(a) of the FTC Act prohibits unfair or deceptive acts or practices in or affecting commerce.   15 U.S.C. § 45(a).   Section 12 of the FTC Act prohibits the

dissemination of false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.   15 U.S.C. §§ 52, 55.   The dissemination of such false advertisement is an unfair or deceptive practice as outlined in Section 5(a).   15 U.S.C. § 52(b).   "Thus, a violation of Section 12, dissemination of false advertising, constitutes a violation of Section 5(a)."   FTC v. Nat'l Urological Group, Inc., 645 F. Supp. 2d 1167, 1188 (N.D. Ga. 2008), aff'd, 356 F. App'x 358 (11th Cir. 2009).   Under the statute, a "false advertisement" is "an advertisement, other than labeling, which is misleading in a material respect."   15 U.S.C. § 55(a)(1).

To demonstrate liability for unfair and deceptive commercial practices under Section 5 or Section 12 of the FTC Act, the plaintiff must establish that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material."   FTC v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003) (citations omitted); 15 U.S.C. § 45.

Under this standard, courts first evaluate whether the advertisement made the purported claims.   Nat'l Urological Group, Inc., 645 F. Supp. 2d at 1189.   The determination is made by evaluating either the terms of the advertisements or "evidence of what consumers interpreted the advertisement to convey."   Id.   To determine the meaning and representations of an advertisement, the court must consider the overall net impression of the advertisement and whether reasonable consumers would interpret a particular message.   Id.

Under the second element of the standard, the FTC may establish that the representation was likely to mislead customers under a "falsity theory" or a "reasonable basis theory."   Id. at 1190.   In other words, the FTC may demonstrate (a) that the

message conveyed by the advertisement was false or (b) that "the advertiser lacked a reasonable basis—or adequate substantiation—for asserting that the message was true." Id.

Under the third prong, the FTC may demonstrate that the challenged representation was material in several ways.   A representation is material if a reasonable prospective buyer is likely to rely upon it.   FTC v. Washington Data Resources, 856 F. Supp. 2d 1247, 1272 (M.D. Fla. 2012), aff'd sub nom. FTC v. Washington Data Resources, Inc., 704 F.3d 1323 (11th Cir. 2013).   Additionally, an express claim, an intentionally-implied claim made by seller, and claims "that significantly involve health, safety, or other areas with which reasonable consumers would be concerned" are presumed material.   Kraft Inc. v. FTC, 970 F.2d 311, 322 (7th Cir. 1992) (citation omitted); FTC v. Transnet Wireless Corp., 506 F. Supp. 2d 1247, 1266, 1267 (S.D. Fla. 2007).

### 1.    Defendants' Weight-Loss Claims (Counts I, II)

The FTC alleges that Defendants' five weight-loss claims, discussed above, are false and deceptive.   (Dkt. 210 at 26–27)   In their response, Defendants raise no dispute as to the existence of the representations or the materiality.   (Dkt. 221)   Thus, the Court focuses its analysis of the alleged deceptive misrepresentations on the second element of the three-part standard: whether consumers were likely to be misled by the claims in the advertisements.   For the reasons that follow, the Court finds that the FTC is entitled to summary judgment on Counts I and II.

The FTC contends that Defendants' claims are deceptive for two reasons: (1) the claims are false, and (2) Defendants had no reasonable basis, or adequate

substantiation, for their claims.   (Dkt. 210 at 40–41)  See Nat'l Urological Group, Inc., 645 F. Supp. 2d at 1190; FTC v. Pantron I Corp., 33 F.3d 1088, 1096 (9th Cir. 1994) (claim may be deemed deceptive if the advertiser had no reasonable basis to assert the claims as true or if the claim is demonstrably false).

The FTC has established that Defendants' claims are false in that they were material and likely to mislead consumers.   As discussed above, Defendants made express claims regarding weight loss.   Those express claims, which significantly involve health, are inherently material.   See Kraft, 970 F.2d at 322.   Defendants disseminated their claims online—through the Roca Labs Websites and online advertisements—to direct consumers to the Roca Labs Websites to purchase the products.   The ads intentionally contained medical images and terminology to bolster the credibility of Defendants' claims and induce customers to believe that the claims were scientifically validated by the medical community.   Thus, the Court concludes that the claims were likely to mislead consumers acting reasonably under the circumstances.

The FTC also has established that Defendants had no reasonable basis to assert the claims because they lack competent and reliable scientific evidence.   For health-related claims, including weight-loss claims, an advertiser must demonstrate that it has competent and reliable scientific evidence to support any claimed reasonable basis to assert that the claims are true.   FTC v. NPB Adver., Inc., No. 8:14-cv-115, 2016 U.S. Dist. LEXIS 151840, at *4, *13 (M.D. Fla. Nov. 2, 2016).   Additionally, the FTC's expert, Dr. Steven Heymsfield ("Dr. Heymsfield"), a medical doctor at the Pennington Biomedical Research Center at Louisiana State University and an expert in obesity treatment and weight loss, opined that no competent and reliable scientific evidence for Defendants'

claims existed.   (Dkt. 210-3)   To prove a weight-loss claim, "experts in the field of obesity treatment and weight loss would require well-designed and properly conducted clinical trials."   (Dkt. 210-3 at 14)   Dr. Heymsfield explained that a trial should be double-blind and placebo-controlled so that the testers and participants are unaware of who is assigned to a particular group.   (Id.)   Dr. Heymsfield also explained that a valid clinical trial would have at least eighty participants and last at least three months.   (Id. at 14–15)   He stated that a clinical trial should test the substance, not the individual ingredients, for which the claims are made because it is well established in the scientific community that the efficacy of individual ingredients is insufficient to establish the efficacy of those ingredients combined.   (Id. at 16)

In their response, Defendants argue that the randomized controlled test ("RCT") described by Dr. Heymsfield is not required to provide competent and reliable scientific evidence.   (Dkt. 221 at 18–22)   Defendants' contention is rooted, primarily, in United States v. Bayer Corp., 2015 WL 5822595 (D.N.J. Sept. 24, 2015).   In Bayer, the Government sought a contempt order against Bayer for violating a consent decree.   Id. at *2.   The Government alleged that Bayer failed to provide an RCT as competent and reliable scientific evidence to substantiate its advertising claims.   Id. at *14.   The court noted the absence of a legal requirement for RCTs and concluded that the "four corners" of the consent decree did not contain any language that required Bayer to provide RCTs to substantiate the claims; ultimately, the court ruled that the Government failed to carry its burden.   Id. at *3, 14–15.   However, the Bayer decision is inapposite both procedurally and factually.   Here, the moving party is not challenging a consent decree such that it carries a legal burden to establish a violation by clear and convincing

evidence.   Moreover, the FTC is not precluded from requiring RCTs or challenging claims for lack of an RCT, and the absence of the RCT is just one piece of evidence demonstrating the lack of competent and reliable evidence of the truth of the claims or their reasonableness.

Defendants failed to produce any competent and reliable scientific evidence to substantiate their claims.   In September 2015, the same month that the FTC filed this Complaint, Defendants' products were studied by the Center for Applied Health Sciences, which issued a report after a clinical trial on the Roca Labs products.   (Dkt. 210-4 at 17) Dr. Heymsfield reviewed the study, which Defendants provided to the FTC.   (Id. at 8–9) The study tested thirty-one overweight adults, including seventeen adults who used the Roca Labs products for twenty-eight days.   (Id. at 17)   The results showed that the participants did not lose weight after taking the Roca Labs products and that there was a "slight but statistically insignificant 'trend' that active users reported feeling less hungry three hours after taking the product."   (Id. at 18)   He noted the study reflected that there was no "lasting reduction in gastric capacity."   (Id.)   Dr. Heymsfield determined that the trial did not provide any competent or reliable scientific evidence because the trial design was flawed.   (Id.)

Additionally, Dr. Heymsfield opined that the scientific articles on weight loss and individual dietary fibers, the specific articles posted on Roca Labs Websites, and other materials provided by Roca Labs do not offer any competent and reliable scientific evidence in support of Defendants' claims.[2]   (Dkt. 210-3 at 11–12)   Defendants offer the

---

[2] Defendants specifically highlight two research study articles, and both are sponsored by Corporate Defendant MCO.   (Dkts. 221-3, 221-4)   One of the authors is Defendant Juravin, who has not been identified as an expert, and the other three authors' qualifications are not listed. (Id.)

affidavit of Dr. Marcus Free ("Dr. Free"), who is a board-certified surgeon and was recently hired as medical director for MCO, as evidence that the Regimen "does appear to be safer, more effective, and superior in several ways to currently available bariatric surgical procedures."   (Dkt. 201-1 ¶¶ 6, 9–13)   Defendants have not established that Dr. Free is a pertinent professional or expert in the field of obesity treatment and weight loss.   As such, Dr. Free's opinion cannot be used as a basis for competent reliable and scientific evidence.

As it relates specifically to Count II, the FTC also has demonstrated that Defendants' claim that the use of Formula and Anti-Cravings is scientifically proven to have a ninety-percent success rate in forcing users to eat half their usual food intake and cause substantial weight loss is false.   This representation of success is an establishment claim because the claim purports to be supported by scientific evidence. By law, an establishment claim is required to have a certain level of scientific proof to support of the claim.   Thompson Med. Co., Inc. v. FTC, 791 F.2d 189, 194 (D.C. Cir. 1986) (explaining that an advertiser "must possess the level of proof claimed in the ad" to support an establishment claim).   The advertiser must have sufficient evidence to satisfy the relevant scientific community of the claim's truth.   POM Wonderful, LLC v. FTC, 777 F.3d 478, 491 (D.C. Cir. 2015).   Defendants have advertised the "scientifically proven" claim online, but they have not produced any evidence to support the claim.   (Dkt. 2 at 36)   As discussed above, Defendants have failed to provide any evidence of a valid clinical study on the Roca Labs products.   Hence, the unsubstantiated claim is false and likely to mislead consumers into believing that it was supported when it was not. Transnet Wireless Corp., 506 F. Supp. 2d at 1266–67 (concluding that the express claims

are presumptively material and inherently misleading); <u>Thompson Med.</u>, 791 F.2d at 194 (affirming the FTC's ruling that an unsubstantiated establishment claim was misleading).

As to Counts I and II, the FTC has established no competent or reliable scientific evidence substantiates Defendants' express claims, which are material misrepresentations likely to mislead reasonable customers. Defendants offer no evidence to raise a dispute of fact. Consequently, the FTC is entitled to summary judgment on Counts I and II.

## 2. Defendants' Representations About Gastricbypass.me (Counts IV, V)

The FTC is entitled to summary judgment on Counts IV and V. The FTC alleges that Defendants deceived consumers by failing to disclose that the testimonials were made by people who were compensated and that Defendants owned an informational website. Specifically, the FTC alleges that Defendants failed to disclose the financial incentives paid to or offered to people who provided testimonials for the Roca Labs products and who posted positive comments on blogs and social media. (Dkt. 210 at 42) The FTC also contends that "Defendants misrepresented Gastricbypass.me as an independent, objective resource for research and information related to bariatric surgery and alternatives to bariatric surgery for weight loss, and about Roca Labs products." (<u>Id.</u>) The evidence to support the FTC's allegations is undisputed.

Material misrepresentations or omissions on which a consumer would likely rely to decide whether to make a purchase constitute deceptive advertising. <u>Tashman</u>, 318 F.3d at 1277. Juravin testified that he created Gastricbypass.me to "educate and scare people about" gastric bypass surgery. (Dkt. 210-8 at 59, 174:9–177:4) Only Roca Labs

products were discussed favorably on the site, although there was no disclosure of the affiliation with Defendants.  (Id. at 59, 175:15–17)   Juravin stated that Gastricbypass.me was controlled by Roca Labs and that he was responsible for the content, but he did not see any value in letting consumers know "[h]ey we are Roca Labs."  (Id. at 59–60, 175:22–177:4)

Purportedly satisfied customers—"Carla" and "Roxie"—depicted in the videos posted on RocaLabs.com were actually Defendants' employees.  (Dkt. 210-19 at 8, 36:3–18; Dkt. 210-19 at 40, 193:11–194:10; Dkt. 210-19 at 33–34, 168:11–169:20; Dkt. 210-23 at 10, 39:20–24)   Defendants directed their employees to create blogs or fictitious posts.   For example, Roca Labs General Manager Sharon King ("King") testified that she wrote a Roca Labs product review under the name of "Fran," which was a fictitious name, and that Juravin edited the review.   (Dkt. 210-19 at 48, 238:24–239:23; Dkt. 210-19 at 48, 239:3–14)   Juravin also directed King to instruct "the Customer Service people" to write posts or reviews and comment on Roca Labs Facebook advertisements.   (Dkt. 210-8 at 69, 237:16–238:8, 238:16–17; Dkt. 210-8 at 72, 281:24–282:24; Dkt. 210-19 at 45, 226:15–227:8)   Defendants did not instruct the employees to disclose their affiliation with Defendants.   (Dkt. 210-19 at 45, 227:5–8)   Roca Labs employee Sharon Hensley ("Hensley"), who appeared on video as "Roxie," testified that she was asked to post positive comments monthly on Facebook about Roca Labs monthly and did not state her association with Defendants.   (Dkt. 210-23 at 19, 138:13–140:10; Dkt. 210-19 at 7, 27:20–24)

Defendants admit that Gastricbypass.me did not state its affiliation with RLI.   (Dkt. 221 at 30)   Yet, they argue that Roxie's testimonial is valid because the weight loss

occurred prior to her employment, although Roxie's video was recorded after she was employed by Defendants.   (Dkt. 221 at 30–31; Dkt. 210-23 at 8, 30:9–18; Dkt. 210-23 at 8, 32:17–33:3)   Defendants' argument misses the point.   The fact that Roxie experienced weight loss success prior to her employment has no bearing on the fact that Defendants failed to disclose their financial relationship with Roxie and others who gave testimonials.   As such, the FTC has established that Defendants failed to disclose that they owned the website, provided reviews of their own products, or had a financial relationship with those who provided testimonials.   Thus, there is no genuine issue of fact in dispute on this issue.

The financial relationship with the testimonialists and ownership of Gastricbypass.me is material.   Defendants exclusively marketed their products online and used testimonials and the website to entice prospective buyers to purchase the Roca Labs products.   (Dkt. 210-24) The financial relationship also is material because Gastricbypass.me website and testimonials involve health matters, weight loss claims, and other information important to the consumer in deciding whether to purchase Roca Labs products.   NPB Adver., Inc., No. 8:14-cv-115, 2016 U.S. Dist. LEXIS 151840, at *13 (granting summary judgment in favor of the FTC after concluding, in part, that the defendant failed to disclose that the testimonialists were compensated and a reasonable consumer likely would rely on the testimonials).   The Court finds that the FTC has demonstrated that Defendants made material misrepresentations and omitted material facts upon which reasonable consumers and prospective customers would likely rely. Thus, the FTC is entitled to summary judgment on Counts IV and V.

### 3.   Defendants' Privacy Claim (Count VI)

The FTC is entitled to summary judgment on Count VI because there is no genuine issue of material fact regarding Defendants' misrepresentation that they would keep private health information confidential.   Defendants do not rebut that they made the express privacy promise, which is presumptively material.   Kraft, 970 F.2d at 322.

Prospective customers who purchased Roca Labs products online entered their health information through the "Qualify & Order" pages that included a Questionnaire, also called a Health Application.   The Qualify & Order page stated that the information that prospective customers enter would be kept confidential and would not be shared. (Dkt. 210-8 at 54, 156:1–157:3; Dkt. 210-14 at 75; Dkt. 210-19 at 17, 95:14–24)   Prior to submitting their order, prospective customers were required to enter their height, weight, gender, age, and information regarding their health issues and weight-related psychological issues on the Questionnaire or Health Application.   (Dkt. 210-8 at 55, 157:23–159:24)

Despite a confidentiality promise, Defendants published customers' sensitive details and disclosed their personal information to payment processors.[3]   In responding to other customers' disputes about credit card charges for Roca Labs products, RLI stated, in part, that the customer had completed a "Qualification Form and provided personal and medical information."   (Dkt. 6-7 at 13)   (citation omitted)   RLI disclosed the personal information to payment processors, such as the height, weight, age, and sex of the customers.   (Id. at 13–14)   RLI also disclosed the customers' personal responses

---

[3]  The Court does not rely on the Defendants' publication of sensitive information in court filings.

regarding why they wanted to lose weight, such as "[b]ecause I want to feel good and stop being sick and tired."   (Id.)

Defendants admit that customers' information from the Questionnaire or Health Application was included in communications with credit card payment processors.   (Dkt. 221 at 33) Defendants argue that the information was publicly available and was necessarily disclosed to address disputes with the credit card payment processors.   (Id. at 33–34)   Defendants also contend that in 2014 the Terms and Conditions stated: "Your information will not be shared or sold for as long as you do not breach the Terms and we will have to use the information provided."   (Dkt. 210-10 at 3)   These arguments are without merit.   Defendants offer no evidence that the customers' current weight, desired weight loss, and other health information was publicly available.   Defendants also offer no supporting evidence that disclosure of customers' sensitive information was necessary to respond to disputes regarding the credit card charges.   Further, the 2014 Terms and Conditions that Defendants cite is dated June 2014, and Alice King and the Broward Customers purchased the products prior to the June 2014 version of the Terms and Conditions.   (Dkt. 210-10 at 2; Dkt. 6-5 at 44, 99-100, 103, 104)

In light of the disclosures, it is undisputed that Defendants' express claims that customers' information would remain private were material and false.   See 15 U.S.C. § 52(b) (providing that the dissemination of false advertisements constitutes an unfair or deceptive practice under Section 5(a)).   Thus, as to Count VI, the Court concludes that there are no triable issues on this point and the FTC is entitled to summary judgment.

### 4.   Defendants' Discount Claim (Count VII)

The FTC is entitled to summary judgment on Count VII because Defendants' post-packaging materials misrepresented that consumers had agreed to pay hundreds of dollars more for the Roca Labs products than what they actually paid if they posted negative reviews about the products or Defendants.   Defendants do not dispute that they made the discount claim or that it is material.   Instead, Defendants argue that the discount claim is not deceptive because customers agreed to the discount and its associated requirements.

When customers received the package of Roca Labs products, two documents were included in the package.   In the "Summary" of the Terms and Conditions and a "Thanks for purchasing" packaging insert, customers were told they were given a "discount off the unsubsidized price of $1580 in exchange for [their] agreement to promote [Defendants'] products" and would owe the full price of $1,580 if they did not honor the agreement.   (Dkt. 210-14 at 84; Dkt. 58 ¶ 53; Dkt. 2-1 at 61–62; Dkt. 6-3 at 30)

Defendants argue that the discount claim is not deceptive because customers were aware of and agreed to the discount and the non-disparagement clause prior to purchase.   They contend that customers were provided sufficient notice in the Terms and Conditions prior to purchase and after the purchase in the documents shipped with the products.   (Dkt. 221 at 36–37)   Defendants suggest that the prior notice in the Terms and Conditions dispels the deception.   These arguments fail for two reasons.

First, Defendants created an overall net impression that the price of the product was $480 without reference to a discount or any concessions as to publishing negative comments.   Defendants advertised that the basic package of Roca Labs products costs

$480 for purchasers with a "valid health insurance."   (Dkt. 6-2 at 64)   In multiple online advertisements, including those that appeared on Google, Bing, and Facebook, Defendants advertised the cost as simply $480, at least for a basic package of Roca Labs products.   (Dkt. 210-11, Dkt. 210-12; Dkt. 210-13)   At the top of the "Roca Labs Procedure Cost" page of Defendants' Websites, Defendants state "Only $480 and NO surgery to gastric bypass cost of $8,000 + health insurance payments. Save yourself from surgery that can cost your life. Save 90%."   (Dkt. 6-2 at 64)   Farther down on that page, in smaller print, Defendants state that the "Roca Labs Formula is available for as low as $480" and display a chart showing the various packages, from the basic package for $480 to the customized package for $1,080.   (Dkt. 6-2 at 64)   The price differences in the packages reflect the quantity of products ordered and the level of customer service provided.   (Id.)   Several of the banner ads that appear online typically have five words: "GASTRIC BYPASS NO SURGERY $480."   (Dkt. 210-10)   Scores of search advertisements also convey the price as $480, stating, for example, "Mini Gastric Bypass $480" followed by "Official Site: No Surgery Solution! Reduce Stomach Size & Lose Weight."   (Dkt. 210-12 at 34–87, 93)   The advertisements did not contain any disclaimers that the price was discounted or subsidized in exchange for a customer's agreement to refrain from publishing negative comments.   As such, Defendants created an overall net impression that the price was $480, with no exceptions or limitations.

Second, the disclaimer in the Terms and Conditions did not dispel the net impression.   Although the Terms and Conditions were disclosed on a hyperlinked page, it was unlikely that consumers would have noticed or clicked on the link.   The link to the Terms and Conditions was at the bottom of the RocaLabs.com page, just above the

"Submit" button.   (Dkt. 6-3 at 28)   Prior to purchasing the Roca Labs products, customers were required to check a box next to the statement "I have checked and do not have any medical reason that can prevent me from suing the Roca Labs Gastric Bypass Alternative procedures and I have read and agree to the terms, privacy and money back reward / return policy."   (Id.)   However, customers were not required to read the Terms and Conditions prior to purchasing.   (Dkt. 221 at 37)   For customers who may have accessed the Terms and Conditions, the disclaimer about the discounted price and non-disparagement clause was inconspicuous and buried among legal, contractual language.   (Dkt. 2-1at 10, 11, 23, 26, 48, 53)

Hence, the disclaimer in the Terms and Conditions fails to dispel the net impression that the price was $480 with no strings attached.   See FTC v. Commerce Planet, Inc., 878 F. Supp. 2d 1048, 1065 (C.D. Cal. 2012) (holding that terms disclosed in a separate, hyperlinked page is insufficient to overcome net impression that the auction kit was free; stating that "disclosures do not automatically exonerate deceptive activities"), aff'd in part and rev'd on other grounds, 815 F.3d 593 (9th Cir. 2016); Washington Data Resources, 856 F. Supp. 2d at 1275 (concluding that a disclaimer buried in a contract provided late in the purchase process is insufficient to dispel a deceptive net impression); FTC v. Cyberspace.com LLC, 453 F.3d 1196, 1200 (9th Cir. 2006) (concluding that small-print disclosure on back of a check was insufficient to defeat net impression that the check was a rebate or refund).   Defendants cannot avoid liability by exclusively advertising that the product costs $480 without any caveats and then burying the conditions of the discount in a separate disclaimer.

Defendants' misrepresentation is material and deceptive because it is an express claim that involves important information to customers: the price of the product and limitations on what customers could say about the products or Defendants.   A customer would likely be misled to believe that he or she had the option to purchase the product at "full" price and maintain the ability to post negative but truthful comments.   Customers also would likely to be misled to believe that they had actually agreed to refrain from posting negative comments, when they had not agreed to do so, by paying the purportedly discounted price.[4]   Accordingly, the Court finds that the FTC is entitled to summary judgment as to Count VII.

## B.    Defendants' Gag Clause Practices (Count III)

The FTC alleges that Defendants' practices related to the gag clause, which prevents customers from making negative comments about Defendants or their products, are unfair under Section 5 of the FTC Act.   (Dkt. 210 at 45)   In the response and their own motion for partial summary judgment as to this count, Defendants contend that the clause is not illegal and that the FTC cannot demonstrate that the practices are unfair. (Dkt. 221; Dkt. 212)   Defendants also argue that they lacked fair notice that the FTC would interpret their practices as unfair.   (Dkt. 221 at 29)   For the reasons that follow, the Court finds that the FTC is entitled to summary judgment on Count III.

### 1. Legality of the Gag Clause

Defendants argue that the FTC cannot assert that the gag clause was unfair because it was part of a valid contract between Defendants and the customers.   (Dkt.

---

[4] In her declaration, customer LaShawn Baker stated that she "did not see or ready anything on the Roca Labs website explaining that [she] was not allowed to talk badly about the product." (Dkt. 6-15 at 2) Other customers made similar statements in their declarations.   (Dkt. 210-25– 210-31)

212 at 11–14)   Defendants contend that the gag clause was part of the Terms and Conditions that customers agreed to because they were required to click on a box next to a sentence stating, *inter alia*, that they had read and agreed to the terms before buying the product.   (Id. at 13)   Defendants cite to a plethora of cases about the enforceability of online "clickwrap" contracts.   As Defendants concede, the enforceability of the contract is not at issue or before the Court.   (Id. at 14)   The issue is whether Defendants' practices related to the gag clause were unfair under Sections 5 of the FTC Act.   Thus, the Court finds no merit in Defendants' contention that the FTC is unable to proceed against Defendants on this basis.

## 2. Unfairness of the Gag Clause

Under Section 5 of the FTC Act, an act or practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not out weighed by countervailing benefits to consumers or to competition."   15 U.S.C. § 45(n).   Additionally, the FTC "may consider established public policies" in its determination of an unfair act or practice.   Id.

### a. Likely to Cause Substantial Injury

The FTC alleges that restricting the flow of information to consumers and the marketplace causes or is likely to cause substantial injury.   (Dkt. 210 at 44)   To support its claim, the FTC cites to the declaration and expert report of Dr. Paul Pavlou ("Dr. Pavlou"), who is an associate dean and professor of information technology and strategy at Temple University.   (Dkt. 210-5).   Dr. Pavlou stated that suppressing truthful negative reviews negatively affects consumers and the marketplace.   (Id. at 8)   He opined that the absence of such reviews inflates the perception of Defendants and the products and

also prevents future customers from learning about potential problems. (Id. at 8, 12 ) Consequently, Dr. Pavlou stated, prospective customers are encouraged to buy products that ultimately may not be desirous or appropriate. (Id. at 8)  Without any, or even with very few, negative reviews, it is likely that "[c]onsumers are more inclined to purchase Roca Labs' products due to their inflated perceptions of product quality, misled by the manipulated absence of negative reviews that artificially inflate[s] their expectations of product quality," according to Dr. Pavlou. (Id. at 13)  The FTC asserts that Juravin's testimony supports its claim.  Juravin testified that he paid a company $40,000 to "make the false comments not show up up front" because false comments "create the wrong impression" and hurt Defendants' sales by at least $40,000. (Dkt. 210-8 at 29–31, 56:22–62:7)

The FTC also argues that Defendants' threats to sue and filing of lawsuits caused or were likely to cause substantial injury.  Defendants threatened legal action against customers who complained or said they would complain to the Better Business Bureau or who said they had plans to post negative comments online. (Dkt. 216 at 11)  For example, customer Marie McGaha ("McGaha") stated in a declaration that she saw no negative online reviews prior to buying Roca Labs products. (Dkt. 6-14 at 2) "Compared to gastric bypass surgery, [i]t seemed like a good option." (Id. at 2)  She bought the products; however, she asked for a refund because she did not like the texture of the mixture and it made her sick. (Id. at 2–3)  Defendants declined to give her a refund.  McGaha wrote a blog about her experience, and readers called the company to complain. (Id. at 3)  Then, she received a letter from Defendants' counsel, who wrote:

> Your statements are defamatory, you are committing tortious interference
> with business and inducing harassment, you have breached your contract

28

with Roca Labs, and you are violating the Federal Lanham Act. Additionally, your actions amount to criminal extortion, which is defined as follows: "The obtaining of property or money from another induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."   This is exactly what you are doing.   If this posting is not IMMEDIATELY removed, Roca Labs will have no choice but to file suit against you.   **Roca Labs will also have no choice but to contact law enforcement regarding the harassing phone calls and the extortion.**

(Id. at 7–8) (emphasis in original)   McGaha also received an email from Defendants asking for her "SS or driving license" so that Defendants could file a police report regarding her "Slander, Defamation and Extortion."   (Id. at 10)   After the email and the letter, McGaha's blog was removed by WordPress, which was also threatened by Defendants with a lawsuit about the blog posts, according to McGaha.   (Id. at 4)   Subsequently, McGaha stopped writing about the product and abated her pursuit of a Better Business Bureau complaint because she "couldn't afford to get sued."   (Id. at 5)   McGaha stated she never received a refund.   Another customer, Amina Di'Leonardi ("Di'Leonardi"), stated in a declaration that she was threatened with legal action after filing a complaint with the Better Business Bureau following an unsuccessful pursuit of a $173 refund for her first installment payment on the nearly $500 purchase.   (Dkt. 210-27 at 3–4)   After being contacted by Defendants' attorney, Di'Leonardi withdrew her complaint because she did not want to be sued.   (Id. at 4)   Joyce Agbetunsin ("Agbetunsin"), a customer, stated that she was threatened with a lawsuit after telling a Roca Labs customer service representative that she did not think the product was legitimate and that she wanted a refund.   (Dkt. 210-26 at 4)   Agbetunsin filed a complaint with the Better Business Bureau in June 2011, but "[w]hen they became aggressive and threatening, I gave up.   I already lost too much time and money dealing with the issue."   (Id. at 5)   Agbetunsin never received her $440 refund.

Defendants contend that the FTC provided no evidence of tangible harm, either economic or physical, and relies solely on intangible harm to make its claim.   Their contention is without merit.   Defendants offer no factual or legal basis to support their argument that the FTC is required to provide evidence of tangible harm.   Defendants cite to the FTC Act's legislative history, which explained "[i]n most cases, substantial injury would involve monetary or economic harm or unwarranted health and safety risks. Emotional impact and more subjective types of harm alone are not intended to make an injury unfair."   S. Rep. No. 103-130, at 13, 1993 WL 322671 (1993).   But neither the legislative history nor the current law requires proof of tangible harm to the exclusion of intangible harm, as Defendants assert.   Further, the FTC is not required to prove that an actual harm has occurred because "the FTC Act contemplates the possibility that conduct can be unfair before actual injury occurs."   FTC v. Wyndham Worldwide Corp., 799 F.3d 236, 264 (3d Cir. 2015).

Because Defendants admittedly suppressed negative information about the products and because Dr. Pavlou testified that the absence of negative information could make a consumer more inclined to purchase Roca Labs products, the Court finds that Defendants' practices have caused or were likely to cause substantial injury to consumers.   The record demonstrates that some consumers paid hundreds of dollars for the Roca Labs products and unsuccessfully sought refunds because of Defendants' practice of issuing threats under the guise of enforcing the gag clause.   Thus, the Court finds that there is no genuine issue of fact on this basis that would preclude summary judgment in favor of the FTC.

### b. Not Reasonably Avoidable by Consumers

The FTC contends that Defendants' practices related to the gag clause cause were likely to cause injury that was not reasonably avoidable because prospective customers who search for information about Roca Labs products would not necessarily be made aware of previous buyers' negative but truthful experiences.   (Dkt. 210 at 48)   For example, in her declaration, customer Rolisa Harper ("Harper") stated that, after watching YouTube videos, she was interested in the products.   (Dkt. 210-32 at 2–3)   She "researched further and didn't find any negative reviews for the product. This influenced my decision to purchase the product.   I always look at product reviews before I purchase a product, especially when a product costs several hundred dollars."   (Id. at 3) Ultimately, without any or very little access to consumers' negative experiences, prospective buyers like Harper are prohibited from making an informed choice.

Defendants offer no evidence that their practices did not prohibit the availability of negative reviews or that their practices were reasonably avoidable by the prospective consumer.   Rather, Defendants argue that prospective customers could have reasonably avoided any injury by reading the contract that contained the gag clause or joining another weight loss program.   (Dkt. 212 at 17–18)   Defendants' argument misses the mark.   Under this prong of the FTC Act, the FTC alleges that Defendants' practices relating to the gag clause, not the gag clause itself, were unfair.   Further, because Defendants offer no facts to support a claim that prospective customers could reasonably avoid a dearth of negative reviews, which the Defendants assiduously prevented from being available, there is no genuine issue of a material fact in dispute on this issue.

### c. Countervailing Benefits to Consumers or Competition

The FTC contends that there is no countervailing benefit to competition or consumers that outweighs the injury caused or likely to be caused by Defendants' gag clause practices.   (Dkt. 210 at 49)   As discussed, the FTC has presented evidence that consumers were injured or likely to be injured by the absence of negative reviews. Defendants present no evidence to the contrary, only arguing that the practices benefited consumers or competition and that a cost-benefits analysis is required.

Defendants assert that consumers benefited from the products by losing weight, increasing their confidence, and taking steps toward a healthier lifestyle.   (Dkt. 212 at 18)   Defendants also argue that the FTC has provided no cost-benefit analysis, which they assert is required by 15 U.S.C. § 45(n).   (Dkt. 221 at 28)     Specifically, Defendants contend that the statute requires courts to

> compare (1) the sum of (a) the costs to Defendants of false negative reviews and (b) the additional costs associated with Defendants' compliance with any order forbidding the disparagement clause going forward (collectively, the "Relevant Costs"), with (2) the magnitude of any substantial consumer injury caused or likely to be caused by the disparagement clause and the attempts to enforce same (the "Relevant Benefits").

(Dkt. 221 at 28–29)

Their arguments fail two primary reasons.   First, Defendants' recitation of the benefits they claim consumers received from using the products ignores the issue presented in this claim, which is whether Defendants' gag clause *practices,* not their products and services, presented a countervailing benefit.   Second, the Court is unpersuaded that such a quantitatively precise cost-benefits analysis is required.   The statute, 15 U.S.C. § 45(n), does not provide for such a detailed analysis.   The case cited by Defendants to support their contention that a detailed cost-benefit analysis is required

is inapposite.   In <u>Wyndham Worldwide Corp.</u>, the court noted that 15 U.S.C. § 45(n) suggests that a cost-benefit analysis is a relevant inquiry in the context of analyzing whether the defendant had fair notice of the FTC's interpretation of a statute but went on to say that such an inquiry considers several relevant factors.   799 F.3d at 255–56 (citing <u>Pa. Funeral Dirs. Ass'n, Inc. v. FTC</u>, 41 F.3d 81, 91 (3d Cir. 1994) (stating that "quantitative data is not necessary in such an evaluation" of whether the benefits of banning casket handling fees outweigh the cost and the absence of quantitative data is not fatal to the FTC's analysis.)).   The <u>Wyndham</u> court did not review a cost-benefits analysis, as no such analysis was presented, no argument was made for an analysis to be provided to the court, and the defendant's fair notice claim was rejected on other grounds.

Based on the evidence presented by the FTC, the Court finds that the FTC has met its burden to establish that Defendants' practices related to the gag clause were unfair.   Only the FTC is entitled to summary judgment on this claim; Defendants' amended motion for partial summary judgment as to Count III is due to be denied.

### 3. Fair Notice of the FTC's Interpretation

Defendants argue that the FTC's unfairness claim is barred by the fair notice doctrine.   (Dkt. 221 at 29)   The fair notice doctrine prevents "deference [to the regulator] from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires."   <u>Global Green, Inc. v. S.E.C.</u>, 631 F. App'x 868, 870 (11th Cir. 2015) [5] (citing <u>Gates & Fox Co. v. OSHRC</u>, 790 F.2d 154, 156 (D.C.Cir.1986)).

---

[5] The Court notes that "[a]lthough an unpublished opinion is not binding on this court, it is persuasive authority.   <u>See</u> 11th Cir. R. 36-2." <u>United States v. Futrell</u>, 209 F.3d 1286, 1289 (11th Cir. 2000).

However, this doctrine is only applied in very limited circumstances.   Global Green, 631 F. App'x at 870 (citing Suburban Air Freight, Inc. v. Transp. Sec. Admin., 716 F.3d 679, 684 (D.C.Cir.2013)).   For example, the doctrine has been applied where the FCC changed course regarding its interpretation of statutory provision and failed to provide fair notice to two broadcasters.   FCC v. Fox TV Stations, Inc., 567 U.S. 239, 253–58 (2012).

Defendants assert that they did not have fair notice that the FTC "would adopt these interpretations in this case."   (Dkt. 221 at 29)   Specifically, Defendants state they had no knowledge that the FTC would consider that an intangible injury could constitute a substantial injury under the statute.   (Id. at 30)   Defendants argue that neither the FTC's policy statements nor any FTC commissioner's testimony provided them with "ascertainable certainty" that an intangible harm would constitute a substantial injury. (Dkt. 221 at 25–27)   These arguments are unpersuasive.

In FTC Policy Statement on Unfairness, the FTC stated that:

> the injury must be substantial.   The Commission is not concerned with trivial or merely speculative harms.   In most cases a substantial injury involves monetary harm, as when sellers coerce consumers into purchasing unwanted goods or services or when consumers buy defective goods or services on credit but are unable to assert against the creditor claims or defenses arising from the transaction.   Unwarranted health and safety risks may also support a finding of unfairness.   Emotional impact and other more subjective types of harm, on the other hand, will not ordinarily make a practice unfair.

FTC's Policy Statement on Unfairness, Sen. Comm. on Commerce, Science and Transportation (Dec. 17, 1980), appended to In the Matter of Int'l Harvester Co., 104 F.T.C. 949 (1984).   The Unfairness Statement further clarified that an "injury may be sufficiently substantial, however, if it does a small harm to a large number of people, or if

---

it raises a significant risk of concrete harm."   Id. at p.5, n.12   The Policy Statement and supplemental explanation harmoniously characterize substantial injury.   Further, neither states that intangible injury is excluded from the definition of substantial injury. Defendants offer no evidence that the FTC abruptly changed course in its enforcement guidelines or in its statutory provisions.   Accordingly, the Court rejects Defendants' argument that the FTC's claim is prohibited under the fair notice doctrine.

### C.   Remedies

Under Section 13(b) of the FTC Act, the FTC seeks permanent injunctive relief against Defendants and monetary relief against Juravin and the Corporate Defendants. 15 U.S.C. § 53(b).   The Court finds that a permanent injunction against all Defendants is warranted.[6]

A permanent injunction is appropriate when there is a "cognizable danger of recurrent violation."   Washington Data Resources, 856 F. Supp. 2d at 1282 (citing United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953)).   Juravin testified that he has moved away from using the Roca Labs brand and is now using "gastric.care," but "[t]he formula is the same formula."   (Dkt. 210-8 at 75, 367:7–368:2, 386:19–387:7)   Juravin also stated that he is marketing the products on Facebook, a "Lost 100" Website, and online videos and chat.   (Dkt. 210-16 at 31, 574:12–575:21)   In his deposition, Juravin also

---

[6] Defendants assert that they have complied with the preliminary injunction and, consequently, the Court lacks subject matter jurisdiction.   (Dkt. 221 at 45–47)   The Court rejects their argument.   Defendants assert no factual basis to suggest that they have fully complied with the injunction or that full compliance divests the Court of jurisdiction.   The Court also is unpersuaded by Defendants' citation to FTC v. Shire ViroPharma Inc., CV 17-131-RGA, 2018 WL 1401329, at *1 (D. Del. Mar. 20, 2018), appeal docketed No. 18-1807 (3d Cir. Apr. 11, 2018).   In Shire, the Court dismissed the FTC's complaint after finding, in relevant part, that the FTC had not adequately pled that the defendant was "about to violate" the law "when the alleged misconduct ceased almost five years before filing of the complaint."   Id. at *6.   The court did not find that it lacked subject matter jurisdiction.

said he told his Facebook boot camp customers: "I'm allowed to tell you anything I want; to do anything I want with you that would lead you to a healthy weight . . ." (Dkt. 210-16 at 24, 542:1–17)   He also testified that he will show the customers "any images I want. I will do anything I want for them for as long as I lead them to achieve a healthy weight." (Id.)   Based on Defendants' extended history of deceptive and unfair practices and Defendants' continued promotion of their products and comparisons to gastric bypass surgery, the FTC has proven that a cognizable danger of recurrent violation exists.   Thus, a permanent injunction prohibiting Defendants' deceptive and unfair practices is justified.

Because the Court has found Defendants liable for violating Section 5 of the FTC Act, it also finds the FTC is entitled to monetary relief under Section 13(b) for consumer redress, including disgorgement.   As to the formula for calculating damages, in accord with Eleventh Circuit precedent, FTC contends that the "proper measure of disgorgement is the amount of the defendants' unjust gains."   (Dkt. 210 at 53)   The "amount of net revenue (gross receipts minus refunds) . . . is the correct measure of unjust gains under section 13(b)."   Washington Data, 704 F.3d at 1327.

In contrast, Defendants invite the Court to calculate disgorgement by:

> . . . tak[ing]the number of complaints registered with the Better Business Bureau that are based on the customer's assertion that the product did not work as advertised from March of 2011 (the time of the first complaint lodged with the BBB) to the date of this filing, September 29, 2018. That number should then be multiplied by $350, the average selling price of the Roca Labs Product during this time period.   Finally, that number should be multiplied by twenty-five (25) to account for customers that might feel the product did not work as advertised, but who did not register a complaint with the BBB.

(Dkt. 221 at 45)   Defendants contend this calculation ensures that the disgorgement is "based on the customer's assertion that the product did not work as advertised."   (Id.)

The Court declines Defendants' invitation.   This calculation is not in accord with binding precedent.   The Eleventh Circuit has held that the proper measure of disgorgement is unjust gain, not consumer loss, and the appropriate measure for unjust gains is net revenue.   Washington Data, 704 F.3d at 1326.   Therefore, the Court finds that the amount of damages in this action shall be calculated by the amount of gross sales revenue minus the amount of customer refunds returned to consumers.

The FTC asserts the net revenue amount is $25,246,000—totaling the gross sales revenue generated from sales minus what the FTC contends is a "reasonable approximation" of customer refunds.   (Dkt. 210 at 54)   The Court notes that FTC has provided sufficient evidence as to the amount of gross sales revenues, which totaled $26.6 million during the relevant time period.   (See e.g., Dkt. 210 at 54-24 at 1, 4).   Specifically the FTC provided Defendants' corporate tax returns for 2011-2015, as well as affidavit testimony verifying the reported revenue.   (Id.; Dkt. 210, 54-9 at 153:1-154:6, 154:19-24,  167:2-168:9,  170:18-171:3,  176:22-177:15).   However, regarding the $1,354,000.00 customer refund amount ($26,000,000.00 gross sales - $25,246,000.00 net revenue = $1,354,000.00), FTC merely states that the amount is a "reasonable approximation."   It does not cite to record evidence, such as internal business records or tax records or bank records.   It offers no affidavit attesting to the specific amount of refunds or how that approximation was derived.   This Court has scoured the record and cannot find any evidentiary support.

"The FTC bears the burden to show the 'reasonably approximate' amount of the defendant's unjust gain."   Washington Data, 856 F. Supp. 2d 1247, 1281 (M.D. Fla. 2012).   In Washington, the FTC "establishe[d] a 'reasonable approximation' of net

revenue" through affidavit testimony which explained how consumer sales data, including refund data, was extracted from Defendants' database and subsequently processed, filtered, and analyzed.   In addition, documentation was provided demonstrating FTC's calculations of the extracted consumer sales data which supported the unjust gains approximation amount.   Similarly, in <u>FTC v. Partners in Health Care Ass'n</u>, 189 F. Supp. 3d 1356, 1370 (S.D. Fla. 2016), the Court was provided with sufficient numerical evidence to conclude that the FTC's approximation of unjust gains was reasonable.[7]   Here there is no evidentiary basis to support the approximation amount provided by FTC is reasonable.   Thus, the Court cannot make a determination at this time as to the appropriate disgorgement amount until the parties have supplemented the record.

The Court also finds that both Juravin and Whiting are individually liable for the Corporate Defendants' deceptive and unfair acts.   For the FTC to demonstrate that the individuals are liable for the deceptive acts of a corporate defendant, the FTC must first demonstrate that the business entities operated in an integrated manner, or as a common enterprise.   <u>Washington Data Resources</u>, 856 F. Supp. 2d at 1271.   The factors used in determining whether a common enterprise exists is whether the businesses "1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing."   <u>Id.</u> at 1271 (citations omitted).   Juravin and Whiting were the only owners and officers of the Corporate Defendants.   (Dkt. 210-24 at 6; Dkt. 219 ¶¶ 1–5)   Juravin owns MCO and JI and has

---

[7] Specifically, a Certified Fraud Examiner (CFE) went through Defendants' files to estimate the amount of loss, and then, using specialized software, the CFE executed a Transactions by Enrollment Agent Report.   From this report, the CFE was able to conclude that the corporate defendants and their affiliates made $9,738,588.86 in gross sales and recorded $992,494.68 in consumer refunds.

been an officer of RLI and RLNU, and Whiting owns and has been an officer of RLI, RLNU, and ZCL.  (Dkt. 219)   The entities also have comingled funds.  For example, revenues generated by MCO in 2014 and 2015 were reported on RLI's corporate tax returns.  (Dkt. 210-8 at 29, 65:12–67:19; Dkt.210-24)   In 2014 and 2015, JI's income was generated from either RLI, RLNU, or MCO.   (Dkt. 210-16 at 18–19, 473:17–478:15) Accordingly, the FTC has demonstrated that the Corporate Defendants operated as a common enterprise.

Next, the FTC must establish that Juravin and Whiting knew of the deceptive acts and either participated directly in or had authority or control over the acts.   FTC v. Gem Merch. Corp., 87 F.3d 466, 470 (11th Cir. 1996) (citing FTC v. Amy Travel Service, Inc., 875 F.2d 564, 573 (7th Cir. 1989)).   The FTC may demonstrate that the individuals had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth."   Amy Travel, 875 F.2d at 574 (citation omitted).   The FTC is not required to prove intent to defraud.   Id.   The FTC may establish that an individual exercised control over the alleged deceptive practices with evidence that the individual controlled the daily operations.   Id. at 573.   Also, the "degree of participation in business affairs is probative of knowledge."   Id. (citation omitted).

The FTC has established that Juravin knew of the material misrepresentations and either participated in the deceptive acts or had authority to control them.   Juravin testified that anything that was on the site was his responsibility.  (Dkt. 210-8 at 50, 137:5–23) Juravin controlled virtually every aspect of the Corporate Defendants' business, including marketing, websites, claim substantiation, expenditures, personnel, and lawsuits.   (Dkt.

210-16 at 7, 426:5-432:3).   Juravin also stated that he was in charge of daily operations and was "responsible for all matters involving Roca Labs, including advertisements." (Dkt. 210-24 at 8)   From 2009 through 2015, Juravin controlled RLI, personally receiving approximately $7 million from the Corporate Defendants during this timeframe.   (Dkt. 210-16 at 11, 448:9-450:2)   Juravin solely controlled RLI's main checking accounts, personally authorized credit card expenditures for online ads, and received bank statements addressed to his home for RLI and ZCL.   (Dkt. 210-16 at 14, 458:5-460:7; Dkt. 210-18 at 38, 221:7-222:25).   Juravin also liberally transferred funds back and forth between all Corporate Defendants, transferred substantial sums to himself, and often paid his personal expenses from the corporate accounts.   (Dkt. 210-18 at 43, 240:9-242:20; Dkt. 210-18 at 45, 249:1-252:15; Dkt. 210-18 at 49, 266:1-267:19)

The FTC also has established that Whiting had knowledge of the deceptive acts. Whiting testified that he was aware of customers' complaints and lawsuits filed by Defendants.   (Dkt. 210-18 at 17, 74:4–9; 76:6–19)   Thus, Whiting cannot disavow knowledge of Defendants' practices.   The FTC also has demonstrated that Whiting had authority to control the deceptive acts because he was an owner and officer of RLI, ZCL, and RLNU.   Whiting testified that he performed bookkeeping and tax preparation services for some, if not all of the Corporate Defendants.   (Dkt. 210-18 at 11, 63:19–72:16.   Whiting's portrait appeared on the Roca Labs Website indicating that he was president of the company.   (Dkt. 210-18 at 52, 281:4–282:5)   Whiting also was compensated for his services, receiving $42,000 in director's fees one year.   (Dkt. 210-18 at 11, 49:3–20)   Whiting's role appears to be more limited than Juravin's role, though Juravin made Whiting aware of matters that required RLI corporate approval.   (Dkt. 210-

8 at 21, 19:14-20:4)   Whiting testified that he and Juravin discussed advertising, but only as to "how the advertising money was going to be spent."   (Dkt. 210-18 at 10, 46:4–11) Nevertheless, the FTC has established that Whiting is liable for injunctive relief due to Whiting's knowledge of the deceptive practices and authority over the acts as a corporate owner and officer.

## IV.   CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** that:

1. Defendants' [Amended] Motion for Partial Summary Judgment as to Count Three of the Amended Complaint (Dkt. 212) is **DENIED**.

2. Plaintiff's Amended Motion for Summary Judgment (Dkt. 210) is **GRANTED as to liability but TAKEN UNDER ADVISEMENT as to damages.**

3. For the reasons stated above, the Court is unable to evaluate Plaintiff's "reasonable approximation" of the disgorgement amount.   Thus, the Plaintiff is required to supplement the record as follows:

    a. Within **twenty-one (21) days** of the date of this Order, Plaintiff is directed to file a supplemental memorandum of no more than five pages that sets forth the specific refunds that are included in its approximation of the disgorgement amount. Plaintiff shall also attach relevant documents of record and deposition testimony, if any, that support this amount.   No additional discovery is permitted.

    b. Upon Plaintiff's submission of this documentation, the **Defendants shall have fourteen (14) days to respond**.

4.  The Clerk is directed to **ADMINISTRATIVELY CLOSE** this case pending the

    supplementation and documentation of the disgorgement amount and briefing

    by the Parties.

**DONE** and **ORDERED** in Tampa, Florida, this 14th day of September, 2018.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person